**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

**COLUMBIA DIVISION**

| | | |
|---|---|---|
| BRIAN BOWEN II, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Civil Action No.: <u>3:18-3118-JFA</u> |
| ADIDAS AMERICA, INC.; | ) | |
| JAMES GATTO; MERL CODE; | ) | |
| CHRISTIAN DAWKINS; MUNISH | ) | |
| SOOD; THOMAS GASSNOLA; and | ) | |
| CHRISTOPHER RIVERS | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S CONSOLIDATED MEMORANDUM OF LAW
<u>IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 5

LEGAL STANDARDS ........................................................................................................... 8

ARGUMENT ......................................................................................................................... 9

I.   PLAINTIFF BOWEN HAS LEGAL STANDING TO REDRESS THE INJURIES TO HIS PROPERTY AND BUSINESS INTERESTS ................................................................. 9

    A.  Plaintiff's Business and Property Interests ................................................................. 11

    B.  Plaintiff's Injuries Are Neither Speculative Nor Impossible to Quantify .................... 18

II.  DEFENDANTS' CRIMINAL RACKETEERING PROXIMATELY CAUSED PLAINTIFF BOWEN'S INJURIES ........................................................................................ 22

    A.  Defendants' Convictions Unequivocally Establish Plaintiff's Direct Injuries ........... 24

    B.  Defendants Are Collaterally Estopped from Arguing Their Wire Fraud Did Not Destroy Bowen's NCAA Eligibility ........................................................................... 28

    C.  Plaintiff Was Directly Injured By Defendants' Predicate Acts ................................ 30

    D.  The Holmes Policy Rationales Support A Finding of Direct Injury ........................... 38

III. THE ADIDAS BRIBERY ENTERPRISE PARTICIPANTS SHARED A COMMON PURPOSE OF PROMOTING THE ADIDAS BRAND THROUGH BRIBERY .......................... 40

IV. IN PARI DELICTO DOES NOT BAR PLAINTIFF'S RICO CLAIMS ....................... 44

V.  PLAINTIFF PLAUSIBLY ALLEGS A RICO CONSPIRACY .................................... 46

VI. ADIDAS IS LIABLE FOR ITS RACKETEERING ACTIVITY AND THAT OF ITS EMPLOYEES AND AGENTS ......................................................................................... 48

CONCLUSION ................................................................................................................... 50

## TABLE OF AUTHORITIES

### CASES

*Adarand Constructors, Inc. v. Mineta*,
  534 U.S. 103 (2001) ................................................................................................ 11

*Am. Honda Motor Co., Inc. Dealerships Relations Litig.*,
  941 F. Supp. 528 (D. Md. 1996) ............................................................................ 10

*Anza v. Ideal Steel Supply Corp*,
  547 U.S. 451 (2006) ................................................................................................ 23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................. 8

*Assoc. Gen. Contractors of Cal., Inc. v. Carpenters*,
  459 U.S. 519 (1983) ................................................................................................ 23

*AvalonBay Cmtys., Inc. v. Willden*,
  No. 1:08-CV-777, 2009 WL 2431571 (E.D. Va. Aug. 7, 2009) ............................ 29

*Bd. of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972) ................................................................................................ 10

*Biggs v. Eaglewood Mortg., LLC*,
  353 F. App'x 864 (4th Cir. 2009) .......................................................................... 32

*Boyle v. United States*,
  556 U.S. 938 (2009) .................................................................................................. 9

*Brandenburg v. Seidel*,
  859 F.2d 1179 (4th Cir.1988) ................................................................................. 23

*Bridge v. Phoenix Bond and Indem. Co.*,
  553 U.S 639 (2008) .......................................................................................... 24, 32

*Brown v. South Carolina State Bd. of Educ.*,
  391 S.E.2d 866 (S.C. 1990) .................................................................................... 16

*Busby v. Crown Supply, Inc.*,
  896 F.2d 833 (4th Cir. 1990) .................................................................................. 38

*Fredrich v. Dolgencorp, LLC*,
  No. 3:13-CV-01072-JFA, 2014 WL 4417407 (D.S.C. Sept. 8, 2014) ...................................... 45

*Froneberger v. Smith*,
  748 S.E.2d 625 (S.C. Ct. App. 2013) ........................................................................................ 45

*Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.*,
  684 S.E.2d 756 (S.C. 2009) ........................................................................................................ 31

*Goodman v. Praxair, Inc.*,
  494 F.3d 458 (4th Cir. 2007) ..................................................................................................... 45

*Hall v. Univ. of Minnesota*,
  530 F. Supp. 104 (D. Minn. 1982) ............................................................................................ 16

*Harrison v. Westinghouse Savannah River Co.*,
  176 F.3d 776 (4th Cir. 1999) ...................................................................................................... 8

*Haynes v. Auto-Owners Ins. Co.*,
  No. CIV.A. 8:12-00470, 2013 WL 4027762 (D.S.C. Aug. 6, 2013) ........................................ 21

*Hemi Group, LLC v. City of New York*,
  559 U.S. 1 (2010) ....................................................................................................................... 24

*Holmes v. Sec. Inv. Prot. Corp.*,
  503 U.S. 258 (1992) .......................................................................................................... 23, 28

*In re Derivium Capital LLC*,
  716 F.3d 355 (4th Cir. 2013) ............................................................................................. 45, 46

*In re Microsoft Corp. Antitrust Litig.*,
  355 F.3d 322, 326 (4th Cir. 2004) ............................................................................................. 29

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ........................................................................................ 50

*In Re NCAA Athletic Grant-in-Aid Cap Litigation*,
  No. 4-14-md-02541-CW (N.D. Cal. Aug. 27, 2018) .................................................................. 20

*In re Neurontin Mktg. & Sales Practices Litig.*,
  712 F.3d 21 (1st Cir. 2013) ................................................................. 24

*Indiana ex rel. Carter v. Pastrick*,
  384 F.Supp.2d 1261 (N.D. Ind. 2005)................................................... 10

*Lowery v. Stovall*,
  92 F.3d 219 (4th Cir. 1996).................................................................. 29

*Martin v. JTH Tax, Inc.*,
  No. 9:10-CV-03016-DCN, 2013 WL 1282224 (D.S.C. Mar. 27, 2013)................................... 9

*Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*,
  18 F.3d 260 (4th Cir. 1994).................................................................. 11

*Myatt v. RHBT Fin. Corp.*,
  635 S.E.2d 545 (S.C. Ct. App. 2006) ................................................... 44

*Nat'l Org. for Women, Inc. v. Scheidler*,
  510 U.S. 249 (1994) ............................................................................ 10

*NCAA v. Bd. of Regents of Univ. of Oklahoma*,
  458 U.S. 85 (1984) .............................................................................. 17

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
  7 F.Supp.3d 955 (N.D. Cal. 2014) .................................................. 12, 31

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ............................................................................ 16

*Phoenix Bond & Indem. Co. v. Bridge*,
  477 F.3d 928 (7th 2007)....................................................................... 10

*Pinter v. Dahl*,
  486 U.S. 622 (1988) ............................................................................ 46

*Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*,
  262 F.3d 260 (4th Cir. 2001)................................................................ 11

*Ramsay v. U.S.I.N.S.*,
    14 F.3d 206 (4th Cir. 1994) ................................................................................. 29

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) ........................................................................................... 18

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ........................................................................................... 36

*Richardson v. Town of Eastover*,
    922 F.2d 1152 (4th Cir. 1991) ............................................................................. 16

*Salinas v. United States*,
    552 U.S. 52 (1997) ............................................................................................. 47

*Schnelling v. Crawford*,
    360 B.R. 139 (Bankr. E.D. Va. 2007) .................................................................. 44

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) ............................................................................................. 9

*Smith v. Allred*,
    No. 2:15-CV-06026, 2016 WL 3094008 (S.D. W.Va. June 1, 2016) ...................... 18

*Smithfield Foods Inc. v. United Food & Commercial Workers Int'l Union*,
    254 F.R.D. 274 (E.D. Va. 2008) ......................................................................... 46

*Spelman v. Bayer Corp.*,
    No. 7:10-CV-00091-JMC, 2011 WL 13312222 (D.S.C. Feb. 22, 2011) .......... 18, 42

*Studio Frames Ltd. v. Standard Fire Ins. Co.*,
    483 F.3d 239 (4th Cir. 2007) ............................................................................... 22

*United States v. Batato*,
    833 F.3d 413 (4th Cir. 2016) ............................................................................... 34

*United States v. Batts*,
    171 F. App'x 977 (4th Cir. 2006) ........................................................................ 42

*United States v. Coffman*,
    94 F.3d 330 (7th Cir. 1996) ................................................................................. 44

*United States v. Fowler*,
    535 F.3d 408 (6th Cir. 2008)........................................................................ 36

*United States v. Gaudin*,
    515 U.S. 506 (1995) .................................................................................... 25

*United States v. Gillion*,
    704 F.3d 284 (4th Cir. 2012) ...................................................................... 31

*United States v. Moore*,
    765 F. Supp. 1251 (E.D. Va. 1991) ............................................................ 29

*United States v. Mouzone*,
    687 F.3d 207 (4th Cir. 2012)....................................................................... 47

*United States v. Najjar*,
    300 F.3d 466 (4th Cir. 2002)....................................................................... 44

*United States v. Sauls*,
    No 18-4454, 2019 WL 386409 .................................................................... 32

*United States v. Tillett*,
    763 F.2d 628 (4th Cir. 1985)....................................................................... 42

*United States v. Walsh*,
    544 F.2d 156 (4th Cir. 1976)....................................................................... 35

*United States v. Wight*,
    819 F.2d 485 (4th Cir.1987)........................................................................ 29

### STATUTES

18 U.S.C. § 224.................................................................................................... 35
18 U.S.C. § 1961............................................................................................ 9,40, 49
18 U.S.C. § 1962(a) .......................................................................................... 38, 47
18 U.S.C. § 1962(c) ..................................................................................... 9, 10, 36
18 U.S.C. § 1964(c) ................................................................................... 10, 22, 24

### RULES

Fed. R. Civ. P. 8(a)(2)............................................................................................ 8

Plaintiff Brian Bowen II ("Brian") respectfully submits his Response in Opposition to the Motions to Dismiss filed by Defendants Merl Code (Dkt. No. 27), Adidas America, Inc. (Dkt. No. 29), Christopher Rivers (Dkt. No. 30), James Gatto (Dkt. No. 33), and Munish Sood (Dkt. No. 41) (collectively, "Defendants").[1]   For the reasons set forth below, Defendants' motions should be denied and this case should proceed to discovery.

## PRELIMINARY STATEMENT

Rarely does a litigant walk into court when the facts alleged in a complaint against it have already been established *as a matter of law*.  Rarely still does this occur when the facts alleged in a civil complaint have already been established *beyond a reasonable doubt*.  This is such a case. Defendants Gatto, Code, Dawkins, Gassnola, and Sood are convicted felons.  Convicted for their participation in the conduct underlying this civil RICO case.  Sood and Gassnola admitted to engaging in wire fraud and other crimes to steer players to Adidas-sponsored NCAA men's basketball teams in their plea agreements and testimony.  Gatto, Code, and Dawkins were found guilty by a jury and admitted to the conduct underlying this scheme during sentencing.

Notwithstanding the extensive record already developed in the criminal cases, which spans thousands of pages of transcripts and untold numbers of exhibits and wiretaps (many of which are redacted and not publicly available), Adidas and its co-conspirators remarkably assert that the conduct alleged in Plaintiff's complaint—the identical conduct that landed many of them a sentence in federal prison—is not really "plausible."  The Court need not accept the legal fiction being peddled before it, as Defendants are estopped from staking out positions in this case that are contrary to the positions they took in their criminal cases—feigning indignance in the

---

[1] Defendants Christian Dawkins and Thomas Gassnola have not moved to dismiss the complaint.

District of South Carolina that such allegations of wrongdoing could ever be raised against them, while pleading for mercy in the Southern District of New York for having engaged in it.

Though not parties to the criminal action, Defendants Adidas and its senior executive Christopher Rivers enjoy no safe harbor from their co-defendants' mendacity. In their sentencing proceedings, Adidas executives Gatto and Code squarely pointed the finger at their employer as the ringleader of this fraud and cited evidence implicating Rivers in the scheme. While Adidas and Rivers may try to argue otherwise when this case is presented to a jury, they sorely lack a reasonable basis now—at the pleading stage—to argue that the conduct that landed their former colleagues in prison, and for which they are alleged to have directed, was simply too implausible to have occurred.

All of this is laid bare in Plaintiff's complaint with a level of specificity that goes beyond that required under the Federal Rules of Civil Procedure. Perhaps recognizing this, Defendants' motions to dismiss travel a convoluted path of misdirection and error, characterizing the law and facts of this case in a manner at odds with the truth. Defendants try to distill Plaintiff's complaint into sweeping conclusory terms, frequently ignoring the substantial facts pled, and overgeneralizing—and habitually disregarding—the relevant binding legal authority in this Circuit governing civil RICO actions. The overstatement and mischaracterization endemic in Defendants' motions must be seen for what it is: a continuing effort to evade responsibility for criminal conduct that severely damaged the careers of some of the top young student-athletes in the country, including Plaintiff Brian Bowen. While Adidas might wish to enter prematurely into the merits of this case before there has been an opportunity for discovery, the well-established principles governing sufficiency of pleadings clearly establish that Plaintiff's allegations are more than adequate to allow this case to go forward.

That Defendants directly injured Plaintiff's business and property interests is clear. The entirety of the criminal cases brought against Defendants Gatto, Code, Dawkins, Sood, and Gassnola rested on the fact that the defrauded universities lost the right to control their student-athlete scholarship funds *because* Defendants' criminal acts rendered those student-athletes ineligible to participate in NCAA competition. The criminal court describe Plaintiff as "the worst victim, most seriously injured victim of the Louisville scheme." Thus, it cannot be credibly argued now that the harm caused to Brian Bowen was derivative of the harm suffered by anyone else, including the University of Louisville.

Defendants' motions are notable for what they do not contest: they do not argue that Plaintiff failed to plead injuries to bona fide property and business interests, only that his injuries are "intangible" and "impossible to quantify." Defendants do not argue that Plaintiff failed to plead an association-in-fact RICO enterprise, but only that it is too implausible that individuals outside of Adidas could have shared a "common purpose" to defraud student-athletes and universities to promote the brand. In fact, Defendants do not challenge the sufficiency of much of Plaintiff's complaint; rather, they primarily seek to dismiss it on grounds of standing, on grounds that certain, specific allegations do not plausibly establish the required elements of a claim, or on grounds of defenses that have no place in a motion to dismiss.

**Adidas** raises five grounds for dismissal: (1) lack of standing due to insufficient damages and insufficient proximate cause; (2) the affirmative defense of *in pari delicto* as a bar to recovery; (3) failure to plausible allege a "common purpose" shared among the association-in-fact enterprise in Counts I and II; (4) lack of agreement to support a RICO conspiracy in Counts II and IV; and (5) insufficient basis to hold Adidas vicariously liable for the acts of its employees and agents. (ECF No. 29 at 2-3; hereinafter "Adidas Mot.".)

**Christopher Rivers** adopts Adidas's arguments (to the extent applicable) and raises two additional arguments: (1) failure to plead that Rivers engaged in predicate acts of racketeering; and (2) lack of standing on grounds that the predicate acts attributed to Rivers were not the proximate cause of Plaintiff's injuries.  (ECF No. 30 at 2; hereinafter "Rivers Mot.".)

**Munish Sood** reargues three of the grounds for dismissal included in Adidas's motion: (1) lack of standing; (2) the affirmative defense of *in pari delicto*; and (3) lack of agreement to support the RICO conspiracy in Count II, and additionally argues that (4) Sood did not "conduct or participate" in the Adidas Bribery Enterprise or share its purpose; and (5) Plaintiff failed to plausibly allege the predicate act of wire fraud.  (ECF No. 41 at 2; hereinafter "Sood Mot.".)

**James Gatto** adopts Adidas's arguments (to the extent applicable) and raises an additional ground that Plaintiff failed to adequately allege "an actionable predicate act."  (ECF No. 33 at 1; hereinafter "Gatto Mot.".)

**Merl Code** adopts Adidas's arguments (to the extent applicable) and but did not file any memorandum of law with his motion.  (ECF No. 27.)

For the reasons discussed below, each of the arguments raised in the five overlapping motions to dismiss fail:  *First*, Brian Bowen has standing to redress the injuries to his business and property interests that were harmed directly by Defendants' racketeering conduct; namely, Bowen's contractual interest in his athletics-based financial aid contract with the University of Louisville ("Louisville" or "UofL"), his status as an amateur athlete and concomitant eligibility to play Division I men's basketball at an NCAA member institution, and the immediate financial costs he incurred to his athletic career and financial interests.  *Second*, the Adidas Bribery Enterprise alleged in Brian's complaint plainly is an association-in-fact enterprise comprised of participants sharing common purposes to defraud players and schools and promote the Adidas

4

brand. *Third*, the affirmative defense of *in pari delicto* cannot be raised in a motion to dismiss and, even if it could, no allegations or inferences suggest Plaintiff cloaked his father in authority to accept bribes from Defendants. *Fourth*, the substantial detail in Plaintiff's complaint negates Defendants' casual and legally incorrect assertion that he failed to plead a RICO conspiracy. And, *fifth*, the remaining arguments specific to individual Defendants are premised on an incorrect understanding and application of the pleading requirements of RICO cases.

Defendants emptily decry this case as nothing more than a "cynical attempt to recover" for the harm they caused to Brian Bowen. But there is nothing cynical about a young crime victim facing down a corrupt multi-national corporation, its convicted executives, and confederates to seek just compensation for the harm they caused to his property, his career, and to the sport of college basketball.

## **FACTUAL BACKGROUND**

This case tells the troubling story of how Adidas, its senior management, would-be sports managers and consultants, college coaches, and AAU team directors elevated profits and professional stature over the sanctity of amateurism in college sports. Plaintiff Brian Bowen is a talented young basketball player and was one of the most sought-after college basketball recruits in 2017. For this, he became a target of the Adidas Bribery Enterprise.

College basketball is big business for sneaker companies. And Adidas's "Competitive Strategy" is unabashedly simple. In its own words:

> [S]ponsorship arrangements are a critical component of adidas' marketing strategy, and that of its competitors. By supplying its products to college teams and coaches. Adidas ensures that its brand (its collective trademarks, logos, and image or identity) is associated with sports and athletes in general, as well as with particular teams and individual athletes and coaches. This association drives demand in the market for adidas' athletic footwear and apparel in several ways. First, the fact that the brand is worn by collegiate athletes in actual competition "authenticates" the brand as a high quality athletic brand, with products that serve the high performance needs of these athletes. Second, the visibility of adidas'

trademarks on the playing field – in a Tennessee vs. Nebraska football game, for example – translates into public exposure that is in fact more valuable than traditional commercial advertising in terms of marketing value and effectiveness.  And third, the use of particular apparel styles and designs by teams and coaches generates demand for those particular apparel styles and designs.  Thus, for example, when a teenager sees his or her favorite college team or athlete wearing a particular adidas jersey, he or she is more inclined to go to a store to try and purchase that garment, or to try and persuade his or her high school team to purchase that uniform. . . . For all of these reasons, adidas spends millions of dollars a year on sponsorship agreements and other promotional arrangements in order to ensure that its trademarks appear on the uniforms and footwear of the top college and university teams in each of the sports to which adidas markets products.[2]

Not content to compete in the marketplace alongside Nike and Under Armour, the complaint alleges Adidas forged a criminal racketeering enterprise to steer the country's most talented high school players to the Adidas brand and, more particularly, to Adidas-sponsored universities.  (¶¶ 103-117.)  To do this, the enterprise approached the parents and guardians of top players from mostly poor or modest economic backgrounds,[3] convinced them that they had their best interests at heart, put "a little something extra in their pocket to tide them over until their son is able to play professionally,"[4] and concealed their actions from the young players and university officials. (¶¶ 105, 118-124.)

Defendants participated in all aspects of this criminal enterprise: Adidas, Rivers, Gatto, and Code directed its strategy, funded the bribes, and through money laundering rendered the bribe payments effectively untraceable; Dawkins and Sood served as liaisons to families of targeted student-athletes and facilitated the bribe payments; Gassnola and other AAU teams and

---

[2] *See Adidas v. Nat'l Collegiate Athletic Ass'n*, No. 98-cv-02510-GTV, Dkt. 1 ¶¶ 7-8 (D. Kan. filed Nov. 12, 1998) (Ram Decl. Ex. 7.)

[3] As the court overseeing the criminal case observed in a post-trial order, Gatto's attorney repeatedly "raised the question of the students-athletes' financial well being," during trial, including by relaying to the jury that "one such player lived in public housing" and attempting to solicit from a witness that "many of the kids on his team did not have a lot of money."  *See United States v. Gatto*, No. 17-cr-0686 (LAK), 2019 WL 266944, at *3 & n.14 (S.D.N.Y. Jan. 17, 2019) ("The Court sustained objections to this line of argument throughout.").  (*See also* Compl. ¶ 5.)

[4] Adidas Mot. Ex. B at 69:19 - 69:3.

team directors helped grow the market for these bribes by targeting up and coming players on their high school-age teams and steering them to the other Enterprise participants; and non-defendant Division I coaches helped grow the market for bribes by requesting other Enterprise members bring talented players to their teams through bribes.  (¶ 108.)

In spring 2017, the Enterprise turned its focus to Brian, who at that time was one of the most sought-after high school players in the country and one of the only remaining McDonald's All-American players yet to commit to a Division I team.  (¶¶ 14, 148-150.)  Dawkins and Code moved quickly to secure his attendance at Adidas's flagship school, the University of Louisville. (¶ 154.)  Through close coordination with Adidas, Gatto, Code, Sood, Gassnola, Dawkins, and unidentified others, Defendants arranged a $100,000 bribe to be funneled from Adidas to Brian's father through a series of bank wires through the Karolina Khaos AAU team bank account and a cash drop delivered by Sood.  (¶¶ 155-158.)  None of this illegal conduct was known to Brian. (¶ 160.)  On June 1, 2017, he publicly announced his decision to play basketball for the University of Louisville.  (¶¶ 159-160.)  In executing their scheme, Defendants violated federal wire fraud, money laundering, and sports bribery statutes.  (¶ 118.)

Federal investigators learned of corruption in college basketball years earlier through an informant and launched an expansive, years-long criminal investigation led by the U.S. Attorney for the Southern District of New York and the FBI.  (¶ 86.)  Defendants became ensnared in the investigation that culminated in the prosecution and convictions of Sood, Gassnola, Gatto, Code, and Dawkins for various offenses, including wire fraud and wire fraud conspiracy.  (¶¶ 19-20, 86, 101.)  Sood was also convicted for his role in a separate but related scheme to bribe Division I coaches to steer players to his sports management company.  (¶ 89.)

For Brian Bowen, the consequences have been brutal. When news of the criminal charges broke less than one month into his freshman year at the University of Louisville, he was immediately ordered to stay away from the team and its facilities. (¶¶ 3,123, 227.) The bribe payments destroyed his eligibility to play basketball at Louisville, along with his opportunity to further enjoy the benefits as a college student-athlete. (*Id.*) Barred from participating in NCAA sports, he had to relocate to the other side of the world to continue developing his career. (¶ 227.)

After Gatto, Code, Dawkins, Sood, and Gassnola were found guilty of engaging in predicate acts of wire fraud and/or wire fraud conspiracy for having defrauded the University of Louisville by destroying Brian's NCAA eligibility, this action promptly followed. As Defendants concede, the facts in the complaint are reliable sourced from trial testimony and exhibits from the two-and-a-half-week-long jury trial of Gatto, Code, and Dawkins held in the Southern District of New York in October 2018, as well as from the prior convictions of Sood and Gassnola.[5]

## LEGAL STANDARDS

A civil complaint need only contain "a short, plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). On a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and take the facts asserted as true. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). A complaint will survive a Rule 12(b)(6) motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A

---

[5] Although the trial transcripts of the criminal trial have been released publicly, much of evidence gathered by prosecutors during the three-year criminal investigation, including wiretapped calls, and emails and text messages traded among Adidas Bribery Enterprise participants remains under seal or only released in heavily redacted form. For example, Gatto's sentencing memorandum includes the cryptic statement that "many of the other individuals that the Government knows participated in the same conduct as Mr. Gatto, including men's basketball coaches at the Universities, have not been, and apparently will not be, criminally charged" followed by ten lines of redactions. *See United States v. Gatto*, No. 17-cr-00686 (ECF No. 282 at 25) (S.D.N.Y. filed Feb 12, 2019) (Ram Decl. Ex 3.)

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678

Claims brought under the federal RICO Act are to be interpreted broadly. "This is the lesson not only of Congress's self-consciously expansive language and overall approach," *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985), but also of the statute's express mandate that it is to "be liberally construed to effectuate its remedial purposes." *Boyle v. United States*, 556 U.S. 938, 944 (2009) . The statute's "'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Sedima*, 473 U.S. at 498. To this end, RICO makes it unlawful for an individual or corporation to conduct the affairs of an enterprise through a "pattern of racketeering activity." 18 U.S.C. § 1962(c). These acts of racketeering include "any act which is indictable" as one of dozens of federal crimes, including wire fraud, money laundering, and sports bribery. 18 U.S.C. § 1961(1)(B). Although a violation of RICO can be redressed in a civil action such as this, what is being redressed is not a violation of a civil law, but a violation of RICO—a criminal statute that prohibits the commission of a pattern of acts indictable as federal crimes. *See Martin v. JTH Tax, Inc.*, No. 9:10-CV-03016-DCN, 2013 WL 1282224, at *6 (D.S.C. Mar. 27, 2013).

## **ARGUMENT**

### I. **PLAINTIFF BOWEN HAS LEGAL STANDING TO REDRESS THE INJURIES TO HIS PROPERTY AND BUSINESS INTERESTS**

Plaintiff's complaint alleges thirteen categories of injuries arising directly from Defendant's racketeering acts. (¶¶ 227, 244.) These damages include, among other items, his lost property interest in his student-athlete agreement with the University of Louisville ("UofL"), his loss of NCAA eligibility, and the hard financial costs he incurred to continue his basketball career after leaving Louisville and to deal with the fallout from the federal government's

investigation of Defendants' crimes.  (*Id.*)  Plaintiff alleges these damages flow directly from

Defendant's predicate acts of wire fraud, money laundering, and sports bribery—acts that

rendered Brian's student-athlete contract with the University of Louisville impossible to perform

and destroyed his NCAA eligibility, making it impossible for him to participate in Division I

men's basketball at any college or university.  (*Id.*, *see also* ¶¶ 118-124.)  Accordingly, the

complaint adequately pleads recoverable damages related directly to his business and property

interests as a college athlete and pre-professional basketball player as well as the financial losses

he suffered because of Defendants' criminal acts.  *See Nat'l Org. for Women, Inc. v. Scheidler*,

510 U.S. 249, 256 (1994) (recognizing, in a civil RICO case, that "factual allegations of injury

resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that

general allegations embrace those specific facts that are necessary to support the claim").

To have standing under § 1964, a civil RICO plaintiff must plausibly allege that his harm

qualifies as injury to "his business or property."  18 U.S.C. § 1964(c).  Whether a property

interest falls within the ambit of § 1962(c)'s "injury to business or property" is ultimately a

matter of state law.  *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *see*

*also Indiana ex rel. Carter v. Pastrick,* 384 F. Supp. 2d 1261, 1266 (N.D. Ind. 2005) (referring to

"state law to determine whether a property interest exist[s] for the purposes of a civil RICO

suit").  With respect to a "business" injury, "lost profits are remediable in RICO, notwithstanding

the fact that any lost profits calculation inherently involves some assumptions about what would

have happened in the past."  *In re Am. Honda Motor Co., Inc. Dealerships Relations Litig.*, 941

F. Supp. 528, 540–41 (D. Md. 1996); *see also Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d

928, 930 (7th 2007) ("Extra bids reduce plaintiffs' chance of winning any given auction, and loss

of a (valuable) chance is real injury.") *aff'd*, 533 U.S. 639, 645 (2008) (discussing Seventh

Circuit's holding that "respondents suffered a 'real injury' when they lost the valuable chance to acquire more liens, and because 'that injury can be redressed by damages.'");[6] *Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*, 18 F.3d 260 (4th Cir. 1994) (finding "lost revenues and customers" are sufficient injuries to establish RICO standing).

Defendants do not contest that Plaintiff adequately pled a requisite injury to his business or property interest. Nor do they raise any argument that his student-athlete agreement or NCAA eligibility do not qualify as business or property interests under § 1964(c). Rather, they simply assert that "with one exception" the alleged damages flowing from the injury to Brian's business and property interests "are entirely speculative and intangible and cannot be recovered under RICO." (Adidas Mot. at 8.) This argument is misplaced, however, because the damages are neither speculative nor intangible and the Fourth Circuit does not require a RICO plaintiff to plead "quantifiable damages." *See Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265-66 (4th Cir. 2001) ("[T]his Circuit has not held that quantifiable damages are a necessary precondition to RICO liability; instead, this Circuit has formulated the requirement in terms of the necessity of proving *some* damages, not a specific amount.").

### A. Plaintiff's Business and Property Interests

**<u>Student-Athlete Agreement</u>** – Brian's student-athlete agreement with the University of Louisville is one example of a business and property interest that was harmed by Defendants' racketeering activity. (Ram Decl. Ex. 5; *see also* ¶ 159 ("This legally binding contract represented, among other things, a property interest that Brian possessed and was entitled to

---

[6] The Supreme Court is obligated to review standing in cases where it has been assumed by lower courts. *See Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110 (2001) ("We are obliged to examine standing *sua sponte* where standing has erroneously been assumed below. . . but we do not examine standing *sua sponte* simply to reach an issue for which standing has been *denied* below."). Thus, the Supreme Court's affirmance of *Bridge* implicitly recognized the "loss of chance" injury as a sufficient basis for standing in RICO cases.

enjoy free from the Defendants' interference or harm."); ¶ 227 (alleging "lost property interest in his Athletics Financial Aid Agreement for Student-Athletes with the University of Louisville").

Brian's contract with the University of Louisville included significant and valuable benefits to his development as a basketball player. These tangible benefits, as described in the complaint and by the NCAA, included: medical treatment for athletes; "elite training opportunities" that included "top-notch coaching, facilities, and equipment" that "typically cost Olympic athletes thousands of dollars per year;" and "nutritionists and dieticians to work with each individual student-athlete."[7]  (*Id.*)  In exchange, basketball recruits like Brian "must provide their schools with their athletic services and acquiesce in the use of their names, images, and likenesses for commercial and promotional purposes." *O'Bannon v. Nat'l Collegiate Athletic Ass'n,* 7 F.Supp.3d 955, 966 (N.D. Cal. 2014), *aff'd in part, vacated in part*, 802 F.3d 1049 (9th Cir. 2015).  The agreement also lists certain terms and conditions that, if violated by Brian, would result in it being modified or canceled.  Brian honored each of these terms.

As one of the country's top basketball recruits in 2017, and as a player widely viewed to go straight into a professional career in the NBA after one or two years in college (a view shared among Defendants in private discussions, *see* ¶ 171), Brian required those specialized resources at UofL to fully prepare for his professional basketball career.  The loss of those benefits is expressly claimed in the complaint.  (*See, e.g.*, ¶ 244 (claiming "lost property interest in his Athletics Financial Aid Agreement," "lost opportunity to enjoy the benefits and experience as a student-athlete," and "loss of ability to develop basketball skills at the highest level of amateur competition as a Division I athlete").)

---

[7] *See* NCAA, BENEFITS TO COLLEGE STUDENT-ATHLETES, http://www.ncaa.org/student-athletes/benefits-college-student-athletes (last visited Mar. 8, 2019).

That these injuries were caused directly by Defendants' racketeering is clear.  Indeed, less than twenty-four hours after the government unsealed its criminal complaints, Brian was automatically removed from the Louisville men's basketball team in accordance with NCAA Bylaw § 12.11.1 ("If a student-athlete is ineligible . . . the institution shall be obligated to apply immediately the applicable rule and to withhold the student-athlete from all intercollegiate competition.") (emphasis added).[8]  He was simultaneously banned from participating in what the NCAA describes as "Countable Athletically Related Activities" that he pursued as a student-athlete, such as practices, athletic conditioning activities, weight training, sports performance training, and skill instruction provided by and administered by team officials and coaches. NCAA Bylaw § 17.02.1.  The loss of access to these highly-coveted activities and costly resources wrought significant harm to Brian's athletic career.

Defendants concede that their interference with Brian's student-athlete agreement represents a cognizable, tangible, and non-speculative damage to his business and property interest.  (See Adidas Mot. at 9 ("The sole non-speculative, property damage Bowen identifies is his alleged lost athletic scholarship to UofL.").)  Yet, to overcome Plaintiff's well-pled damages, they impermissibly ask the Court to rely on their allegations regarding the extent of benefits Brian lost under his student-athlete agreement when they rendered him ineligible to participate on the Louisville men's basketball team.  (Adidas Mot. at 9.)  For example, Defendants cite a message posted on Twitter by the "@LouisvilleMBB" account, referenced in ¶ 227 of the complaint, that states "[Bowen] may remain on scholarship but will not be allowed to practice or compete."  (Adidas Mot. at 6.)  Defendants argue this message is conclusive proof of "UofL's commitment" to "honor his scholarship," and, therefore, they reason, Brian cannot claim any

---

[8] NCAA DIVISION I MANUAL 2017-18 (relevant bylaws excerpted in Ram Decl. Ex. 1.), available at http://www.ncaapublications.com/productdownloads/D118.pdf

financial harm due to their racketeering activity. (*Id.*) This argument, however, is contrary to the well-pled complaint and ignores the significant harm Brian suffered: he had an athletic-based contract with a top-tier program where he would be trained by a Hall of Fame coach in a world class $237 million facility and play against elite competition. (¶¶ 7-9.) When Defendants destroyed Brian's eligibility, he lost his contractually-guaranteed place in the NBA proving grounds known as NCAA Division I Men's Basketball. (*Id.*)

Defendants argument that "UofL's discretionary decision to withhold Bowen from competition" was the cause of his injuries is incorrect. (Adidas Mot. at 12). To be clear, UoL did not make any decision regarding Brian's eligibility. He was rendered ineligible by NCAA Bylaws when Defendants paid the bribe, and also by operation of the bylaws as soon as UofL learned of Defendants' conduct. NCAA Bylaws §§ 12.11.1, 16.01.1, 16.02.3, 16.02.4. That the convicted defendants will pay restitution to the University of Louisville for the scholarship funds it provided to Brian demonstrates its lack of discretion regarding Brian's eligibility. Put another way, if UofL made a discretionary decision regarding Brian's eligibility, then the criminal court would have had no basis to order Code, Dawkins, and Gatto to pay restitution. The Twitter message cited in the complaint refers to the "student" portion of the benefits assured to Brian in his student-athlete agreement that were directly harmed by Defendants (i.e., tuition), but not the "athlete" portion of the benefits that were also contractually-guaranteed and lost. Once Brian's eligibility was destroyed, he became damaged goods to the University and the Twitter message communicated to him that he was effectively being removed from the University.

If Brian's property interest in the student-athlete agreement is viewed as a "bundle of sticks," he unequivocally lost those sticks that "allowed [him] to practice with or compete" on the team, along with the other "Countable Athletically Related Activities" valuable to his career

14

development and, per NCAA Bylaw § 14.5.1, lost the right to compete for any other NCAA

men's basketball team.  The Twitter message proffered by Defendants confirms only that those

losses would be permanent.  Even setting aside the scholarship portion of the student-athlete

agreement, the remaining lost benefits have a concrete, tangible value that can be readily

discovered in litigation, whether through third-party discovery from the University of Louisville

or through expert testimony.  *See Mid Atlantic Telecom*, 18 F.3d at 264 ("[P]laintiff should have

the opportunity to develop support for its [RICO injury] claims through discovery.").

Defendants next assert that Brian "voluntarily relinquished the scholarship when he chose

to withdraw from UofL" and that his "voluntary decision to leave UofL was the sole cause of the

loss of his athletic scholarship."  (Adidas Mot. at 9.)  This argument rests on allegations and

assumptions found nowhere in the complaint, ignores the contrary well-pleaded allegations, and

fails to address the other valuable property interests under the agreement that were harmed.

**NCAA Eligibility** – Brian's loss of his NCAA eligibility is another injury to his business

and property interests caused by Defendants.  NCAA eligibility is a bargained-for benefit under

NCAA rules. (¶¶ 29-39.)  Brian, like all student athletes, was required to register with the NCAA

Eligibility Center and undergo an extensive certification process prior to gaining eligibility

status.  (Carns Tr. 383:14 -385:25, Ram Decl. Ex. 9.)  The Eligibility Center reviews academic

records and assesses each prospective student-athlete's amateur status during the certification

process.  (*Id.*)  The NCAA certified Brian's eligibility before he applied to college and again

prior to August 25, 2017.  (UofL Men's Basketball Cert. of Eligibility, Ram Decl. Ex. 6.)

By agreeing to abide by the amateurism rules as early as middle school and by agreeing

to forego participation in certain tournaments and other pre-professional opportunities in high

school, Brian preserved his eligibility to play men's basketball at an NCAA school.  (¶ 30; *see*

*generally* NCAA Article 12 "Amateurism and Eligibility.")  Once his eligibility was certified by

the NCAA, he used that status to gain entry to Louisville's men's basketball team so he could

further his athletic career and prepare for the NBA.  (¶ 159.)  In this respect, Brian's interest in

his NCAA eligibility is no different than recognized property interests in similar benefits.  *See*

*Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (recognizing a property interest exists "if there

are such rules or mutually explicit understandings that support [the holder's] claim of entitlement

to the benefit"); *Roth*, 408 U.S. at 577 (property interests "are created and their dimensions are

defined by existing rules or understandings that stem from an independent source"); *Richardson*

*v. Town of Eastover*, 922 F.2d 1152, 1157 (4th Cir. 1991) ("[M]utual expectations may create an

entitlement in a license."); *see also Brown v. South Carolina State Bd. of Educ.*, 391 S.E.2d 866,

867 (S.C. 1990) (recognizing property interest in teaching certificate necessary for

employment).[9]  The right of amateurism and eligibility is so valuable, the Court has stated:

> "The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports. **There can be no question** but that it needs ample latitude to play that role, or **that the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics** and is entirely consistent with the goals of the Sherman Act. But consistent with the Sherman Act, the role of the NCAA must be to preserve a tradition that might otherwise die; rules that restrict output are hardly consistent with this role. Today we hold only that the record supports the District Court's conclusion that by curtailing output and blunting the ability of member institutions to respond to consumer preference, **the NCAA has restricted rather than enhanced the place of intercollegiate athletics in the Nation's life**…"

---

[9] Some courts have considered the separate issue of whether athletic eligibility represents a *constitutionally protected* property interest under the Fourteenth Amendment, but those cases are inapplicable here as property interests protected under RICO and property interests protected under the Fourteenth Amendment Due Process Clause are neither co-extensive nor mutually exclusive. Indeed, many of those cases have turned on the state actor doctrine.  *Compare Hall v. Univ. of Minnesota*, 530 F. Supp. 104, 109 (D. Minn. 1982) (recognizing a student-athlete's property right in attending a university to preserve athletic eligibility) *with Arlosoroff v. Nat'l Collegiate Athletic Ass'n*, 746 F.2d 1019, 1021 (4th Cir. 1984) ("The fact that NCAA's regulatory function may be of some public service lends no support to the finding of state action, for the function is not one traditionally reserved to the state.").  For RICO purposes, it is necessary only to recognize that Brian's NCAA eligibility has the character of property under state law or that it represents a business interest to him in preparing for a professional sports career.

*NCAA v. Bd. of Regents of Univ. of Oklahoma*, 458 U.S. 85, 120 (1984) (emphasis added).

Brian's NCAA eligibility to participate in Division I men's basketball was also a valuable business interest to him. (¶¶ 7-9.) The NCAA is the proving ground for the NBA. (¶ 8.) Elite players like Brian are not permitted to play in the NBA until they are one year removed from high school and, unlike other professional sports, no player may contract with an NBA team unless they have first participated in the NBA draft.[10] Therefore, there are two career decisions players like Brian make following high school graduation that are critical to their career as a professional athlete: (1) where to play basketball after high school graduation and prior to the NBA draft; and (2) when to forego the amateur status and participate in the NBA draft. (¶ 120.)

Defendants' argument that Brian's NBA career was too speculative ignores their own statements that Brian was a lock for the NBA and that was why they needed him to play for UofL and later sign an endorsement contract with Adidas. (*See, e.g.* ¶ 171.) That his eligibility had value is evidenced by the fact that Adidas funded a $100,000 bribe to ensure Brian played basketball for Adidas-sponsored Louisville rather than Nike-sponsored Oregon or any other school or professional team. (¶¶ 154, 161.) Additionally, the "daunting odds" that Adidas contends "confront all collegiate athletes who seek to play in the NBA" is misleading. (Adidas Mot. at 8.) The NCAA reports over 18,000 men's basketball players at NCAA member institutions nationwide.[11] Far fewer play in Division I (~5,500) like Plaintiff, fewer still receive scholarships (~4,500) like Plaintiff, fewer still are ranked as five-star recruits (< 30 annually) like

---

[10] *See* NBA-NBPA COLLECTIVE BARGAINING AGREEMENT JAN. 19, 2017, Article X: Player Eligibility and NBA Draft, at 273 (Jan. 19, 2017) *available at* https://nbpa.com/cba ("No player may sign a Contract or play in the NBA unless he has been eligible for selection in at least one (1) NBA Draft. No player shall be eligible for selection in more than two (2) NBA Drafts.") (last visited Mar. 8, 2019).

[11] http://www.ncaa.org/about/resources/research/estimated-probability-competing-college-athletics

Plaintiff, and fewer still are named McDonald's All-Americans (24 annually) like Plaintiff.[12]

For a player of Brian's caliber, a professional sports career is not at all speculative; it is a given.

Roughly 70% of Brian's teammates on the 2017 McDonald's All-American team are already

playing in the NBA, while the remaining are projected to be drafted in the NBA after college.

**Additional Business and Property Interests** – In addition to Brian's student-athlete

agreement and NCAA eligibility, the complaint adequately alleges direct financial damages

ranging from the various out-of-pocket costs arising from his removal from UofL's basketball

team with applying to and trying out for other Division I men's basketball teams, relocation costs

to South Carolina after being removed from UofL's team, costs incurred with obtaining

employment as a professional basketball player in Australia (including relocation costs), and

attorney's fees and costs incurred in connection with the federal government's investigation of

Defendants' criminal conduct. (¶ 227.)   Any one of these concrete financial injuries is sufficient

to establish Plaintiff's standing to bring suit.   "Money, of course, is a form of property." *Reiter v.*

*Sonotone Corp.*, 442 U.S. 330, 338 (1979); *see also Smith v. Allred*, No. 2:15-CV-06026, 2016

WL 3094008, at *14 (S.D. W.Va. June 1, 2016); *Spelman v. Bayer Corp.*, No. 7:10-CV-00091-

JMC, 2011 WL 13312222, at *3 (D.S.C. Feb. 22, 2011) ("Plaintiffs allege that they 'have been

injured by expending money on the purchase of Men's Multis, where such purchases were

caused by Bayer's fraudulent and unlawful promotion.' . . . This allegation adequately pleads an

injury to business or property caused by Bayer's alleged racketeering activity.").

### B.  Plaintiff's Injuries Are Neither Speculative Nor Impossible to Quantify

Defendants' belief that Plaintiff's damages are "entirely speculative" or "impossible to

quantify" is unfounded.  (Adidas Mot. at 8.)  To the contrary, Defendants believed in the value of

---

[12] *Id.*

his ability to play basketball for Louisville—they revealed it in closed door conversations surreptitiously recorded by the FBI and they quantified it through expert testimony proffered at the criminal trial of Gatto, Code, and Dawkins.  Moreover, the value of playing Division I basketball is so concrete, non-speculative and measurable that it is an insurable interest.

Common sense reasoning from the facts pled in the complaint and Defendants admissions in the criminal case demonstrate that a value can be ascribed to Brian's loss.  Adidas assigned a value to Brian's Division I experience when it funded a $100,000 bribe to secure his attendance at Louisville so he would later sign an endorsement deal as an NBA player, (¶¶ 155, 166); Sood and Dawkins did so when discussing whether Brian was a top ten or top twenty NBA draft pick and a worthwhile future client, (¶¶ 170-171); Gatto, Code, Sood, Dawkins, and Gassnola did so in private conversations (¶ 155), and also during sentencing when Gatto, Code, and Dawkins argued for a reduction in the restitution owed to the University of Louisville because "the record demonstrates that [they] expected that the student athletes would each be 'one and done' players who would only receive *one* year of scholarship funds before moving on to play professionally in the NBA."  (Gatto Sent. Memo. at 35 n.5, Ram Decl. Ex 3.)  These statements demonstrate that the market—even an illegal market—can assign value to a college players experience.

That there can be value assigned to the experience Brian lost is evidenced by the massive amount of corporate money poured into NCAA Division I college basketball.  In litigation brought by Adidas against the NCAA over a bylaw governing the size of its three-stripe logo on player uniforms, Adidas argued for injunctive relief on grounds that: "The stakes in this litigation are high.  The promotion of name brands of athletic apparel within the NCAA is big business.  There is a multi-billion dollar market for promotional and licensing rights involving NCAA college uniforms." *Adidas v. NCAA*, No. 98-cv-02510, Dkt. 4 at 3 (D. Kan. filed Nov. 12, 1998)

(Ram Decl. Ex. 8.)  Adidas was not exaggerating when it assigned a billion-dollar value to the privilege of placing a two-inch logo on a college player's jersey.  The same holds true today. The television broadcast rights to the annual three-week March Madness basketball tournament cost CBS and Turner almost $20 billion.  (¶ 27.)  For Brian, the stakes in this case are no less than they were for Adidas in 1998.  For Adidas to argue that the billion-dollar college sports market is so valuable that to limit the size of its logo would "threaten the core" of its business, but that it otherwise has no "concrete" value to the young student-athletes wearing those uniforms before an audience of millions exemplifies the corporate plantation mentality endemic in college sports today.  *See Adidas v. NCAA*, Mot. for Prelim. Injunc. at 4 (Ram Decl. Ex. 8.)

Litigation regarding the value of Division I student-athlete's benefits and contributions is extensive, resulting in numerous expert opinions from some of the top sports economists in the world.  *See, e.g.*, *In Re NCAA Athletic Grant-in-Aid Cap Litigation*, No. 4-14-md-02541-CW, ECF No. 993 at 36 (Defendant NCAA's Opening Stmt.) (N.D. Cal. filed Aug. 27, 2018) (describing testimony from Nobel Laureate James Heckman regarding "[t]he value of a collegiate experience in which academics are integrated with athletics," and his finding that "male Division I basketball and FBS football student-athletes earn more after college than they would have if they did not participate in intercollegiate athletics").  Defendants, too, have recognized the importance of expert testimony to quantify Brian's value as a UofL basketball player.  Last fall, Gatto sought to introduce expert testimony in his criminal trial to establish that the "benefit" created by their fraud far outweighed the loss to UofL.  Using multiple regression analysis, their expert concluded that "a 'five-star' athlete is responsible for approximately 8.2% of a university's revenue from men's basketball" and, for the University of Louisville, that represented $3,604,760 in value that the school would have received from Brian Bowen had his

eligibility not been destroyed. *Gatto*, No. 17-cr-00686-LAK, ECF No. 211 at 5-6 (S.D.N.Y. filed Sept. 26, 2018) (Ram Decl. Ex. 11.)  If Defendants can pin the value of Brian's role on UofL's basketball team *to the dollar*, there should be no doubt that the same analysis can uncover the value he lost when they rendered him ineligible to play there.

Indeed, the value to a player of participating in NCAA Division I men's basketball is so significant that it has become an insurable interest. The NCAA permits top athletes in Division I basketball to obtain "loss of value" insurance to protect their future contract values as professional from diminution while playing in college.  According to the NCAA:

> Loss of value (LoV) coverage is insurance that protects a student-athlete's future contract value from decreasing below a predetermined amount due to a significant injury or illness suffered during the policy's designated coverage period. It is typically purchased for the year leading up to the athlete's draft eligibility. . . . Insurance underwriters will first determine an athlete's eligibility based on their draft position. If they are projected to be selected early in the draft, underwriters could offer coverage limit that typically falls between $1 million and $10 million, based on the projected draft position. The underwriters will then set a loss-of-value threshold that is typically 50 to 60 percent of the athlete's projected rookie contract. If the contract an athlete signs falls below that threshold as a direct result of an injury or illness suffered during the coverage period, the insurance would pay them the difference between the actual contract's value and the policy's predetermined value.[13]

The difference in contract value between the number one NBA draft pick and the number thirty draft pick over a four-year rookie contract can run in the tens of millions of dollars; hence, the need for coverage.  The fact that underwriters can precisely assign values to lost earnings due to a drop in NBA draft position demonstrates that this value is neither "speculative" nor "impossible to quantify."  Moreover, the fact that insurance is offered on a NCAA Division I athlete's professional earnings demonstrates its character as property.  *See, e.g.*, *Haynes v. Auto-Owners Ins. Co.*, No. CIV.A. 8:12-00470, 2013 WL 4027762, at *2 (D.S.C. Aug. 6, 2013)

---

[13] *See* NCAA, LOSS-OF-VALUE FAQs, http://www.ncaa.org/about/resources/insurance/loss-value-faqs (last visited Mar. 8, 2019).

("Anyone who derives a benefit from property's existence or would suffer a loss from its destruction may have an insurable interest in that property."); *Studio Frames Ltd. v. Standard Fire Ins. Co.*, 483 F.3d 239, 245 (4th Cir. 2007) ("An insurable interest exists in property if the policyholder derives a benefit from [the property's] existence or would suffer loss from its destruction.") (citation and quotation marks omitted).

Finally, even if Plaintiff had pled no quantifiable damages (which he disputes), he still has standing because he has sufficiently pled the fact of an injury to his business or property interests. *Potomac Elec. Power Co.*, 262 F.3d at 265 (recognizing that § 1964(c)'s injury requirement "refers to the fact of injury and not the amount"). Accordingly, Defendants' arguments that Brian's injuries are "impossible to quantify," is not only incorrect as a factual matter but also inapplicable to the issue of standing. So long as a RICO plaintiff has plausibly alleged a cognizable injury to his business or property stemming from the predicate acts of racketeering, he has legal standing. *Id.* at 265-66. This is because the civil remedies provision of RICO provides an award of attorney's fees and costs, *see* § 1964(c), and nominal damages in the form of fees may be awarded in the absence of proof of specific damages. *Id.* at 265.

## II.  DEFENDANTS' CRIMINAL RACKETEERING PROXIMATELY CAUSED PLAINTIFF BOWEN'S INJURIES

There can be no serious dispute in this case that Defendants' predicate acts of racketeering led directly to Plaintiff's injuries. His injuries are not alleged to be derivative of any harm suffered by a third party. In fact, and as alleged in the complaint, there were no intervening steps between Defendants' predicate acts of racketeering and his injuries. (*E.g.*, ¶¶ 119, 224-226.) Undeniably, the loss of Brian's NCAA eligibility was the factual predicate of the criminal case against Defendants for defrauding the University of Louisville. Had their fraudulent acts not first rendered him ineligible under NCAA rules, there would have been no

actionable fraud on Louisville justifying their prosecution.  Defendants' convictions prove this

point, and the complaint alleges all of this in detail—including how Defendants' bribery scheme

led to the loss of his NCAA eligibility and that of other student-athlete recruits targeted by the

Adidas Bribery Enterprise.  (*Id.*)  That Brian's injuries satisfy the proximate cause requirement

cannot now be credibly challenged—the directness of his injuries finds ample support under

long-standing RICO jurisprudence as well as the policy rationales underlying the direct injury

requirement in RICO cases.  And, above all, it is simply a matter of common sense and reason.

Proximate cause in civil RICO cases is a flexible concept that does not lend itself to "'a

black-letter rule that will dictate the result in every case.'" *Holmes v. Sec. Inv. Prot. Corp.*, 503

U.S. 258, 272 n.20 (1992) (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459

U.S. 519, 536 (1983)); *see also Brandenburg v. Seidel*, 859 F.2d 1179, 1189 (4th Cir. 1988),

(recognizing that legal causation in civil RICO cases "involv[es] a policy rather than a purely

factual determination: whether the conduct has been so significant and important a cause that the

defendant should be held responsible").  Rather, the Supreme Court "use[s] 'proximate cause' to

label generically the judicial tools used to limit a person's responsibility for the consequences of

that person's own acts," *Holmes*, 503 U.S. at 268, with a particular emphasis on the "demand for

some direct relation between the injury asserted and the injurious conduct alleged," *id*.; *see

also Anza v. Ideal Steel Supply Corp*, 547 U.S. 451, 461 (2006) ("[T]he central question it must

ask is whether the alleged violation led directly to the plaintiff's injuries.").

In *Holmes*, the Court construed the "by reason of" language of § 1964(c) to incorporate

common law principles of proximate cause, including the requirement that there be "some direct

relation between the injury asserted and the injurious conduct alleged" because "a plaintiff who

complained of *harm flowing merely* for the misfortunes visited upon *a third person* by the

defendant's acts was generally said to stand at too remote a distance to recover." 503 U.S. at 268-69 (emphasis added). In *Bridge v. Phoenix Bond and Indem. Co.*, the Court clarified that a RICO plaintiff need not show its own reliance on a defendant's misrepresentation in the context of underlying predicate acts of fraud. 553 U.S. 639, 657-58 (2008) ("Nor is first-party reliance necessary to ensure that there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate-cause principles articulated in *Holmes* and *Anza*."). Finally, in *Hemi Group, LLC v. City of New York*, the Court's plurality reaffirmed these principles, finding that "[m]ultiple steps . . . separat[ing] the alleged fraud from the asserted injury," such as "the independent actions of third and even fourth parties" are insufficient to establish proximate cause." 559 U.S. 1, 15 (2010).

Plaintiff does not need to "prove a series of negatives; he doesn't have to 'offer evidence which positively exclude[s] every other possible cause of the accident." *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 45 (1st Cir. 2013) (citations and internal quotation marks omitted). Rather, "[o]nce a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, the burden shifts to the [RICO] defendant to rebut this causal inference." *Id.* This, Defendants have failed to do.

### A. Defendants' Convictions Unequivocally Establish Plaintiff's Direct Injuries

Defendants cannot escape the fact that the criminal cases explicitly resolved the issue of causation that they now attempt to re-manufacture for this Court. Plaintiff's complaint adequately alleged that the predicate acts of wire fraud and wire fraud conspiracy for which Gatto, Code, Dawkins, Sood, and Gassnola were convicted destroyed his eligibility. (¶¶ 119-120.) Likewise, it adequately alleges direct injuries from money laundering and sports bribery. (¶¶ 121-122.) For each of these predicate acts, the harm alleged stems largely from Brian's loss

24

of NCAA eligibility and concomitant interference with his student-athlete agreement, not from any subsequent discretionary decisions made by Louisville or anyone else. (¶ 224-27.)  That it has been sufficiently pled in the complaint and can be reasonably inferred from the allegations should resolve this issue on a motion to dismiss.

More importantly, the question of whether Defendants' criminal acts directly injured Brian's eligibility has already been established as a matter of law: (1) it was the basis of the criminal charges filed against Gatto, Code, Dawkins, Sood, and Gassnola; (2) it was a factual predicate necessary for their convictions; (3) it was an issue of fact conclusively determined by the *Gatto* jury; (4) it was confessed to by Gassnola and Sood in their plea hearings; and (5) the Court relied on it in sentencing in accordance with Defendants' Sixth and Fourteenth Amendment rights.  *See United States v. Gaudin,* 515 U.S. 506, 510 (1995) ("[C]riminal convictions [] rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.").  The evidence of direct injury in this case (none of which is acknowledged in Defendants' motions) is manifest:

| Source[14] | Statement Regarding Eligibility |
|---|---|
| Criminal complaint against Gatto, Code, Dawkins, Sood, and enterprise participant Brad Augustine unsealed on Sept. 26, 2017. (Compl. Ex. 2 ¶ 2, ¶ 14(b).) | ¶ 2 - "[Defendants] . . . participated in a scheme to defraud . . . by making and concealing bribe payments . . . thereby causing the universities to agree to provide athletic scholarships to student-athletes **who, in truth and in fact, were ineligible to compete as a result of the bribe payments.**" <br><br> ¶14(b) - "A student-athlete is rendered 'ineligible' to participate in Division I sports if the athlete is recruited by a university or any 'representative of its athletic interests' in violation of NCAA rules." |

---

[14] In reviewing a Rule 12(b)(6) dismissal, the Court may properly take judicial notice of matters of public record, *see Hall v. Virginia,* 385 F.3d 421, 424 n.3 (4th Cir.2004), documents attached to the complaint, *see* Fed. R. Civ. P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic, *see Blankenship v. Manchin,* 471 F.3d 523, 526 n. 1 (4th Cir.2006).

| Gassnola plea hearing (Ram Decl. Ex. 10 at 22:12-21.) | Gassnola: "**I knew these payments would render the athletes ineligible** to receive scholarships from these universities, and further knew these payments would be concealed from the universities. At the time I did this, I knew this was illegal, and I took the steps to conceal this." |
|---|---|
| Sood Criminal Information filed Aug. 27, 2018 ¶ 8 (Ram Decl. Ex. 12.) | "Sood and others known and unknown participated in a scheme to defraud NCAA Division I universities by facilitating and concealing payments . . . thereby causing those universities to provide or agree to provide athletic scholarships to student-athletes **who, in truth and in fact, were ineligible to compete as a result of the payments**." |
| Sood plea hearing (Sood Mot. Ex. A at 25:24-25; 26:3-7) | Sood: "The overt acts in the information accurately describe my conduct."<br><br>Sood: "I believed that . . . receipt of those payments by the players and/or their families could make the players ineligible, causing harm to the university." |
| Direct Examination of University of Louisville's Senior Associate Athletic Director for Compliance John Carns during criminal trial of Gatto, Code, and Dawkins. (Ram Decl. Ex. 9 at 391:8-21.) | Q: [quoting Brian's student-athlete financial aid agreement] "I understand this tender must be immediately reduced or canceled if I . . . accept compensation for participating in an athletics contest. Do you see that?"<br><br>A: Yes.<br><br>Q: Why is that a basis for canceling the financial agreement?<br><br>A: **The amateurism would not be valid at that point if that happens.**<br><br>Q: Mr. Carns, does it matter if the compensation is accepted by the student-athlete or his family?<br>A: No. |
| Government's Sentencing Memo in *United States v. Gatto* at 11, 14 (Ram Decl. Ex. 2.) | "Notwithstanding their repeated protestations to the contrary, **the defendants' conduct caused real harm**: harm to the Universities, **harm to the student-athletes involved**, and harm to other third parties impacted by the defendants' crimes."<br><br>"With respect to Brian Bowen, Jr., for example, as the trial evidence established, Bowen Jr. had no knowledge of the illicit payments being funneled from the defendants to his father. Nonetheless, he was immediately taken off the court when the news of defendants' arrests broke and never played a single game for the University of Louisville (or any other college) as a result. Bowen, Jr., who ultimately left Louisville after it became clear he would be unlikely to be able **to reestablish his eligibility** as a result of the defendants' conduct, is currently playing professional basketball in Australia." |

This factual finding in the criminal cases was naturally reached because eligibility is a binary determination based solely on compliance with NCAA eligibility rules. *See United States v. Gatto*, No. 17-CR-0686 (LAK), 2019 WL 266944, at *1 (S.D.N.Y. Jan. 17, 2019) ("[T]hese students lose their status as amateurs if they or their family members accept prohibited financial assistance or other economic benefits, including inducements (other than an athletic scholarship) to attend a particular NCAA university.") (citing NCAA Bylaws §§ 12.01.1, 12.1.2, 13.01.1, 13.2.1).  Accordingly, Brian and the other student-athletes targeted by the Adidas Bribery Enterprise lost their eligibility not based on "discretionary" decisions by "several independent actors," such as university athletic department personnel weighing the pros and cons of allowing a student-athlete victimized by Defendants to participate in games, but due to Defendants' blatant violations of NCAA bylaws.  *See* NCAA Bylaw § 12.01.1 ("Only an amateur student-athlete is eligible for intercollegiate athletics participation in a particular sport."); §13.01.1 ("The recruitment of a student-athlete by a member institution or any representative of its athletics interests in violation of the [NCAA's] legislation . . . shall result in the student-athlete becoming ineligible to represent that institution in intercollegiate activities.") (emphasis added); § 13.2.1 ("An institution's staff member or any representative of its athletics interests shall not be involved, directly or indirectly, in making arrangements for or giving or offering to give any financial aid or other benefits to a prospective student-athlete or his or her relatives or friend."); § 16.01.1 ("A student-athlete shall not receive any extra benefit. Receipt by a student-athlete of an award, benefit or expense allowance not authorized by NCAA legislation renders the student-athlete ineligible for athletics competition in the sport for which the improper award, benefit or expense was received") (emphasis added); § 16.02.3 ("An extra benefit is any special arrangement by an institutional employee or representative of the institution's athletics interests

to provide a student-athlete or the student-athlete family member or friend a benefit not expressly authorized by NCAA legislation"); Testimony of UofL's Senior Associate Athletic Director for Compliance John Carns 402:23–403:5 (Ram Decl. Ex. 9) (affirming that Adidas is "considered [a] representative of the university's athletic interests" under NCAA rules).

Thus, Brian's injuries are not "flowing merely from the misfortunes visited upon a third person" or derivative of another's direct injury." *Holmes*, 503 U.S. at 269.   Rather, his injuries are unique to him, were caused directly by Defendants, and stand-alone regardless of whether others were also injured by Defendants' conduct.  That Code, Dawkins, and Gatto were convicted of defrauding the University of Louisville and ordered to pay restitution to the school based on the value of Brian's lost scholarship proves the point.  These Defendants were not ordered to pay restitution because UofL lost a good math student—they were ordered to pay restitution because Louisville contracted with one of the nation's top basketball talents to be a student-athlete and Defendants took away the "athlete" portion of his student-athlete eligibility. Were a student-athlete's eligibility left to the discretion of the universities, who generate millions of dollars in revenue from their basketball programs and who receive hundreds of millions more from the bribe-paying apparel sponsors, it would be unimaginable that any top recruit would ever be found ineligible to compete.

## B. Defendants Are Collaterally Estopped from Arguing Their Wire Fraud Did Not Destroy Bowen's NCAA Eligibility

Given that Defendants' conduct to destroy Bowen's NCAA eligibility has already been established (and admitted to) as the predicate of the wire fraud and wire fraud conspiracy committed against the University of Louisville, Defendants Gatto, Code, Sood, Dawkins, and Gassnola are foreclosed from relitigating or otherwise challenging this component of their criminal convictions in this civil proceeding.  *See, e.g.*, *Ramsay v. U.S.I.N.S.*, 14 F.3d 206, 210

(4th Cir. 1994); *United States v. Moore*, 765 F. Supp. 1251, 1255 (E.D. Va. 1991) (applying collateral estoppel to issues litigated "in the form of a plea agreement" (citing *United States v. Wight*, 819 F.2d 485, 487 (4th Cir.1987)).  Collateral estoppel is routinely invoked against defendants in RICO actions who dispute essential elements of their convictions.  *See, e.g.*, *AvalonBay Cmtys., Inc. v. Willden*, No. 1:08-CV-777, 2009 WL 2431571, at *3-6 (E.D. Va. Aug. 7, 2009), *aff'd*, 392 F. App'x 209 (4th Cir. 2010) (invoking *sua sponte* collateral estoppel and judicial estoppel in granting summary judgment in favor of a civil RICO plaintiff).

Here, the doctrine of offensive, non-mutual collateral estoppel forecloses the re-litigation of whether Defendants' predicate acts of wire fraud caused Brian to lose his NCAA eligibility: this fact has already been established beyond a reasonable doubt in the trial of Defendants Gatto, Code, and Dawkins; Defendants Sood and Gassnola admitted under oath that this fact would have been proven beyond a reasonable doubt at trial; this fact was "critical and necessary" to finding that the University of Louisville had been defrauded of scholarship money and, thus, was "critical and necessary" to their convictions; Gatto, Code, and Sood's criminal convictions are final and valid; and each had full and fair opportunities to litigate these issues in the criminal proceedings.[15]  *See In re Microsoft Corp. Antitrust Litig*., 355 F.3d 322, 326 (4th Cir. 2004).

Defendant Sood is also judicially estopped from contesting this fact because he admitted to it when accepted his guilty plea.  *See Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996) (applying judicial estoppel "to preclude [a civil litigant] from contradicting the statements he made when he pleaded guilty.").  Sood's argument here that Bowen's injuries were not

---

[15] Importantly, the issue Defendants Gatto, Code, and Sood are estopped from challenging relates to the *causal sequence* of the injuries suffered by Bowen.  Accordingly, a judgment that establishes proximate cause of Bowen's injuries against Gatto, Code, and Sood necessarily establishes proximate cause against all defendants, including Adidas and Rivers, as the complaint alleges concerted action by all Defendants.

"sequentially the direct result of" Defendants' racketeering activity directly contradicts the position he took when he pled guilty. *Compare* Sood Mot. at 13 (arguing that Plaintiff's "injuries were not 'sequentially the direct result' of any of the four alleged acts of racketeering activity"), *with United States v. Sood*, No. 18-cr-620, ECF No. 70 at 6 (Aug. 18, 2018 Criminal Information) ("Sood . . . participated in a scheme to defraud NCAA Division I universities by facilitating and concealing payments to prospective and current student-athletes at those universities, and their families . . . thereby causing those universities to provide or agree to provide athletic scholarships to student-athletes who, in truth and in fact, were ineligible to compete as a result of the payments."), *and* Sood Mot. Ex. A at 5 (Tr. 25:24-25) ("The overt acts in the information accurately describe my conduct.").

### C.  Plaintiff Was Directly Injured By Defendants' Predicate Acts

Defendants attempt to shore up the deficiency of their proximate cause argument by isolating certain statements in the complaint and recasting them to create new arguments for dismissal: (1) "the right to make a fully-informed decision about where to attend college is not a property interest protected by the wire fraud statute;" (2) "Bowen cannot allege that he was denied any of the tangible economic benefits offered to him by UofL;" and (3) Bowen has not alleged facts suggesting that Defendants' lack of disclosure was motivated by an intent to harm him."  (*Id.* at 14.)  Variations of these arguments were raised and rejected in Defendants' criminal cases and fail here as well because they rest on a dishonest presentation of Plaintiff's allegations and rely on stale propositions of law that have long since been rejected in this circuit.

First, the notion that Defendants could be convicted of wire fraud for defrauding the University of Louisville of its right to control its decision whether to award an athletic scholarship to an ineligible student-athlete, but not for defrauding the same student-athlete of his

right to control his eligibility or college decision by withholding the same material information is unsupported in the law. *See Bridge*, 533 U.S. 657-58. Defendants ignore their convictions in the Second Circuit on this very theory and ignore contrary authority in the Fourth Circuit recognizing that "the federal fraud statutes should be 'interpreted broadly insofar as property rights are concerned'" and that property rights under the mail and wire fraud statutes "need not be tangible" and include "the intangible right to control the disposition of his assets." *United States v. Gillion*, 704 F.3d 284, 295 (4th Cir. 2012). At a minimum, this "right to control" encompasses Brian's right to control his NCAA eligibility and which school (and athletic apparel company) should benefit from his name, image, and likeness. *O'Bannon*, 7 F. Supp. 3d at 966; *see also Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.*, 684 S.E.2d 756, 760 (S.C. 2009) ("We further hold the right to control the use of one's identity is a property right that is transferable, assignable, and survives the death of the named individual."). The heart of this complaint reflects that Bowen attached the highest importance to these rights—a reasonable position for any top student-athlete who will compete professionally after college. *See Gilliam*, 704 F.3d at 296 ("A misrepresentation is material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.")

Second, Bowen plausibly alleges he was denied tangible economic benefits as a student-athlete as a result of Defendants destroying his NCAA eligibility. That the loss of those benefits was felt *after* Defendants' criminal acts were publicized and made known to the University of Louisville does not make it any less direct of an injury. A NCAA member institution, such as UofL, has absolutely no discretion under NCAA rules to allow ineligible student-athletes to remain on their teams, so it cannot be argued that this category of harmed flowed from any discretionary decision by Louisville in any respect. (NCAA Bylaws §§ 16.01.1, 16.02.3,

16.02.4.)  Defendants, of course, knew this as each are "experienced and sophisticated players in the world of college athletics."[16]  (Gov't Sent. Memo at 3, Ram Decl. Ex. 2.)  Further, Plaintiff does not allege he "abandoned" his athletic scholarship, and the suggestion that he did has no factual basis in the complaint.  If Defendants wish to counter Plaintiff's well-pleaded allegations, they may do so at trial, not in a motion to dismiss.

Third, Defendants' assertion that they were not "motivated by an intent to harm" Plaintiff is at best a factual issue, but regardless it is legally irrelevant to the issue of causation in a RICO case.  (Adidas Mot. at 14; Sood Mot. at 18.)  With respect to the predicate acts of wire fraud, the "the necessary intent to defraud requires that the defendant specifically intend to deceive or cheat *someone*, as opposed to merely taking action that knowingly or recklessly results in fraud." *United States v. Sauls*, No 18-4454, 2019 WL 386409, at *1 (4th Cir. Jan. 31, 2019) (emphasis added); *see also Bridge*, 553 U.S. at 649 ("[A] person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations."); *Biggs v. Eaglewood Mortg., LLC*, 353 F. App'x 864, 867 (4th Cir. 2009) ("*Bridge*'s holding eliminates the requirement that a plaintiff prove reliance in order to prove a violation of RICO predicated on mail fraud."). Thus, the fact that Bowen was injured because of Defendants' deliberate misrepresentations to the University of Louisville is sufficient to plead a RICO injury.

Plaintiff's complaint plausibly alleges Defendants intended to defraud the universities (and, in fact, five of them were convicted of that).  (*E.g.*, ¶¶ 119, 166.)  Plaintiff's complaint

---

[16] Adidas has long demonstrated its deep familiarity and reliance on NCAA bylaws.  *See Adidas v. Nat'l Coll. Athletic Ass'n.*, 64 F. Supp. 2d 1097 (D. Kan. 1999).  In a motion for a preliminary injunction filed in that case, Adidas acknowledged that NCAA "Member Institutions are governed by an elaborate Constitution and Operating and Administrative Bylaws involving dozens of sports competition from archery to volleyball" and that "[t]he bylaws govern non-commercial matters, such as student's eligibility and rules of the game."  (Ram Decl. Ex. 8 at 5-6.)  The individual defendants likewise admitted their knowledge of NCAA rules.  (*See, e.g.*, Code Sent. Memo. at 4, Ram Decl. Ex. 4 ("Like many others, [Code] understood he was violating the NCAA's rules.")).

equally and plausibly alleges that Defendants knew their bribery scheme would defraud student-athletes of their eligibility to participate in NCAA Division I men's basketball, invariably the reason they operated in secret. (*E.g.,* ¶¶ 110, 166.) More than plausibly suggesting intent, these allegations are *prima facie* evidence of their intent to harm Plaintiff Bowen. (*E.g.*, ¶ 104 (discussing Defendants' "exploitation of the young players' images and likenesses"); ¶¶ 110-111 (Gassnola testifying that "Rivers made clear to Adidas employees that he 'didn't want any proof of' such payments in writing"); ¶ 154 (Code instructing Dawkins: "don't send Bowen to Oregon. Call me."); ¶166 (Sood, Code, and an undercover FBI agent discussing how "sham arrangements like this are how athletic apparel companies like Adidas mask payments to high-school athletes in order to get around NCAA rules."); *id.* (Code instructing Sood and an undercover FBI agent that "for cleanliness and lack of questions, the bribe payment should be in cash"), ¶ 174 (Dawkins instructing an undercover FBI agent "some of it can't be completely accounted for on paper because some of it is, whatever you want to call it, illegal"); ¶¶ 166, 175 (Defendants' use of sham invoices), ¶¶ 180-203 (Adidas's money laundering scheme). Likewise, Adidas's citation to Gatto's opening statement in his criminal trial provides further evidence of intent: "The NCAA rules were broken" because "these kids bring in millions of dollars in revenue." (Adidas Mot. Ex. B 66:9, 69:12-13; Pl. Compl. ¶¶ 105-06.) Additionally, an exhibit to Gatto's sentencing memorandum further establishes Defendants' desire to promote the Adidas brand at Bowen's expense. (*See* Gatto Sent. Memo. Ex. 45 at 3, Ram Decl. Ex. 3 (Sood: "When you said you were working the phones, what are you doing?" Code: "Working my phones in terms of my folks internally. . . . To get – to help the kid go *where we need him to go*. That's how he ended up at Louisville.") (emphasis added).) Against this background, it is clear Defendants' deliberate acts to steer Bowen "where [they] need[ed] him to go" using an illegal bribery scheme

they knew would render him ineligible under NCAA rules plausibly establishes their intent to harm him. *Sauls*, 2019 WL 386409 at *1 (stating that intent to defraud refers to "'[t]he intent to accomplish the precise criminal act that one is later charged with.'") (quoting *United States v. Batato*, 833 F.3d 413, 430 (4th Cir. 2016)).

Defendants' predicate acts of money laundering and sports bribery also directly harmed Brian. Without citation to any legal authority, Adidas make the conclusory assertion that "[t]he other two predicate acts Bowen alleges—money laundering and sports bribery—are speculative and unrelated to the injuries Bowen says he suffered." (Adidas Mot. at 15.) Not so. The criminal money laundering scheme alleged in the complaint was the vehicle through which Defendants were able to fund and disguise their fraudulent activities. (¶¶ 183-215.) Through this money laundering operation, Adidas, Rivers, and Gatto funded bribes out of corporate coffers to the families of many student-athletes, including Dennis Smith, Jr.'s father, Billy Preston's mother, Silvio De Sousa's guardian, and Brian's father. (¶¶ 128, 135, 144, 169.) As part of this operation, Gatto, Rivers, and Code facilitated payments to Adidas-sponsored AAU teams using sham invoices designed to conceal the payments to outsiders. (¶ 226; *see also* ¶ 206 Indeed, the money laundering operation was essential to furthering the secrecy of the bribery scheme; without it, Adidas would not have been able to continue its estimated billion-dollar sponsorship of college sports if the world knew it was actively undermining NCAA rules and thwarting student-athlete's eligibility. And, as discussed above, it was the payments facilitated through Defendants' money laundering that destroyed Brian's eligibility.

Defendants' unlawful acts of sports bribery equally wrought harm on Brian, his education, and basketball career. The federal sports bribery statute is purposefully broad and designed to capture almost any form of bribery to influence sporting events. *See* 18 U.S.C. § 224

(targeting anyone who "carries into effect, attempts to carry into effect, or conspires with any other person to carry into effect any scheme in commerce to influence, *in any way*, by bribery any sporting contest, with knowledge that the purpose of such scheme is to influence by bribery that contest.") (emphasis added). Though there are few reported cases brought under the statute, the Fourth Circuit has examined it closely and conclusively affirmed its breadth. *See United States v. Walsh*, 544 F.2d 156, 158-59 (4th Cir. 1976) ("The statutory language does not purport to limit its application, and where the power of Congress is clear, and the language of exercise is broad, we perceive no duty to construe a statute narrowly." (citations and quotation marks omitted)). Indeed, the *Walsh* court found that "a plain reading of the statute indicates that it is designed to encompass bribery schemes originated by participants in a sporting contest as well as those initiated by 'outsiders.'" *Id.* at 159; *see also id.* ("[W]e conclude that Section 224 was designed to cover a great range of offenders.").

As with the other predicate acts, the complaint pleads each of the required elements of federal sports bribery, which Defendants do not dispute. (¶¶ 121, 179.) Rather, they assert only that the "alleged victims of sports bribery violations were non-adidas teams, which were unable to secure top recruits, and the NCAA, which presided over games with compromised integrity." (Adidas Mot. at 15.) While non-Adidas schools and the NCAA were certainly harmed by Defendants' acts of sports bribery, it cannot be credibly argued that the student-athletes, who were essentially bought, sold, and traded like chattel by Defendants, did not also suffer from those acts. Plaintiff alleges as much in the complaint. (*see, e.g.*, ¶¶ 121, 123-24, 225.)

Sood and Rivers raise separate arguments contesting the sufficiency of their conduct to establish RICO liability. (Sood. Mot. at 13-16; Rivers Mot. at 5-12.) The complaint plausibly alleges that each engaged in multiple predicate acts of wire fraud, sports bribery, and money

laundering—all of which combined to harm Plaintiff.  As noted in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), section 1962(c) allows an injured plaintiff to impose RICO liability on any "person" who "conduct[s] or participate[s], *directly or indirectly*, in the conduct of such enterprise's affairs."  18 U.S.C. § 1962(c) (emphasis added).  The word "conduct" requires an "element of direction," but the word "participate" is a "term of breadth."  *Reves*, 507 U.S. at 178.  "To participate in the conduct of affairs must be broader than 'to conduct.'"  *Id.* at 179.  "Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required."  *Id.*  To have some part in directing the enterprise's affairs, a defendant needs only to "mak[e] decisions on behalf of the enterprise or. . . knowingly carry[] them out."  *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008).  "[A]n enterprise can be operated by 'lower rung participants in the enterprise.'"  *Id*. at 419.

Here, Plaintiff alleged facts plausibly showing that Sood and Rivers each participated in making decisions about the conduct of the Adidas Bribery Enterprise.[17]  Sood carried out the decisions of the Enterprise by coordinating with other defendants, received money from an undercover FBI agent, delivered bribe money to Plaintiff's father, repeatedly communicated with co-conspirators over the telephone regarding the bribery scheme, and formed and owned a

---

[17] Sood erroneously argues that he should be considered an "outsider" under *Reves* for purposes of determining whether he participated in the conduct of the Adidas Bribery Enterprise.  (Sood Mot. at 14-15.)  His argument, however, misconstrues the Court's definition of an "outsider."  In *Reves*, the plaintiffs maintained that a farm co-op was the sole member of a RICO enterprise, so the Court determined whether the co-op's outside accountants had participated in the conduct of the enterprise's affairs and concluded that as "outsiders" the accountants had no control over the operations or management of the cooperative.  *Reves*, 507 U.S. at 186.  Here, unlike in *Reves*, Sood cannot be viewed as an outsider to the Adidas Bribery Enterprise because, unlike the co-op's accountants, he is alleged to be a *member* of the Enterprise.  *See MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 979 (7th Cir. 1995) (holding that members of an association-in-fact enterprise are, by definition, insiders).

company with Dawkins through which Adidas money was laundered, and helped launder money passed from Adidas to the Karolina Khaos AAU team. (¶¶ 191, 122, 155, 165-171, 195.) Rivers is one of Adidas's senior executives who is alleged to have overseen operations for the Enterprise, which he termed "Black Ops," including by personally approving a $25,000 bribe payment to the family of Dennis Smith, Jr. But more importantly, as one of the leaders of the scheme, Rivers is alleged to have directed others, including Gatto, Gassnola, and a dozen Adidas employees, not to mention any bribe payments in writing. (¶¶ 108, 110-111, 126, 129, 177, 206.) Unquestionably, the complaint alleges Sood and Rivers were aware of the Adidas Bribery Enterprise's common purpose, made decisions for the Enterprise, and carried out its predicate acts. (*Id.*). Sood was convicted for his participation in the scheme that defrauded Plaintiff and the University of Louisville and testified against Gatto, Code, and Dawkins at their trial.[18]

Rivers attempt to minimize his role by arguing that he was not criminally charged and did not testify at the trial of Gatto, Code, and Dawkins does not carry weight. (Rivers Mot. at 3.) In truth, he is alleged to have been a key person under investigation whose communications with at least one Adidas-sponsored university were subpoenaed (¶ 100) and, in the words of one of the prosecutors, there was "a lot of testimony about Mr. Rivers at this trial." (Gassnola Tr. 1315:15-16, Ram Decl. Ex. 9.) That he was not prosecuted does not absolve him of his conduct. *Sedima,*

---

[18] Sood's motion egregiously misrepresents several events in the criminal cases: First, he states that the Nov. 7, 2017 indictment "alleged that the 'scheme participants' . . . included Plaintiff and his father." (Sood Mot. 3-4.) That is false—there was no mention of Brian in the indictment and prosecutors, the Court, UofL, and his father have all stated on the record that Brian had no knowledge of the scheme and, in fact, he was described by the court as the "most seriously injured victim." (Ram Decl. Ex. 14 at 39:18-19.) Second, Sood states that he "was not indicted" as if to convey some degree of innocence but fails to mention (i) that he was caught lying to the FBI during its investigation and (ii) that he was later subject to indictment but waived it, choosing instead to cooperate with prosecutors. *See United States v. Sood,* 18-cr-0620, ECF No. 72 (waiver of indictment) (S.D.N.Y. filed Aug. 27, 2018). Third, Sood insists he did not share a common purpose "to ensure that the student-athlete(s) attended a particular school," (Sood Mot. at 4), but the Aug. 27, 2018 Criminal Information to which he pleaded guilty tells a different story. (*See* Sood Crim. Information ¶ 8, Ram Decl. Ex. 12.) Given his apparent changed view, it is unclear whether Sood intends to withdraw his guilty plea before sentencing.

473 U.S. at 493 ("A guilty party may escape conviction for any number of reasons. . . . Private attorney general provisions such as § 1964(c) are in part designed to fill prosecutorial gaps.").[19]

Finally, Adidas raises a one-sentence argument ostensibly challenging Plaintiff's injury under Counts III and IV of the complaint. (*See* Adidas Mot at 15 ("Nor does Bowen allege a direct harm from adidas's purported generation and use of income derived from the alleged scheme."). To the extent this argument seeks dismissal of Counts III and IV, which relate to the "investment injury" provision of the RICO statute, § 1962(a), it fails. The Fourth Circuit has expressly rejected Adidas's theory that a RICO plaintiff bringing a claim under § 1962(a) must suffer a "direct harm from adidas's purported generation and use of income derived from the alleged scheme." (Adidas Mot. at 15.) *See Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837 (4th Cir. 1990) ("[I]ndividuals may be injured by the investment and use of the illegally obtained income. However, this is not the only injury that plaintiffs sustain "by reason of" a § 1962(a) violation."); *see also Potomac Elec. Power Co.*, 262 F.3d at 264 n.2 ("In this Circuit, a plaintiff need not show that the damages flowed from the use or investment of the racketeering income, only that damages flowed from racketeering activity itself."). Adidas fails to present any argument why the Fourth Circuit's holding in *Busby* should be disregarded—despite citing *Busby* later in its brief in support of a wholly separate argument.

### D.  The Holmes Policy Rationales Support A Finding of Direct Injury

In addition to the overwhelming factual allegations establishing a direct injury, the policy rationales for limiting RICO's civil damages to only those with a direct injury weigh decidedly

---

[19] Rivers's suggestion that the absence of allegations regarding his participation in the "nearly 7,000 recorded telephone calls" suggests innocence is also misleading. (Rivers Mot. 2 n.2.). Those call transcripts are in the custody of the U.S. Attorney's Office, subject to a protective order, and only a small number have been released. Even Gatto complained in his sentencing memo that "many of the other individuals that the Government knows participated in the same conduct" have not been criminally charged. (Gatto Sent. Memo. at 25, Ram Decl. Ex. 3.)

in Plaintiff's favor. *Holmes*, 503 U.S. at 269-70. First, Bowen's damages are attributable *entirely* to the Defendants' racketeering conduct, are unique to him, and standalone regardless of whether others were injured. Bowen's loss of eligibility preceded the harm to UofL; thus, he was the only one proximately injured by Defendants' racketeering (and no less directly injured than the insolvent broker-dealers in *Holmes* or New York tax authority in *Anza*, whom the Court found to be the directly injured parties). *Holmes,* 503 U.S. at 273; *Anza* 547 U.S. at 458. Second, there is no issue of apportioning damages among plaintiffs at different degrees of separation from the racketeering acts, and Defendants have failed to identify any such problem. (See Adidas Mot. 15-16.) There is only one plaintiff who can claim Brian's injuries and that is Brian. He can only be awarded one bucket of damages and no other person can share in it. It matters not whether other student-athlete victims who lost their eligibility also bring suit. As *Holmes* made clear, if a defendant's racketeering caused direct injury to more than one plaintiff, the defendant may well be obligated to compensate different plaintiffs for different injuries. *Holmes*, 503 U.S. at 273-74. Third, there is no potential plaintiff who has been more directly injured by the Adidas Bribery Enterprise than Brian, who lost his NCAA eligibility, lost the ability to develop into a top-tier professional athlete by playing basketball in the proving ground that is Division I men's basketball. (¶¶ 8, 244.) And no one has a greater incentive to ensure that Defendants' RICO violations do not go unremedied than Brian Bowen. The defrauded universities, by contrast, who are being paid hundreds of millions of dollars by Adidas have far less incentive to seek a recovery against the financial underwriter of their athletic programs.[20]

Defendants hollowly suggest that the *Holmes* policy concerns cannot be satisfied in this case because "the universities were direct victims" of their fraud and were "vindicated by

---

[20] *See* Ram Decl. Ex. 3 (Gatto Sentencing Memo at 23) ("Moreover, it bears noting that none of the Universities have terminated their sponsorship agreements with Adidas.").

SDNY's criminal prosecution." (Adidas Mot. at 16.) Defendants misapprehend the point made in *Holmes*. If criminal prosecution of a predicate act were enough to vindicate Congress's and the public's interest in combatting wide-spread racketeering activity, then virtually no private right of action could ever be maintained against a convicted defendant, for every RICO predicate act is separately prosecutable by the government. *See* 18 U.S.C. § 1961(1). Tellingly, Defendants fail to explain how the criminal convictions alleviated Bowen's injuries in any way.

## III.   THE ADIDAS BRIBERY ENTERPRISE PARTICIPANTS SHARED A COMMON PURPOSE OF PROMOTING THE ADIDAS BRAND THROUGH BRIBERY

The concept of an "association-in-fact" enterprise under the federal RICO statute is as basic as it is broad. Such an enterprise is "simply a continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 948. "That an 'enterprise' must have a purpose is apparent from the meaning of the term in ordinary usage, *i.e.,* a 'venture,' 'undertaking,' or 'project.'" *Id.* at 946. Indeed, "the existence of an association-in-fact is oftentimes more readily proven by what is *[sic]* does, rather than by abstract analysis of its structure." *Id.* at 951. So much so that "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." *Id.* at 951.

The Adidas Bribery Enterprise is a classic association-in-fact RICO enterprise. Its members run the gamut of those scheming to profit off the backs of promising young student-athletes hoping to play on NCAA Division I men's college basketball teams: (1) the Adidas Participants, including the company and its employees such as Gatto, Rivers, and Code; (2) the Athlete Advisor participants, such as Dawkins and Sood; (3) the Division I Basketball Participants, such as men's basketball coaches at Adidas-sponsored universities; and (4) the AAU Basketball Participants sponsored by Adidas, such as Defendant Gassnola. (¶ 108.)

Together, these participants targeted the parents and guardians of high school boys, through bribery, to play on Adidas-sponsored college teams.  (¶¶ 103-107, 109-117.)

Defendants argue that "stripped down to its only plausible core" the Enterprise "consists at most of adidas and its employees and agents named in the Complaint" and, therefore, Plaintiff has "failed to allege an enterprise separate from the persons associated" with it. (Adidas Mot. at 21.)  Defendants' argument rises and falls on a singular conclusory assertion: that "Bowen has not plausibly alleged . . . that Sood, Dawkins, assistant coaches at Division I schools sponsored by adidas, and directors of adidas-sponsored AAU teams all acted with a common purpose." *Id.*

Even a cursory review of the complaint reveals an extensive discussion of the shared purposes among all enterprise participants as well as the reasons *why* they banded together to support the Adidas brand.  (*See, e.g.*, ¶¶ 104, 107, 116.)  One of the many threads linking the Enterprise participants together is their collective desire to help Adidas by artificially growing the company's sneaker industry market share through bribery.  (¶ 104 ("The principal purpose of the Adidas Bribery Enterprise is to help Adidas artificially grow and preserve market share in the ultracompetitive sneaker industry by infiltrating high school level and Division I men's basketball through bribery and illegal acts.").)  Additionally, the participants each shared goals to defraud the student-athletes of their eligibility and defraud the universities of the right to control their scholarship funds.  (*See, e.g.*, ¶¶ 119-120, 223 ("The goal of the racketeering activity was to conduct the affairs of the Adidas Bribery Enterprise in a manner that illegally and secretly funneled money to the families of prospective student-athletes, including Plaintiff's father.").)[21]

---

[21] Defendants Sood and Gassnola admitted in their guilty pleas to the goal of defrauding the universities, so they cannot now in good faith argue otherwise.  Fed. R. Civ. P. 11(b)(4).  *See AARP v. Am. Family Prepaid Legal Corp.*, 604 F. Supp. 2d 785, 794 (M.D.N.C. 2009) ("While the Mail House Defendants may not have shared in all the goals of the enterprise, it is sufficient that they are alleged to have shared an illegal purpose to defraud.").

As with members of many criminal racketeering enterprises, the participants in the Adidas Bribery Enterprise were not simply acting out of fealty to Adidas. Rather, they each shared a common goal to profit by engaging together in the predicate acts of wire fraud, money laundering, and sports bribery. (¶ 107 ("By banding together to prop up the Adidas brand through deceptive and illegal conduct, the Enterprise participants stood to grow their own power and influence in college basketball."); ¶ 116 ("By banding together to prop up the Adidas brand through deceptive and illegal conduct, all of the Enterprise participants stood to gain financially").) The twin aims of building up the Adidas brand through illegal acts while simultaneously carving out opportunities for profit and professional gain are commonplace among RICO association-in-fact enterprises. One need only conjure up images of criminal gangs to recognize that individuals often personally benefit (whether through profit or self-preservation) by carrying out the illegal acts of an enterprise.[22] *See, e.g.*, *United States v. Batts*, 171 F. App'x 977, 981 (4th Cir. 2006) (finding common purpose among gang of crack dealers where members referred drug buyers to each other and took turns dealing "so everybody could get a sale"); *United States v. Tillett*, 763 F.2d 628, 631 (4th Cir. 1985) ("[T]he common purpose of [defendant and his financiers] at any relevant time was making money in the illegal trafficking of marijuana."). Yet, even assuming the Enterprise participants were working together solely to further their self-interests, this still does not overcome the presumption of a common purpose. *See Spelman v. Bayer Corp.*, No. 7:10-CV-00091-JMC, 2011 WL 13312222, at *4 (D.S.C. Feb.

---

[22] The criminal RICO indictment against New York's infamous Gambino Crime Family alleged members shared a common purpose of "[p]reserving and augmenting the power, territory, and financial profits of the enterprise through murder, intimidation, violence, and threats of physical and economic harm." *United States v. Squitieri et al.*, No. 05-cr-00228-AKH, Indictment, ECF. No. 1 at 13 (S.D.N.Y. filed Mar. 2, 2005). Substitute "wire fraud, money laundering, and sports bribery" for the violent crimes listed in the Gambino indictment and the Adidas Bribery Enterprise looks to share a remarkably similar purpose. That the same common purpose was enough to take down one of the country's most notorious criminal syndicates demonstrates its sufficiency here.

22, 2011) ("A goal of making money establishes a common purpose where the enterprise members sought to profit from the alleged illegal activity.").

Defendants' secondary argument regarding an insufficient distinction between the RICO enterprise and the persons associated with it also lacks merit, as it relies on the conclusory assertion that Plaintiff failed to adequate plead that the non-Adidas Participants, *i.e.* Dawkins, Sood, the AAU Basketball Participants (including Gassnola, 1-Family, New England Playaz, and the Karolina Khaos), and the Division I Basketball Participants (including UofL assistant coaches Johnson and Fair), shared common purposes with each other and with the Adidas Participants. As alleged, the Adidas Participants and the non-Adidas Participants worked closely together to plan, coordinate, and execute the criminal acts to further these goals. (¶¶ 103-117.) This is plain from the allegations in the complaint, the record in the related criminal cases, and can be reasonably inferred from both. (*See, e.g.*, ¶¶ 103-104, 105 (quoting Gatto and Code's opening statements to jury in criminal trial regarding benefits of the scheme to Division I Basketball participants); ¶¶ 106-117; ¶ 177 (describing Adidas Enterprise Participants' scheme to conceal bribe payments with assistance from Division I Basketball Participants Kenny Johnson and Jordan Fair);[23] ¶¶ 184-206 (describing coordination between Gatto, Code, Dawkins, and Karolina Khaos to launder money); Compl. Ex. 2 ¶¶ 11(a), 11(b); Sood Mot. Ex. A 25:12-16).) There also remains Defendant Gassnola, who Plaintiff alleges acted in two capacities: as an outside consultant to Adidas and as director of the AAU team known as the New England Playaz. (¶ 20.) Adidas has not embraced Gassnola's criminal acts as its own, but even if it does,

---

[23] Defendants' contention that "securing commitments from top players is a zero-sum game" lacks merit because it assumes basketball recruits are fungible assets suitable to fill the needs of any team. Moreover, it ignores the reality that Division I teams are limited to just thirteen total basketball scholarships (*see* ¶ 32), many of which are already allocated to upperclassmen, and that teams recruit players based on specific needs, such as lack of depth at the point guard position. (¶ 131.) Thus, it does not follow that "one team's gain is another's loss." (Adidas Mot. at 22.)

the allegations of his conduct as an AAU team director are enough to establish the required

RICO person/enterprise distinction.  (¶ 204.)  *See United States v. Najjar*, 300 F.3d 466, 484 (4th

Cir. 2002) ("Tri–City complains that it is improper to put 'two hats' on Najjar, one as an

employee of Tri–City, and the other as an individual, in order to show an enterprise and common

purpose. We find Tri–City's arguments here to be without merit and affirm the conviction.").

## IV.    <u>IN PARI DELICTO DOES NOT BAR PLAINTIFF'S RICO CLAIMS</u>

*In pari delicto* embodies the common-sense principle that "'a plaintiff who has

participated in wrongdoing may not recover damages resulting from the wrongdoing.'"  *Myatt v.*

*RHBT Fin. Corp.*, 635 S.E.2d 545, 547 (S.C. Ct. App. 2006).  The doctrine bars "a claim by a

plaintiff who was a participant in the conduct giving rise to the claim."  *Schnelling v. Crawford*,

360 B.R. 139, 158 (Bankr. E.D. Va. 2007) ("Plaintiffs who are truly in pari delicto are those who

have themselves violated the law . . . .")).  It is an affirmative defense, and its application

requires an inherent fact-intensive inquiry best suited for a jury.  Nonetheless, it is not a good

defense in this case. That Defendants would now suggest that Brian acquiesced in, approved, or

otherwise authorized their criminal conduct or his father's role in accepting bribe money from

them is as much a reflection on their character as it is repugnant.  *See, e.g.*, *United States v.*

*Coffman*, 94 F.3d 330, 334 (7th Cir. 1996) (rejecting victim-blaming defense theory and noting

that "picking on the vulnerable normally makes your conduct more rather than less culpable.").

Plaintiff has not violated any law, is not alleged to have participated in any way in

Defendants' criminal scheme let alone alleged to have had knowledge of it.  (¶¶ 123, 160.)  On

the contrary, the U.S. District Court overseeing the criminal trial of Gatto, Code, and Dawkins

found that the trial evidence established "Bowen Jr. had no knowledge of the illicit payments

being funneled from the defendants to his father."  *Gatto*, No. 17-cr-00686, ECF No. 288 at 14.

44

Federal prosecutors who oversaw the criminal investigation likewise agreed that that Brian "never knew about the payments to his father." (Gov't Sent. Memo. at 24, Ram Decl. Ex. 2.) And both agreed that Brian was, in fact, "the worst victim, most seriously injured victim of the Louisville scheme." (Mar. 5, 2019 Sent. Tr. at 39:17-18, Ram Decl. Ex. 14.)

Defendants' argument, clearly raised in bad faith, is devoid of any legal or factual support. First, the *in pari delicto* defense is an affirmative defense that is wholly inappropriate to raise in a motion to dismiss. *See In re Derivium Capital LLC*, 716 F.3d 355, 367 (4th Cir. 2013); *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). Second, the defense is inherently factual and requires Defendants to establish an agency relationship encompassing the apparent authority to engage in illegal conduct, which they cannot do. *Froneberger v. Smith*, 748 S.E.2d 625, 631 (S.C. Ct. App. 2013) (recognizing agency relationship is a factual question); *Fredrich v. Dolgencorp, LLC*, No. 3:13-CV-01072-JFA, 2014 WL 4417407, at *10 (D.S.C. Sept. 8, 2014) ("The doctrine of apparent authority focuses on the principal's manifestation to a third party that the agent has certain authority."). Third, the complaint plainly states that Brian did not appoint anyone to represent him, thus a finding of apparent authority flies in the face of the complaint's well-pleaded allegations. (¶156 ("At no time ever, however, had Plaintiff hired or authorized Dawkins or anyone else to act in any capacity as a sports agent or to secure his admission to any university in exchange for any benefit."). Fourth, apparent authority could never be found on these facts because, as alleged, Defendants intended to keep Brian in the dark about their scheme, thus they cannot now in good faith argue they were "acting with [Brian's] consent." (Adidas Mot. at 18.) (Compl. ¶¶ 120, 123-124.) Fifth, there is no legal authority to support Defendants' position that because Brian's father nurtured his interest in basketball "since his son began playing the sport at three or four years old," he therefore manifested to Defendants that his

45

father had authority to accept bribes to steer him to Adidas-sponsored schools, and Defendants cite none.[24] *Cf. Fredrich* 2014 WL 4417407, at *10.  Sixth, even accepting Defendants' entire unsupported assertions over the well-pled allegations in the complaint, there is simply no basis to conclude that "as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress." *Pinter v. Dahl,* 486 U.S. 622, 632 (1988); *see also Smithfield Foods Inc. v. United Food & Commercial Workers Int'l Union*, 254 F.R.D. 274, 280 (E.D. Va. 2008) (rejecting *in pari delicto* defense in RICO case on grounds that alleged conduct "would not establish" that plaintiff "was of 'equal fault' relative to the Defendants"). Brian earned his place on the UofL basketball on his own merit and had no reason to risk his eligibility and career to get there; rather, Defendants admit they were "trying to help one of our flagship schools in [Louisville] you know, secure a five star caliber kid." (¶ 166(f).).  *In re Derivium Capital LLC*, 716 F.3d at 367 ("[T]he wrongs of an agent are not imputed to the principal if the agent acted adverse to the principal's interests.").  Accordingly, the Court should reject this defense in its entirety.

## V.    PLAINTIFF PLAUSIBLY ALLEGES A RICO CONSPIRACY

Counts II and IV of the complaint adequately plead RICO conspiracies to violate § 1962(c) and § 1962(a), respectively.  Defendants briefly contend, however, that Plaintiff failed to plead a RICO conspiracy on grounds that (1) he did not adequately plead a substantive RICO violation in Counts I or IV of the complaint and (2) because his allegations that Defendants agreed to commit substantive RICO offenses are "conclusory."  (Adidas Mot. at 24; Sood Mot. at 19.)  Defendants' argument rests on the assertion that Plaintiff failed to allege "a specific time,

---

[24] Similarly, no reasonable inference supports Defendants' assertion that because Brian's father may have received payments or reimbursements from Nike when Brian played high school basketball that *Adidas* would have knowledge of that or any basis to infer from it that Brian *manifested to Defendants* that his father had authority to accept bribes on his behalf to steer him to UofL. (Adidas Mot at 2-3, 18.)

place, date, or other circumstance surrounding the formation of any purported conspiratorial

agreement." (Adidas Mot. at 24.) This argument should be disregarded because it is premised

on a misconception of the law governing RICO conspiracies (which is broader than the general

conspiracy provision applicable to federal crimes) and runs afoul of binding legal authorities.

In *Salinas v. United States*, the Supreme Court held that "[a RICO] conspiracy may exist

even if a conspirator does not agree to commit or facilitate each and every part of the substantive

offense." 522 U.S. 52, 65 (1997). Rather, "it suffices that [the conspirator] adopt the goal of

furthering or facilitating the criminal endeavor" which the conspirator "may do so in any number

of ways short of agreeing to undertake all of the acts necessary for the crime's completion." *Id.*

at 63. All that is required "is that the Defendant knew about the racketeering activity and 'agreed

to facilitate the scheme.'" *Id.* at 66. "[S]imply agreeing to advance a RICO undertaking is

sufficient" to establish liability. *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012).

Indeed, this "agreement" can be manifested "by either words or action." *Tillett*, 763 F.2d at 632.

Plaintiff more than adequately alleges that each Defendant was aware of and participated

in the conspiracy to unlawfully steer student-athlete recruits to Adidas-sponsored universities.

For example, the complaint alleges that Rivers instructed Gatto, Gassnola, and a dozen other

unidentified Adidas employees to refrain from putting "confidential Black Opp's information" in

writing (¶ 110), which Gassnola described as a coded reference meaning "payments to players

and families of players" (¶ 111), the result of which hid the fraud from Brian and UofL; Gassnola

discussed a $25,000 bribe payment to the family of Dennis Smith, Jr. with Rivers, who

authorized it (¶ 126); Gatto, Code, Sood, and Dawkins extensively discussed and facilitated the

scheme to bring Plaintiff to the University of Louisville (¶¶ 148-176); Adidas, Gatto, Code,

Dawkins, together with the Karolina Khaos and New England Playaz AAU teams laundered

bribe money (¶¶ 185-207); Adidas maintained an inflated, multimillion dollar discretionary budget[25] to fund bribe payments (¶¶ 113, 209) that Gatto, Code, and Rivers drew upon to fund bribe payments through a sham invoicing scheme (¶ 206). Moreover, the complaint alleges the fact of Gatto, Code, Dawkins, Sood, and Gassnola's convictions for wire fraud conspiracy for their participation in the Adidas Bribery Enterprise. (¶¶ 19, 20, 101.) Each of these examples plainly demonstrates that "defendants participated in the enterprise conspirac[ies] with knowledge of the essential nature of the plan." *Tillett*, 763 F.2d at 632. Nothing more is required to plead a RICO conspiracy.

## VI.    ADIDAS IS LIABLE FOR ITS RACKETEERING ACTIVITY AND THAT OF ITS EMPLOYEES AND AGENTS

Adidas's argument that Brian "has not adequately alleged that adidas benefited from or promoted the acts of its employees and agents" Rivers, Gatto, Code, and Gassnola (Adidas Mot. at 25) is flatly contradicted by the numerous allegations in the complaint plainly describing how Adidas benefited from the fraud, but it is also legally irrelevant for purposes of its motion. Adidas is a proper defendant because the complaint primarily alleges *direct* corporate liability against it as a culpable "person" under 18 U.S.C. § 1961(3). Thus, the Court need not weigh Adidas's vicarious liability unless it finds the complaint fails to plausibly allege direct liability against the company (an argument Adidas does not raise in its motion to dismiss).

Yet, the allegations establishing Adidas's liability on a *respondeat superior* theory are plentiful. (*See, e.g.*, ¶¶ 98, 104-106, 121, 166.) The suggestion that the complaint fails to allege

---

[25] Adidas criticizes Plaintiff for "patently misrepresent[ing]" prosecutors' description of this budget in its opening statement during Gatto's criminal trial. *See* Adidas Mot. at 25-26 ("This patently misrepresents the prosecutors' opening statement, in which they stated only that Gatto, as director of global sports marketing, oversaw a 'multi-million dollar budget,' not that this budget was for bribes.") Far from misrepresenting the government's words, Plaintiff's description was rather mild compared to the government's description of the budget in its sentencing memo: "Gatto's role in the scheme was particularly crucial: he provided access to the multi-million dollar Adidas slush fund he controlled, money necessary to fund the payments." (Gov't Sent. Memo at 26, Ram Decl. Ex. 2.)

that Adidas benefited from the acts of its employees is further belied by Adidas's self-contradictory admission elsewhere in its motion that "Bowen asserts that the 'overarching purpose' of the alleged racketeering enterprise was to generate revenue and visibility for adidas." (citing Compl. ¶ 121).)  Likewise, statements by Adidas's employees and agents flatly contradict its argument that the fraud, bribery and money laundering were merely "unauthorized acts" by rogue employees.  Gatto plainly states in his Rule 12(b)(2) motion that "[e]very allegation in the Complaint with respect to Mr. Gatto involves his acts undertaken, if at all, within the scope of his employment with adidas."  (ECF No. 34-1 at 3.)  Code likewise affirms his intent to serve Adidas, both in conversations with Sood, (¶ 166(f) ("this is kind of one of those instances where we needed to step up and help one of our flagship schools in [Louisville], you know, secure a five star caliber kid.  Obviously that helps, you know, our potential business . . . and that's an Adidas-sponsored school"), and in his sentencing memorandum, (Code Sent. Memo. at 16, Ram Decl. Ex. 4 ("[T]he actions taken by Mr. Code, which led to these charges, were both directed and encouraged by Adidas.").)  Gassnola did so in his trial testimony, admitting to paying five families when he "worked for Adidas" and that the payments were for Adidas's benefit. (Gassnola Tr. 915:12-23, Ram Decl. Ex. 9 (Q: "Why did you make these payments?"  A: "These players were either part of *our grassroots circuit*, *we wanted them on our grassroots circuit*, they were going to *our universities* or in the process of going to *our universities*.").)[26]

      Perhaps recognizing the weakness of this argument, Adidas refers to the testimony of a company bookkeeper at Gatto's trial to show that even she was deceived by the sham invoicing

---

[26] Adidas vicarious liability discussion contains other grossly misleading statements.  *Compare* Adidas Mot. at 26 ("[T]he Complaint never alleges that marketing efforts associated with any improperly recruited athlete in particular generated increased sales for adidas.") *with* Compl. ¶ 241 ("[A]s a result of affecting consumer preferences through its unlawful bribery and market boosting efforts, Adidas generated additional income from sales and apparel and footwear that it would not have received had it not engaged in the criminal acts of racketeering described herein.")

scheme.  Adidas represents that she "provided finance approval for certain invoices relevant to

the scheme" but would not have done so had she been aware of the fraud.  (Adidas Mot. at 26.)

But in her testimony, she specifically disavowed having any responsibility for "validat[ing] that

the invoice is appropriate and needs to be paid" and, instead, identified Gatto as the responsible

person.  (Harksen Tr. 1280:3-21, Ram Decl. Ex. 9.)  To the extent her testimony has any

relevance, it shows knowledge within Adidas that such bribe payments are, in fact, a "violation

of NCAA regulations." (Adidas Mot. Ex. B at 16 (Harksen Tr. 1284:19–1285:3).)  Far from

exculpating Adidas from RICO liability then, this statement substantiates Adidas's knowledge of

the fraud.  "This is so because violations of simple rules are obvious, and an inference of scienter

becomes more probable as the violations become more obvious."  *In re MicroStrategy, Inc. Sec.*

*Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000).  (*See also* ¶ 210.)

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.


Dated: March 8, 2019                          Respectfully submitted,

                                              **MCLEOD LAW GROUP, LLC**

                                               /s/ W. Mullins McLeod, Jr.
                                              W. Mullins McLeod, Jr.  (Fed ID No.: 7142)
                                              Colin V. Ram (Fed ID No.: 12958)
                                              H. Cooper Wilson, III (Fed ID No.: 10107)
                                              P.O. Box 21624
                                              Charleston, South Carolina 29413
                                              Tel: (843) 277-6655
                                              Fax: (843) 277-6660

                                              *Attorneys for the Plaintiff Brian Bowen II*