# **EXHIBIT A**

Deposition of Dan Cutler



Deposition of:

# Daniel R Cutler

*March 23, 2021*

In the Matter of:

# Bowen v. Adidas

## Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Page 1

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF SOUTH CAROLINA

2                    COLUMBIA DIVISION

3     BRIAN BOWEN, II,

4              Plaintiff,

5         vs.                    C/A NO. 3:18-3118-JFA

6     ADIDAS AMERICA, INC.; JAMES GATTO, MERLE CODE,

      CHRISTIAN DAWKINS, MUNISH SOOD, THOMAS GASSNOLA and

7     CHRISTOPHER RIVERS,

8              Defendants.

9

10    VIDEOTAPE

      VIDEO TELECONFERENCE

11    DEPOSITION OF:   DANIEL R. CUTLER

12    DATE:            March 23, 2021

13    TIME:            10:13 a.m.

14

      LOCATION:        Law Offices of

15                     Phillip C. Ciccarelli

                       55 N. Pleasant Street

16                     Amherst, MA

17    TAKEN BY:        Counsel for the Plaintiff

18    REPORTED BY:     PATRICIA L. THOMPSON,

                       Registered Professional Reporter

19

20

21

22

23

24

25

Daniel R Cutler    March 23, 2021
Bowen v. Adidas

---

Page 2

```
1   APPEARANCES OF COUNSEL:
2
3       ATTORNEYS FOR THE PLAINTIFF
            BRIAN BOWEN, II:
4
        McLEOD LAW GROUP, LLC
5       BY:  COLIN V. RAM
            (Via VTC)
6       3 Morris Street, Suite A
        Charleston, SC  29403
7       (843) 277-6655
        colin@mcleod-lawgroup.com
8
9       ATTORNEYS FOR THE DEFENDANT
            ADIDAS AMERICA, INC.:
10
        DEBEVOISE & PLIMPTON, LLP
11      BY:  ANDREW LEVINE
            CATHERINE HART
12          (Via VTC)
        919 3rd Avenue
13      New York, NY 10022-3916
        (212) 909-6000
14      amlevine@debevoise.com
        chart@debevoise.com
15
16      ATTORNEYS FOR THE DEFENDANT
            JAMES GATTO:
17
        DEBORAH B. BARBIER, LLC
18      BY:  DEBORAH B. BARBIER
            (Via VTC)
19      1811 Pickens Street
        Columbia, SC  29201
20      (803) 445-1032
        dbb@deborahbarbier.com
21
22
23
24
25
```

---

Page 3

```
1   APPEARANCES (Continued):
2       ATTORNEYS FOR THE DEFENDANT
            CHRISTOPHER RIVERS:
3
        NELSON MULLINS RILEY & SCARBOROUGH
4       BY:  ROBERT LINDHOLM
            WESLEY T. MORAN
5           (Via VTC)
        301 S. College Street
6       One Wells Fargo Center
        Charlotte, NC 28202
7       (704) 417-3231
        robert.lindholm@nelsonmullins.com
8       wes.moran@nelsonmullins.com
9       ATTORNEYS FOR BRIAN BOWEN, SR.:
10      GOINGS LAW FIRM
        BY:  JESSICA L. GOODING
11          CHRISTOPHER PASCHAL
            (Via VTC)
12      1510 Calhoun Street
        Columbia, SC 29201
13      (803) 350-9230
        jgooding@goingslawfirm.com
14      cpaschal@goingslawfirm.com
15      ATTORNEYS FOR THE DEPONENT
            DANIEL R. CUTLER:
16
        LAW OFFICE OF PHILIP C. CICCARELLI
17      BY:  PHILIP C. CICCARELLI
            (Via VTC)
18      55 N. Pleasant Street
        Amherst, MA 01002
19      (413) 230-3255
        phil@ciccarelli.law
20
        ALSO PRESENT:
21
        Paul Lovin, Special Counsel
22      Adidas America, Inc.
23      Ashley Bowler, Videotape Specialist
24
25          (INDEX AT REAR OF TRANSCRIPT)
```

---

Page 4

```
1           THE VIDEOTAPE SPECIALIST:  Good
2   morning.  We are going on record at 10:13 a.m. on
3   March 23rd, 2021.  This is Media Unit 1 of the
4   video-recorded deposition of Dan Cutler taken by
5   counsel for the plaintiff in the matter of Brian
6   Bowen, II versus Adidas America, Inc., et al, filed
7   in the United States District Court, Case No.
8   3:18-3118-JFA.
9           This deposition is being held
10  virtually.  The witness is located at 55 North
11  Pleasant Street, Amherst, Massachusetts 01002.
12          My name is Ashley Bowler from the firm
13  Veritext and I'm the videographer.  The court
14  reporter is Patty Thompson from the firm Veritext.
15          Counsel and all attending remotely will
16  now state their appearances and affiliations for
17  the record.
18          MR. RAM:  Good morning.  This is Colin
19  Ram on behalf of plaintiff Brian Bowen, II.
20          MR. CICCARELLI:  Good morning.  This is
21  Philip Ciccarelli on behalf of the deponent, Daniel
22  Cutler.
23          MR. LEVINE:  Good morning.  This is
24  Andrew Levine from Debevoise & Plimpton here on
25  behalf of Adidas with my colleague, Catherine Hart.
```

---

Page 5

```
1           MS. BARBIER:  Good morning.  This is
2   Deborah Barbier.  I'm here on behalf of James
3   Gatto.
4           MR. LINDHOLM:  Good morning.  This is
5   Robert Lindholm from Nelson Mullins.  I'm here with
6   my colleague, Wes Moran, and we represent the
7   defendant Christopher Rivers.
8           MS. GOODING:  Good morning.  This is
9   Jess Gooding from Goings Law Firm.  We represent
10  Brian Bowen, Sr.
11          MR. LOVIN:  Good morning.  Paul Lovin.
12  I'm special counsel at Adidas.
13          THE VIDEOTAPE SPECIALIST:  If there are
14  no objections to the witness being sworn in
15  remotely, the court reporter will now swear in the
16  witness and we may proceed.
17          MR. RAM:  Before we get started there
18  are two stipulations that we have discussed just a
19  couple of minutes ago.
20          The first is that an objection for one
21  party will suffice for an objection for all for the
22  sake of the transcript; and second, the witness is
23  physically located in Massachusetts and our
24  videographer and our court reporter is physically
25  located in South Carolina.  And I understand that
```

2 (Pages 2 - 5)

Daniel R Cutler                                                    March 23, 2021
Bowen v. Adidas

Page 6

1  all the parties stipulate to the recording and the
2  transcription of this deposition by reporters in
3  South Carolina.
4        Does anybody object to that?
5        MR. LEVINE:  No objections from Adidas.
6        MS. BARBIER:  No objection from Mr.
7  Gatto.
8        MR. LINDHOLM:  No objection from Mr.
9  Rivers.
10        MR. CICCARELLI:  No objection from Mr.
11  Cutler.
12        MS. GOODING:  No objection from Bowen,
13  Sr.
14        MR. RAM:  Great.  Thank you, everybody.
15            DANIEL R. CUTLER
16  being first duly sworn, testified as follows:
17            EXAMINATION
18  BY MR. RAM:
19    Q.    Mr. Cutler, a few minutes ago I
20  introduced myself to you.  Again, my name is Colin
21  Ram.  I represent Brian Bowen, II, who is the
22  plaintiff in this case.
23        Can you please state your full name for
24  the record.
25    A.    Daniel Cutler.

Page 7

1    Q.    And I see you're represented by an
2  attorney today, Mr. Ciccarelli.
3        Is he your attorney for purposes of
4  today's deposition testimony?
5    A.    He is.
6    Q.    Do you have any other attorneys
7  representing you here today?
8    A.    Not here.
9    Q.    Great.  Well, I'm sure Mr. Ciccarelli
10  has probably explained some of the basic rules of
11  depositions.
12        The rules here in South Carolina
13  require me just to touch on a few high points to
14  make sure that you all understand exactly what is
15  going to transpire here today.
16        We have a lot of questions for you, a
17  number of documents to go over.  I expect it's
18  going to be a full day.  I also anticipate that
19  some of the other attorneys you see on the screen
20  will be asking you questions later.  We will do our
21  best to move forward and be as efficient as
22  possible and certainly appreciate from your end as
23  well.  You know, the better that we can sort of ask
24  questions and get answers and move quickly I think
25  will be best for everybody.

Page 8

1        And so with that in mind one of the
2  first things that is going to be important for you,
3  Mr. Cutler, is to make sure that you understand
4  what I'm asking you or what any of the other
5  attorneys are asking you in terms of the question
6  itself; and so if there is any question I ask you
7  where you don't understand what I'm asking, please
8  ask me for clarification and I will try to provide
9  that to you.
10        Is that fair?
11    A.    Yes.
12    Q.    Great.  One thing:  I just noticed that
13  you're nodding your head.  And although this is
14  being video-recorded and sort of sitting here, you
15  know, face-to-face, it is important for purposes of
16  the transcript for us -- for both of us to give
17  verbal responses.  So I would appreciate if you
18  could -- you know, if you're nodding yes, that's
19  fine, but just give a yes.  Or if you're nodding
20  no, just say the word "no" so we have a good
21  record.
22        Is that fair?
23    A.    Yes.
24    Q.    Great.  Like I said, we're going to be
25  going most of the day here.  We'll certainly try to

Page 9

1  take breaks on a regular basis with five-minute
2  breaks here and there.  We can take a lunch break
3  if you all need it.
4        If at any point in time, though, you
5  need a break for whatever reason, that's perfectly
6  fine.  Just let us know and we'll do that.  Our
7  only request here is that if I've asked you a
8  question that you haven't yet answered, please go
9  ahead and answer the question before we go on
10  break.
11        Is that fair?
12    A.    Yes.
13    Q.    Our rules here -- our local rules here
14  in South Carolina restrict your ability to speak
15  with your attorney during breaks and also when
16  questions are pending about the substance of your
17  testimony.
18        You can certainly talk about, you know,
19  a wide range of things under the sun but not about
20  your testimony.  So I may ask you periodically when
21  we get back from breaks not to discuss your
22  testimony with him.
23        Do you understand that?
24    A.    I do.
25    Q.    Mr. Ciccarelli also has an obligation

3 (Pages 6 - 9)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 10

1  under our local rules, to the extent that you all
2  do have a discussion amongst yourself regarding the
3  substance, he needs to disclose that on the record
4  when we return from breaks.
5          So there may be a couple of instances
6  where Mr. Ciccarelli has a privilege, an
7  attorney/client privilege objection.  I don't
8  anticipate that today, but that's certainly -- that
9  is one exception to that rule I just went over with
10 you.
11         So before we get started do you have
12 any questions for me?
13     A.   I do not.
14     Q.   All right.  Do you have any -- is there
15 anything preventing you -- and this is a standard
16 question, I should say, but is there anything
17 preventing you from giving truthful and accurate
18 and complete testimony here today?
19     A.   No, not that I'm aware of.
20     Q.   Are you on any medication or influence
21 of drugs or alcohol right now?
22     A.   A little bit of caffeine.
23     Q.   Understood.  Me as well.
24         First let me start out -- and I'm going
25 to ask you what you did to prepare for today's

Page 11

1  deposition.  What I'm not asking you to do is tell
2  me what you and Mr. Ciccarelli discussed, if
3  anything.  So don't tell me what you all have
4  discussed in private, but please let me start out
5  and ask you:  Tell us what you did to prepare for
6  today's deposition.
7      A.   Reviewed documents with my counsel.
8      Q.   Did you have any discussions with
9  anybody other than your counsel?
10     A.   I did.
11     Q.   And who were those individuals?
12     A.   Additional counsel.
13     Q.   Which ones?
14     A.   I believe that's privileged.
15     Q.   No.
16         You're represented by Mr. Ciccarelli.
17 Are there any other attorneys that represent you?
18     A.   Not for this case at the moment.
19     Q.   And so which other attorneys did you
20 speak with in preparation for today?
21     A.   Other counsel that I've had for
22 previous issues in regards to this case.
23     Q.   Okay.  So your personal counsel?  An
24 attorney that represented you?
25     A.   Yes.

Page 12

1      Q.   Okay.  And what are their names?
2      A.   Ty Park and Chris Greer.
3      Q.   Are those attorneys in Massachusetts?
4      A.   I believe they are based out of New
5  York.
6      Q.   Out of New York.  Okay.  Do you know
7  what law firm they're with?
8      A.   They've changed law firms.  I think
9  it's White & Case now.
10     Q.   White & Case.  Okay.
11         Give me the last names again.  I didn't
12 catch that clearly.
13     A.   Park, Greer.
14     Q.   And did Mr. Park and Mr. Greer
15 represent you in connection with a criminal
16 investigation conducted by the U.S. Attorney's
17 Office?
18     A.   They were my counsel for a period of
19 time.
20     Q.   Right.  Do you have any other attorneys
21 that you spoke with in preparation for your
22 testimony here today?
23     A.   None that I spoke with, no.
24     Q.   Did you speak with any attorneys from
25 Adidas?

Page 13

1      A.   I did not speak with any attorneys from
2  Adidas in regards to this deposition.
3      Q.   Did you speak with any attorneys for
4  any of the other defendants in our case?
5          I can give you the names of the
6  defendants, if that will be helpful for you.
7      A.   I did not speak with any of the other
8  attorneys.
9      Q.   Okay.  So other than Mr. Park,
10 Mr. Greer and Mr. Ciccarelli have you spoken with
11 anybody in preparation for your deposition here
12 today?
13     A.   I did not speak with any of them, no.
14     Q.   You didn't speak with anyone else?  Is
15 that what you testified to?
16     A.   Yes.  Correct.
17     Q.   You mentioned earlier that you reviewed
18 some documents.  Can you tell me which documents
19 you reviewed in preparation for today?
20     A.   A number of documents.
21     Q.   Okay.  Can you ballpark that number,
22 please.
23     A.   If I had to guess, probably a couple
24 dozen.
25     Q.   Were those documents emails?

4 (Pages 10 - 13)

Daniel R Cutler                      March 23, 2021
Bowen v. Adidas

Page 14

1      A.    Among the documents were emails.
2      Q.    Yeah.  What else were the documents
3   besides emails?
4      A.    I believe there were some text messages
5   as well.
6      Q.    All right.  Anything else besides
7   emails and text messages?
8      A.    Not that I recall.
9      Q.    How long ago did you review those
10  documents?
11     A.    Over the past few weeks.
12     Q.    All right.  Do you have any documents
13  with you today?
14     A.    I do not.
15     Q.    As we go through today I'm going to
16  show you a number of documents, including emails
17  and text messages, and so I want to make sure you
18  are ready to take a look at those.  But what I
19  would like to do first is see if we can go ahead
20  and just get a little bit of understanding of who
21  you are, Mr. Cutler, since we haven't had a chance
22  to speak with you before and just get a sense of
23  your education and your work experience.
24          Can you please start out and just tell
25  us from college forward about your professional

Page 15

1   experience starting with your education.
2      A.    I attended the University of
3   Massachusetts - Amherst.  Following my graduation I
4   interned at Reebok International.  Following that I
5   was a consultant for Reebok.  Following that I
6   worked for Global Athletics and Marketing.
7   Following that I worked for the Naismith Basketball
8   -- Naismith Memorial Basketball Hall of Fame, and
9   then following that I worked as a consultant for
10  Adidas America.  And then following that I worked
11  at DBA Sports Management.
12     Q.    Do you currently work at DBA Sports
13  Management?
14     A.    I'm in the process of transitioning
15  employment opportunities.
16     Q.    Do you currently work there?
17     A.    No.  I'm currently in between jobs.
18     Q.    So are you employed at all in any
19  capacity right now?
20     A.    I think I'm -- I think technically I
21  would be on my end of my employment at DBA.
22     Q.    All right.  I want to show you -- this
23  is just a copy.  This is our first exhibit here,
24  Exhibit 1 in the Exhibit Share folder.  If you
25  don't mind, please open up that PDF and let me know

Page 16

1   when you have it in front of you.
2      A.    I do.
3      Q.    And so what I would like to do -- if
4   you can just take a look at this and tell me what
5   this document is.
6      A.    This would be my LinkedIn profile.
7      Q.    Did you create your LinkedIn profile
8   yourself?
9      A.    Yes.
10     Q.    I would like to review that with you,
11  if we can.
12          Starting at the second page, your
13  education shows you graduated in 2007 from Amherst;
14  is that right?
15     A.    UMass.
16     Q.    UMass - Amherst.  Okay.
17          And then your first job out of college
18  was a consultant for Reebok Basketball?
19     A.    Correct.
20     Q.    What did you do in that capacity as a
21  basketball consultant for Reebok?
22     A.    There was a number of tasks involved.
23     Q.    Such as?
24     A.    I helped to run some of our grassroots
25  basketball events.  I collaborated on basketball

Page 17

1   marketing for our professional teams and our
2   professional athletes on a number of events.
3      Q.    And where were you physically located
4   when you were working for Reebok?
5      A.    Reebok was located in Canton,
6   Massachusetts at the time.
7      Q.    Is that where you worked?
8      A.    Yeah.
9      Q.    And you worked there through June 2009.
10  What were the circumstances of leaving Reebok?
11     A.    I got an opportunity that I chose to
12  accept.
13     Q.    What was that opportunity?
14     A.    To go work for Global Athletics.
15     Q.    And you left Reebok in June 2009; is
16  that right?
17     A.    I don't recall exactly, but somewhere
18  in that range.
19     Q.    Looking at Exhibit 1, your LinkedIn
20  profile, it says that you were there from 2007 to
21  2009.
22          Does that refresh your recollection of
23  when you left Reebok?
24     A.    No.  I see what it says, but -- again,
25  this is a LinkedIn profile.  I'm not sure of the

5 (Pages 14 - 17)

Daniel R Cutler                                March 23, 2021
Bowen v. Adidas

Page 18

1    exact dates on it.
2        Q.    And then you joined Global Athletics;
3    is that right?
4        A.    I did.
5        Q.    Okay.  And tell me what Global
6    Athletics is.
7        A.    It is a sports marketing agency.
8        Q.    All right.  And your position on your
9    profile states that you were a director of
10   basketball operations.  Is that accurate?
11       A.    Yes.
12       Q.    Are those dates of employment for
13   Global Athletics -- are those accurate?
14       A.    I don't recall exactly, but that seems
15   like a little long in terms of my time that I would
16   have actually been there.
17       Q.    How long do you think you were actually
18   there?
19       A.    I think probably two, two and a half
20   years.  I don't recall exactly.
21       Q.    What did you do as Director of
22   Basketball Operations for Global Athletics?
23       A.    I recruited collegiate athletes that
24   were looking to play professional basketball.
25       Q.    And what did you recruit them for?

Page 19

1        A.    To place into professional basketball
2    opportunities.
3        Q.    So is that professional basketball
4    opportunities with the NBA?
5        A.    NBA.  Also G League.  Also anything
6    international.
7        Q.    Are you an agent?
8        A.    I am not.
9        Q.    So what was your -- what was your
10   responsibility with respect to recruiting college
11   athletes to professional basketball leagues?
12       A.    Just be a little more specific on the
13   question.
14       Q.    Well, how about this:  Why don't you
15   tell me what was your responsibility in terms of
16   recruiting college basketball players?
17       A.    Develop relationships; talk to their
18   families; let them know what we could provide for
19   them as an agency if they chose to come with us
20   after their college athletic abilities was
21   exhausted.
22       Q.    And which college athletes do you
23   recall working with or recruiting during that time?
24       A.    I don't recall who.  It was probably
25   ten years ago at this point.

Page 20

1        Q.    You don't recall any particular
2    athletes that you spoke to while you worked with
3    Global Athletics?
4        A.    I talked to a bunch of athletes while I
5    was there.
6        Q.    I'm sorry?
7        A.    I probably talked to hundreds of
8    athletes while I was there.
9        Q.    Do you remember the name of any one of
10   the hundreds of athletes that you spoke with while
11   you worked at Global Athletics?
12       A.    I believe we represented a player named
13   Travis Franklin.
14       Q.    Any other names come to mind?
15       A.    Cody Augustus comes to mind.
16       Q.    Okay.  What did you do with respect to
17   them in terms of recruitment?
18       A.    I developed a relationship and let them
19   know that we were an agency that could help them
20   achieve their dreams of playing professional
21   basketball.
22       Q.    How do you develop -- at that time how
23   did you develop a relationship with college
24   basketball players?
25       A.    What do you mean?

Page 21

1        Q.    Well, you said -- how did you build
2    your relationships?  How did you get the college
3    players that you tried to recruit?
4        A.    I relied on industry relationships.
5        Q.    What does that mean, "industry
6    relationships?"
7        A.    You know, throughout working in the
8    space I was able to develop relationships with
9    mentors, coaches, parents -- whoever it may be --
10   and I was able to use those connections to make
11   introductions to those players.
12       Q.    How did you make introductions to the
13   college basketball players?
14       A.    Usually through a parent or a coach.
15       Q.    Okay.  And what would you -- when you
16   got that introduction to the college player, what
17   was your pitch?
18       A.    It varied based on the athlete.
19       Q.    Okay.  Tell me about it.
20       A.    Tell you about what?
21       Q.    Your pitch.
22       A.    It varied based on the athlete.
23       Q.    How did it vary?
24       A.    Different athletes have different
25   needs; different athletes have different wants.  So

6 (Pages 18 - 21)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 22

1  whether it was an athlete that was looking to play
2  at a certain level, if we were -- had expertise at
3  placing players in or whether it was somebody that
4  was unable to secure a different representation and
5  needed somebody else -- you know, it just depended
6  on the athlete.
7      Q.    Did you speak to athletes while they
8  were still playing college basketball?
9      A.    Can you repeat the question?
10     Q.    When you were having these
11  conversations with college basketball players, were
12  they still in college?
13     A.    Yeah.
14     Q.    Were they still playing college
15  basketball at the time?
16     A.    Sure.  Yes, they were.
17     Q.    Were you aware of any NCAA rules that
18  prohibited college players from speaking to
19  potential agents?
20     A.    Not that I recall.
21     Q.    You don't recall being aware of that or
22  you don't recall that rule?
23     A.    I do not recall any rule that would
24  have -- I was aware of that would have made that
25  inappropriate.

Page 23

1      Q.    Do you believe it's appropriate for
2  professional sports agents to talk to college
3  basketball players about professional opportunities
4  while they're still playing college basketball?
5      A.    It's not really what I believe.  There
6  is rules that are in place, I believe.
7      Q.    What are those rules?
8      A.    As far as I understand, that there is
9  nothing wrong with having a conversation with a
10  college athlete.
11     Q.    Nothing wrong with you having a
12  conversation with the college athlete?
13     A.    I believe you were asking a question
14  about representing athletes and agents.
15     Q.    Okay.  Is that who you're referring to,
16  athletes and agents?
17     A.    Athletes, agents who would work for an
18  agency.
19     Q.    Do you believe that it's appropriate
20  for agents, people who work for a professional
21  sports agency, to speak to college basketball
22  players while they're still playing college
23  basketball?
24     A.    I'm not sure.
25     Q.    You're not sure of your belief?

Page 24

1      MR. CICCARELLI:  Objection.
2      Q.    (Continued)  Mr. Cutler, did you
3  understand my question?
4      A.    Can you repeat the question?
5      Q.    Yeah.  Are you not sure of your belief?
6      A.    I'm not sure my belief is in question
7  here.  There is rules that are on the books that
8  allow that conduct.
9      Q.    What are your personal beliefs
10  regarding those rules?
11     A.    I wouldn't -- I don't have a personal
12  belief based on the rules.
13     Q.    Do you believe those rules should be
14  followed?
15     A.    It's not for me to say.
16     Q.    Why not?
17     A.    I'm not governed by any rules at the
18  moment.  I don't work for anybody that deals in
19  college athletes.
20     Q.    Right.  At the time that you were
21  employed in a position where you were dealing with
22  college athletes did you believe it was appropriate
23  to follow the NCAA rules regarding conduct with
24  college athletes?
25     A.    At the time I was employed in the

Page 25

1  position that I dealt with college athletes I
2  followed the rules.
3      Q.    Just so we're clear, Mr. Cutler, are
4  you testifying that you followed NCAA rules when
5  you were in any professional positions where you
6  were dealing with college athletes?
7      A.    I followed the rules in dealing with
8  collegiate athletes.  I believe that's what we were
9  talking about, my time at Global Athletics.
10     Q.    You were later employed by Adidas
11  America; correct?
12     A.    I was a consultant for Adidas America.
13     Q.    Okay.  And while you were a consultant
14  for Adidas America did you comply with the NCAA
15  rules regarding contact with college players?
16     A.    What do you mean by "contact with
17  college players?"
18     Q.    Well, did you follow -- are you
19  familiar with NCAA rules regarding what can and
20  cannot be provided to college players in terms of
21  benefits or money?
22     A.    I'm not familiar with all of the rules
23  in the NCAA rule back.
24     Q.    Regardless of whether you're familiar
25  with all the rules in the NCAA rule book are you

7 (Pages 22 - 25)

Daniel R Cutler                                   March 23, 2021
Bowen v. Adidas

Page 26

1  aware that there are rules that restrict the
2  provision of money or benefits to a college player?
3      A.   I don't recall exactly the rules, but
4  I'm generally aware of some of the rules.
5      Q.   Okay.  Looking back at the time as a
6  consultant for Adidas America, did you follow those
7  rules?
8      A.   I don't recall exactly, but I would say
9  I did my best to.
10     Q.   What does that mean you did your best
11 to?
12     A.   It means I did my best to follow the
13 rules.
14     Q.   Looking back at Exhibit 1, your
15 LinkedIn profile, after Global Athletics you worked
16 for the Basketball Hall of Fame?
17     A.   I see that.
18     Q.   Okay.  You started working there in
19 September of 2013?
20     A.   I don't recall exact dates.
21     Q.   What is that?
22     A.   I don't recall the exact dates.
23     Q.   Okay.  Is that an approximate date that
24 you worked there?
25     A.   It seems like a fair approximation.

Page 27

1      Q.   Okay.  Why did you leave Global
2  Athletics to go work at the Basketball Hall of
3  Fame?
4      A.   Better opportunity.
5      Q.   Okay.  Was your employment terminated
6  by Global Athletics or did you voluntarily resign?
7      A.   Voluntarily resigned.
8      Q.   What about with Reebok?  Did you --
9      A.   Voluntarily resigned.
10     Q.   Okay.
11     A.   I was never a full-time employee at
12 Reebok, just to specify that.
13     Q.   Okay.  And is this description on your
14 LinkedIn profile regarding the work you did at the
15 Basketball Hall of Fame -- is that accurate?
16     A.   It appears to be.
17     Q.   Do you see anything that's inaccurate
18 on that description that you wrote?
19     A.   Just give me a moment to review it.
20          Yeah.  That seems generally accurate.
21     Q.   Okay.  Earlier or a little lower on
22 your LinkedIn profile it says:  First Team Sports -
23 President.
24          What is First Team Sports?
25     A.   It is an LLC.

Page 28

1      Q.   Okay.  Did you create this LLC?
2      A.   I did.
3      Q.   And tell me what First Team Sports does
4  as a business.
5      A.   Just in general what they do?
6      Q.   Let me ask you this:  Is First Team
7  Sports your company?
8      A.   I believe I just said it was.
9      Q.   Okay.  Did you create it?
10     A.   I believe I just answered that.
11     Q.   All right.  Was there anybody -- did
12 you create it, Mr. Cutler?
13     A.   Again, I believe I just answered that
14 yes.
15     Q.   Are there any other members of the LLC
16 for First Team Sports other than you?
17     A.   We did not have any other employees
18 full time.
19     Q.   Did anyone other than you work for
20 First Team Sports?
21     A.   Again, we didn't have any other
22 full-time employees.
23     Q.   Who is "we?"
24     A.   What do you mean?
25     Q.   "We didn't have any full-time

Page 29

1  employees."  My question is:  Who is the "we" that
2  you're referring to?
3      A.   You're asking me about First Team
4  Sports and my company that I created, so I think
5  it's pretty safe to say First Team Sports is me.
6      Q.   Okay.  Did anyone else other than you,
7  Mr. Cutler, work for First Team Sports?
8      A.   I will answer it again the same way.
9  There was no other full-time employees.  We did not
10 have any other full-time employees.
11     Q.   What about part-time employees; did
12 First Team Sports have part-time employees?
13     A.   First Team Sports hired workers for
14 certain events.
15     Q.   What type of events?
16     A.   Sports marketing events.
17     Q.   Sports marketing events put on by whom?
18     A.   First Team Sports.
19     Q.   Did First Team Sports provide any
20 services for Adidas America?
21     A.   First Team Sports did provide services
22 for Adidas America.
23     Q.   And what were those services that were
24 provided to Adidas America?
25     A.   A number of services, but to the best

8 (Pages 26 - 29)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

---

Page 30

1 of my recollection mainly event management.
2    Q.    All right.  What events did First Team
3 Sports manage for Adidas America?
4    A.    I can't remember all of them.  There
5 was a number of them.
6    Q.    Why don't you tell me the ones that you
7 remember then.
8    A.    We were involved in a lot of Adidas
9 basketball events.
10    Q.    Your LinkedIn profile says:  First Team
11 Sports - President, 2011 to 2012.  One year.
12          How long did First Team Sports play
13 into existence?
14    A.    I don't recall exactly.
15    Q.    Does it still exist?
16    A.    I don't believe it does.
17    Q.    When did you close the company?
18    A.    I don't recall.
19    Q.    All right.  Did you pay taxes or did
20 First Team Sports pay tax, federal tax or state
21 income tax?
22    A.    You would have to talk to my tax
23 professional about that.
24    Q.    Why would I need to talk to your tax
25 professional about that?

Page 31

1    A.    I outsource my taxes.
2    Q.    What is the name of your tax
3 professional who handled taxes for First Team
4 Sports?
5    A.    I don't recall.  I can find that and
6 get it to you through my attorney.
7    Q.    Where are the records from First Team
8 Sports located?
9    A.    I'm not sure.
10    Q.    Well, do you have the records for First
11 Team Sports?
12    A.    Again, I'm not sure where they are.  I
13 just moved, so everything is kind of in a jumble.
14    Q.    Okay.  Where did you move to?
15    A.    I moved to Hadley, Massachusetts.
16    Q.    What is your address?
17          THE WITNESS:  Do I have to tell him?
18          MR. CICCARELLI:  Objection.
19    Q.    (Continued)  What is your address,
20 Mr. Cutler?
21    A.    I'm not going to answer that.
22    Q.    Why aren't you going to answer the
23 question?
24    A.    I don't see how my address is relevant
25 to this deposition.

Page 32

1    Q.    Well, it's not up for you to determine
2 whether it's relevant.
3          Can you please answer the question,
4 sir.  Mr. Cutler, are you refusing to answer the
5 question of where your current address is?
6    A.    I'm just not -- I'm not sure why my
7 address is relevant here.  I don't think my home
8 address is a relevant topic to this deposition.
9    Q.    Well, regardless of what you think may
10 be relevant or not to this deposition are you
11 refusing to answer that question?
12          MR. CICCARELLI:  We have noted our
13 objection for the record.  I don't believe it's a
14 necessary question for this deposition.
15          MR. RAM:  Well, you understand, then,
16 in federal rules objections to relevancy are not to
17 be made for a deposition.  They can be made
18 afterwards.
19          Do you understand that, Mr. Ciccarelli?
20          MR. CICCARELLI:  I do.
21          MR. RAM:  Do you want to go off the
22 record for a second, Mr. Ciccarelli?
23          MR. CICCARELLI:  We would like to go
24 off the record.
25          MR. RAM:  All right.  Let's go off the

Page 33

1 record.
2          THE VIDEOTAPE SPECIALIST:  We are going
3 off record.  The time is 10:46 a.m.
4          (Discussion off the record.)
5          THE VIDEOTAPE SPECIALIST:  We are back
6 on record.  The time is 10:55 a.m.
7 BY MR. RAM:
8    Q.    Mr. Cutler, during our brief recess
9 there did you have an opportunity to talk to your
10 attorney, Mr. Ciccarelli?
11    A.    I did.
12    Q.    Okay.  Are you prepared to answer the
13 question of what your address is?
14    A.    14 Morning Star Drive.
15    Q.    What is the city, state and ZIP,
16 please?
17    A.    Hadley, Massachusetts 01035.
18    Q.    Thank you.
19          I want to circle back to your work with
20 Global Athletics where you were Director of
21 Basketball Operations for a few minutes.
22          You talked about building a
23 relationship with college players.  Were you an
24 agent at the time there?
25    A.    I believe I answered that and said I

Veritext Legal Solutions
800.743.DEPO (3376)      calendar-carolinas@veritext.com      www.veritext.com

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 34

1    was not.
2        Q.    You were not an agent.  And did you
3    work for agents at Global Athletics?
4        A.    I worked for an agent.
5        Q.    Which agent?
6        A.    A gentleman by the name of Mark
7    Whetmore.
8        Q.    And is Mark Whetmore an NBA player
9    agent as far as you know?
10       A.    I believe at the time he was.
11       Q.    Okay.  And what was your
12   responsibilities with Mr. Whetmore in terms of
13   getting players?
14       A.    Clarify the question.
15       Q.    Yeah.  What were you -- I just want a
16   better understanding of the work that you were
17   doing for Global with respect to college basketball
18   players.
19             We talked a little bit about building
20   relationships; correct?
21       A.    Yeah.
22       Q.    Okay.  And so what was your -- what was
23   the purpose of doing that, of building
24   relationships with college players while you worked
25   for Global?

Page 35

1        A.    Develop a level of familiarity so that
2    when we are representing them and helping them with
3    their professional career they aren't going into it
4    blind with somebody they don't know.
5        Q.    Okay.  So would it be fair to say that
6    your job was to introduce them to your company,
7    Global Athletics, so that they would hire Global
8    Athletics as their professional sports agent when
9    they decided to go pro?
10       A.    I believe that was generally one of my
11   jobs.
12             I wouldn't say it was to introduce them
13   to Global Athletics; I was to introduce them to
14   myself while I worked for Global Athletics.
15       Q.    You were being paid by Global
16   Athletics; right?
17       A.    I was.
18       Q.    And so what was the purpose of
19   introducing the college players to you personally?
20       A.    Sorry?
21       Q.    Yeah.  I mean, I just want to better
22   understand what your role was in terms of
23   relationship building while you worked for Global
24   Athletics.
25       A.    My job was to build relationships.

Page 36

1        Q.    With college basketball players?
2        A.    With a number of people, including
3    college basketball players.
4        Q.    What was that -- what was the purpose
5    of building those relationships with the college
6    basketball players?
7        A.    I would refer back to the answer I just
8    gave of -- was to develop a relationship with them
9    so that when we're trying to help them achieve
10   their dreams of being professional basketball
11   players they're not going into it blind with
12   somebody they don't know at all.
13       Q.    And so that second part of helping the
14   players so they don't go into the process blind,
15   does that include signing them as clients to the
16   agency?
17       A.    I wasn't an agent, so I didn't sign
18   clients.
19       Q.    No.  But Mr. Whetmore, who you worked
20   for, was an agent; right?
21       A.    Correct.
22       Q.    Was that the job, that you would build
23   relationships with college players on behalf of the
24   agency and then bring them over to Mr. Whetmore if
25   and when they wanted to sign with an agent?

Page 37

1        A.    I had a number of jobs there, but
2    certainly developing relationships and introducing
3    them to Mr. Whetmore and to the agency was
4    certainly one of them.
5        Q.    Okay.  Is that -- I mean, is there a
6    name for that job that you had?
7        A.    Director of the basketball operations.
8        Q.    I'm not talking about the formal job
9    title that you had at Global Athletics, but just
10   that process of building relationships with college
11   players on behalf of a sports agent.
12       A.    I was the director of basketball
13   operations at Global Athletics.
14       Q.    Are you familiar with the term
15   "runner?"
16       A.    Yeah.  I'm familiar with runners.
17       Q.    And what are runners?
18       A.    People that are running on the street
19   are considered runners.
20       Q.    Within sports agencies have you heard
21   the term "runners" referred to as people who work
22   for a sports agency?
23       A.    I think I've heard that term in the
24   past before.
25       Q.    Do you have an understanding of what

10 (Pages 34 - 37)

Daniel R Cutler                                      March 23, 2021
Bowen v. Adidas

1  that term means?
2      A.    Not generally, but if you could
3  elaborate I would be happy to say what I may know
4  or may not know.
5      Q.    Why don't you just go ahead and tell us
6  what you may know and may not know.
7      A.    I don't know much about the term.  You
8  used it; I didn't.
9      Q.    Right.  But you're familiar with the
10  term; correct?
11      A.    Yes.  I've heard the term before.
12      Q.    So why don't you tell the ladies and
13  gentlemen of the jury who are watching this video
14  right now your understanding of what runners are.
15          (Audio interference.)
16  BY MR. RAM:
17      Q.    I don't think the court reporter got
18  your answer.
19          (The court reporter read the previous
20  question.)
21      A.    I don't know exactly.  It's a loose
22  term that I've heard from around before, but -- I
23  don't know if I've ever heard an exact definition.
24          MR. RAM:  Why don't we go off the
25  record briefly.

1          THE VIDEOTAPE SPECIALIST:  Going off
2  record.  The time is 11:02 a.m.
3          (Short recess taken.)
4          THE VIDEOTAPE SPECIALIST:  We are back
5  on record.  The time is 11:05 a.m.
6          MR. RAM:  All right.  Madam Court
7  Reporter, I will ask you if you could repeat the
8  question that I had asked, Mr. Cutler.
9          (The court reporter read the question
10  at Page 38, Line 12.)
11          THE WITNESS:  I don't have an exact
12  definition, to the best of my knowledge, but it's a
13  general term that has been used around basketball
14  industry and agents, I'm sure, for some time, but I
15  don't have an exact definition.
16  BY MR. RAM:
17      Q.    What is your understanding of the term
18  "runner?"
19      A.    Again, I don't have a specific
20  definition.  I'm not sure exactly what it means.
21      Q.    Do you have any understanding of what
22  the term "runner" means?
23      A.    Generally somebody that doesn't
24  necessarily have any other aspects within the
25  agency and is just out in the market trying to find

1  kids.
2      Q.    Trying to find kids for what purpose?
3      A.    I'm speculating, but I assume to
4  introduce to agents.
5      Q.    Briefly can you tell us how you got
6  paid at Global Athletics.  Were you on salary
7  there?
8      A.    I was.
9      Q.    Did you receive any bonuses?
10      A.    I don't recall, but I don't believe so.
11      Q.    Was any part of your compensation based
12  on the success of Global Athletics signing players
13  to agency agreements?
14      A.    I don't recall exactly, but I believe
15  at the time I was just a salaried employee.
16      Q.    All right.  Let's talk about your work
17  for Adidas America.
18          When did you join Adidas America?
19      A.    I was a consultant for Adidas America.
20  I've never worked at Adidas America.
21      Q.    So when did you first become a
22  consultant for Adidas America?
23      A.    Sometime, I believe, in 2014.
24      Q.    All right.  And what was your role as a
25  consultant for Adidas when you joined in 2014?

1      A.    I had a number of roles.
2      Q.    And what are they?  What were they?
3      A.    I don't remember all of them to be
4  specific, but I was involved in the grassroots and
5  professional basketball departments.
6      Q.    And what is the grassroots department?
7  Can you please explain that for everyone.
8      A.    There is a number of -- I think it's an
9  umbrella term that encompasses everything high
10  school and below.  So high school and younger.
11      Q.    Okay.  So is that -- so high school age
12  and younger basketball players?
13      A.    The term "grassroots" doesn't refer
14  directly to basketball.
15      Q.    Okay.  Did -- as a consultant for
16  Adidas what was your -- what did you do with
17  respect -- what sports did you consult for?  Was it
18  basketball?
19      A.    Just basketball.
20      Q.    And so grassroots basketball -- what
21  does that encompass in terms of age groups?
22      A.    Again, I believe high school and below.
23      Q.    All right.  Let's take a look at
24  Exhibit 1, please, your LinkedIn description of
25  your roles and responsibilities.

11 (Pages 38 - 41)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

1    Do you have that in front of you?
2    A.    I do.
3    Q.    And it says your title is sports
4  marketing manager.
5    Were you -- was that a title that you
6  had as a consultant?
7    A.    I don't know if that's a title that I
8  was ever given as a consultant.
9    Q.    So what is a sports marketing manager?
10   A.    I believe that is my definition to best
11  describe my work there on a LinkedIn profile.
12   Q.    Okay. And the LinkedIn profile and
13  five bullets points listed below that -- does that
14  accurately reflect the work you did for Adidas
15  America as a consultant while you were -- during
16  that time period?
17   A.    Yeah. I believe that this generally
18  describes my role while I was there.
19   Q.    Let's start with the first bullet
20  point. It says: Co-directed Adidas grassroots
21  basketball campaign, which included signing club
22  and high school programs and identifying and
23  recruiting high school players for individual
24  events.
25    Can you please tell us a little bit

1  about that, please, you being a director of Adidas
2  grassroots basketball campaign.
3    A.    So I don't believe I said that I am the
4  co-director. I co-directed the basketball
5  campaign, which included signing club and high
6  school programs, identifying and recruiting high
7  school players for individual events.
8    Q.    So who else directed that in addition
9  to you?
10   A.    I believe that Chris Rivers as well as
11  Tonie Hanson directed that.
12   Q.    Other than Mr. Rivers and Miss Hanson
13  did anybody else co-direct the grassroots
14  basketball campaign while you worked as a
15  consultant?
16   A.    You would have to ask somebody at
17  Adidas. I just -- those were the people that I
18  dealt with.
19   Q.    Okay. And it says -- you write: Which
20  included signing club and high school programs.
21    What do you mean by "signing?"
22   A.    Part of our -- part of the platform was
23  to have teams come under our brand and sponsor
24  teams.
25   Q.    Would that be basketball teams?

1    A.    That could be club basketball teams;
2  that could be high school teams.
3    Q.    So how did you go about signing club
4  and high school programs?
5    A.    I'm sorry?
6    Q.    How did you go about doing that piece
7  of work there, signing club and high school
8  programs?
9    A.    Can you clarify that question? I mean,
10  it's -- I don't understand.
11   Q.    I just wanted to get a better
12  understanding of what you mean by signing club and
13  high school programs in terms of the work that you
14  specifically did.
15   A.    What did I do to help sign club and
16  high school basketball programs?
17   Q.    Yes, sir.
18   A.    Develop relationships with coaches;
19  develop relationships with athletic directors;
20  develop relationships with program directors.
21   Q.    And then it continues. It says:
22  Identifying and recruiting high school players for
23  individual events.
24    Do you see that there? Do you see
25  that, Mr. Cutler?

1    A.    I said I see that.
2    Q.    Tell us about what you did to recruit
3  high school players for individual events.
4    A.    Identifying elite, talented basketball
5  players and develop relationships with them and
6  their families.
7    Q.    So starting with that first point, how
8  did you identify elite basketball players?
9    A.    From my years of experience.
10   Q.    So could you repeat that, please.
11   A.    Through my years of experience.
12   Q.    How did your years of experience help
13  you in identifying elite basketball players?
14   A.    I believe I developed a pretty keen eye
15  on what good basketball players look like.
16   Q.    Okay. And so how do you then recruit
17  those players?
18   A.    I made contact with a family member,
19  whether it be a mother, father, or a mentor, like a
20  coach.
21   Q.    And how would you find those people to
22  make contact with? You know, the mother, the
23  father, or the coach.
24   A.    I don't remember exactly, but, you
25  know, if I'm at a game and I see a player, I

12 (Pages 42 - 45)

Daniel R Cutler                          March 23, 2021
Bowen v. Adidas

Page 46

1  probably would go up to his coach after the game.
2      Q.    And what type of conversation -- if you
3  didn't know the coach, what type of conversation
4  would you have with the coach?
5      A.    As far as what?
6      Q.    In terms of identifying and recruiting
7  high school players.
8      A.    I would introduce myself and tell the
9  coach that we would love to have their player come
10 to one of our events.
11     Q.    Would you -- if you didn't know the
12 player or the player's family, would you ask the
13 coach to point out mom and dad to you if they were
14 there?
15     A.    I don't remember exactly.
16     Q.    Do you recall ever doing that, talking
17 to mom or dad of a high school player?
18     A.    Have I ever talked to a mom or a dad of
19 a high school player? Is that the question?
20     Q.    Yes, sir.
21     A.    Yes. Sorry. I didn't hear the
22 question. I apologize.
23     Q.    That's fine. I'm just trying to
24 understand if you -- you know, you're doing your
25 job. You're identifying top talented high school

Page 47

1  players and you want to meet the parents.
2          How do you go about doing that if you
3  don't know them?
4      A.    Some of the elite players -- their
5  parents were known, who they were. Sometimes a
6  coach would have to make an introduction.
7      Q.    And so when you were first -- in
8  instances where you -- do you recall any instances
9  of meeting a high school player's parents for the
10 first time?
11     A.    Not specifically.
12     Q.    I mean, that's probably something that
13 probably happened fairly regularly, though; right?
14     A.    Yes. I regularly met high school
15 parents.
16     Q.    So when you would talk to them for the
17 first time, what would you tell them about yourself
18 and what you were doing?
19     A.    Every conversation was different.
20     Q.    I'm sure every conversation was a
21 little bit different, but did you have a standard:
22 Hey, this is who I am. This is what I do and this
23 is why I want to talk to you?
24          Did you have those type of
25 conversations?

Page 48

1      A.    Yeah. I introduced myself. I would
2  let them know that I was a consultant for Adidas
3  and that, you know, their son or -- yeah. I didn't
4  deal with girls basketball. So their son would be
5  somebody that we would be interested in having a
6  relationship with for bringing to one of our
7  events.
8      Q.    Okay. And you talked a minute ago
9  about your experience in, I guess, spotting
10 talented basketball players.
11          Did you -- I mean, in going through the
12 process, anybody can -- you know, we can go home
13 tonight and watch a college basketball game and see
14 some great players. We can all do that.
15          I imagine there is more to it than just
16 watching the player; right?
17     A.    Clarify. I'm not sure what you mean.
18     Q.    Okay. Just in terms of your process
19 for identifying that the elite high school
20 basketball players, can you tell me a little bit
21 more about what you did in order to identify those
22 kind of players.
23     A.    Other than just watching them?
24     Q.    Yes.
25     A.    No.

Page 49

1      Q.    I mean, did you talk to other people?
2  Did you talk to coaches, for example?
3      A.    Sure. I talked to a lot of people.
4      Q.    Would you go look at rankings online to
5  see what the ranking services said about different
6  players?
7      A.    I would have discussions with people
8  that created the rankings and we would bounce ideas
9  off of each other.
10     Q.    Okay. And which rankings are you
11 referring to there?
12     A.    A number of them. I don't recall
13 exactly.
14     Q.    Is ESPN rankings one of them?
15     A.    ESPN has a ranking system.
16     Q.    Yeah. Was that a source that you would
17 use when you're scouting elite high school
18 basketball players?
19     A.    Did I -- I'm not sure what you mean.
20     Q.    Well, in the course of scouting top
21 elite high school basketball players did you refer
22 to any rankings list that are published online?
23     A.    In my recruiting did I do that?
24     Q.    In your -- yes; in your recruiting.
25     A.    I refer to a number of different

13 (Pages 46 - 49)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 50

1    industry rankings as well as discussions with
2    people within the industry.
3        Q.    All right.  So with respect to the
4    industry rankings that you would look at, just tell
5    us which ones those were.  I just want to get an
6    idea.
7        A.    There is just too many to count.  I
8    couldn't recall them all.
9        Q.    I mean, would you look at Rivals
10   rankings list?
11       A.    On a given day I may look at Rivals at
12   one point.
13       Q.    What about ESPN, their list?
14       A.    On a given day I may look at ESPN.
15       Q.    What about NBA Draft.net; would that be
16   a list you would look at?
17       A.    I don't think they do a high school
18   ranking, so I don't think I would have consulted
19   with that.
20       Q.    Would they rank players, though?
21       A.    Do they rank players for what?
22       Q.    I mean, do they project out players?
23       A.    I'm not intimately familiar with NBA
24   Draft, but I believe they have a mock draft.
25       Q.    Would you ever record the mock draft in

Page 51

1    identifying top talent?
2        A.    Not for identifying talent when I was
3    out recruiting, no.
4        Q.    What would you use it for then?
5        A.    I'm sorry?
6        Q.    Was it for any purpose?
7        A.    I'm sure that among our discussions at
8    Adidas when we were talking about professional
9    basketball opportunities we would look at mock
10   drafts to see who might be projected to be a high
11   lottery pick.
12       Q.    Okay.  And then -- so we're talking
13   about the mock drafts now.
14             Did you say NBA Draft on that was one
15   of those mock drafts that you would look at when
16   you're projecting out internally who might go pro?
17       A.    Yeah.  I think you brought up NBA
18   Draft.net, but I believe they have a mock draft
19   that I've seen before..
20       Q.    Are there other mock drafts that you
21   can recall that you may have referenced?
22       A.    I don't recall exactly, but there is a
23   number of people on the internet who do mock
24   drafts.
25       Q.    Do you recall any of the names or the

Page 52

1    names of the services of any of the mock drafts
2    that you would rely on generally when projecting
3    which players might go pro?
4        A.    At the time, not specifically.  I know
5    ESPN had one.  Draft Express was one that was well
6    known at the time.
7             So again, four years ago -- the
8    industry has changed quite a bit with the amount of
9    people that are doing that, so I don't know
10   exactly, but I know that those are two of the ones
11   that we used.
12       Q.    Going back to Exhibit 1, your bullet
13   point says you managed more than 40 programs,
14   including oversight of a $10 million budget.
15             Is that accurate, that bullet point on
16   your LinkedIn profile?
17       A.    It's generally accurate, yeah.
18       Q.    And so what are the 40 -- when you talk
19   about managing more than 40 grassroots programs,
20   tell us a little bit about what you did to manage
21   those programs.
22       A.    I helped sign them, identify them, and
23   maintain relationships with the program directors;
24   helped to let them know where our events were going
25   to take place in order for them to be able to plan

Page 53

1    out their schedules; stay in close contact as the
2    point of contact for our individual events.
3        Q.    And the next bullet talks about
4    different events down there.  It says you developed
5    and executed key events, including McDonald's All
6    American Game, Adidas Summer Championships, Adidas
7    Nations, The Path, and Adidas EuroCamp.
8             Were those some of the tournaments that
9    you were referring to or games that you helped
10   manage?
11       A.    Yeah.  I believe those are all things
12   that I worked on.
13       Q.    And going back up you state:  Oversight
14   of a $10 million budget.
15             Can you tell us a little bit about that
16   budget that you oversaw.
17       A.    I was one of the people that was asked
18   to give input on those 40 grassroots programs and
19   how our budget that we were allotted was spent
20   among those 40 programs.
21       Q.    And that was -- is that $10 million --
22   was that an annual budget?
23       A.    I'm not sure.  You would have to ask
24   somebody at Adidas.
25       Q.    Well, what do you recall the amount of

14 (Pages 50 - 53)

Daniel R Cutler                                   March 23, 2021
Bowen v. Adidas

Page 54

1    money that was available to spend on the grassroots
2    programs?
3         A.    I don't recall an exact number.  I'm
4    sorry.
5         Q.    Okay.  But you put down $10 million
6    here.  That's why I'm asking about that figure.  Do
7    you know?
8         A.    I see that.
9         Q.    Okay.  Do you know why you put $10
10   million down here?
11        A.    A general estimation, I suppose; but
12   again, I don't recall exactly.  I would be just
13   speculating.
14        Q.    I wouldn't expect you sitting here
15   today to remember the exact dollars and cents, but
16   is that an approximation?  Sitting here today does
17   that sound like an approximate correct amount of
18   the budget that you had that you oversaw?
19        A.    Again, I don't remember really
20   specifics; but again, you know, based on 40
21   programs and the events we were in that seems like
22   it's a reasonable estimation based on the LinkedIn
23   profile that I created.
24        Q.    And then going down to "developed and
25   executed key events."

Page 55

1         Let's talk about McDonald's All
2    American Game.  What is that?
3         A.    It is an all-star game for high school
4    basketball.
5         Q.    And was that a game that Adidas
6    sponsored?
7         A.    You would have to ask Adidas what their
8    exact role was.  We were, I think, the apparel
9    provider for it.
10        Q.    Okay.  And have you McDonald's All
11   American games?
12        A.    I have attended numerous McDonald's All
13   American Games.
14        Q.    During your time at Adidas in 2014 to
15   2018 did you go to the McDonald's All American Game
16   each of those years?
17        A.    I believe so.
18             No.  Let me correct that.  I don't
19   believe I was there in 2018.
20        Q.    Okay.  But the other years while you
21   worked as a consultant you attended McDonald's --
22        A.    I don't remember exactly, but yeah; the
23   majority of the times I would have been there.
24        Q.    So what were your roles and
25   responsibilities with respect to McDonald's All

Page 56

1    American Game?
2         A.    We would arrive to -- we would ship all
3    of the products.  We would create player bags;
4    often act as a liaison amongst the week with the
5    McDonald's staff due to our relationships
6    previously with a lot of the kids that were
7    familiar with who we were, so it was a comfortable
8    situation while they were all being flown in to a
9    foreign place.
10        Q.    And how many players played in the
11   McDonald's All American Game?
12        A.    48 athletes attended.
13        Q.    So it's in your view the top basketball
14   game for high school athletes every year?
15        A.    I believe it's considered one of the
16   top.
17        Q.    Yeah.  What are some of the other top
18   games that high school athletes get invited to
19   play?
20        A.    The Jordan Brand Classic, I believe, is
21   a well-regarded one.  I believe there is a Pangos
22   Game that's one of them.  The Derby Classic has
23   been one in the past.  There is a number of them.
24        Q.    Yeah.  If you had to rank them what
25   would be -- would McDonald's All American be at the

Page 57

1    top?
2         A.    I believe that and the Jordan Brand
3    Classic would probably be similar.
4         Q.    And then briefly, how do the East
5    Gauntlet and Nations Summer Championships, The Path
6    -- can you give us just a breakdown of what those
7    leagues or tournaments or games are in terms of who
8    plays within those different things, starting with
9    Adidas Gauntlet.
10        A.    Adidas Gauntlet was our platform that
11   was our circuit for those 40 grassroot programs.
12        Q.    And what about Nations?
13        A.    Adidas Nations was an all-star camp, I
14   guess would be the best way to put it.
15        Q.    Would Adidas invite players from the
16   Gauntlet series to play in Nations?
17        A.    We would invite all student athletes
18   that were eligible.  If they were elite players and
19   they were good enough, they would be invited
20   whether they were on the Gauntlet or not.
21        Q.    And then what is Adidas Uprising?
22        A.    It's another name for the Adidas
23   Gauntlet.  We have changed names a few times, but
24   you would have to refer to somebody from Adidas for
25   that.

15 (Pages 54 - 57)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 58

1    Q.    Did you ever work Adidas Uprising
2  games?
3    A.    I worked some of those tournaments.
4    Q.    Okay.  And then what were the summer
5  championships that you have listed here?
6    A.    We did -- summer championships were a
7  one-week event that was held at the end of the
8  summer to cap off the NCAA recruiting period.
9    Q.    And was that -- summer championships,
10  is that essentially a summer showcase where coaches
11  can attend and you get all the college coaches
12  there and they can see all of the top players in
13  the same venue?
14    A.    Yeah.  That also took place during the
15  Gauntlet and Uprising, but the summer championships
16  is an extension of those.
17    Q.    So was it normal, then, to have college
18  coaches and assistant coaches come to these
19  basketball tournaments to scout players?
20    A.    Yes.  That's the way it works.
21    Q.    Your next bullet point on your LinkedIn
22  says you managed 15 NBA athletes across all
23  Adidas-related activities including recruitment,
24  management and management of activation calendars,
25  organization and execution of possible overseas

Page 59

1  trips for appearances.
2         What did you do with respect to
3  professional athletes, the NBA athletes?
4    A.    Recruited, managed their activation
5  calendars and organized and executed overseas trips
6  for their appearances.
7    Q.    Let's start with recruitment.  How did
8  you recruit -- what does that mean, your
9  recruitment piece?
10    A.    Once they're declared for the draft or
11  their eligibility is exhausted we put together a
12  pitch for them to sign with Adidas.
13    Q.    And so how would you identify the
14  players that you would pitch to?
15    A.    Talking to industry insiders about who
16  may get drafted at a high spot or who may be a
17  person that would be a good -- a marketable
18  athlete.
19    Q.    And so I'm going to ask you some
20  commonsense questions, I think, for somebody with
21  your experience, but why was it important to
22  recruit top players to Adidas?
23    A.    Why is it -- to Adidas as professional
24  athlete endorsers?
25    Q.    Yes.

Page 60

1    A.    I didn't work at Adidas.  You would
2  have to ask somebody that worked in the company
3  that would make those decisions.
4    Q.    All right.  But with respect to the
5  recruitment that you did for NBA athletes -- let's
6  talk about that.  What recruitment did you do?
7    A.    I would put together pitches and talk
8  to them, their families, their agents, about why I
9  thought Adidas would be a good place for them.
10    Q.    And what would your pitch sound like?
11         I mean, why would Adidas have been a
12  good place for some athletes who were just turning
13  pro?
14    A.    It would vary from athlete to athlete.
15    Q.    But Adidas is the same; correct?  The
16  same company; right?
17    A.    Adidas is one singular company, yes.
18    Q.    So what were the benefits of signing
19  with Adidas versus one of Adidas' competitors?
20         What would you tell players and their
21  families about signing with Adidas?
22    A.    It would depend on which athlete and
23  which family.
24    Q.    All right.  And why would that depend
25  on which athlete and which family?

Page 61

1    A.    It's hard to fit a square peg in a
2  round hole.
3    Q.    And the players being the square peg
4  and Adidas being the round hole?
5    A.    Or vice versa.
6    Q.    Okay.  So, I mean, what do you recall
7  about some of those pitches that you made regarding
8  the benefits of signing an up-and-coming player to
9  the Adidas brand?
10    A.    Sometimes Adidas had more money
11  allocated to a certain athlete, so that was
12  obviously attractive to some people.
13         Sometimes, you know, a kid grew up
14  loving Derrick Rose and Dwight Howard and thought
15  that was cool.  Again, it's just kind of based on
16  which athlete it was and what was their interest
17  and what was their interest level.
18    Q.    I want to show you another document
19  here.
20         Mr. Cutler, your relationship with
21  Adidas you said was as a consultant; correct?  Is
22  that correct?
23    A.    Correct.
24    Q.    So did you have a consulting agreement
25  with Adidas to memorialize your relationship with

16 (Pages 58 - 61)

Daniel R Cutler                                      March 23, 2021
Bowen v. Adidas

Page 62

1  the company?
2      A.    I believe I had a consulting agreement
3  with Adidas.
4      Q.    And I will show that to you here when I
5  put it up as an exhibit.
6          If you go to Exhibit Share and open up
7  Exhibit 2, please.  Do you see that document in
8  front of you?
9      A.    I see a document.
10     Q.    Do you recognize this document?
11     A.    You have to give me a minute to review
12  the whole thing.
13         Okay.  I have reviewed it.
14     And do you recognize this document,
15  Mr. Cutler?
16     A.    Now that I see it I recognize what it
17  is.  I don't recall exactly everything in it, but I
18  recognize it.
19     Q.    Okay.  And what is it?
20     A.    It's a consultant sponsorship
21  agreement.
22     Q.    Is that between you and Adidas America?
23     A.    It appears to be.
24     Q.    Is this the consulting agreement that
25  governed your relationship with Adidas?

Page 63

1      A.    What do you mean?
2      Q.    Well, how did you become a consultant
3  with Adidas?  Let's start there.
4      A.    I was asked to be a consultant at
5  Adidas.
6      Q.    Who asked you to be a consultant at
7  Adidas?
8      A.    Chris Rivers.
9      Q.    Okay.  And had you met Chris Rivers
10  before he asked you to be a consultant there?
11     A.    I had.
12     Q.    And where did you first meet Chris
13  Rivers?
14     A.    I first met Chris Rivers at Reebok.
15     Q.    And what did Mr. Rivers tell you to get
16  you to work as a consultant for Adidas?
17     A.    What did he tell me?
18     Q.    Yeah.
19     A.    Asked me if I wanted to be a consultant
20  for Adidas.
21     Q.    Okay.  Did he tell you about what the
22  job would entail?
23     A.    He sent me a consultant and sponsorship
24  agreement, I assume.
25     Q.    What was your understanding of what

Page 64

1  being an Adidas consultant would be when you first
2  became a consultant?
3      A.    Helping to manage their grassroots
4  efforts as well as manage some of their NBA
5  athletes.
6      Q.    Okay.  You met Mr. Rivers when you
7  first started working at Reebok.
8          Was that during your internship or when
9  you were employed part time?
10     A.    I met with him to establish the
11  internship.
12     Q.    Did Mr. Rivers hire you at Reebok as an
13  intern?
14     A.    I don't recall exactly, but I would
15  imagine that to be correct.
16     Q.    Did you report to Mr. Rivers while you
17  worked at Reebok?
18     A.    I believe that's the case.
19     Q.    And you were a consultant for Reebok;
20  correct?
21     A.    I believe that's how I would put it.
22     Q.    Well, was that -- were you employed by
23  Reebok or --
24     A.    I was not.
25     Q.    You were not.  Okay.  And so tell us

Page 65

1  about what your role was as a consultant for
2  Reebok.
3      A.    I helped with their grassroots
4  basketball department and their professional
5  athletes at the time.
6      Q.    Did you report to Mr. Rivers that
7  entire time?
8      A.    I did.
9      Q.    And then you left to go to Global from
10  Reebok; is that right?
11     A.    I believe that would be correct.
12     Q.    Did you talk to Mr. Rivers about
13  leaving Reebok and going to Global Athletics?
14     A.    Did I talk to him about it?
15     Q.    Did you say:  Hey, I'm thinking about
16  going there.  What do you think?
17     A.    Yes.
18     Q.    What do you recall about those
19  discussions that you had?
20     A.    I don't recall.
21     Q.    Do you recall his reaction?
22     A.    I don't recall.
23     Q.    Did he try to get you to stay with
24  Reebok?
25     A.    I don't recall.

17 (Pages 62 - 65)

Daniel R Cutler                               March 23, 2021
Bowen v. Adidas

Page 66

1    Q.    Did he say: Hey, it would be a great
2  experience for you to go to work for a professional
3  sports agent for a while?
4    A.    I don't recall.  It was a conversation
5  over ten years ago at this point.  Sorry.
6    Q.    In looking at your consulting
7  agreement, if you look at Paragraph 2 it says:  The
8  term.  The agreement shall commence on the date
9  first above written and continue through December
10  31st, 2016.  And at the top it says the agreement
11  is entered into as of January 1st, 2016.
12         Prior to January 1st, 2016 did you have
13  a consulting or written agreement with Adidas?
14    A.    I'm not sure.
15    Q.    Do you recall any document that set
16  forth the amount of compensation that you would
17  receive when you joined Adidas in 2014?
18    A.    I don't remember.
19    Q.    Okay.  How much money were you making
20  from Adidas?
21    A.    I can't remember.
22    Q.    Can you ballpark it?
23    A.    I just don't -- I don't remember.
24    Q.    Was it more than a hundred thousand
25  dollars in 2014?

Page 67

1    A.    Unfortunately not.
2    Q.    More than $50,000 on an annual basis?
3    A.    I believe it probably would be
4  somewhere around that number.
5    Q.    And then this agreement, Exhibit 2 --
6  if you turn on Page 2, Paragraph 5, it says:  Base
7  compensation.  Contract Year 1 2016 is $85,000.  In
8  contract year 2017 it was $85,000.
9         Do you see that?
10    A.    I see that.
11    Q.    Was that what you were paid by Adidas
12  during those two years to be a consultant?
13    A.    I believe that was my salary -- my base
14  compensation, yeah.
15    Q.    Did you receive bonuses as well?
16    A.    I don't know if there was any official
17  bonuses.  I just don't remember.
18    Q.    Did you receive any unofficial bonuses
19  during the time as a consultant for Adidas?
20    A.    I was given some products, shoes, but I
21  don't know -- I don't recall if there was any
22  bonuses.
23    Q.    Other than product do you remember --
24  do you recall ever being given money by Chris
25  Rivers directly?

Page 68

1    A.    I don't recall exactly.
2    Q.    Do you recall receiving any money from
3  Jill Pendleton?
4    A.    I believe I got a check from Jill
5  Pendelton at one time in my life.
6    Q.    Okay.  Do you recall what that check
7  was for?
8    A.    I don't.
9    Q.    Do you recall why she gave you a check?
10    A.    I worked a number of events.  It could
11  have been repayment of services.  It could have
12  been for services rendered.  I'm not sure.
13    Q.    Do you recall how much money that check
14  was written for?
15    A.    I don't recall the exact number.
16    Q.    Do you recall the approximate number?
17    A.    I don't -- I don't recall a specific
18  number.  I'm sorry.
19    Q.    Was it $50,000?
20    A.    I don't recall the exact number.  I'm
21  sorry.
22    Q.    Well, I understand you don't recall the
23  exact number, sir.  I'm asking you to approximate
24  it.
25         Was it around a ballpark of $50,000?

Page 69

1    A.    I don't know.  I don't remember.
2    Q.    Did you ever receive approximately
3  $50,000 from Jill Pendleton?
4    A.    I don't believe I've ever received
5  $50,000 from Jill Pendleton; but again, I would
6  just be speculating.  I don't recall exactly.
7    Q.    Well, do you think she's ever -- or
8  anybody else has ever given you that amount of
9  money other than Adidas?
10    A.    I would be speculating, but I don't
11  believe I ever received that much money from
12  anybody during that time other than Adidas.
13    Q.    So other than your base compensation of
14  $85,000 and product is there any other cash or
15  check, money payment, that you received from
16  Adidas?
17    A.    For my -- I'm not sure I understand the
18  question.
19    Q.    You were a consultant for Adidas;
20  correct?
21    A.    I believe that's correct.
22    Q.    Let's scroll to the bottom of this
23  document, please; the last page.  Do you see that?
24    A.    What?
25    Q.    Do you see the last page of the

18 (Pages 66 - 69)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 70

1  document?
2      A.   I see the last page.
3      Q.   Under the term "Consultant" there is a
4  signature. Is that your signature?
5      A.   That looks like my signature.
6      Q.   Okay. And to the left of it there is a
7  signature. It says "Chris McGuire" underneath,
8  Head of Sports Marketing.
9           Do you see that?
10     A.   I see that.
11     Q.   And underneath him it says Paul
12 Ehrlich, General Counsel. Do you see that?
13     A.   I see that.
14     Q.   Is this the agreement that you signed
15 to be a consultant with Adidas?
16     A.   My signature is on this agreement.
17     Q.   Okay. Do you understand this document
18 to govern your relationship with Adidas or not?
19     A.   What do you mean by "govern" my
20 relationship with Adidas?
21     Q.   Well, what do you understand this
22 document to state?
23     A.   What I'm being paid for my work at
24 Adidas to consult for them.
25     Q.   All right. Do you view this as an

Page 71

1  agreement or a contract that you had with Adidas?
2      A.   I believe this is an agreement, yes.
3      Q.   Okay. Do you recall any other written
4  agreements that you had with Adidas other than this
5  one that we're looking at right now?
6      A.   I don't believe I had any other written
7  agreements with Adidas.
8      Q.   How often were you paid by Adidas?
9  Monthly? Weekly? Every quarter?
10     A.   I believe I was paid twice a year.
11     Q.   Did Adidas withhold taxes from your
12 payment?
13     A.   No.
14     Q.   So you were responsible for paying your
15 own taxes on that money; is that right?
16     A.   I believe that's correct.
17     Q.   When did your employment with Adidas
18 end?
19     A.   I wasn't employed by Adidas.
20     Q.   I appreciate that correction.
21          When did your relationship with Adidas
22 end?
23     A.   I don't recall the exact date.
24     Q.   Okay. According to your LinkedIn
25 profile it says you were with Adidas through

Page 72

1  November of 2018.
2          Does that sound correct to you?
3      A.   I would be speculating. I'm just not
4  sure.
5      Q.   Were you speculating when you put
6  together your LinkedIn profile and you typed in
7  those dates?
8      A.   Possibly. I think it's a possibility I
9  was speculating.
10     Q.   Does November -- around November 2018
11 sound correct?
12     A.   You have to give me a time to review my
13 files, but it sounds like it could be. But again,
14 I would be speculating.
15     Q.   What files are you referring to?
16     A.   My personal files.
17     Q.   Right. And what are those personal
18 files that --
19     A.   Papers that are in my possession.
20     Q.   Do you have papers relating to Adidas
21 in your possession?
22     A.   I don't.
23     Q.   Do you have copies of check stubs in
24 your possession?
25     A.   Not on me. No, I don't.

Page 73

1      Q.   Not on you. You don't have anything on
2  you right now. We talked about that earlier. But
3  do you have that in your personal files?
4      A.   I haven't seen that lately, but I don't
5  know where it is.
6      Q.   Do you have copies of the consulting
7  agreements that you had with Adidas?
8      A.   I don't believe I do.
9      Q.   Okay. Do you recall who made the
10 decision to end your consulting agreement with
11 Adidas?
12     A.   I believe my contract expired.
13     Q.   Okay. And is the contract that we have
14 here, Exhibit 2 -- is that the same contract that
15 you're referring to?
16     A.   I believe that's correct.
17     Q.   Okay. Did Adidas ever tell you: Hey,
18 we don't want you to consult with us anymore?
19     A.   I believe that conversation was between
20 my counsel.
21     Q.   I'm sorry. Between your counsel and
22 who?
23     A.   Adidas.
24     Q.   Did Adidas tell your attorneys that
25 they don't want you to work for them as a

19 (Pages 70 - 73)

Daniel R Cutler                                March 23, 2021
Bowen v. Adidas

Page 74

1 consultant?
2      A.   I assume that's privileged.
3      Q.   Well, I'm asking -- do you understand
4 that Adidas spoke to your counsel about your
5 consulting agreement with Adidas?
6      A.   I believe all conversation with my
7 counsel would be privileged.
8      Q.   All right.  So who was the name of your
9 counsel?  Is that Mr. Park and Mr. Greer?
10     A.   At the time I believe that to be the
11 case.
12     Q.   Okay.  Are those the attorneys that
13 would have spoken with Adidas regarding your
14 consulting agreement?
15     A.   Again, I believe that to be true.
16     Q.   Okay.  And did you incur lawyer fees by
17 having Mr. Park and Mr. Greer represent you?
18     A.   I'm sorry?
19          MR. CICCARELLI:  We didn't hear that
20 question.  It broke up.
21     Q.   (Continued)  Mr. Park and Mr. Greer,
22 they represented you; correct?
23     A.   Correct.
24     Q.   Their law firm represented you?
25     A.   Correct.

Page 75

1      Q.   How did you come to retain those two
2 lawyers?
3      A.   What do you mean how did I come to
4 obtain or select those two lawyers?
5          MR. LEVINE:  Just to be clear, I assume
6 you're not asking him to testify about any
7 conversations he had with counsel at the time,
8 which would include conversations with the
9 company's counsel, given his work for the company
10 during the relevant time period.
11         MR. RAM:  Well, I'm only talking
12 about --
13 BY MR. RAM:
14     Q.   Mr. Cutler, I want to be clear.  This
15 is universal throughout today.  I don't want you to
16 tell me about any conversations that you had with
17 your lawyers, lawyers who represented you
18 personally.
19     A.   Okay.
20     Q.   How did Mr. Park and Mr. Greer come to
21 represent you as attorneys?
22         MR. LEVINE:  I just want to repeat what
23 I said before to make sure we are in line, which is
24 any conversations that were had at the time between
25 counsel to Adidas and Mr. Cutler would also have

Page 76

1 been privileged, even if not with counsel, even if
2 not acting as counsel to him personally.
3          So we would object to, you know, any
4 questions that ask him to divulge the nature of
5 privileged communications between him and the
6 company's counsel.
7          MR. RAM:  Okay.  But the facts should
8 not be privileged.  You agree with that, Andy;
9 right?
10         MR. LEVINE:  Facts are not privileged,
11 but if you're asking what he was told by
12 counsel or any advice he may have received about
13 retaining other counsel, that would certainly be
14 privileged.
15     Q.   (Continued)  So let's not talk about
16 conversations.
17         Mr. Cutler, tell me:  How did these two
18 attorneys, Mr. Park and Mr. Greer, come into your
19 life?
20     A.   Privileged.  I can't because it came
21 through a conversation with one of my attorneys.
22         MR. RAM:  Off the record real quick.
23         THE VIDEOTAPE SPECIALIST:  We are going
24 off record.  This is the end of Media Unit 1.  The
25 time is 11:51 a.m.

Page 77

1          (Short recess taken.)
2          THE VIDEOTAPE SPECIALIST:  We are back
3 on record.  This is the beginning of Media Unit 2.
4 The time is 12:09 p.m.
5 BY MR. RAM:
6      Q.   Mr. Cutler, during the break did you
7 have an opportunity to speak to your attorney?
8      A.   I did.
9      Q.   Okay.  I'm going to continue asking you
10 questions regarding the attorneys at White & Case.
11 What I'm not going to want you to do, though, is
12 disclose conversations that you had with your
13 attorneys for White & Case.
14     A.   Okay.
15     Q.   At what point in time did Mr. Park and
16 Mr. Greer from White & Case become your attorneys?
17     A.   I don't remember the exact date.
18     Q.   Do you remember the year?
19     A.   It would have been, I assume, 2017.
20     Q.   Okay.  And was that after Mr. Gatto was
21 arrested?
22     A.   I believe so.
23     Q.   Okay.  Well, do you recall having
24 attorneys from White & Case represent you before
25 September 26th, 2017?

20 (Pages 74 - 77)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 78

1    A.    I don't believe so.
2    Q.    Did you hire these lawyers from White &
3    Case to represent you?
4    A.    I did.
5    Q.    Were these lawyers at White & Case
6    referred to you by your family?
7    A.    I don't recall.
8    Q.    You don't recall whether your family
9    said: Hey, Dan, you need to go talk to these guys
10   from White & Cutler. They're good attorneys.
11         Excuse me. White & Case.
12   A.    It formerly was White & Cutler.
13         No; I don't recall.
14   Q.    Well, do you recall having any
15   discussions with any family members regarding you
16   hiring attorneys?
17   A.    I don't recall.
18   Q.    Okay. Well, Mr. Cutler, let's start
19   with your family members, because they might
20   recall.
21         What family do you talk to? Do you
22   have brothers, sisters, parents who are alive?
23   A.    I do.
24   Q.    What are their names?
25   A.    Jan Cutler.

Page 79

1    Q.    And who is Jan?
2    A.    My mother.
3    Q.    What is your father's name?
4    A.    He's deceased. Please don't mention
5    him.
6    Q.    Fair enough.
7          Where does your mother live?
8    A.    My family is in Massachusetts.
9    Q.    Do you have any siblings?
10   A.    I do.
11   Q.    What are their names?
12   A.    Michael and Matthew.
13   Q.    Where do Michael and Matthew live?
14   A.    Florida and New York.
15   Q.    Did you talk to Michael and Matthew or
16   your mother Jan regarding hiring White & Case
17   attorneys?
18   A.    I will repeat it. I don't remember.
19   Q.    Do you recall whether they told you or
20   recommended or referred you to White & Case?
21   A.    I don't recall.
22   Q.    All right. Do you recall if any
23   friends referred you to White & Case?
24   A.    I don't recall.
25   Q.    Do you recall how -- this is a yes or

Page 80

1    no question. Do you recall how you became -- how
2    you found White & Case attorneys to represent you?
3    A.    I don't recall specifically how I found
4    them.
5    Q.    Okay. Did you find those attorneys
6    yourself?
7    A.    I interviewed a number of attorneys
8    myself.
9    Q.    How did you find the names of those to
10   represent you or interview?
11   A.    I'm not sure I recall.
12   Q.    What are some of the other names of
13   attorneys that you interviewed with?
14   A.    I don't recall. I didn't retain them.
15   Q.    Did somebody provide you a list of
16   attorneys?
17   A.    I don't recall.
18   Q.    Why were you having interviews with
19   attorneys to represent you?
20         MR. LEVINE: Just to be clear, this is
21   other than any communications that he had either
22   with his personal counsel or counsel to Adidas?
23         MR. RAM: Yeah. Andy, I just want to
24   make clear: He is not an Adidas employee. You
25   agree; correct?

Page 81

1          MR. LEVINE: No. He was a consultant.
2          MR. RAM: And Adidas had a
3    attorney/client relationship with Mr. Cutler?
4          MR. LEVINE: Absolutely.
5          Just to clarify, he's within the scope
6    of the attorney/client privilege that exists for
7    Adidas, which is a slightly different way of
8    agreeing with your formulation.
9          MR. RAM: Okay.
10   Q.    (Continued) Mr. Cutler, prior to
11   retaining White & Case did you know those
12   attorneys, Mr. Park and Mr. Greer?
13   A.    I didn't retain White & Case.
14         MR. RAM: Phil, we are still having
15   some audio issues on your end.
16         THE WITNESS: We can hear you. It's
17   just garbled.
18         THE VIDEOTAPE SPECIALIST: It's the
19   same issue we were having before. We are going off
20   record. The time is 12:16 p.m.
21         (Short recess taken.)
22         THE VIDEOTAPE SPECIALIST: We are back
23   on record. The time is 12:17 p.m.
24   BY MR. RAM:
25   Q.    Mr. Cutler, prior to retaining the

21 (Pages 78 - 81)

1 attorneys from White & Case did you ever have a
2 meeting with lawyers from Adidas?
3    A.   Have I ever met with lawyers from
4 Adidas?
5    Q.   Not have you ever, but let's say in the
6 month or two prior to retaining White & Case did
7 you have a meeting with Adidas attorneys?
8    A.   I don't recall if I ever had a meeting
9 with them in those months.
10    Q.   Okay.  Do you recall traveling up to
11 Portland, Oregon after Mr. Gatto was arrested?
12    A.   I do recall that.
13    Q.   Do you recall at the Portland meeting
14 there were any attorneys from Adidas?
15    A.   I don't believe I recall any meeting
16 with attorneys at that time.
17    Q.   Do you recall any meetings that you had
18 with Adidas attorneys at any time?
19    A.   I sat with Adidas attorneys numerous
20 times.
21    Q.   How many times?
22    A.   I wouldn't remember.
23    Q.   More than twice?
24    A.   I met with -- again, I've met with
25 Adidas attorneys a number of times casually and

1 professionally.
2    Q.   Let's talk about professionally after
3 Mr. Gatto was arrested in September of 2017.
4         Do you remember a meeting with
5 attorneys from Adidas after that time period?
6    A.   I don't.  Off the top of my head I
7 don't recall the specific meetings with Adidas
8 attorneys.
9    Q.   Do you recall any specific
10 conversations with Adidas attorneys after the time
11 Mr. Gatto was arrested and before you hired White &
12 Case?
13    A.   Sure.  I spoke to Adidas attorneys
14 probably during that time.
15    Q.   Do you recall which attorneys you spoke
16 with?
17    A.   I'm sure I spoke with Mr. Levine.
18    Q.   Did you speak with anybody else from
19 Adidas?
20    A.   Mr. Levine is the only one that I
21 remember.
22    Q.   Okay.  Did you speak with Keith
23 McIntire?
24    A.   I don't believe I've ever heard that
25 name.

1    Q.   Okay.  Did you speak with Paul Ehrlich,
2 the general counsel of Adidas?
3    A.   I don't believe I ever met with Paul
4 Ehrlich.
5    Q.   Did you speak with Mr. Levine or his
6 colleague, Andrew Ceresney, from Debevoise &
7 Plimpton?
8    A.   I don't believe during that period I
9 spoke with either of them.
10    Q.   And so after these two attorneys from
11 White & Case become your attorneys starting in that
12 time period forward what was your understanding of
13 what White & Case was representing you for?  What
14 legal matters?
15    A.   To clarify, they weren't at White &
16 Case at the time.  They were at Park & Jensen.  And
17 what was the question in regards to that?
18    Q.   What was your understanding of why
19 these attorneys were representing you?
20         MR. LEVINE:  Are you just asking for
21 the topic of the representation as opposed to
22 communications they had about the representation?
23         MR. RAM:  That's fair.
24         MS. BARBIER:  I object to that.  I
25 think you're asking him for privileged information.

1         MR. RAM:  He's got an attorney sitting
2 next to him.
3    Q.   (Continued)  What was the substance
4 matter of the representation?
5         MR. LEVINE:  Object for the record,
6 please.
7    Q.   (Continued)  Mr. Cutler, what was the
8 subject matter of representation that you had with
9 these two White & Case -- these two attorneys from
10 Park & Jensen?
11    A.   That's privileged.
12    Q.   Okay.
13    A.   I can say what I want.  I'm not
14 answering that.
15    Q.   So you're refusing to tell us why two
16 attorneys were representing you?
17    A.   Again, clarify the question.  Because I
18 think you're asking about conversations I had with
19 my attorneys.
20    Q.   I'm not asking about conversations you
21 had with your attorneys.  I'm trying to understand:
22 What was the reason you had two attorneys?
23    A.   That would have been determined in my
24 conversation with those two attorneys.
25    Q.   Okay.  Were those two attorneys

Daniel R Cutler                                March 23, 2021
Bowen v. Adidas

Page 86

1   representing you in a criminal investigation at any
2   point in time?
3       A.   I don't -- I've never been a part of a
4   criminal investigation, to my knowledge.
5       Q.   Have you ever been interviewed by
6   federal prosecutors at any point in your life?
7       A.   No.
8       Q.   Have you ever been interviewed by FBI
9   agents at any point in your life?
10      A.   No.
11      Q.   Have you ever been interviewed by law
12  enforcement officials or prosecutors at any point
13  in your life?
14      A.   Have I ever been interviewed by a law
15  enforcement official?
16      Q.   From the time period September 2017
17  forward did you ever sit down in a room with any
18  prosecutors or law enforcement officials?
19      A.   Not that I'm aware of.
20      Q.   Okay.  Have you ever received a
21  criminal subpoena?
22      A.   You would have to ask my attorneys.
23      Q.   Okay.  Do you recall receiving a
24  criminal subpoena at any point?
25      A.   Not to my recollection.

Page 87

1       Q.   Okay.  Do you recall gathering
2   documents and producing documents in response to a
3   subpoena?
4       A.   Not that I did myself.  No; I don't
5   remember that.
6       Q.   Do you recall that you had some
7   obligation to produce documents in response to a
8   subpoena?
9       A.   I believe that my attorneys would have
10  been able to handle that.
11      Q.   I'm sure they would have been able to
12  handle that, but do you recall that you had to
13  provide documentation in response to a subpoena?
14      A.   I believe that they have documentation
15  that I gave to my attorneys.
16      Q.   Okay.  And what did you give to your
17  attorneys?
18      A.   Documentation.
19      Q.   What type of documentation?
20      A.   Emails, text messages.  Things like
21  that.
22      Q.   And at what point in time did you give
23  those materials to your attorneys?
24      A.   I just don't recall the exact time.
25      Q.   Ballpark it for us, please.

Page 88

1       A.   Sometime after September of 2017.
2       Q.   Okay.  And why did you give those
3   materials to your attorneys?
4       A.   What do you mean "why?"
5       Q.   Well, did you walk in their office one
6   day and say:  Here is all my emails.  Here is all
7   my text messages?
8       A.   That would be something I discussed
9   with my attorneys that would be privileged.
10      Q.   Did you understand your emails and text
11  messages were going to be produced to third
12  parties?
13      A.   What do you mean?
14      Q.   Did you understand that your emails and
15  text messages were going to be produced to federal
16  prosecutors?
17          MR. LEVINE:  Other than as he may have
18  learned from his counsel?
19          What are we doing?  Is your question
20  what he understands happened with these documents
21  other than what he was told by his counsel?
22          MR. RAM:  I'm not injecting the source
23  of his information in this question.
24          MS. BARBIER:  Did he say he was
25  subpoenaed?

Page 89

1          MR. LEVINE:  He said he didn't recall
2   receiving any subpoena.
3          MS. BARBIER:  I don't know how his
4   conversations with his lawyers about what documents
5   they wanted to review is not privileged.
6          MR. RAM:  I'm not asking about
7   conversations he had over what documents his
8   lawyers wanted to review, Debbie.
9          MR. LEVINE:  Could you re-ask the
10  question, please, counsel?
11      Q.   (Continued)  Mr. Cutler, did you incur
12  legal fees for retaining Park & Jensen to represent
13  you?
14      A.   Did I incur legal fees for them?
15      Q.   Yes, sir.
16      A.   I believe there were legal fees
17  associated with them representing me.
18      Q.   Did you pay any of those legal fees?
19      A.   I don't believe I personally paid them,
20  no.
21      Q.   Do you know who paid those?
22      A.   I believe that would have gone through
23  counsel and the company that I worked for at the
24  time.
25      Q.   And what company was that?

23 (Pages 86 - 89)

Daniel R Cutler                          March 23, 2021
Bowen v. Adidas

Page 90

1    A.    I was a consultant for Adidas.
2    Q.    And is that the company you're
3  referring to, Adidas?
4    A.    Any conversation with them, my
5  attorneys and Adidas.
6    Q.    Did you understand that Adidas was
7  paying your legal bills?
8    A.    Sure.
9    Q.    Well, that's a yes or no question.
10        Was that your understanding at the time
11  that Adidas was paying your legal fees?
12    A.    Yes.
13    Q.    Okay.  Do you know the approximate
14  dollar amount of legal fees that you incurred with
15  Park & Jensen?
16    A.    I don't have a clue.
17    Q.    Did you ever see a legal bill?
18    A.    I do not recall.
19    Q.    Did they ever send you one?
20    A.    I do not recall.
21    Q.    And those two lawyers now work for
22  White & Case; is that right?
23    A.    I believe that to be the case.
24    Q.    Do they still represent you today?
25        Not here today in this deposition, but

Page 91

1  during this time.
2    A.    I'm not sure.  I don't -- can you
3  clarify the question?  I'm not sure where you're
4  going with that.
5    Q.    Yeah.  Mr. Park and Mr. Greer are still
6  your attorneys?
7    A.    I don't know --
8        MR. LEVINE:  Objection.
9    A.    (Continued)  I don't know what is going
10  on there.
11        MR. LEVINE:  We're in a very sensitive
12  area here in terms of protecting the
13  attorney/client privilege that exists in various
14  directions.  I fear that the questions may be
15  confusing as well.
16        Is the question just whether there was
17  an ongoing attorney/client relationship between
18  Mr. Cutler and these other lawyers?
19        MR. RAM:  No.  I mean, any -- what do
20  you mean "ongoing?"  I mean, his discussion he had
21  at any point in time he was ever represented by
22  counsel would be privileged in perpetuity unless he
23  waives that privilege.  That's not the issue.
24        The question is does he still have
25  those two lawyers representing him or not.  It's

Page 92

1  just a fact of representation.
2  BY MR. RAM:
3    Q.    Mr. Cutler, do Mr. Park and Mr. Greer
4  and the law firm White & Case -- do they still
5  represent you as your attorneys in any capacity
6  sitting here today?
7    A.    Yes.
8    Q.    And what is the subject matter of their
9  representation of you?
10        MR. LEVINE:  The same objection as
11  before on privilege except to the extent you're
12  asking just generally what is the topic of
13  engagement.
14    Q.    (Continued)  Yes.  Generally what is
15  the topic of engagement between you and your
16  attorneys from White & Case?
17    A.    They provide counsel.
18    Q.    I'm sorry.  What is that?
19    A.    They provide counsel.
20    Q.    And what is the general subject matter?
21  Is it real estate?  Is it divorce?  What do they
22  represent you on?
23    A.    They provide counsel.
24    Q.    Why do they provide you counsel?
25    A.    At my request they provide counsel.

Page 93

1    Q.    And why do you request legal counsel?
2    A.    Privileged.
3    Q.    What do you mean "privileged?"
4    A.    That's between me and the attorneys.
5    Q.    I'm not asking you what you spoke to
6  with your attorneys.  I'm asking why --
7    A.    You're asking why I had an attorney.
8  That's between me and my attorneys.
9    Q.    That's a decision that you made in your
10  head: I need an attorney.  So I'm asking you why
11  you reached that decision.
12    A.    I had a discussion with my attorney --
13  with attorneys and determined in that conversation
14  that I would retain attorneys.
15    Q.    And you still have attorneys sitting
16  here today?
17    A.    Mr. Ciccarelli is representing me
18  today.
19    Q.    In addition to Mr. Ciccarelli do you
20  still have White & Case representing you today?
21    A.    They do not represent me in this
22  deposition.
23    Q.    They're still your attorneys, though;
24  correct, sir?
25    A.    They are -- I still have representation

24 (Pages 90 - 93)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 94

1  outside of Mr. Ciccarelli.
2      Q.   Is that representation the attorneys
3  that we're talking about, the attorneys from White
4  & Case?
5      A.   They are involved in representing
6  myself, yes.
7      Q.   Okay.  Any other attorneys?
8      A.   Not that I'm aware of.
9      Q.   And you are currently unemployed;
10  right?
11      A.   That's incorrect.
12      Q.   When did your employment formally
13  terminate?
14      A.   I'm not sure of an exact date.
15      Q.   Were you told the date when your
16  employment was going to terminate?
17          At the beginning -- a couple of hours
18  ago you said you're almost in between jobs.  So how
19  did you determine you're almost in between jobs?
20      A.   I'm leaving one position for another.
21      Q.   Okay.  And when are you leaving your
22  current position?
23      A.   I haven't set a date yet.
24      Q.   When do you plan to?
25      A.   I'm not sure yet.

Page 95

1      Q.   Have you told your current employer
2  that you are planning to leave?
3      A.   I have.
4      Q.   When did you tell them?
5      A.   A few days ago, I believe.
6      Q.   And did you tell them a particular
7  date?
8      A.   We have not discussed that yet.
9      Q.   Did you tell them why you were leaving?
10      A.   I told them I had another opportunity.
11      Q.   Mr. Cutler, earlier you mentioned that
12  you reviewed some text messages in preparation for
13  today.  And so I want to show you a document here.
14  We're going to mark this as Exhibit 3.  You can
15  pull up the Exhibit Share platform in a minute.
16          Let me know when you have the document
17  in front of you.  Let me refresh the screen and see
18  if it shows up now.
19      A.   It does.
20      Q.   You have some controls on the screen
21  there in this Exhibit Share platform.  If you move
22  the mouse and the cursor around you can enlarge
23  things.  You also have bars on the bottom and on
24  the right side to move things up and down.
25          Do you see those?

Page 96

1      A.   Yes.
2      Q.   And so what I would like for you to do
3  right now, Mr. Cutler, is take a look at this
4  document.  It's 970 pages.
5      A.   970 pages?  Do you want me to look at
6  the whole thing?
7      Q.   Well, let me ask you this:  Have you
8  seen -- take a look and take as much time as you
9  need, but have you seen this document before?
10          And I'll represent to you that this was
11  produced to me by attorneys from Adidas, and it has
12  not been changed.  This is the exact form that we
13  received it from Adidas.  I understand Adidas
14  produced this in the same format to the US
15  Attorney's Office.
16          So have you seen this document before?
17      A.   Again, you're talking about a 970-page
18  document, for the record, but I'm not sure I
19  recognize this off the top of my head.
20      Q.   Spend a couple of minutes right now,
21  please.  Scroll through it.  Look at it.  You were
22  looking at text messages the other day.
23      A.   I have a question on Page 20.  Do you
24  want me to review this whole thing, or are we
25  talking about a specific thing?  I don't know if

Page 97

1  there is a point in me reviewing all 970 pages if
2  they're not all relevant.
3      Q.   So I'm going to ask you questions about
4  different text messages and specific about line
5  numbers and that sort of thing.
6          What I want to do right now,
7  Mr. Cutler, is just ask, first of all, have you
8  seen -- do you recognize this spreadsheet of text
9  messages?
10      A.   I don't.
11      Q.   Have you seen your text messages in
12  this format before?
13      A.   I've seen a similar format, but not
14  this format specifically.
15      Q.   Did you see it in an Excel spreadsheet?
16      A.   I don't recall.
17      Q.   Do you see at the top -- let's just
18  review the column headers, and this might help.
19          You've got all the columns starting at
20  Column A.  These are just the numbers that were
21  assigned when these documents were produced to the
22  U.S. Attorney's Office.  There is different
23  threads.  Column D says:  Custodian, Dan Cutler.
24          Do you see that there?
25      A.   I do.

25 (Pages 94 - 97)

Daniel R Cutler                          March 23, 2021
Bowen v. Adidas

Page 98

1    Q.    And to the right of that it says:
2  Record Type, Cellebrite. That's the name of the
3  software, MSS.
4    A.    Okay.
5    Q.    At any point in time did you provide
6  your cell phone to any attorneys?
7    A.    I believe I did.
8    Q.    And Column G has a date and a time
9  stamp. Column H has a From, and there is a
10  telephone number there.
11        Do you see that telephone number?
12    A.    I do.
13    Q.    All right. And I won't read that into
14  the record unless you want me to, but is that your
15  telephone number?
16    A.    That appears to be.
17    Q.    Is that still your telephone number?
18    A.    Yes.
19    Q.    And was that -- how long have you had
20  that cell phone number?
21    A.    I'm not sure.
22    Q.    Did you have it back in 2017, 2016,
23  2015?
24    A.    I assume so.
25    Q.    You've had it a long time?

Page 99

1    A.    Sure.
2    Q.    All right. And is this your cell phone
3  number?
4    A.    Yes.
5    Q.    Okay. Do you have any other cell phone
6  telephone numbers other than this one?
7    A.    No, not at this time.
8    Q.    Did you ever have a cell phone with a
9  different phone number than this one?
10    A.    Sure.
11    Q.    And approximately when did you have
12  that prior cell phone?
13    A.    I don't recall exactly.
14    Q.    Since the time that you were a
15  consultant for Adidas to the present have you had
16  any other cell phone numbers other than this one
17  that appears on Column H on the first row?
18    A.    Not that I remember.
19    Q.    Did you have -- at the time that you
20  had this phone number back in 2015, 2016, 2017 did
21  you have a separate cell phone number?
22    A.    I don't believe so.
23    Q.    Some people have a business phone.
24  Some people have a separate phone for personal
25  stuff. I'm just asking if that was your practice,

Page 100

1  to have a cell phone for a business? What is that?
2    A.    I don't believe so.
3    Q.    All right. When you say you don't
4  believe so, is that a yes, you did or no, you
5  didn't or --
6    A.    To the best of my recollection I don't
7  believe so.
8    Q.    Is that something that you think you
9  would be able to tell the jury right now if you had
10  more than one cell phone a few years ago?
11    A.    To the best of my recollection I don't
12  remember having another cell phone.
13    Q.    Do you have any memory issues sitting
14  here today?
15        MR. CICCARELLI: Objection;
16  argumentative.
17    Q.    (Continued) Do you have any memory
18  issues or anything unusual that's affecting your
19  memory, Mr. Cutler?
20    A.    Not to any recollection that I have.
21    Q.    All right. Column I of this
22  spreadsheet lists the To field. Do you see that
23  there?
24    A.    Yes.
25    Q.    This first one -- the first entries

Page 101

1  says Chris Rivers, and there is a telephone
2  associated with him, with Mr. Rivers. Do you see
3  that?
4    A.    I do.
5    Q.    And then Column J lists all the
6  participants in a particular text message, so if
7  there is more than two you'll see more than two
8  people there.
9        Do you understand that?
10    A.    I do.
11    Q.    And Column K has the date and time
12  stamp and Column L is the actual message that was
13  sent, the SMS message.
14        Do you see that there?
15    A.    I do.
16    Q.    And so I understand in having gone
17  through these -- my understanding is that these are
18  all, let's say, work-related emails or nonpersonal
19  emails. You know, there is nothing with your
20  mother in here; there is nothing with your brothers
21  in here; there is nothing with your girlfriend or
22  your wife or, you know, friends and that type of
23  thing outside of work. That's just my
24  understanding. And so we're not going to review
25  anything like that here today.

26 (Pages 98 - 101)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 102

1          Do you understand that?
2      A.   I would hope so.
3      Q.   This cell phone number that appears at
4  the top here that we just looked at in Column H
5  next to your name, did you use this cell phone in
6  connection with your being a consultant with
7  Adidas?
8      A.   That's my personal cell phone.
9      Q.   Did you use it for work-related
10 purposes?
11     A.   I used it for a number of purposes.
12 I'm sure I used it at times for work.
13     Q.   Well, there is 970 pages of text
14 messages between you and folks connected with
15 Adidas.
16          Is it fair to say that you used it for
17 purposes connected to you being a consultant for
18 Adidas?
19     A.   I'm sure I used it for purposes of
20 being such that of my consultantship, but I also
21 used it for personal messages to people at Adidas
22 that had nothing to do with work as well.
23     Q.   Okay.  We're talking about this
24 personal cell phone, but did Adidas provide you a
25 cell phone to use for your work as a consultant?

Page 103

1      A.   They did not.
2      Q.   Did they pay for your cell phone bill
3  at all?
4      A.   I believe I was given money to pay my
5  cell phone bill through Adidas, yes.
6      Q.   So they did cover at least your cell
7  phone -- your monthly cell phone bill?
8      A.   Sure.
9      Q.   Do you recall who your service provider
10 is?
11     A.   I believe it's been Verizon.
12     Q.   So when you had telephone calls or text
13 messages for Adidas=related business stuff did you
14 use this phone?
15     A.   Yes; probably.
16     Q.   In looking back on just your sort of
17 practices when you were working as a consultant at
18 Adidas, was sending of text messages sort of a
19 primary way of communicating with the people you
20 worked with?
21     A.   I wouldn't say a primary but one of a
22 number of ways that I communicated with people.
23     Q.   Was it something that you used on a
24 regular basis, to text?
25     A.   Yeah.  I text normally all day long.

Page 104

1      Q.   And, I mean, is that true with
2  communicating with coaches?  Did you use text
3  messages?
4      A.   I believe that would be true.
5      Q.   The same thing with high school
6  players?  Families?
7      A.   Yep.  I use text messages for all sorts
8  of communications.
9      Q.   I imagine -- listen, you know, that
10 players today -- at least in the past few years
11 they probably only communicate with text messages
12 with other people; right?  I mean, is that your
13 general experience with high school players?
14     A.   I don't -- I don't agree with that.
15     Q.   I mean, based on your experience --
16 you're the only one on the screen here who has
17 worked with high school basketball players.
18          What is your sense of their preferred
19 form of communication with adults?
20     A.   There is a number of ways:  Phone
21 calls, text messages, social media messaging.
22 There is a number of ways.
23     Q.   So you reviewed about 20 pages or so,
24 by I really want to understand.  I mean, looking at
25 this document and based on the representation I

Page 105

1  gave you about where we got this -- we got this
2  from Adidas.  We understand it was produced to
3  federal prosecutors in New York, the same document.
4  It has not been changed.
5          Do you understand that it accurately
6  reflects the text messages when they were on your
7  phone when they were collected by your attorneys?
8      A.   If everything you say is true I have no
9  reason not to believe that; but again, I would have
10 to review 970 pages to make sure that that's an
11 accurate statement.
12     Q.   But based on my representations to you,
13 which are truthful, as far as I know,
14 representations that were provided to me by Adidas
15 that that's true, so --
16     A.   If what you're saying is to be believed
17 to be true then yes, of course.
18     Q.   All right.  Fair enough.
19          We're going to walk through some of
20 these the rest of the afternoon, but we can set
21 this aside for now.  I want to turn to a different
22 subject, and it's Soul Patrol.
23          Are you familiar with the name Soul
24 Patrol?
25     A.   I have heard that name.

27 (Pages 102 - 105)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 106

1    Q.    Yeah.  What is Soul Patrol?
2    A.    I'm not sure exactly what it is, but
3  I've heard the name.
4    Q.    And where did you hear the name?
5    A.    Since -- in my reviewing of the
6  documents I've seen it in emails before.
7    Q.    Emails with Adidas?
8    A.    I believe there is people from Adidas
9  that were on them.
10    Q.    I mean, do you have a recollection of
11  what Soul Patrol was?
12    A.    Again, not really.  It's more I've seen
13  it in documents that I reviewed in preparation for
14  this deposition.
15    Q.    Okay.  Do those documents refresh your
16  recollection of what Soul Patrol is?
17    A.    Again, I've seen the term, but you
18  would have to ask more specific questions based
19  around that.  I don't know a general description of
20  what you're trying to get to.
21    Q.    I'm just looking for a definition of
22  Soul Patrol.
23    A.    I have no definition of Soul Patrol for
24  you.
25    Q.    Do you mean that you don't know the

Page 107

1  definition of Soul Patrol or you don't know what it
2  means or --
3    A.    I just know that there is no definition
4  of Soul Patrol that I would be able to give you.
5    Q.    Who came up with the name Soul Patrol?
6    A.    I don't know.
7    Q.    Where did you first hear it from?  Who
8  did you hear it from?
9    A.    I'm not sure.
10    Q.    Do you know when you first started
11  hearing the term "Soul Patrol?"
12    A.    It's not a term I heard very often.
13    Q.    Does Soul Patrol have a purpose?
14    A.    You would have to clarify what you
15  mean.
16    Q.    What is your understanding -- your best
17  understanding of what the term "Soul Patrol" means?
18    A.    Again, I don't have an understanding of
19  the term "Soul Patrol."  You would have to be more
20  specific in your question, please.
21    Q.    You don't have any understanding
22  whatsoever of Soul Patrol, what it means?
23    A.    I have never used the term "Soul
24  Patrol" before.
25    Q.    But you've heard other people use the

Page 108

1  term "Soul Patrol;" correct?
2    A.    I've seen it in documents that I've
3  been reviewing for this deposition.
4    Q.    And those documents would have been
5  emails sent to you; correct?
6    A.    If I recall, I believe they were sent
7  to a number of people, including myself.
8    Q.    And when you received those emails did
9  you know what "Soul Patrol" meant?
10    A.    Again, I would refer back to the fact
11  that I don't know what Soul Patrol is, and if you
12  want to clarify that question I would be happy to
13  try to answer that.
14    Q.    Are you familiar with the term "Black
15  Ops?"
16    A.    I've seen it in documents that I've
17  been reviewing for this deposition.
18    Q.    Please tell the jury what the term
19  "Black Ops" means.
20    A.    You would have to pull up the documents
21  that you wanted me to try to figure it out what
22  that meant.
23    Q.    All right.  Sitting here right now do
24  you have an understanding of what the term "Black
25  Ops" means?

Page 109

1    A.    I believe in military terms it's a
2  covert group, I believe.
3    Q.    Yeah.  How about in Adidas terms; what
4  does the term "Black Ops" mean?
5    A.    You would have to ask somebody that
6  used that term.  I don't think I've ever used that
7  term, to the best of my recollection.
8    Q.    Do you recall Adidas employees using
9  that term, "Black Ops?"
10    A.    I've seen documentation that had that
11  term written in it.
12    Q.    Did that documentation -- is that
13  documentation from Adidas employees using the term
14  "Black Ops?"
15    A.    I'm not sure exactly who wrote it.
16    Q.    Do you know who TJ Gassnola is?
17    A.    I do.
18    Q.    I mean, he's somebody you've known for
19  a while; correct?
20    A.    Yes.  I've known TJ for a while.
21    Q.    How long have you known TJ?
22    A.    If I had to guess, I would say 15, 20
23  years.
24    Q.    Do you know when you first met him?
25    A.    I would -- again, speculating, I think

28 (Pages 106 - 109)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 110

1 I probably met him when I was in high school,
2 playing high school basketball.
3      Q.    And where did you play high school
4 basketball?
5      A.    I play at Amherst High School in
6 Amherst, Massachusetts.
7      Q.    Did you ever play for an AAU team in
8 high school?
9      A.    I played for a very bad team called the
10 Pioneer Valley Lightning.
11      Q.    Did you ever play against the New
12 England Players?
13      A.    We were not in the same scope of
14 talent, so it would have been unfair to do so.  We
15 did not.
16      Q.    But you recall meeting TJ Gassnola
17 while you were a high school player?
18      A.    I recalling being aware of him.  I
19 believe I probably met him at some point.
20      Q.    But as a high school player you're
21 aware of TJ Gassnola?
22      A.    Sure.  I was a high school basketball
23 player in the area where he was also in the area.
24      Q.    What is your understanding of who he
25 was while you were in high school?

Page 111

1      A.    I believe while in high school he was
2 involved with AAU basketball.
3      Q.    Do you know that TJ Gassnola testified
4 at a criminal trial of Jim Gatto and Christopher
5 Dawkins?
6      A.    From following the trial I was aware of
7 that.
8      Q.    One of the things that he testified
9 regarding regarding was Black Ops and what that
10 meant, and he testified -- I will represent to you
11 he testified that confidential Black Ops
12 information referred to payments to players and
13 families of players.
14      Does that refresh your recollection of
15 what the term "Black Ops" means?
16      A.    What is the question?
17      Q.    The question is:  Did what I just
18 described that TJ Gassnola defined Black Ops to
19 mean -- does that refresh your recollection of what
20 Black Ops means that he described to --
21      A.    I don't have an opinion about TJ
22 Gassnola's opinion.
23      Q.    Okay.  Well, does that help you -- does
24 that refresh your recollection of what the term
25 "Black Ops" means?

Page 112

1      A.    Again, I never used the term "Black
2 Ops" myself, so that would be TJ Gassnola's
3 definition.  It's not something that I would be
4 able to have any say in.
5      Q.    So you said you followed the criminal
6 trial of Mr. Gatto?
7      A.    I did.
8      Q.    Did you talk to anybody about Adidas
9 during the trial?  I mean anybody from Adidas while
10 the trial was going on.  Any of your colleagues.
11      A.    I'm sure at some point that we
12 discussed the trial and what was going on.
13      Q.    I want to read you some quotes from the
14 trial.  Because we were not there.  And I don't
15 know how much you've heard or not, how much you may
16 have heard.  I'm going to read these to you and I
17 just want to get your reaction.  And so this is
18 from Jim Gatto.
19      First let me ask you:  You know Jim
20 Gatto; right?
21      A.    I do.
22      Q.    I mean, how long have you known
23 Mr. Gatto?
24      A.    I'm not sure exactly.  Probably met him
25 ten years ago.

Page 113

1      Q.    Was he one of the Adidas employees that
2 you interacted with while you were a consultant for
3 Adidas?
4      A.    Sure.  Me and Jim interacted before.
5      Q.    Would you say he was somebody you had a
6 close working relationship with Jim Gatto during
7 that time period?
8      A.    Yes.  I would say that Jim and I were
9 friendly.
10      Q.    I mean, outside of work were you guys
11 friends?
12      A.    Sure.  I was friendly with Jim.
13      Q.    So you're following the news of Jim's
14 criminal trial, and that's somebody who is a friend
15 and a colleague who is on trial; right?
16      A.    Yeah.  I suppose that's an accurate
17 description.
18      Q.    Yeah.  I'm guessing you probably took
19 an interest in watching that trial for, among other
20 reasons, the fact that one of your friends was on
21 trial.
22      A.    Sure.  I was interested in how the
23 trial was going to turn out for my friend.  So I
24 would say that's accurate.
25      Q.    And so I just want to -- Dan, I just

29 (Pages 110 - 113)

Daniel R Cutler                          March 23, 2021
Bowen v. Adidas

Page 114

1  want to read you a couple of things of what his
2  attorney said at the trial.  You know, Jim didn't
3  testify.  But I just want to read a couple of
4  things and see your reaction to it.
5      A.   Okay.
6      Q.   The first quote is:  From Jim Gatto's
7  perspectives this is a win-win-win situation.  It's
8  a win for the universities who end up with top
9  ranked players who hopefully lead the universities
10  to basketball glory.  It's a win for Jim's
11  employer, Adidas, which is the corporate sponsor of
12  these universities and which would benefit from
13  being associated with a winning basketball team.
14          That's one of the statements his
15  criminal attorney made to the jury in that case.
16          He described the situation was a
17  win-win-win.  Do you have any reaction to that?
18      A.   To what?
19      Q.   To what I just read you.
20      A.   I don't have a reaction to something
21  that is -- you're reading.  No; I do not have a
22  reaction.
23      Q.   Were you aware that Adidas employees or
24  consultants were making payments to families of
25  high school basketball players?

Page 115

1      A.   I was not aware at the time.
2      Q.   At which time?
3      A.   At the time I was at Adidas.
4      Q.   Okay.  Another thing Mr. Gassnola's
5  attorney said:  A successful basketball program,
6  college basketball program, is the equivalent of a
7  winning lottery ticket, each capable of bringing in
8  millions of dollars of revenue.
9          Based on your professional experience
10  is that true?
11      A.   Is what true?
12      Q.   That college kids bring in millions of
13  dollars of revenue for the universities they play
14  for regardless of what school it is.
15      A.   Repeat the question, please.
16      Q.   This is not a complicated subject
17  matter.
18          I mean, we're in the middle of March.
19  We're in the middle of March Madness; right?
20      A.   It's the middle of March, yes.
21      Q.   Are you following the tournament right
22  now?
23      A.   I've watched basketball this month,
24  yes.
25      Q.   Is that something you enjoy doing?

Page 116

1      A.   I like basketball, yes.
2      Q.   And in your experience going back to
3  your internship with Reebok through the present do
4  you have an understanding that the top college
5  players bring in revenue for the universities?
6      A.   I don't know what you mean by the "top
7  college players bring in revenue."
8      Q.   Well, you have an understanding of who
9  the top elite basketball players are; right?
10      A.   I know who the top elite basketball
11  players are, yes.
12      Q.   Within college basketball?
13      A.   Correct.
14      Q.   And do you have an understanding
15  whether or not those top players, while playing for
16  a particular university, bring in money for that
17  university?
18      A.   The universities make money on ticket
19  sales, on arena sales.  On a variety of ways.
20      Q.   Right.  And does having the top college
21  basketball player play for a particular team
22  increase those revenue sources in your opinion?
23      A.   Speculating.  I wouldn't be sure.  I'm
24  sure there is plenty of programs that don't get the
25  top players in the country that still have a

Page 117

1  healthy revenue.
2      Q.   What about the programs that have the
3  top?  I mean, the best of the best.
4      A.   The best programs usually make money
5  because they're the best programs.
6      Q.   Mr. Gatto's attorney said:
7  Additionally now, to be fair, Adidas is not
8  sponsoring these universities out of the goodness
9  of its heart -- excuse me.  Out of the goodness of
10  its corporate heart.  The better that one of these
11  colleges does on the basketball court the better it
12  is for Adidas, which gets to be associated with a
13  winning team and in the end hopefully sell more
14  sleepers.
15          Is that comment from Jim Gatto's
16  attorney -- do you agree with that?
17      A.   Do I agree that it's advantageous to
18  sponsor the top programs in the country because of
19  the visibility that they would receive in the run
20  during March Madness?  Is that the question?
21      Q.   Yeah.
22      A.   I believe that to be true, yes.
23      Q.   All right.  And the last thing I want
24  to review from Mr. Gatto's attorney -- she said:
25  And we're going to be straight with you here.  If a

30 (Pages 114 - 117)

Daniel R Cutler                                March 23, 2021
Bowen v. Adidas

Page 118

1  basketball coach went to Jim and told him that he
2  really wanted a particular kid on that team and he
3  asked Jim to make that happen, Jim understood. Jim
4  understood that to mean that Adidas should help the
5  kids' family out financially if that's what they
6  wanted.
7          Did you share in that understanding as
8  well?
9      A.   Are you asking me about my opinion on
10 another opinion -- person's conversation with Jim
11 Gatto?
12     Q.   No. I'm asking if you agree with that
13 statement.
14     A.   What statement?
15     Q.   All right. That if a basketball coach
16 of a university sponsored by Adidas went to Jim
17 Gattos and said "hey" -- he really wanted a
18 particular kid on the team, that Jim would
19 understand that to mean that Adidas should help out
20 the kids' family financially.
21     A.   I'm unaware of any of those
22 conversations ever happening.
23     Q.   Have you ever provided financial
24 support to a high school player?
25     A.   What do you mean by "financial

Page 119

1  support?"
2      Q.   Have you ever given money to a high
3  school basketball player?
4      A.   I have not ever given money to a high
5  school basketball player, to the best of my
6  recollection.
7      Q.   Have you given -- have you paid for an
8  event for a basketball player?
9      A.   In the past I have provided certain --
10 I've paid for certain things in the past.
11     Q.   Such as what?
12     A.   I believe I've paid for a flight in the
13 past.
14     Q.   A flight? Okay. And who was that for?
15     A.   I don't remember. I don't recall the
16 person it was for.
17     Q.   Was that for Frank Jackson?
18     A.   It could have been. Possibly.
19     Q.   And I will tell you, Mr. Cutler, the
20 answer to all these questions are in the text
21 messages, which I'm sure you understand. So we'll
22 go through these. We're not trying to trick you
23 here, and I hope you're --
24     A.   You have asked me to review 970 pages
25 in about six minutes. So if you can bring that up

Page 120

1  in the text messages, I would be happy to address
2  it.
3      Q.   Well, sitting here today do you have a
4  recollection of paying for a flight for Frank
5  Jackson?
6      A.   I believe that possibly to be true.
7      Q.   Did you pay for more than one flight at
8  the request of Frank Jackson?
9      A.   I don't recall specifically, but
10 possibly.
11     Q.   Did you pay for his girlfriend to come
12 visit him at Duke?
13     A.   I don't recall specifically, but
14 possibly.
15     Q.   Do you recall making any payments to --
16 for any other players, providing flights to
17 players?
18     A.   Not off the top of my head, but if you
19 have anything you would like to share with me, I
20 would be happy to look at it.
21     Q.   Yeah. Other than flights have you
22 provided anything else to high school basketball
23 players? Any other gifts?
24     A.   I can't recall. I'm not sure.
25     Q.   Is that something that you would have

Page 121

1  done and you just don't remember the specifics of
2  it or is that something you never would have done?
3      A.   I just don't recall. I'm sorry.
4      Q.   Mr. Cutler, let's take a look at
5  another exhibit here in your folder, Exhibit 4.
6  Let me know when you have it in front of you.
7          Do you have the document in front of
8  you?
9      A.   One moment, please. Okay.
10     Q.   So this is dated January 17, 2017. The
11 subject says: Sole Patrol descriptions. And Sole
12 is spelled "S-O-L-E," at least on this document.
13         Is that the one you're looking at?
14     A.   I see that.
15     Q.   And so do you see the different names
16 on here, including yours on this document?
17     A.   I see my name.
18     Q.   It says: Dan Cutler, Amherst,
19 Massachusetts. Grassroots NCAA and NBA. Has
20 worked most major events. Outstanding at forming
21 relationships with All Americans and building
22 creative platforms.
23         Is that an accurate description of you?
24     A.   I'm not sure who wrote that, but I
25 don't disagree with any of that.

31 (Pages 118 - 121)

Daniel R Cutler                                       March 23, 2021
Bowen v. Adidas

Page 122

1    Q.    And let's start at the top.
2          Corey Hulio Smith.  Who is Cory Smith?
3    A.    He is a director of one of our
4    grassroots programs at Adidas.
5    Q.    And what is the name of his grassroots
6    program?
7    A.    The Atlanta Celtics.
8    Q.    In the description there --
9    A.    Excuse me.  I apologize.  I see the
10   sentence, but do you have anything who this is from
11   or who this is to?
12   Q.    No.  This is just a document that we
13   have.  And that's a fair question.
14         So Hulio Smith -- it says:  Great at
15   building rapport with parents and working behind
16   enemy lines to deliver brand advantages.
17         Do you agree or disagree with that
18   statement?
19   A.    I'm not really sure what that means, so
20   I wouldn't be able to give my opinion on that.
21   Q.    So "great at building rapport with
22   parents."  Do you understand what that means?
23   A.    Yes.  I generally understand what that
24   means.
25   Q.    That's what you did; right?

Page 123

1    A.    I worked major events and I was
2    outstanding at forming relationships with All
3    Americans and building creative platforms, as it
4    says.
5    Q.    No.  I'm talking about your work
6    history with Adidas.  I mean, we talked about this,
7    talking to parents; right?
8    A.    I thought you were referencing this
9    document.
10         Sure.  In the past I have developed
11   relationships and rapport with parents.
12   Q.    Was Hulio good at doing that as well?
13   A.    I didn't work very much with Hulio.
14   Q.    Did you work with Merl Code?
15   A.    Not very much.
16   Q.    When did you meet Merl Code?  When did
17   you first meet him?
18   A.    I don't recall.
19   Q.    Were you working as an Adidas
20   consultant when you first met him, or did you meet
21   him prior?
22   A.    I probably would have met him just in
23   the past with our shared experiences in the
24   industry.
25   Q.    Did you work with him directly when you

Page 124

1    were working for Adidas as a consultant?
2    A.    I wouldn't say directly, would be the
3    way I would put it.
4    Q.    How would you put it?
5    A.    We worked at Adidas at the same time.
6    Q.    But did you have interactions with him?
7    A.    Limited.
8    Q.    TJ Gassnola on this document, Exhibit 4
9    -- it says:  Grassroots and NCAA.  Extremely
10   connected with key insiders at all different brands
11   and a lead liaison with Kansas and Indiana.
12         Is that a fair description of TJ's
13   role?
14   A.    You would have to ask whoever wrote
15   that document.  I wasn't -- I didn't know all the
16   ins and outs of what TJ did or didn't do.
17   Q.    Based on what you did know about what
18   TJ did and didn't do is that a fair --
19   A.    I know he had relationships with some
20   college programs and obviously he had his AAU
21   program as well.
22   Q.    Was he extremely connected with key
23   insiders at all brands?
24   A.    I'm not sure.
25   Q.    Was he Adidas' lead liaison with Kansas

Page 125

1    and Indiana?
2    A.    I believe Adidas has people on the
3    ground at Kansas and Indiana that are not TJ.
4    Q.    But was TJ a liaison with Kansas and
5    Indiana?
6    A.    Again, you would have to ask whoever
7    wrote that document, but I'm sure he had
8    relationships with most of the schools and their
9    coaching staff, as we all did.
10   Q.    I'm just trying to understand this
11   piece.
12         Why would TJ have a relationship with
13   Kansas if he's a director of an AAU basketball team
14   in your neck of the woods in Massachusetts?  It
15   seems like a pretty far ways away.
16   A.    TJ's teams often had high-level
17   players, which would reach the level of playing at
18   a place like Indiana or Kansas.  So obviously he
19   had relationships with all -- a number of schools,
20   including Kansas, Indiana, as well as a number of
21   schools that he was a student sponsor.
22   Q.    The next one after you, Etop Udo-Ema.
23   Is that how he pronounces his name?
24   A.    It's certainly a confusing name, but I
25   believe that's correct.

32 (Pages 122 - 125)

Daniel R Cutler                           March 23, 2021
Bowen v. Adidas

Page 126

1    Q.    It says:  Grassroots NCAA.  Most
2  influential grassroots rep on the west coast.  Very
3  influential on social media and driving team sales.
4         Did you have an opportunity to work
5  with Etop?
6    A.    Etop, I believe.  But yeah.  We were
7  around the same events for -- you know, at events,
8  but certainly limited working with him.
9    Q.    Was he on the west coast then?
10   A.    Yeah.  I believe he was in California.
11   Q.    Do you know where in California?
12   A.    Somewhere in the Los Angeles area.  He
13 runs a program called the Compton Magic, but I
14 don't believe he lives in Compton.
15   Q.    And then Jamie Palmer.  It says:
16 Grassroots.  Recognized as one of the best scouts
17 in the country.  Very connected in the south and
18 midwest.
19        Do you know Jamie Palmer?
20   A.    I do.
21   Q.    And who is Jamie?
22   A.    He's one of the best scouts in the
23 country.
24   Q.    Is that your opinion?
25   A.    I think that's probably -- I share that

Page 127

1  opinion.
2    Q.    I would like to show you another
3  document.  If you refresh your -- go back to the
4  main screen and refresh your Exhibit Share.  It
5  will be up there in a second.
6         This is Exhibit 5.  So go ahead and
7  please click that open.
8    A.    Okay.
9    Q.    Just take a look at the document, if
10 you can, briefly.
11        So you see this email.  It's from Chris
12 Rivers to Jim Gatto.  That's the top email.  Do you
13 see that?
14   A.    Yeah.  If you'll just give me a moment
15 to review the whole document, please.
16   Q.    Sure.
17   A.    Okay.  Thank you.
18   Q.    So I want to ask you about -- if you
19 can scroll down to the bottom of the first page of
20 this document.  Right at the bottom it says:
21 Projected consultant.  Cash money.  Dan Cutler.
22 $60,000.
23        And then on the next page it has Hulio
24 and some other individuals on there.
25   A.    Okay.

Page 128

1    Q.    Did you receive $60,000 in addition to
2  the consultant agreement that we reviewed earlier?
3    A.    No.
4    Q.    Okay.  And underneath the list of names
5  it says:  And to be honest, I would really like to
6  built out a spreadsheet with all the above travel
7  plus additional trips that will be made by TJ,
8  Hulio, and Dan.
9         So let me ask you:  What type of travel
10 were you doing for Adidas?
11   A.    Around this period of time?
12   Q.    Yeah.  2015.
13   A.    I would have been traveling to high
14 school games, college games, NBA games.
15   Q.    So if you go back up to the bottom of
16 the first page, there is a paragraph that starts
17 "going forward."  Do you see that?
18   A.    I do.
19   Q.    Okay.  It states:  Going forward I
20 would also like to agree on a consultant's dollars
21 for TJ.  I am not going to budge on this AAU deal,
22 but I feel he should be compensated for what he
23 does on the Black Ops team/Soul Patrol.
24        Do you see that?
25   A.    I read that, yeah.

Page 129

1    Q.    Do you know what TJ did for the Black
2  Ops team or Soul Patrol?
3    A.    Again, I'm not sure what the Black Ops
4  team/Soul Patrol mean, but TJ had a number of roles
5  at Adidas.
6    Q.    What was your understanding of TJ's
7  role at Adidas?
8    A.    He was involved with relationships with
9  college programs as well as some high school
10 players.
11   Q.    So setting aside the New England
12 players, did you understand that he had other
13 responsibilities for Adidas outside of just running
14 the New England players?
15   A.    He was influential within grassroots
16 basketball in general, so he would from time to
17 time help assist other programs with their rosters
18 as well.
19   Q.    When you say "other programs," what
20 types of programs are you referring to?
21   A.    Other AAU programs.
22   Q.    Outside of AAU basketball did TJ
23 Gassnola have a role that you saw at Adidas?
24   A.    Again, he had relationships with
25 college programs as well as their coaching staffs,

33 (Pages 126 - 129)

Daniel R Cutler                                March 23, 2021
Bowen v. Adidas

1   and I wasn't sure exactly what he did or did not
2   do, to be specific.
3        Q.   Did you recall ever talking to him
4   about these interactions with college coaching
5   staff?
6        A.   Not specifically, no.
7        Q.   Are you aware of any particular
8   interactions that he had with college coaching
9   staff?
10       A.   Not from my recollection, no.
11       Q.   Let's take a look at another document,
12  if you go back to the main screen.  This is going
13  to be Exhibit 6.  Let me know when you have this
14  one.
15       A.   I'm sorry.  Which exhibit?  I see 8
16  now.
17       Q.   Just Exhibit 6.
18       A.   Okay.  Thank you.
19       Q.   So, Mr. Cutler, do you have this
20  document in front of you?
21       A.   I do.
22       Q.   And so this is an email dated February
23  18th, 2015 from Chris Rivers to several folks,
24  including you.
25            Do you see your name in the To field?

1        A.   I do, as well as a number of other
2   names.
3        Q.   Is that your email address, Dan
4   Cutler@gmail.com?
5        A.   That's me.
6        Q.   And do you use that email address for
7   purposes of communicating on behalf of Adidas?
8        A.   From time to time, yeah.
9        Q.   So the subject line of this email is:
10  Adidas Soul Patrol a/k/a Black Ops Update No. 1.
11            Do you see that subject line?
12       A.   I do.
13       Q.   And so there is a number of points
14  here.  One, two, three and four, and the first one
15  says "Communication."
16            Let me ask you this:  Do you recall
17  receiving this email?
18       A.   Not at the time, no.
19       Q.   Do you recognize Chris Rivers' email
20  address at the top?
21       A.   I do.
22       Q.   And let's go through the To field.
23  Please tell me each of the names there, who those
24  folks are.  To the best of your understanding what
25  their roles and responsibilities were with Adidas

1   in February of 2015.
2        A.   You're asking me six years ago.  I just
3   wouldn't recall at the time.
4        Q.   These are folks that you worked with or
5   interacted with.
6        A.   I interacted with a lot of folks.
7        Q.   Well, let's talk about these folks here
8   on this email.  Please tell the jury starting with
9   Junior Duperrier who he was and what your
10  understanding of what his role was with Adidas.
11       A.   Junior Duperrier was an NBA sports
12  marketing employee.
13       Q.   What was your understanding of his
14  responsibility at Adidas?
15       A.   He dealt with NBA athletes.
16       Q.   Did that include signing NBA athletes
17  to endorsement deals, shoe deals?
18       A.   I don't recall that he was involved in
19  the actual signing of them.
20       Q.   Was he involved in managing the
21  relationships with NBA players?
22       A.   I believe that would be an accurate
23  representation of what he did.
24       Q.   What about the next one, Cory Butler?
25       A.   Cory Butler was on the sports marketing

1   team, NCAA.
2        Q.   And what is your understanding of what
3   his role and responsibilities were at this time?
4        A.   I'm not sure exactly.  He was involved
5   in some grassroots events and some college events.
6        Q.   What type of events was he involved
7   with?
8        A.   Cory was at Nations.  Cory was at our
9   Uprising events.  I believe that's where I would
10  have interacted with Cory mostly.
11       Q.   What about Anthony Coleman; who is
12  Anthony Coleman?
13       A.   Anthony Coleman was involved in our
14  grassroots basketball department.
15       Q.   I'm sorry.  He was what?
16       A.   He was involved in the grassroots
17  basketball department.
18       Q.   Okay.  What was his role and
19  responsibilities as you understood them in February
20  of 2015?
21       A.   He was one of the people that was
22  involved in helping decide what teams got sponsored
23  and what players were selected for certain events.
24       Q.   And when you say "what teams got
25  sponsored," what are you referring to?  AAU teams?

34 (Pages 130 - 133)

Daniel R Cutler                                   March 23, 2021
Bowen v. Adidas

Page 134

1      A.   Club basketball, yes.
2      Q.   Club basketball.  Okay.
3           So the next one is TJ Gassnola.  We
4  talked about him.  And then Corey Hulio Smith and
5  then yourself.
6           Did we cover everybody here who
7  received this email?
8      A.   I didn't hear the question.
9      Q.   Have we covered everybody on the To
10 field in this email?
11     A.   Yeah.  I believe we've talked about all
12 these people.
13     Q.   And so the email from Chris Rivers,
14 copy to Jim Gatto and then Tonie Hanson and
15 yourself.  Who is Tonie Hanson?
16     A.   I'm not sure what her exact title is,
17 but she was involved in grassroots basketball.
18     Q.   What was your understanding of her
19 involvement in grassroots basketball?  What did she
20 do?
21     A.   I believe she was one of the people who
22 is help set the direction for the grassroots
23 basketball department.
24     Q.   Do you know who or how she set that
25 direction?

Page 135

1      A.   You would have to ask her.  I'm sorry.
2      Q.   What do you mean by "set the
3  direction?"  Can you just give us an explanation of
4  that.
5      A.   Strategy; where our events would take
6  place; what certain product that would be used for
7  certain events; how to build out of the gyms we
8  booked at our events.  Things like that.
9      Q.   And I want to direct you to the second
10 paragraph.  Under Paragraph 1 it says:
11 Communication.  And Mr. Rivers writes:  Please
12 don't include any confidential Black Ops
13 information but make sure there is enough detail
14 that validates the money we spent in addition to
15 demonstrating how we are building relationships
16 that will help us in the grassroots process.
17          Do you see that there?
18     A.   I do.
19     Q.   What was your understanding of what
20 Chris Rivers wrote that we just reviewed?
21     A.   I'm not sure what he meant by that.
22     Q.   Did you know at the time that you
23 received it what he meant by that?
24     A.   If I would read that I would say it was
25 relating to how we were building relationships to

Page 136

1  make sure that we are in a position to sign draft
2  candidates when they come out of school.
3      Q.   And so when we're talking about
4  building relationships, what does that mean?
5      A.   I think a number of ways to do that,
6  but I recognize that as developing relationships
7  with families, players, coaches.
8      Q.   And is that college players, families,
9  coaches?
10     A.   I don't think it specifies.  I'm not
11 sure.
12     Q.   No.  But your understanding of what
13 that referred to, "building relationships?"
14     A.   Building relationships with college
15 players, with high school players.  So it could be
16 both.
17     Q.   Okay.  And did building those
18 relationships -- does that help Adidas in the draft
19 signing process?
20     A.   I think it helps to be familiar with
21 who you're going to sign with so that you have a
22 trust level of the company that you end up signing
23 with and somebody that you can point to as a key
24 contact there.
25     Q.   Are you referring to from the player's

Page 137

1  point of view?
2      A.   Player or family.
3      Q.   But let me ask you this.  Again, this
4  may be a commonsense thing; and I think we have
5  touched on it a little bit, but what was the point
6  of building relationships?
7          (Discussion off the record.)
8  BY MR. RAM:
9      Q.   I will repeat the question as best as I
10 can.
11          Mr. Cutler, help us understand the
12 purpose of building relationship with college
13 players and their family members and explain how
14 that would help Adidas in the draft signing
15 process.
16     A.   A level of familiarity that the family
17 and player would have when signing with that
18 certain brand.  Obviously a level of familiarity
19 with the college, but having somebody that they can
20 identify as a trusted person that they can go to if
21 there is any issues.
22          So, you know, if there is an equal
23 offer between Adidas, Nike and Under Armor, if we
24 have a better relationship we would hope that that
25 relationship would be able to carry us in that

35 (Pages 134 - 137)

Page 138

1 particular signing.
2     Q.   All right.  So there is a business
3 purpose to building a relationship early on that
4 would pay off later; right?
5     A.   I don't -- I don't believe that's what
6 I said.
7     Q.   Okay.  I don't want to put words in
8 your mouth, but having that relationship helps in
9 signing these players once they go pro, right, to
10 endorsement deals?
11     A.   Correct.  I believe that having a good
12 relationship could be a benefit when you're going
13 to sign a player once they're eligible and signed
14 as a pro.
15     Q.   And when we're talking about signing
16 players, are you referring to shoe endorsement
17 deals?
18     A.   Yes.
19     Q.   And so a shoe endorsement deal with
20 Adidas, then, since you worked as a consultant for
21 Adidas; right?
22     A.   Is that why I was building a
23 relationship?  Is that your question?
24     Q.   Is that one of the reasons you were
25 developing relationships?

Page 139

1     A.   Sure.  That's one of the reasons I
2 would have been developing relationships.
3     Q.   And again, this is a simple thing.
4 We're just trying to understand why this was going
5 on, just in terms of what your day-to-day stuff is.
6         And so if you're building relationships
7 for in part to have a good relationship when a
8 college kid enters the draft and goes pro then
9 you'll have that strong relationship to sign with
10 Adidas, if you're fortunate to; right?
11     A.   Ideally if that's a player that the
12 brand was interested in signing to an endorsement
13 contract, if I had -- or any of us had a good
14 relationship with him that could help make that an
15 easy transition for him and his family then we
16 would obviously love to do so.
17     Q.   All right.  And so part of the
18 relationship building process that you're doing
19 early on -- there is an end goal for that; right?
20     A.   I don't think it's a singular goal,
21 but, again, it's beneficial if there is a
22 relationship with a player.
23         (Internet interruption.)
24         (Discussion off the record.)
25

Page 140

1 BY MR. RAM:
2     Q.   Mr. Cutler, going back to Exhibit 6,
3 this paragraph that we reviewed, Mr. Rivers writes
4 under Communications:  After every trip a short
5 recap is sent to Jim and myself.  I'm not concerned
6 with the format.  Although they are not formalized,
7 it is important that we have notes on who we are
8 seeing and how each of those touch points help us
9 to ensure a long-term future.
10         Is that -- what I just read there, do
11 you see that on the page?
12     A.   I do.
13     Q.   Just explain to us your understanding
14 of what Mr. Rivers was saying about having notes on
15 who we're seeing and how each of these touch points
16 will help us in the short-term future.
17     A.   I'm speculating on what Mr. Rivers
18 would have meant, but I would assume --
19     Q.   I'm sorry to interrupt you.  I want to
20 know what you understood, not what you thought.  I
21 don't want you to speculate about what Mr. Rivers
22 intended.  I want your understanding of this.
23     A.   Well, do you want me to give you my
24 understanding of somebody else's explanation?  So I
25 just -- to me and myself this means that we -- our

Page 141

1 touch points with these athletes that would help in
2 the short- and long-term future.  So whether it
3 would be getting a player to come to Adidas Nations
4 or, you know, getting -- you know, develop a
5 relationship for more of a long-term relationship
6 that would build towards a future endorsement
7 contract.
8     Q.   And then right after that he writes:
9 Please don't include any confidential Black Ops
10 information.  Make sure there is enough detail that
11 validates the money we spent.
12         So I want to ask you again:  Having
13 read this in context, do you have an understanding
14 of what Black Ops is?
15     A.   Again, you would have to ask Chris.
16 I'm not sure.  Those aren't my words.
17     Q.   I know they're not your words.  You are
18 a consultant and this is your job.  So what was
19 your understanding of what confidential Black Ops
20 information meant?
21     A.   I didn't have an understanding of what
22 confidential Black Ops meant, to the best of my
23 recollection.
24     Q.   Well, did you ask Mr. Rivers what it
25 meant?

36 (Pages 138 - 141)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 142

1    A.   I don't believe I did.
2    Q.   Did you say: Hey, I don't know what
3  this means.  What are you talking about, "Black
4  Ops?" What is that?
5    A.   I'm sorry.  I don't believe I had that
6  conversation, to the best of my recollection.
7    Q.   Why not?
8    A.   I did the job that I was asked to do
9  and I did my depth chart according to Bullet No. 3.
10   Q.   What was your job?
11   A.   To build the Nations depth chart and to
12  develop relationships with potential players.
13   Q.   Was building a relationship with
14  players part of Black Ops?
15   A.   No.  You would have to ask Chris Rivers
16  apparently, according to this email.  I'm sorry.
17   Q.   Let's go back to the main screen.  I
18  want to show you another document marked as Exhibit
19  7.
20       MR. LEVINE:  Before you go to the next
21  document, just to put it out there, I realize that
22  we were slow going at the outset of the day and
23  we've been going now for about an hour and 20.  I'm
24  mindful that it's 1:35.
25       I just want to see -- while the lawyers

Page 143

1  have the stamina to go forever, if folks generally
2  want a lunch break at some point or, you know, if
3  the witness otherwise wants a break -- you know,
4  just want to keep that in mind before we go too
5  much longer.
6        MR. CICCARELLI:  How is a 2 o'clock
7  stop time?
8        MR. RAM:  That's fine.  We can go until
9  2 o'clock Eastern and then take a lunch break, if
10  that's what you want.
11       MR. CICCARELLI:  That would be great.
12  We would appreciate that.
13       MR. LEVINE:  That's great for us.
14  Thanks.
15  BY MR. RAM:
16   Q.   So Exhibit 7 is -- Mr. Cutler, if you
17  can take a look at Exhibit 7, please.
18   A.   Okay.
19   Q.   This is an email dated February 24th of
20  2015.
21   A.   Okay.  I've read it.
22   Q.   And so I will just note for the
23  record --
24       MR. RAM:  And Patty, I would ask if you
25  can change this.  It says -- the exhibit sticker is

Page 144

1  Exhibit 6, but in the Exhibit Share it's showing as
2  Exhibit 7.  This document is ADID 000326806.  Can
3  you make that change?
4        (Discussion off the record.)
5  BY MR. RAM:
6    Q.   So Mr. Cutler, if you can look at this
7  document.  At the bottom right-hand corner it has a
8  yellow sticker, Exhibit 6, and this is dated
9  February 24, 2015.  Do you see that?
10   A.   Yes.
11   Q.   And it says: From Chris Rivers.
12       Do you see that?  Do you see Chris
13  Rivers is the sender?
14   A.   I see it says: From Rivers, Chris.
15  Yes.
16   Q.   Is that his email address at Adidas as
17  far as you know?
18   A.   It appears to be.
19   Q.   All right.  In the To field it says:
20  Dan Cutler.  And that's your email address, isn't
21  it?
22   A.   Yes, it is.
23   Q.   And it's some of the same names that we
24  just reviewed: TJ Gassnola, Cory Smith, Cory
25  Butler, Junior Duperrier, Anthony Coleman, copy to

Page 145

1  Jim Gatto, Chris Hanson and Chris Rivers, and then
2  Madison Ornstil.
3    A.   I see that.
4    Q.   Who is Madison Ornstil?
5    A.   I believe at the time she was an Adidas
6  sports marketing employee.
7    Q.   Do you know what she did for sports
8  marketing?
9    A.   She did a lot of our WMBA sports
10  marketing.
11   Q.   Did she work in mens basketball as far
12  as you know?
13   A.   I believe she had some duties in men's
14  basketball.  You would have to ask her.  I'm not
15  exactly sure of her entire scope.
16   Q.   All right.  I would like for you to
17  read this email, please, out loud for the record.
18   A.   You want me to read an email out load?
19   Q.   Yes.  Read it to the jury, please.
20   A.   Why?
21   Q.   Please read the email.
22   A.   That's not a question.  I'm not -- I
23  apologize for asking questions of everybody.  Why
24  would I read this out loud if the jury can read it?
25   Q.   I'm asking you to read it to the jury.

37 (Pages 142 - 145)

Daniel R Cutler                                           March 23, 2021
Bowen v. Adidas

Page 146

1     A.    I'm unable to read it out loud.
2     Q.    Why not?
3           MR. CICCARELLI: Objection. I don't
4  believe there is a question here.
5     Q.    (Continued) Are you not willing to
6  read this email out loud to the jury?
7           MR. CICCARELLI: Objection. There is
8  no jury.
9           MR. RAM: Mr. Ciccarelli, portions of
10 this video will be shown to the jury at trial. I'm
11 sure you're aware of that.
12    Q.    (Continued) Mr. Cutler, are you unable
13 to read this email out loud to the jury that's
14 watching this video?
15    A.    Mr. Ram, couldn't you just read it out
16 loud for me?
17    Q.    I'm asking you to. Are you willing to
18 read it out loud to the jury right now?
19          MS. BARBIER: I object. Colin, there
20 is currently no jury watching this, and so I think
21 that's a misleading statement.
22    Q.    (Continued) Mr. Cutler, are you
23 willing to read it to the jury?
24    A.    Yeah. Why not? Let's have fun. Come
25 on, Colin. All right.

Page 147

1           I believe it is: Soul Patrol. We have
2  a lot of work to do and we will get it done. Bold.
3  But we will do it our way, exclamation point,
4  underline. You will have the best players in the
5  country at our events, exclamation point. But we
6  will do it our way, exclamation point, bold
7  underline. Stay on the grind. Every phone call,
8  every text, every message returned, every email.
9  It matters, exclamation point. Remember to treat
10 every kid like he is the next Derrick Rose, John
11 Wall, or Damian Miller and we will never go wrong,
12 exclamation point, bold, underline. You've got to
13 believe that we are better than our competition
14 because we will never be outworked. Exclamation
15 point, underlined, bold. I respect that
16 competition and acknowledge their market
17 leadership, but it's time for the leaders of the
18 new school to step to the front of the class, and
19 we are the new leaders... so let's -- capitalized
20 -- take it, underline bold. I'm not reading the
21 uTube link. I am a little fired up right now,
22 exclamation point, Rivers. Thank you.
23          THE WITNESS: We're going to take a
24 break now.
25          MR. RAM: Why don't we go ahead and

Page 148

1  take our lunch break.
2           MR. CICCARELLI: Why don't we.
3           THE VIDEOTAPE SPECIALIST: We are going
4  off record. This is the end of Media Unit 2, the
5  time is 1:43 p.m.
6           (Lunch recess taken.)
7           THE VIDEOTAPE SPECIALIST: We are back
8  on record. This is the beginning of Media Unit 3.
9  The time is 2:35 p.m.
10          MR. RAM: Mr. Ciccarelli, we just
11 returned from our lunch break. You said your
12 client had something he wants to say.
13          MR. CICCARELLI: I just wanted to
14 clarify for the record, you had asked earlier --
15 this is the beginning of the deposition -- about
16 who he specifically spoke with in preparation, and
17 he had indicated that he had testified that he had
18 conversations with personal counsel.
19          We just wanted to make sure the record
20 is clear that counsel from Debevoise was present in
21 one meeting last week. Just so that the record is
22 clear.
23          MR. RAM: Thank you. I appreciate
24 that, Mr. Ciccarelli.
25

Page 149

1  BY MR. RAM:
2     Q.    Just briefly before we move on to other
3  topics, Mr. Cutler, do you recall the name of the
4  attorney from Debevoise who was present during the
5  call that you had in preparation for the
6  deposition?
7     A.    Mr. Levine.
8     Q.    Was there anybody else from his firm
9  that you recall being on the telephone call?
10    A.    I believe Miss Hart was there as well.
11    Q.    All right. I'm not going to be
12 antagonistic to anybody, but, Mr. Cutler, can you
13 tell me what was discussed on the call with
14 Mr. Levine and Miss Hart?
15    A.    I don't believe --
16          MR. LEVINE: Just to confirm, you just
17 mean the subject matter of the conversation; right?
18          MR. RAM: Well, I just want to
19 establish -- and I'll be straight with you.
20          Are you asserting a privilege on behalf
21 of Adidas of any communications that you had with
22 Mr. Cutler?
23          MR. LEVINE: Thanks for asking. So on
24 behalf of Adidas and with respect to that meeting
25 in particular we would say that there is a

38 (Pages 146 - 149)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 150

1  preexisting attorney/client privilege that we have
2  an interest in protecting that relates to his prior
3  work on behalf of the company and then there is a
4  common interest as well that extends to the subject
5  matter of the litigation and his testimony today.
6         So, you know, questions you might ask
7  that don't ask him to reveal privileged
8  communications like the topic generally of the
9  discussions seems to be totally fair game, but we
10 would object to anything that gets into the
11 substance of the communications in that meeting.
12        MR. RAM:  Okay.  Is anybody going to
13 instruct the witness not to answer the question?
14        MR. LEVINE:  Well, I was just
15 clarifying it.
16        If you were just asking him what the
17 subject matter was of the conversation, I think he
18 can answer that, but if you're going to probe any
19 particular things that his counsel told him in the
20 presence of Debevoise, then we would object and,
21 you know, would expect that he wouldn't answer
22 those questions.
23        MR. RAM:  Okay.  And again, I'm not
24 trying to get the witness to say something that --
25 I want to just go through the process of preserving

Page 151

1  the record on this issue.
2         MR. LEVINE:  Sure.
3  BY MR. RAM:
4  Q.    So, Mr. Cutler, again I'm going to ask
5  you a question.  And Mr. Levine or your lawyer may
6  object, so listen to their objection, please.
7         Can you tell me the substance of the
8  conversation that you had in preparation for your
9  deposition testimony today on the call with
10 Catherine Hart and Andrew Levine?
11        MR. CICCARELLI:  Object to that.
12        MR. RAM:  What is the basis for the
13 objection, Philip?
14        MR. CICCARELLI:  Privilege.
15        MR. RAM:  All right.  Is anybody
16 instructing the witness not to answer that
17 question?
18        MR. CICCARELLI:  I am.
19        MR. RAM:  Okay.  Andy, are you as well?
20 Your head was nodding, but --
21        MR. LEVINE:  I think it's Phil's place
22 to instruct the witness not to answer, but we
23 support that position.
24 Q.    (Continued)  Mr. Cutler, are you
25 accepting your attorney's instruction about not to

Page 152

1  answer the substance of what was discussed on the
2  call with Mr. Levine and Miss Hart?
3  A.    Yes.
4  Q.    Okay.  All right.  Well, we'll pick
5  this up offline if we need to later.
6         I want to move back briefly,
7  Mr. Cutler.  Before our break you had read that
8  document into the record that was Exhibit 7, and
9  the one question I had for you:  Having reviewed
10 that document does that remind you in any way of
11 what Soul Patrol was and what it meant?
12 A.    No.
13 Q.    I want to direct you to another
14 document, if you can pull up on Exhibit Share as
15 Exhibit 8.  This is another email, and this is
16 actually a response from Anthony Coleman to the
17 document we read that was Exhibit 7.  So let me
18 know when you have this in front of you.
19 A.    I do.
20 Q.    Okay.  And you see the date on this
21 email?  It says February 23rd.  The time is 2336
22 and 18 seconds.  It looks like maybe there is a
23 difference between the time zones between the
24 original email and the response to this.
25        Do you see the date and time in the

Page 153

1  Sent field?
2  A.    I do.
3  Q.    And this says it's from Anthony
4  Coleman, Anthony.Coleman@Adidas.com.  Do you see
5  that?
6  A.    I do.
7  Q.    And you explained earlier who Anthony
8  Coleman is.  He's an Adidas employee; correct?
9  A.    He was.
10 Q.    Okay.  And this was sent -- Mr.
11 Coleman's email was sent to Chris Rivers -- that's
12 in the To field.  Do you see his email address
13 there?
14 A.    I do.
15 Q.    It was copied to you, Dan
16 Cutler@gmail.com along with the other folks on the
17 original email.  Do you see that there?
18 A.    I do.
19 Q.    And again, I'm just probably going to
20 -- it may sound like a broken record on these next
21 couple of documents, but is that your email
22 address, Dan Cutler@gmail.com?
23 A.    It is.
24 Q.    And to the extent that we'll see your
25 email address in other documents, do you agree that

39 (Pages 150 - 153)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 154

1    that is your personal -- or that is your email, Dan
2    Cutler@gmail.com?  That's the one you use?
3        A.    It's certainly an email I would use.
4        Q.    Okay.  Did you use that in business
5    communications with folks at Adidas?
6        A.    At certain times I did.
7        Q.    Okay.  On this instance this email that
8    you received from Anthony Coleman, is that another
9    -- is this an example of a work email that you
10   received at your email account?
11       A.    Sure.  I would agree with that
12   description.
13       Q.    And the beginning of the email says:
14   Soul Patrol plus Black Rob, The Mob, Swings, and
15   Mad Dog.
16            I just want you to translate.  I know
17   Swings.  I've heard that before.  Is Swings Jim
18   Gatto?  Is that his nickname?
19       A.    I think some people use that name for a
20   nickname for him.
21       Q.    Who is Black Rob?
22       A.    I'm not sure.
23       Q.    The Mob, M-O-B, do you know who that
24   refers to?
25       A.    I don't know.

Page 155

1        Q.    How about Mad Dog?
2        A.    That was a name we sometimes used for
3    Madison.
4        Q.    And then he continues and says:  I
5    agree with Rivs a/k/a Senor Negro.
6            Is that a reference to Chris Rivers?
7        A.    You would have to ask Anthony Coleman.
8        Q.    What is your understanding of this?
9        A.    I've never called Chris Rivers that.
10       Q.    When you say that, are you referring to
11   Rivs or Senor Negro?
12       A.    The latter.
13       Q.    But is Rivs -- is Rivs a reference to
14   Chris Rivers?
15       A.    I would agree with that.
16       Q.    Let's move on to another exhibit here.
17   This is going to be Exhibit 9 in your documents.
18   Let me know when you have it up in front of you.
19       A.    Okay.
20       Q.    So there is an email.  The From line
21   says: Chris Rivers@Adidas.com.  Do you see that?
22       A.    I'm sorry.  Can you just give me a
23   moment to review the document first?
24       Q.    Yes, sir.
25       A.    Thank you.  Okay.  Sorry.  Could you --

Page 156

1        Q.    Okay.  So you see this email is from
2    Chris Rivers@Adidas.com?
3        A.    Uh-huh.
4        Q.    In the From line.  And the date sent,
5    Friday, April 10th, 2015; is that correct?
6        A.    I see that.
7        Q.    And in the To field do you recognize
8    your name there?
9        A.    Yes.  I see my name.
10       Q.    Dan Cutler@gmail.com?
11       A.    I see that email, yeah.
12       Q.    And we have other individuals on here
13   who we've already discussed.
14            In the cc line it says Tonie Hanson,
15   and then it says A. Hall@network.com.
16            Do you know who that email address
17   references?
18       A.    I would be assuming -- and making only
19   an assumption -- that that would be Albert Hall.
20       Q.    Who is Albert Hall?
21       A.    He's the president of the HallPass
22   Network.
23       Q.    Do you know what the HallPass Network
24   is?
25       A.    They are an event management and media

Page 157

1    company.
2        Q.    Do you know what work Mr. Hall
3    performed for Adidas? if any.
4        A.    He was contracted, I believe, to often
5    set up our gyms; provide live streaming
6    capabilities for our events as well as some
7    logistics.
8        Q.    Did he have an AAU team as well?
9        A.    Not to my knowledge.  I'm not aware of
10   that.
11       Q.    The subject line of the email -- do you
12   see that there?
13       A.    I do.
14       Q.    Adidas Basketball Next Generation
15   90-Day Status Report; is that right?
16       A.    That appears to be correct.
17       Q.    And then underneath Subject it says
18   there is an attachment:  Adidas Basketball Next
19   Generation 90-Day Status, 4.7,15.PDF.
20            Do you see this on this email you
21   received?
22       A.    I see there is an attachment.  I don't
23   see the actual attachment, but I see that.
24       Q.    We'll take a look at the attachment
25   here in a second.  I've got that here.

40 (Pages 154 - 157)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 158

1    Do you know what the reference to
2 Adidas Basketball Next Generation is?
3    A.    Not off the top of my head.
4    Q.    And then the email is addressed to Soul
5 Patrol plus Vanilla Extract.
6    A.    I see that.
7    Q.    Do you know who Vanilla Extract may be
8 referring to?
9    A.    I would just be -- I would be
10 speculating.
11    Q.    Did Mr. Rivers have a nickname for
12 about everybody there?
13    A.    I don't know if that's the case, but he
14 may have had nicknames for everybody.
15    Q.    Did he have a nickname for you?
16    A.    He had a few.
17    Q.    What were they?
18    A.    Cutty, Cutler, Cuts, I suppose are all
19 names he used.
20    Q.    So his email states:  Attached is what
21 was presented this week to upper management
22 detailing the work we have been doing since
23 December 1.  We are just getting started, but
24 please know that your efforts have been recognized
25 all the way in Germany and now we are under the

Page 159

1 microscope to deliver what we were promising.
2    Do you see that?
3    A.    I do.
4    Q.    And this email again, was this -- you
5 would have received in as an Adidas consultant; is
6 that correct?
7    A.    Yes, I believe so.
8    Q.    Is this a work email?
9    A.    It would appear to be.
10    Q.    Let's take a look at Exhibit 10, which
11 is the attachment to Exhibit 9.
12    A.    Do you have a specific portion of this
13 that you would like me to look at, or am I just
14 reading the whole thing?
15    Q.    No.  I'll walk you through it.  There
16 is a couple of pages I just want to touch on with
17 you, but first my question is:  Do you recognize in
18 Exhibit 10 -- have you seen this Power Point
19 before?
20    A.    In preparation for this deposition I've
21 seen this before.
22    Q.    Okay.  If you can scroll down to Page
23 5, please.  And there is no page number on the
24 document itself, but on the viewer, if you go to
25 Page 5, the slide is entitled "Current Operating

Page 160

1 Org Chart."
2    A.    Uh-huh.
3    Q.    And you see a bunch of people there.  I
4 want to touch on -- well, I think we've probably
5 hit most of the people here already in our
6 discussion, but I just want to make sure we've got
7 everybody.
8    First of all, do you recognize all the
9 names in the green boxes on this slide, Page 5?
10    A.    Yes, I do.
11    Q.    Okay.  I've been meaning to ask you:
12 As a consultant for Adidas Basketball who at Adidas
13 did you directly report to?
14    A.    The majority of my communications were
15 who I reported to, Chris Rivers.
16    Q.    And, I mean, was he your primary point
17 of contact at Adidas?
18    A.    He was.
19    Q.    And did he give you assignments as a
20 consultant and say:  Hey, we need you to go here
21 and cover this?  Or whatever the case may be.
22    A.    Yes.  I believe he would have been
23 somebody that would have given me direction.
24    Q.    Again, not to belabor the point, but
25 was he the primary person who gave you direction?

Page 161

1    A.    Yeah.  I would say Chris and -- I would
2 say Chris would be the primary, and Tonie Hanson
3 was also somebody that I was directly dealing with.
4    Q.    Was there -- looking back on your
5 relationship with the company, was Tonie
6 responsible -- with respect to your work, was she
7 responsible for a particular, you know, area and
8 then Chris Rivers was responsible for something
9 else, or did they have -- did they kind of share
10 the portfolio?
11    A.    I would say that their leadership kind
12 of overlapped.
13    Q.    The leadership of grassroots basketball
14 or something else?
15    A.    Of my consultantship.
16    Q.    Okay.  And in the boxes in yellow
17 there is your name, TJ, Hulio, Jill Pendelton.  We
18 discussed Jill a little bit earlier.
19    What is your understanding of Jill
20 Pendelton's role with respect to Next Generation
21 Basketball?
22    A.    Jill was an event operator for some of
23 our NCAA period events.
24    Q.    In addition to being an event operator
25 did she have other responsibilities?

41 (Pages 158 - 161)

Daniel R Cutler                                March 23, 2021
Bowen v. Adidas

Page 162

1    A.    Not that I'm aware of.
2    Q.    And then at the bottom it says:
3  Integrated team.
4        And I want you to take a look at those
5  names there.  Do you recognize any of those
6  individuals?
7    A.    I do.
8    Q.    Let's just briefly touch each one to
9  the extent you know what their roles and
10 responsibilities were with basketball sports
11 marketing.
12       So starting with Jeff Attila,
13 A-T-T-I-L-A, do you know what his role and
14 responsibilities were?
15   A.    I would be -- I would be generally
16 speaking because obviously these people were
17 employees outside of the team that I worked with
18 day to day, but I believe Jeff Attila had -- did
19 some sort of visual social marketing
20 responsibilities.  But again, that's just my
21 assumption based on the time I spent with him.
22   Q.    That's fair.
23       The team that you worked with on a
24 day-to-day basis, who was that besides Chris Rivers
25 and Tonie Coleman?

Page 163

1    A.    Jim Gatto, Anthony Coleman, Madison
2  Ornstil.
3    Q.    Mark Rasol.  Do you know what his
4  responsibilities were with respect to grassroots
5  basketball?
6    A.    I'm unaware.
7    Q.    What about Mike Delivio?
8    A.    I do believe I know him.  I apologize.
9  I'm not surely exactly what Mike did.  I believe
10 Mike again was on some sort of a digital social
11 media team, I believe.
12   Q.    Okay.  What about Emily Cieslinski?
13   A.    The last name is good of a guess as I'm
14 going to get.
15       I believe Emily was on the brand
16 marketing team.  Again, I apologize for not knowing
17 their exact roles, but I would see her from time to
18 time at events and when I was in the office.
19   Q.    That's fair.
20       When you would go to the office, are
21 you referring to Portland, Oregon?
22   A.    Correct.
23   Q.    Where did you physically,
24 geographically -- where were you primarily located
25 when you were an Adidas consultant?

Page 164

1    A.    Massachusetts.
2    Q.    Did you work from home when you were in
3  Massachusetts then?
4    A.    Correct.
5    Q.    And then you would travel when you were
6  going to different events, I take it.
7    A.    Correct.
8    Q.    Did you have an office, a physical
9  office, in Portland other than a work space that
10 you would use when you were there?
11   A.    No.  I couched there mostly while I was
12 in the office.
13   Q.    And how often would you go out to
14 Portland, Oregon to the Adidas headquarters when
15 you were a consultant?
16   A.    Sporadically.  There was no real
17 schedule of it.  Maybe once a quarter at most.
18 Maybe more.  Twice a year.
19   Q.    Going back to our list here, we have
20 Sarah Foster under the integrated team.
21       Do you remember Sarah, what her roles
22 and responsibilities were with respect to
23 grassroots basketball?
24   A.    I recall Sarah.  I believe she was on
25 the events team.

Page 165

1    Q.    What about Maddie Breskin?
2    A.    Maddie was on the public relations
3  team.
4    Q.    Jarrett Mann?
5    A.    I believe Jarrett Mann was on the
6  product team.
7    Q.    Ray Boyd?
8    A.    I believe Ray was also on the product
9  team.
10   Q.    And then the last one on there, Mike
11 Hubert.
12   A.    I believe Mike Hubert was also on the
13 product team.
14   Q.    If we can scroll forward on this
15 Exhibit 10 two more slides, and this is Page 7 and
16 it says:  Key field contact touch points.
17       Do you see that there?
18   A.    I do.
19   Q.    Okay.  Do you recognize -- take a look
20 at this.  And I want to ask you about the data
21 points that are listed here.  So just take a
22 moment, please, and just look at these.
23   A.    Okay.
24   Q.    Do you have an understanding of what
25 key field contact touch points means, generally

42 (Pages 162 - 165)

Daniel R Cutler                          March 23, 2021
Bowen v. Adidas

Page 166

1  speaking?
2      A.    Sure.
3      Q.    How would you explain that?
4      A.    Well, based on these categories it
5  appears how many times our team was able to get
6  touch points for our high school games or attend
7  college games or visit Adidas campus schools.
8  Things like that.
9      Q.    And do you have an understanding of why
10  the number of touch points would be recorded,
11  counted, tracked?  That sort of thing.
12     A.    You would have to ask whoever -- I
13  would just be speculating to try to guess.
14     Q.    Okay.  It says here:  HS games
15  attended.
16           I take it that's high school games
17  attended.
18     A.    That's a fair assumption.
19     Q.    And then 155.
20           Who was the team that would go out and
21  go to these high school games?
22     A.    All the people that you just listed
23  prior to this on the screen.
24     Q.    All the people prior to --
25     A.    That we discussed on the previous

Page 167

1  screen.
2      Q.    Would that include the folks listed on
3  the integrated team, the marketing, digital folks?
4      A.    You would have to ask whoever put this
5  together.  I'm not sure.
6      Q.    And again, this is dated -- I think
7  April 10th of 2015.
8           Did you personally attend a lot of high
9  school games during this time period on behalf of
10  Adidas?
11     A.    What do you mean by "a lot?"
12     Q.    Well, okay.  Did you attend high school
13  games on behalf of Adidas when you were a
14  consultant there?
15     A.    Sure.
16     Q.    I mean, was that part of your
17  responsibilities to go out to high school games and
18  meet and greet or whatever it was?  Scout?
19     A.    Yeah.  Part of my responsibilities was
20  to attend high school games for sure.
21     Q.    And we talked earlier about, you know,
22  talking to coaches, talking to players, talking to
23  families.
24           Was there other reasons that you were
25  at high school games?

Page 168

1      A.    Sure.
2      Q.    Business reasons?
3      A.    Yeah.  To watch games, to scout, to
4  make sure that we're seeing the best players, and
5  it always helps to get a personal eye on a player
6  in a game to make sure that we're not just watching
7  highlights or something like that.
8      Q.    I mean, is that important?  I mean,
9  just turning on Sports Center at 2:00 a.m. and --
10  you're not going to see a high school game on
11  Sports Center, but is it good to actually watch the
12  games in person in order to really kind of see the
13  players?
14     A.    Yes.  I think it's important to provide
15  context and not just watch highlights.
16           You can make a highlight of all my high
17  school videos and it would make it look like I was
18  actually a pretty good player if put together
19  properly.
20     Q.    I bet.  I guess you can watch a single
21  player for several minutes that the camera is not
22  going to see; right?
23     A.    Right.
24     Q.    And then further down here -- I mean,
25  it has:  College coach.  Touch points, 98.

Page 169

1           Do you have an understanding of what
2  that data point reference is?
3      A.    I don't -- again, speculating because I
4  didn't build the deck, but I would assume that's
5  you know, coaches that coached at Adidas-sponsored
6  NCAA events where they either talked to or saw them
7  in person.
8      Q.    Would that include telephone, email, or
9  text messages?
10     A.    Again, I wouldn't be sure of that.
11     Q.    Further down it says:  Future first
12  ground pick, direct contacts, 126.
13           Do you see that there?
14     A.    I see that.
15     Q.    Do you have an understanding of what
16  that reference is?
17     A.    Again, for not building the deck I
18  wouldn't actually know, but I would assume it's
19  pretty self-explanatory for somebody who made
20  contact with somebody that was considered to be
21  first round pick.
22     Q.    And first round of the NBA draft?
23     A.    Sorry.  Excuse me.  I believe that to
24  be the case, yes.
25     Q.    All right.  And then further down it

43 (Pages 166 - 169)

Daniel R Cutler                                        March 23, 2021
Bowen v. Adidas

1    says: Top 30 high school players met with in the
2    2017, 2016 and 2018 classes. It says 51.
3          Do you see that there?
4    A.    I do.
5    Q.    And again, if you can, just, you know,
6    for somebody who is not a basketball person, what
7    does that mean?
8    A.    Again, with respect to what it means in
9    terms of the document you would have to ask whoever
10   built it, but I would speculate that that means
11   having a touch point with one of those top 30
12   ranked players based on some ranking system,
13   whether it be -- again, like we spoke about
14   earlier, rivals in ESPN for the consensus top 30
15   players, getting some touch point with players that
16   were elite players in most of the classes.
17   Q.    Right underneath it says: Top 30
18   player interactions, 95.
19   A.    Uh-huh.
20   Q.    What is your understanding of what that
21   data point references?
22   A.    Again, I refer back to -- I didn't
23   build the deck, so I think you would have to ask
24   whoever did. But I would imagine it would be a
25   similar situation, but I don't know what that

1    means. Obviously 30 players, 95 interactions. I'm
2    not exactly sure what that reference is.
3    Q.    The phrase "player family
4    interactions," though, does that have any meaning
5    to you?
6    A.    I would take that -- again,
7    speculating, I would take that to mean interactions
8    of saying hello to a parent; having, you know,
9    discussions with a parent or a family member.
10   Q.    And then I want to get your
11   understanding -- first of all, we have top 30 in
12   there.
13         Do you know why top 30 and not top 40
14   or top 50 or top 20?
15   A.    Again, I apologize. You would have to
16   ask whoever created this deck. I didn't make that,
17   so I'm not sure why that says that.
18   Q.    Let me ask it this way: In terms of
19   the rank and that type of thing, are the ranks done
20   in groups of 30?
21   A.    I don't believe they are.
22   Q.    In terms of the NBA draft, how many
23   slots are there in the first round of the NBA
24   draft?
25   A.    30 in the first round.

1    Q.    You said 30?
2    A.    I believe there is 30 in the first
3    round.
4    Q.    Do you have an understanding of why the
5    data point and player family interactions for the
6    top 30 players is 95, whereas the top 30 high
7    school players met with in the 2016, 2017 and 2018
8    classes is 51?
9    A.    Again, you would have to go back to the
10   fact that I didn't build the deck, so I would just
11   be speculating. But it was regular practice and we
12   were instructed to always go through a family
13   member rather than going through the child.
14   Q.    And why was that? Just help us
15   outsiders to understand that.
16   A.    A fair number of the players are under
17   18, so I think if there is a random adult going up
18   to their child that would be a strange practice.
19   So we would always try to check in with the parent
20   and guardian so they knew who we were, especially
21   if we were to take them on a Nations trip or
22   something like that.
23         Obviously if they're away from their
24   families we want to make sure that they have a
25   point of contact of who their children were with.

1    Q.    I'm talking about running into somebody
2    in a high school game. You're going to talk to mom
3    and dad before you talk to their son?
4    A.    Yeah. That's the route I would go as
5    to not alarm anybody why is a random 30-year-old
6    kid talking to a 17-year-old.
7    Q.    Understood.
8          You mentioned that -- and I'm
9    paraphrasing -- instructions that you were given to
10   talk to other parents.
11         What do you recall about that
12   instruction?
13   A.    I recall being told to make sure we
14   touched -- had a touch point with a parent or
15   guardian.
16   Q.    And who gave you that instruction?
17   A.    That was from Mr. Rivers, Mr. Gatto,
18   and Miss Hanson, I believe.
19   Q.    And do you recall how that was -- that
20   instruction was given to you? Was that at a
21   meeting or in an email?
22   A.    I don't recall exactly. I think it was
23   just pretty much our standard method of operating.
24   Q.    So a standard method of operation. All
25   right.

44 (Pages 170 - 173)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 174

1        Let's scroll down -- I think three more
2  slides.  It's a scouting slide, and this is, I
3  believe, Page -- it might be Page 9 or 10 of the
4  Power Point.  Let me know when you see the heading.
5  It says "Scouting."
6     A.   I see that.
7     Q.   And the slide reads:  We've made it a
8  priority to maintain, initiate and extend
9  relationships with top ranked prospects in every
10  high school class regardless of brand affiliation.
11        Do you see that there?
12     A.   I do.
13     Q.   Is that understanding, you know, as an
14  Adidas consultant of what the company's priorities
15  were with respect to scouting a grassroots
16  basketball?
17     A.   I'm sorry.  Could you just go over that
18  question again?
19     Q.   Yeah.  I'm asking you as an Adidas
20  basketball consultant during this time period, you
21  know, is the statement consistent with your
22  understanding that it's a priority to maintain
23  relationships with top ranked prospects in every
24  high school class?
25     A.   Yeah.  Again, going back -- you know,

Page 175

1  wanting to make sure we have those relationships so
2  that if any of those kids turned out to be somebody
3  that we were looking for as an endorsement contract
4  or going to NBA, it would be helpful to have that
5  be an established relationship.
6     Q.   Those four bullet points there -- I
7  think you just touched on the last one.  It says:
8  Players we sign in each NBA draft.
9        The first one talks about Adidas
10  Uprising.  The second one is Point of View, POV, on
11  Adidas basketball product.
12        Is that referring to just getting
13  feedback on the product?
14     A.   Yeah.
15        Oftentimes we would consult with our
16  grassroots basketball program coaches to get their
17  feedback of the student athletes on, you know, if a
18  shoe was comfortable or not or if they felt it was
19  too -- focused group type activities.
20     Q.   The next bullet says:  Consider an
21  Adidas college.
22        What does that mean?
23     A.   I believe -- again, speculating, I
24  believe it would be to consider colleges that are
25  amongst the roster that Adidas sponsored.

Page 176

1     Q.   And when you say that, I mean is that
2  part of just the touch points and interactions with
3  the top ranked prospects referenced here -- is one
4  of those to kind of help them consider going to an
5  Adidas-sponsored program?
6     A.   Again, speculating, because I didn't
7  create the document, but I think considering an
8  Adidas college that we have a relationship with
9  obviously was beneficial to all the parties that
10  are involved.
11     Q.   I'm sure it is.  And I'm guessing -- I
12  know you're saying you're speculating because you
13  didn't draft this, and I get that.
14        What I really want to get is just your
15  personal understanding as one of the recipients of
16  this slide that -- you know, you received this in
17  your email.  So I just want to see what makes sense
18  with you and what doesn't make sense with you in
19  terms of your work experience there.
20     A.   I think if there was a particular
21  college that Adidas had in their sponsor that
22  seemed to be also a good level of play for a
23  particular student athlete and they were interested
24  in going there, there was nothing wrong with making
25  sure that they were aware of that school.

Page 177

1     Q.   The level of play, are you talking
2  about just -- what do you mean by that, the "level
3  of play?"
4     A.   Well, not every player can go to
5  Kentucky or Duke or Kansas or UCLA; right?  So if
6  there is a player that is a lower level but they
7  come to us and they say "hey, I don't know what to
8  do here" -- you know, obviously if there is a
9  potential that their level is that of not of one of
10  those blue bloods, we may have a relationship.
11     Q.   And then with -- I mean, the top
12  prospects that are referenced here, the top ranked
13  prospects -- I mean, what type of Adidas schools
14  are they going to -- are you going to talk about
15  with them?
16     A.   I believe at the time we had a
17  portfolio of a number of high level of colleges
18  that were consistently ranked in the top ten of
19  basketball polls.
20     Q.   I think you just mentioned a few:
21  Kansas, Louisville.  Not Kentucky, but Louisville.
22     A.   I said Kentucky.  You said Louisville.
23     Q.   Yeah.  Is Louisville one of those?
24     A.   Louisville is an Adidas-sponsored
25  school at the time, yes.

45 (Pages 174 - 177)

Daniel R Cutler                        March 23, 2021
Bowen v. Adidas

Page 178

1    Q.    And Kentucky is not; right?
2    A.    Not what?
3    Q.    Not an Adidas-sponsored school.
4    A.    No; I don't believe they are.
5    Q.    Okay.  If you can scroll down to the
6  next slide, please.  It says:  Target athletes.
7  Large emphasis has been put on establishing and
8  nurturing players who are projected as lottery
9  picks in the 2016 and 2019 NBA drafts, and there is
10 four players pictured there.
11   A.    I see that.
12   Q.    Is this line consistent with the work
13 that you were doing that you've talked about in
14 terms of establishing and nurturing players,
15 relationships with players who are potential draft
16 lottery picks?
17   A.    I didn't have relationships with any of
18 these four players I see.
19   Q.    No, not these ones.  I'm just saying in
20 general as part of your work as a consultant is
21 this slide consistent with -- there is an emphasis
22 on establishing and nurturing players who are, you
23 know, projected to be lottery picks in the NBA
24 draft.
25   A.    Sure.  Yeah.  Back to the same point of

Page 179

1  making sure that those high potential, high draft
2  picks -- there was some sort of relationship
3  cultivated so they feel comfortable if they were to
4  choose to come with us.
5    Q.    And then the next slide there is ESPN
6  2016 class rankings.  Do you see that slide?
7    A.    I do.
8    Q.    And then it's got a number of folks on
9  there, but it says:  We are in contact with 22 of
10 the top 30 players in the 2016 class.
11        Do you see that there?
12   A.    I do.
13   Q.    And again, was the ESPN 2016 class
14 rankings -- was that one of the rankings that
15 Adidas grassroots used to identify the top 30
16 players in each of the classes?
17   A.    It appears to be that we would have
18 used ESPN in this regard.
19   Q.    And aside from this slide was that --
20 again, maybe we'll touch on it here in a second,
21 but was that one of the sources that you used or
22 you referred to from time to time to identify the
23 top high school players?
24   A.    Yes.  I would say that's accurate.
25        I respected the people that worked at

Page 180

1  ESPN that did their rankings, so I would have
2  consulted their rankings.
3    Q.    Again, there is 30 here.  That seems to
4  be the magic number.
5        Do you know why there is 30 people on
6  the list?
7    A.    Again, you would have to contact
8  whoever was the one to have created this.
9    Q.    Okay.  Let's control down.  It's going
10 to be Page 19, and this is Next Gen.
11   A.    Can you just give me a moment?  If it's
12 okay with you guys I would just like to kind of get
13 the context and read the slide before we get to 19,
14 if that's okay with you.
15   Q.    That's fine.  Just let me know when
16 you're there.
17   A.    Thank you.  Okay.  Thank you.
18   Q.    All right.  So this slide says:  Next
19 Gen 2020.  Making an impactful and consistent
20 statement among middle school players ages 11 to 14
21 will be a three-year process.  The importance of
22 establishing inroads with future top 100 high
23 school prospects in bringing awareness in product
24 seeding is essential in order for us to achieve
25 youth basketball leadership by 2020.

Page 181

1        Do you agree?  Is this statement here
2  consistent with your understanding of what the
3  goals were for Adidas grassroots basketball at this
4  time period?
5    A.    Speculating, but that would be
6  something that was way above my level of input.
7  That would be a higher brand conversation that I
8  wasn't involved in.
9    Q.    Do you think that's more of -- you said
10 a "higher brand conversation."
11   A.    Above my pay grade, for lack of a
12 better term.
13   Q.    Is that something like Chris McGuire
14 would know the answer to this question rather than
15 you?
16   A.    I wouldn't know.
17   Q.    Let's go -- if you go down to -- it's
18 going to be Slide 22, and it's entitled "NCAA."
19   A.    With the logos on it?
20   Q.    It's the one right after the logos.
21   A.    Yeah.  I see it.
22   Q.    This one says:  The NCAA platform
23 allows us to connect Adidas to the top basketball
24 programs in the country and showcase new products,
25 stories, driving brand perception.  And then there

46 (Pages 178 - 181)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 182

1  is a four bullets on there.
2          Do you see those?
3      A.   I do.
4      Q.   The first one: Increased communication
5  with head and assistant coaches.
6          Is that something that you engaged in
7  as an Adidas consultant?
8      A.   Did I communicate with head and
9  assistant coaches?
10     Q.   Yes; at NCAA schools.
11     A.   Yes. I communicated with head coaches
12 at a number of NCAA schools.
13     Q.   And the second bullet: Providing
14 constant recruiting support and intelligence to
15 school staff.
16         Is that something that you did as well?
17     A.   I would disagree with the first part,
18 but I definitely would have shared information and
19 intelligence with a number of school staff.
20     Q.   Which part do you disagree with?
21     A.   I don't know what "recruiting support"
22 really refers to.
23     Q.   Did you help schools recruit players
24 to, you know, Division 1 programs or recruit high
25 school kids to their teams?

Page 183

1      A.   Could you just be a little more
2  specific? What do you mean "help" the schools
3  recruit?
4      Q.   Did you put schools in contact with
5  players or players' families, high school players?
6      A.   If I was asked to from a student
7  athlete or a family I would often -- yeah. I would
8  certainly connect schools and players at Adidas and
9  non-Adidas sponsored schools.
10     Q.   Was that part of your job
11 responsibilities, then, as a consultant?
12     A.   I don't believe I was specifically
13 tasked with doing so.
14     Q.   I want to show you real quick since
15 we're just talking about rankings and that type of
16 stuff -- since we're on that topic I want to show
17 you another document. If you go to the main screen
18 and if you open up Exhibit 11.
19     A.   Okay.
20     Q.   So this is an email from you, Dan
21 Cutler@gmail.com, dated January 24, 2015.
22         Do you see your name on the From field?
23     A.   I do.
24     Q.   Again, is this your email address?
25     A.   That would be consistent with my email.

Page 184

1      Q.   And then January 24 of 2015, that's the
2  date on this email; correct?
3      A.   That appears to be the date.
4      Q.   And then you sent it to who?
5      A.   It appears that was sent to Rivers,
6  Chris.
7      Q.   Let me show you -- since there is
8  really no text in here other than your name let me
9  show you the document that's listed as the
10 attachment there, and the attachment states:
11 Adidas 2015 Nations Impact Player Tracker.
12         Do you see that attachment or do you
13 see that listed on your cover email?
14     A.   I do.
15     Q.   And the subject line of this email is
16 depth charts; right?
17     A.   It appears to be, yes.
18     Q.   Let's go ahead and open up Exhibit 12,
19 which is an Excel spreadsheet, and this is the
20 attachment to the email that we just looked at.
21     A.   I don't see anything when I open it.
22 It just says the connection has been set. It's not
23 coming up.
24     Q.   Are you back on -- are you on the
25 Exhibit Share platform?

Page 185

1      A.   I see that there is Exhibit 12. Just
2  when we click on it nothing comes up.
3          MR. CICCARELLI: It says the connection
4  was reset. I don't know what that means.
5          MR. RAM: Andy, are you getting that on
6  your end?
7          MR. LEVINE: It took a moment to load,
8  but it eventually opened here.
9          MR. CICCARELLI: And we're in.
10 BY MR. RAM:
11     Q.   Mr. Cutler, this is the attachment that
12 you had sent to Mr. Rivers there where the subject
13 line was depth charts. And so if you can just take
14 a moment to look at this, I want to ask you
15 generally about depth charts and what you prepared
16 here.
17     A.   Okay.
18     Q.   Let me know when you've had a chance to
19 give it an overview.
20     A.   Yep.
21     Q.   Okay. Did you create this Adidas
22 Nations Impact Player Tracker?
23     A.   I don't recall from the time, but I
24 don't see any reason why that wouldn't be possible.
25     Q.   I mean, is this something that you

47 (Pages 182 - 185)

Daniel R Cutler                              March 23, 2021
Bowen v. Adidas

Page 186

1  would have done in the course of being a
2  consultant?
3      A.   I'm sure I created a lot of
4  spreadsheets from time to time.
5      Q.   Would they be sort of spreadsheets of
6  player rankings that you would have created then
7  like this one?
8      A.   I'm not sure about rankings, but
9  certainly spreadsheets with player information on
10 them.
11     Q.   So this one here, what would this
12 document be used for?
13     A.   I'm not really sure of the exact -- you
14 know, this is probably from five years ago.  So I
15 don't remember specifically.
16     Q.   If you can click on the Tab 2016.
17     A.   Sure.
18     Q.   And so you have on the left under
19 Column A is the players' names and it says:  Point
20 guard, shooting guard, small forward, power
21 forward, center, and then you've got guys listed
22 under there.
23     A.   I see that.
24     Q.   And then to the right it says the
25 ranking range, and there is different numbers.

Page 187

1           What does that column mean, "Ranking
2  Range?"
3      A.   Again, from just my best recollection
4  as this document is five years old or so I believe
5  that would be just the range amongst the reputable
6  rankings that they were -- that they were ranked
7  somewhere around.
8      Q.   Okay.  And if you go to the next tab,
9  2017 to 2018, is that ranking range going to be
10 reflective of the rankings that you referenced?
11     A.   Sure.  That would make sense to me.
12     Q.   Okay.  And then you'll see my client is
13 listed on there, Brian Bowen.  I think he's listed
14 twice, one under shooting guard and then again
15 under small forward in Column A.  Do you see that?
16     A.   I see that.
17     Q.   And what is his ranking on this list
18 here?
19     A.   It appears to be 6.
20     Q.   All right.  Let's move on to -- I want
21 to show you another document here.  You can put the
22 Excel aside.
23           Go ahead and pull up Exhibit 13, if you
24 can, and take a look at that.
25     A.   Okay.

Page 188

1      Q.   So this document -- this email that I
2  have marked as Exhibit 13, the center is Chris
3  Rivers@Adidas.com.  Do you see that there?
4      A.   I see that.
5      Q.   And the date of the email, December
6  20th, 2015.  Do you see that?
7      A.   I do.
8      Q.   Okay.  And do you see your name on here
9  as one of the recipients in the To field?
10     A.   Yep.
11     Q.   Do you see your email address, Dan
12 Cutler@gmail.com?
13     A.   I do.
14     Q.   And there is a number of other folks on
15 here as well.
16           The subject line of the email is:  Soul
17 Patrol Upcoming Missions.  Do you see that?
18     A.   I do.
19     Q.   Okay.  And Mr. Rivers writes:
20 Gentlemen, I realize that we are all moving in
21 multiple directions, which will continue for a
22 while.  So to help get us more streamlined I need
23 your input.  No. 1, by Tuesday, December 22nd
24 please email Dan your list of top five to seven
25 players in the 2017 or 2018 classes that we should

Page 189

1  make a hard push to get, assuming it will take some
2  creative persuasion to get it done.
3           Do you see that there?
4      A.   Yes.
5      Q.   Do you remember receiving this email
6  from Chris Rivers?
7      A.   I do not.
8      Q.   Do you know what Soul Patrol Upcoming
9  Missions refers to?
10     A.   I do not.
11     Q.   Do you remember receiving lists of top
12 five to seven players in the 2017 and 2018 classes
13 that were sent to you by other folks who received
14 this email?
15     A.   I do not recall.
16     Q.   Do you recall -- do you have an
17 understanding of what Mr. Rivers meant when he said
18 that "we should make a hard push to get?"
19     A.   I'm not sure.  You would have to ask
20 Mr. Rivers.
21     Q.   But do you have an understanding of --
22     A.   No, I don't.  I don't recall any
23 understanding of what he meant.
24     Q.   Do you have an understanding of what it
25 meant when he said "assuming it will take some

48 (Pages 186 - 189)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 190

1  creative persuasion to get it done?"
2      A.    Again, I'm sorry. I don't have any
3  recollection of what this would have meant.
4      Q.    You just don't remember what "creative
5  persuasion" means?
6      A.    It's, again, not my words, so you would
7  have to ask Mr. Rivers.
8      Q.    But do you have -- I know it's
9  Mr. Rivers' words, but do you have an understanding
10  of what he meant by "creative persuasion?"
11      A.    I don't. I can't interpret his words.
12      Q.    Okay. When Mr. Rivers says "email Dan
13  your list of top five to seven players in the 2017
14  or 2018 classes that we should make a hard push to
15  get," what does it mean to get a player?
16      A.    Again, I'm not sure. You would have to
17  ask Mr. Rivers.
18      Q.    Do you recall having a conversation
19  with Mr. Rivers about this email?
20      A.    I had a number of conversations with
21  Mr. Rivers, but I don't remember this email
22  specifically being one of them.
23      Q.    Do you have any recollection in your
24  time being an Adidas consultant of what it means to
25  get a player?

Page 191

1      A.    Possibly to play for an AAU team of
2  ours. Possibly to attend Adidas Nations. I'm just
3  not sure. Again, you're asking me to interpret
4  Mr. Rivers' words.
5      Q.    Do you know how Soul Patrol got
6  players?
7      A.    Again, I'm just not --
8          MR. CICCARELLI: Objection.
9  BY MR. RAM:
10      Q.    What was your answer, Mr. Cutler?
11      A.    I said: Again, I don't know what you
12  mean.
13      Q.    No. 2 on this email says: Please plan
14  on being in Portland on January 20th, afternoon,
15  and 21st.
16          Do you recall traveling to Portland,
17  Oregon on January 20th and 21st of 2016?
18      A.    I don't recall specifically being there
19  those dates, but I have no reason to believe I
20  didn't.
21      Q.    And again, this is a working email you
22  received, right, from Mr. Rivers?
23      A.    It appears that that would be the case.
24      Q.    If you can open up -- bear with me one
25  second, please.

Page 192

1          MR. CICCARELLI: Can we take five
2  minutes to use the bathroom?
3          MR. RAM: Yeah. That's fine. Let's
4  take a break.
5          THE VIDEOTAPE SPECIALIST: We are going
6  off record. The time is 3:32 p.m.
7          (Short recess taken.)
8          THE VIDEOTAPE SPECIALIST: We are back
9  on record. This is the beginning of Media Unit 4.
10  The time is 3:44 p.m.
11  BY MR. RAM:
12      Q.    Mr. Cutler, if you can, please open up
13  Exhibit 14. We've added additional exhibits in
14  here just to speed the process along, but if you
15  can start with Exhibit 14.
16      A.    Okay.
17      Q.    Do you have that in front of you?
18      A.    I do.
19      Q.    All right. So this is an email chain.
20  We looked at the first email in the chain a couple
21  of minutes ago.
22          Do you see that, the one that we
23  reviewed? The subject is Soul Patrol Upcoming
24  Missions.
25      A.    I see that.

Page 193

1      Q.    This email is from Anthony
2  Coleman@Adidas.com; is that correct?
3      A.    That appears to be correct.
4      Q.    Dated December 22nd, 2015.
5      A.    It appears to be correct.
6      Q.    All right. Do you see your email
7  address in the To field?
8      A.    I do.
9      Q.    And the subject line of this is a reply
10  to Soul Patrol Upcoming Missions; correct?
11      A.    That's what it appears to be.
12      Q.    Do you recall receiving this email?
13      A.    I do not.
14      Q.    Is this a work email?
15      A.    It looks like it would be.
16      Q.    And then Mr. Coleman writes: Fellows,
17  don't forget to hit Dan with the names by EOD.
18  Thanks, AC.
19          Do you see that on Mr. Coleman's email?
20      A.    You've got to read that last part of
21  that, too.
22      Q.    Go ahead and read that one.
23      A.    I'll read that one happily. "A/k/a Mr.
24  Mani/Pedi."
25      Q.    All you guys have nicknames.

49 (Pages 190 - 193)

Daniel R Cutler                          March 23, 2021
Bowen v. Adidas

Page 194

1        All right.  So AC writes:  Don't forget
2    to hit Dan with the names by end of day.
3        Do you recall receiving the names from
4    the different recipients of this email?
5        A.    I don't have any recollection of it.
6        Q.    Do you know why Chris and Anthony
7    Coleman were telling folks to send the names to you
8    as opposed to somebody else?
9        A.    If I had to assume based on other
10   documents we've seen, I would have created a
11   spreadsheet of the names.
12       Q.    Let's take a look at Document 15.  If
13   you can just pull that up and let me know when you
14   have it in front of you.
15       A.    I see it.
16       Q.    Okay.  And this is -- it's an email
17   chain, and if we start at the bottom the earliest
18   email in this email chain is December 20th from
19   Chris Rivers, and this is his email asking folks to
20   email you, Dan, your list of top five to seven
21   players in the 2017 and 2018 classes that we should
22   make a hard push to get, assuming it will take some
23   creative persuasion to get it done.
24       You see on that email; right?
25       A.    I do.

Page 195

1        Q.    Okay.  And then the middle email is
2    from TJ Gassnola@gmail.com to Chris Rivers, and it
3    looks like a response that was just sent from Mr.
4    Gassnola to Mr. Rivers.
5        A.    It appears to be that.
6        Q.    And then the top email -- it says from
7    Chris Rivers@Adidas.com.  Do you see that?
8        A.    I do.
9        Q.    And the date is December 23rd, 2015.
10   Do you see that date?
11       A.    I see that date.
12       Q.    And are you the recipient of this email
13   from Chris Rivers?
14       A.    That appears to be the case.
15       Q.    Okay.  And it says:  FW.  Forward Soul
16   Patrol Upcoming Missions - from TJ.
17       Do you see that?
18       A.    I do.
19       Q.    Is this a work-related email that you
20   received from Mr. Rivers?
21       A.    It would seem to be.
22       Q.    And again, looking at this email and
23   the emails that we've looked at in the past few
24   exhibits do you have an understanding now of what
25   Soul Patrol was?

Page 196

1        A.    Again, I'm not -- I have no
2    recollection of knowing what Soul Patrol is.
3        Q.    Okay.  All right.  Let's look at TJ's
4    email to Chris Rivers that was then forwarded to
5    you on 2017.  There is list of six names there.
6        Do you see those?
7        A.    I do.
8        Q.    The first one is Ayton.  Do you
9    recognize that name?
10       A.    I'm sorry.  There is some background
11   noise.  What was that?
12       Q.    The first name under 2017 is Ayton.  Do
13   you recognize that player's name?
14       A.    I do.
15       Q.    And who that would be?
16       A.    If I had to guess I would believe that
17   would be in reference to Deandre Ayton.
18       Q.    The next name, Vanderbilt.  Do you know
19   who that would be?
20       A.    Again, subjectively I would view that
21   would be Jarrett Vanderbilt.
22       Q.    Do you know what the "AFST" in
23   parentheses refers to?
24       A.    I'm sorry.  You would have to ask TJ
25   Gassnola.

Page 197

1        Q.    Is that something you've seen before in
2    communications with Adidas?
3        A.    No, not to my recollection.
4        Q.    How about the next name, McCoy?
5        A.    Speculating --
6        (Internet interference.)
7        (Discussion off the record.)
8    BY MR. RAM:
9        Q.    Mr. Cutler, I apologize.  I'm going to
10   ask you again for the sake of having a record here:
11   Mr. McCoy -- I believe you said Brandon McCoy; is
12   that right?
13       A.    Again, speculating, but that would make
14   sense based on the timeline.
15       Q.    And the next name, Bowen.
16       A.    Again, probably based on the timeline
17   -- I'm speculating, but I would assume Brian Bowen.
18       Q.    And then Tillman?
19       A.    I'm not sure about the Tillman.  There
20   was a couple of players around that time named
21   Tillman.  I don't remember who that would be in
22   reference to specifically.
23       Q.    And the name after that, Tremont
24   Waters.
25       A.    Yeah.  I'm familiar with Tremont

50 (Pages 194 - 197)

Page 198

1 Waters.
2     Q.    And TJ says next to him:  Maybee LOL.
3         Do you have a sense of why he would
4 have done that?
5     A.    You would have to ask TJ.  But he
6 played for one of TJ's teams, and he wasn't very
7 good.
8     Q.    And then under 2018 the name is listed
9 Javonte Smart.
10     A.    I'm familiar with Javonte Smart.
11     Q.    Are you familiar with all those names
12 there, Reid, DeSousa and Brown?
13     A.    Outside of an horrendous misspelling of
14 Nazreon Reid's name, yes; I'm familiar with all of
15 those.
16     Q.    Yeah.  Naz Reid unfortunately is
17 misspelled throughout these documents.  But let me
18 ask you this.  I mean, this is TJ's response to the
19 top five to seven players from Chris Rivers, and
20 Mr. Rivers forwards this to you.
21         Do you have any recollection of what
22 you did with this information?
23     A.    I just -- I wouldn't remember at this
24 point.
25     Q.    Are you saying you don't remember?

Page 199

1     A.    Yeah.  I mean, you're talking about
2 almost six years ago.  I don't remember what I
3 would have done with that.  I would assume I would
4 have put it into a spreadsheet, but I don't
5 remember it exactly.  Again, this is an assumption,
6 speculating.
7     Q.    Okay.  But you see Mr. Gassnola lists
8 Brian Bowen as one of his top players in the 2017
9 class in his email to Mr. Rivers.  Do you see that?
10     A.    I see Mr. Bowen's name there.
11     Q.    And this is in response to Mr. Rivers'
12 email from December 20th asking everyone to send
13 you a list of the top five to seven players in the
14 2017 and 2018 classes that we should make a hard
15 push to get, assuming it will take some creative
16 persuasion to get it done; is that right?
17     A.    Yeah.  That's an email to Chris Rivers,
18 not to me.
19     Q.    Right.  But then Chris Rivers sent this
20 to you; right?
21     A.    Yes.  That appears correct.
22     Q.    And the subject line is Soul Patrol
23 Upcoming Missions from TJ.
24     A.    Yeah.  Again, that appears to be the
25 case.

Page 200

1     Q.    Let's look at Exhibit 16, please.
2     A.    Okay.
3     Q.    All right.  This is dated December
4 22nd, 2015.  Do you see that date at the top?
5     A.    I do.
6     Q.    It's from Corey Hulio.  Is that Cory
7 Smith?
8     A.    I believe that's his email, yes.
9     Q.    And do you see your email address as
10 one listed in the cc line of this email?
11     A.    Yes.  I believe I was cc'd on this.
12     Q.    And again, with all these emails with
13 the subject matter -- is this a work-related email?
14     A.    This appears to be a work-related email
15 regardless of the subject matter.
16     Q.    Okay.  And in taking a look at this,
17 what does this -- do you understand this email from
18 Corey to be?
19     A.    Could you just specify -- what do you
20 mean by that?
21     Q.    Yeah.  I mean, this is -- again, it's
22 an email chain.  It's a response to Mr. Rivers'
23 December 20th email asking everyone to email you
24 their list of top five to seven players in the 2017
25 and 2018 classes that we should make a hard push to

Page 201

1 get, assuming it will take some creative persuasion
2 to get it done.
3         Do you recognize this email as Corey
4 Hulio's list of players that he was submitting in
5 response to Mr. Rivers' email?
6     A.    Yeah.  That would appear to be Corey
7 Smith's top five to seven players that we should
8 make a hard push to get.
9     Q.    Let's take a look at the next document,
10 which is Exhibit 17, please.  Let me know when
11 you've got that in front of you, please.
12     A.    I see that.
13     Q.    Again, starting from the bottom, this
14 is an email chain.  The original email is the
15 December 20th, 2015 email from Mr. Rivers
16 requesting folks to send you their list of top five
17 to seven players and the middle email in the chain
18 is -- do you see that at the bottom, Mr. Rivers?
19     A.    I do.
20     Q.    And then the middle response is from TJ
21 Gassnola@gmail.com to Chris Rivers dated December
22 23rd, 2015.  Do you see that in the middle?
23     A.    I see that.
24     Q.    And it's just from TJ to Chris Rivers;
25 correct?

51 (Pages 198 - 201)

Daniel R Cutler                          March 23, 2021
Bowen v. Adidas

Page 202

1    A.    It appears to be.
2    Q.    And then he states:  We need to add
3  Rowan Barrett from Monteverde to the Soul Patrol
4  hit list.  Do you see that?
5    A.    Yeah.  I read that.
6    Q.    And then this email was forwarded to
7  you; is that correct?
8    A.    Yes.
9    Q.    And it was sent to you by Chris Rivers?
10    A.    It appears to be, yes.
11    Q.    And the date is December 23rd, 2015?
12    A.    I see that.
13    Q.    And that's your email again, Dan
14  Cutler@gmail.com in the To field?
15    A.    This is still me.
16    Q.    And Mr. Rivers writes:  FYI.
17    A.    Uh-huh.
18    Q.    Okay.  Were you -- do you recall taking
19  a look at this email, assembling a list of the Soul
20  Patrol hit list?
21    A.    I'm sorry?
22    Q.    Do you recall assembling -- I'm using
23  TJ's phrase here, "Soul Patrol hit list."
24         Do you recall -- does this email
25  refresh your recollection on whether or not you

Page 203

1  were collecting the names from the various folks
2  who received Chris Rivers' December 20th email?
3    A.    Again, I have no reason to believe that
4  those names weren't sent to me, but I don't recall
5  it at the time.
6    Q.    Again, is this a work-related email
7  that you received along with the others?
8    A.    I would assume this is related to, yes,
9  our work that we were doing.
10    Q.    The work you were doing for Adidas?
11    A.    I was forwarded it by somebody at
12  Adidas, so I think that's a fair assumption.
13    Q.    Well, I don't want to make an
14  assumption.  I mean, this is your work history, so
15  these are communications with you and Adidas
16  consultants and Adidas employees; correct?
17    A.    This is a communication from Chris
18  Rivers to me forwarding me a message from another
19  consultant to him.
20    Q.    Okay.  And again, it's not a trick
21  question.  Was that a work-related email?
22    A.    I have no reason to believe it wasn't.
23    Q.    Let's go to Exhibit 18, please.  Take a
24  look at that.
25    A.    Okay.  I've opened that.

Page 204

1    Q.    All right.  So this email is from Chris
2  Rivers@Adidas.com dated January 8, 2016.  Do you
3  see that?
4    A.    I do.
5    Q.    And this one is -- it doesn't have an
6  exhibit sticker on here, but we'll make a note to
7  have that added on there.  But this is labeled in
8  Exhibit Share as Exhibit 18.
9         Do you see that on your screen when you
10  clicked on it?
11    A.    Exhibit 00018.PDF.
12    Q.    Okay.  And again, in the To field do
13  you see your email address listed there?
14    A.    Yes.  I see mine as well as a number of
15  others.
16    Q.    And do you see other people with
17  Adidas.com emails?
18    A.    Not in the To.
19    Q.    Do you see those in the cc field?
20    A.    Yes, I do.
21    Q.    All right.  And the subject line of
22  this email is 2016 Uprising Soul Patrol meetings,
23  January 20.  Is that correct?
24    A.    That appears to be correct.  Yes.
25    Q.    So Mr. Rivers writes:  Gentlemen, we

Page 205

1  will meet all day Wednesday, January 20th in
2  Portland, and we have a lot to cover and share.
3  Please be ready to start at 9:00 a.m.  An agenda
4  will be ready next week.
5         And then there is some other
6  discussions there and he continues:  Lastly, please
7  be prepared for some new travel and expense
8  policies going forward.  Let me know if you have
9  any questions.  Rivers.
10         Did I read that correctly?
11    A.    Yes.  You left out a sentence, but yes;
12  that's all correct.
13    Q.    Do you recall traveling to Portland,
14  Oregon to Adidas America headquarters for a meeting
15  on Wednesday, January 20th of 2016?
16    A.    I don't recall specifically, but I have
17  no reason to believe I didn't.
18    Q.    And again, the subject line is 2016
19  Uprising Soul Patrol meetings, January 20th.
20         Does that subject line in the reference
21  to a meeting in Portland help you recall what Soul
22  Patrol was?
23    A.    Again, I don't remember that term.
24    Q.    Did the reference there in "please be
25  prepared for some new travel and expense policies

52 (Pages 202 - 205)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 206

1    going forward" -- do you have any recollection of
2    what those new travel and expense policies were in
3    early 2016?
4        A.    You would have to ask Chris, who wrote
5    the email. I'm sorry. I don't recall.
6        Q.    I just want to ask you if you have a
7    recollection as a consultant of whether or not you
8    were subject to new travel and expense policies in
9    that time frame.
10       A.    I wouldn't remember.
11       Q.    And again, is this an email that you
12   received, a work email?
13       A.    I don't have any reason to believe it's
14   not.
15       Q.    All right. Let's go to Exhibit 19.
16   Let me know when you have Exhibit 19 in front of
17   you.
18       A.    I do.
19       Q.    Okay. And so starting at the top,
20   again this email is from Chris Rivers@Adidas.com;
21   correct?
22       A.    That appears to be the case.
23       Q.    It's dated January 31st, 2016.
24       A.    That appears to be the case.
25       Q.    And there is a number of recipients to

Page 207

1    this email; correct?
2        A.    Yes.
3        Q.    And you're listed first there, Dan
4    Cutler@gmail.com; correct?
5        A.    Yes. That's the name on there.
6        Q.    And there is a number of other folks
7    copied and cc'd on this email; correct?
8        A.    Yes. That appears to be so.
9        Q.    And the subject line is: Black Ops,
10   Rivers Solo Mission Recap, Napa, California.
11           Do you see that subject line?
12       A.    I do.
13       Q.    And he addresses this "Distinguished
14   Soul Patrol Members."
15           Do you see that there in the email?
16       A.    I see that.
17       Q.    Again, do you have any recollection of
18   Soul Patrol from this email that's addressed to you
19   and others as distinguished Soul Patrol members?
20       A.    Again, I've heard the term. I have no
21   idea what it would refer to.
22       Q.    In what context have you heard the term
23   "Soul Patrol?"
24       A.    You've mentioned it multiple times in
25   this deposition.

Page 208

1        MR. CICCARELLI: Objection. I think
2    we've asked and answered that question.
3    BY MR. RAM:
4        Q.    I just want to clarify.
5            Outside of today's deposition do you
6    have a recollection of hearing the term "Soul
7    Patrol?"
8        A.    Again, as I said, I remember hearing
9    it. I just don't know in context and I wouldn't
10   recall as to what it would be. I would just be
11   speculating.
12       Q.    So Mr. Rivers writes: As we discussed
13   in Portland, it's imperative that you recap your
14   field trips. I don't need anything formal, but I
15   need to make sure that you accomplish some real
16   business objectives and that you communicate key
17   points to Jim and I.
18           So I want to ask you a couple of
19   sentences about that first line in the email to
20   Distinguished Soul Patrol Members.
21           First, do you recall what the
22   discussions were at the meeting in Portland on
23   January 20th and 21st, 2016?
24       A.    I do not recall.
25       Q.    What is your understanding as a

Page 209

1    recipient of this email about being imperative to
2    recap your field trips?
3        A.    Again, based on my understanding of the
4    email that I didn't write, if you go on a trip, to
5    obviously reply back with some sort of a recap to
6    justify your travel expenses.
7        Q.    And what are the types of -- your
8    understanding of the term "field trips," what would
9    that entail?
10       A.    I think this is an example of a trip.
11       Q.    Okay. Did you take field trips?
12       A.    I took trips. What do you mean by
13   "field trips?"
14       Q.    Well, that's the term that's used in
15   the email. I just want to understand that.
16       A.    Again, that would be Chris' term. You
17   would have to ask Chris.
18       Q.    But did you take trips then?
19       A.    I traveled for work regularly.
20       Q.    You did. Okay.
21           And then Chris writes: I need to make
22   sure that you've accomplished some real business
23   objectives and that you communicate key points to
24   Jim and I.
25           What do you make of that sentence

53 (Pages 206 - 209)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 210

1  there?  What is your understanding of it?
2      A.    You would have to ask Chris.
3      Q.    But what is your understanding?
4      A.    I'm not sure I understand what you
5  want, what you're trying to get out of this
6  question.
7      Q.    I'm not trying to get anything other
8  than what you understand as a recipient of this
9  email of what it means to you.
10     A.    For me it would mean if I went on a
11 trip and watched a game, talk about who I saw at
12 the game, the players that I watched, who was
13 there; anybody that I may have talked to.
14     Q.    Okay.  Where he states "accomplish some
15 real business objectives," what is your
16 understanding of "real business objectives?"
17     A.    Who I went to see; what teams were
18 there; people I talked to.  Those would be real
19 business objectives.
20     Q.    Okay.  The people that you talked to,
21 would that include players and players' families?
22     A.    They would be within the scope of
23 people that I would talk to.  Sure.
24     Q.    Okay.  College players?  High school
25 players?

Page 211

1      A.    It would depend on the trip I went on.
2      Q.    But those players would be within the
3  scope; is that right?
4      A.    Scope of what?
5      Q.    What you just said, the scope of your
6  meetings with people.
7      A.    Those players would fall within the
8  scope of any of my travels possibly.
9      Q.    Maybe another way to put it:  It
10 doesn't exclude high school players or parents of
11 high school players, does it?
12     A.    I don't think it excludes anybody.
13         I think if I ran into a former NBA
14 player, if I ran into a former work colleague, if I
15 ran into a competitor, I think -- to not exclude
16 anybody I think leaves a large number of people.
17     Q.    I guess what I'm trying to understand
18 is since this is addressed -- the subject line is
19 Black Ops, Rivers, Solo Mission Recap, Napa,
20 California, and it's addressed to Distinguished
21 Soul Patrol Members.  And the second line of his
22 email is referring to accomplishing some real
23 business objectives.
24         And so was it -- was that what Soul
25 Patrol was engaged in, was accomplishing Adidas'

Page 212

1  business objectives?
2         MR. LEVINE:  Objection.
3      A.    Could you ask the question again?
4      Q.    Yeah.  Was that what Soul Patrol was
5  engaged in, was to accomplish Adidas' business
6  objectives?
7         MR. LEVINE:  Objection.
8      A.    Again, I would be unfamiliar with what
9  you mean by "Soul Patrol members" and what their
10 objectives would be.
11     Q.    You do see that you're one of the
12 recipients?  You're the first person on the To line
13 of this email and it's addressed to Distinguished
14 Soul Patrol Members; right?
15     A.    I see that on the email and I see what
16 the subject is and I see the first sentence.
17     Q.    All right.  Let's go to Exhibit 20,
18 please -- or excuse me.  21.
19     A.    21?
20     Q.    Yeah.  Okay.  Go ahead and take a look
21 at this one, Mr. Cutler.
22     A.    I see it.
23     Q.    Again, I just want to start at the top.
24         This email is from Chris
25 Rivers@Adidas.com; correct?

Page 213

1      A.    Yes.  That appears to be correct.
2      Q.    Okay.  And it's dated Wednesday, March
3  2nd, 2016; is that correct?
4      A.    That appears to be true.
5      Q.    Okay.  And there is a number of people
6  listed in the To field, including Dan
7  Cutler@gmail.com; correct?
8      A.    Yes.  I believe I'm listed six or
9  seven.
10     Q.    Again, that's your email address;
11 right?
12     A.    That would be correct.
13     Q.    And the subject line is:  Best
14 recruiters at the assistant coach level.  Correct?
15     A.    Yes.
16     Q.    Okay.  Is this another example of a
17 work email?
18     A.    I'm sure you could signify this as a
19 work email if you wanted.
20     Q.    Well, I mean, what else would it be
21 other than a work email?
22     A.    This seems to be potentially just a
23 personal email.
24     Q.    And what gives you that indication that
25 it's personal as opposed to work?

54 (Pages 210 - 213)

Daniel R Cutler                          March 23, 2021
Bowen v. Adidas

Page 214

1     A.    It seems like it's a little more
2  friendly rather than anything business or work
3  objective within this email.
4     Q.    Are the people who received the email
5  -- are those all people that you worked with as an
6  Adidas consultant?
7     A.    Those are people that I would have been
8  at times working with as an Adidas consultant.
9     Q.    And those are Adidas consultants and
10 Adidas employees; correct?
11    A.    That appears to be correct.
12    Q.    And Chris Rivers is an Adidas employee;
13 correct?
14    A.    Yes.  That appears to be correct.
15    Q.    And he cc'd Jim Gatto at Adidas.com,
16 and Mr. Gattos is an Adidas employee; correct?
17    A.    That appears to be correct.
18    Q.    So his email states:  I was able to
19 rank our Soul Patrol best recruiters, but I didn't
20 want to start any shit.
21          Do you see that?
22    A.    I do.
23    Q.    And then he says:  Oh, what the hell.
24 Let's get started.  And then he lists 1 through 10.
25    A.    I see that.

Page 215

1     Q.    And No. 7 is Dan.
2     A.    It appears to be.
3     Q.    Looking at this email, the subject
4  line, Best Recruiters At the Assistant Coach Level,
5  what does that mean?
6     A.    If you took the time to review the rest
7  of the document there is a forwarded email by ESPN
8  insiders ranking the best recruiters in college
9  basketball.
10    Q.    And so what does this -- who are the
11 Soul Patrol best recruiters that are referenced
12 here?
13    A.    It appears to be a list of names on
14 there.
15    Q.    And your name is No. 7, Dan?
16    A.    That would make sense that that would
17 be in reference to me.
18    Q.    And ahead of you is TJ, No. 6.
19    A.    It appears to be.
20    Q.    And Jim Gatto is No. 1.
21    A.    Gatto appears to be No. 1.
22    Q.    All right.  Let's take a look at
23 Exhibit 22, please.
24    A.    Okay.  Just give me a minute to review
25 the entire email.  I'm sorry.

Page 216

1     Q.    Go for it.
2     A.    Thank you.  Okay.
3     Q.    So the top of the email, the center is
4  Chris Rivers@Adidas.com; is that correct?
5     A.    That appears to be correct.
6     Q.    And the date is December 16th, 2016?
7     A.    Yes.  That appears to be correct.
8     Q.    And do you see your name listed as one
9  of the recipients in the To field?
10    A.    I do.
11    Q.    That's your email address, Dan
12 Cutler@gmail.com?
13    A.    It still is.
14    Q.    And there is another name in there in
15 the To field, Tracy Moore at Creative
16 Collective.Com.
17          Do you know who Tracy Moore is?
18    A.    I'm familiar with the name.
19    Q.    Who is Tracy Moore?
20    A.    She was -- to be quite honest, I don't
21 know exactly what she did, but she was around some
22 events of ours.  I believe she helped with PR.
23    Q.    And the subject line of this email is:
24 2016 to 2017 Adidas Uprising High School Overview.
25    A.    I see that.

Page 217

1     Q.    And then again this one is addressed to
2  Soul Patrol.
3     A.    I see that.
4     Q.    Is this a work-related email?
5     A.    It appears to be.
6     Q.    It says:  Below is an update FYI and
7  what Tonie, Troy, Olivia and Bobby have been
8  working on.  Do not forward as this is internal
9  info.
10          Do you see that?
11    A.    I do.
12    Q.    And who is "Bobby" referenced there, do
13 you know?
14    A.    I believe that would be in reference to
15 Bobby Jones.
16    Q.    And who is Bobby Jones?
17    A.    I believe at the time he was an
18 external employee of Adidas.
19    Q.    Do you know what Mr. Jones' role was as
20 an external employee?
21    A.    I wouldn't know.
22    Q.    The subject line is:  Romeo Langford at
23 Sports Center No. 4.
24          And we'll take a look at that right
25 now.  But Romeo Langford, are you familiar with the

55 (Pages 214 - 217)

Daniel R Cutler                                March 23, 2021
Bowen v. Adidas

Page 218

1  name?
2       A.    I am.
3       Q.    And who is Romeo Langford?
4       A.    He was -- at this time he was a high
5  school basketball player.
6       Q.    Did you know Romeo Langford
7  personally --
8       A.    I did.
9       Q.    -- at this time?
10            And how did you come to meet Romeo
11 Langford?
12      A.    Romeo played on one of our grassroots
13 basketball organizations who we sponsored.
14      Q.    Do you recall which one it was?
15      A.    I believe at that time it would have
16 been Eric Gordon All Stars, I think.
17      Q.    Go ahead and open up Exhibit 23.
18 That's the attachment to this email.  So you can
19 just take a look at it.  And it's just a screen
20 shot.
21      A.    I see that.
22      Q.    Do you recall when you met Romeo
23 Langford -- when you first met him?
24      A.    I don't recall.
25      Q.    He's from Indiana; right?

Page 219

1       A.    I believe, yes.
2       Q.    Is that where his AAU team was, in
3  Indiana?
4       A.    I believe so.
5       Q.    And what was the name of the team? Did
6  you say Eric Gordon All Stars?
7       A.    Yes.  I believe at that time he was
8  playing Eric Gordon.  I believe at that time it
9  could also be called the EG 10 All Stars.
10      Q.    Do you know whether he played for
11 another team after EG 10?
12      A.    Yes, I believe he did.
13      Q.    And what team was that?
14      A.    I believe they were called 22 Vision.
15      Q.    Was that an Adidas-sponsored team?
16      A.    I believe that would be the case.
17      Q.    Did you have any -- in your role as an
18 Adidas consultant did you work with 22 Vision at
19 all?
20      A.    What do you mean by "work with?"
21      Q.    Did you have any -- you know, as a
22 consultant did you have any interaction with 22
23 Vision?
24      A.    Sure.
25      Q.    And who ran 22 Vision?

Page 220

1       A.    I believe -- I don't know who ran it.
2  I know that Romeo's father was involved as well as
3  one of his close friends.  I believe actually his
4  cousin.
5       Q.    His cousin.  But his father was
6  involved; correct?
7       A.    Yes.  Mr. Langford was involved.
8       Q.    And so was Mr. Langford paid as an
9  Adidas consultant for 22 Vision?
10      A.    I wouldn't know that.
11      Q.    Okay.  Who would know that?
12      A.    Mr. Rivers possibly.
13            Do you mind if we discuss in Exhibit 22
14 the original email from Tonie Hanson and why this
15 email is relevant?
16      Q.    If you want to go back to Exhibit 22.
17      A.    I just think it's a good snapshot of
18 what we did in Adidas grassroots basketball.
19      Q.    Okay.  Let's go back to Exhibit 22.
20 Share with me your thoughts on this.
21      A.    Well, if you look on the second page of
22 our objectives for the '16 - '17 season:  Create
23 compelling stories, positive engagements; build
24 activations and excite consumers.
25            I think that was the goal of Adidas

Page 221

1  grassroots basketball from someone that worked
2  internally.  I just wanted to point that out.
3       Q.    What does "build activations" mean?
4  What is your understanding of that phrase?
5       A.    You would have to ask Tonie Hanson.
6  That is an internal key word that I wasn't a part
7  of.
8       Q.    Do you know what the phrase "build
9  activations" means?
10      A.    I don't know specifically what that
11 would be calling out.
12      Q.    Okay.  I'm just asking because you said
13 this summarizes the sort of objectives for
14 grassroots.
15      A.    I just think it's a good snapshot of,
16 you know, a shift -- if you go to the top, a shift
17 in brand perception, product awareness, and things
18 like that.  Positive conversations.  I just wanted
19 to touch on that if we're going to go through that.
20      Q.    But you don't know what "build
21 activations" means?
22      A.    Yeah.  You would have to ask Miss
23 Hanson about that.
24      Q.    Okay.  Is there anything else on
25 Exhibit 22 that you wanted to point out?

56 (Pages 218 - 221)

Daniel R Cutler                                March 23, 2021
Bowen v. Adidas

Page 222

1    A.    Nope. That's all. Thank you.
2    Q.    Let's go to Exhibit 24, please. Let me
3  know when you've got it in front of you.
4    A.    Okay.
5    Q.    In the course of you working as an
6  Adidas consultant you engaged in travel, of course;
7  right?
8    A.    Yes.
9    Q.    You would have incurred airfare,
10 hotels, meals on the road, et cetera; is that
11 right?
12   A.    I believe all of them would be correct,
13 yes.
14   Q.    So would you periodically submit
15 expense reports to Adidas for the expenses that you
16 incurred in connection with your business travel
17 for Adidas?
18   A.    Yes.
19   Q.    So let's take a look at this email
20 here, Exhibit 24. It says from Dan
21 Cutler@gmail.com. Again, that's you; correct?
22   A.    That's me.
23   Q.    The date is November 29, 2016; is that
24 right?
25   A.    Yes.

Page 223

1    Q.    And then you sent this to Jim Gatto,
2  copied Chris Rivers; is that right?
3    A.    That appears to be.
4    Q.    Is there a reason why you sent
5  Mr. Gatto your invoice and copied Rivers as opposed
6  to just sending it to Chris Rivers?
7    A.    I don't recall specifically, but I'm
8  sure there is some reason. That would make sense.
9    Q.    Was Jim Gatto the person who was -- in
10 terms of approving invoices, from your perspective?
11   A.    I'm not sure specifically. I think
12 there was times when I sent invoices to either one
13 of them.
14   Q.    Okay. Is this a work-related email
15 that you sent?
16   A.    Yeah. It appears to be.
17   Q.    And at the bottom it has -- it looks
18 like a little signature block. Dan Cutler,
19 Co-Director Adidas Uprising. Phone number, your
20 email, and I guess your Twitter handle; is that
21 right?
22   A.    Those all appear to be what is on the
23 bottom of the email.
24   Q.    And so you state in here: Jimmy,
25 included in this invoice expenses for Boston JV

Page 224

1  commercial with champs, Jaylin Brown transportation
2  and support staff, Rivers, plus Cutler hotel.
3  $2,500. And then you have other expenses here.
4       The next line is $3,500. The next line
5  is $1,500. The next line is $1,500. The next line
6  is $2,500 and the next one is 2,000.
7       And the reason I went over those
8  numbers is because I just wanted to ask: When you
9  were working as a Adidas consultant and you were
10 submitting expenses was it -- were your expenses
11 all hitting nice round numbers, or was it
12 permissible to sort of say this is approximately
13 what I incurred in expenses for this particular
14 trip and here is a nice round number?
15      What was the policy for travel
16 reimbursements with Adidas at that time?
17   A.    I'm not sure I had specific
18 instructions; but again, it would be a long time
19 ago. I wouldn't remember.
20   Q.    Would submitting an expense report with
21 these round numbers -- was that just sort of the
22 usual course of business for you and Adidas in
23 terms of reimbursing you for your expenses?
24   A.    I couldn't speak to Adidas; but again,
25 from -- I don't recall specifics of it, but this is

Page 225

1  the way I submitted my invoice.
2    Q.    Are there other invoices -- I mean, the
3  attachment states "Cutler November 2016." And I
4  want to take a look at this here in a second.
5       How regularly would you submit expense
6  reports to Adidas?
7    A.    Whenever they were incurred.
8    Q.    Was it a fairly regular thing for you
9  to do?
10   A.    It was -- was it regular for me to
11 incur expenses?
12   Q.    Incur expenses and then submit expense
13 reports.
14   A.    Yes. It's normal course of business to
15 incur expenses and submit expense reports to get
16 reimbursed.
17   Q.    Were there limits on the types of
18 reimbursements that you could receive other than
19 travel charges, meals, hotels? That sort of thing.
20   A.    Can you specify what you mean?
21   Q.    Well, yes. So if you look at -- in
22 this email here the line that states: Mohegan Sun
23 - date - Al Jackson travel plus meal with Alan
24 Frank plus Cutler hotel, $1,500.
25      First of all, do you recall that

57 (Pages 222 - 225)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

---

Page 226

1  particular line item expense of $1,500?
2      A.   I don't recall that off the top of my
3  head.
4      Q.   Do you recall going to Mohegan Sun?
5      A.   I've been to Mohegan Sun a number of
6  times.
7      Q.   Do you recall in November of 2016 going
8  to Mohegan Sun?
9      A.   I don't have any recollection of that
10  trip specifically.
11      Q.   Then it says:  Duke - Al Jackson trial,
12  plus meal with Al and Frank.
13          Who is Al Jackson?
14      A.   Al Jackson is Frank Jackson's father.
15      Q.   And what would the Al Jackson trial
16  represent?
17      A.   I'm not sure it says that specifically.
18  It says:  Duke - Al Jackson travel plus meals.  So
19  it would be referring to my travel.  I'm not sure.
20      Q.   You're not sure what it refers to
21  specifically based on this?
22      A.   Right.  We're talking about an email
23  from six year ago.  So I'm not positive.
24      Q.   Let's look at the attachment to this
25  email, which is Exhibit 25.  Let me know when you

Page 227

1  have that up.
2      A.   Okay.
3      Q.   So this is an invoice.  It says:  First
4  Team Sports, 129 Chase Street, Amherst,
5  Massachusetts.
6          It looks like your phone number is
7  listed there, and then it says:  First Team
8  LLC@gmail.com.  Do you see that?
9      A.   I do.
10      Q.   And so I guess the question -- the
11  first question:  Why did you submit an invoice from
12  First Team Sports to Adidas as opposed to just in
13  your personal name?
14      A.   I'm not sure.  I'm not sure what you
15  mean by that.
16      Q.   Well, this is your company, First Team
17  Sports; right?
18      A.   Correct.
19      Q.   You're the only guy with First Team
20  Sports who runs it; right?
21      A.   I'm the only one that would have had --
22  that would have been at First Team Sports at the
23  time, yes.
24      Q.   And so I guess the question is:  Were
25  the expenses that you submitted -- were those

Page 228

1  expenses incurred by First Team Sports?
2      A.   What do you mean by that?
3      Q.   Well, I'm just wondering why First Team
4  Sports submitted an invoice to Adidas.
5          Did First Team Sports incur expenses on
6  behalf of Adidas?
7      A.   Dan Cutler doing business as First Team
8  Sports incurred expenses.
9      Q.   And I'm not trying to be complicated
10  here.  It may just be that when you submit expenses
11  and you just have a Word document that says First
12  Team Sports and you send it -- I mean, that's not
13  -- if that's the way you did it, that's all I'm
14  just looking for.  Or if there was a particular
15  reason you submitted it as First Team Sports
16  versus:  Here is Dan Cutler's invoice to Adidas
17  America.
18      A.   I just don't recall.  I'm not sure why
19  that would be.
20      Q.   Did First Team Sports have a consultant
21  agreement with Adidas?
22      A.   I'm not sure if we had something on
23  record or not.  I wouldn't know.
24      Q.   You wouldn't know?
25      A.   I don't know.  I don't know if we had

Page 229

1  something on the record or not.
2      Q.   Is it possible that First Team Sports
3  had a consulting agreement with Adidas separate and
4  apart from your personal consulting agreement with
5  Adidas?
6      A.   I wouldn't recall.
7      Q.   What would help you -- what would you
8  need to do in order to answer that question?
9      A.   It's five, six years ago.  I just
10  wouldn't recall at this time.
11      Q.   That email address First Team
12  LLC@gmail.com, is that a good email address?
13      A.   I'm sorry?
14      Q.   The email address on this invoice, this
15  First Team LLC@gmail.com, is that a -- is that
16  still a good email address?
17      A.   By "good" what do you mean?
18      Q.   Is that still an active email address?
19      A.   I think it still exists, yeah.  I'm
20  sure I still have it.
21      Q.   And it just says "Cutler November 2016"
22  under the description, 13,500; is that right?
23      A.   Yep.  That's what it appears to say.
24      Q.   Did you send -- it says:  To Adidas
25  America, Inc., Attention Accounts Payable, Camden,

58 (Pages 226 - 229)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 230

1    Mass.
2         Did you actually mail it to that
3    address or did you just put that on the invoice and
4    then just email it over to Mr. Gatto and
5    Mr. Rivers?
6         A.    I believe the normal process would be
7    for me to email it to Rivers or Gatto and possibly
8    Tonie Hanson.
9         Q.    So these two exhibits, Exhibit 24 and
10   25, do they accurately represent sort of the level
11   of detail that you provided when you submitted
12   expense reimbursements to Adidas?
13        A.    It varied, but, I mean, this was --
14   this was an invoice I submitted.
15        Q.    All right.  But I guess my question is:
16   Is this typical of the invoices that you submit?
17   Not necessarily the amount, but just the amount of
18   information and detail that was disclosed to
19   Adidas.
20        A.    I submitted a large number of invoices
21   over the course of my time there, so I wouldn't
22   know what was normal and what was not normal.
23   There was different invoices sent at different
24   times.
25        Q.    I want to turn to some text messages

Page 231

1    here.
2         MR. RAM:  Does anybody need to take a
3    break right now or should we --
4         THE WITNESS:  Can I get three minutes
5    to use the restroom?
6         MR. RAM:  Absolutely.  Let's go off the
7    record.
8         THE VIDEOTAPE SPECIALIST:  We are going
9    off record.  This is end of Media Unit 4.  The time
10   is 4:36 p.m.
11        (Short recess taken.)
12        THE VIDEOTAPE SPECIALIST:  We are back
13   on record.  There is the beginning of Media Unit 5.
14   The time is 4:47 p.m.
15   BY MR. RAM:
16        Q.    Mr. Cutler, I want to -- what I would
17   like to do right now is just show you some text
18   messages.  And so some of these will take a look at
19   that master exhibit of all your text messages,
20   Exhibit 3, but for others what we have done is just
21   taken the particular text message chain and put it
22   in a separate document just purely for the sake of
23   making it easy for you to read and access.  So
24   we'll go through those right now.
25        The first one I want to direct you to

Page 232

1    is Exhibit 26, and if you open that up we'll take a
2    look at this one together.
3         Just to orient you, Mr. Cutler, you'll
4    notice at the top it's the same column headers that
5    were on the master document.  The row numbers at
6    the far left starts out in this particular one
7    21923 and then it goes in sequence down the page.
8    Those are the row -- excuse me.  The line
9    references, the row references from that master
10   document.  And so just so you know sort of how this
11   relates to the big document.
12        A.    Got it.
13        Q.    And then the communications under
14   Column L, the back and forth, and to the left of
15   that you can see who the To and From fields are.
16        A.    Got you.
17        Q.    Are you ready?
18        A.    Uh-huh.
19        Q.    So, Mr. Cutler, I want to direct you to
20   really what is going to be on Line 219 to -- well,
21   I'll give you the exact line reference here, but if
22   you go to -- if you see the dates in Column G, the
23   time stamp dates, we're referring to the dates of
24   August 21st, 2015.  So it's sort of midway through
25   that document.

Page 233

1         A.    Okay.
2         Q.    And so have you had a chance to review
3    these text messages?
4         A.    I just read through them, yeah.
5         Q.    All right.  Good.  So these are -- it
6    looks like you are using the What's Up ap on the
7    phone; is that correct?
8         A.    That appears to be correct based on,
9    you know, what I see here.  I'm not familiar with
10   this technology, but I think that looks right.
11        Q.    Fair enough.  And you see on the From
12   field your name is listed and also Chris Rivers,
13   and it's just back and forth between you and
14   Mr. Rivers.
15        A.    Yes.
16        Q.    And so I want to direct your attention
17   to just the communications on August 21st of 2019,
18   and it starts out:  Chilling.  Went to practice.
19   Heading back now.
20        And that's from you to Mr. Rivers, and
21   then a little bit later at -- 1412 is the time.  So
22   2:12.  You write:  TJ needs to be checked.
23        Do you see that?
24        A.    I see that.
25        Q.    And then you write:  He's pushing in on

59 (Pages 230 - 233)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

1  TJ Leaf situation.  Getting in Etop's way.
2         What do you recall about what TJ --
3  first of all, that first "TJ needs to be checked,"
4  is that a reference to TJ Gassnola?
5      A.    I don't recall specifically, but I
6  assume so.
7      Q.    And the next line:  He's pushing in on
8  TJ Leaf situation.
9         TJ Leaf is a basketball player;
10  correct?
11     A.    Yes.  That's correct.
12     Q.    And you write:  Getting in Etop's way.
13        And Rivers replies:  What now?
14        And you state:  It's such a bad look
15  for us, Dude.
16        Rivers says:  I need more details in
17  order to call and check him.  Is he working for
18  Kansas or NC State?
19        And your response is:  Kansas/UCLA.
20        And then the conversation finishes out
21  on those last three lines.
22        And so Mr. Rivers writes:  Is he
23  working for Kansas or NC State, and your response
24  was:  Kansas/UCLA.
25        What did you mean by that?  Help us

1  understand what that communication is between you
2  and Mr. Rivers.
3      A.    Again, we're talking about -- I believe
4  about six years ago at that point.  So you would
5  have to ask a more specific question.  I don't
6  recall this conversation.
7      Q.    Okay.  Do you recall TJ Gassnola's
8  involvement with recruitment of TJ Leaf?
9      A.    Not from -- I have no recollection of
10  this.
11     Q.    Do you know what the TJ Leaf situation
12  is in reference to?
13     A.    I don't have any specific concrete
14  recollection of it.  I know that TJ Leaf, just from
15  my knowledge of him, had committed to Arizona and
16  then de=committed, and I think there was -- he was
17  a highly recruited athlete.
18     Q.    Do you have any understanding of why TJ
19  Gassnola would be involved in TJ Leaf's recruitment
20  to college?
21     A.    Again, I apologize.  I just don't have
22  a recollection of the details of the situation.
23     Q.    All right.  Well, generally speaking
24  was TJ Gassnola involved in recruiting players to
25  Kansas or NC State?

1      A.    What do you mean by "recruiting players
2  to Kansas or NC State?"
3      Q.    Getting high school kids and steering
4  them to Kansas or NC State.
5      A.    I believe he would have been involved
6  in information sharing and discussions with college
7  coaches, but I wouldn't have any knowledge of any
8  of the other activities you're talking about.
9      Q.    And so, I mean, what is that
10  information sharing with college coaches?  What do
11  you mean by that?
12     A.    Just what he's hearing, what he's
13  seeing, what he knows, what he doesn't know, what
14  he had for lunch.
15        It could be a number of things, but
16  anything that could assist the coaches in, you
17  know, having some information that they may not
18  have prior to that.
19     Q.    About a basketball recruit?  Is that
20  what we're talking about?
21     A.    Yeah; a recruit.  His family, their
22  situation.  You know, who else is recruiting them?
23  Maybe -- you know, you might hear throughout the
24  rumors in the industry who a certain athlete was
25  interested in going to this school or that school,

1  and if you could help a school, you know, either be
2  able to get out of recruitment and not waste their
3  time or know that they're in good shape with a
4  family or a student athlete, obviously that's
5  helpful.  So that's what I mean by "information
6  sharing."
7      Q.    Is that something you did as well as an
8  Adidas consultant?
9      A.    Did what, exchange information?
10     Q.    Yes.  Engage in information sharing
11  with college coaches about prospective recruits.
12     A.    Sure.  I would engage with information
13  sharing with Adidas and non-Adidas.
14     Q.    I'm sorry?
15     A.    I would engage with information sharing
16  including Adidas sponsored and non-Adidas sponsored
17  schools.
18     Q.    And what was your -- why would you do
19  that?  What is the point?
20        I understand what you communicate and I
21  get why that may be good to the college coach, but
22  the question is:  Why do you share that information
23  with them?
24     A.    I have relationships with the kids
25  often from our events.  So spending a week with a

60 (Pages 234 - 237)

Daniel R Cutler                                     March 23, 2021
Bowen v. Adidas

Page 238

1  kid or four days with a kid -- obviously being able
2  to speak to them and develop a relationship with
3  them they may tell you some things that are
4  important to them and, you know, key things that
5  may matter.
6          You know, I happen to really like the
7  color of blue or I'm looking for -- I would like to
8  go to school where it's warm.  So you may
9  understand more information, and if we can pass
10  that along and help the kid get recruited by the
11  school that he wants to go, you know, I was happy
12  to help develop that information.
13         I've been doing this for a long time --
14         (Internet interruption.)
15         (Discussion off the record.)
16  BY MR. RAM:
17     Q.    So, I mean, I guess how did you -- the
18  development of your relationship with the coaches,
19  I understand that's something you did over the
20  course of your career, building relationships.
21         I mean, do the coaches know you well?
22  Do you feel like you had -- with individual coaches
23  you had a good working relationship with them?
24     A.    I mean, obviously there is a wide range
25  of coaches; right?  There is 300 and something

Page 239

1  individual schools.  Each staff has at least four
2  members that are out on the road usually.  And
3  those are obviously rotating numbers.
4          So I have great relationships with
5  some; I have no relationship with some; I have okay
6  relationships with some.  It just depended on the
7  individual coach at the time.
8     Q.    Who were some of the coaches you had?
9     A.    It's too long of a list for me to be
10  able to read off at this time.
11     Q.    Is there anybody that comes to mind
12  right now?
13     A.    Sure.  I have a great relationship with
14  John Scheyer at Duke.  I consider Jim Caliperi as
15  somebody that I have known since I was ten years
16  old and helped raise me.  Bruiser Flint from
17  University of Kentucky; Jim Albrunt at University
18  of Miami; Mike Murrell at University of Texas.
19         I'm happy to keep going.  Duane
20  Jennings is a new head coach at Albany.
21     Q.    You mentioned John Scheyer at Duke.
22         (Discussion off the record.)
23         THE VIDEOTAPE SPECIALIST:  We are back
24  on record.  The time is 5:01 p.m.
25

Page 240

1  BY MR. RAM:
2     Q.    Mr. Cutler, did you in the course of
3  your career develop close working relationships
4  with coaches at Kansas University or the University
5  of Kansas?
6     A.    I know coaches at University of Kansas,
7  yes.
8     Q.    And which ones do you know?
9     A.    I was friendly with or at least had
10  knowledge of all of them and had some sort of
11  relationship with all of them.
12     Q.    And how did they get to know you?
13     A.    They would see me at events.  They
14  would see me at Adidas events that they were
15  running:  Grassroots tournaments, Final Four.
16  Things like that.
17     Q.    Yeah.  Would they -- would you reach
18  out to them or they would reach out to you about
19  particular basketball players?
20     A.    We discussed basketball players a lot,
21  yeah.
22     Q.    From your perspective do they trust
23  your judgment?
24     A.    You're asking me to judge whether
25  somebody trusts my judgment?  I can't speak for

Page 241

1  anybody else.
2     Q.    No.  I'm just saying from your
3  perspective.  I mean, if somebody was like -- you
4  picked up the phone and you were like:  Hey, coach,
5  you really need to take a look at this great
6  player.  And they're like:  Yeah.  Whatever.
7  Thanks.  Or to actually engage with you.
8          I mean, how did coaches take your --
9  the intelligence that you were providing them about
10  particular recruits?
11     A.    I'm not sure what they would have done
12  with the intelligence after I gave it to them.
13     Q.    Let's take a look at -- let's go to
14  Exhibit 27, please.  And this is an excerpt from
15  the cell phone spreadsheet starting at Line 14381
16  through 14398.  Just let me know when you get it up
17  there.
18     A.    14381?
19     Q.    That's the line number.
20     A.    What numbers are you referring to?  I'm
21  sorry.
22     Q.    Well, no.  I was just talking about the
23  lines on the spreadsheet here.  But let me ask you
24  while the document is in front of you:  Do you know
25  an individual named Richard Hurt?

61 (Pages 238 - 241)

Daniel R Cutler                                March 23, 2021
Bowen v. Adidas

Page 242

1    A.   I do.
2    Q.   And was he the father of Matthew Hurt?
3    A.   He was or he is.
4    Q.   And was he also the AAU team coach for
5    Matthew's team?
6    A.   I believe he was one of a number of
7    coaches, yes.
8    Q.   And who is -- just for the sake of
9    everybody, who is Matthew Hurt?
10   A.   Matthew Hurt is a college basketball
11   player at the moment.
12   Q.   And where does he play basketball?
13   A.   Duke University.
14   Q.   At Duke.
15        So the first message in this text
16   message chain -- and again, I want to reference
17   there in Column J do you see your name, Dan Cutler?
18   And that's your phone number next to your name?
19   A.   That appears to be correct.
20   Q.   And it has Richard Hurt, is another one
21   of the participants, and there is a phone number
22   there with Area Code 507.  Do you see that?
23   A.   Yeah.  It appears to be the case.
24   Q.   Is this -- why were you texting with
25   Richard Hurt?

Page 243

1    A.   It appears that he texted me.
2    Q.   Okay.  But what was your relationship
3    with Mr. Hurt, the dad?
4    A.   Mr. Hurt is obviously more than just a
5    dad.  He's one of our grassroots coaches.  So
6    obviously I had a multi-facet relationship with
7    Richard Hurt.
8    Q.   So his message to you on August 3rd of
9    2016 -- the message says:  Good morning, sir.  Hope
10   you've gotten back home okay or maybe you were
11   getting a little well-earned vacation/R&R.  I know
12   you've been busy but just wanted to see if you
13   heard anything out of Kansas as it pertains to
14   Matthew.  I'm a little surprised based on what
15   Coach Self said about him and the way he has
16   played.  Also given the number of 2019's, they have
17   offered some.  I'm even more surprised that one of
18   them isn't Matthew.  The most disappointing thing
19   is that I have tried to connect via phone/text many
20   times over the past couple of months with Jerrance
21   with no response outside of the original connection
22   that you set up.  Is there another assistant I
23   should connect with?  Should I reach out to Coach
24   Self directly?  I typically don't like to do the
25   check-in type stuff with the head coach.  Not sure

Page 244

1    why I'm fretting so much about Kansas other than
2    the Adidas flagship and they are pretty much the
3    only major program that is recruiting.  We have no
4    clue where we stand with them.  Sorry to keep
5    pestering you.
6         And then do you see your response
7    underneath that?  "Hey, man.  Sorry for the delay.
8    Matthew was good.  Spoke to him for a few.  He
9    seemed okay."
10   A.   I see that.
11   Q.   And then you sent another text message
12   to Mr. Hurt:  You should hear from Kansas shortly.
13        And then Richard Hurt replies:  Sounds
14   good.  We appreciate your help and support.
15        So what was your -- Mr. Hurt referenced
16   Jerrance in here.  Is this the assistant coach to
17   Kansas?
18   A.   Yeah.  That's the only Jerrance I would
19   know, Assistant Coach at University of Kansas.
20   Q.   And he references that he's tried to
21   connect with Jerrance with no response outside of
22   the original connection that you set up.
23        What was the original connection that
24   you set up between Richard Hurt and Jerrance?
25   A.   I wouldn't remember specifics.  I'm

Page 245

1    sorry.
2    Q.   Do you recall speaking to Jerrance
3    about Matthew Hurt?
4    A.   I don't recall specifics, but I
5    definitely had discussed Matthew Hurt with Coach
6    Howard.
7    Q.   And all this is in connection with your
8    consulting job?
9    A.   I'm sure you could look at it that way.
10        I would say this is my relationship
11   with a father who is trying to help get his son
12   recruited.
13   Q.   Let's take a look at Exhibit 28,
14   please.
15   A.   What number?  I'm sorry.
16   Q.   28, please.
17   A.   Thank you.  Okay.
18   Q.   And so this document here -- there is
19   just one line on it.  The From number is Area Code
20   319.  Do you recognize that number at all?
21   A.   I don't.
22   Q.   Okay.  Based on my understanding of the
23   way this data works is that if you have a name
24   associated with the phone number saved in your
25   phone it would appear there, but if you didn't have

62 (Pages 242 - 245)

Daniel R Cutler                                            March 23, 2021
Bowen v. Adidas

Page 246

1  the name and it was just a phone number that
2  appeared when they texted you then there would be
3  nothing other than -- in the From field other than
4  the telephone number, if that helps.
5      A.   Okay.
6      Q.   So you recognize your phone number and
7  your name under the participants?
8      A.   I do.
9      Q.   And so this date is January 20th of
10 2017.  It's an incoming message to you.  Do you see
11 that?
12     A.   I do.
13     Q.   It says:  Dan, just talked Joey Howser.
14 He's really intrigued by Kansas.  I know you guys
15 had talked briefly about it last week and it stuck.
16 We're in Lawrence this weekend and they had
17 themselves a little tour around campus this
18 morning.  Think you could get Coach Self to give
19 Joey a call or catch a game?
20     A.   Okay.
21     Q.   Do you remember receiving this message?
22     A.   I don't.
23     Q.   Reading this message, do you know who
24 it's from?
25     A.   I don't.

Page 247

1      Q.   Who is Joey Howser?
2      A.   He was a high school basketball player
3  at the time.  Played for one of our AAU sponsored
4  programs.
5      Q.   Do you know where he went to college?
6      A.   I believe he started at Marquette
7  University and currently attends Michigan
8  University, if I'm correct in my recollection.
9      Q.   Marquette and then Michigan State.
10 Okay.
11          Do you know why somebody would reach
12 out to you to ask if you could get Coach Self to
13 give Joey a call or catch a game?
14     A.   Are you asking me to speculate?
15     Q.   Well, do you have a relationship with
16 Coach Self where you could give -- you could reach
17 out to him and ask him to give Joey Howser a call?
18     A.   I have enough of a relationship with
19 Coach Self where we were in semi-normal contact
20 from time to time.
21     Q.   Okay.  And, I mean, what were you in
22 semi-normal contact with Coach Self about?
23     A.   Usually basketball-related items.
24     Q.   Would it be related to recruiting then?
25 I mean, the grassroots side of the house.

Page 248

1      A.   I wouldn't say just limited to that.
2  We talked about a number of things, but I'm sure we
3  talked about recruiting in some aspects.
4      Q.   What else would you have -- topics
5  would have been part of your discussions with Coach
6  Self at that time?
7      A.   I would have congratulated him on the
8  big win.
9          There are times where a coach would
10 text me during an event to say:  Hey, what team is
11 playing?  When is this team playing and on what
12 court?  Things like that.
13     Q.   Let's go to Exhibit 29, please.  So
14 this is a four-page excerpt of the master
15 spreadsheet.
16     A.   Hold on.  This is very small.  Okay.
17     Q.   And so you've got a number of text
18 messages on here; but again, Jerrance Howard -- is
19 that the assistant coach, Jerrance Howard,
20 assistant coach at Kansas?
21     A.   I believe that would be the case.
22     Q.   Okay.  And the participants line,
23 Column J, do you see your name and telephone
24 number?  Right?
25     A.   I do.

Page 249

1      Q.   And you see the name Jerrance Howard in
2  there with a telephone number of Area Code 785 on
3  there?
4      A.   Yes.  That appears to be the case.
5      Q.   Do you understand that to be Jerrance
6  Howard's phone number?
7      A.   I don't have any reason to believe it's
8  not.
9      Q.   So I just -- starting on the third
10 line -- this is dated June 3rd, 2016.  It's a
11 message from you to him.  You say:  Yo.
12          He says:  What's up?
13          You say:  Chilling.  How are you?
14          And his response:  Just trying to get
15 some players.
16     A.   Yep.
17     Q.   And you say:  I got one a few years
18 away who is interested.
19          Coach Howard says:  Who is that?
20          Your response:  Matthew Hurt from D-1
21 Minnesota.
22          Do you see that?
23     A.   I do.
24     Q.   And was that -- that's Matthew Hurt who
25 we were referring to earlier when you were speaking

63 (Pages 246 - 249)

Daniel R Cutler                              March 23, 2021
Bowen v. Adidas

Page 250

1    to his father, right, Richard Hurt?  The same guy?
2        A.    Yeah, I believe so.
3        Q.    Okay.  What was your relationship with
4    Jerrance Howard just in terms of the topics that
5    you all would talk about?
6        A.    Mostly around recruiting, but Jerrance
7    would from time to time ask me about certain
8    products that Adidas had that he was looking to
9    maybe get outside of -- you know, that he couldn't
10   find on our website or something.  But mostly
11   around recruiting and high school and college
12   basketball.
13       Q.    So I want to continue reading through
14   this.
15           So you say:  Matthew Hurt from D-1
16   Minnesota.
17           And Jerrance's response is:  Oh, shit.
18   He's good.
19           And you say:  Very good.  Dad was
20   asking me if you guys are interested.
21           And then Coach Howard says:  Do I need
22   to do anything now?
23       A.    Uh-huh.
24       Q.    Okay.  And then you respond:  Are you
25   allowed to call?  Or he has to reach out?

Page 251

1           You say:  B.  B just wants to know you
2    guys have an interest.
3        A.    That should say:  He just wants to
4    know.  Sorry about that.
5        Q.    Coach Howard says:  Don't his dad sit
6    on the bench?
7           Do you know what that means?
8        A.    I think that was just a question he was
9    asking if his dad sat on the bench.
10          So if you see during this -- you know,
11   I say -- I asked:  Are you allowed to call or does
12   he have to reach out? referencing Jerrance would be
13   well versed in the rules as to when he could
14   contact a student athlete and the family.
15       Q.    Is it reference to like a quiet period?
16   Is that what you're talking about?
17       A.    I believe so.  Depending what year you
18   are it varies when you're allowed to make contact
19   with college coaches and whether you can call them
20   or you have to wait for them to call you.
21       Q.    And then you say:  I think so.
22          And he says:  Very.
23          Then Coach Howard says:  Can you please
24   let him know and pass my number to him?
25          Your response:  I will pass it along.

Page 252

1    He came up to me at Nations and was curious about
2    you guys and said he hadn't heard from anyone.  I
3    let him know that 2019 is a ways away but that I
4    was positive you guys were interested.
5           And then Coach Howard responds to you:
6    We heard he was going to Min -- I guess Minnesota
7    -- with his brother in 2019.
8           Your response:  I'm sure they have a
9    leg-up, but they brought it to me, so that means
10   he's interested at least.
11          And Coach Howard responds to you:
12   Thank you.  Talked to dad yesterday.  Good guy.
13       A.    I think this is a textbook way that I
14   would have done with my job of information sharing.
15       Q.    Okay.  Let's scroll down to a little
16   bit later.  I will give you the time stamp here.
17   August 3rd, 2016.  It starts out:  Not much, man.
18   How are you?
19          That's from you to Coach Howard.  Do
20   you see that?
21       A.    I'm sorry.  Where is it?  I apologize.
22       Q.    Yeah.  This is 23590.
23       A.    Thank you.  Sorry about that.
24       Q.    No problem.  And if you look in the
25   date field it's 8/3/2016.

Page 253

1        A.    Okay.
2        Q.    So this is a text from you to Coach
3    Howard.  You say:  Not much, man.  How are you?
4           Coach Howard replies:  I'm just trying
5    to get some players.  Or:  I'm good at just trying
6    to get some players.
7           And you reply:  I'm getting blitzed by
8    the dad.  Is there a reason you guys haven't
9    offered Matthew Hurt yet?
10          And then coach says -- or Coach Howard
11   says:  I will get with coach.  We will offer today.
12          What was your understanding of Coach
13   Howard's message "I will get with coach?"  Is that
14   Bill Self?
15       A.    I would assume he would be talking
16   about the head coach, yes.
17       Q.    And then your reply:  Awesome.  I
18   appreciate it.  Dad is a good man, but he is a
19   little overbearing.  We just want you guys to be in
20   the best position possible.
21          Coach Howard replies:  My man.  Thank
22   you.
23          Then he says:  Can you send me dad's
24   info?
25          You reply with a telephone number with

64 (Pages 250 - 253)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 254

1  a 507 area code. And then a little bit later Coach
2  Howard replies to you: Just talked with dad and we
3  offered.
4        So do you understand that after this
5  text message that Kansas made an offer to Matthew
6  Hurt?
7      A.    I don't recall the text message, but I
8  see that.
9      Q.    Okay. Again, is this -- you described
10  the earlier message as being sort of textbook
11  communications that you had.
12        Is this another example of a textbook
13  communication or textbook example of a
14  communication that you had with coaches?
15      A.    Yeah. A father of an elite high school
16  basketball player who has asked about a
17  relationship that I hold with a coaching staff is
18  wondering if that school is interested in his son.
19  And then I warned: Dad is possibly a little bit
20  overbearing. So I was trying to do -- you know,
21  warn one side; help the other side.
22      Q.    Is that just sort of part and parcel of
23  your role as sort of having the relationships --
24  you know, the close relationships with the parents
25  and the kids but also having the relationships with

Page 255

1  the coaches, just to put them together when it's a
2  good fit?
3      A.    I mean, this is --
4        THE VIDEOTAPE SPECIALIST: Would you
5  like me to go off record?
6        (Short recess taken.)
7        (The court reporter read the previous
8  question.)
9        THE WITNESS: Should I go ahead?
10  BY MR. RAM:
11      Q.    Go ahead, please.
12      A.    Again, I think this is -- yeah. This
13  is exactly what I would have done where a family or
14  a father or a player says: Hey, there is a school
15  we really like. We really would like to see if
16  they are interested in recruiting us.
17        And I'm happy to reach out to a given
18  coach and do that, whether it be Kansas, whether it
19  be Duke, whether it be any other school. I was
20  happy to do that to try to help assist the kids and
21  their families of reaching their best school
22  possible based on their potential.
23      Q.    Was that -- I mean -- and you did that.
24        Did the other basketball consultants at
25  Adidas as far as you know engage in similar type

Page 256

1  work?
2      A.    You would have to ask them. I'm sorry.
3  I wouldn't know.
4      Q.    I'm just asking if you're aware of that
5  or not.
6      A.    I apologize. I just kind of was aware
7  of what I was doing.
8      Q.    Got you.
9        Let's scroll down and go on to the next
10  page, and this is going to be close to the bottom
11  on the page. The line number is 23627. Again,
12  this is a continuation of the text message chain
13  with Coach Howard.
14      A.    Okay.
15      Q.    So these entries are October 10, 2016.
16      A.    Okay.
17      Q.    And then it looks like at 1:14 p.m. you
18  say -- or Coach Howard says: Thanks. Went to see
19  Matt and dad last week. They've been good and they
20  love you. Coach knows you've been helping since
21  Day 1. Thank you.
22        And your response: Those are my
23  people.
24        So again, Matt and dad -- is that a
25  reference to Matthew Hurt and Richard Hurt?

Page 257

1      A.    I think that's a fair assumption.
2      Q.    Your reply was: Those are my people.
3      A.    Yeah. I would assume that's the case.
4  I have no reason to believe that it's not.
5      Q.    And Mr. Howard -- he says: Coaches --
6  yeah. Coach's knows you've been helping since Day
7  1. Thank you.
8        Who is that in reference to?
9      A.    If I had to make that assumption, I
10  would assume Bill Self.
11      Q.    And so, again, I just want to talk on
12  the -- at least Jerrance Howard knows who you are
13  and I'm assuming trusts your judgement to some
14  degree.
15        You reached out to him about Matthew
16  Hurt; right?
17      A.    I don't recall the exact chain of
18  command -- or chain of events, but I believe that
19  to be the case, yeah.
20      Q.    I'm just talking about the text
21  messages we were looking at earlier where you
22  reached out and they made an offer the same day to
23  him.
24      A.    I would have to go back and review, but
25  obviously I believe they were -- I don't think all

65 (Pages 254 - 257)

Daniel R Cutler                                      March 23, 2021
Bowen v. Adidas

Page 258

1   that was the same day. I could be wrong.
2       Q.    This was in August of 2016, August 3rd,
3   the message we just reviewed. You said: I'm
4   getting blitzed by the dad. Is there a reason you
5   guys haven't offered Matthew Hurt yet?
6       A.    Right. I reached out originally in
7   June, is when this conversation began. So, I mean,
8   all and all it's over a two-month period that I'm
9   sure they evaluated him on their own, because in
10  between June 3rd and August 3rd would be all of the
11  July evaluation periods for college coaches.
12          So I would assume they had a chance to
13  have seen him in person and make their own
14  assumptions as to what they would like to do in
15  terms of offering that.
16      Q.    And so I'm just == I mean, I'm just
17  talking -- you know, we're looking at these August
18  3rd text messages. I mean, I believe it was -- you
19  know, he says: I'm good. Just trying to get some
20  players, at 11:26 a.m.
21          30 seconds later: I am getting blitzed
22  by the dad. Is there a reason you guys haven't
23  offered Matthew Hurt yet?
24          Three minutes later -- less than three
25  minutes later he says: I'll get with coach.

Page 259

1           And then 30 seconds later: We will
2   offer today.
3       A.    Okay.
4       Q.    I mean, I'm just -- you know, it sounds
5   -- that to me is -- I mean, that was a pretty quick
6   turn of events between the time you texted Coach
7   Howard August 3rd until the time you said they were
8   going to make an offer today.
9       A.    Again, I just -- for the record I think
10  it's important to point out that we first started
11  this series of conversations in June. And then we
12  talked again in August, and I believe it's over the
13  course of a number of hours where he responds back:
14  We just talked to the dad and we offered -- I
15  believe there was about an eight-hour gap there.
16  So it's certainly enough time for them to sit down
17  as a staff and make a determination as to how they
18  wanted to go forward.
19      Q.    I guess what I'm asking you: Coach
20  Howard knows you and knows you've got -- at least
21  in this instance a relationship with a particular
22  player; right?
23      A.    Sure.
24      Q.    And you reached out to him and it was a
25  very quick turnaround. They said they're going to

Page 260

1   make an offer. Is that right?
2       A.    He says: We'll offer today. But, you
3   know, you would have to ask him what that means in
4   terms of if they're going to an offer.
5           I see -- if you keep going it says:
6   Just talked to dad. We have offered again. About
7   eight hours later.
8       Q.    Got you. I see that there at 9:06 p.m.
9           I mean, you are not just some random
10  basketball fan who was just blowing up somebody's
11  phone just saying: Hey, you need to look at this
12  person or that person; right?
13      A.    I think I'm a -- yeah. I would say
14  that I'm more than a random basketball fan. I
15  think that's an accurate description.
16      Q.    You're not some basketball geek hanging
17  outside of a stadium taking tickets, checking
18  people in and trying to find coaches and push them
19  in the corner and say: Hey, you need to recruit
20  this guy. That's not who you are?
21      A.    I don't think that's an accurate
22  representation of who Dan Cutler is.
23      Q.    You're not just the guy who is
24  collecting tickets or handing out wristbands at
25  high school games, are you?

Page 261

1       A.    I've done that.
2       Q.    Your relationship with college coaches
3   is not based on that, is it?
4       A.    I have a multi-faceted relationships
5   with a number of college folks.
6       Q.    But there is a lot of people who just
7   take tickets and hand out wristbands at high school
8   basketball games, right, across the country?
9       A.    I would assume every gym in America has
10  somebody that takes tickets and hands out
11  wristbands. That's not what I do.
12      Q.    I got you. All right. Let's move on
13  here to Exhibit 30.
14      A.    I have done that. For the record, I've
15  volunteered to do that before. So it's clear.
16  Amherst High School had Dan Cutler take tickets.
17      Q.    That's good. Give me one second.
18          Dan, if you can open up Exhibit 30,
19  please, and this is an email.
20      A.    Hold on one second. I don't see 30.
21  Let me refresh real quick. Sorry.
22          Yeah. Okay.
23      Q.    All right. I wanted to ask you: Do
24  you see this email here that's dated May 15, 2018?
25      A.    I do.

66 (Pages 258 - 261)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 262

1    Q.    And this is from you, Dan
2    Cutler@gmail.com?
3    A.    It is.
4    Q.    The subject is: Teams.
5    A.    Yep.
6    Q.    And you sent it to Rashon
7    Burno@gmail.com?
8    A.    Yes. That appears to be the case.
9    Q.    Who is Rashon Burno?
10   A.    He was a college basketball coach.
11   Q.    And where was he a coach?
12   A.    At this time I believe he had just
13   gotten to Arizona State maybe.
14   Q.    All right. And so this email you say:
15   Burno, I'm highlighting one or two kids on these
16   teams. I can link you up with the directors. Let
17   me know who you need a link to and I will help set
18   it up.
19        And then you've got a list of teams and
20   players; right?
21   A.    Yeah. That appears to be the case.
22   Q.    What was -- how did you know Rashon
23   Burno? How did you come to know him?
24   A.    He was a college basketball coach.
25   Q.    Right. But how did you come to know

Page 263

1    him like personally?
2    A.    Seeing him at events that I ran.
3         I don't remember what school he was at
4    the time. I think he had just taken a new job at
5    Arizona State. I believe he was at University of
6    Florida before that. But again, my knowledge of
7    the landscape of basketball and especially those
8    recruiting events led a lot of coaches to develop
9    relationships with me.
10   Q.    So this email -- you are giving him a
11   list of high school players; right?
12   A.    Yes. That's correct.
13   Q.    And what was the purpose? Just to help
14   him get started at Arizona State?
15   A.    Sorry to cut you off. I don't know
16   exactly what the genesis of this conversation was,
17   but I think, if my memory serves me at all --
18   again, I had just gotten over there and was looking
19   at our rosters and seeing who -- players that were
20   uncommitted to schools at the time that might be
21   recruitable athletes. And then I offered to link
22   him up with the other grassroots basketball
23   directors of programs that we may have sponsored.
24        So I'm just connecting a coach with
25   somebody that could help get that process started.

Page 264

1    Q.    Okay. This email, is that sort of an
2    example of that process that you just described?
3    A.    I don't think there was a form email
4    per se, but this appears to be, you know, just
5    names of athletes that I thought were high level
6    players that would be good for that level.
7    Q.    All right. Let's open up Exhibit 31.
8    It should be loaded now. We're going back to text
9    messages.
10   A.    I'm sorry. You said 31?
11   Q.    Yeah. 31, please.
12   A.    Okay.
13   Q.    Again, this is an excerpt of the master
14   text message spreadsheet that we looked at earlier
15   today.
16   A.    Okay.
17   Q.    I and want to just direct your
18   attention -- we'll start with the first line here.
19   The time stamp is May 27, 2017, and the From is
20   Romeo Langford. And then under the participants in
21   Column J do you see your telephone number?
22   A.    I do.
23   Q.    And do you see Romeo Langford's
24   telephone number?
25   A.    I see a number with the name Romeo

Page 265

1    Langford next to it.
2    Q.    It's 502 area code?
3    A.    Yes.
4    Q.    And who is Romeo Langford?
5    A.    He was a high school basketball player
6    at the time.
7    Q.    And the message in Column L -- it says:
8    This is Romeo. I got a new number.
9    A.    Uh-huh.
10   Q.    It says: 22. Then it says: Speaking
11   about mail, what is my Yeezy's coming in?
12   A.    And your response: Which ones? And he
13   says: Anyone you can get.
14        Do you see that?
15   A.    I do.
16   Q.    What was sort of the nature of your
17   communication here with Romeo Langford?
18   A.    I believe he's asking me about Adidas
19   product.
20   Q.    And the Adidas product is Yeezy or the
21   Kenya West shoes?
22   A.    Yeah. That would be the case.
23   Q.    Are those hard to come by in your
24   experience?
25   A.    For myself or -- no, but in general

Daniel R Cutler                                              March 23, 2021
Bowen v. Adidas

Page 266

1  population it could be possible that it would be
2  difficult to come by.
3      Q.    And so he's asking you for a pair of
4  Yeezys; is that right?
5      A.    That appears to be his request.
6      Q.    Do you recall if you sent him a pair of
7  Yeezy's?
8      A.    I don't recall specifically if I did or
9  not.  I wouldn't -- I wouldn't be surprised if I
10  did.
11     Q.    Is that an unusual request from a kid
12  like Romeo Langford who is a top basketball player
13  in the country?
14     A.    I believe, if I recall correctly, he
15  was a member of our Path program, and all of the
16  players that were a part of that Path program
17  received one.  And at the time we were unable to
18  find one his size, so we were -- we owed him a pair
19  based on that event.
20     Q.    So everyone who participated in the
21  Path got a pair of Yeezy's?
22     A.    Yes.  The entire camp did.
23     Q.    The entire camp did except for Romeo
24  Langford?
25     A.    Romeo's size was unavailable at the

Page 267

1  time in the system, so we waited until his size was
2  available, and then when they were we made sure to
3  ship him a pair so he could get the same product
4  that all the other kids got.
5      Q.    Let's take a look at Exhibit 32, which
6  is a continuation.  Let me know when you have that
7  in front of you.
8      A.    I do.
9      Q.    So the date on this is -- it starts
10  March 26, 2017 and goes through April 25th, 2017,
11  and again in the participants it has your name, Dan
12  Cutler.
13         Is that your phone number, Dan?
14     A.    Yes.  I believe that's my phone number.
15  That looks accurate.
16     Q.    And the name says Romeo Langford.  It's
17  got an 812 area code.
18     A.    I see that.
19     Q.    And so it looks like these texts were
20  sent earlier in time than Exhibit 31 where he
21  starts out saying:  I got a new phone number.
22     A.    I don't recall what was in that last
23  exhibit, but if you say that to be true I have no
24  reason to believe it's not.
25     Q.    All right.  And he says:  Made it to my

Page 268

1  gate.  Made it home.
2         You reply:  My guy.
3         He says:  Right on.  Then he's got some
4  emojis here.  It looks like a shoe, an arrow, and a
5  home.  Do you see that?
6      A.    I do.
7      Q.    What did you understand those emojis to
8  mean?
9      A.    That would appear to be somebody
10  requesting shoes towards the home.
11     Q.    Your response to that emoji was:
12  Address, size.
13     A.    Correct.
14     Q.    All right.  And then he says -- he
15  gives an address.  He says:  14 or 14-1/2 in
16  Yeezy's.
17         And then you were trying to extract the
18  rest of his address from him; is that right?
19     A.    Yes.  That appears to be correct.
20     Q.    And so, you know, these communications
21  that you had with Romeo Langford, are those in
22  connection with your work?
23     A.    What do you mean by "in connection"
24  with my work?
25     Q.    Were these personal text messages that

Page 269

1  you were having with Romeo or were these in
2  connection with your consultant job?
3      A.    I had a relationship with him through
4  my consultant job at Adidas, but I don't know if I
5  would say that these are -- I just don't know how
6  to clarify.
7         I mean, obviously I had a personal
8  relationship with him along with my relationship
9  with him as it pertains to Adidas.
10     Q.    Let me show you one last thing here.
11  If you can, open up Exhibit 33, which I just loaded
12  in there.
13     A.    Let me just refresh it real quick.
14  Thank you.  Okay.
15     Q.    And this is actually one of the things
16  about the text message spreadsheet, is we get the
17  text, but when you send a photograph there is a
18  separate file for that.  So your photographs are
19  connected to your text message spreadsheets.
20         And so this is a photograph that was
21  sent by you on August 22nd, 2017.  And this is my
22  No. 22602 on Exhibit 31, and this is the image that
23  was shared there.
24         Do you recognize the handwriting on
25  that FedEx label?

68 (Pages 266 - 269)

Daniel R Cutler                          March 23, 2021
Bowen v. Adidas

Page 270

1    A.    That is unfortunately my terrible
2    handwriting.
3    Q.    And what is that address there that you
4    have underneath your name?
5    A.    That would be Portland, 55 -- I believe
6    it says 5055 North Greeley Avenue, Portland, Oregon
7    97217.
8    Q.    And what address is that?
9    A.    I recognize that as Adidas headquarters
10   in Portland.
11   Q.    And then this is addressed to Romeo
12   Langford, and then it's got his address in New
13   Albany, Indiana; is that right?
14   A.    That appears to be so.
15   Q.    Did you send this from Portland,
16   Oregon?
17   A.    I did not.
18   Q.    Where did you send this?
19   A.    Just to clarify, I don't believe I did.
20   Q.    Fair enough. It looks like the box
21   says -- tape on there from Staples, shipping tape.
22   A.    Yes. I see that.
23   Q.    Where would you have gotten a pair of
24   Yeezy's to send to Romeo Langford?
25   A.    Are you suggesting that in this box is

Page 271

1    a pair of Yeezy's?
2    Q.    Well, according to the text message
3    chain you indicate that it is.
4    A.    Do you mind if we go back to that text
5    message chain?
6    Q.    Absolutely. That's fine.
7    A.    So 32?
8    Q.    I believe it's 31.
9    A.    Let me just check something. Okay.
10   Q.    So I just want to direct you to maybe
11   the last six lines of that text message.
12   A.    Yeah. I see it.
13   Q.    There is a JPEG. Do you see that
14   there, August 22nd? That's the JPEG image we're
15   looking at.
16        Romeo's response is: Finally.
17   You send him an emoji. He sends one
18   back and then he says: I forgot to say thanks for
19   the Yeezy's on August 26.
20   A.    Okay. Thanks for the clarification. I
21   see that.
22   Q.    If you can take a look at Exhibit 34,
23   please.
24   A.    Just quickly before I look at this, is
25   this still along the same train of thought just

Page 272

1    before I take a break?
2    Q.    No. We're sort of moving on.
3    A.    Do you mind if we take five minutes so
4    I can grab a coffee?
5    Q.    Let's do that.
6        THE VIDEOTAPE SPECIALIST: We are going
7    off record. The time is 5:47 p.m.
8        (Short recess taken.)
9        THE VIDEOTAPE SPECIALIST: We are back
10   on record. The time is 5:58 p.m.
11   BY MR. RAM:
12   Q.    Mr. Cutler, during the break did you
13   have any discussions with any attorneys regarding
14   the substance of your testimony here today?
15   A.    I did not.
16   Q.    All right. Let's switch gears here. I
17   want to talk to you a little bit about Frank
18   Jackson, who we discussed earlier today.
19       Frank Jackson is a college basketball
20   player; right? Or he was.
21   A.    Yes. He played basketball in college.
22   Q.    And he played with Duke; is that right?
23   A.    Yes. He attended Duke University.
24   Q.    Is he a senior with Duke right now?
25   A.    No. He's in the NBA.

Page 273

1    Q.    That's right. How many years did he
2    play at Duke?
3    A.    I don't recall specifically, but one or
4    two.
5    Q.    What was your relationship to Frank
6    Jackson? How did that develop?
7    A.    Over the course of a number of years
8    regularly developed a relationship with him and his
9    family.
10   Q.    How did that -- not to retread all
11   ground about your explanation of meeting the
12   parents and meeting the players. Was Frank Jackson
13   an example of you meeting the players and the
14   families?
15   A.    I met Frank Jackson's family and
16   himself.
17   Q.    I'm sorry. Where?
18   A.    I don't recall where I first met them,
19   but it was somebody that I met during my -- during
20   my time in basketball.
21   Q.    And he's originally from Utah; is that
22   correct?
23   A.    I believe he was living in Utah for a
24   period of time, yeah.
25   Q.    Correct. Is that where he was playing

69 (Pages 270 - 273)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

1  basketball, college sports basketball, when you met
2  him?
3      A.    Yeah.  I believe he was playing with
4  the Utah Prospects.
5      Q.    You mentioned earlier John Scheyer, and
6  he's an assistant coach at Duke University; is that
7  right?
8      A.    Yes.
9      Q.    If you can pull up Exhibit 34, and this
10 is an excerpt of your text message threads.  Let me
11 know when you've got that in front of you.
12     A.    Will do.  Okay.
13     Q.    All right.  So you see this is dated
14 August 14th of 2016.  Do you see that date there?
15     A.    Yes.  I see April 14th, 2016.
16     Q.    And in the participants, Column J,
17 there is your name with your telephone number.  Do
18 you recognize that?
19     A.    I do.
20     Q.    And then there is a telephone number,
21 919 area code, and the name John Scheyer.  Do you
22 see that?
23     A.    I do.
24     Q.    And so there is just five messages
25 here.  We'll just read through these.

1          You sent the message April 14th, 2016:
2  The Jackson family is super excited about
3  everything.  Spent All Hoops Summit with the whole
4  family.
5          Coach Scheyer replies:  Yeah.  Great
6  people, and Frank is a stud.  Thanks.  How long is
7  the event?
8          And then you say:  Dude, he's better
9  than anyone realizes.
10         John Scheyer replies:  He is.  Really
11 is.
12         So I guess my question is:  Why were
13 you reaching out to John Scheyer at Duke regarding
14 Frank Jackson?
15     A.    Again, I really connected with coaches
16 at a number of universities, and I believe this was
17 the end of Frank's high school career.
18     Q.    So at that time were you just reaching
19 out to coaches that you had relationships with to
20 see if they had any interest?
21     A.    No.  At this time Frank was already
22 committed to Duke University.
23     Q.    Let's go to Exhibit 3, if you can.  And
24 this is the master spreadsheet and I'm going to
25 direct you to Line 17, 986.

1      A.    What page?
2      Q.    I will give you the page number here in
3  a second.  So this is going to be on Page 591 of
4  9070 of the master spreadsheet of your text
5  messages, and the particular text --
6      A.    I'm sorry.  I apologize.  591 you said?
7      Q.    Yeah.  591 is the page.
8      A.    What line number?
9      Q.    So you will see it's highlighted in
10 blue.  So we'll just start with the blue
11 highlights.
12         MR. LEVINE:  Is there a way to jump to
13 the page?
14         MR. RAM:  There might be.
15     A.    I'm close.
16     Q.    I think if you scroll and -- it's a
17 little bit of hunt and peck.
18     A.    Okay.  You said 17986?
19     Q.    Yeah.  17986.  That's correct.
20     A.    Got you.
21     Q.    And so this is the first one
22 highlighted in blue and you see the participants
23 listed there are your number, Dan Cutler.  Do you
24 see that?
25     A.    Yeah.

1      Q.    And 301 area code and the name Frank
2  Jackson.
3      A.    Uh-huh.
4      Q.    Okay.  And this date is June 13th,
5  2015.  And so Frank writes to you at 4:52 p.m.:
6  Yo, Dan.  I need a size 13.
7          Your response of:  What?
8  He says:  Those white shoes we got.
9          You said:  Oh, got you.
10 He replies:  Thanks.
11         Then emojis.  A little kiss emoji.  He
12 replies:  You're the best, Dan, with some lips.
13         Did you provide shoes to Frank Jackson
14 then?
15     A.    I provided shoes to Frank Jackson on a
16 number of occasions.
17     Q.    And what was the purpose of providing
18 him shoes other than the fact that he was asking
19 you for them?
20     A.    We did product seeding often to a
21 number of athletes.
22     Q.    What does that mean, "product seeding?"
23     A.    Sending product to athletes.
24     Q.    Did you do that with high school
25 athletes?

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 278

1    A.    Sure.
2    Q.    At this time period was Frank Jackson
3  in college or was he just finishing his senior
4  year?
5    A.    I don't have a specific recollection,
6  but I believe he was in high school at the time.
7    Q.    And he was -- so he was not yet in
8  college at this time period, right, in June of
9  2015?
10    A.    Again, to the best of my memory I don't
11  believe he was in college at this time.
12    Q.    And so when you say the product
13  seeding, when you send product to players, is
14  product seeding -- you know, is one example done
15  when a player reaches out to you and says: Hey,
16  send me a pair of shoes?
17    A.    Sure.  I guess that would fall under
18  the definition of product seeding.
19    Q.    Was that just a regular -- not a
20  regular, but maybe just a part of your job to
21  respond to those requests?
22    A.    Sure.  If I had a relationship with a
23  player and the player happened to reach out to me I
24  would have -- that would have been a part of some
25  of my activities at my job.

Page 279

1    Q.    Okay.  If you can, in this spreadsheet
2  let's scroll down to Line 18353.  It's on Page 602
3  or 603.
4        Give me one second, Dan, please.
5    A.    Take your time, sir.
6    Q.    Earlier today we talked about Frank
7  Jackson and an airplane ticket.
8        Do you recall paying for airfare for
9  Frank Jackson in --
10    A.    In 2016?
11    Q.    Yes, sir.
12    A.    I don't recall specific dates, but I do
13  recall at some point I definitely paid for airfare
14  for Frank Jackson.
15    Q.    And why did you pay for airfare for
16  Frank Jackson in the past?
17    A.    What do you mean why did I pay for it?
18    Q.    Yeah.  What was the reason of paying?
19  Did he reach out to you and say: Hey, I need a
20  plane ticket?
21    A.    I believe that would be how that would
22  have transpired.
23    Q.    Okay.  And when he made that request to
24  you, did you buy him a plane ticket?
25    A.    I believe so.

Page 280

1    Q.    And why did you do that?  Why did you
2  buy him a plane ticket?
3        MR. LEVINE:  Objection.
4    A.    I was asked to do something for a
5  person that I considered a friend and decided that
6  I could do so if I chose to.
7    Q.    Do you recall buying a plane ticket for
8  his girlfriend to travel to Raleigh, Durham to
9  visit him in college?
10    A.    Off the top of my head I don't recall
11  that.
12    Q.    Is that familiar to you at all?
13    A.    It wouldn't surprise me, but I don't
14  recall the specifics.
15        MR. RAM:  All right.  Give me a second
16  here.  I've got some connection issues here.
17        Do you mind if we fix this over here on
18  this end?  We've got just a lag.  If you don't mind
19  going off the record.
20        THE VIDEOTAPE SPECIALIST:  We are going
21  record.  The time is 6:11 p.m.
22        (Short recess taken.)
23        THE VIDEOTAPE SPECIALIST:  We are back
24  on record.  The time is 6:22 p.m.
25

Page 281

1  BY MR. RAM:
2    Q.    Mr. Cutler, do you still have Exhibit 3
3  in front of you?
4    A.    I do.
5    Q.    And are you on Page 603?
6    A.    Yes, I believe so.
7    Q.    Let's go to Line 18357.  Excuse me.
8  358.  It's dated September 23rd, 2016.  It's a
9  message from Frank Jackson to you.
10    A.    Yes.
11    Q.    And he writes:  Can Adidas pay for my
12  flight?  LOL.
13        Do you see that?
14    A.    I do.
15    Q.    And what was your response?
16    A.    I wrote:  To where? it appears.
17    Q.    And Frank replies:  Utah for my fall
18  break.
19        What is your response to that?
20    A.    I said:  We can't, but it can magically
21  appear.
22    Q.    And Frank states:  I would love that if
23  it did.  LOL.  I can leave Thursday night and have
24  to be back Monday night.  So October 6th through
25  10th.  How we looking?  Could that work?

71 (Pages 278 - 281)

Daniel R Cutler                                     March 23, 2021
Bowen v. Adidas

Page 282

1       And what did you write there?
2       A.    I believe it says:  As long as Al is
3   fine with it.
4       Q.    Al being Frank's father?
5       A.    Yeah.  I believe that to be the case.
6       Q.    And Frank replies:  Yeah.  He said
7   that's cool.  What time can you get?  I got to let
8   my academic adviser guy know.
9       And then you reply:  That work?  And
10  then you send him an image.
11      Does this refresh your recollection
12  about purchasing a plane ticket for Frank Jackson
13  at that time period?
14      A.    Yeah.  Like I said, I have no reason to
15  believe I didn't do that.
16      Q.    Let's scroll down a little bit just in
17  the next page.  It's going to be Line 18412.  We'll
18  start over there.
19      A.    Okay.
20      Q.    Yeah.  18412.  And again, it's a
21  message from Frank Jackson dated November 28, 2016.
22  It says: Dan, what's up?
23      Let me know when you're there.
24      A.    I'm there.
25      Q.    So it says:  Dan, what's up?  You think

Page 283

1   you can fly someone out to Duke?  Ha ha.  If not,
2   no worries at all.
3       What was your response to him?
4       A.    It appears I said:  When for?
5       Q.    The next response:  Just my girl before
6   she leaves on her miss.  Ha ha.  My dad was
7   supposed to, but I don't think he can.
8       You reply:  What days?
9       And Frank replies:  Thursday through
10  Monday.
11      And then you sent him a text image of a
12  plane ticket -- or he sends you a text, and then
13  you reply:  800 bucks.
14      And Frank says:  I know it's a lot.
15  It's all good.  I'll find a way to get her out
16  here.
17      Then on the next page you respond:
18  There is a Jet Blue overnight that's only 600.
19      And Frank replies:  That's perfect.
20  Any airline.  Doesn't matter.  Would it be those
21  dates, the 1st through 5th?
22      And then you reply:  She can fly out on
23  the night of the 30th and get there the 5th and
24  return Monday the 5th.
25      Frank says:  Perfect.  That would be

Page 284

1   great.
2       And then the conversation continues
3   about the logistics of the trip.
4       Does this refresh your recollection
5   about whether you purchased a plane ticket for
6   Frank Jackson's girlfriend to come visit him at
7   Duke?
8       A.    Again, I don't recall at the time, but
9   this obviously confirms that that happened.
10      Q.    All right.  And why did you do that?
11      A.    I considered Frank a good friend, and
12  once he checked with his parents to make sure it
13  was okay, as a friend I decided to purchase the
14  flight.
15      Q.    And you say -- you qualify that "as a
16  friend."
17      Why do you qualify that "as a friend"
18  as opposed to -- why do you include that in there?
19      A.    I clearly reference that Adidas can't
20  buy his flights, so I'm doing it personally.
21      Q.    But when did you reference that Adidas
22  can't buy his flight?
23      A.    In the last communication.  He asked
24  can Adidas buy my flight, and I said no.
25      Q.    And what did you say after that?

Page 285

1       A.    I actually said:  We can't, but it can
2   magically appear.
3       Q.    What did you mean by "magically?"
4       A.    Dan Cutler, individual person, can
5   purchase it for him.
6       Q.    Why couldn't Adidas buy his plane
7   ticket?
8       A.    I wasn't authorized to have Adidas
9   purchase his plane ticket.
10      Q.    Authorized?  What do you mean you were
11  not authorized?  Who would have given you
12  authorization for that?
13      A.    Nobody.
14      Q.    Did you get reimbursed by Adidas for
15  the plane ticket, the cost of the plane ticket?
16      A.    I don't believe I would have done that.
17      Q.    What about the ticket to his
18  girlfriend, for his girlfriend to come visit him at
19  Duke?
20      A.    The same answer.
21      Q.    So no, or you don't think you would
22  have?
23      A.    I don't -- I don't recall, but I would
24  say no.  But I'm not sure.
25      Q.    Do you recall providing Frank Jackson

72 (Pages 282 - 285)

Daniel R Cutler                          March 23, 2021
Bowen v. Adidas

Page 286

1  Adidas shoes in April of 2016?
2      A.    You've shown me text messages that said
3  that I did, so I don't see why that wouldn't be the
4  case. But I don't recall that specifically.
5      Q.    Do you know who Alex Reese is?
6      A.    Yes. I'm familiar with that name.
7      Q.    And who is Alex Reese?
8      A.    He is a basketball player.
9      Q.    And where does he play basketball right
10  now?
11     A.    I believe he's at the University of
12  Alabama.
13     Q.    Did Alabama have a game last night?
14     A.    I've got a nine-month pregnant fiancee.
15  I unfortunately was unable to watch games last
16  night, but I believe so.
17     Q.    Congratulations.
18     A.    Thank you.
19     Q.    Do you know if Alex Reese is currently
20  playing for Alabama?
21     A.    To the best of my knowledge he's still
22  there.
23     Q.    Do you know who Chris Monroe is?
24     A.    I believe Chris Monroe was a program
25  director for an AAU program.

Page 287

1      Q.    And do you know which program, which
2  AAU program?
3      A.    I'm not sure what they were called at
4  all times. I believe they changed names a few
5  times, but the name that is most on the top of my
6  head would be Team Carroll.
7      Q.    Where is that located?
8      A.    Southern state, I believe. Maybe
9  Alabama.
10     Q.    Do you recall purchasing a plane ticket
11  for Alex Reese and his mother in April -- excuse
12  me. May of 2015.
13     A.    Not off the top of my head. That
14  doesn't -- I don't recall that.
15     Q.    Dewan Hernandez. Do you know Dewan?
16     A.    I know Dewan Huell. I think he also
17  may go by Dewan Hernandez as well.
18     Q.    Yeah. Dewan Huell changed his name to
19  Dewan Hernandez.
20     A.    Yes. I know who he is.
21     Q.    So you know him when he was going by
22  "Dewan Huell?"
23     A.    Yeah. That's the name he was going by
24  when he was a high school athlete.
25     Q.    Let's take a look briefly here at

Page 288

1  Exhibit 36.
2      A.    Okay.
3      Q.    Do you recall giving Dewan Huell a
4  graduation present when he graduated from high
5  school?
6      A.    I'm not sure I gave him a graduation
7  present. I don't recall giving him a gift.
8      Q.    Do you recall paying for him to go on a
9  cruise?
10     A.    I believe there was a senior trip that
11  he asked if I could help him go on.
12     Q.    Did you help him go on that
13  financially?
14     A.    I sure did.
15     Q.    And do you remember if he went down to
16  Key West?
17     A.    I don't recall where the trip was. You
18  would have to ask him. I'm sorry.
19     Q.    Did you give him money to go on his
20  senior trip then or his graduation trip?
21     A.    I believe I paid for his ticket on the
22  boat. I don't believe I gave him money.
23     Q.    Are you familiar with Rosi Karen?
24     A.    Yes.
25            May I just for the record clarify that

Page 289

1  Dewan Huell at the time -- his mother had just
2  gotten evicted from his home and was in dire
3  financial straits, so I felt inclined that -- I had
4  a student athlete that I had a relationship with.
5  I felt like it was the right thing to do.
6      Q.    Okay. Thank you. Do you know Rosi
7  Karen?
8      A.    I do.
9      Q.    And who is Mr. Karen?
10     A.    Mr. Karen was a program director for
11  one of our programs.
12     Q.    Do you know which one?
13     A.    Texas -- I'm sorry. Hold on.
14     Q.    Houston?
15     A.    They were in Houston. It was
16  Basketball University.
17     Q.    You've got a good memory sometimes.
18            Did Rosi have a son, Jaedon LeDee?
19     A.    Rosi and Jaedon are not related.
20     Q.    Not related?
21     A.    I don't believe so.
22     Q.    Who is Jaedon LeDee?
23     A.    Jaedon LeDee was a player that played,
24  I believe, on Rosi's team.
25     Q.    Did you ever meet Jaedon LeDee?

73 (Pages 286 - 289)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 290

1    A.    Yes.  Absolutely.
2    Q.    Did you ever provide Rosi a copy of
3  your AmEx credit card so he could use it?
4    A.    I don't specifically recall doing that,
5  but I -- I don't recall.
6    Q.    Is that something that -- something
7  that you would have done?
8    A.    I believe there was times where some of
9  our programs were unable to get their funds for
10  travel in time, so I would have purchased flights
11  for them and to be reimbursed when they got their
12  checks for their travel.
13    Q.    Who would reimburse you, the teams
14  themselves or Adidas?
15    A.    No.  Sorry.  Excuse me.  The teams
16  would.  Once they got their travel allotments I
17  would usually get a check written back from those
18  teams.
19    Q.    Would you deposit that check into your
20  bank account?
21    A.    Probably into the First Team Sports
22  account.
23    Q.    Okay.  Immanuel Quickley, are you
24  familiar with him?
25    A.    I am.

Page 291

1    Q.    And was he a college basketball player?
2    A.    At one point, yes, he was.
3    Q.    In 2016 he was in high school.
4        Did you -- what kind of player was he
5  in high school as far as you know?
6    A.    What do you mean "what kind of player?"
7    Q.    Was he one of the elite players in the
8  country?
9    A.    He was a very good player.
10    Q.    Was he a McDonald's All American?
11    A.    I believe he was.
12    Q.    Was he a five-star recruit?
13    A.    I believe that term would be accurate
14  for him.
15    Q.    Do you recall sending Mr. Quickley and
16  his family Adidas products?
17    A.    Absolutely.
18    Q.    And did you send him and his parents
19  and his family shoes?
20    A.    I did.
21    Q.    Why did you do that?
22    A.    Product seeding.
23    Q.    And how would product seeding work with
24  his family members who are not basketball players?
25    A.    I would just send it in their size.

Page 292

1    Q.    Zion Williamson.  Did you have a
2  relationship with Zion Williamson?
3    A.    I know Zion Williamson.
4    Q.    Did you know him in high school?
5    A.    I did.
6    Q.    And how did you know him?
7    A.    I dealt with him through a number of
8  different events.
9    Q.    Okay.  Would those be Adidas events?
10    A.    The majority of which I would say would
11  be Adidas events.
12    Q.    Were you -- do you recall meeting him
13  in Spartanburg, South Carolina?  Down here.
14    A.    We held an event in Spartanburg, South
15  Carolina.
16    Q.    Do you recall seeing Zion at that
17  event?
18    A.    Yeah.  He would have been participating
19  in that event.
20    Q.    Did you interact with him at that
21  event?
22    A.    I interacted with a number of student
23  athletes at the event.  I'm sure I would have said
24  hello to him.
25    Q.    But in particular did you have any sort

Page 293

1  of responsibility for helping Zion Williamson at
2  that event?
3    A.    I often helped him just with -- he drew
4  a lot of attention at our events from crowds and
5  media, and so I was often somebody that helped just
6  kind of contain that, and I guess we placed a
7  security guard to make sure that he was okay at our
8  events.
9    Q.    Do you recall ever providing plane
10  tickets for Zion and his family?
11    A.    Not to the best of my recollection.
12    Q.    Let's go to Exhibit 3.  Do you still
13  have it in front of you?
14    A.    Let me pull it back up.  Okay.
15    Q.    So Exhibit 3, if you can go to -- let's
16  start at Page 203.  This is going to be Line 5737.
17    A.    I'm sorry.  You said 203?
18    Q.    Yeah.  Page 203 of Exhibit 3.
19    A.    I'm sorry.  What line again?
20    Q.    5737, please.
21    A.    Okay.
22    Q.    Okay.  And this is a message that you
23  got with Olivia Guidera.  Who is Olivia?  Briefly.
24    A.    Olivia was another consultant, possibly
25  external employee.  I'm sorry.  You would have to

74 (Pages 290 - 293)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 294

1  ask somebody at Adidas.  But she's another person
2  that worked within the grassroots basketball
3  department.
4      Q.    Okay.  Do you see the message from her
5  dated July 27, 2016, Line 5737?
6      A.    Yes; I do see a message from her.
7      Q.    And it's Column J again.  Is this your
8  telephone number and your name?
9      A.    That appears to be my name and my
10 telephone number.
11     Q.    And Olivia Guidera -- that is her name
12 there?
13     A.    Yes.  That appears to be.
14     Q.    And she says:  They are missing seats
15 for these.
16           And she sends you an image.  "The only
17 options for the young kid and mom are in Delta
18 Comfort for both.  And for the dad and Zion -- they
19 only have middle seats, so you might need to put
20 them all in Delta Comfort."
21           And then she sends you an image.  Do
22 you see that?
23     A.    I do.
24     Q.    Would it be unusual for Adidas to pay
25 for flights for mom and dad to go to a game, the

Page 295

1  family?
2      A.    Would it be unusual for us to pay for
3  flights to go to a game?
4      Q.    I don't know if it was a game or not,
5  but would it be unusual for the parents of the kid
6  to travel to go to a game?
7      A.    Would you like me to talk specifically
8  about this event?
9      Q.    Well, generally.  You mentioned earlier
10 these kids are in high school surrounded by adults.
11 It kind of makes sense mom and dad part of the
12 conversation; right?
13     A.    Sure.
14     Q.    And so when kids are traveling is it
15 unusual for mom and dad to go with them?
16     A.    It would just depend on the event that
17 we were running as to whether or not we were
18 providing transportation for the family or not.
19           It could be specifically in reference
20 to, I believe, Adidas Nations or a Prip, which we
21 would have included all parents on.
22     Q.    So all parents went to the Path?
23     A.    Yes.  All parents and guardians are
24 offered travel on all the Pstops -- correction.
25 Not all the Path stops, a number of the Path stops,

Page 296

1  and all of them are offered it.
2      Q.    What about siblings; would you pay for
3  siblings to go as well?
4      A.    I believe for the Path we provided for
5  four people that could travel to a certain event.
6      Q.    Was that true for all the players and
7  their families?
8      A.    I think it depended on what, you know,
9  their close family was, but I believe in general we
10 would accommodate their nuclear family, to use that
11 word.
12     Q.    Okay.  Do you know Ryan Faulkner?
13     A.    I'm familiar with the name.
14     Q.    And who is Ryan Faulkner?
15     A.    Ryan is one of the directors of a
16 program called Game Elite.
17     Q.    Where is Game Elite located?
18     A.    They're in Georgia.
19     Q.    In Georgia.  All right.
20           Do you recall communications with Mr.
21 Faulkner regarding getting a product to Zion and
22 his family?
23     A.    I don't recall specifically.
24     Q.    Would that have been something unusual?
25           We talked about Immanuel Quickley,

Page 297

1  getting product to him and his family.  Would you
2  have done the same for Zion Williamson and his
3  family when he was in high school?
4      A.    He played for Ryan Faulkner's team, so
5  it would have been not unusual for me to send
6  product to Ryan designated for a kid of his level.
7      Q.    Would you send product to everybody on
8  the team or just for a kid at his level?
9      A.    Everybody received product, but some
10 kids were certainly able to receive additional
11 product.
12     Q.    Why is that?  I mean --
13     A.    Because they're a part of our Nations,
14 Path.  They were part of a different program.
15     Q.    But if you -- you know, aside from the
16 product they would get from going to those
17 particular programs, Nation, Path, do you recall
18 any specific occasions where the kid or family
19 would reach out and say: Hey, we want some shoes.
20 Send it to us?
21     A.    Absolutely.
22     Q.    And in response to those requests do
23 you recall doing that with Zion Williamson?
24     A.    I don't believe I ever got a request
25 from Zion directly, but through Ryan I may have.

75 (Pages 294 - 297)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 298

1    Q.    So if Ryan had gotten a request from
2  the Williamson family for Adidas product for Zion
3  and his mom and step dad and siblings, would that
4  have been an issue just giving that over to him?
5    A.    Ryan would have been one of our program
6  directors, so I would have had no issue to send
7  product to Ryan.
8    Q.    To gift to Zion Williamson or his
9  family?
10    A.    I would be -- that's speculative on
11  what Ryan would do with it once he got the product.
12    Q.    But if he told you that they were
13  looking for product and they say "process a product
14  order for Zion and his family," would that be
15  pretty clear what he was going to do with it?
16    A.    Sure.  I would assume that would be
17  going toward Zion and his family.
18    Q.    Do you know Jamal Brunt?
19    A.    I do.
20    Q.    And who is Jamal Brunt?
21    A.    Jamal Brunt is a basketball coach.
22    Q.    And where does he coach?
23    A.    I believe he's now at Virginia
24  Commonwealth University.
25    Q.    Where was he before he was at VCU?

Page 299

1    A.    I believe he was at University of
2  Miami.
3    Q.    Do you recall a conversation that you
4  had with Jamal -- text messages with Jamal Brunt
5  with reference to Zion Williamson?
6    A.    I'm not sure I recall any specific
7  between Zion Williamson and Jamal.
8    Q.    Do you mind going to Page 232 of
9  Exhibit 3, please.
10    A.    Sure.
11    Q.    Let me know when you get there.
12    A.    Yes.  I'm there.
13    Q.    So if you go to Line 6757.
14    A.    Okay.
15    Q.    All right.  And so Column J has your
16  telephone number and "Dan Cutler."  Do you see
17  that?
18    A.    I do.
19    Q.    And then next to it is the name Jamal
20  Brunt and an 804, which is a Virginia area code.
21  Do you see that?
22    A.    Yeah.  I see an 804 number and Jamal
23  Brunt's name.
24    Q.    So Coach Brunt, is he just another --
25  he's another couch that you communicate with

Page 300

1  regarding players?
2    A.    I would communicate with Jamal Brunt on
3  a number of topics, but certainly players would be
4  one of them.
5    Q.    So this text message change May 6, 2016
6  starts out:  Love the Adidas for the Path.  Be in
7  touch.
8          You respond:  We're doing it, man.
9          And then Jamal replies:  If we get
10  close enough to be in top two, do you think he
11  knows you guys will continue to take care of him at
12  Adidas school?
13          Do you know who he's referring to
14  there?
15    A.    I don't have it off the top of my head,
16  but -- I'm not sure exactly who he's referring to
17  at that time.
18    Q.    Do you know what he's referring to in
19  terms of -- regardless of what player, but to take
20  care of him at the Adidas school -- what that would
21  mean?
22    A.    I don't know specifically what Jamal
23  would be meaning.  That's me interpreting what he
24  was thinking.
25    Q.    Let's scroll down here a little bit.

Page 301

1  Let's go to Line 11916, please.
2          MR. LEVINE:  What page is that?
3          MR. RAM:  405.
4    A.    It says Line 11916.  Okay.
5    Q.    All right.  I want to -- this is a text
6  conversation between you and Chris Rivers.  If you
7  look in Column J do you see your telephone number
8  and your name there?
9    A.    Yes, I do.
10    Q.    And you see Chris Rivers there as well?
11    A.    Yes, I do.
12    Q.    All right.  The date of this one is
13  September 18 of 2015.
14    A.    Okay.
15    Q.    And so you send a message to Chris
16  Rivers:  Any way to hide this so I don't have to
17  bill Jimmy back for it?
18          Do you recall what you're referring to
19  when you sent that message to Chris Rivers?
20    A.    Not the intimate specifics, but I
21  believe in review for this I know that to be a
22  situation where the budget for that -- for
23  grassroots basketball was pretty high, and so I was
24  asking if there was any way that I could use a
25  different budget to be able to get on that flight.

76 (Pages 298 - 301)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 302

1    Q.    Who is the "Jen" referenced there in
2    that message?
3    A.    I believe it was Chris' travel agent.
4    Q.    Do you know her full name?
5    A.    Sorry.  I don't know.
6    Q.    Did she work at Adidas?
7    A.    I believe she worked for the travel
8    agency, but I'm not positive.
9    Q.    Do you know the name of the travel
10   agency?
11   A.    I don't.  I'm sorry.
12   Q.    Was that an occurrence that would come
13   up where you would be over -- or the company would
14   be over budget on particular events or event and
15   you would have to bill something to a different
16   budget code?
17   A.    I wasn't in charge of or had access to
18   the budget code, so I wouldn't know.
19   Q.    But you're referring to hiding it from
20   Jen.  That's why I'm asking.
21   A.    I'm not referring to hiding it from
22   Jen.
23   Q.    Or was that your -- do you recall in
24   this specific instance what happened to the cost
25   for the flight?

Page 303

1    A.    I don't think I got on that flight.
2    Q.    Okay.  Well, did you get on a different
3    flight?  I'm assuming.
4    A.    No.  I think due to budget restraints I
5    wasn't able to go on the trip.
6    Q.    We just have a couple more things and
7    we'll be done.
8          I do want to ask you -- let's go down
9    -- scroll further down on Exhibit 3.  It's going to
10   be 15,600 through 609.
11   A.    609?
12         MR. LEVINE:  What is the page number?
13         MR. RAM:  15600 through --
14         MR. LEVINE:  Page number?
15         MR. RAM:  I will tell you in a second.
16   503.
17   Q.    (Continued)  Let me know when you get
18   there.
19   A.    Sorry.  You said 503?
20   Q.    15600 -- yeah.  513.
21   A.    15600?
22   Q.    Yes, sir.
23   A.    Okay.
24   Q.    And so this is a message between you
25   and Ryan Faulkner.

Page 304

1          Do you see in Column J your name and
2    telephone number there?
3    A.    I do.
4    Q.    And next to your name and telephone
5    number do you see the name Ryan Falker or Faulkner?
6    A.    I believe it's Falker.
7    Q.    Falker.  Okay.
8    A.    I could have that just incorrect.
9    Q.    Sure.  And this is dated May 14th,
10   2016.  And you said earlier Ryan was the AAU coach
11   for Zion Williamson's team; is that right?
12   A.    For a period of time, yeah.
13   Q.    Which team was that again?
14   A.    Game Elite.
15   Q.    Game Elite.  Okay.  And so let's read
16   through this.
17         You write:  There is only one more seat
18   on Zion's flight.  What do you want to do?
19         Do you see that there?
20   A.    Yeah.
21   Q.    And Ryan's response:  Put the mom on
22   Zion flight.  Put the dad on the next flight.  Put
23   them all on the same return flight.
24         And your response is what?
25   A.    I believe I write:  Okay.  Dad is going

Page 305

1    to go early and get the same connection.
2    Q.    And Ryan says:  Cool.  Send me the
3    info.
4          Ryan says:  Parents can't eat at hotel.
5    Arrive from Airport.  Question mark, question mark,
6    question mark.
7          And your response is:  Zion's people
8    are not included in that group.
9          And he says:  Thank you.
10         And then what is your next message to
11   Ryan after that "thank you?"
12   A.    "We also officially aren't putting any
13   parents up, so let's make sure that we all keep
14   that private, please."
15   Q.    Right.  And what were you asking him to
16   keep private?
17   A.    I believe by the text message that we
18   were putting up Zion's parents.
19   Q.    In a hotel?
20   A.    I don't know for sure, but I assume so.
21   Q.    Okay.  Do you recall -- do you have any
22   personal knowledge -- and again, we're sitting here
23   in a deposition under oath.
24         Do you have any personal knowledge of
25   anyone from Adidas or any Adidas consultants paying

77 (Pages 302 - 305)

Daniel R Cutler                              March 23, 2021
Bowen v. Adidas

Page 306

1  money directly or indirectly to Zion Williamson's
2  family?
3      A.   Not that I recall.
4      Q.   Would it surprise you to learn if that
5  happened?
6          MR. LEVINE:  Objection.
7      A.   Can you repeat the question?
8      Q.   Would it surprise you to learn if that
9  happened?
10     A.   What are you referring to?
11     Q.   If somebody from Adidas paid money to
12  the family of Zion Williamson directly or
13  indirectly.
14     A.   I wouldn't -- I would be speculating,
15  so I wouldn't be able to answer that question.
16     Q.   Did you have any conversations with
17  Olivia Guidera about payments that Chris Rivers was
18  making to Zion Williamson's family?
19     A.   Again, I don't recall any of those
20  conversations.
21     Q.   Do you recall any conversations with
22  Chris Rivers about payments he was making to the
23  family?
24     A.   I just don't remember.  I don't recall.
25     Q.   Do you think that's something that you

Page 307

1  would recall?
2      A.   I just -- I don't recall.
3      Q.   Do you have knowledge of anybody at
4  Adidas paying money to any high school basketball
5  recruit?
6      A.   I'm not sure.  I don't recall.
7      Q.   Have you ever heard of anybody at
8  Adidas paying money to any high school basketball
9  don't recall that being one of them for sure.
10     Q.   When you say you don't recall, is it
11  possible it happened and you just don't remember
12  sitting here today?
13         MR. LEVINE:  Objection.
14     A.   Can you rephrase the question?
15     Q.   You say you don't recall.  Is it
16  possible that it may have happened, but you just
17  don't recall sitting here today?
18         MR. LEVINE:  Objection.
19     A.   A lot of things are possible.  I don't
20  recall.
21     Q.   Okay.  All right.  I've got very brief
22  documents to show you.  These are the last two,
23  Exhibit 42 and 43.  I just want to circle back to
24  invoices that you submitted to Adidas.  So if you
25  can open up Exhibit 42, please.

Page 308

1      Q.   Do you have Exhibit 42 in front of you,
2  Mr. Cutler?
3      A.   I do.
4      Q.   Do you recognize this document?
5      A.   It doesn't -- it looks like an invoice,
6  but I don't recognize the document.
7      Q.   All right.  Do you recognize the name
8  on the document in the top left-hand corner?
9      A.   I do.
10     Q.   And whose name is that, Mr. Cutler?
11     A.   Dan Cutler.
12     Q.   And is that your address underneath
13  your name?
14     A.   That is.
15     Q.   And this invoice is dated February
16  15th, 2015.  Do you see that on the right side?
17     A.   I do.
18     Q.   And this was sent to Jim Gatto?
19     A.   I see that.
20     Q.   Adidas International Marketing BV.  Do
21  you see that?
22     A.   I do.
23     Q.   In Amsterdam.
24     A.   It appears to be.
25     Q.   Okay.  We looked at an invoice earlier

Page 309

1  today that you had sent to an address in
2  Massachusetts.
3      Q.   My question is:  Did you send -- did
4  you send invoices to Amsterdam as reflected on this
5  document?
6      A.   Did I mail them to Amsterdam?
7      Q.   Well, were they -- did you invoice
8  Adidas International for the description on the
9  invoice?
10     A.   I invoiced where my -- where the people
11  at Adidas told me to invoice.
12     Q.   Okay.  And that's fair.
13         Who were the people at Adidas who told
14  you where to send the invoice?
15     A.   I'm not sure.  It would be a number of
16  people.
17     Q.   Who could it have been?
18     A.   Who would have told me where to
19  invoice?
20     Q.   Yes, sir.
21     A.   It could have been Tonie Hanson; it
22  could have been Chris Rivers; it could have been
23  Jim Gatto.
24     Q.   Are those the three people that you
25  would have conversations with about invoices and

78 (Pages 306 - 309)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 310

1  payments?
2     A.   I had conversations with a number of
3  people, but those are the three people that I would
4  have most likely have invoiced at their direction.
5     Q.   Is it likely that one of the three of
6  them told you where to -- or what address to put on
7  this invoice?
8     A.   I just couldn't say.  I don't recall
9  this invoice at all.
10    Q.   Okay.  You see the description there?
11 It says:  Management fee.  Junior Nations, North
12 Carolina, $30,000.
13    A.   I see that.
14    Q.   Did you get paid a management fee?  Did
15 you have a contract to provide management for a
16 tournament in North Carolina?
17    A.   I don't recall.
18    Q.   Do you recall getting paid $30,000 by
19 Adidas in February of 2015 for a management fee?
20    A.   I don't recall.
21    Q.   Well, we were looking at your
22 consultant agreement earlier today and I believe it
23 said your annual compensation was $80,000; right?
24    A.   I don't believe that to be true.
25    Q.   What do you believe to be true, then,

Page 311

1  regarding your compensation?  Was it 85,000?
2     A.   I believe 85,000 was the proper number.
3     Q.   Okay.  And so this invoice is for
4  $30,000 for a management fee.
5          Do you have any recollection of why you
6  were submitting an invoice to Adidas International
7  for a management fee in February of 2015?
8     A.   I don't recall.  I'm sorry.
9          MR. RAM:  We are on Exhibit 43, now.
10 BY MR. RAM:
11    Q.   Mr. Cutler, let me know when you have
12 this in front of you.
13    A.   I do.
14    Q.   Again, your name on this invoice, Dan
15 Cutler, and your address listed in Amherst,
16 Massachusetts.
17    A.   I see that.
18    Q.   That's your phone number and your email
19 underneath that; correct?
20    A.   Yes.  That's correct.
21    Q.   And this invoice on the right is dated
22 February 10th, 2015; correct?
23    A.   Correct.
24    Q.   And the description says:  Consulting
25 fee, 2015 January through June, $30,000.

Page 312

1          Do you see that?
2     A.   I do.
3     Q.   Were you getting paid $30,000 in a
4  consulting fee in 2015?
5     A.   I don't recall.
6     Q.   I'm sorry?
7     A.   I don't recall.
8     Q.   What was your compensation in 2015 for
9  the consulting services you provided to Adidas?
10    A.   I don't recall exactly what I was paid.
11    Q.   Does $60,000 a year seem roughly what
12 you would have been paid in 2015?
13         MR. LEVINE:  Objection.
14    A.   I don't recall.
15    Q.   You just looked over at your attorney
16 on the right.  Did he shake his head to you?
17    A.   Privileged.
18    Q.   I'm sorry.  What?
19    A.   He didn't do anything.  I can look at
20 my attorney if I would like.
21    Q.   Right.  Is your attorney giving you any
22 signal right now?
23    A.   No.  Mr. Levine said objection, and I
24 was just looking to see if I could answer the
25 question or not.

Page 313

1     Q.   In looking at this Exhibit 43, the
2  address of this invoice, like the one that was
3  submitted five days later or dated five days later
4  to Jim Gatto Adidas International BV in Amsterdam.
5  Do you see that?
6     A.   That's what it appears to say.
7     Q.   So I guess my question is:  What were
8  you doing in February of 2015 where you submitted
9  two invoices within a five-day period totaling
10 $60,000 to Adidas International in Amsterdam?
11    A.   I don't recall.  I'm sorry.
12    Q.   You have no recollection of what you
13 did to cause you to submit two invoices for $30,000
14 each in five days of each other?
15         MR. LEVINE:  Objection.
16    A.   I think I've answered the question.
17         MR. RAM:  Give me one moment.
18         Mr. Cutler, thank you.  That's all the
19 questions I have for you today.  There may be some
20 other attorneys who have questions for you, and I
21 will turn it over to them.
22         Thank you.
23         MR. LINDHOLM:  This is Rob.  Do you or
24 Debbie have any questions?  I have probably about
25 15 or 20 minutes tops.

79 (Pages 310 - 313)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

1        MS. BARBIER:  I don't have any
2    questions.
3        MR. LEVINE:  I have a few questions.
4        THE VIDEOTAPE SPECIALIST:  We are going
5    off record.  This is end of Media Unit 5.  The time
6    is 7:06 p.m.
7        (Short recess taken.)
8        THE VIDEOTAPE SPECIALIST:  We are back
9    on record.  This is the beginning of Media Unit 7.
10   The time is 7:10 p.m.
11           EXAMINATION
12   BY MR. LINDHOLM:
13       Q.    Great.  Thank you.  Mr. Cutler, my name
14   is Rob Lindholm and I'm an attorney for one of the
15   defendants, Christopher Rivers.  We've heard a lot
16   about Mr. Rivers, I think, during your deposition
17   here today and I think you testified earlier,
18   Mr. Cutler, that Christopher Rivers hired you as an
19   intern at Reebok in 2007.
20       A.    Yeah.  I believe that's correct.
21       Q.    Did you know Mr. Rivers before that
22   time?
23       A.    I did not.
24       Q.    And when you were at Reebok was
25   Mr. Rivers your boss?

1        A.    I would say that's an accurate
2    representation.
3        Q.    What about at Adidas; was he your boss
4    technically?
5        A.    Yes.  I would say that's accurate.
6        Q.    And when you were at Adidas,
7    Mr. Cutler, how would you describe your sort of
8    interaction with Mr. Rivers?  Was it daily
9    interaction?  Weekly interaction?
10       A.    Daily, I would say.
11       Q.    And multiple times a day usually?
12       A.    Yes.
13       Q.    Would you describe your relationship
14   with Mr. Rivers at Adidas as a close relationship?
15       A.    Yes.
16       Q.    I want to go over -- I want to spend a
17   couple of minutes on Mr. Rivers' job
18   responsibilities.
19           Did Mr. Rivers have any responsibility
20   for managing relationships with AAU teams?
21       A.    Are you speaking to his job description
22   as it's posted or just as his daily activities?
23       Q.    Why don't we start with as it's posted,
24   I guess.
25       A.    I wouldn't know what his job posting

1    looks like.  I'm sorry.
2        Q.    What about his everyday daily
3    activities; did he have any responsibilities with
4    managing relationships with AAU teams?
5        A.    Yes.
6        Q.    In Mr. Rivers' everyday activities did
7    he have any responsibility for overseeing
8    Adidas-sponsored events?
9        A.    Yeah.  I would say that's accurate.
10       Q.    In his everyday activities did Mr.
11   Rivers have any interaction with college coaches?
12       A.    I wouldn't know day to day, but I would
13   assume that from time to time he definitely spoke
14   with college coaches.
15       Q.    And in Mr. Rivers' everyday activities
16   at Adidas did he have any interactions with high
17   school basketball players?
18       A.    I would say that would be accurate.
19       Q.    In his daily activities at Adidas did
20   Mr. Rivers have any interaction with NBA basketball
21   players?
22       A.    Yes.
23       Q.    In Mr. Rivers' everyday activities at
24   Adidas did he have interactions with families of
25   high school basketball players?

1        A.    I would assume that to be true.
2        Q.    And did he -- do you know if he
3    interacted with NBA basketball players' families in
4    his work at Adidas?
5        A.    Yes.  That is true.
6        Q.    Mr. Cutler, I want to spend a couple of
7    minutes talking about -- we have talked, I think, a
8    bit today about some of the Adidas-sponsored
9    events, and I think you named a couple.  I think
10   you mentioned Adidas Nations and the summer
11   championships.  Do you remember that?
12       A.    I do.
13       Q.    Do you know what Mr. Rivers' role was
14   with respect to, for example, the summer
15   championships?
16       A.    He was -- he was obviously intimately
17   involved with teams that were there, but in terms
18   of on-the-ground duties, I don't have exact
19   knowledge of what he did day to day.
20       Q.    Mr. Cutler, did he have any overall
21   responsibilities for those events?
22       A.    Yeah.  He was probably -- he was
23   probably the senior Adidas person on site at all
24   times.
25       Q.    And, Mr. Cutler, did you have any

80 (Pages 314 - 317)

Daniel R Cutler                                        March 23, 2021
Bowen v. Adidas

Page 318

1  responsibility with managing those events?
2      A.   Yes, sir, I did.
3      Q.   And I just want to talk about some of
4  those events, and maybe we can use the summer
5  championships as an example of it.
6          Can you give me an idea of the size of
7  the summer championships?  How many players were
8  there?
9      A.   How many players?
10     Q.   Yeah.  How many players would have been
11 invited to that?
12     A.   So to clarify, it's not an invitational
13 event.  It's an open event for all clubs that can
14 come play.
15         I think at our largest event I believe
16 we were up towards 400 teams.  So you go ten -- you
17 know, conservatively ten players per roster.
18 You're looking at four or five thousand people.
19     Q.   Where would you typically hold those?
20 You know, for example, the summer championships.
21     A.   We used a number of locations in or
22 around Las Vegas, but our main headquarters were at
23 the Cashman Center.
24     Q.   How many -- roughly -- people would the
25 Cashman Center seat?

Page 319

1      A.   We were able to sit, I believe, nine or
2  ten full courts within the Cashman Center.  So I
3  don't know about -- you know, in terms of capacity,
4  but a large number.
5      Q.   And as part of your role with respect
6  to those events, Mr. Cutler, did you ever have to
7  advance some of the expenses for some of those
8  events?
9      A.   Yes.
10     Q.   And then did you later seek
11 reimbursement for those expenses from Adidas?
12     A.   Yes, I would.
13     Q.   I want to go through a couple of those
14 expenses just to get an idea how big those events
15 were.  Let's use again the summer championships as
16 an example.
17         Any sense in what an overall budget for
18 that would have been?  Ballpark.
19     A.   Just for the summer championships
20 alone?
21     Q.   Correct.
22     A.   I don't have -- I don't really have a
23 ballpark.  I mean, setting up just Cashman and the
24 courts it was hundreds of thousands of dollars.
25     Q.   And would part of those costs have been

Page 320

1  the facility rentals?  For example, the Cashman
2  Center.
3      A.   Absolutely.
4      Q.   Would you have had to or would Adidas
5  have to have brought in hardwood courts to add to
6  the venue?
7      A.   Yeah.  We rented an empty building and
8  then outsourced people to come in and set up the
9  courts.
10     Q.   And would you have had expenses for
11 things such as air-conditioning?
12     A.   Yeah.  I believe just to turn on
13 air-conditioning in one of the public schools I
14 think was a five-figure number.
15     Q.   What about expenses for things like
16 signs and banners?
17     A.   Very expensive.
18     Q.   Would Adidas have covered expenses for
19 players to travel to and from the tournament?
20     A.   I don't generally think we would
21 provide expenses for individual players to travel
22 to a tournament.
23     Q.   Would you have provided any hotels for
24 the players?
25     A.   I believe we would provide staff

Page 321

1  hotels.  I don't know -- I don't know for certain
2  if we would provide individual players hotels, but
3  I believe there was a period of time where we may
4  have fronted some hotel money.
5      Q.   And a couple of minutes ago you
6  mentioned that, you know, at times you advanced
7  some of the costs for these tournaments on your
8  credit card; is that correct?
9      A.   Yes; routinely.
10     Q.   And was that something, you know, for
11 you personally that you wanted to do?  Was there
12 any advantage to doing that?
13     A.   Not really.  I mean, credit card points
14 are always great, but it was routinely quite a
15 stress financially for myself, and I believe I
16 expressed that a number of times.
17     Q.   And, Mr. Cutler, give me a sense of how
18 much money you put on a credit cart at any one
19 time.  Or what would sort of be a balance for one
20 of these tournaments that you would advance money
21 for?
22     A.   For an individual tournament I wouldn't
23 be able to pin down a number, but it was high tens
24 of thousands of dollars.
25     Q.   The expenses you personally might have

81 (Pages 318 - 321)

Daniel R Cutler                    March 23, 2021
Bowen v. Adidas

Page 322

1   advanced, would that have covered things at times
2   such as air travel?
3       A.    For -- could you be just a little more
4   specific when you say "air travel?"
5       Q.    Yes.  So would you have ever had to
6   advance expenses for either staff or player air
7   travel at any of these events?
8       A.    Certainly staff air travel I would pay
9   for.  And then for -- again, as I referenced
10  earlier in the deposition, if there was occasion
11  where, you know, a certain club or multiple clubs
12  -- their travel budget wasn't available for -- you
13  know, it took them too long to get set up in the
14  systems with a vendor, there are oftentimes I would
15  pay that, and then once they were able to get set
16  up they would pay me back.
17      Q.    Would you have at times advanced money
18  for things like hotel for staff members for some of
19  these tournaments?
20      A.    Yeah.  That sounds like something I
21  would do.
22      Q.    How would you eventually get reimbursed
23  for these expenses that you paid?
24      A.    I would invoice back based on the hotel
25  receipts.

Page 323

1       Q.    And would you ever have occasion,
2   Mr. Cutler, to submit invoices prior to these
3   tournaments actually happening for some of these
4   expenses?
5       A.    Very rarely, but -- I don't remember a
6   specific instance, but it was -- I remember
7   conversations about whether or not we should
8   invoice prior to the event or not.
9       Q.    I think we touched on this a little
10  earlier, but who would you typically submit your
11  invoice to at Adidas?
12      A.    Just in general or for summer
13  basketball, summer championship related events?
14      Q.    Just generally.
15      A.    It would be -- it usually went to
16  either Mr. Gatto, Mr. Rivers, or Miss Hanson.
17      Q.    When you submitted one of these
18  invoices, what was the kind of typical timeline on
19  how long it would take for one of these invoices to
20  get reimbursed?
21      A.    Once I was set up in the system and it
22  got submitted I believe there was usually a 30-day
23  net.  So usually within a month.
24      Q.    Did you ever have any issues with
25  getting the invoices paid quickly?

Page 324

1       A.    Sure.  Absolutely.
2       Q.    Can you just elaborate a little bit on
3   what kind of issues you had.
4       A.    There were just times where it just
5   took a long time to get paid, whether it be on a
6   slow submitting or on a slow back-end work on the
7   finance department.
8       Q.    And you mentioned it would sometimes
9   take a long time to get paid.  What is a long time?
10      A.    Two, three, four months sometimes.
11      Q.    Did you ever have any issues getting --
12  strike that.
13            You mentioned earlier that sometimes
14  you had tens of thousands of dollars that you would
15  put on your credit card; is that right?
16      A.    Yeah.
17      Q.    Did you ever have any issues with
18  getting large amounts reimbursed by Adidas?
19      A.    What do you mean by that?
20      Q.    Did you ever have any issues with
21  getting amounts over a certain threshold approved?
22      A.    I think I was always asked to keep my
23  invoices under, I think, $25,000.
24      Q.    Mr. Cutler, did you ever have occasion
25  when you had expenses that were more than the

Page 325

1   $25,000 and you therefore broke up the expenses
2   into individual invoices?
3       A.    That sounds like something that I would
4   have done.
5       Q.    And Mr. Cutler, just one more question
6   on the invoices here.
7            Did you ever submit an invoice to
8   Adidas that would have been requesting
9   reimbursement for money that would have been used
10  to pay players or families to go to an
11  Adidas-sponsored college or university?
12      A.    I wouldn't have ever had knowledge of
13  any of that.
14      Q.    So you wouldn't have submitted an
15  invoice for that?
16      A.    No.
17      Q.    Mr. Cutler, I want to spend a couple of
18  minutes -- you earlier testified that you had -- I
19  think we saw some examples of it.
20            You had plenty of communications with
21  assistant or head coach Division 1 college
22  basketball coaches; is that correct?
23      A.    Yes.
24      Q.    And you mentioned one of the purposes
25  -- or the purpose for that was sort of an

82 (Pages 322 - 325)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 326

1    information sharing purpose; is that correct?
2        A.    I think that's how I put it.
3        Q.    And would those conversations with
4    either assistant college basketball coaches or head
5    college basketball coaches -- would that have been
6    limited to coaches at Adidas-sponsored schools?
7        A.    No, I don't believe so.
8        Q.    I know this isn't going to be an exact
9    mathematical calculation here, but what is your
10   sense?  Would you have had more conversations with
11   college basketball coaches at non-Adidas-sponsored
12   schools as opposed to Adidas-sponsored schools?
13       A.    Again, based on your question obviously
14   it would be a guesstimate, but I think the general
15   skew of the numbers would be that there were more
16   non-Adidas schools than Adidas schools.  So I think
17   that would be a fair assessment.
18       Q.    We talked a couple of minutes ago of
19   Mr. Rivers' role and the fact that he may have --
20   let me ask it a different way.
21           Would Mr. Rivers have had contact with
22   assistant or head college basketball coaches?
23           MR. LEVINE:  Objection.
24       Q.    (Continued)  You can go ahead and
25   answer.

Page 327

1        A.    Could you rephrase the question,
2    please, or repeat the question?
3        Q.    Do you know if Mr. Rivers ever had any
4    contact with assistant or head coaches in Division
5    1 college basketball?
6        A.    I've seen him speak to college coaches
7    before.  So yeah; I would assume so.
8        Q.    Do you know why those college coaches
9    would have been speaking to Mr. Rivers?
10       A.    I wouldn't have the details of those
11   conversations, but I assume the same lines as I
12   would have, information sharing.
13       Q.    In those conversations that you had
14   with college coaches were they asking you for your
15   advice on the caliber of player these kids were
16   usually?
17       A.    Could you clarify what you mean by my
18   "advice?"
19       Q.    So were these college coaches -- when
20   you had these conversations, were they looking for
21   your scouting reports on these kids?
22       A.    I think that's a general fair way to
23   put it.  I think they were interested in my opinion
24   on a player and their skill level.
25       Q.    I want to talk to you -- you mentioned

Page 328

1    earlier in your testimony that you had -- you had a
2    role with interacting with high school -- with high
3    school athletes; correct?  Basketball players.
4        A.    Yes.  That's true.
5        Q.    And you also interacted with their
6    families at times?
7        A.    Yes, I did.
8        Q.    To the best of your knowledge was it
9    against NCAA rules for you to have interactions as
10   a consultant with Adidas with either players or
11   their families while they were in high school?
12       A.    Not that I'm aware of.
13       Q.    Mr. Cutler, did you ever have occasion
14   to go on any overseas trips with any of the teams
15   that Adidas sponsored?
16       A.    Yes; I believe I did.
17       Q.    Do you know if Mr. Rivers ever went on
18   any of those overseas trips?
19       A.    He often -- I often accompanied him on
20   the trips as well.
21       Q.    Do you know if any of the -- if any
22   high school basketball players ever reached out to
23   Mr. Rivers for advice on any topic?
24       A.    I don't have specific instances, but I
25   believe Mr. Rivers would definitely have been

Page 329

1    somebody that high school players would have
2    reached out to for advice.
3        Q.    Mr. Cutler, did any high school players
4    ever reach out to you at any time for any advice?
5        A.    Sure.
6        Q.    Did they ever reach out to you for any
7    advice on where to go to college or a university?
8        A.    I spoke about a number of things with
9    high school athletes, but I'm certain at some point
10   or not they asked me my opinion on certain
11   colleges.
12       Q.    Are you aware of -- strike that.
13           Are you aware of Mr. Rivers ever paying
14   a player or his family for providing any sort of
15   benefit so that a particular player would commit to
16   an Adidas-sponsored school?
17       A.    I'm not aware of that.
18       Q.    Mr. Cutler, are you aware of Chris
19   Rivers making or coordinating any payments to
20   Dennis Smith, Jr. or anyone in Dennis Smith, Jr.'s
21   family so that Dennis Smith would attend a
22   particular college or university?
23       A.    I have no knowledge of that.
24       Q.    Are you aware of Chris Rivers ever
25   making or coordinating any payments to Brian Bowen,

83 (Pages 326 - 329)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

1    Sr. or anyone in his family so that Brian Bowen
2    would attend any particular college or university?
3        A.    No.
4        Q.    Are you aware of Chris Rivers being
5    involved in any way with getting Brian Bowen, Jr.
6    to attend the University of Louisville?
7        A.    I'm not aware of that.
8        Q.    Knowing everything you know today,
9    Mr. Cutler, do you have any reason to believe that
10   Mr. Rivers ever helped coordinate a scheme to pay
11   players and their families to attend
12   Adidas-sponsored schools?
13           MR. LEVINE:  Objection.
14       Q.    (Continued)  You can go ahead and
15   answer.
16       A.    Could you repeat the question, please?
17       Q.    Sure.  Are you aware, Mr. Cutler, of
18   Mr. Rivers ever helping coordinate a scheme to pay
19   players or their families to attend an
20   Adidas-sponsored college or university?
21       A.    I'm not aware of Chris Rivers ever
22   doing so.
23       Q.    Mr. Cutler, you talked -- and Mr. Ram
24   asked you some questions about Frank Jackson
25   earlier.  Do you remember that?

1        A.    Yes, I do.
2        Q.    You talked about some shoes and some
3    flights that you helped arrange.
4        A.    I remember that.
5        Q.    Did you help arrange the purchase of
6    those shoes and the flights so that Mr. Jackson,
7    Frank Jackson, would attend an Adidas-sponsored
8    school?
9        A.    No.  I believe those flights were
10   purchased while he was already at a school that was
11   sponsored by a non-Adidas shoe company.
12       Q.    And that school you're referring to is
13   Duke; correct?
14       A.    Yes.  That's where Frank Jackson
15   attended.
16       Q.    And Mr. Ram also mentioned a player
17   named Dewan Huell.  Do you remember that?
18       A.    I do.
19       Q.    And he mentioned a cruise ticket
20   earlier.
21       A.    I remember that.
22       Q.    Did you help arrange or pay for that
23   cruise ticket to entice Mr. Huell to go to an
24   Adidas-sponsored college or university?
25       A.    No.  That's not what I do.

1            MR. LUNDHOLM:  I don't have any other
2    questions.  I appreciate your time, Mr. Cutler.
3    Thank you.
4            MR. PASCHAL:  Anybody object to me
5    asking just a few questions?
6               EXAMINATION
7    BY MR. PASCHAL:
8        Q.    Mr. Cutler, my name is Chris Paschal.
9    I'm one of the people who gave introductions
10   earlier.  I'm with Goings Law Firm.  I represent
11   Brian Bowen, Sr., in this case.  Just a few
12   questions.
13           Before this litigation or any of these
14   legal proceedings did you ever talk to Brian Bowen,
15   Sr. before?
16       A.    I met Brian Bowen, Sr. on a few
17   occasions.
18       Q.    When you met with Brian Bowen, Sr. did
19   he ever ask for any money for his son to play
20   basketball?
21       A.    He's never asked me for anything.
22       Q.    Did he ever request money by phone to
23   you?
24       A.    I've never talked to Brian Bowen, Sr.
25   on the phone.

1        Q.    When you talked to Brian Bowen, Sr.
2    what did y'all talk about?
3        A.    To the best of my recollection it would
4    be when I would see him at events say hello, ask
5    him how his family was doing, and move along.
6        Q.    Did you ever have any conversations
7    about Adidas paying his son money or himself money?
8        A.    I don't remember any conversations like
9    that.
10           MR. PASCHAL:  That's all the questions
11   I've got.  I appreciate it.
12           MS. BARBIER:  I don't have any
13   questions.
14               EXAMINATION
15   BY MR. RAM:
16       Q.    I just have two brief follow-ups,
17   Mr. Cutler.
18           You mentioned in the beginning, I
19   think, that you yourself played AAU basketball in
20   high school.
21       A.    Yes.  I played AAU basketball.
22       Q.    And Mr. Lindholm, Mr. Rivers' attorney,
23   was asking a lot about tournaments that you were
24   involved with with Adidas in terms of setting them
25   up and managing them; correct;

84 (Pages 330 - 333)

Daniel R Cutler                                    March 23, 2021
Bowen v. Adidas

Page 334

1    A.    Yes; I believe so.
2    Q.    Are you aware of any tournament entry
3 fees that were associated with any AAU basketball
4 tournaments that you either played in or helped
5 arrange?
6    A.    Yes.  Tournaments have entry fees.
7    Q.    And what is the ballpark range of those
8 entry fees?
9    A.    I believe at the time that I was around
10 it was somewhere between three and four hundred
11 dollars.
12    Q.    Have you ever seen an entry fee above a
13 thousand dollars?
14    A.    Not to my recollection.
15    Q.    Have you ever seen an entry of $50,000
16 for a tournament?
17    A.    Not that I'm aware of.
18    Q.    Would you be surprised to see a
19 tournament entry fee of $70,000?
20    A.    That would be a large number for a
21 tournament.
22    Q.    For a single team; right?
23    A.    Yeah.
24    Q.    Mr. Lindholm was asking you about
25 invoices and money spent on tournaments that you

Page 335

1 had helped participate in with Adidas.
2         Do you recall those questions a few
3 minutes ago?
4    A.    Yes, sir.
5    Q.    And with those invoices ourselves here
6 when you and I were talking at the end.  Do you
7 remember that?
8    A.    Yes.  You asked me a number of
9 questions about invoices.
10    Q.    Have you ever padded your invoices on
11 submitting them for payment?
12    A.    What do you mean by "padding" my
13 invoices?
14    Q.    Well, I mean, have you ever added an
15 invoice for -- let's say hotel rooms for a
16 tournament.  Have you added -- increased that cost
17 beyond what was actually incurred to cover other
18 expenses?
19    A.    If there were additional expenses that
20 were involved in that trip then I would invoice for
21 them so I could recoup the money that I spent.
22    Q.    In invoicing for those expenses would
23 you disguise them as other expenses?
24    A.    I would disagree with that assertion.
25    Q.    Have you ever -- remember, you are

Page 336

1 under oath here.
2         We have looked at a lot of text
3 messages and a lot of emails.  Have you ever padded
4 a bill for a hotel stay that was submitted to
5 Adidas to add in extra charges?
6    A.    Off the top of my head I don't recall,
7 but if there were additional expenses that I needed
8 to recoup that I needed for a trip I may not have
9 broken down into each individual category, but I
10 made sure that I recouped the money that I spent.
11    Q.    The extra money that you spent, would
12 that include plane tickets you provided the
13 families?
14    A.    I'm not sure that I recall doing that.
15    Q.    Would it include cruises that you
16 offered a player?
17    A.    I don't believe that to be true.
18    Q.    Why not?
19    A.    I don't recall.
20         MR. RAM:  Thank you, sir.
21         THE WITNESS:  Thank you.
22         MR. LEVINE:  Nothing on behalf of
23 Adidas.
24         THE VIDEOTAPE SPECIALIST:  We are off
25 the record.  The time is 7:37 p.m.  This concludes

Page 337

1 the virtual-recorded testimony of Dan Cutler and
2 will be retained by Veritext.
3         (PLAINTIFF'S EXHIBIT 1, Resume of
4 Daniel R. Cutler, marked for identification.)
5         (PLAINTIFF'S EXHIBIT 2, Consultant
6 Agreement, marked for identification.)
7         (PLAINTIFF'S EXHIBIT 3, group of
8 documents - Confidential, marked for
9 identification.)
10         (PLAINTIFF'S EXHIBIT 4, email, Soul
11 Patrol Descriptions, marked for identification.)
12         (PLAINTIFF'S EXHIBIT 5, copy of email
13 chain, marked for identification.)
14         (PLAINTIFF'S EXHIBIT 6, copy of email
15 chain, marked for identification.)
16         (PLAINTIFF'S EXHIBIT 7, copy of email
17 chain, marked for identification.)
18         (PLAINTIFF'S EXHIBIT 8, copy of email
19 chain, marked for identification.)
20         (PLAINTIFF'S EXHIBIT 9, copy of email
21 chain, marked for identification.)
22         (PLAINTIFF'S EXHIBIT 10, Adidas Next
23 Gen Basketball 90 Day Overview, marked for
24 identification.)
25         (PLAINTIFF'S EXHIBIT 11, copy of email

85 (Pages 334 - 337)

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

Page 338

1   chain, marked for identification.)
2       (PLAINTIFF'S EXHIBIT 12, copy of Excel
3   spreadsheet, marked for identification.)
4       (PLAINTIFF'S EXHIBIT 13, copy of email
5   chain, marked for identification.)
6       (PLAINTIFF'S EXHIBIT 14, copy of email
7   chain, marked for identification.)
8       (PLAINTIFF'S EXHIBIT 15, copy of email
9   chain, marked for identification.)
10      (PLAINTIFF'S EXHIBIT 16, copy of email
11   chain, marked for identification.)
12      (PLAINTIFF'S EXHIBIT 17, copy of email
13   chain, marked for identification.)
14      (PLAINTIFF'S EXHIBIT 18, copy of email
15   chain, marked for identification.)
16      (PLAINTIFF'S EXHIBIT 19, copy of email
17   chain, marked for identification.)
18      (PLAINTIFF'S EXHIBIT 20, copy of email
19   chain, marked for identification.)
20      (PLAINTIFF'S EXHIBIT 21, copy of email
21   chain, marked for identification.)
22      (PLAINTIFF'S EXHIBIT 22, copy of email
23   chain, marked for identification.)
24      (PLAINTIFF'S EXHIBIT 23, copy of image
25   in Sports Center, marked for identification.)

Page 339

1      (PLAINTIFF'S EXHIBIT 24, copy of email.
2   Subject - Expense Report, marked for
3   identification.)
4      (PLAINTIFF'S EXHIBIT 25, copy of First
5   Team Sports invoice, marked for identification.)
6      (PLAINTIFF'S EXHIBIT 26, copy of text
7   messages, marked for identification.)
8      (PLAINTIFF'S EXHIBIT 27, copy of text
9   messages, marked for identification.)
10     (PLAINTIFF'S EXHIBIT 28, copy of text
11   messages, marked for identification.)
12     (PLAINTIFF'S EXHIBIT 29, copy of text
13   messages, marked for identification.)
14     (PLAINTIFF'S EXHIBIT 30, copy of email,
15   marked for identification.)
16     (PLAINTIFF'S EXHIBIT 31, copy of text
17   messages, marked for identification.)
18     (PLAINTIFF'S EXHIBIT 32, copy of text
19   messages, marked for identification.)
20     (PLAINTIFF'S EXHIBIT 33, copy of FedEx
21   label, marked for identification.)
22     (PLAINTIFF'S EXHIBIT 34, copy of text
23   messages, marked for identification.)
24     (PLAINTIFF'S EXHIBIT 35, copy of text
25   messages, marked for identification.)

Page 340

1      (PLAINTIFF'S EXHIBIT 36, copy of text
2   messages, marked for identification.)
3      (PLAINTIFF'S EXHIBIT 37, copy of text
4   messages, marked for identification.)
5      (PLAINTIFF'S EXHIBIT 38, copy of image,
6   marked for identification.)
7      (PLAINTIFF'S EXHIBIT 39, copy of
8   Carnival cruise search, marked for identification.)
9      (PLAINTIFF'S EXHIBIT 40, copy of
10   FareHarbor search, marked for identification.)
11     (PLAINTIFF'S EXHIBIT 41, copy of Delta
12   ticket, marked for identification.)
13     (PLAINTIFF'S EXHIBIT 42, copy of
14   invoice from Dan Cutler, marked for
15   identification.)
16     (PLAINTIFF'S EXHIBIT 43, copy of
17   invoice from Dan Cutler, marked for
18   identification.)
19     (Deposition concluded at 7:37 p.m.)
20
21
22
23
24
25

Page 341

1        CERTIFICATE OF REPORTER
2
3      I, Patricia L. Thompson, Registered
4   Professional Reporter and Notary Public for the
5   State of South Carolina at Large, do hereby certify
6   that the foregoing transcript is a true, accurate
7   and complete record.
8
9      I further certify that I am neither related
10   to nor counsel for any party to the cause pending
11   or interested in the events thereof.
12
13      Witness my hand, I have hereunto affixed by
14   official seal this 29th day of March 2021 at
15   Charleston, ........, South Carolina.
16
17
18
19
20
21
22   Patricia L. Thompson
     Registered Professional Reporter
     My Commission Expires
23   October 15, 2025
24
25

86 (Pages 338 - 341)

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

Page 342

```
        I N D E X

              Page    Line

DANIEL R. CUTLER            6      15
EXAMINATION                 6      17
BY MR. RAM
EXAMINATION               314      11
BY MR. LINDHOLM:
EXAMINATION               332      6
BY MR. PASCHAL
EXAMINATION               333      14
BY MR. RAM
CERTIFICATE OF REPORTER   341      1



          E X H I B I T S

              Page    Line
EXHIBIT 1, Resume         337      3
of Daniel R. Cutler
EXHIBIT 2,                337      5
Consultant Agreement
```

A. WILLIAM ROBERTS, JR., & ASSOCIATES (800) 743-DEPO

Page 344

```
EXHIBIT 15, copy          338      8
of email chain
EXHIBIT 16, copy          338      10
of email chain
EXHIBIT 17, copy          338      12
of email chain
EXHIBIT 18, copy          338      14
of email chain
EXHIBIT 19, copy          338      16
of email chain
EXHIBIT 20, copy          338      18
of email chain
EXHIBIT 21, copy          338      20
of email chain
EXHIBIT 22, copy          338      22
of email chain
EXHIBIT 23, copy          338      24
of image in Sports Center
EXHIBIT 24, copy          339      1
of email.  Subject - Expense
Report
EXHIBIT 25, copy          339      4
of First Team Sports invoice
EXHIBIT 26, copy          339      6
of text messages
```

A. WILLIAM ROBERTS, JR., & ASSOCIATES (800) 743-DEPO

Page 343

```
EXHIBIT 3, group          337      7
of documents - Confidential
EXHIBIT 4, email,         337      10
Soul Patrol Descriptions
EXHIBIT 5, copy of        337      12
email chain
EXHIBIT 6, copy of        337      14
email chain
EXHIBIT 7, copy of        337      16
email chain
EXHIBIT 8, copy of        337      18
email chain
EXHIBIT 9, copy of        337      20
email chain
EXHIBIT 10, Adidas        337      22
Next Gen Basketball 90 Day
Overview
EXHIBIT 11, copy          337      25
of email chain
EXHIBIT 12, copy          338      2
of Excel spreadsheet
EXHIBIT 13, copy          338      4
of email chain
EXHIBIT 14, copy          338      6
of email chain
```

A. WILLIAM ROBERTS, JR., & ASSOCIATES (800) 743-DEPO

Page 345

```
EXHIBIT 27, copy          339      8
of text messages
EXHIBIT 28, copy          339      10
of text messages
EXHIBIT 29, copy          339      12
of text messages
EXHIBIT 30, copy          339      14
of email
EXHIBIT 31, copy          339      16
of text messages
EXHIBIT 32, copy          339      18
of text messages
EXHIBIT 33, copy          339      20
of FedEx label
EXHIBIT 34, copy          339      22
of text messages
EXHIBIT 35, copy          339      24
of text messages
EXHIBIT 36, copy          340      1
of text messages
EXHIBIT 37, copy          340      3
of text messages
EXHIBIT 38, copy          340      5
of image
EXHIBIT 39, copy          340      7
```

A. WILLIAM ROBERTS, JR., & ASSOCIATES (800) 743-DEPO

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

Page 346

| | | | |
|---|---|---|---|
| 1 | of Carnival cruise search | | |
| 2 | EXHIBIT 40, copy | 340 | 9 |
| 3 | of FareHarbor search | | |
| 4 | EXHIBIT 41, copy | 340 | 11 |
| 5 | of Delta ticket | | |
| 6 | EXHIBIT 42, copy | 340 | 13 |
| 7 | of invoice from Dan Cutler | | |
| 8 | EXHIBIT 43, copy | 340 | 16 |
| 9 | of invoice from Dan Cutler | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Veritext Legal Solutions

800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[& - 2016]**

Page 1

**&**

**&**   2:10 3:3 4:24
12:9,10 77:10,13
77:16,24 78:2,5,10
78:11,12 79:16,20
79:23 80:2 81:11
81:13 82:1,6
83:11 84:6,11,13
84:15,16 85:9,10
89:12 90:15,22
92:4,16 93:20
94:4 342:25
343:25 344:25
345:25

**0**

**00018.pdf.**   204:11
**000326806**   144:2
**01002**   3:18 4:11
**01035**   33:17

**1**

**1**   4:3 15:24 17:19
26:14 41:24 52:12
67:7 76:24 131:10
135:10 158:23
182:24 188:23
214:24 215:20,21
249:20 250:15
256:21 257:7
325:21 327:5
337:3 342:14,22
344:19 345:19
**1,500**   224:5,5
225:24 226:1
**10**   52:14 53:14,21
54:5,9 159:10,18
165:15 174:3
214:24 219:9,11
256:15 337:22
343:3,15 344:3
345:3

**100**   180:22
**10022-3916**   2:13
**10:13**   1:13 4:2
**10:46**   33:3
**10:55**   33:6
**10th**   156:5 167:7
281:25 311:22
**11**   180:20 183:18
337:25 342:8
343:18 346:4
**11916**   301:1,4
**11:02**   39:2
**11:05**   39:5
**11:26**   258:20
**11:51**   76:25
**12**   39:10 184:18
185:1 338:2 343:5
343:20 344:5
345:5
**126**   169:12
**129**   227:4
**12:09**   77:4
**12:16**   81:20
**12:17**   81:23
**13**   187:23 188:2
277:6 338:4
343:22 346:6
**13,500**   229:22
**13th**   277:4
**14**   33:14 180:20
192:13,15 268:15
338:6 342:12
343:7,24 344:7
345:7
**14-1/2**   268:15
**1412**   233:21
**14381**   241:15,18
**14398**   241:16
**14th**   274:14,15
275:1 304:9

**15**   58:22 109:22
194:12 261:24
313:25 338:8
341:23 342:5
344:1
**15,600**   303:10
**1510**   3:12
**155**   166:19
**15600**   303:13,20
303:21
**15th**   308:16
**16**   200:1 220:22
338:10 343:9
344:3,9 345:9
346:8
**16th**   216:6
**17**   121:10 173:6
201:10 220:22
275:25 338:12
342:6 344:5
**17986**   276:18,19
**18**   152:22 172:17
203:23 204:8
301:13 338:14
343:11 344:7,11
345:11
**1811**   2:19
**18353**   279:2
**18357**   281:7
**18412**   282:17,20
**18th**   130:23
**19**   180:10,13
206:15,16 338:16
344:9
**1:14**   256:17
**1:35**   142:24
**1:43**   148:5
**1st**   66:11,12
283:21

**2**

**2**   62:7 66:7 67:5,6
73:14 77:3 143:6
143:9 148:4
191:13 337:5
342:24 343:20
**2,000**   224:6
**2,500**   224:3,6
**20**   96:23 104:23
109:22 142:23
171:14 204:23
212:17 313:25
338:18 343:13
344:11,13 345:13
**2007**   16:13 17:20
314:19
**2009**   17:9,15,21
**2011**   30:11
**2012**   30:11
**2013**   26:19
**2014**   40:23,25
55:14 66:17,25
**2015**   98:23 99:20
128:12 130:23
132:1 133:20
143:20 144:9
156:5 167:7
183:21 184:1,11
188:6 193:4 195:9
200:4 201:15,22
202:11 232:24
277:5 278:9
287:12 301:13
308:16 310:19
311:7,22,25 312:4
312:8,12 313:8
**2016**   66:10,11,12
67:7 98:22 99:20
170:2 172:7 178:9
179:6,10,13
186:16 191:17

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[2016 - 38]**

Page 2

204:2,22 205:15
205:18 206:3,23
208:23 213:3
216:6,24 222:23
225:3 226:7
229:21 243:9
249:10 252:17
256:15 258:2
274:14,15 275:1
279:10 281:8
282:21 286:1
291:3 294:5 300:5
304:10
**2017** 67:8 77:19,25
83:3 86:16 88:1
98:22 99:20
121:10 170:2
172:7 187:9
188:25 189:12
190:13 194:21
196:5,12 199:8,14
200:24 216:24
246:10 264:19
267:10,10 269:21
**2018** 55:15,19 72:1
72:10 170:2 172:7
187:9 188:25
189:12 190:14
194:21 198:8
199:14 200:25
261:24
**2019** 178:9 233:17
252:3,7
**2019's** 243:16
**2020** 180:19,25
**2021** 1:12 4:3
341:14
**2025** 341:23
**203** 293:16,17,18
**20th** 188:6 191:14
191:17 194:18

199:12 200:23
201:15 203:2
205:1,15,19
208:23 246:9
**21** 212:18,19
338:20 344:13
**212** 2:13
**21894** 341:18
**219** 232:20
**21923** 232:7
**21st** 191:15,17
208:23 232:24
233:17
**22** 179:9 181:18
215:23 219:14,18
219:22,25 220:9
220:13,16,19
221:25 265:10
338:22 343:15
344:15,15 345:15
**22602** 269:22
**22nd** 188:23 193:4
200:4 269:21
271:14
**23** 1:12 218:17
338:24 344:17
**230-3255** 3:19
**232** 299:8
**2336** 152:21
**23590** 252:22
**23627** 256:11
**23rd** 4:3 152:21
195:9 201:22
202:11 281:8
**24** 144:9 183:21
184:1 222:2,20
230:9 339:1
344:17,19 345:17
**24th** 143:19
**25** 226:25 230:10
339:4 343:18

344:22
**25,000** 324:23
325:1
**25th** 267:10
**26** 232:1 267:10
271:19 339:6
344:24
**26th** 77:25
**27** 241:14 264:19
294:5 339:8 345:1
**277-6655** 2:7
**28** 245:13,16
282:21 339:10
345:3
**28202** 3:6
**29** 222:23 248:13
339:12 345:5
**29201** 2:19 3:12
**29403** 2:6
**29th** 341:14
**2:00** 168:9
**2:12** 233:22
**2:35** 148:9
**2nd** 213:3

**3**

**3** 2:6 95:14 142:9
148:8 231:20
275:23 281:2
293:12,15,18
299:9 303:9 337:7
342:22 343:1
345:21
**3,500** 224:4
**30** 170:1,11,14,17
171:1,11,13,20,25
172:1,2,6,6 173:5
179:10,15 180:3,5
258:21 259:1
261:13,18,20
323:22 339:14
345:7

**30,000** 310:12,18
311:4,25 312:3
313:13
**300** 238:25
**301** 3:5 277:1
**30th** 283:23
**31** 264:7,10,11
267:20 269:22
271:8 339:16
345:9
**314** 342:8
**319** 245:20
**31st** 66:10 206:23
**32** 267:5 271:7
339:18 345:11
**33** 269:11 339:20
345:13
**332** 342:10
**333** 342:12
**337** 342:22,24
343:1,3,5,7,9,11
343:13,15,18
**338** 343:20,22,24
344:1,3,5,7,9,11
344:13,15,17
**339** 344:19,22,24
345:1,3,5,7,9,11
345:13,15,17
**34** 271:22 274:9
339:22 345:15
**340** 345:19,21,23
345:25 346:2,4,6,8
**341** 342:14
**35** 339:24 345:17
**350-9230** 3:13
**358** 281:8
**36** 288:1 340:1
345:19
**37** 340:3 345:21
**38** 39:10 340:5
345:23

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[39 - accepting]**

Page 3

**39**   340:7 345:25
**3:18-3118**   1:5 4:8
**3:32**   192:6
**3:44**   192:10
**3rd**   2:12 243:8
249:10 252:17
258:2,10,10,18
259:7

**4**

**4**   121:5 124:8
192:9 217:23
231:9 337:10
343:3,22 344:22
**4.7,15.pdf.**   157:19
**40**   52:13,18,19
53:18,20 54:20
57:11 171:13
340:9 346:2
**400**   318:16
**405**   301:3
**41**   340:11 346:4
**413**   3:19
**417-3231**   3:7
**42**   307:23,25 308:1
340:13 346:6
**43**   307:23 311:9
313:1 340:16
346:8
**445-1032**   2:20
**48**   56:12
**4:36**   231:10
**4:47**   231:14
**4:52**   277:5

**5**

**5**   67:6 127:6
159:23,25 160:9
231:13 314:5
337:12 342:24
343:5 345:23

**50**   171:14
**50,000**   67:2 68:19
68:25 69:3,5
334:15
**502**   265:2
**503**   303:16,19
**5055**   270:6
**507**   242:22 254:1
**51**   170:2 172:8
**513**   303:20
**55**   1:15 3:18 4:10
270:5
**5737**   293:16,20
294:5
**591**   276:3,6,7
**5:01**   239:24
**5:47**   272:7
**5:58**   272:10
**5th**   283:21,23,24

**6**

**6**   130:13,17 140:2
144:1,8 187:19
215:18 300:5
337:14 342:5,6,10
343:7,24 344:24
**60,000**   127:22
128:1 312:11
313:10
**600**   283:18
**602**   279:2
**603**   279:3 281:5
**609**   303:10,11
**6757**   299:13
**6:11**   280:21
**6:22**   280:24
**6th**   281:24

**7**

**7**   142:19 143:16,17
144:2 152:8,17
165:15 215:1,15

**314:9 337:16**
343:1,9 345:25
**70,000**   334:19
**704**   3:7
**743**   342:25 343:25
344:25 345:25
**785**   249:2
**7:06**   314:6
**7:10**   314:10
**7:37**   336:25
340:19

**8**

**8**   130:15 152:15
204:2 337:18
343:11 344:1
345:1
**8/3/2016**   252:25
**80,000**   310:23
**800**   283:13 342:25
343:25 344:25
345:25
**803**   2:20 3:13
**804**   299:20,22
**812**   267:17
**843**   2:7
**85,000**   67:7,8
69:14 311:1,2

**9**

**9**   155:17 159:11
174:3 337:20
343:13 346:2
**90**   157:15,19
337:23 343:16
**9070**   276:4
**909-6000**   2:13
**919**   2:12 274:21
**95**   170:18 171:1
172:6
**970**   96:4,5,17 97:1
102:13 105:10

119:24
**97217**   270:7
**98**   168:25
**986**   275:25
**9:00**   205:3
**9:06**   260:8

**a**

**a.m.**   1:13 4:2 33:3
33:6 39:2,5 76:25
168:9 205:3
258:20
**aau**   110:7 111:2
124:20 125:13
128:21 129:21,22
133:25 157:8
191:1 219:2 242:4
247:3 286:25
287:2 304:10
315:20 316:4
333:19,21 334:3
**abilities**   19:20
**ability**   9:14
**able**   21:8,10 52:25
87:10,11 100:9
107:4 112:4
122:20 137:25
166:5 214:18
237:2 238:1
239:10 297:10
301:25 303:5
306:15 319:1
321:23 322:15
**absolutely**   81:4
231:6 271:6 290:1
291:17 297:21
320:3 324:1
**ac**   193:18 194:1
**academic**   282:8
**accept**   17:12
**accepting**   151:25

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[access - adidas]

Page 4

access 231:23
302:17
accommodate
296:10
accompanied
328:19
accomplish 208:15
210:14 212:5
accomplished
209:22
accomplishing
211:22,25
account 154:10
290:20,22
accounts 229:25
accurate 10:17
18:10,13 27:15,20
52:15,17 105:11
113:16,24 121:23
132:22 179:24
260:15,21 267:15
291:13 315:1,5
316:9,18 341:6
accurately 42:14
105:5 230:10
achieve 20:20 36:9
180:24
acknowledge
147:16
act 56:4
acting 76:2
activation 58:24
59:4
activations 220:24
221:3,9,21
active 229:18
activities 58:23
175:19 236:8
278:25 315:22
316:3,6,10,15,19
316:23

actual 101:12
132:19 157:23
add 202:2 320:5
336:5
added 192:13
204:7 335:14,16
addition 43:8
93:19 128:1
135:14 161:24
additional 11:12
128:7 192:13
297:10 335:19
336:7
additionally 117:7
address 31:16,19
31:24 32:5,7,8
33:13 120:1 131:3
131:6,20 144:16
144:20 153:12,22
153:25 156:16
183:24 188:11
193:7 200:9
204:13 213:10
216:11 229:11,12
229:14,16,18
230:3 268:12,15
268:18 270:3,8,12
308:12 309:1
310:6 311:15
313:2
addressed 158:4
207:18 211:18,20
212:13 217:1
270:11
addresses 207:13
adid 144:2
adidas 1:6 2:9
3:22 4:6,25 5:12
6:5 12:25 13:2
15:10 25:10,12,14
26:6 29:20,22,24

30:3,8 40:17,18,19
40:20,22,25 41:16
42:14,20 43:1,17
48:2 51:8 53:6,6,7
53:24 55:5,7,14
57:9,10,13,15,21
57:22,24 58:1,23
59:12,22,23 60:1,9
60:11,15,17,19,19
60:21 61:4,9,10,21
61:25 62:3,22,25
63:3,5,7,16,20
64:1 66:13,17,20
67:11,19 69:9,12
69:16,19 70:15,18
70:20,24 71:1,4,7
71:8,11,17,19,21
71:25 72:20 73:7
73:11,17,23,24
74:4,5,13 75:25
80:22,24 81:2,7
82:2,4,7,14,18,19
82:25 83:5,7,10,13
83:19 84:2 90:1,3
90:5,6,11 96:11,13
96:13 99:15 102:7
102:15,18,21,24
103:5,13,18 105:2
105:14 106:7,8
109:3,8,13 112:8,9
113:1,3 114:11,23
115:3 117:7,12
118:4,16,19 122:4
123:6,19 124:1,5
124:25 125:2
128:10 129:5,7,13
129:23 131:7,10
131:25 132:10,14
136:18 137:14,23
138:20,21 139:10
141:3 144:16

145:5 149:21,24
153:8 154:5 157:3
157:14,18 158:2
159:5 160:12,12
160:17 163:25
164:14 166:7
167:10,13 169:5
174:14,19 175:9
175:11,21,25
176:5,8,21 177:13
177:24 178:3
179:15 181:3,23
182:7 183:8,9
184:11 185:21
190:24 191:2
197:2 203:10,12
203:15,16 205:14
211:25 212:5
214:6,8,9,10,12,16
216:24 217:18
219:15,18 220:9
220:18,25 222:6
222:15,17 223:19
224:9,16,22,24
225:6 227:12
228:4,6,16,21
229:3,5,24 230:12
230:19 237:8,13
237:13,16,16
240:14 244:2
250:8 255:25
265:18,20 269:4,9
270:9 281:11
284:19,21,24
285:6,8,14 286:1
290:14 291:16
292:9,11 294:1,24
295:20 298:2
300:6,12,20 302:6
305:25,25 306:11
307:4,24 308:20

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

309:8,11,13
310:19 311:6
312:9 313:4,10
315:3,6,14 316:8
316:16,19,24
317:4,8,10,23
319:11 320:4,18
323:11 324:18
325:8,11 326:6,11
326:12,16,16
328:10,15 329:16
330:12,20 331:7
331:11,24 333:7
333:24 335:1
336:5,23 337:22
343:15
**adidas.com** 156:2
193:2 204:2,17
206:20 212:25
214:15 216:4
**adidas.com.** 153:4
155:21 188:3
195:7
**adult** 172:17
**adults** 104:19
295:10
**advance** 319:7
321:20 322:6
**advanced** 321:6
322:1,17
**advantage** 321:12
**advantageous**
117:17
**advantages** 122:16
**advice** 76:12
327:15,18 328:23
329:2,4,7
**adviser** 282:8
**affiliation** 174:10
**affiliations** 4:16

**affixed** 341:13
**afst** 196:22
**afternoon** 105:20
191:14
**age** 41:11,21
**agencies** 37:20
**agency** 18:7 19:19
20:19 23:18,21
36:16,24 37:3,22
39:25 40:13 302:8
302:10
**agenda** 205:3
**agent** 19:7 33:24
34:2,4,5,9 35:8
36:17,20,25 37:11
66:3 302:3
**agents** 22:19 23:2
23:14,16,17,20
34:3 39:14 40:4
60:8 86:9
**ages** 180:20
**ago** 5:19 6:19 14:9
19:25 48:8 52:7
66:5 94:18 95:5
100:10 112:25
132:2 186:14
192:21 199:2
224:19 226:23
229:9 235:4 321:5
326:18 335:3
**agree** 76:8 80:25
104:14 117:16,17
118:12 122:17
128:20 153:25
154:11 155:5,15
181:1
**agreeing** 81:8
**agreement** 61:24
62:2,21,24 63:24
66:7,8,10,13 67:5
70:14,16 71:1,2

73:10 74:5,14
128:2 228:21
229:3,4 310:22
337:6 342:25
**agreements** 40:13
71:4,7 73:7
**ahead** 9:9 14:19
38:5 127:6 147:25
184:18 187:23
193:22 212:20
215:18 218:17
255:9,11 326:24
330:14
**air** 320:11,13
322:2,4,6,8
**airfare** 222:9
279:8,13,15
**airline** 283:20
**airplane** 279:7
**airport** 305:5
**al** 4:6 225:23
226:11,12,13,14
226:15,18 282:2,4
**alabama** 286:12
286:13,20 287:9
**alan** 225:23
**alarm** 173:5
**albany** 239:20
270:13
**albert** 156:19,20
**albrunt** 239:17
**alcohol** 10:21
**alex** 286:5,7,19
287:11
**alive** 78:22
**allocated** 61:11
**allotments** 290:16
**allotted** 53:19
**allow** 24:8
**allowed** 250:25
251:11,18

**allows** 181:23
**america** 1:6 2:9
3:22 4:6 15:10
25:11,12,14 26:6
29:20,22,24 30:3
40:17,18,19,20,22
42:15 62:22
205:14 228:17
229:25 261:9
**american** 53:6
55:2,11,13,15 56:1
56:11,25 291:10
**americans** 121:21
123:3
**amex** 290:3
**amherst** 1:16 3:18
4:11 15:3 16:13
16:16 110:5,6
121:18 227:4
261:16 311:15
**amlevine** 2:14
**amount** 52:8
53:25 54:17 66:16
69:8 90:14 230:17
230:17
**amounts** 324:18
324:21
**amsterdam**
308:23 309:4,6
313:4,10
**andrew** 2:11 4:24
84:6 151:10
**andy** 76:8 80:23
151:19 185:5
**angeles** 126:12
**annual** 53:22 67:2
310:23
**answer** 9:9 29:8
31:21,22 32:3,4,11
33:12 36:7 38:18
108:13 119:20

3:18-cv-03118-JFA    Date Filed 03/30/21    Entry Number 202-1    Page 96 of 152

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[answer - assistant]

Page 6

150:13,18,21
151:16,22 152:1
181:14 191:10
229:8 285:20
306:15 312:24
326:25 330:15
**answered** 9:8
28:10,13 33:25
208:2 313:16
**answering** 85:14
**answers** 7:24
**antagonistic**
149:12
**anthony** 133:11,12
133:13 144:25
152:16 153:3,7
154:8 155:7 163:1
193:1 194:6
**anthony.coleman**
153:4
**anticipate** 7:18
10:8
**anybody** 6:4 11:9
13:11 24:18 28:11
43:13 48:12 69:8
69:12 83:18 112:8
112:9 149:8,12
150:12 151:15
173:5 210:13
211:12,16 231:2
239:11 241:1
307:3 332:4
**anymore** 73:18
**ap** 233:6
**apart** 229:4
**apologize** 46:22
122:9 145:23
163:8,16 171:15
197:9 235:21
252:21 256:6
276:6

**apparel** 55:8
**apparently** 142:16
**appear** 159:9
201:6 223:22
245:25 268:9
281:21 285:2
**appearances** 2:1
3:1 4:16 59:1,6
**appeared** 246:2
**appears** 27:16
62:23 98:16 99:17
102:3 144:18
157:16 166:5
179:17 184:3,5,17
187:19 191:23
193:3,5,11 195:5
195:14 199:21,24
200:14 202:1,10
204:24 206:22,24
207:8 213:1,4
214:11,14,17
215:2,13,19,21
216:5,7 217:5
223:3,16 229:23
233:8 242:19,23
243:1 249:4 262:8
262:21 264:4
266:5 268:19
270:14 281:16
283:4 294:9,13
308:24 313:6
**appreciate** 7:22
8:17 71:20 143:12
148:23 244:14
253:18 332:2
333:11
**appropriate** 23:1
23:19 24:22
**approved** 324:21
**approving** 223:10

**approximate**
26:23 54:17 68:16
68:23 90:13
**approximately**
69:2 99:11 224:12
**approximation**
26:25 54:16
**april** 156:5 167:7
267:10 274:15
275:1 286:1
287:11
**area** 91:12 110:23
110:23 126:12
161:7 242:22
245:19 249:2
254:1 265:2
267:17 274:21
277:1 299:20
**arena** 116:19
**argumentative**
100:16
**arizona** 235:15
262:13 263:5,14
**armor** 137:23
**arrange** 331:3,5
331:22 334:5
**arrested** 77:21
82:11 83:3,11
**arrive** 56:2 305:5
**arrow** 268:4
**ashley** 3:23 4:12
**aside** 105:21
129:11 179:19
187:22 297:15
**asked** 9:7 39:8
53:17 63:4,6,10,19
118:3 119:24
142:8 148:14
183:6 208:2
251:11 254:16
280:4 284:23

288:11 324:22
329:10 330:24
332:21 335:8
**asking** 7:20 8:4,5
8:7 11:1 23:13
29:3 54:6 68:23
74:3 75:6 76:11
77:9 84:20,25
85:18,20 89:6
92:12 93:5,6,7,10
99:25 118:9,12
132:2 145:23,25
146:17 149:23
150:16 174:19
191:3 194:19
199:12 200:23
221:12 240:24
247:14 250:20
251:9 256:4
259:19 265:18
266:3 277:18
301:24 302:20
305:15 327:14
332:5 333:23
334:24
**aspects** 39:24
248:3
**assembling** 202:19
202:22
**asserting** 149:20
**assertion** 335:24
**assessment** 326:17
**assigned** 97:21
**assignments**
160:19
**assist** 129:17
236:16 255:20
**assistant** 58:18
182:5,9 213:14
215:4 243:22
244:16,19 248:19

3:18-cv-03118-JFA     Date Filed 03/30/21     Entry Number 202-1     Page 97 of 152

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[assistant - back]

Page 7

248:20 274:6
325:21 326:4,22
327:4
**associated** 89:17
101:2 114:13
117:12 245:24
334:3
**associates** 342:25
343:25 344:25
345:25
**assume** 40:3 63:24
74:2 75:5 77:19
98:24 140:18
169:4,18 194:9
197:17 199:3
203:8 234:6
253:15 257:3,10
258:12 261:9
298:16 305:20
316:13 317:1
327:7,11
**assuming** 156:18
189:1,25 194:22
199:15 201:1
257:13 303:3
**assumption**
156:19 162:21
166:18 199:5
203:12,14 257:1,9
**assumptions**
258:14
**athlete** 21:18,22
22:1,6 23:10,12
59:18,24 60:14,14
60:22,25 61:11,16
176:23 183:7
235:17 236:24
237:4 251:14
287:24 289:4
**athletes** 17:2
18:23 19:11,22

20:2,4,8,10 21:24
21:25 22:7 23:14
23:16,17 24:19,22
24:24 25:1,6,8
56:12,14,18 57:17
58:22 59:3,3 60:5
60:12 64:5 65:5
132:15,16 141:1
175:17 178:6
263:21 264:5
277:21,23,25
292:23 328:3
329:9
**athletic** 19:20
44:19
**athletics** 15:6
17:14 18:2,6,13,22
20:3,11 25:9
26:15 27:2,6
33:20 34:3 35:7,8
35:13,14,16,24
37:9,13 40:6,12
65:13
**atlanta** 122:7
**attached** 158:20
**attachment**
157:18,22,23,24
159:11 184:10,10
184:12,20 185:11
218:18 225:3
226:24
**attend** 58:11 166:6
167:8,12,20 191:2
329:21 330:2,6,11
330:19 331:7
**attended** 15:2
55:12,21 56:12
166:15,17 272:23
331:15
**attending** 4:15

**attends** 247:7
**attention** 229:25
233:16 264:18
293:4
**attila** 162:12,18
**attorney** 7:2,3
9:15 10:7 11:24
31:6 33:10 77:7
81:3,6 85:1 91:13
91:17 93:7,10,12
114:2,15 115:5
117:6,16,24 149:4
150:1 312:15,20
312:21 314:14
333:22
**attorney's** 12:16
96:15 97:22
151:25
**attorneys** 2:3,9,16
3:2,9,15 7:6,19
8:5 11:17,19 12:3
12:20,24 13:1,3,8
73:24 74:12 75:21
76:18,21 77:10,13
77:16,24 78:10,16
79:17 80:2,5,7,13
80:16,19 81:12
82:1,7,14,16,18,19
82:25 83:5,8,10,13
83:15 84:10,11,19
85:9,16,19,21,22
85:24,25 86:22
87:9,15,17,23 88:3
88:9 90:5 91:6
92:5,16 93:4,6,8
93:13,14,15,23
94:2,3,7 96:11
98:6 105:7 272:13
313:20
**attractive** 61:12

**audio** 38:15 81:15
**august** 232:24
233:17 243:8
252:17 258:2,2,10
258:17 259:7,12
269:21 271:14,19
274:14
**augustus** 20:15
**authorization**
285:12
**authorized** 285:8
285:10,11
**available** 54:1
267:2 322:12
**avenue** 2:12 270:6
**aware** 10:19 22:17
22:21,24 26:1,4
86:19 94:8 110:18
110:21 111:6
114:23 115:1
130:7 146:11
157:9 162:1
176:25 256:4,6
328:12 329:12,13
329:17,18,24
330:4,7,17,21
334:2,17
**awareness** 180:23
221:17
**awesome** 253:17
**ayton** 196:8,12,17

**b**

**b** 2:17,18 154:23
251:1,1 342:19
**back** 9:21 25:23
26:5,14 33:5,19
36:7 39:4 52:12
53:13 77:2 81:22
98:22 99:20
103:16 108:10
116:2 127:3

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

128:15 130:12
140:2 142:17
148:7 152:6 161:4
164:19 170:22
172:9 174:25
178:25 184:24
192:8 209:5
220:16,19 231:12
232:14 233:13,19
239:23 243:10
257:24 259:13
264:8 271:4,18
272:9 280:23
281:24 290:17
293:14 301:17
307:23 314:8
322:16,24 324:6
**background**
196:10
**bad** 110:9 234:14
**bags** 56:3
**balance** 321:19
**ballpark** 13:21
66:22 68:25 87:25
319:18,23 334:7
**bank** 290:20
**banners** 320:16
**barbier** 2:17,18
5:1,2 6:6 84:24
88:24 89:3 146:19
314:1 333:12
**barrett** 202:3
**bars** 95:23
**base** 67:6,13 69:13
**based** 12:4 21:18
21:22 24:12 40:11
54:20,22 61:15
104:15,25 105:12
106:18 115:9
124:17 162:21
166:4 170:12

194:9 197:14,16
209:3 226:21
233:8 243:14
245:22 255:22
261:3 266:19
322:24 326:13
**basic** 7:10
**basis** 9:1 67:2
103:24 151:12
162:24
**basketball** 15:7,8
16:18,21,25,25
18:10,22,24 19:1,3
19:11,16 20:21,24
21:13 22:8,11,15
23:3,4,21,23 26:16
27:2,15 30:9
33:21 34:17 36:1
36:3,6,10 37:7,12
39:13 41:5,12,14
41:18,19,20 42:21
43:2,4,14,25 44:1
44:16 45:4,8,13,15
48:4,10,13,20
49:18,21 51:9
55:4 56:13 58:19
65:4 104:17 110:2
110:4,22 111:2
114:10,13,25
115:5,6,23 116:1,9
116:10,12,21
117:11 118:1,15
119:3,5,8 120:22
125:13 129:16,22
133:14,17 134:1,2
134:17,19,23
145:11,14 157:14
157:18 158:2
160:12 161:13,21
162:10 163:5
164:23 170:6

174:16,20 175:11
175:16 177:19
180:25 181:3,23
215:9 218:5,13
220:18 221:1
234:9 236:19
240:19,20 242:10
242:12 247:2,23
250:12 254:16
255:24 260:10,14
260:16 261:8
262:10,24 263:7
263:22 265:5
266:12 272:19,21
273:20 274:1,1
286:8,9 289:16
291:1,24 294:2
298:21 301:23
307:4 316:17,20
316:25 317:3
323:13 325:22
326:4,5,11,22
327:5 328:3,22
332:20 333:19,21
334:3 337:23
343:16
**bathroom** 192:2
**bear** 191:24
**began** 258:7
**beginning** 77:3
94:17 148:8,15
154:13 192:9
231:13 314:9
333:18
**behalf** 4:19,21,25
5:2 36:23 37:11
131:7 149:20,24
150:3 167:9,13
228:6 336:22
**belabor** 160:24

**belief** 23:25 24:5,6
24:12
**beliefs** 24:9
**believe** 11:14 12:4
14:4 20:12 23:1,5
23:6,13,19 24:13
24:22 25:8 28:8
28:10,13 30:16
32:13 33:25 34:10
35:10 40:10,14,23
41:22 42:10,17
43:3,10 45:14
50:24 51:18 53:11
55:17,19 56:15,20
56:21 57:2 62:2
64:18,21 65:11
67:3,13 68:4 69:4
69:11,21 71:2,6,10
71:16 73:8,12,16
73:19 74:6,10,15
77:22 78:1 82:15
83:24 84:3,8 87:9
87:14 89:16,19,22
90:23 95:5 98:7
99:22 100:2,4,7
103:4,11 104:4
105:9 106:8 108:6
109:1,2 110:19
111:1 117:22
119:12 120:6
125:2,25 126:6,10
126:14 132:22
133:9 134:11,21
138:5,11 142:1,5
145:5,13 146:4
147:1,13 149:10
149:15 157:4
159:7 160:22
162:18 163:8,9,11
163:15 164:24
165:5,8,12 169:23

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

171:21 172:2
173:18 174:3
175:23,24 177:16
178:4 183:12
187:4 191:19
196:16 197:11
200:8,11 203:3,22
205:17 206:13
213:8 216:22
217:14,17 218:15
219:1,4,7,8,12,14
219:16 220:1,3
222:12 230:6
235:3 236:5 242:6
247:6 248:21
249:7 250:2
251:17 257:4,18
257:25 258:18
259:12,15 262:12
263:5 265:18
266:14 267:14,24
270:5,19 271:8
273:23 274:3
275:16 278:6,11
279:21,25 281:6
282:2,5,15 285:16
286:11,16,24
287:4,8 288:10,21
288:22 289:21,24
290:8 291:11,13
295:20 296:4,9
297:24 298:23
299:1 301:21
302:3,7 304:6,25
305:17 310:22,24
310:25 311:2
314:20 318:15
319:1 320:12,25
321:3,15 323:22
326:7 328:16,25
330:9 331:9 334:1

334:9 336:17
**believed** 105:16
**bench** 251:6,9
**beneficial** 139:21
176:9
**benefit** 114:12
138:12 329:15
**benefits** 25:21
26:2 60:18 61:8
**best** 7:21,25 26:9
26:10,12 29:25
39:12 42:10 57:14
100:6,11 107:16
109:7 117:3,3,4,5
119:5 126:16,22
131:24 137:9
141:22 142:6
147:4 168:4 187:3
213:13 214:19
215:4,8,11 253:20
255:21 277:12
278:10 286:21
293:11 328:8
333:3
**bet** 168:20
**better** 7:23 27:4
34:16 35:21 44:11
117:10,11 137:24
147:13 181:12
275:8
**beyond** 335:17
**big** 232:11 248:8
319:14
**bill** 90:17 103:2,5
103:7 253:14
257:10 301:17
302:15 336:4
**bills** 90:7
**bit** 10:22 14:20
34:19 42:25 47:21
48:20 52:8,20

53:15 137:5
161:18 233:21
252:16 254:1,19
272:17 276:17
282:16 300:25
317:8 324:2
**black** 108:14,19
108:24 109:4,9,14
111:9,11,15,18,20
111:25 112:1
128:23 129:1,3
131:10 135:12
141:9,14,19,22
142:3,14 154:14
154:21 207:9
211:19
**blind** 35:4 36:11
36:14
**blitzed** 253:7
258:4,21
**block** 223:18
**bloods** 177:10
**blowing** 260:10
**blue** 177:10 238:7
276:10,10,22
283:18
**boat** 288:22
**bobby** 217:7,12,15
217:16
**bold** 147:2,6,12,15
147:20
**bonuses** 40:9
67:15,17,18,22
**book** 25:25
**booked** 135:8
**books** 24:7
**boss** 314:25 315:3
**boston** 223:25
**bottom** 69:22
95:23 127:19,20
128:15 144:7

162:2 194:17
201:13,18 223:17
223:23 256:10
**bounce** 49:8
**bowen** 1:3 2:3 3:9
4:6,19 5:10 6:12
6:21 187:13
197:15,17 199:8
329:25 330:1,5
332:11,14,16,18
332:24 333:1
**bowen's** 199:10
**bowler** 3:23 4:12
**box** 270:20,25
**boxes** 160:9
161:16
**boyd** 165:7
**brand** 43:23 56:20
57:2 61:9 122:16
137:18 139:12
163:15 174:10
181:7,10,25
221:17
**brandon** 197:11
**brands** 124:10,23
**break** 9:2,5,10
77:6 143:2,3,9
147:24 148:1,11
152:7 192:4 231:3
272:1,12 281:18
**breakdown** 57:6
**breaks** 9:1,2,15,21
10:4
**breskin** 165:1
**brian** 1:3 2:3 3:9
4:5,19 5:10 6:21
187:13 197:17
199:8 329:25
330:1,5 332:11,14
332:16,18,24
333:1

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[brief - casually]

Page 10

brief 33:8 307:21
333:16
briefly 38:25 40:5
57:4 127:10 149:2
152:6 162:8
246:15 287:25
293:23
bring 36:24
115:12 116:5,7,16
119:25
bringing 48:6
115:7 180:23
broke 74:20 325:1
broken 153:20
336:9
brother 252:7
brothers 78:22
101:20
brought 51:17
252:9 320:5
brown 198:12
224:1
bruiser 239:16
brunt 298:18,20
298:21 299:4,20
299:24 300:2
brunt's 299:23
bucks 283:13
budge 128:21
budget 52:14
53:14,16,19,22
54:18 301:22,25
302:14,16,18
303:4 319:17
322:12
build 21:1 35:25
36:22 135:7 141:6
142:11 169:4
170:23 172:10
220:23 221:3,8,20

building 33:22
34:19,23 35:23
36:5 37:10 121:21
122:15,21 123:3
135:15,25 136:4
136:13,14,17
137:6,12 138:3,22
139:6,18 142:13
169:17 238:20
320:7
built 128:6 170:10
bullet 42:19 52:12
52:15 53:3 58:21
142:9 175:6,20
182:13
bullets 42:13
182:1
bunch 20:4 160:3
burno 262:7,9,15
262:23
business 28:4
99:23 100:1
103:13 138:2
154:4 168:2
208:16 209:22
210:15,16,19
211:23 212:1,5
214:2 222:16
224:22 225:14
228:7
busy 243:12
butler 132:24,25
144:25
buy 279:24 280:2
284:20,22,24
285:6
buying 280:7
bv 308:20 313:4

c

c 1:5,15 3:16,17
caffeine 10:22
calculation 326:9
calendars 58:24
59:5
calhoun 3:12
caliber 327:15
california 126:10
126:11 207:10
211:20
caliperi 239:14
call 147:7 149:5,9
149:13 151:9
152:2 234:17
246:19 247:13,17
250:25 251:11,19
251:20
called 110:9
126:13 155:9
219:9,14 287:3
296:16
calling 221:11
calls 103:12
104:21
camden 229:25
camera 168:21
camp 57:13
266:22,23
campaign 42:21
43:2,5,14
campus 166:7
246:17
candidates 136:2
canton 17:5
cap 58:8
capabilities 157:6
capable 115:7
capacity 15:19
16:20 92:5 319:3

capitalized 147:19
card 290:3 321:8
321:13 324:15
care 300:11,20
career 35:3 238:20
240:3 275:17
carnival 340:8
346:1
carolina 1:1 5:25
6:3 7:12 9:14
292:13,15 310:12
310:16 341:5,15
carroll 287:6
carry 137:25
cart 321:18
case 4:7 6:22
11:18,22 12:9,10
13:4 64:18 74:11
77:10,13,16,24
78:3,5,11 79:16,20
79:23 80:2 81:11
81:13 82:1,6
83:12 84:11,13,16
85:9 90:22,23
92:4,16 93:20
94:4 114:15
158:13 160:21
169:24 191:23
195:14 199:25
206:22,24 219:16
242:23 248:21
249:4 257:3,19
262:8,21 265:22
282:5 286:4
332:11
cash 69:14 127:21
cashman 318:23
318:25 319:2,23
320:1
casually 82:25

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[catch - clarify]

Page 11

catch 12:12
246:19 247:13
categories 166:4
category 336:9
catherine 2:11
4:25 151:10
cause 313:13
341:10
cc 156:14 200:10
204:19
cc'd 200:11 207:7
214:15
cell 98:6,20 99:2,5
99:8,12,16,21
100:1,10,12 102:3
102:5,8,24,25
103:2,5,6,7 241:15
cellebrite 98:2
celtics 122:7
center 3:6 168:9
168:11 186:21
188:2 216:3
217:23 318:23,25
319:2 320:2
338:25 344:18
cents 54:15
ceresney 84:6
certain 22:2 29:14
61:11 119:9,10
133:23 135:6,7
137:18 154:6
236:24 250:7
296:5 321:1
322:11 324:21
329:9,10
certainly 7:22
8:25 9:18 10:8
37:2,4 76:13
125:24 126:8
154:3 183:8 186:9
259:16 297:10

300:3 322:8
certificate 341:1
342:14
certify 341:5,9
cetera 222:10
chain 192:19,20
194:17,18 200:22
201:14,17 231:21
242:16 256:12
257:17,18 271:3,5
337:13,15,17,19
337:21 338:1,5,7,9
338:11,13,15,17
338:19,21,23
343:6,8,10,12,14
343:19,23,25
344:2,4,6,8,10,12
344:14,16
championship
323:13
championships
53:6 57:5 58:5,6,9
58:15 317:11,15
318:5,7,20 319:15
319:19
champs 224:1
chance 14:21
185:18 233:2
258:12
change 143:25
144:3 300:5
changed 12:8 52:8
57:23 96:12 105:4
287:4,18
charge 302:17
charges 225:19
336:5
charleston 2:6
341:15,15
charlotte 3:6

chart 2:14 142:9
142:11 160:1
charts 184:16
185:13,15
chase 227:4
check 68:4,6,9,13
69:15 72:23
172:19 234:17
243:25 271:9
290:17,19
checked 233:22
234:3 284:12
checking 260:17
checks 290:12
child 172:13,18
children 172:25
chilling 233:18
249:13
choose 179:4
chose 17:11 19:19
280:6
chris 12:2 43:10
63:8,9,12,14 67:24
70:7 101:1 127:11
130:23 131:19
134:13 135:20
141:15 142:15
144:11,12,14
145:1,1 153:11
155:6,9,14,21
156:2 160:15
161:1,2,8 162:24
181:13 184:6
188:2 189:6 194:6
194:19 195:2,7,13
196:4 198:19
199:17,19 201:21
201:24 202:9
203:2,17 204:1
206:4,20 209:16
209:17,21 210:2

212:24 214:12
216:4 223:2,6
233:12 286:23,24
301:6,10,15,19
302:3 306:17,22
309:22 329:18,24
330:4,21 332:8
christian 1:6
christopher 1:7
3:2,11 5:7 111:4
314:15,18
ciccarelli 1:15
3:16,17 4:20,21
6:10 7:2,9 9:25
10:6 11:2,16
13:10 24:1 31:18
32:12,19,20,22,23
33:10 74:19 93:17
93:19 94:1 100:15
143:6,11 146:3,7,9
148:2,10,13,24
151:11,14,18
185:3,9 191:8
192:1 208:1
ciccarelli.law 3:19
cieslinski 163:12
circle 33:19
307:23
circuit 57:11
circumstances
17:10
city 33:15
clarification 8:8
271:20
clarify 34:14 44:9
48:17 81:5 84:15
85:17 91:3 107:14
108:12 148:14
208:4 269:6
270:19 288:25
318:12 327:17

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[clarifying - column]**

Page 12

clarifying 150:15
class 147:18
174:10,24 179:6
179:10,13 199:9
classes 170:2,16
172:8 179:16
188:25 189:12
190:14 194:21
199:14 200:25
classic 56:20,22
57:3
clear 25:3 75:5,14
80:20,24 148:20
148:2 261:15
298:15
clearly 12:12
284:19
click 127:7 185:2
186:16
clicked 204:10
client 10:7 81:3,6
91:13,17 148:12
150:1 187:12
clients 36:15,18
close 30:17 53:1
113:6 220:3 240:3
254:24 256:10
276:15 296:9
300:10 315:14
club 42:21 43:5,20
44:1,3,7,12,15
134:1,2 322:11
clubs 318:13
322:11
clue 90:16 244:4
coach 21:14 45:20
45:23 46:1,3,4,9
46:13 47:6 118:1
118:15 168:25
213:14 215:4
237:21 239:7,20

241:4 242:4
243:15,23,25
244:16,19 245:5
246:18 247:12,16
247:19,22 248:5,9
248:19,20 249:19
250:21 251:5,23
252:5,11,19 253:2
253:4,10,10,11,12
253:13,16,21
254:1 255:18
256:13,18,20
258:25 259:6,19
262:10,11,24
263:24 274:6
275:5 298:21,22
299:24 304:10
325:21
coach's 257:6
coached 169:5
coaches 21:9
44:18 49:2 58:10
58:11,18,18 104:2
136:7,9 167:22
169:5 175:16
182:5,9,11 236:7
236:10,16 237:11
238:18,21,22,25
239:8 240:4,6
241:8 242:7 243:5
251:19 254:14
255:1 257:5
258:11 260:18
261:2 263:8
275:15,19 316:11
316:14 325:22
326:4,5,6,11,22
327:4,6,8,14,19
coaching 125:9
129:25 130:4,8
254:17

coast 126:2,9
code 1:6 123:14,16
242:22 245:19
249:2 254:1 265:2
267:17 274:21
277:1 299:20
302:16,18
cody 20:15
coffee 272:4
coleman 133:11
133:12,13 144:25
152:16 153:4,8
154:8 155:7
162:25 163:1
193:2,16 194:7
coleman's 153:11
193:19
colin 2:5,7 4:18
6:20 146:19,25
collaborated
16:25
colleague 4:25 5:6
84:6 113:15
211:14
colleagues 112:10
collected 105:7
collecting 203:1
260:24
collective.com.
216:16
college 3:5 14:25
16:17 19:10,16,20
19:22 20:23 21:2
21:13,16 22:8,11
22:12,14,18 23:2,4
23:10,12,21,22
24:19,22,24 25:1,6
25:15,17,20 26:2
33:23 34:17,24
35:19 36:1,3,5,23
37:10 48:13 58:11

58:17 115:6,12
116:4,7,12,20
124:20 128:14
129:9,25 130:4,8
133:5 136:8,14
137:12,19 139:8
166:7 168:25
175:21 176:8,21
210:24 215:8
235:20 236:6,10
237:11,21 242:10
247:5 250:11
251:19 258:11
261:2,5 262:10,24
272:19,21 274:1
278:3,8,11 280:9
291:1 316:11,14
325:11,21 326:4,5
326:11,22 327:5,6
327:8,14,19 329:7
329:22 330:2,20
331:24
colleges 117:11
175:24 177:17
329:11
collegiate 18:23
25:8
color 238:7
columbia 1:2 2:19
3:12
column 97:18,20
97:23 98:8,9
99:17 100:21
101:5,11,12 102:4
186:19 187:1,15
232:4,14,22
242:17 248:23
264:21 265:7
274:16 294:7
299:15 301:7
304:1

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[columns - consultant]

Page 13

columns  97:19
come  19:19 20:14
   43:23 46:9 58:18
   75:1,3,20 76:18
   120:11 136:2
   141:3 146:24
   177:7 179:4
   218:10 262:23,25
   265:23 266:2
   284:6 285:18
   302:12 318:14
   320:8
comes  20:15 185:2
   239:11
comfort  294:18,20
comfortable  56:7
   175:18 179:3
coming  61:8
   184:23 265:11
command  257:18
commence  66:8
comment  117:15
commercial  224:1
commission
   341:22
commit  329:15
committed  235:15
   235:16 275:22
common  150:4
commonsense
   59:20 137:4
commonwealth
   298:24
communicate
   104:11 182:8
   208:16 209:23
   237:20 299:25
   300:2
communicated
   103:22 182:11

communicating
   103:19 104:2
   131:7
communication
   104:19 131:15
   135:11 182:4
   203:17 235:1
   254:13,14 265:17
   284:23
communications
   76:5 80:21 84:22
   104:8 140:4
   149:21 150:8,11
   154:5 160:14
   197:2 203:15
   232:13 233:17
   254:11 268:20
   296:20 325:20
company  28:7
   29:4 30:17 35:6
   60:2,16,17 62:1
   75:9 89:23,25
   90:2 136:22 150:3
   157:1 161:5
   227:16 302:13
   331:11
company's  75:9
   76:6 174:14
compelling  220:23
compensated
   128:22
compensation
   40:11 66:16 67:7
   67:14 69:13
   310:23 311:1
   312:8
competition
   147:13,16
competitor  211:15
competitors  60:19

complete  10:18
   341:7
complicated
   115:16 228:9
comply  25:14
compton  126:13
   126:14
concerned  140:5
concluded  340:19
concludes  336:25
concrete  235:13
conditioning
   320:11,13
conduct  24:8,23
conducted  12:16
confidential
   111:11 135:12
   141:9,19,22 337:8
   343:2
confirm  149:16
confirms  284:9
confusing  91:15
   125:24
congratulated
   248:7
congratulations
   286:17
connect  181:23
   183:8 243:19,23
   244:21
connected  102:14
   102:17 124:10,22
   126:17 269:19
   275:15
connecting  263:24
connection  12:15
   102:6 184:22
   185:3 222:16
   243:21 244:22,23
   245:7 268:22,23
   269:2 280:16

305:1
connections  21:10
consensus  170:14
conservatively
   318:17
consider  175:20
   175:24 176:4
   239:14
considered  37:19
   56:15 169:20
   280:5 284:11
considering  176:7
consistent  174:21
   178:12,21 180:19
   181:2 183:25
consistently
   177:18
constant  182:14
consult  41:17
   70:24 73:18
   175:15
consultant  15:5,9
   16:18,21 25:12,13
   26:6 40:19,22,25
   41:15 42:6,8,15
   43:15 48:2 55:21
   61:21 62:20 63:2
   63:4,6,10,16,19,23
   64:1,2,19 65:1
   67:12,19 69:19
   70:3,15 74:1 81:1
   90:1 99:15 102:6
   102:17,25 103:17
   113:2 123:20
   124:1 127:21
   128:2 138:20
   141:18 159:5
   160:12,20 163:25
   164:15 167:14
   174:14,20 178:20
   182:7 183:11

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[consultant - cost]

Page 14

| | | | |
|---|---|---|---|
| 186:2 190:24 | **continue** 66:9 77:9 | 306:21 309:25 | 55:18 60:15 61:21 |
| 203:19 206:7 | 188:21 250:13 | 310:2 323:7 326:3 | 61:22,23 64:15,20 |
| 214:6,8 219:18,22 | 300:11 | 326:10 327:11,13 | 65:11 69:20,21 |
| 220:9 222:6 224:9 | **continued** 3:1 24:2 | 327:20 333:6,8 | 71:16 72:2,11 |
| 228:20 237:8 | 31:19 74:21 76:15 | **cool** 61:15 282:7 | 73:16 74:22,23,25 |
| 269:2,4 293:24 | 81:10 85:3,7 | 305:2 | 80:25 93:24 108:1 |
| 310:22 328:10 | 89:11 91:9 92:14 | **coordinate** 330:10 | 108:5 109:19 |
| 337:5 342:25 | 100:17 146:5,12 | 330:18 | 116:13 125:25 |
| **consultant's** | 146:22 151:24 | **coordinating** | 138:11 153:8 |
| 128:20 | 303:17 326:24 | 329:19,25 | 156:5 157:16 |
| **consultants** | 330:14 | **copied** 153:15 | 159:6 163:22 |
| 114:24 203:16 | **continues** 44:21 | 207:7 223:2,5 | 164:4,7 184:2 |
| 214:9 255:24 | 155:4 205:6 284:2 | **copies** 72:23 73:6 | 193:2,3,5,10 |
| 305:25 | **contract** 67:7,8 | **copy** 15:23 134:14 | 199:21 201:25 |
| **consultantship** | 71:1 73:12,13,14 | 144:25 290:2 | 202:7 203:16 |
| 102:20 161:15 | 139:13 141:7 | 337:12,14,16,18 | 204:23,24 205:12 |
| **consulted** 50:18 | 175:3 310:15 | 337:20,25 338:2,4 | 206:21 207:1,4,7 |
| 180:2 | **contracted** 157:4 | 338:6,8,10,12,14 | 212:25 213:1,3,7 |
| **consulting** 61:24 | **control** 180:9 | 338:16,18,20,22 | 213:12,14 214:10 |
| 62:2,24 66:6,13 | **controls** 95:20 | 338:24 339:1,4,6,8 | 214:11,13,14,16 |
| 73:6,10 74:5,14 | **conversation** 23:9 | 339:10,12,14,16 | 214:17 216:4,5,7 |
| 229:3,4 245:8 | 23:12 46:2,3 | 339:18,20,22,24 | 220:6 222:12,21 |
| 311:24 312:4,9 | 47:19,20 66:4 | 340:1,3,5,7,9,11 | 227:18 233:7,8 |
| **consumers** 220:24 | 73:19 74:6 76:21 | 340:13,16 343:5,7 | 234:10,11 242:19 |
| **contact** 25:15,16 | 85:24 90:4 93:13 | 343:9,11,13,18,20 | 247:8 263:12 |
| 45:18,22 53:1,2 | 118:10 142:6 | 343:22,24 344:1,3 | 268:13,19 273:22 |
| 136:24 160:17 | 149:17 150:17 | 344:5,7,9,11,13,15 | 273:25 276:19 |
| 165:16,25 169:20 | 151:8 181:7,10 | 344:17,19,22,24 | 311:19,20,22,23 |
| 172:25 179:9 | 190:18 234:20 | 345:1,3,5,7,9,11 | 314:20 319:21 |
| 180:7 183:4 | 235:6 258:7 | 345:13,15,17,19 | 321:8 325:22 |
| 247:19,22 251:14 | 263:16 284:2 | 345:21,23,25 | 326:1 328:3 |
| 251:18 326:21 | 295:12 299:3 | 346:2,4,6,8 | 331:13 333:25 |
| 327:4 | 301:6 | **corey** 122:2 134:4 | **correction** 71:20 |
| **contacts** 169:12 | **conversations** | 200:6,18 201:3,6 | 295:24 |
| **contain** 293:6 | 22:11 47:25 75:7 | **corner** 144:7 | **correctly** 205:10 |
| **context** 141:13 | 75:8,16,24 76:16 | 260:19 308:8 | 266:14 |
| 168:15 180:13 | 77:12 83:10 85:18 | **corporate** 114:11 | **cory** 122:2 132:24 |
| 207:22 208:9 | 85:20 89:4,7 | 117:10 | 132:25 133:8,8,10 |
| **continuation** | 118:22 148:18 | **correct** 13:16 | 144:24,24 200:6 |
| 256:12 267:6 | 190:20 221:18 | 16:19 25:11 34:20 | **cost** 285:15 302:24 |
| | 259:11 306:16,20 | 36:21 38:10 54:17 | 335:16 |

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[costs - dan]

Page 15

costs 319:25 321:7
couch 299:25
couched 164:11
counsel 1:17 2:1
  3:21 4:5,15 5:12
  11:7,9,12,21,23
  12:18 70:12 73:20
  73:21 74:4,7,9
  75:7,9,25 76:1,2,6
  76:12,13 80:22,22
  84:2 88:18,21
  89:10,23 91:22
  92:17,19,23,24,25
  93:1 148:18,20
  150:19 341:10
count 50:7
counted 166:11
country 116:25
  117:18 126:17,23
  147:5 181:24
  261:8 266:13
  291:8
county 341:15
couple 5:19 10:5
  13:23 94:17 96:20
  114:1,3 153:21
  159:16 192:20
  197:20 208:18
  243:20 303:6
  315:17 317:6,9
  319:13 321:5
  325:17 326:18
course 49:20
  105:17 186:1
  222:5,6 224:22
  225:14 230:21
  238:20 240:2
  259:13 273:7
court 1:1 4:7,13
  5:15,24 38:17,19
  39:6,9 117:11

248:12 255:7
courts 319:2,24
  320:5,9
cousin 220:4,5
cover 103:6 134:6
  160:21 184:13
  205:2 335:17
covered 134:9
  320:18 322:1
covert 109:2
cpaschal 3:14
create 16:7 28:1,9
  28:12 56:3 176:7
  185:21 220:22
created 29:4 49:8
  54:23 171:16
  180:8 186:3,6
  194:10
creative 121:22
  123:3 189:2 190:1
  190:4,10 194:23
  199:15 201:1
  216:15
credit 290:3 321:8
  321:13,18 324:15
criminal 12:15
  86:1,4,21,24 111:4
  112:5 113:14
  114:15
crowds 293:4
cruise 288:9
  331:19,23 340:8
  346:1
cruises 336:15
cultivated 179:3
curious 252:1
current 32:5 94:22
  95:1 159:25
currently 15:12,16
  15:17 94:9 146:20
  247:7 286:19

cursor 95:22
custodian 97:23
cut 263:15
cutler 1:11 3:15
  4:4,22 6:11,15,19
  6:25 8:3 14:21
  24:2 25:3 28:12
  29:7 31:20 32:4
  33:8 39:8 44:25
  61:20 62:15 75:14
  75:25 76:17 77:6
  78:10,12,18,25
  81:3,10,25 85:7
  89:11 91:18 92:3
  95:11 96:3 97:7
  97:23 100:19
  119:19 121:4,18
  127:21 130:19
  131:4 137:11
  140:2 143:16
  144:6,20 146:12
  146:22 149:3,12
  149:22 151:4,24
  152:7 153:16,22
  154:2 156:10
  158:18 183:21
  185:11 188:12
  191:10 192:12
  197:9 202:14
  207:4 212:21
  213:7 216:12
  222:21 223:18
  224:2 225:3,24
  228:7 229:21
  231:16 232:3,19
  240:2 242:17
  260:22 261:16
  262:2 267:12
  272:12 276:23
  281:2 285:4
  299:16 308:2,10

308:11 311:11,15
  313:18 314:13,18
  315:7 317:6,20,25
  319:6 321:17
  323:2 324:24
  325:5,17 328:13
  329:3,18 330:9,17
  330:23 332:2,8
  333:17 337:1,4
  340:14,17 342:5
  342:23 346:7,9
cutler's 228:16
cuts 158:18
cutty 158:18

d

d 97:23 249:20
  250:15 342:1
dad 46:13,17,18
  173:3 243:3,5
  250:19 251:5,9
  252:12 253:8,18
  254:2,19 256:19
  256:24 258:4,22
  259:14 260:6
  283:6 294:18,25
  295:11,15 298:3
  304:22,25
dad's 253:23
daily 315:8,10,22
  316:2,19
damian 147:11
dan 4:4 78:9 97:23
  113:25 121:18
  127:21 128:8
  131:3 144:20
  153:15,22 154:1
  156:10 183:20
  188:11,24 190:12
  193:17 194:2,20
  202:13 207:3
  213:6 215:1,15

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[dan - described]

Page 16

216:11 222:20
223:18 228:7,16
242:17 246:13
260:22 261:16,18
262:1 267:11,13
276:23 277:6,12
279:4 282:22,25
285:4 299:16
308:11 311:14
337:1 340:14,17
346:7,9
**daniel** 1:11 3:15
4:21 6:15,25
337:4 342:5,23
**data** 165:20 169:2
170:21 172:5
245:23
**date** 1:12 26:23
66:8 71:23 77:17
94:14,15,23 95:7
98:8 101:11
152:20,25 156:4
184:2,3 188:5
195:9,10,11 200:4
202:11 216:6
222:23 225:23
246:9 252:25
267:9 274:14
277:4 301:12
**dated** 121:10
130:22 143:19
144:8 167:6
183:21 193:4
200:3 201:21
204:2 206:23
213:2 249:10
261:24 274:13
281:8 282:21
294:5 304:9
308:15 311:21
313:3

**dates** 18:1,12
26:20,22 72:7
191:19 232:22,23
232:23 279:12
283:21
**dawkins** 1:6 111:5
**day** 7:18 8:25
50:11,14 88:6
96:22 103:25
139:5,5 142:22
157:15,19 162:18
162:18,24,24
194:2 205:1
256:21 257:6,22
258:1 313:9
315:11 316:12,12
317:19,19 323:22
337:23 341:14
343:16
**days** 95:5 238:1
283:8 313:3,3,14
**dba** 15:11,12,21
**dbb** 2:20
**de** 235:16
**deal** 48:4 128:21
138:19
**dealing** 24:21 25:6
25:7 161:3
**deals** 24:18 132:17
132:17 138:10,17
**dealt** 25:1 43:18
132:15 292:7
**deandre** 196:17
**debbie** 89:8
313:24
**debevoise** 2:10
4:24 84:6 148:20
149:4 150:20
**debevoise.com**
2:14,14

**deborah** 2:17,18
5:2
**deborahbarbier....**
2:20
**deceased** 79:4
**december** 66:9
158:23 188:5,23
193:4 194:18
195:9 199:12
200:3,23 201:15
201:21 202:11
203:2 216:6
**decide** 133:22
**decided** 35:9
280:5 284:13
**decision** 73:10
93:9,11
**decisions** 60:3
**deck** 169:4,17
170:23 171:16
172:10
**declared** 59:10
**defendant** 2:9,16
3:2 5:7
**defendants** 1:8
13:4,6 314:15
**defined** 111:18
**definitely** 182:18
245:5 279:13
316:13 328:25
**definition** 38:23
39:12,15,20 42:10
106:21,23 107:1,3
112:3 278:18
**degree** 257:14
**delay** 244:7
**deliver** 122:16
159:1
**delivio** 163:7
**delta** 294:17,20
340:11 346:5

**demonstrating**
135:15
**dennis** 329:20,20
329:21
**department** 41:6
65:4 133:14,17
134:23 294:3
324:7
**departments** 41:5
**depend** 60:22,24
211:1 295:16
**depended** 22:5
239:6 296:8
**depending** 251:17
**depo** 342:25
343:25 344:25
345:25
**deponent** 3:15
4:21
**deposit** 290:19
**deposition** 1:11
4:4,9 6:2 7:4 11:1
11:6 13:2,11
31:25 32:8,10,14
32:17 90:25 93:22
106:14 108:3,17
148:15 149:6
151:9 159:20
207:25 208:5
305:23 314:16
322:10 340:19
**depositions** 7:11
**depth** 142:9,11
184:16 185:13,15
**derby** 56:22
**derrick** 61:14
147:10
**describe** 42:11
315:7,13
**described** 111:18
111:20 114:16

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[described - documents]

Page 17

254:9 264:2
**describes** 42:18
**description** 27:13
27:18 41:24
106:19 113:17
121:23 122:8
124:12 154:12
229:22 260:15
309:8 310:10
311:24 315:21
**descriptions**
121:11 337:11
343:4
**designated** 297:6
**desousa** 198:12
**detail** 135:13
141:10 230:11,18
**detailing** 158:22
**details** 234:16
235:22 327:10
**determination**
259:17
**determine** 32:1
94:19
**determined** 85:23
93:13
**develop** 19:17
20:22,23 21:8
35:1 36:8 44:18
44:19,20 45:5
141:4 142:12
238:2,12 240:3
263:8 273:6
**developed** 20:18
45:14 53:4 54:24
123:10 273:8
**developing** 37:2
136:6 138:25
139:2
**development**
238:18

**dewan** 287:15,15
287:16,17,18,19
287:22 288:3
289:1 331:17
**difference** 152:23
**different** 21:24,24
21:25,25 22:4
47:19,21 49:5,25
53:4 57:8 81:7
97:4,22 99:9
105:21 121:15
124:10 164:6
186:25 194:4
230:23,23 292:8
297:14 301:25
302:15 303:2
326:20
**difficult** 266:2
**digital** 163:10
167:3
**dire** 289:2
**direct** 43:13 135:9
152:13 169:12
231:25 232:19
233:16 264:17
271:10 275:25
**directed** 42:20
43:4,8,11
**direction** 134:22
134:25 135:3
160:23,25 310:4
**directions** 91:14
188:21
**directly** 41:14
67:25 123:25
124:2 160:13
161:3 243:24
297:25 306:1,12
**director** 18:9,21
33:20 37:7,12
43:1,4 122:3

125:13 223:19
286:25 289:10
**directors** 44:19,20
52:23 262:16
263:23 296:15
298:6
**disagree** 121:25
122:17 182:17,20
335:24
**disappointing**
243:18
**disclose** 10:3
77:12
**disclosed** 230:18
**discuss** 9:21
220:13
**discussed** 5:18
11:2,4 88:8 95:8
112:12 149:13
152:1 156:13
161:18 166:25
208:12 240:20
245:5 272:18
**discussion** 10:2
33:4 91:20 93:12
137:7 139:24
144:4 160:6 197:7
238:15 239:22
**discussions** 11:8
49:7 50:1 51:7
65:19 78:15 150:9
171:9 205:6
208:22 236:6
248:5 272:13
**disguise** 335:23
**distinguished**
207:13,19 208:20
211:20 212:13
**district** 1:1,1 4:7
**division** 1:2
182:24 325:21

327:4
**divorce** 92:21
**divulge** 76:4
**document** 16:5
61:18 62:7,9,10,14
66:15 69:23 70:1
70:17,22 95:13,16
96:4,9,16,18
104:25 105:3
121:7,12,16
122:12 123:9
124:8,15 125:7
127:3,9,15,20
130:11,20 142:18
142:21 144:2,7
152:8,10,14,17
155:23 159:24
170:9 176:7
183:17 184:9
186:12 187:4,21
188:1 194:12
201:9 215:7
228:11 231:22
232:5,10,11,25
241:24 245:18
308:4,6,8 309:5
**documentation**
87:13,14,18,19
109:10,12,13
**documents** 7:17
11:7 13:18,18,20
13:25 14:1,2,10,12
14:16 87:2,2,7
88:20 89:4,7
97:21 106:6,13,15
108:2,4,16,20
153:21,25 155:17
194:10 198:17
307:22 337:8
343:2

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**dog** 154:15 155:1
**doing** 34:17,23
  44:6 46:16,24
  47:2,18 52:9
  88:19 115:25
  123:12 128:10
  139:18 158:22
  178:13 183:13
  203:9,10 228:7
  238:13 256:7
  284:20 290:4
  297:23 300:8
  313:8 321:12
  330:22 333:5
  336:14
**dollar** 90:14
**dollars** 54:15
  66:25 115:8,13
  128:20 319:24
  321:24 324:14
  334:11,13
**dozen** 13:24
**draft** 50:24,24,25
  51:14,18 52:5
  59:10 136:1,18
  137:14 139:8
  169:22 171:22,24
  175:8 176:13
  178:15,24 179:1
**draft.net** 50:15
  51:18
**drafted** 59:16
**drafts** 51:10,13,15
  51:20,24 52:1
  178:9
**dreams** 20:20
  36:10
**drew** 293:3
**drive** 33:14
**driving** 126:3
  181:25

**drugs** 10:21
**duane** 239:19
**dude** 234:15 275:8
**due** 56:5 303:4
**duke** 120:12 177:5
  226:11,18 239:14
  239:21 242:13,14
  255:19 272:22,23
  272:24 273:2
  274:6 275:13,22
  283:1 284:7
  285:19 331:13
**duly** 6:16
**duperrier** 132:9
  132:11 144:25
**durham** 280:8
**duties** 145:13
  317:18
**dwight** 61:14

**e**

**e** 121:12 342:1,19
**earlier** 13:17
  27:21 73:2 95:11
  128:2 148:14
  153:7 161:18
  167:21 170:14
  249:25 254:10
  257:21 264:14
  267:20 272:18
  274:5 279:6 295:9
  304:10 308:25
  310:22 314:17
  322:10 323:10
  324:13 325:18
  328:1 330:25
  331:20 332:10
**earliest** 194:17
**early** 138:3 139:19
  206:3 305:1
**earned** 243:11

**east** 57:4
**eastern** 143:9
**easy** 139:15
  231:23
**eat** 305:4
**education** 14:23
  15:1 16:13
**efficient** 7:21
**efforts** 64:4
  158:24
**ehrlich** 70:12 84:1
  84:4
**eight** 259:15 260:7
**either** 80:21 84:9
  169:6 223:12
  237:1 322:6
  323:16 326:4
  328:10 334:4
**elaborate** 38:3
  324:2
**eligibility** 59:11
**eligible** 57:18
  138:13
**elite** 45:4,8,13
  47:4 48:19 49:17
  49:21 57:18 116:9
  116:10 170:16
  254:15 291:7
  296:16,17 304:14
  304:15
**else's** 140:24
**ema** 125:22
**email** 127:11,12
  130:22 131:3,6,9
  131:17,19 132:8
  134:7,10,13
  142:16 143:19
  144:16,20 145:17
  145:18,21 146:6
  146:13 147:8
  152:15,21,24

153:11,12,17,21
153:25 154:1,3,7,9
154:10,13 155:20
156:1,11,16
157:11,20 158:4
158:20 159:4,8
169:8 173:21
176:17 183:20,24
183:25 184:2,13
184:15,20 188:1,5
188:11,16,24
189:5,14 190:12
190:19,21 191:13
191:21 192:19,20
193:1,6,12,14,19
194:4,16,18,18,19
194:20,24 195:1,6
195:12,19,22
196:4 199:9,12,17
200:8,9,10,13,14
200:17,22,23,23
201:3,5,14,14,15
201:17 202:6,13
202:19,24 203:2,6
203:21 204:1,13
204:22 206:5,11
206:12,20 207:1,7
207:15,18 208:19
209:1,4,15 210:9
211:22 212:13,15
212:24 213:10,17
213:19,21,23
214:3,4,18 215:3,7
215:25 216:3,11
216:23 217:4
218:18 220:14,15
222:19 223:14,20
223:23 225:22
226:22,25 229:11
229:12,14,16,18
230:4,7 261:19,24

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[email - exactly]

Page 19

262:14 263:10
264:1,3 311:18
337:10,12,14,16
337:18,20,25
338:4,6,8,10,12,14
338:16,18,20,22
339:1,14 343:3,6,8
343:10,12,14,19
343:23,25 344:2,4
344:6,8,10,12,14
344:16,20 345:8
**emails** 13:25 14:1
14:3,7,16 87:20
88:6,10,14 101:18
101:19 106:6,7
108:5,8 195:23
200:12 204:17
336:3
**emily** 163:12,15
**emoji** 268:11
271:17 277:11
**emojis** 268:4,7
277:11
**emphasis** 178:7,21
**employed** 15:18
24:21,25 25:10
64:9,22 71:19
**employee** 27:11
40:15 80:24
132:12 145:6
153:8 214:12,16
217:18,20 293:25
**employees** 28:17
28:22 29:1,9,10,11
29:12 109:8,13
113:1 114:23
162:17 203:16
214:10
**employer** 95:1
114:11

**employment** 15:15
15:21 18:12 27:5
71:17 94:12,16
**empty** 320:7
**encompass** 41:21
**encompasses** 41:9
**endorsement**
132:17 138:10,16
138:19 139:12
141:6 175:3
**endorsers** 59:24
**enemy** 122:16
**enforcement**
86:12,15,18
**engage** 237:10,12
237:15 241:7
255:25
**engaged** 182:6
211:25 212:5
222:6
**engagement** 92:13
92:15
**engagements**
220:23
**england** 110:12
129:11,14
**enjoy** 115:25
**enlarge** 95:22
**ensure** 140:9
**entail** 63:22 209:9
**entered** 66:11
**enters** 139:8
**entice** 331:23
**entire** 65:7 145:15
215:25 266:22,23
**entitled** 159:25
181:18
**entries** 100:25
256:15
**entry** 334:2,6,8,12
334:15,19

**eod** 193:17
**equal** 137:22
**equivalent** 115:6
**eric** 218:16 219:6
219:8
**especially** 172:20
263:7
**espn** 49:14,15
50:13,14 52:5
170:14 179:5,13
179:18 180:1
215:7
**essential** 180:24
**essentially** 58:10
**establish** 64:10
149:19
**established** 175:5
**establishing** 178:7
178:14,22 180:22
**estate** 92:21
**estimation** 54:11
54:22
**et** 4:6 222:10
**etop** 125:22 126:5
126:6
**etop's** 234:1,12
**eurocamp** 53:7
**evaluated** 258:9
**evaluation** 258:11
**event** 30:1 58:7
119:8 156:25
161:22,24 248:10
266:19 275:7
292:14,17,19,21
292:23 293:2
295:8,16 296:5
302:14 318:13,13
318:15 323:8
**events** 16:25 17:2
29:14,15,16,17
30:2,9 42:24 43:7

44:23 45:3 46:10
48:7 52:24 53:2,4
53:5 54:21,25
68:10 121:20
123:1 126:7,7
133:5,5,6,9,23
135:5,7,8 147:5
157:6 161:23
163:18 164:6,25
169:6 216:22
237:25 240:13,14
257:18 259:6
263:2,8 292:8,9,11
293:4,8 302:14
316:8 317:9,21
318:1,4 319:6,8,14
322:7 323:13
333:4 341:11
**eventually** 185:8
322:22
**everybody** 6:14
7:25 134:6,9
145:23 158:12,14
160:7 242:9 297:7
297:9
**everyday** 316:2,6
316:10,15,23
**evicted** 289:2
**exact** 18:1 26:20
26:22 38:23 39:11
39:15 54:3,15
55:8 68:15,20,23
71:23 77:17 87:24
94:14 96:12
134:16 163:17
186:13 232:21
257:17 317:18
326:8
**exactly** 7:14 17:17
18:14,20 26:3,8
30:14 38:21 39:20

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[exactly - eye]

Page 20

40:14 45:24 46:15
49:13 51:22 52:10
54:12 55:22 62:17
64:14 68:1 69:6
99:13 106:2
109:15 112:24
130:1 133:4
145:15 163:9
171:2 173:22
199:5 216:21
255:13 263:16
300:16 312:10
**examination** 6:17
314:11 332:6
333:14 342:6,8,10
342:12
**example** 49:2
154:9 209:10
213:16 254:12,13
264:2 273:13
278:14 317:14
318:5,20 319:16
320:1
**examples** 325:19
**excel** 97:15 184:19
187:22 338:2
343:21
**exception** 10:9
**excerpt** 241:14
248:14 264:13
274:10
**exchange** 237:9
**excite** 220:24
**excited** 275:2
**exclamation** 147:3
147:5,6,9,12,14,22
**exclude** 211:10,15
**excludes** 211:12
**excuse** 78:11
117:9 122:9
169:23 212:18

232:8 281:7
287:11 290:15
**executed** 53:5
54:25 59:5
**execution** 58:25
**exhausted** 19:21
59:11
**exhibit** 15:23,24
15:24 17:19 26:14
41:24 52:12 62:5
62:6,7 67:5 73:14
95:14,15,21 121:5
121:5 124:8 127:4
127:6 130:13,15
130:17 140:2
142:18 143:16,17
143:25 144:1,1,2,8
152:8,14,15,17
155:16,17 159:10
159:11,18 165:15
183:18 184:18,25
185:1 187:23
188:2 192:13,15
200:1 201:10
203:23 204:6,8,8
204:11 206:15,16
212:17 215:23
218:17 220:13,16
220:19 221:25
222:2,20 226:25
230:9 231:19,20
232:1 241:14
245:13 248:13
261:13,18 264:7
267:5,20,23
269:11,22 271:22
274:9 275:23
281:2 288:1
293:12,15,18
299:9 303:9
307:23,25 308:1

311:9 313:1 337:3
337:5,7,10,12,14
337:16,18,20,22
337:25 338:2,4,6,8
338:10,12,14,16
338:18,20,22,24
339:1,4,6,8,10,12
339:14,16,18,20
339:22,24 340:1,3
340:5,7,9,11,13,16
342:22,24 343:1,3
343:5,7,9,11,13,15
343:18,20,22,24
344:1,3,5,7,9,11
344:13,15,17,19
344:22,24 345:1,3
345:5,7,9,11,13,15
345:17,19,21,23
345:25 346:2,4,6,8
**exhibits** 192:13
195:24 230:9
**exist** 30:15
**existence** 30:13
**exists** 81:6 91:13
229:19
**expect** 7:17 54:14
150:21
**expense** 205:7,25
206:2,8 222:15
224:20 225:5,12
225:15 226:1
230:12 339:2
344:20
**expenses** 209:6
222:15 223:25
224:3,10,10,13,23
225:11,12,15
227:25 228:1,5,8
228:10 319:7,11
319:14 320:10,15
320:18,21 321:25

322:6,23 323:4
324:25 325:1
335:18,19,22,23
336:7
**expensive** 320:17
**experience** 14:23
15:1 45:9,11,12
48:9 59:21 66:2
104:13,15 115:9
116:2 176:19
265:24
**experiences**
123:23
**expertise** 22:2
**expired** 73:12
**expires** 341:22
**explain** 41:7
137:13 140:13
166:3
**explained** 7:10
153:7
**explanation** 135:3
140:24 273:11
**explanatory**
169:19
**express** 52:5
**expressed** 321:16
**extend** 174:8
**extends** 150:4
**extension** 58:16
**extent** 10:1 92:11
153:24 162:9
**external** 217:18,20
293:25
**extra** 336:5,11
**extract** 158:5,7
268:17
**extremely** 124:9
124:22
**eye** 45:14 168:5

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**f**

face 8:15,15
facet 243:6
faceted 261:4
facility 320:1
fact 92:1 108:10
  113:20 172:10
  277:18 326:19
facts 76:7,10
fair 8:10,22 9:11
  26:25 35:5 79:6
  84:23 102:16
  105:18 117:7
  122:13 124:12,18
  150:9 162:22
  163:19 166:18
  172:16 203:12
  233:11 257:1
  270:20 309:12
  326:17 327:22
fairly 47:13 225:8
falker 304:5,6,7
fall 211:7 278:17
  281:17
fame 15:8 26:16
  27:3,15
familiar 25:19,22
  25:24 37:14,16
  38:9 50:23 56:7
  105:23 108:14
  136:20 197:25
  198:10,11,14
  216:18 217:25
  233:9 280:12
  286:6 288:23
  290:24 296:13
familiarity 35:1
  137:16,18
families 19:18
  45:6 60:8,21
  104:6 111:13

114:24 136:7,8
167:23 172:24
183:5 210:21
255:21 273:14
296:7 316:24
317:3 325:10
328:6,11 330:11
330:19 336:13
family 45:18 46:12
  60:23,25 78:6,8,15
  78:19,21 79:8
  118:5,20 137:2,13
  137:16 139:15
  171:3,9 172:5,12
  183:7 236:21
  237:4 251:14
  255:13 273:9,15
  275:2,4 291:16,19
  291:24 293:10
  295:1,18 296:9,10
  296:22 297:1,3,18
  298:2,9,14,17
  306:2,12,18,23
  329:14,21 330:1
  333:5
fan 260:10,14
far 23:8 34:9 46:5
  105:13 125:15
  144:17 145:11
  232:6 255:25
  291:5
fareharbor 340:10
  346:3
fargo 3:6
father 45:19,23
  220:2,5 226:14
  242:2 245:11
  250:1 254:15
  255:14 282:4
father's 79:3

faulkner 296:12
  296:14,21 303:25
  304:5
faulkner's 297:4
fbi 86:8
fear 91:14
february 130:22
  132:1 133:19
  143:19 144:9
  152:21 308:15
  310:19 311:7,22
  313:8
federal 30:20
  32:16 86:6 88:15
  105:3
fedex 269:25
  339:20 345:14
fee 310:11,14,19
  311:4,7,25 312:4
  334:12,19
feedback 175:13
  175:17
feel 128:22 179:3
  238:22
fees 74:16 89:12
  89:14,16,18 90:11
  90:14 334:3,6,8
fellows 193:16
felt 175:18 289:3,5
fiancee 286:14
field 100:22
  130:25 131:22
  134:10 144:19
  153:1,12 156:7
  165:16,25 183:22
  188:9 193:7
  202:14 204:12,19
  208:14 209:2,8,11
  209:13 213:6
  216:9,15 233:12
  246:3 252:25

fields 232:15
figure 54:6 108:21
  320:14
file 269:18
filed 4:6
files 72:13,15,16
  72:18 73:3
final 240:15
finally 271:16
finance 324:7
financial 118:23
  118:25 289:3
financially 118:5
  118:20 288:13
  321:15
find 31:5 39:25
  40:2 45:21 80:5,9
  250:10 260:18
  266:18 283:15
fine 8:19 9:6 46:23
  143:8 180:15
  192:3 271:6 282:3
finishes 234:20
finishing 278:3
fired 147:21
firm 3:10 4:12,14
  5:9 12:7 74:24
  92:4 149:8 332:10
firms 12:8
first 5:20 6:16 8:2
  10:24 14:19 15:23
  16:17 27:22,24
  28:3,6,16,20 29:3
  29:5,7,12,13,18,19
  29:21 30:2,10,12
  30:20 31:3,7,10
  40:21 42:19 45:7
  47:7,10,17 63:12
  63:14 64:1,7 66:9
  97:7 99:17 100:25
  100:25 107:7,10

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[first - future]

Page 22

109:24 112:19 114:6 123:17,20 127:19 128:16 131:14 155:23 159:17 160:8 169:11,21,22 171:11,23,25 172:2 175:9 182:4 182:17 192:20 196:8,12 207:3 208:19,21 212:12 212:16 218:23 225:25 227:3,7,11 227:12,16,19,22 228:1,3,5,7,11,15 228:20 229:2,11 229:15 231:25 234:3,3 242:15 259:10 264:18 273:18 276:21 290:21 339:4 344:23

**fit** 61:1 255:2

**five** 9:1 42:13 186:14 187:4 188:24 189:12 190:13 192:1 194:20 198:19 199:13 200:24 201:7,16 229:9 272:3 274:24 291:12 313:3,3,9 313:14 318:18 320:14

**fix** 280:17

**flagship** 244:2

**flight** 119:12,14 120:4,7 281:12 284:14,22,24 301:25 302:25 303:1,3 304:18,22

304:22,23

**flights** 120:16,21 284:20 290:10 294:25 295:3 331:3,6,9

**flint** 239:16

**florida** 79:14 263:6

**flown** 56:8

**fly** 283:1,22

**focused** 175:19

**folder** 15:24 121:5

**folks** 102:14 130:23 131:24 132:4,6,7 143:1 153:16 154:5 167:2,3 179:8 188:14 189:13 194:7,19 201:16 203:1 207:6 261:5

**follow** 24:23 25:18 26:6,12 333:16

**followed** 24:14 25:2,4,7 112:5

**following** 15:3,4,5 15:7,9,10 111:6 113:13 115:21

**follows** 6:16

**foregoing** 341:6

**foreign** 56:9

**forever** 143:1

**forget** 193:17 194:1

**forgot** 271:18

**form** 96:12 104:19 264:3

**formal** 37:8 208:14

**formalized** 140:6

**formally** 94:12

**format** 96:14 97:12,13,14 140:6

**former** 211:13,14

**formerly** 78:12

**forming** 121:20 123:2

**formulation** 81:8

**forth** 66:16 232:14 233:13

**fortunate** 139:10

**forward** 7:21 14:25 84:12 86:17 128:17,19 165:14 186:20,21 187:15 195:15 205:8 206:1 217:8 259:18

**forwarded** 196:4 202:6 203:11 215:7

**forwarding** 203:18

**forwards** 198:20

**foster** 164:20

**found** 80:2,3

**four** 52:7 131:14 175:6 178:10,18 182:1 238:1 239:1 240:15 248:14 296:5 318:18 324:10 334:10

**frame** 206:9

**frank** 119:17 120:4,8 225:24 226:12,14 272:17 272:19 273:5,12 273:15 275:6,14 275:21 277:1,5,13 277:15 278:2 279:6,9,14,16 281:9,17,22 282:6

282:12,21 283:9 283:14,19,25 284:6,11 285:25 330:24 331:7,14

**frank's** 275:17 282:4

**franklin** 20:13

**fretting** 244:1

**friday** 156:5

**friend** 113:14,23 280:5 284:11,13 284:16,17

**friendly** 113:9,12 214:2 240:9

**friends** 79:23 101:22 113:11,20 220:3

**front** 16:1 42:1 62:8 95:17 121:6 121:7 130:20 147:18 152:18 155:18 192:17 194:14 201:11 206:16 222:3 241:24 267:7 274:11 281:3 293:13 308:1 311:12

**fronted** 321:4

**full** 6:23 7:18 27:11 28:18,22,25 29:9,10 302:4 319:2

**fun** 146:24

**funds** 290:9

**further** 168:24 169:11,25 303:9 341:9

**future** 140:9,16 141:2,6 169:11 180:22

3:18-cv-03118-JFA    Date Filed 03/30/21    Entry Number 202-1    Page 113 of 152

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[fw - go]

Page 23

fw 195:15
fyi 202:16 217:6

**g**

g 19:5 98:8 232:22
game 45:25 46:1
48:13 53:6 55:2,3
55:5,15 56:1,11,14
56:22 150:9 168:6
168:10 173:2
210:11,12 246:19
247:13 286:13
294:25 295:3,4,6
296:16,17 304:14
304:15
games 53:9 55:11
55:13 56:18 57:7
58:2 128:14,14,14
166:6,7,14,16,21
167:9,13,17,20,25
168:3,12 260:25
261:8 286:15
gap 259:15
garbled 81:17
gassnola 1:6
109:16 110:16,21
111:3,18 124:8
129:23 134:3
144:24 195:2,4
196:25 199:7
201:21 234:4
235:19,24
gassnola's 111:22
112:2 115:4 235:7
gate 268:1
gathering 87:1
gatto 1:6 2:16 5:3
6:7 77:20 82:11
83:3,11 111:4
112:6,18,20,23
113:6 118:11
127:12 134:14

145:1 154:18
163:1 173:17
214:15 215:20,21
223:1,5,9 230:4,7
308:18 309:23
313:4 323:16
gatto's 114:6
117:6,15,24
gattos 118:17
214:16
gauntlet 57:5,9,10
57:16,20,23 58:15
gears 272:16
geek 260:16
gen 180:10,19
337:23 343:16
general 28:5 39:13
54:11 70:12 84:2
92:20 104:13
106:19 129:16
178:20 265:25
296:9 323:12
326:14 327:22
generally 26:4
27:20 35:10 38:2
39:23 42:17 52:2
52:17 92:12,14
122:23 143:1
150:8 162:15
165:25 185:15
235:23 295:9
320:20 323:14
generation 157:14
157:19 158:2
161:20
genesis 263:16
gentleman 34:6
gentlemen 38:13
188:20 204:25
geographically
163:24

georgia 296:18,19
germany 158:25
getting 34:13
141:3,4 158:23
170:15 175:12
185:5 234:1,12
236:3 243:11
253:7 258:4,21
296:21 297:1
310:18 312:3
323:25 324:11,18
324:21 330:5
gift 288:7 298:8
gifts 120:23
girl 283:5
girlfriend 101:21
120:11 280:8
284:6 285:18,18
girls 48:4
give 8:16,19 12:11
13:5 27:19 53:18
57:6 62:11 72:12
87:16,22 88:2
107:4 122:20
127:14 135:3
140:23 155:22
160:19 180:11
185:19 215:24
232:21 246:18
247:13,16,17
252:16 261:17
276:2 279:4
280:15 288:19
313:17 318:6
321:17
given 42:8 50:11
50:14 67:20,24
69:8 75:9 103:4
119:2,4,7 160:23
173:9,20 243:16
255:17 285:11

gives 213:24
268:15
giving 10:17
263:10 288:3,7
298:4 312:21
global 15:6 17:14
18:2,5,13,22 20:3
20:11 25:9 26:15
27:1,6 33:20 34:3
34:17,25 35:7,7,13
35:14,15,23 37:9
37:13 40:6,12
65:9,13
glory 114:10
gmail.com 131:4
153:16,22 154:2
156:10 183:21
188:12 195:2
201:21 202:14
207:4 213:7
216:12 229:12,15
262:2,7
gmail.com. 222:21
227:8
go 7:17 9:8,9
14:15,19 17:14
27:2 32:21,23,25
35:9 36:14 38:5
38:24 44:3,6 46:1
47:2 48:12 49:4
51:16 52:3 55:15
62:6 65:9 66:2
78:9 119:22 127:3
127:6 128:15
130:12 131:22
137:20 138:9
142:17,20 143:1,4
143:8 147:11,25
150:25 159:24
160:20 163:20
164:13 166:20,21

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[go - guess]

Page 24

167:17 172:9,12
173:4 174:17
177:4 181:17,17
183:17 184:18
187:8,23 193:22
203:23 206:15
209:4 212:17,20
216:1 218:17
220:16,19 221:16
221:19 222:2
231:6,24 232:22
238:8,11 241:13
248:13 255:5,9,11
256:9 257:24
259:18 271:4
275:23 281:7
287:17 288:8,11
288:12,19 293:12
293:15 294:25
295:3,6,15 296:3
299:13 301:1
303:5,8 305:1
315:16 318:16
319:13 325:10
326:24 328:14
329:7 330:14
331:23
**goal** 139:19,20
220:25
**goals** 181:3
**goes** 139:8 232:7
267:10
**going** 4:2 7:15,18
8:2,24,25 10:24
14:15 31:21,22
33:2 35:3 36:11
39:1 48:11 52:12
52:24 53:13 54:24
59:19 65:13,16
76:23 77:9,11
81:19 88:11,15

91:4,9 94:16
95:14 97:3 101:24
105:19 112:10,12
112:16 113:23
116:2 117:25
128:17,19,21
130:12 136:21
138:12 139:4
140:2 142:22,23
147:23 148:3
149:11 150:12,18
151:4 153:19
155:17 163:14
164:6,19 168:10
168:22 172:13,17
173:2 174:25
175:4 176:4,24
177:14,14 180:9
181:18 187:9
192:5 197:9 205:8
206:1 221:19
226:4,7 231:8
232:20 236:25
239:19 252:6
256:10 259:8,25
260:4,5 264:8
272:6 275:24
276:3 280:19,20
282:17 287:21,23
293:16 297:16
298:15,17 299:8
303:9 304:25
314:4 326:8
**goings** 3:10 5:9
332:10
**goingslawfirm.c...**
3:13,14
**good** 4:1,18,20,23
5:1,4,8,11 8:20
45:15 57:19 59:17
60:9,12 78:10

123:12 138:11
139:7,13 163:13
168:11,18 176:22
198:7 220:17
221:15 229:12,16
229:17 233:5
237:3,21 238:23
243:9 244:8,14
250:18,19 252:12
253:5,18 255:2
256:19 258:19
261:17 264:6
283:15 284:11
289:17 291:9
**gooding** 3:10 5:8,9
6:12
**goodness** 117:8,9
**gordon** 218:16
219:6,8
**gotten** 243:10
262:13 263:18
270:23 289:2
298:1
**govern** 70:18,19
**governed** 24:17
62:25
**grab** 272:4
**grade** 181:11
**graduated** 16:13
288:4
**graduation** 15:3
288:4,6,20
**grassroot** 57:11
**grassroots** 16:24
41:4,6,13,20 42:20
43:2,13 52:19
53:18 54:1 64:3
65:3 121:19 122:4
122:5 124:9 126:1
126:2,16 129:15
133:5,14,16

134:17,19,22
135:16 161:13
163:4 164:23
174:15 175:16
179:15 181:3
218:12 220:18
221:1,14 240:15
243:5 247:25
263:22 294:2
301:23
**great** 6:14 7:9 8:12
8:24 48:14 66:1
122:14,21 143:11
143:13 239:4,13
241:5 275:5 284:1
314:13 321:14
**greeley** 270:6
**green** 160:9
**greer** 12:2,13,14
13:10 74:9,17,21
75:20 76:18 77:16
81:12 91:5 92:3
**greet** 167:18
**grew** 61:13
**grind** 147:7
**ground** 125:3
169:12 273:11
317:18
**group** 2:4 109:2
175:19 305:8
337:7 343:1
**groups** 41:21
171:20
**guard** 186:20,20
187:14 293:7
**guardian** 172:20
173:15
**guardians** 295:23
**guess** 13:23 48:9
57:14 109:22
163:13 166:13

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[guess - high]

Page 25

168:20 196:16
211:17 223:20
227:10,24 230:15
238:17 252:6
259:19 275:12
278:17 293:6
313:7 315:24
**guessing** 113:18
176:11
**guesstimate**
326:14
**guidera** 293:23
294:11 306:17
**guy** 227:19 250:1
252:12 260:20,23
268:2 282:8
**guys** 78:9 113:10
180:12 186:21
193:25 246:14
250:20 251:2
252:2,4 253:8,19
258:5,22 300:11
**gym** 261:9
**gyms** 135:7 157:5

**h**

**h** 98:9 99:17 102:4
342:19
**ha** 283:1,1,6,6
**hadley** 31:15
33:17
**half** 18:19
**hall** 15:8 26:16
27:2,15 156:15,19
156:20 157:2
**hallpass** 156:21,23
**hand** 144:7 261:7
308:8 341:13
**handing** 260:24
**handle** 87:10,12
223:20

**handled** 31:3
**hands** 261:10
**handwriting**
269:24 270:2
**hanging** 260:16
**hanson** 43:11,12
134:14,15 145:1
156:14 161:2
173:18 220:14
221:5,23 230:8
309:21 323:16
**happen** 118:3
238:6
**happened** 47:13
88:20 278:23
284:9 302:24
306:5,9 307:11,16
**happening** 118:22
307:7 323:3
**happily** 193:23
**happy** 38:3 108:12
120:1,20 238:11
239:19 255:17,20
**hard** 61:1 189:1
189:18 190:14
194:22 199:14
200:25 201:8
265:23
**hardwood** 320:5
**hart** 2:11 4:25
149:10,14 151:10
152:2
**head** 8:13 70:8
83:6 93:10 96:19
120:18 151:20
158:3 182:5,8,11
226:3 239:20
243:25 253:16
280:10 287:6,13
300:15 312:16
325:21 326:4,22

327:4 336:6
**headers** 97:18
232:4
**heading** 174:4
233:19
**headquarters**
164:14 205:14
270:9 318:22
**healthy** 117:1
**hear** 46:21 74:19
81:16 106:4 107:7
107:8 134:8
236:23 244:12
**heard** 37:20,23
38:11,22,23 83:24
105:25 106:3
107:12,25 112:15
112:16 154:17
207:20,22 243:13
252:2,6 307:7,8
314:15
**hearing** 107:11
208:6,8 236:12
**heart** 117:9,10
**held** 4:9 58:7
292:14
**hell** 214:23
**hello** 171:8 292:24
333:4
**help** 20:19 36:9
44:15 45:12 97:18
111:23 118:4,19
129:17 134:22
135:16 136:18
137:11,14 139:14
140:8,16 141:1
172:14 176:4
182:23 183:2
188:22 205:21
229:7 234:25
237:1 238:10,12

244:14 245:11
254:21 255:20
262:17 263:13,25
288:11,12 331:5
331:22
**helped** 16:24
52:22,24 53:9
65:3 216:22
239:16 293:3,5
330:10 331:3
334:4 335:1
**helpful** 13:6 175:4
237:5
**helping** 35:2 36:13
64:3 133:22
256:20 257:6
293:1 330:18
**helps** 136:20 138:8
168:5 246:4
**hereunto** 341:13
**hernandez** 287:15
287:17,19
**hey** 47:22 65:15
66:1 73:17 78:9
118:17 142:2
160:20 177:7
241:4 244:7
248:10 255:14
260:11,19 278:15
279:19 297:19
**hide** 301:16
**hiding** 302:19,21
**high** 7:13 41:9,10
41:11,22 42:22,23
43:5,6,20 44:2,4,7
44:13,16,22 45:3
46:7,17,19,25 47:9
47:14 48:19 49:17
49:21 50:17 51:10
55:3 56:14,18
59:16 104:5,13,17

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[high - important]

Page 26

110:1,2,3,5,8,17
110:20,22,25
111:1 114:25
118:24 119:2,4
120:22 125:16
128:13 129:9
136:15 166:6,16
166:21 167:8,12
167:17,20,25
168:10,16 170:1
172:6 173:2
174:10,24 177:17
179:1,1,23 180:22
182:24 183:5
210:24 211:10,11
216:24 218:4
236:3 247:2
250:11 254:15
260:25 261:7,16
263:11 264:5
265:5 275:17
277:24 278:6
287:24 288:4
291:3,5 292:4
295:10 297:3
301:23 307:4
316:16,25 321:23
328:2,2,11,22
329:1,3,9 333:20
**higher** 181:7,10
**highlight** 168:16
**highlighted** 276:9
276:22
**highlighting**
262:15
**highlights** 168:7
168:15 276:11
**highly** 235:17
**hire** 35:7 64:12
78:2

**hired** 29:13 83:11
314:18
**hiring** 78:16 79:16
**history** 123:6
203:14
**hit** 160:5 193:17
194:2 202:4,20,23
**hitting** 224:11
**hold** 248:16
254:17 261:20
289:13 318:19
**hole** 61:2,4
**home** 32:7 48:12
164:2 243:10
268:1,5,10 289:2
**honest** 128:5
216:20
**hoops** 275:3
**hope** 102:2 119:23
137:24 243:9
**hopefully** 114:9
117:13
**horrendous**
198:13
**hotel** 224:2 225:24
305:4,19 321:4
322:18,24 335:15
336:4
**hotels** 222:10
225:19 320:23
321:1,2
**hour** 142:23
259:15
**hours** 94:17
259:13 260:7
**house** 247:25
**houston** 289:14,15
**howard** 61:14
245:6 248:18,19
249:1,19 250:4,21
251:5,23 252:5,11

252:19 253:3,4,10
253:21 254:2
256:13,18 257:5
257:12 259:7,20
**howard's** 249:6
253:13
**howser** 246:13
247:1,17
**hs** 166:14
**hubert** 165:11,12
**huell** 287:16,18,22
288:3 289:1
331:17,23
**huh** 156:3 160:2
170:19 202:17
232:18 250:23
265:9 277:3
**hulio** 122:2,14
123:12,13 127:23
128:8 134:4
161:17 200:6
**hulio's** 201:4
**hundred** 66:24
334:10
**hundreds** 20:7,10
319:24
**hunt** 276:17
**hurt** 241:25 242:2
242:9,10,20,25
243:3,4,7 244:12
244:13,15,24
245:3,5 249:20,24
250:1,15 253:9
254:6 256:25,25
257:16 258:5,23

**i**

**idea** 50:6 207:21
318:6 319:14
**ideally** 139:11
**ideas** 49:8

**identification**
337:4,6,9,11,13,15
337:17,19,21,24
338:1,3,5,7,9,11
338:13,15,17,19
338:21,23,25
339:3,5,7,9,11,13
339:15,17,19,21
339:23,25 340:2,4
340:6,8,10,12,15
340:18
**identify** 45:8
48:21 52:22 59:13
137:20 179:15,22
**identifying** 42:22
43:6 44:22 45:4
45:13 46:6,25
48:19 51:1,2
**ii** 1:3 2:3 4:6,19
6:21
**image** 269:22
271:14 282:10
283:11 294:16,21
338:24 340:5
344:18 345:24
**imagine** 48:15
64:15 104:9
170:24
**immanuel** 290:23
296:25
**impact** 184:11
185:22
**impactful** 180:19
**imperative** 208:13
209:1
**importance**
180:21
**important** 8:2,15
59:21 140:7 168:8
168:14 238:4
259:10

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

inaccurate 27:17
inappropriate
  22:25
inclined 289:3
include 36:15 75:8
  132:16 135:12
  141:9 167:2 169:8
  210:21 284:18
  336:12,15
included 42:21
  43:5,20 223:25
  295:21 305:8
including 14:16
  36:2 52:14 53:5
  58:23 108:7
  121:16 125:20
  130:24 213:6
  237:16
income 30:21
incoming 246:10
incorrect 94:11
  304:8
increase 116:22
increased 182:4
  335:16
incur 74:16 89:11
  89:14 225:11,12
  225:15 228:5
incurred 90:14
  222:9,16 224:13
  225:7 228:1,8
  335:17
index 3:25
indiana 124:11
  125:1,3,5,18,20
  218:25 219:3
  270:13
indicate 271:3
indicated 148:17
indication 213:24

indirectly 306:1
  306:13
individual 42:23
  43:7 44:23 45:3
  53:2 238:22 239:1
  239:7 241:25
  285:4 320:21
  321:2,22 325:2
  336:9
individuals 11:11
  127:24 156:12
  162:6
industry 21:4,5
  39:14 50:1,2,4
  52:8 59:15 123:24
  236:24
influence 10:20
influential 126:2,3
  129:15
info 217:9 253:24
  305:3
information 84:25
  88:23 111:12
  135:13 141:10,20
  182:18 186:9
  198:22 230:18
  236:6,10,17 237:5
  237:9,10,12,15,22
  238:9,12 252:14
  326:1 327:12
initiate 174:8
injecting 88:22
input 53:18 181:6
  188:23
inroads 180:22
ins 124:16
insiders 59:15
  124:10,23 215:8
instance 154:7
  259:21 302:24
  323:6

instances 10:5
  47:8,8 328:24
instruct 150:13
  151:22
instructed 172:12
instructing 151:16
instruction 151:25
  173:12,16,20
instructions 173:9
  224:18
integrated 162:3
  164:20 167:3
intelligence
  182:14,19 241:9
  241:12
intended 140:22
interact 292:20
interacted 113:2,4
  132:5,6 133:10
  292:22 317:3
  328:5
interacting 328:2
interaction 219:22
  315:8,9,9 316:11
  316:20
interactions 124:6
  130:4,8 170:18
  171:1,4,7 172:5
  176:2 316:16,24
  328:9
interest 61:16,17
  113:19 150:2,4
  251:2 275:20
interested 48:5
  113:22 139:12
  176:23 236:25
  249:18 250:20
  252:4,10 254:18
  255:16 327:23
  341:11

interference 38:15
  197:6
intern 64:13
  314:19
internal 217:8
  221:6
internally 51:16
  221:2
international 15:4
  19:6 308:20 309:8
  311:6 313:4,10
interned 15:4
internet 51:23
  139:23 197:6
  238:14
internship 64:8,11
  116:3
interpret 190:11
  191:3
interpreting
  300:23
interrupt 140:19
interruption
  139:23 238:14
interview 80:10
interviewed 80:7
  80:13 86:5,8,11,14
interviews 80:18
intimate 301:20
intimately 50:23
  317:16
intrigued 246:14
introduce 35:6,12
  35:13 40:4 46:8
introduced 6:20
  48:1
introducing 35:19
  37:2
introduction
  21:16 47:6

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[introductions - june]

Page 28

**introductions**
21:11,12 332:9
**investigation**
12:16 86:1,4
**invitational**
318:12
**invite** 57:15,17
**invited** 56:18
57:19 318:11
**invoice** 223:5,25
225:1 227:3,11
228:4,16 229:14
230:3,14 308:5,15
308:25 309:7,9,11
309:14,19 310:7,9
311:3,6,14,21
313:2 322:24
323:8,11 325:7,15
335:15,20 339:5
340:14,17 344:23
346:7,9
**invoiced** 309:10
310:4
**invoices** 223:10,12
225:2 230:16,20
230:23 307:24
309:4,25 313:9,13
323:2,18,19,25
324:23 325:2,6
334:25 335:5,9,10
335:13
**invoicing** 335:22
**involved** 16:22
30:8 41:4 94:5
111:2 129:8
132:18,20 133:4,6
133:13,16,22
134:17 176:10
181:8 220:2,6,7
235:19,24 236:5
317:17 330:5

**333:24 335:20
involvement**
134:19 235:8
**issue** 81:19 91:23
151:1 298:4,6
**issues** 11:22 81:15
100:13,18 137:21
280:16 323:24
324:3,11,17,20
**item** 226:1
**items** 247:23

**j**

**j** 101:5 242:17
248:23 264:21
274:16 294:7
299:15 301:7
304:1
**jackson** 119:17
120:5,8 225:23
226:11,13,14,15
226:18 272:18,19
273:6,12 275:2,14
277:2,13,15 278:2
279:7,9,14,16
281:9 282:12,21
285:25 330:24
331:6,7,14
**jackson's** 226:14
273:15 284:6
**jaedon** 289:18,19
289:22,23,25
**jamal** 298:18,20
298:21 299:4,4,7
299:19,22 300:2,9
300:22
**james** 1:6 2:16 5:2
**jamie** 126:15,19
126:21
**jan** 78:25 79:1,16
**january** 66:11,12
121:10 183:21

**184:1 191:14,17
204:2,23 205:1,15
205:19 206:23
208:23 246:9
311:25
**jarrett** 165:4,5
196:21
**javonte** 198:9,10
**jaylin** 224:1
**jeff** 162:12,18
**jen** 302:1,20,22
**jennings** 239:20
**jensen** 84:16 85:10
89:12 90:15
**jerrance** 243:20
244:16,18,21,24
245:2 248:18,19
249:1,5 250:4,6
251:12 257:12
**jerrance's** 250:17
**jess** 5:9
**jessica** 3:10
**jet** 283:18
**jfa** 1:5 4:8
**jgooding** 3:13
**jill** 68:3,4 69:3,5
161:17,18,19,22
**jim** 111:4 112:18
112:19 113:4,6,8
113:12 114:2,6
117:15 118:1,3,3,3
118:10,16,18
127:12 134:14
140:5 145:1
154:17 163:1
208:17 209:24
214:15 215:20
223:1,9 239:17
308:18 309:23
313:4

**jim's** 113:13
114:10
**jimmy** 223:24
301:17
**job** 16:17 35:6,25
36:22 37:6,8
46:25 63:22
141:18 142:8,10
183:10 245:8
252:14 263:4
269:2,4 278:20,25
315:17,21,25
**jobs** 15:17 35:11
37:1 94:18,19
**joey** 246:13,19
247:1,13,17
**john** 147:10
239:14,14,21
274:5,21 275:10
275:13
**join** 40:18
**joined** 18:2 40:25
66:17
**jones** 217:15,16,19
**jordan** 56:20 57:2
**jpeg** 271:13,14
**jr** 329:20 330:5
342:25 343:25
344:25 345:25
**jr.'s** 329:20
**judge** 240:24
**judgement** 257:13
**judgment** 240:23
240:25
**july** 258:11 294:5
**jumble** 31:13
**jump** 276:12
**june** 17:9,15
249:10 258:7,10
259:11 277:4
278:8 311:25

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[junior - knows]**

Page 29

junior 132:9,11
144:25 310:11
jury 38:13 100:9
108:18 114:15
132:8 145:19,24
145:25 146:6,8,10
146:13,18,20,23
justify 209:6
jv 223:25

**k**

k 101:11 131:10
155:5 193:23
kansas 124:11,25
125:3,4,13,18,20
177:5,21 234:18
234:19,23,24
235:25 236:2,4
240:4,5,6 243:13
244:1,12,17,19
246:14 248:20
254:5 255:18
karen 288:23
289:7,9,10
keen 45:14
keep 143:4 239:19
244:4 260:5
305:13,16 324:22
keith 83:22
kentucky 177:5,21
177:22 178:1
239:17
kenya 265:21
key 53:5 54:25
124:10,22 136:23
165:16,25 208:16
209:23 221:6
238:4 288:16
kid 61:13 118:2,18
139:8 147:10
173:6 238:1,1,10
266:11 294:17

295:5 297:6,8,18
kids 40:1,2 56:6
115:12 118:5,20
175:2 182:25
236:3 237:24
254:25 255:20
262:15 267:4
295:10,14 297:10
327:15,21
kind 31:13 48:22
61:15 161:9,11
168:12 176:4
180:12 256:6
291:4,6 293:6
295:11 323:18
324:3
kiss 277:11
knew 172:20
know 7:23 8:15,18
9:6,18 12:6 15:25
19:18 20:19 21:7
22:5 34:9 35:4
36:12 38:3,4,6,6,7
38:21,23 42:7
45:22,25 46:3,11
46:24 47:3 48:2,3
48:12 52:4,9,10,24
54:7,9,20 61:13
67:16,21 69:1
73:5 76:3 81:11
89:3,21 90:13
91:7,9 95:16
96:25 101:19,22
104:9 105:13
106:19,25 107:1,3
107:6,10 108:9,11
109:16,24 111:3
112:15,19 114:2
116:6,10 121:6
124:15,17,19
126:7,11,19 129:1

130:13 134:24
135:22 137:22
140:20 141:4,4,17
142:2 143:2,3
144:17 145:7,12
150:6,21 152:18
154:16,23,25
155:18 156:16,23
157:2 158:1,7,13
158:24 161:7
162:9,13 163:3,8
167:21 169:5,18
170:5,25 171:8,13
174:4,13,21,25
175:17 176:12,16
177:7,8 178:23
180:5,15 181:14
181:16 182:21,24
185:4,18 186:14
189:8 190:8 191:5
191:11 194:6,13
196:18,22 201:10
205:8 206:16
208:9 216:17,21
217:13,19,21
218:6 219:10,21
220:1,2,10,11
221:8,10,16,20
222:3 226:25
228:23,24,25,25
230:22 232:10
233:9 235:11,14
236:13,17,22,23
237:1,3 238:4,6,11
238:21 240:6,8,12
241:16,24 243:11
244:19 246:14,23
247:5,11 250:9
251:1,4,7,10,24
252:3 254:20,24
255:25 256:3

258:17,19 259:4
260:3 262:17,22
262:23,25 263:15
264:4 267:6
268:20 269:4,5
274:11 278:14
282:8,23 283:14
286:5,19,23 287:1
287:15,16,20,21
289:6,12 291:5
292:3,4,6 295:4
296:8,12 297:15
298:18 299:11
300:13,18,22
301:21 302:4,5,9
302:18 303:17
305:20 311:11
314:21 315:25
316:12 317:2,13
318:17,20 319:3,3
321:1,1,6,10
322:11,13 326:8
327:3,8 328:17,21
330:8
knowing 163:16
196:2 330:8
knowledge 39:12
86:4 157:9 235:15
236:7 240:10
263:6 286:21
305:22,24 307:3
317:19 325:12
328:8 329:23
known 47:5 52:6
109:18,20,21
112:22 239:15
knows 236:13
256:20 257:6,12
259:20,20 300:11

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[l - lists]**

Page 30

**l**

**l** 1:18 3:10 101:12
121:12 162:13
232:14 265:7
341:3,21
**label** 269:25
339:21 345:14
**labeled** 204:7
**lack** 181:11
**ladies** 38:12
**lag** 280:18
**landscape** 263:7
**langford** 217:22
217:25 218:3,6,11
218:23 220:7,8
264:20 265:1,4,17
266:12,24 267:16
268:21 270:12,24
**langford's** 264:23
**large** 178:7 211:16
230:20 319:4
324:18 334:20
341:5
**largest** 318:15
**las** 318:22
**lastly** 205:6
**lately** 73:4
**law** 1:14 2:4 3:10
3:16 5:9 12:7,8
74:24 86:11,14,18
92:4 332:10
**lawgroup.com** 2:7
**lawrence** 246:16
**lawyer** 74:16
151:5
**lawyers** 75:2,4,17
75:17 78:2,5 82:2
82:3 89:4,8 90:21
91:18,25 142:25
**lead** 114:9 124:11
124:25

**leaders** 147:17,19
**leadership** 147:17
161:11,13 180:25
**leaf** 234:1,8,9
235:8,11,14
**leaf's** 235:19
**league** 19:5
**leagues** 19:11 57:7
**learn** 306:4,8
**learned** 88:18
**leave** 27:1 95:2
281:23
**leaves** 211:16
283:6
**leaving** 17:10
65:13 94:20,21
95:9
**led** 263:8
**ledee** 289:18,22,23
289:25
**left** 17:15,23 65:9
70:6 186:18
205:11 232:6,14
308:8
**leg** 252:9
**legal** 84:14 89:12
89:14,16,18 90:7
90:11,14,17 93:1
332:14
**level** 22:2 35:1
61:17 125:16,17
136:22 137:16,18
176:22 177:1,2,6,9
177:17 181:6
213:14 215:4
230:10 264:5,6
297:6,8 327:24
**levine** 2:11 4:23,24
6:5 75:5,22 76:10
80:20 81:1,4
83:17,20 84:5,20

85:5 88:17 89:1,9
91:8,11 92:10
142:20 143:13
149:7,14,16,23
150:14 151:2,5,10
151:21 152:2
185:7 212:2,7
276:12 280:3
301:2 303:12,14
306:6 307:13,18
312:13,23 313:15
314:3 326:23
330:13 336:22
**liaison** 56:4
124:11,25 125:4
**life** 68:5 76:19
86:6,9,13
**lightning** 110:10
**limited** 124:7
126:8 248:1 326:6
**limits** 225:17
**lindholm** 3:4 5:4,5
6:8 313:23 314:12
314:14 333:22
334:24 342:9
**line** 39:10 75:23
97:4 131:9,11
155:20 156:4,14
157:11 178:12
184:15 185:13
188:16 193:9
199:22 200:10
204:21 205:18,20
207:9,11 208:19
211:18,21 212:12
213:13 215:4
216:23 217:22
224:4,4,5,5 225:22
226:1 232:8,20,21
234:7 241:15,19
245:19 248:22

249:10 256:11
264:18 275:25
276:8 279:2 281:7
282:17 293:16,19
294:5 299:13
301:1,4 342:3,21
**lines** 122:16
234:21 241:23
271:11 327:11
**link** 147:21 262:16
262:17 263:21
**linkedin** 16:6,7
17:19,25 26:15
27:14,22 30:10
41:24 42:11,12
52:16 54:22 58:21
71:24 72:6
**lips** 277:12
**list** 49:22 50:10,13
50:16 80:15 128:4
164:19 180:6
187:17 188:24
190:13 194:20
196:5 199:13
200:24 201:4,16
202:4,19,20,23
215:13 239:9
262:19 263:11
**listed** 42:13 58:5
165:21 166:22
167:2 184:9,13
186:21 187:13,13
198:8 200:10
204:13 207:3
213:6,8 216:8
227:7 233:12
276:23 311:15
**listen** 104:9 151:6
**lists** 100:22 101:5
189:11 199:7
214:24

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**litigation** 150:5 332:13
**little** 10:22 14:20 18:15 19:12 27:21 34:19 42:25 47:21 48:20 52:20 53:15 137:5 147:21 161:18 183:1 214:1 223:18 233:21 243:11,14 246:17 252:15 253:19 254:1,19 272:17 276:17 277:11 282:16 300:25 322:3 323:9 324:2
**live** 79:7,13 157:5
**lives** 126:14
**living** 273:23
**llc** 2:4,17 27:25 28:1,15 227:8 229:12,15
**llp** 2:10
**load** 145:18 185:7
**loaded** 264:8 269:11
**local** 9:13 10:1
**located** 4:10 5:23 5:25 17:3,5 31:8 163:24 287:7 296:17
**location** 1:14
**locations** 318:21
**logistics** 157:7 284:3
**logos** 181:19,20
**lol** 198:2 281:12 281:23
**long** 14:9 18:15,17 30:12 98:19,25 103:25 109:21

112:22 140:9 141:2,5 224:18 238:13 239:9 275:6 282:2 322:13 323:19 324:5,9,9
**longer** 143:5
**look** 14:18 16:4 41:23 45:15 49:4 50:4,9,11,14,16 51:9,15 66:7 96:3 96:5,8,21 120:20 121:4 127:9 130:11 143:17 144:6 157:24 159:10,13 162:4 165:19,22 168:17 185:14 187:24 194:12 196:3 200:1,16 201:9 202:19 203:24 212:20 215:22 217:24 218:19 220:21 222:19 225:4,21 226:24 231:18 232:2 234:14 241:5,13 245:9,13 252:24 260:11 267:5 271:22,24 287:25 301:7 312:19
**looked** 102:4 184:20 192:20 195:23 264:14 308:25 312:15 336:2
**looking** 17:19 18:24 22:1 26:5 26:14 66:6 71:5 96:22 103:16 104:24 106:21

121:13 161:4 175:3 195:22 215:3 228:14 238:7 250:8 257:21 258:17 263:18 271:15 281:25 298:13 310:21 312:24 313:1 318:18 327:20
**looks** 70:5 152:22 193:15 195:3 223:17 227:6 233:6,10 256:17 267:15,19 268:4 270:20 308:5 316:1
**loose** 38:21
**los** 126:12
**lot** 7:16 30:8 49:3 56:6 132:6 145:9 147:2 167:8,11 186:3 205:2 240:20 261:6 263:8 283:14 293:4 307:8,19 314:15 333:23 336:2,3
**lottery** 51:11 115:7 178:8,16,23
**loud** 145:17,24 146:1,6,13,16,18
**louisville** 177:21 177:21,22,23,24 330:6
**love** 46:9 139:16 256:20 281:22 300:6
**lovin** 3:21 5:11,11
**loving** 61:14

**lower** 27:21 177:6
**lunch** 9:2 143:2,9 148:1,6,11 236:14
**lundholm** 332:1

## m

**m** 154:23
**ma** 1:16 3:18
**mad** 154:15 155:1
**madam** 39:6
**maddie** 165:1,2
**madison** 145:2,4 155:3 163:1
**madness** 115:19 117:20
**magic** 126:13 180:4
**magically** 281:20 285:2,3
**mail** 230:2 265:11 309:6
**main** 127:4 130:12 142:17 183:17 318:22
**maintain** 52:23 174:8,22
**major** 121:20 123:1 244:3
**majority** 55:23 160:14 292:10
**making** 66:19 114:24 120:15 156:18 176:24 179:1 180:19 231:23 306:18,22 329:19,25
**man** 244:7 252:17 253:3,18,21 300:8
**manage** 30:3 52:20 53:10 64:3 64:4

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[managed - meet]

Page 32

managed 52:13
58:22 59:4
management
15:11,13 30:1
58:24,24 156:25
158:21 310:11,14
310:15,19 311:4,7
manager 42:4,9
managing 52:19
132:20 315:20
316:4 318:1
333:25
mani 193:24
mann 165:4,5
march 1:12 4:3
115:18,19,20
117:20 213:2
267:10 341:14
mark 34:6,8 95:14
163:3 305:5,5,6
marked 142:18
188:2 337:4,6,8,11
337:13,15,17,19
337:21,23 338:1,3
338:5,7,9,11,13,15
338:17,19,21,23
338:25 339:2,5,7,9
339:11,13,15,17
339:19,21,23,25
340:2,4,6,8,10,12
340:14,17
market 39:25
147:16
marketable 59:17
marketing 15:6
17:1 18:7 29:16
29:17 42:4,9 70:8
132:12,25 145:6,8
145:10 162:11,19
163:16 167:3
308:20

marquette 247:6,9
mass 230:1
massachusetts
4:11 5:23 12:3
15:3 17:6 31:15
33:17 79:8 110:6
121:19 125:14
164:1,3 227:5
309:2 311:16
master 231:19
232:5,9 248:14
264:13 275:24
276:4
materials 87:23
88:3
mathematical
326:9
matt 256:19,24
matter 4:5 85:4,8
92:8,20 115:17
149:17 150:5,17
200:13,15 238:5
283:20
matters 84:14
147:9
matthew 79:12,13
79:15 242:2,9,10
243:14,18 244:8
245:3,5 249:20,24
250:15 253:9
254:5 256:25
257:15 258:5,23
matthew's 242:5
maybee 198:2
mccoy 197:4,11,11
mcdonald's 53:5
55:1,10,12,15,21
55:25 56:5,11,25
291:10
mcguire 70:7
181:13

mcintire 83:23
mcleod 2:4,7
meal 225:23
226:12
meals 222:10
225:19 226:18
mean 20:25 21:5
25:16 26:10 28:24
35:21 37:5 43:21
44:9,12 47:12
48:11,17 49:1,19
50:9,22 59:8
60:11 61:6 63:1
70:19 75:3 88:4
88:13 91:19,20,20
93:3 104:1,12,15
104:24 106:10,25
107:15 109:4,18
111:19 112:9,22
113:10 115:18
116:6 117:3 118:4
118:19,25 123:6
129:4 135:2 136:4
149:17 160:16
167:11,16 168:8,8
168:24 170:7
171:7 175:22
176:1 177:2,11,13
183:2 185:25
187:1 190:15
191:12 198:18
199:1 200:20,21
203:14 209:12
210:10 212:9
213:20 215:5
219:20 221:3
225:2,20 227:15
228:2,12 229:17
230:13 234:25
236:1,9,11 237:5
238:17,21,24

241:3,8 247:21,25
255:3,23 258:7,16
258:18 259:4,5
260:9 268:8,23
269:7 277:22
279:17 285:3,10
291:6 297:12
300:21 319:23
321:13 324:19
327:17 335:12,14
meaning 160:11
171:4 300:23
means 26:12 38:1
39:20,22 107:2,17
107:22 108:19,25
111:15,20,25
122:19,22,24
140:25 142:3
165:25 170:8,10
171:1 185:4 190:5
190:24 210:9
221:9,21 251:7
252:9 260:3
meant 108:9,22
111:10 135:21,23
140:18 141:20,22
141:25 152:11
189:17,23,25
190:3,10
media 4:3 76:24
77:3 104:21 126:3
148:4,8 156:25
163:11 192:9
231:9,13 293:5
314:5,9
medication 10:20
meet 47:1 63:12
123:16,17,20
167:18 205:1
218:10 289:25

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[meeting - money]

Page 33

meeting 47:9 82:2
82:7,8,13,15 83:4
110:16 148:21
149:24 150:11
173:21 205:14,21
208:22 273:11,12
273:13 292:12
meetings 82:17
83:7 204:22
205:19 211:6
member 45:18
171:9 172:13
266:15
members 28:15
78:15,19 137:13
207:14,19 208:20
211:21 212:9,14
239:2 291:24
322:18
memorial 15:8
memorialize 61:25
memory 100:13
100:17,19 263:17
278:10 289:17
men's 145:13
mens 145:11
mention 79:4
mentioned 13:17
95:11 173:8
177:20 207:24
239:21 274:5
295:9 317:10
321:6 324:8,13
325:24 327:25
331:16,19 333:18
mentor 45:19
mentors 21:9
merl 123:14,16
merle 1:6
message 101:6,12
101:13 147:8

203:18 231:21
242:15,16 243:8,9
244:11 246:10,21
246:23 249:11
253:13 254:5,7,10
256:12 258:3
264:14 265:7
269:16,19 271:2,5
271:11 274:10
275:1 281:9
282:21 293:22
294:4,6 300:5
301:15,19 302:2
303:24 305:10,17
messages 14:4,7
14:17 87:20 88:7
88:11,15 95:12
96:22 97:4,9,11
102:14,21 103:13
103:18 104:3,7,11
104:21 105:6
119:21 120:1
169:9 230:25
231:18,19 233:3
248:18 257:21
258:18 264:9
268:25 274:24
276:5 286:2 299:4
336:3 339:7,9,11
339:13,17,19,23
339:25 340:2,4
344:25 345:2,4,6
345:10,12,16,18
345:20,22
messaging 104:21
met 47:14 63:9,14
64:6,10 82:3,24,24
84:3 109:24 110:1
110:19 112:24
123:20,22 170:1
172:7 218:22,23

273:15,18,19
274:1 332:16,18
method 173:23,24
miami 239:18
299:2
michael 79:12,13
79:15
michigan 247:7,9
microscope 159:1
middle 115:18,19
115:20 180:20
195:1 201:17,20
201:22 294:19
midway 232:24
midwest 126:18
mike 163:7,9,10
165:10,12 239:18
military 109:1
miller 147:11
million 52:14
53:14,21 54:5,10
millions 115:8,12
min 252:6
mind 8:1 15:25
20:14,15 143:4
220:13 239:11
271:4 272:3
280:17,18 299:8
mindful 142:24
mine 204:14
minnesota 249:21
252:6
minnessota 250:16
minute 9:1 48:8
62:11 95:15
215:24
minutes 5:19 6:19
33:21 96:20
119:25 168:21
192:2,21 231:4
258:24,25 272:3

313:25 315:17
317:7 321:5
325:18 326:18
335:3
misleading 146:21
missing 294:14
mission 207:10
211:19
missions 188:17
189:9 192:24
193:10 195:16
199:23
misspelled 198:17
misspelling 198:13
mob 154:14,23
mock 50:24,25
51:9,13,15,18,20
51:23 52:1
mohegan 225:22
226:4,5,8
mom 46:13,17,18
173:2 294:17,25
295:11,15 298:3
304:21
moment 11:18
24:18 27:19 121:9
127:14 155:23
165:22 180:11
185:7,14 242:11
313:17
monday 281:24
283:10,24
money 25:21 26:2
54:1 61:10 66:19
67:24 68:2,13
69:9,11,15 71:15
103:4 116:16,18
117:4 119:2,4
127:21 135:14
141:11 288:19,22
306:1,11 307:4

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[money - new]**

Page 34

321:4,18,20
322:17 325:9
332:19,22 333:7,7
334:25 335:21
336:10,11
**monroe** 286:23,24
**monteverde** 202:3
**month** 82:6
115:23 258:8
286:14 323:23
**monthly** 71:9
103:7
**months** 82:9
243:20 324:10
**moore** 216:15,17
216:19
**moran** 3:4 5:6
**morning** 4:2,18,20
4:23 5:1,4,8,11
33:14 243:9
246:18
**morris** 2:6
**mother** 45:19,22
79:2,7,16 101:20
287:11 289:1
**mouse** 95:22
**mouth** 138:8
**move** 7:21,24
31:14 95:21,24
149:2 152:6
155:16 187:20
261:12 333:5
**moved** 31:13,15
**moving** 188:20
272:2
**mss** 98:3
**mullins** 3:3 5:5
**multi** 243:6 261:4
**multiple** 188:21
207:24 315:11
322:11

**munish** 1:6
**murrell** 239:18

**n**

**n** 1:15 3:18 342:1
**naismith** 15:7,8
**name** 4:12 6:20,23
20:9 31:2 34:6
37:6 57:22 74:8
79:3 83:25 98:2
102:5 105:23,25
106:3,4 107:5
121:17 122:5
125:23,24 130:25
149:3 154:19
155:2 156:8,9
161:17 163:13
183:22 184:8
188:8 196:9,12,13
196:18 197:4,15
197:23 198:8,14
199:10 207:5
215:15 216:8,14
216:18 218:1
219:5 227:13
233:12 242:17,18
245:23 246:1,7
248:23 249:1
264:25 267:11,16
270:4 274:17,21
277:1 286:6 287:5
287:18,23 294:8,9
294:11 296:13
299:19,23 301:8
302:4,9 304:1,4,5
308:7,10,13
311:14 314:13
332:8
**named** 20:12
197:20 241:25
317:9 331:17

**names** 12:1,11
13:5 20:14 51:25
52:1 57:23 78:24
79:11 80:9,12
121:15 128:4
131:2,23 144:23
158:19 160:9
162:5 186:19
193:17 194:2,3,7
194:11 196:5
198:11 203:1,4
215:13 264:5
287:4
**napa** 207:10
211:19
**nation** 297:17
**nations** 53:7 57:5
57:12,13,16 133:8
141:3 142:11
172:21 184:11
185:22 191:2
252:1 295:20
297:13 310:11
317:10
**nature** 76:4
265:16
**naz** 198:16
**nazreon** 198:14
**nba** 19:4,5 34:8
50:15,23 51:14,17
58:22 59:3 60:5
64:4 121:19
128:14 132:11,15
132:16,21 169:22
171:22,23 175:4,8
178:9,23 211:13
272:25 316:20
317:3
**nc** 3:6 234:18,23
235:25 236:2,4

**ncaa** 22:17 24:23
25:4,14,19,23,25
58:8 121:19 124:9
126:1 133:1
161:23 169:6
181:18,22 182:10
182:12 328:9
**necessarily** 39:24
230:17
**necessary** 32:14
**neck** 125:14
**need** 9:3,5 30:24
78:9 93:10 96:9
152:5 160:20
188:22 202:2
208:14,15 209:21
229:8 231:2
234:16 241:5
250:21 260:11,19
262:17 277:6
279:19 294:19
**needed** 22:5 336:7
336:8
**needs** 10:3 21:25
233:22 234:3
**negro** 155:5,11
**neither** 341:9
**nelson** 3:3 5:5
**nelsonmullins.c...**
3:7,8
**net** 323:23
**network** 156:22
156:23
**network.com.**
156:15
**never** 27:11 40:20
86:3 107:23 112:1
121:2 147:11,14
155:9 332:21,24
**new** 2:13 12:4,6
79:14 105:3

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[new - official]

Page 35

110:11 129:11,14
147:18,19 181:24
205:7,25 206:2,8
239:20 263:4
265:8 267:21
270:12
news 113:13
nice 224:11,14
nickname 154:18
154:20 158:11,15
nicknames 158:14
193:25
night 281:23,24
283:23 286:13,16
nike 137:23
nine 286:14 319:1
nodding 8:13,18
8:19 151:20
noise 196:11
non 183:9 237:13
237:16 326:11,16
331:11
nonpersonal
101:18
nope 222:1
normal 58:17
225:14 230:6,22
230:22 247:19,22
normally 103:25
north 4:10 270:6
310:11,16
notary 341:4
note 143:22 204:6
noted 32:12
notes 140:7,14
notice 232:4
noticed 8:12
november 72:1,10
72:10 222:23
225:3 226:7
229:21 282:21

nuclear 296:10
number 7:17
13:20,21 14:16
16:22 17:2 29:25
30:5 36:2 37:1
41:1,8 49:12,25
51:23 54:3 56:23
67:4 68:10,15,16
68:18,20,23 80:7
82:25 98:10,11,15
98:17,20 99:3,9,20
99:21 102:3,11
103:22 104:20,22
108:7 125:19,20
129:4 131:1,13
136:5 159:23
166:10 172:16
177:17 179:8
180:4 182:12,19
188:14 190:20
204:14 206:25
207:6 211:16
213:5 223:19
224:14 226:5
227:6 230:20
236:15 241:19
242:6,18,21
243:16 245:15,19
245:20,24 246:1,4
246:6 248:2,17,24
249:2,6 251:24
253:25 256:11
259:13 261:5
264:21,24,25
265:8 267:13,14
267:21 273:7
274:17,20 275:16
276:2,8,23 277:16
277:21 292:7,22
294:8,10 295:25
299:16,22 300:3

301:7 303:12,14
304:2,5 309:15
310:2 311:2,18
318:21 319:4
320:14 321:16,23
329:8 334:20
335:8
numbers 97:5,20
99:6,16 186:25
224:8,11,21 232:5
239:3 241:20
326:15
numerous 55:12
82:19
nurturing 178:8
178:14,22
ny 2:13

**o**

o 121:12 154:23
o'clock 143:6,9
oath 305:23 336:1
object 6:4 76:3
84:24 85:5 146:19
150:10,20 151:6
151:11 332:4
objection 5:20,21
6:6,8,10,12 10:7
24:1 31:18 32:13
91:8 92:10 100:15
146:3,7 151:6,13
191:8 208:1 212:2
212:7 280:3 306:6
307:13,18 312:13
312:23 313:15
326:23 330:13
objections 5:14
6:5 32:16
objective 214:3
objectives 208:16
209:23 210:15,16
210:19 211:23

212:1,6,10 220:22
221:13
obligation 9:25
87:7
obtain 75:4
obviously 61:12
124:20 125:18
137:18 139:16
162:16 171:1
172:23 176:9
177:8 209:5 237:4
238:1,24 239:3
243:4,6 257:25
269:7 284:9
317:16 326:13
occasion 322:10
323:1 324:24
328:13
occasions 277:16
297:18 332:17
occurrence 302:12
october 256:15
281:24 341:25
offer 137:23
253:11 254:5
257:22 259:2,8
260:1,2,4
offered 243:17
253:9 254:3 258:5
258:23 259:14
260:6 263:21
295:24 296:1
336:16
offering 258:15
office 3:16 12:17
88:5 96:15 97:22
163:18,20 164:8,9
164:12
offices 1:14
official 67:16
86:15 341:14

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[officially - original]

Page 36

officially 305:12
officials 86:12,18
offline 152:5
oftentimes 175:15
  322:14
oh 214:23 250:17
  277:9
okay 11:23 12:1,6
  12:10 13:9,21
  16:16 18:5 20:16
  21:15,19 23:15
  25:13 26:5,18,23
  27:1,5,10,13,21
  28:1,9 29:6 31:14
  33:12 34:11,22
  35:5 37:5 41:11
  41:15 42:12 43:19
  45:16 48:8,18
  49:10 51:12 54:5
  54:9 55:10,20
  58:4 61:6 62:13
  62:19 63:9,21
  64:6,25 66:19
  68:6 70:6,17 71:3
  71:24 73:9,13,17
  74:12,16 75:19
  76:7 77:9,14,20,23
  78:18 80:5 81:9
  82:10 83:22 84:1
  85:12,25 86:20,23
  87:1,16 88:2
  90:13 94:7,21
  98:4 99:5 102:23
  106:15 111:23
  114:5 115:4
  119:14 121:9
  127:8,17,25 128:4
  128:19 130:18
  133:18 134:2
  136:17 138:7
  143:18,21 150:12

150:23 151:19
152:4,20 153:10
154:4,7 155:19,25
156:1 159:22
160:11 161:16
163:12 165:19,23
166:14 167:12
178:5 180:9,12,14
180:17 183:19
185:17,21 187:8
187:12,25 188:8
188:19 190:12
192:16 194:16
195:1,15 196:3
199:7 200:2,16
202:18 203:20,25
204:12 206:19
209:11,20 210:14
210:20,24 212:20
213:2,5,16 215:24
216:2 220:11,19
221:12,24 222:4
223:14 227:2
233:1 235:7 239:5
243:2,10 244:9
245:17,22 246:5
246:20 247:10,21
248:16,22 250:3
250:24 252:15
253:1 254:9
256:14,16 259:3
261:22 264:1,12
264:16 269:14
271:9,20 274:12
276:18 277:4
279:1,23 282:19
284:13 288:2
289:6 290:23
292:9 293:7,14,21
293:22 294:4
296:12 299:14

301:4,14 303:2,23
304:7,15,25
305:21 307:21
308:25 309:12
310:10 311:3
old 173:5,6 187:4
  239:16
olivia 217:7
  293:23,23,24
  294:11 306:17
once 59:10 138:9
  138:13 164:17
  284:12 290:16
  298:11 322:15
  323:21
ones 11:13 30:6
  50:5 52:10 178:19
  240:8 265:12
ongoing 91:17,20
online 49:4,22
open 15:25 62:6
  127:7 183:18
  184:18,21 191:24
  192:12 218:17
  232:1 261:18
  264:7 269:11
  307:25 318:13
opened 185:8
  203:25
operating 159:25
  173:23
operation 173:24
operations 18:10
  18:22 33:21 37:7
  37:13
operator 161:22
  161:24
opinion 111:21,22
  116:22 118:9,10
  122:20 126:24
  127:1 327:23

329:10
opportunities
  15:15 19:2,4 23:3
  51:9
opportunity 17:11
  17:13 27:4 33:9
  77:7 95:10 126:4
opposed 84:21
  194:8 213:25
  223:5 227:12
  284:18 326:12
ops 108:15,19,25
  109:4,9,14 111:9
  111:11,15,18,20
  111:25 112:2
  128:23 129:2,3
  131:10 135:12
  141:9,14,19,22
  142:4,14 207:9
  211:19
options 294:17
order 48:21 52:25
  168:12 180:24
  229:8 234:17
  298:14
oregon 82:11
  163:21 164:14
  191:17 205:14
  270:6,16
org 160:1
organization
  58:25
organizations
  218:13
organized 59:5
orient 232:3
original 152:24
  153:17 201:14
  220:14 243:21
  244:22,23

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

originally 258:6
273:21
ornstil 145:2,4
163:2
outs 124:16
outset 142:22
outside 94:1
101:23 113:10
129:13,22 162:17
198:13 208:5
243:21 244:21
250:9 260:17
outsiders 172:15
outsource 31:1
outsourced 320:8
outstanding
121:20 123:2
outworked 147:14
overall 317:20
319:17
overbearing
253:19 254:20
overlapped 161:12
overnight 283:18
oversaw 53:16
54:18
overseas 58:25
59:5 328:14,18
overseeing 316:7
oversight 52:14
53:13
overview 185:19
216:24 337:23
343:17
owed 266:18

**p**

p.m. 77:4 81:20,23
148:5,9 192:6,10
231:10,14 239:24
256:17 260:8
272:7,10 277:5

280:21,24 314:6
314:10 336:25
340:19
padded 335:10
336:3
padding 335:12
page 16:12 39:10
67:6 69:23,25
70:2 96:17,23
127:19,23 128:16
140:11 159:22,23
159:25 160:9
165:15 174:3,3
180:10 220:21
232:7 248:14
256:10,11 276:1,2
276:3,7,13 279:2
281:5 282:17
283:17 293:16,18
299:8 301:2
303:12,14 342:3
342:21
pages 96:4,5 97:1
102:13 104:23
105:10 119:24
159:16
paid 35:15 40:6
67:11 70:23 71:8
71:10 89:19,21
119:7,10,12 220:8
279:13 288:21
306:11 310:14,18
312:3,10,12
322:23 323:25
324:5,9
pair 266:3,6,18,21
267:3 270:23
271:1 278:16
palmer 126:15,19
pangos 56:21

papers 72:19,20
paragraph 66:7
67:6 128:16
135:10,10 140:3
paraphrasing
173:9
parcel 254:22
parent 21:14
171:8,9 172:19
173:14
parentheses
196:23
parents 21:9 47:1
47:5,9,15 78:22
122:15,22 123:7
123:11 173:10
211:10 254:24
273:12 284:12
291:18 295:5,21
295:22,23 305:4
305:13,18
park 12:2,13,14
13:9 74:9,17,21
75:20 76:18 77:15
81:12 84:16 85:10
89:12 90:15 91:5
92:3
part 29:11,12
36:13 40:11 43:22
43:22 64:9 86:3
139:7,17 142:14
167:16,19 176:2
178:20 182:17,20
183:10 193:20
221:6 248:5
254:22 266:16
278:20,24 295:11
297:13,14 319:5
319:25
participants 101:6
242:21 246:7

248:22 264:20
267:11 274:16
276:22
participate 335:1
participated
266:20
participating
292:18
particular 20:1
95:6 101:6 116:16
116:21 118:2,18
130:7 138:1
149:25 150:19
161:7 176:20,23
224:13 226:1
228:14 231:21
232:6 240:19
241:10 259:21
276:5 292:25
297:17 302:14
329:15,22 330:2
parties 6:1 88:12
176:9
party 5:21 341:10
paschal 3:11 332:4
332:7,8 333:10
342:11
pass 238:9 251:24
251:25
path 53:7 57:5
266:15,16,21
295:22,25,25
296:4 297:14,17
300:6
patricia 1:18
341:3,21
patrol 105:22,24
106:1,11,16,22,23
107:1,4,5,11,13,17
107:19,22,24
108:1,9,11 121:11

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

128:23 129:2,4
131:10 147:1
152:11 154:14
158:5 188:17
189:8 191:5
192:23 193:10
195:16,25 196:2
199:22 202:3,20
202:23 204:22
205:19,22 207:14
207:18,19,23
208:7,20 211:21
211:25 212:4,9,14
214:19 215:11
217:2 337:11
343:4
**patty** 4:14 143:24
**paul** 3:21 5:11
70:11 84:1,3
**pay** 30:19,20
89:18 103:2,4
120:7,11 138:4
181:11 279:15,17
281:11 294:24
295:2 296:2 322:8
322:15,16 325:10
330:10,18 331:22
**payable** 229:25
**paying** 71:14 90:7
90:11 120:4 279:8
279:18 288:8
305:25 307:4
329:13 333:7
**payment** 69:15
71:12 335:11
**payments** 111:12
114:24 120:15
306:17,22 310:1
329:19,25
**pdf** 15:25

**peck** 276:17
**pedi** 193:24
**peg** 61:1,3
**pendelton** 68:5
161:17
**pending** 9:16
341:10
**pendleton** 68:3
69:3,5
**pendleton's**
161:20
**people** 23:20 36:2
37:18,21 43:17
45:21 49:1,3,7
50:2 51:23 52:9
53:17 61:12 99:23
99:24 101:8
102:21 103:19,22
104:12 106:8
107:25 108:7
125:2 133:21
134:12,21 154:19
160:3,5 162:16
166:22,24 179:25
180:5 204:16
210:18,20,23
211:6,16 213:5
214:4,5,7 256:23
257:2 260:18
261:6 275:6 296:5
305:7 309:10,13
309:16,24 310:3,3
318:18,24 320:8
332:9
**perception** 181:25
221:17
**perfect** 283:19,25
**perfectly** 9:5
**performed** 157:3
**period** 12:18
42:16 58:8 75:10

83:5 84:8,12
86:16 113:7
128:11 161:23
167:9 174:20
181:4 251:15
258:8 273:24
278:2,8 282:13
304:12 313:9
321:3
**periodically** 9:20
222:14
**periods** 258:11
**permissible**
224:12
**perpetuity** 91:22
**person** 59:17
119:16 137:20
160:25 168:12
169:7 170:6
212:12 223:9
258:13 260:12,12
280:5 285:4 294:1
317:23
**person's** 118:10
**personal** 11:23
24:9,11 72:16,17
73:3 80:22 99:24
102:8,21,24
148:18 154:1
168:5 176:15
213:23,25 227:13
229:4 268:25
269:7 305:22,24
**personally** 35:19
75:18 76:2 89:19
167:8 218:7 263:1
284:20 321:11,25
**perspective**
223:10 240:22
241:3

**perspectives** 114:7
**persuasion** 189:2
190:1,5,10 194:23
199:16 201:1
**pertains** 243:13
269:9
**pestering** 244:5
**phil** 3:19 81:14
**phil's** 151:21
**philip** 3:16,17 4:21
151:13
**phillip** 1:15
**phone** 98:6,20
99:2,5,8,9,12,16
99:20,21,23,24
100:1,10,12 102:3
102:5,8,24,25
103:2,5,7,7,14
104:20 105:7
147:7 223:19
227:6 233:7 241:4
241:15 242:18,21
243:19 245:24,25
246:1,6 249:6
260:11 267:13,14
267:21 311:18
332:22,25
**photograph**
269:17,20
**photographs**
269:18
**phrase** 171:3
202:23 221:4,8
**physical** 164:8
**physically** 5:23,24
17:3 163:23
**pick** 51:11 152:4
169:12,21
**picked** 241:4
**pickens** 2:19

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[picks - please]**

Page 39

picks 178:9,16,23
179:2
pictured 178:10
piece 44:6 59:9
125:11
pin 321:23
pioneer 110:10
pitch 21:17,21
59:12,14 60:10
pitches 60:7 61:7
place 19:1 23:6
52:25 56:9 58:14
60:9,12 125:18
135:6 151:21
placed 293:6
placing 22:3
plaintiff 1:4,17 2:3
4:5,19 6:22
plaintiff's 337:3,5
337:7,10,12,14,16
337:18,20,22,25
338:2,4,6,8,10,12
338:14,16,18,20
338:22,24 339:1,4
339:6,8,10,12,14
339:16,18,20,22
339:24 340:1,3,5,7
340:9,11,13,16
plan 52:25 94:24
191:13
plane 279:20,24
280:2,7 282:12
283:12 284:5
285:6,9,15,15
287:10 293:9
336:12
planning 95:2
platform 43:22
57:10 95:15,21
181:22 184:25

platforms 121:22
123:3
play 18:24 22:1
30:12 56:19 57:16
110:3,5,7,11
115:13 116:21
176:22 177:1,3
191:1 242:12
273:2 286:9
318:14 332:19
played 56:10
110:9 198:6
218:12 219:10
243:16 247:3
272:21,22 289:23
297:4 333:19,21
334:4
player 20:12 21:16
26:2 34:8 45:25
46:9,12,17,19
48:16 56:3 61:8
110:17,20,23
116:21 118:24
119:3,5,8 137:2,17
138:13 139:11,22
141:3 168:5,18,21
170:18 171:3
172:5 177:4,6
184:11 185:22
186:6,9 190:15,25
211:14 218:5
234:9 241:6
242:11 247:2
254:16 255:14
259:22 265:5
266:12 272:20
278:15,23,23
286:8 289:23
291:1,4,6,9 300:19
322:6 327:15,24
329:14,15 331:16

336:16
player's 46:12
47:9 136:25
196:13
players 19:16
20:24 21:3,11,13
22:3,11,18 23:3,22
25:15,17,20 33:23
34:13,18,24 35:19
36:1,3,6,11,14,23
37:11 40:12 41:12
42:23 43:7 44:22
45:3,5,8,13,15,17
46:7 47:1,4 48:10
48:14,20,22 49:6
49:18,21 50:20,21
50:22 52:3 56:10
57:15,18 58:12,19
59:14,22 60:20
61:3 104:6,10,13
104:17 110:12
111:12,13 114:9
114:25 116:5,7,9
116:11,15,25
120:16,17,23
125:17 129:10,12
129:14 132:21
133:23 136:7,8,15
136:15 137:13
138:9,16 142:12
142:14 147:4
167:22 168:4,13
170:1,12,15,15,16
171:1 172:6,7,16
175:8 178:8,10,14
178:15,18,22
179:10,16,23
180:20 182:23
183:5,5,5,8 186:19
188:25 189:12
190:13 191:6

194:21 197:20
198:19 199:8,13
200:24 201:4,7,17
210:12,21,21,24
210:25 211:2,7,10
211:11 235:24
236:1 240:19,20
249:15 253:5,6
258:20 262:20
263:11,19 264:6
266:16 273:12,13
278:13 291:7,24
296:6 300:1,3
316:17,21,25
317:3 318:7,9,10
318:17 320:19,21
320:24 321:2
325:10 328:3,10
328:22 329:1,3
330:11,19
playing 20:20 22:8
22:14 23:4,22
110:2 116:15
125:17 219:8
248:11,11 273:25
274:3 286:20
plays 57:8
pleasant 1:15 3:18
4:11
please 6:23 8:7 9:8
11:4 13:22 14:24
15:25 32:3 33:16
41:7,24 42:25
43:1 45:10 62:7
69:23 79:4 85:6
87:25 89:10 96:21
107:20 108:18
115:15 121:9
127:7,15 131:23
132:8 135:11
141:9 143:17

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[please - probably]**

Page 40

145:17,19,21
151:6 158:24
159:23 165:22
178:6 188:24
191:13,25 192:12
200:1 201:10,11
203:23 205:3,6,24
212:18 215:23
222:2 241:14
245:14,16 248:13
251:23 255:11
261:19 264:11
271:23 279:4
293:20 299:9
301:1 305:14
307:25 327:2
330:16
**plenty** 116:24
325:20
**plimpton** 2:10
4:24 84:7
**plus** 128:7 154:14
158:5 224:2
225:23,24 226:12
226:18
**point** 9:4 19:25
42:20 45:7 46:13
50:12 52:13,15
53:2 58:21 66:5
77:15 86:2,6,9,12
86:24 87:22 91:21
97:1 98:5 110:19
112:11 136:23
137:1,5 143:2
147:3,5,6,9,12,15
147:22 159:18
160:16,24 169:2
170:11,15,21
172:5,25 173:14
174:4 175:10
178:25 186:19

198:24 221:2,25
235:4 237:19
259:10 279:13
291:2 329:9
**points** 7:13 42:13
131:13 140:8,15
141:1 165:16,21
165:25 166:6,10
168:25 175:6
176:2 208:17
209:23 321:13
**policies** 205:8,25
206:2,8
**policy** 224:15
**polls** 177:19
**population** 266:1
**portfolio** 161:10
177:17
**portion** 159:12
**portions** 146:9
**portland** 82:11,13
163:21 164:9,14
191:14,16 205:2
205:13,21 208:13
208:22 270:5,6,10
270:15
**position** 18:8
24:21 25:1 94:20
94:22 136:1
151:23 253:20
**positions** 25:5
**positive** 220:23
221:18 226:23
252:4 302:8
**possession** 72:19
72:21,24
**possibility** 72:8
**possible** 7:22
58:25 185:24
229:2 253:20
255:22 266:1

307:11,16,19
**possibly** 72:8
119:18 120:6,10
120:14 191:1,2
211:8 220:12
230:7 254:19
293:24
**posted** 315:22,23
**posting** 315:25
**potential** 22:19
142:12 177:9
178:15 179:1
255:22
**potentially** 213:22
**pov** 175:10
**power** 159:18
174:4 186:20
**pr** 216:22
**practice** 99:25
172:11,18 233:18
**practices** 103:17
**preexisting** 150:1
**preferred** 104:18
**pregnant** 286:14
**preparation** 11:20
12:21 13:11,19
95:12 106:13
148:16 149:5
151:8 159:20
**prepare** 10:25
11:5
**prepared** 33:12
185:15 205:7,25
**presence** 150:20
**present** 3:20 99:15
116:3 148:20
149:4 288:4,7
**presented** 158:21
**preserving** 150:25
**president** 27:23
30:11 156:21

**pretty** 29:5 45:14
125:15 168:18
169:19 173:23
244:2 259:5
298:15 301:23
**preventing** 10:15
10:17
**previous** 11:22
38:19 166:25
255:7
**previously** 56:6
**primarily** 163:24
**primary** 103:19
103:21 160:16,25
161:2
**prior** 66:12 81:10
81:25 82:6 99:12
123:21 150:2
166:23,24 236:18
323:2,8
**priorities** 174:14
**priority** 174:8,22
**prip** 295:20
**private** 11:4
305:14,16
**privilege** 10:6,7
81:6 91:13,23
92:11 149:20
150:1 151:14
**privileged** 11:14
74:2,7 76:1,5,8,10
76:14,20 84:25
85:11 88:9 89:5
91:22 93:2,3
150:7 312:17
**pro** 35:9 51:16
52:3 60:13 138:9
138:14 139:8
**probably** 7:10
13:23 18:19 19:24
20:7 46:1 47:12

3:18-cv-03118-JFA    Date Filed 03/30/21    Entry Number 202-1    Page 131 of 152

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[probably - put]

Page 41

47:13 57:3 67:3
83:14 103:15
104:11 110:1,19
112:24 113:18
123:22 126:25
153:19 160:4
186:14 197:16
290:21 313:24
317:22,23
probe   150:18
problem   252:24
proceed   5:16
proceedings
332:14
process   15:14
36:14 37:10 48:12
48:18 135:16
136:19 137:15
139:18 150:25
180:21 192:14
230:6 263:25
264:2 298:13
produce   87:7
produced   88:11
88:15 96:11,14
97:21 105:2
producing   87:2
product   67:23
69:14 135:6 165:6
165:8,13 175:11
175:13 180:23
221:17 265:19,20
267:3 277:20,22
277:23 278:12,13
278:14,18 291:22
291:23 296:21
297:1,6,7,9,11,16
298:2,7,11,13,13
products   56:3
67:20 181:24
250:8 291:16

professional   1:18
14:25 17:1,2
18:24 19:1,3,11
20:20 23:2,3,20
25:5 30:23,25
31:3 35:3,8 36:10
41:5 51:8 59:3,23
65:4 66:2 115:9
341:4,22
professionally
83:1,2
profile   16:6,7
17:20,25 18:9
26:15 27:14,22
30:10 42:11,12
52:16 54:23 71:25
72:6
program   44:20
52:23 115:5,6
122:6 124:21
126:13 175:16
176:5 244:3
266:15,16 286:24
286:25 287:1,2
289:10 296:16
297:14 298:5
programs   42:22
43:6,20 44:4,8,13
44:16 52:13,19,21
53:18,20 54:2,21
57:11 116:24
117:2,4,5,18 122:4
124:20 129:9,17
129:19,20,21,25
181:24 182:24
247:4 263:23
289:11 290:9
297:17
prohibited   22:18
project   50:22

projected   51:10
127:21 178:8,23
projecting   51:16
52:2
promising   159:1
pronounces
125:23
proper   311:2
properly   168:19
prosecutors   86:6
86:12,18 88:16
105:3
prospective
237:11
prospects   174:9
174:23 176:3
177:12,13 180:23
274:4
protecting   91:12
150:2
provide   8:8 19:18
29:19,21 80:15
87:13 92:17,19,23
92:24,25 98:5
102:24 157:5
168:14 277:13
290:2 310:15
320:21,25 321:2
provided   25:20
29:24 105:14
118:23 119:9
120:22 230:11
277:15 296:4
312:9 320:23
336:12
provider   55:9
103:9
providing   120:16
182:13 241:9
277:17 285:25
293:9 295:18

329:14
provision   26:2
pstops   295:24
public   165:2
320:13 341:4
published   49:22
pull   95:15 108:20
152:14 187:23
194:13 274:9
293:14
purchase   284:13
285:5,9 331:5
purchased   284:5
290:10 331:10
purchasing   282:12
287:10
purely   231:22
purpose   34:23
35:18 36:4 40:2
51:6 107:13
137:12 138:3
263:13 277:17
325:25 326:1
purposes   7:3 8:15
102:10,11,17,19
131:7 325:24
push   189:1,18
190:14 194:22
199:15 200:25
201:8 260:18
pushing   233:25
234:7
put   29:17 54:5,9
57:14 59:11 60:7
62:5 64:21 72:5
124:3,4 138:7
142:21 167:4
168:18 178:7
183:4 187:21
199:4 211:9 230:3
231:21 255:1

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[put - ready]**

Page 42

putting 305:12,18

**q**

qualify 284:15,17
quarter 71:9
164:17
question 8:5,6 9:8
9:9 10:16 19:13
22:9 23:13 24:3,4
24:6 29:1 31:23
32:3,5,11,14 33:13
34:14 38:20 39:8
39:9 44:9 46:19
46:22 69:18 74:20
80:1 84:17 85:17
88:19,23 89:10
90:9 91:3,16,24
96:23 107:20
108:12 111:16,17
115:15 117:20
122:13 134:8
137:9 138:23
145:22 146:4
150:13 151:5,17
152:9 159:17
174:18 181:14
203:21 208:2
210:6 212:3
227:10,11,24
229:8 230:15
235:5 237:22
251:8 255:8
275:12 305:5,5,6
306:7,15 307:14
309:3 312:25
313:7,16 325:5
326:13 327:1,2
330:16

294:19 304:21,22
304:22 310:6
321:18 324:15
326:2 327:23
questions 7:16,20
7:24 9:16 10:12
59:20 76:4 77:10
91:14 97:3 106:18
119:20 145:23
150:6,22 205:9
313:19,20,24
314:2,3 330:24
332:2,5,12 333:10
333:13 335:2,9
quick 76:22
183:14 259:5,25
261:21 269:13
quickley 290:23
291:15 296:25
quickly 7:24
271:24 323:25
quiet 251:15
quite 52:8 216:20
321:14
quote 114:6
quotes 112:13

**r**

r 1:11 3:15 6:15
337:4 342:5,23
r&r 243:11
raise 239:16
raleigh 280:8
ram 2:5 4:18,19
5:17 6:14,18,21
32:15,21,25 33:7
38:16,24 39:6,16
75:11,13 76:7,22
77:5 80:23 81:2,9
81:14,24 84:23
85:1 88:22 89:6
91:19 92:2 137:8
140:1 143:8,15,24
144:5 146:9,15
147:25 148:10,23
149:1,18 150:12

150:23 151:3,12
151:15,19 185:5
185:10 191:9
192:3,11 197:8
208:3 231:2,6,15
238:16 240:1
255:10 272:11
276:14 280:15
281:1 301:3
303:13,15 311:9
311:10 313:17
330:23 331:16
333:15 336:20
342:7,13
ran 211:13,14,15
219:25 220:1
263:2
random 172:17
173:5 260:9,14
range 9:19 17:18
186:25 187:2,5,9
238:24 334:7
rank 50:20,21
56:24 171:19
214:19
ranked 114:9
170:12 174:9,23
176:3 177:12,18
187:6
ranking 49:5,15
50:18 170:12
186:25 187:1,9,17
215:8
rankings 49:4,8,10
49:14,22 50:1,4,10
179:6,14,14 180:1
180:2 183:15
186:6,8 187:6,10
ranks 171:19
rapport 122:15,21
123:11

rarely 323:5
rashon 262:6,9,22
rasol 163:3
ray 165:7,8
reach 125:17
240:17,18 243:23
247:11,16 250:25
251:12 255:17
278:23 279:19
297:19 329:4,6
reached 93:11
257:15,22 258:6
259:24 328:22
329:2
reaches 278:15
reaching 255:21
275:13,18
reaction 65:21
112:17 114:4,17
114:20,22
read 38:19 39:9
98:13 112:13,16
114:1,3,19 128:25
135:24 140:10
141:13 143:21
145:17,18,19,21
145:24,24,25
146:1,6,13,15,18
146:23 152:7,17
180:13 193:20,22
193:23 202:5
205:10 231:23
233:4 239:10
255:7 274:25
304:15
reading 114:21
147:20 159:14
246:23 250:13
reads 174:7
ready 14:18 205:3
205:4 232:17

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[real - recollection]

Page 43

**real** 76:22 92:21
164:16 183:14
208:15 209:22
210:15,16,18
211:22 261:21
269:13
**realize** 142:21
188:20
**realizes** 275:9
**really** 23:5 54:19
104:24 106:12
118:2,17 122:19
128:5 168:12
176:14 182:22
184:8 186:13
232:20 238:6
241:5 246:14
255:15,15 275:10
275:15 319:22
321:13
**rear** 3:25
**reason** 9:5 85:22
105:9 185:24
191:19 203:3,22
205:17 206:13
223:4,8 224:7
228:15 249:7
253:8 257:4 258:4
258:22 267:24
279:18 282:14
330:9
**reasonable** 54:22
**reasons** 113:20
138:24 139:1
167:24 168:2
**recall** 14:8 17:17
18:14,20 19:23,24
20:1 22:20,21,22
22:23 26:3,8,20,22
30:14,18 31:5
40:10,14 46:16

47:8 49:12 50:8
51:21,22,25 53:25
54:3,12 61:6
62:17 64:14 65:18
65:20,21,22,25
66:4,15 67:21,24
68:1,2,6,9,13,15
68:16,17,20,22
69:6 71:3,23 73:9
77:23 78:7,8,13,14
78:17,20 79:19,21
79:22,24,25 80:1,3
80:11,14,17 82:8
82:10,12,13,15,17
83:7,9,15 86:23
87:1,6,12,24 89:1
90:18,20 97:16
99:13 103:9 108:6
109:8 110:16
119:15 120:9,13
120:15,24 121:3
123:18 130:3
131:16 132:3,18
149:3,9 164:24
173:11,13,19,22
185:23 189:15,16
189:22 190:18
191:16,18 193:12
194:3 202:18,22
202:24 203:4
205:13,16,21
206:5 208:10,21
208:24 218:14,22
218:24 223:7
224:25 225:25
226:2,4,7 228:18
229:6,10 234:2,5
235:6,7 245:2,4
254:7 257:17
266:6,8,14 267:22
273:3,18 279:8,12

279:13 280:7,10
280:14 284:8
285:23,25 286:4
287:10,14 288:3,7
288:8,17 290:4,5
291:15 292:12,16
293:9 296:20,23
297:17,23 299:3,6
301:18 302:23
305:21 306:3,19
306:21,24 307:1,2
307:6,9,10,15,17
307:20 310:8,17
310:18,20 311:8
312:5,7,10,14
313:11 335:2
336:6,14,19
**recalling** 110:18
**recap** 140:5
207:10 208:13
209:2,5 211:19
**receipts** 322:25
**receive** 40:9 66:17
67:15,18 69:2
117:19 128:1
225:18 297:10
**received** 69:4,11
69:15 76:12 86:20
96:13 108:8 134:7
135:23 154:8,10
157:21 159:5
176:16 189:13
191:22 195:20
203:2,7 206:12
214:4 266:17
297:9
**receiving** 68:2
86:23 89:2 131:17
189:5,11 193:12
194:3 246:21

**recess** 33:8 39:3
77:1 81:21 148:6
192:7 231:11
255:6 272:8
280:22 314:7
**recipient** 195:12
209:1 210:8
**recipients** 176:15
188:9 194:4
206:25 212:12
216:9
**recognize** 62:10
62:14,16,18 96:19
97:8 131:19 136:6
156:7 159:17
160:8 162:5
165:19 196:9,13
201:3 245:20
246:6 269:24
270:9 274:18
308:4,6,7
**recognized** 126:16
158:24
**recollection** 17:22
30:1 86:25 100:6
100:11,20 106:10
106:16 109:7
111:14,19,24
119:6 120:4
130:10 141:23
142:6 187:3 190:3
190:23 194:5
196:2 197:3
198:21 202:25
206:1,7 207:17
208:6 226:9 235:9
235:14,22 247:8
278:5 282:11
284:4 293:11
311:5 313:12
333:3 334:14

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[recommended - related]

Page 44

**recommended**
79:20
**record** 4:2,17 6:24
8:21 10:3 32:13
32:22,24 33:1,3,4
33:6 38:25 39:2,5
50:25 76:22,24
77:3 81:20,23
85:5 96:18 98:2
98:14 137:7
139:24 143:23
144:4 145:17
148:4,8,14,19,21
151:1 152:8
153:20 192:6,9
197:7,10 228:23
229:1 231:7,9,13
238:15 239:22,24
255:5 259:9
261:14 272:7,10
280:19,21,24
288:25 314:5,9
336:25 341:7
**recorded** 4:4 8:14
166:10 337:1
**recording** 6:1
**records** 31:7,10
**recoup** 335:21
336:8
**recouped** 336:10
**recruit** 18:25 21:3
45:2,16 59:8,22
182:23,24 183:3
236:19,21 260:19
291:12 307:5
**recruitable** 263:21
**recruited** 18:23
59:4 235:17
238:10 245:12
**recruiters** 213:14
214:19 215:4,8,11

**recruiting** 19:10
19:16,23 42:23
43:6 44:22 46:6
49:23,24 51:3
58:8 182:14,21
235:24 236:1,22
244:3 247:24
248:3 250:6,11
255:16 263:8
**recruitment** 20:17
58:23 59:7,9 60:5
60:6 235:8,19
237:2
**recruits** 237:11
241:10
**reebok** 15:4,5
16:18,21 17:4,5,10
17:15,23 27:8,12
63:14 64:7,12,17
64:19,23 65:2,10
65:13,24 116:3
314:19,24
**reese** 286:5,7,19
287:11
**refer** 36:7 41:13
49:21,25 57:24
108:10 170:22
207:21
**reference** 155:6,13
158:1 169:2,16
171:2 196:17
197:22 205:20,24
215:17 217:14
232:21 234:4
235:12 242:16
251:15 256:25
257:8 284:19,21
295:19 299:5
**referenced** 51:21
176:3 177:12
187:10 215:11

217:12 244:15
302:1 322:9
**references** 156:17
170:21 232:9,9
244:20
**referencing** 123:8
251:12
**referred** 37:21
78:6 79:20,23
111:12 136:13
179:22
**referring** 23:15
29:2 49:11 53:9
72:15 73:15 90:3
129:20 133:25
136:25 138:16
155:10 158:8
163:21 175:12
211:22 226:19
232:23 241:20
249:25 300:13,16
300:18 301:18
302:19,21 306:10
331:12
**refers** 154:24
182:22 189:9
196:23 226:20
**reflect** 42:14
**reflected** 309:4
**reflective** 187:10
**reflects** 105:6
**refresh** 17:22
95:17 106:15
111:14,19,24
127:3,4 202:25
261:21 269:13
282:11 284:4
**refusing** 32:4,11
85:15
**regard** 179:18

**regarded** 56:21
**regarding** 10:2
24:10,23 25:15,19
27:14 61:7 74:13
77:10 78:15 79:16
111:9,9 272:13
275:13 296:21
300:1 311:1
**regardless** 25:24
32:9 115:14
174:10 200:15
300:19
**regards** 11:22
13:2 84:17
**registered** 1:18
341:3,22
**regular** 9:1 103:24
172:11 225:8,10
278:19,20
**regularly** 47:13,14
209:19 225:5
273:8
**reid** 198:12,16
**reid's** 198:14
**reimburse** 290:13
**reimbursed**
225:16 285:14
290:11 322:22
323:20 324:18
**reimbursement**
319:11 325:9
**reimbursements**
224:16 225:18
230:12
**reimbursing**
224:23
**related** 58:23
101:18 102:9
103:13 195:19
200:13,14 203:6,8
203:21 217:4

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[related - respect]**

Page 45

223:14 247:23,24
289:19,20 323:13
341:9
**relates** 150:2
232:11
**relating** 72:20
135:25
**relations** 165:2
**relationship** 20:18
20:23 33:23 35:23
36:8 48:6 61:20
61:25 62:25 70:18
70:20 71:21 81:3
91:17 113:6
125:12 137:12,24
137:25 138:3,8,12
138:23 139:7,9,14
139:18,22 141:5,5
142:13 161:5
175:5 176:8
177:10 179:2
238:2,18,23 239:5
239:13 240:11
243:2,6 245:10
247:15,18 250:3
254:17 259:21
261:2 269:3,8,8
273:5,8 278:22
289:4 292:2
315:13,14
**relationships**
19:17 21:2,4,6,8
34:20,24 35:25
36:5,23 37:2,10
44:18,19,20 45:5
52:23 56:5 121:21
123:2,11 124:19
125:8,19 129:8,24
132:21 135:15,25
136:4,6,13,14,18
137:6 138:25

139:2,6 142:12
174:9,23 175:1
178:15,17 237:24
238:20 239:4,6
240:3 254:23,24
254:25 261:4
263:9 275:19
315:20 316:4
**relevancy** 32:16
**relevant** 31:24
32:2,7,8,10 75:10
97:2 220:15
**relied** 21:4
**rely** 52:2
**remember** 20:9
30:4,7 41:3 45:24
46:15 54:15,19
55:22 66:18,21,23
67:17,23 69:1
77:17,18 79:18
82:22 83:4,21
87:5 99:18 100:12
119:15 121:1
147:9 164:21
186:15 189:5,11
190:4,21 197:21
198:23,25 199:2,5
205:23 206:10
208:8 224:19
244:25 246:21
263:3 288:15
306:24 307:11
317:11 323:5,6
330:25 331:4,17
331:21 333:8
335:7,25
**remind** 152:10
**remotely** 4:15
5:15
**rendered** 68:12

**rentals** 320:1
**rented** 320:7
**rep** 126:2
**repayment** 68:11
**repeat** 22:9 24:4
39:7 45:10 75:22
79:18 115:15
137:9 306:7 327:2
330:16
**rephrase** 307:14
327:1
**replies** 234:13
244:13 253:4,21
254:2 275:5,10
277:10,12 281:17
282:6 283:9,19
300:9
**reply** 193:9 209:5
253:7,17,25 257:2
268:2 282:9 283:8
283:13,22
**report** 64:16 65:6
157:15 160:13
224:20 339:2
344:21
**reported** 1:18
160:15
**reporter** 1:18 4:14
5:15,24 38:17,19
39:7,9 255:7
341:1,4,22 342:14
**reporters** 6:2
**reports** 222:15
225:6,13,15
327:21
**represent** 5:6,9
6:21 11:17 12:15
74:17 75:21 77:24
78:3 80:2,10,19
89:12 90:24 92:5
92:22 93:21 96:10

111:10 226:16
230:10 332:10
**representation**
22:4 84:21,22
85:4,8 92:1,9
93:25 94:2 104:25
132:23 260:22
315:2
**representations**
105:12,14
**represented** 7:1
11:16,24 20:12
74:22,24 75:17
91:21
**representing** 7:7
23:14 35:2 84:13
84:19 85:16 86:1
89:17 91:25 93:17
93:20 94:5
**reputable** 187:5
**request** 9:7 92:25
93:1 120:8 266:5
266:11 279:23
297:24 298:1
332:22
**requesting** 201:16
268:10 325:8
**requests** 278:21
297:22
**require** 7:13
**reset** 185:4
**resign** 27:6
**resigned** 27:7,9
**respect** 19:10
20:16 34:17 41:17
50:3 55:25 59:2
60:4 147:15
149:24 161:6,20
163:4 164:22
170:8 174:15
317:14 319:5

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[respected - rivers]

Page 46

respected 179:25
respond 250:24
  278:21 283:17
  300:8
responds 252:5,11
  259:13
response 87:2,7,13
  152:16,24 195:3
  198:18 199:11
  200:22 201:5,20
  234:19,23 243:21
  244:6,21 249:14
  249:20 250:17
  251:25 252:8
  256:22 265:12
  268:11 271:16
  277:7 281:15,19
  283:3,5 297:22
  304:21,24 305:7
responses 8:17
responsibilities
  34:12 41:25 55:25
  129:13 131:25
  133:3,19 161:25
  162:10,14,20
  163:4 164:22
  167:17,19 183:11
  315:18 316:3
  317:21
responsibility
  19:10,15 132:14
  293:1 315:19
  316:7 318:1
responsible 71:14
  161:6,7,8
rest 105:20 215:6
  268:18
restraints 303:4
restrict 9:14 26:1
restroom 231:5

resume 337:3
  342:22
retain 75:1 80:14
  81:13 93:14
retained 337:2
retaining 76:13
  81:11,25 82:6
  89:12
retread 273:10
return 10:4
  283:24 304:23
returned 147:8
  148:11
reveal 150:7
revenue 115:8,13
  116:5,7,22 117:1
review 14:9 16:10
  27:19 62:11 72:12
  89:5,8 96:24
  97:18 101:24
  105:10 117:24
  119:24 127:15
  155:23 215:6,24
  233:2 257:24
  301:21
reviewed 11:7
  13:17,19 62:13
  95:12 104:23
  106:13 128:2
  135:20 140:3
  144:24 152:9
  192:23 258:3
reviewing 97:1
  106:5 108:3,17
richard 241:25
  242:20,25 243:7
  244:13,24 250:1
  256:25
right 10:14,21
  12:20 14:6,12
  15:19,22 16:14

17:16 18:3,8
24:20 28:11 30:2
30:19 32:25 35:16
36:20 38:9,14
39:6 40:16,24
41:23 47:13 48:16
50:3 60:4,16,24
65:10 70:25 71:5
71:15 72:17 73:2
74:8 76:9 79:22
90:22 94:10 95:24
96:3,20 97:6 98:1
98:13 99:2 100:3
100:9,21 104:12
105:18 108:23,23
112:20 113:15
115:19,21 116:9
116:20 117:23
118:15 122:25
123:7 127:20
138:2,4,9,21
139:10,17,19
141:8 144:7,19
145:16 146:18,25
147:21 149:11,17
151:15 152:4
157:15 168:22,23
169:25 170:17
173:25 177:5
178:1 180:18
181:20 184:16
186:24 187:20
191:22 192:19
193:6 194:1,24
196:3 197:12
199:16,19,20
200:3 204:1,21
206:15 211:3
212:14,17 213:11
215:22 217:24
218:25 222:7,11

222:24 223:2,21
226:22 227:17,20
229:22 230:15
231:3,17,24 233:5
233:10 235:23
238:25 239:12
248:24 250:1
257:16 258:6
259:22 260:1,12
261:8,12,23
262:14,20,25
263:11 264:7
266:4 267:25
268:3,14,18
270:13 272:16,20
272:22,24 273:1
274:7,13 278:8
280:15 284:10
286:9 289:5
295:12 296:19
299:15 301:5,12
304:11 305:15
307:21 308:7,16
310:23 311:21
312:16,21,22
324:15 334:22
riley 3:3
rivals 50:9,11
  170:14
rivers 1:7 3:2 5:7
  6:9 43:10,12 63:8
  63:9,13,14,15 64:6
  64:12,16 65:6,12
  67:25 101:1,2
  127:12 130:23
  131:19 134:13
  135:11,20 140:3
  140:14,17,21
  141:24 142:15
  144:11,13,14
  145:1 147:22

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[rivers - says]**

153:11 155:6,9,14
155:21 156:2
158:11 160:15
161:8 162:24
173:17 184:5
185:12 188:3,19
189:6,17,20 190:7
190:9,12,17,19,21
191:4,22 194:19
195:2,4,7,13,20
196:4 198:19,20
199:9,11,17,19
200:22 201:5,15
201:18,21,24
202:9,16 203:2,18
204:2,25 205:9
206:20 207:10
208:12 211:19
212:25 214:12
216:4 220:12
223:2,5,6 224:2
230:5,7 233:12,14
233:20 234:13,16
234:22 235:2
301:6,10,16,19
306:17,22 309:22
314:15,16,18,21
314:25 315:8,14
315:17,19 316:6
316:11,15,20,23
317:13 323:16
326:19,21 327:3,9
328:17,23,25
329:13,19,24
330:4,10,18,21
333:22
**rivs** 155:5,11,13
155:13
**road** 222:10 239:2
**rob** 154:14,21
313:23 314:14

**robert** 3:4 5:5
**robert.lindholm**
3:7
**roberts** 342:25
343:25 344:25
345:25
**role** 35:22 40:24
42:18 55:8 65:1
124:13 129:7,23
132:10 133:3,18
161:20 162:13
217:19 219:17
254:23 317:13
319:5 326:19
328:2
**roles** 41:1,25
55:24 129:4
131:25 162:9
163:17 164:21
**romeo** 217:22,25
218:3,6,10,12,22
264:20,23,25
265:4,8,17 266:12
266:23 267:16
268:21 269:1
270:11,24
**romeo's** 220:2
266:25 271:16
**room** 86:17
**rooms** 335:15
**rose** 61:14 147:10
**rosi** 288:23 289:6
289:18,19 290:2
**rosi's** 289:24
**roster** 175:25
318:17
**rosters** 129:17
263:19
**rotating** 239:3
**roughly** 312:11
318:24

**round** 61:2,4
169:21,22 171:23
171:25 172:3
224:11,14,21
**route** 173:4
**routinely** 321:9,14
**row** 99:17 232:5,8
232:9
**rowan** 202:3
**rule** 10:9 22:22,23
25:23,25
**rules** 7:10,12 9:13
9:13 10:1 22:17
23:6,7 24:7,10,12
24:13,17,23 25:2,4
25:7,15,19,22,25
26:1,3,4,7,13
32:16 251:13
328:9
**rumors** 236:24
**run** 16:24 117:19
**runner** 37:15
39:18,22
**runners** 37:16,17
37:19,21 38:14
**running** 37:18
129:13 173:1
240:15 295:17
**runs** 126:13
227:20
**ryan** 296:12,14,15
297:4,6,25 298:1,5
298:7,11 303:25
304:5,10 305:2,4
305:11
**ryan's** 304:21

**s**

**s** 3:5 121:12
342:19
**safe** 29:5

**sake** 5:22 197:10
231:22 242:8
**salaried** 40:15
**salary** 40:6 67:13
**sales** 116:19,19
126:3
**sarah** 164:20,21
164:24
**sat** 82:19 251:9
**saved** 245:24
**saw** 129:23 169:6
210:11 325:19
**saying** 105:16
140:14 171:8
176:12 178:19
198:25 241:2
260:11 267:21
**says** 17:20,24
27:22 30:10 42:3
42:20 43:19 44:21
52:13 53:4 58:22
66:7,10 67:6 70:7
70:11 71:25 97:23
98:1 101:1 121:11
121:18 122:14
123:4 124:9 126:1
126:15 127:20
128:5 131:15
135:10 143:25
144:11,14,19
152:21 153:3
154:13 155:4,21
156:14,15 157:17
162:2 165:16
166:14 169:11
170:1,2,17 171:17
174:5 175:7,20
178:6 179:9
180:18 181:22
184:22 185:3
186:19,24 190:12

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[says - see]**

Page 48

191:13 195:6,15
198:2 214:23
217:6 222:20
226:11,17,18
227:3,7 228:11
229:21,24 234:16
243:9 246:13
249:12,19 250:21
251:5,22,23
253:10,11,23
255:14 256:18
257:5 258:19,25
260:2,5 265:7,10
265:10,13 267:16
267:25 268:3,14
268:15 270:6,21
271:18 277:8
278:15 282:2,22
282:25 283:14,25
294:14 301:4
305:2,4,9 310:11
311:24
**sc** 2:6,19 3:12
**scarborough** 3:3
**schedule** 164:17
**schedules** 53:1
**scheme** 330:10,18
**scheyer** 239:14,21
274:5,21 275:5,10
275:13
**school** 41:10,10,11
41:22 42:22,23
43:6,7,20 44:2,4,7
44:13,16,22 45:3
46:7,17,19,25 47:9
47:14 48:19 49:17
49:21 50:17 55:3
56:14,18 104:5,13
104:17 110:1,2,3,5
110:8,17,20,22,25
111:1 114:25

115:14 118:24
119:3,5 120:22
128:14 129:9
136:2,15 147:18
166:6,16,21 167:9
167:12,17,20,25
168:10,17 170:1
172:7 173:2
174:10,24 176:25
177:25 178:3
179:23 180:20,23
182:15,19,25
183:5 210:24
211:10,11 216:24
218:5 236:3,25,25
237:1 238:8,11
247:2 250:11
254:15,18 255:14
255:19,21 260:25
261:7,16 263:3,11
265:5 275:17
277:24 278:6
287:24 288:5
291:3,5 292:4
295:10 297:3
300:12,20 307:4
316:17,25 328:2,3
328:11,22 329:1,3
329:9,16 331:8,10
331:12 333:20
**schools** 125:8,19
125:21 166:7
177:13 182:10,12
182:23 183:2,4,8,9
237:17 239:1
263:20 320:13
326:6,12,12,16,16
330:12
**scope** 81:5 110:13
145:15 210:22
211:3,4,5,8

**scout** 58:19 167:18
168:3
**scouting** 49:17,20
174:2,5,15 327:21
**scouts** 126:16,22
**screen** 7:19 95:17
95:20 104:16
127:4 130:12
142:17 166:23
167:1 183:17
204:9 218:19
**scroll** 69:22 96:21
127:19 159:22
165:14 174:1
178:5 252:15
256:9 276:16
279:2 282:16
300:25 303:9
**se** 264:4
**seal** 341:14
**search** 340:8,10
346:1,3
**season** 220:22
**seat** 304:17 318:25
**seats** 294:14,19
**second** 5:22 16:12
32:22 36:13 127:5
135:9 157:25
175:10 179:20
182:13 191:25
211:21 220:21
225:4 261:17,20
276:3 279:4
280:15 303:15
**seconds** 152:22
258:21 259:1
**secure** 22:4
**security** 293:7
**see** 7:1,19 14:19
17:24 26:17 27:17
31:24 44:24,24

45:1,25 48:13
49:5 51:10 54:8
58:12 62:7,9,16
67:9,10 69:23,25
70:2,9,10,12,13
90:17 95:17,25
97:15,17,24 98:11
100:22 101:2,7,14
114:4 121:14,15
121:17 122:9
127:11,13 128:17
128:24 130:15,25
131:11 135:17
140:11 142:25
144:9,12,12,14
145:3 152:20,25
153:4,12,17,24
155:21 156:1,6,9
156:11 157:12,20
157:22,23,23
158:6 159:2 160:3
163:17 165:17
168:10,12,22
169:13,14 170:3
174:4,6,11 176:17
178:11,18 179:6
179:11 181:21
182:2 183:22
184:12,13,21
185:1,24 186:23
187:12,15,16
188:3,4,6,8,11,17
189:3 192:22,25
193:6,19 194:15
194:24 195:7,10
195:11,17 196:16
199:7,9,10 200:4,9
201:12,18,22,23
202:4,12 204:3,9
204:13,14,16,19
207:11,15,16

**[see - short]**

210:17 212:11,15
212:15,16,22
214:21,25 216:8
216:25 217:3,10
218:21 227:8
232:15,22 233:9
233:11,23,24
240:13,14 242:17
242:22 243:12
244:6,10 246:10
248:23 249:1,22
251:10 252:20
254:8 255:15
256:18 260:5,8
261:20,24 264:21
264:23,25 265:14
267:18 268:5
270:22 271:12,13
271:21 274:13,14
274:15,22 275:20
276:9,22,24
281:13 286:3
294:4,6,22 299:16
299:21,22 301:7
301:10 304:1,5,19
308:16,19,21
310:10,13 311:17
312:1,24 313:5
333:4 334:18
**seeding** 180:24
277:20,22 278:13
278:14,18 291:22
291:23
**seeing** 140:8,15
168:4 236:13
263:2,19 292:16
**seek** 319:10
**seen** 51:19 73:4
96:8,9,16 97:8,11
97:13 106:6,12,17
108:2,16 109:10

159:18,21 194:10
197:1 258:13
327:6 334:12,15
**select** 75:4
**selected** 133:23
**self** 169:19 243:15
243:24 246:18
247:12,16,19,22
248:6 253:14
257:10
**sell** 117:13
**semi** 247:19,22
**send** 90:19 194:7
199:12 201:16
228:12 229:24
253:23 269:17
270:15,18,24
271:17 278:13,16
282:10 291:18,25
297:5,7,20 298:6
301:15 305:2
309:3,4,14
**sender** 144:13
**sending** 103:18
223:6 277:23
291:15
**sends** 271:17
283:12 294:16,21
**senior** 272:24
278:3 288:10,20
317:23
**senor** 155:5,11
**sense** 14:22 104:18
176:17,18 187:11
197:14 198:3
215:16 223:8
295:11 319:17
321:17 326:10
**sensitive** 91:11
**sent** 63:23 101:13
108:5,6 140:5

153:1,10,11 156:4
184:4,5 185:12
189:13 195:3
199:19 202:9
203:4 223:1,4,12
223:15 230:23
244:11 262:6
266:6 267:20
269:21 275:1
283:11 301:19
308:18 309:1
**sentence** 122:10
205:11 209:25
212:16
**sentences** 208:19
**separate** 99:21,24
229:3 231:22
269:18
**september** 26:19
77:25 83:3 86:16
88:1 281:8 301:13
**sequence** 232:7
**series** 57:16
259:11
**serves** 263:17
**service** 103:9
**services** 29:20,21
29:23,25 49:5
52:1 68:11,12
312:9
**set** 66:15 94:23
105:20 134:22,24
135:2 157:5
184:22 243:22
244:22,24 262:17
320:8 322:13,15
323:21
**setting** 129:11
319:23 333:24
**seven** 188:24
189:12 190:13

194:20 198:19
199:13 200:24
201:7,17 213:9
243:17
**shake** 312:16
**shape** 237:3
**share** 15:24 62:6
95:15,21 118:7
120:19 126:25
127:4 144:1
152:14 161:9
184:25 204:8
205:2 220:20
237:22
**shared** 123:23
182:18 269:23
**sharing** 236:6,10
237:6,10,13,15
252:14 326:1
327:12
**shift** 221:16,16
**ship** 56:2 267:3
**shipping** 270:21
**shit** 214:20 250:17
**shoe** 132:17
138:16,19 175:18
268:4 331:11
**shoes** 67:20
265:21 268:10
277:8,13,15,18
278:16 286:1
291:19 297:19
331:2,6
**shooting** 186:20
187:14
**short** 39:3 77:1
81:21 140:4,16
141:2 192:7
231:11 255:6
272:8 280:22
314:7

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[shortly - sort]**

Page 50

shortly 244:12
shot 218:20
show 14:16 15:22
  61:18 62:4 95:13
  127:2 142:18
  183:14,16 184:7,9
  187:21 231:17
  269:10 307:22
showcase 58:10
  181:24
showing 144:1
shown 146:10
  286:2
shows 16:13 95:18
siblings 79:9 296:2
  296:3 298:3
side 95:24 247:25
  254:21,21 308:16
sign 36:17,25
  44:15 52:22 59:12
  136:1,21 138:13
  139:9 175:8
signal 312:22
signature 70:4,4,5
  70:7,16 223:18
  341:18
signed 70:14
  138:13
signify 213:18
signing 36:15
  40:12 42:21 43:5
  43:20,21 44:3,7,12
  60:18,21 61:8
  132:16,19 136:19
  136:22 137:14,17
  138:1,9,15 139:12
signs 320:16
similar 57:3 97:13
  170:25 255:25
simple 139:3

single 168:20
  334:22
singular 60:17
  139:20
sir 32:4 44:17
  46:20 68:23 89:15
  93:24 155:24
  243:9 279:5,11
  303:22 309:20
  318:2 335:4
  336:20
sisters 78:22
sit 86:17 251:5
  259:16 319:1
site 317:23
sitting 8:14 54:14
  54:16 85:1 92:6
  93:15 100:13
  108:23 120:3
  305:22 307:12,17
situation 56:8
  114:7,16 170:25
  234:1,8 235:11,22
  236:22 301:22
six 119:25 132:2
  196:5 199:2 213:8
  226:23 229:9
  235:4 271:11
size 266:18,25
  267:1 268:12
  277:6 291:25
  318:6
skew 326:15
skill 327:24
sleepers 117:14
slide 159:25 160:9
  174:2,7 176:16
  178:6,21 179:5,6
  179:19 180:13,18
  181:18

slides 165:15
  174:2
slightly 81:7
slots 171:23
slow 142:22 324:6
  324:6
small 186:20
  187:15 248:16
smart 198:9,10
smith 122:2,2,14
  134:4 144:24
  200:7 329:20,20
  329:21
smith's 201:7
sms 101:13
snapshot 220:17
  221:15
social 104:21
  126:3 162:19
  163:10
software 98:3
sole 121:11,11
solo 207:10 211:19
somebody 22:3,5
  35:4 36:12 39:23
  43:16 48:5 53:24
  57:24 59:20 60:2
  80:15 109:5,18
  113:5,14 136:23
  137:19 140:24
  160:23 161:3
  169:19,20 170:6
  173:1 175:2 194:8
  203:11 239:15
  240:25 241:3
  247:11 261:10
  263:25 268:9
  273:19 293:5
  294:1 306:11
  329:1

somebody's
  260:10
son 48:3,4 173:3
  245:11 254:18
  289:18 332:19
  333:7
sood 1:6
sorry 20:6 35:20
  44:5 46:21 51:5
  54:4 66:5 68:18
  68:21 73:21 74:18
  92:18 121:3
  130:15 133:15
  135:1 140:19
  142:5,16 155:22
  155:25 169:23
  174:17 190:2
  196:10,24 202:21
  206:5 215:25
  229:13 237:14
  241:21 244:4,7
  245:1,15 251:4
  252:21,23 256:2
  261:21 263:15
  264:10 273:17
  276:6 288:18
  289:13 290:15
  293:17,19,25
  302:5,11 303:19
  311:8 312:6,18
  313:11 316:1
sort 7:23 8:14 97:5
  103:16,18 162:19
  163:10 166:11
  179:2 186:5 209:5
  221:13 224:12,21
  225:19 230:10
  232:10,24 240:10
  254:10,22,23
  264:1 265:16
  272:2 292:25

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[sort - sports]**

315:7 321:19
325:25 329:14
**sorts** 104:7
**soul** 105:22,23
106:1,11,16,22,23
107:1,4,5,11,13,17
107:19,22,23
108:1,9,11 128:23
129:2,4 131:10
147:1 152:11
154:14 158:4
188:16 189:8
191:5 192:23
193:10 195:15,25
196:2 199:22
202:3,19,23
204:22 205:19,21
207:14,18,19,23
208:6,20 211:21
211:24 212:4,9,14
214:19 215:11
217:2 337:10
343:4
**sound** 54:17 60:10
72:2,11 153:20
**sounds** 72:13
244:13 259:4
322:20 325:3
**source** 49:16
88:22
**sources** 116:22
179:21
**south** 1:1 5:25 6:3
7:12 9:14 126:17
292:13,14 341:5
341:15
**southern** 287:8
**space** 21:8 164:9
**spartanburg**
292:13,14

**speak** 9:14 11:20
12:24 13:1,3,7,13
13:14 14:22 22:7
23:21 77:7 83:18
83:22 84:1,5
224:24 238:2
240:25 327:6
**speaking** 22:18
162:16 166:1
235:23 245:2
249:25 265:10
315:21 327:9
**special** 3:21 5:12
**specialist** 3:23 4:1
5:13 33:2,5 39:1,4
76:23 77:2 81:18
81:22 148:3,7
192:5,8 231:8,12
239:23 255:4
272:6,9 280:20,23
314:4,8 336:24
**specific** 19:12
39:19 41:4 68:17
83:7,9 96:25 97:4
106:18 107:20
130:2 159:12
183:2 224:17
235:5,13 278:5
279:12 297:18
299:6 302:24
322:4 323:6
328:24
**specifically** 44:14
47:11 52:4 80:3
97:14 120:9,13
130:6 148:16
183:12 186:15
190:22 191:18
197:22 205:16
221:10 223:7,11
226:10,17,21

234:5 266:8 273:3
286:4 290:4 295:7
295:19 296:23
300:22
**specifics** 54:20
121:1 224:25
244:25 245:4
280:14 301:20
**specifies** 136:10
**specify** 27:12
200:19 225:20
**speculate** 140:21
170:10 247:14
**speculating** 40:3
54:13 69:6,10
72:3,5,9,14 109:25
116:23 140:17
158:10 166:13
169:3 171:7
172:11 175:23
176:6,12 181:5
197:5,13,17 199:6
208:11 306:14
**speculative** 298:10
**speed** 192:14
**spelled** 121:12
**spend** 54:1 96:20
315:16 317:6
325:17
**spending** 237:25
**spent** 53:19
135:14 141:11
162:21 275:3
334:25 335:21
336:10,11
**spoke** 12:21,23
20:2,10 74:4
83:13,15,17 84:9
93:5 148:16
170:13 244:8
316:13 329:8

**spoken** 13:10
74:13
**sponsor** 43:23
114:11 117:18
125:21 176:21
**sponsored** 55:6
118:16 133:22,25
169:5 175:25
176:5 177:24
178:3 183:9
218:13 219:15
237:16,16 247:3
263:23 316:8
317:8 325:11
326:6,11,12
328:15 329:16
330:12,20 331:7
331:11,24
**sponsoring** 117:8
**sponsorship** 62:20
63:23
**sporadically**
164:16
**sports** 15:11,12
18:7 23:2,21
27:22,24 28:3,7,16
28:20 29:4,5,7,12
29:13,16,17,18,19
29:21 30:3,11,12
30:20 31:4,8,11
35:8 37:11,20,22
41:17 42:3,9 66:3
70:8 132:11,25
145:6,7,9 162:10
168:9,11 217:23
227:4,12,17,20,22
228:1,4,5,8,12,15
228:20 229:2
274:1 290:21
338:25 339:5
344:18,23

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[spot - suite]

Page 52

spot 59:16
spotting 48:9
spreadsheet 97:8
97:15 100:22
128:6 184:19
194:11 199:4
241:15,23 248:15
264:14 269:16
275:24 276:4
279:1 338:3
343:21
spreadsheets
186:4,5,9 269:19
square 61:1,3
sr 3:9 5:10 6:13
330:1 332:11,15
332:16,18,24
333:1
stadium 260:17
staff 56:5 125:9
130:5,9 182:15,19
224:2 239:1
254:17 259:17
320:25 322:6,8,18
staffs 129:25
stamina 143:1
stamp 98:9 101:12
232:23 252:16
264:19
stand 244:4
standard 10:15
47:21 173:23,24
staples 270:21
star 33:14 55:3
57:13 291:12
stars 218:16 219:6
219:9
start 10:24 11:4
14:24 42:19 59:7
63:3 78:18 122:1
192:15 194:17

205:3 212:23
214:20 264:18
276:10 282:18
293:16 315:23
started 5:17 10:11
26:18 64:7 107:10
158:23 214:24
247:6 259:10
263:14,25
starting 15:1
16:12 45:7 57:8
84:11 97:19 132:8
162:12 201:13
206:19 241:15
249:9
starts 128:16
232:6 233:18
252:17 267:9,21
300:6
state 4:16 6:23
30:20 33:15 53:13
70:22 223:24
234:14,18,23
235:25 236:2,4
247:9 262:13
263:5,14 287:8
341:5
statement 105:11
118:13,14 122:18
146:21 174:21
180:20 181:1
statements 114:14
states 1:1 4:7 18:9
128:19 158:20
184:10 202:2
210:14 214:18
225:3,22 281:22
status 157:15,19
stay 53:1 65:23
147:7 336:4

steering 236:3
step 147:18 298:3
sticker 143:25
144:8 204:6
stipulate 6:1
stipulations 5:18
stop 143:7
stops 295:25,25
stories 181:25
220:23
straight 117:25
149:19
straits 289:3
strange 172:18
strategy 135:5
streaming 157:5
streamlined
188:22
street 1:15 2:6,19
3:5,12,18 4:11
37:18 227:4
stress 321:15
strike 324:12
329:12
strong 139:9
stubs 72:23
stuck 246:15
stud 275:6
student 57:17
125:21 175:17
176:23 183:6
237:4 251:14
289:4 292:22
stuff 99:25 103:13
139:5 183:16
243:25
subject 85:8 92:8
92:20 105:22
115:16 121:11
131:9,11 149:17
150:4,17 157:11

157:17 184:15
185:12 188:16
192:23 193:9
199:22 200:13,15
204:21 205:18,20
206:8 207:9,11
211:18 212:16
213:13 215:3
216:23 217:22
262:4 339:2
344:20
subjectively
196:20
submit 222:14
225:5,12,15
227:11 228:10
230:16 313:13
323:2,10 325:7
submitted 225:1
227:25 228:4,15
230:11,14,20
307:24 313:3,8
323:17,22 325:14
336:4
submitting 201:4
224:10,20 311:6
324:6 335:11
subpoena 86:21
86:24 87:3,8,13
89:2
subpoenaed 88:25
substance 9:16
10:3 85:3 150:11
151:7 152:1
272:14
success 40:12
successful 115:5
suffice 5:21
suggesting 270:25
suite 2:6

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[summarizes - talking]

Page 53

summarizes
  221:13
summer  53:6 57:5
  58:4,6,8,9,10,15
  317:10,14 318:4,7
  318:20 319:15,19
  323:12,13
summit  275:3
sun  9:19 225:22
  226:4,5,8
super  275:2
support  118:24
  119:1 151:23
  182:14,21 224:2
  244:14
suppose  54:11
  113:16 158:18
supposed  283:7
sure  7:9,14 8:3
  14:17 17:25 22:16
  23:24,25 24:5,6
  31:9,12 32:6
  39:14,20 47:20
  48:17 49:3,19
  51:7 53:23 66:14
  68:12 69:17 72:4
  75:23 80:11 83:13
  83:17 87:11 90:8
  91:2,3 94:14,25
  96:18 98:21 99:1
  99:10 102:12,19
  103:8 105:10
  106:2 107:9
  109:15 110:22
  112:11,24 113:4
  113:12,22 116:23
  116:24 119:21
  120:24 121:24
  122:19 123:10
  124:24 125:7
  127:16 129:3

130:1 133:4
134:16 135:13,21
136:1,11 139:1
141:10,16 145:15
146:11 148:19
151:2 154:11,22
160:6 166:2 167:5
167:15,20 168:1,4
168:6 169:10
171:2,17 172:24
173:13 175:1
176:11,25 178:25
179:1 186:3,8,13
186:17 187:11
189:19 190:16
191:3 197:19
208:15 209:22
210:4,23 213:18
219:24 223:8,11
224:17 226:17,19
226:20 227:14,14
228:18,22 229:20
237:12 239:13
241:11 243:25
245:9 248:2 252:8
258:9 259:23
267:2 278:1,17,22
284:12 285:24
287:3 288:6,14
292:23 293:7
295:13 298:16
299:6,10 300:16
304:9 305:13,20
307:6,9 309:15
324:1 329:5
330:17 336:10,14
surely  163:9
surprise  280:13
  306:4,8
surprised  243:14
  243:17 266:9

334:18
surrounded
  295:10
swear  5:15
swings  154:14,17
  154:17
switch  272:16
sworn  5:14 6:16
system  49:15
  170:12 267:1
  323:21
systems  322:14

t

t  3:4 162:13,13
  342:19
tab  186:16 187:8
take  9:1,2 14:18
  16:4 41:23 52:25
  96:3,8,8 121:4
  127:9 130:11
  135:5 143:9,17
  147:20,23 148:1
  157:24 159:10
  162:4 164:6
  165:19,21 166:16
  171:6,7 172:21
  185:13 187:24
  189:1,25 192:1,4
  194:12,22 199:15
  201:1,9 203:23
  209:11,18 212:20
  215:22 217:24
  218:19 222:19
  225:4 231:2,18
  232:1 241:5,8,13
  245:13 261:7,16
  267:5 271:22
  272:1,3 279:5
  287:25 300:11,19
  323:19 324:9

taken  1:17 4:4
  39:3 77:1 81:21
  148:6 192:7
  231:11,21 255:6
  263:4 272:8
  280:22 314:7
takes  261:10
talent  51:1,2
  110:14
talented  45:4
  46:25 48:10
talk  9:18 19:17
  23:2 30:22,24
  33:9 40:16 47:16
  47:23 49:1,2
  52:18 55:1 60:6,7
  65:12,14 76:15
  78:9,21 79:15
  83:2 112:8 132:7
  173:2,3,10 177:14
  210:11,23 250:5
  257:11 272:17
  295:7 318:3
  327:25 332:14
  333:2
talked  20:4,7
  33:22 34:19 46:18
  48:8 49:3 73:2
  123:6 134:4,11
  167:21 169:6
  178:13 210:13,18
  210:20 246:13,15
  248:2,3 252:12
  254:2 259:12,14
  260:6 279:6
  296:25 317:7
  326:18 330:23
  331:2 332:24
  333:1
talking  25:9 37:8
  46:16 51:8,12

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[talking - text]

Page 54

59:15 75:11 94:3
96:17,25 102:23
123:5,7 130:3
136:3 138:15
142:3 167:22,22
167:22 173:1,6
177:1 183:15
199:1 226:22
235:3 236:8,20
241:22 251:16
253:15 257:20
258:17 317:7
335:6
**talks** 53:3 175:9
**tape** 270:21,21
**target** 178:6
**tasked** 183:13
**tasks** 16:22
**tax** 30:20,20,21,22
30:24 31:2
**taxes** 30:19 31:1,3
71:11,15
**team** 27:22,24
28:3,6,16,20 29:3
29:5,7,12,13,18,19
29:21 30:2,10,12
30:20 31:3,7,11
110:7,9 114:13
116:21 117:13
118:2,18 125:13
126:3 128:23
129:2,4 133:1
157:8 162:3,17,23
163:11,16 164:20
164:25 165:3,6,9
165:13 166:5,20
167:3 191:1 219:2
219:5,11,13,15
227:4,7,12,16,19
227:22 228:1,3,5,7
228:12,15,20

229:2,11,15 242:4
242:5 248:10,11
287:6 289:24
290:21 297:4,8
304:11,13 334:22
339:5 344:23
**teams** 17:1 43:23
43:24,25 44:1,2
125:16 133:22,24
133:25 182:25
198:6 210:17
262:4,16,19
290:13,15,18
315:20 316:4
317:17 318:16
328:14
**technically** 15:20
315:4
**technology** 233:10
**teleconference**
1:10
**telephone** 98:10
98:11,15,17 99:6
101:1 103:12
149:9 169:8 246:4
248:23 249:2
253:25 264:21,24
274:17,20 294:8
294:10 299:16
301:7 304:2,4
**tell** 11:1,3,5 13:18
14:24 16:4 18:5
19:15 21:19,20
28:3 30:6 31:17
38:5,12 40:5
42:25 45:2 46:8
47:17 48:20 50:4
52:20 53:15 60:20
63:15,17,21 64:25
73:17,24 75:16
76:17 85:15 95:4

95:6,9 100:9
108:18 119:19
131:23 132:8
149:13 151:7
238:3 303:15
**telling** 194:7
**ten** 19:25 66:5
112:25 177:18
239:15 318:16,17
319:2
**tens** 321:23 324:14
**term** 37:14,21,23
38:1,7,10,11,22
39:13,17,22 41:9
41:13 66:8 70:3
106:17 107:11,12
107:17,19,23
108:1,14,18,24
109:4,6,7,9,11,13
111:15,24 112:1
140:9,16 141:2,5
181:12 205:23
207:20,22 208:6
209:8,14,16
291:13
**terminate** 94:13
94:16
**terminated** 27:5
**terms** 8:5 18:15
19:15 20:17 25:20
34:12 35:22 41:21
44:13 46:6 48:18
57:7 91:12 109:1
109:3 139:5 170:9
171:18,22 176:19
178:14 223:10
224:23 250:4
258:15 260:4
300:19 317:17
319:3 333:24

**terrible** 270:1
**testified** 6:16
13:15 111:3,8,10
111:11 148:17
314:17 325:18
**testify** 75:6 114:3
**testifying** 25:4
**testimony** 7:4 9:17
9:20,22 10:18
12:22 150:5 151:9
272:14 328:1
337:1
**texas** 239:18
289:13
**text** 14:4,7,17
87:20 88:7,10,15
95:12 96:22 97:4
97:8,11 101:6
102:13 103:12,18
103:24,25 104:2,7
104:11,21 105:6
119:20 120:1
147:8 169:9 184:8
230:25 231:17,19
231:21 233:3
242:15 243:19
244:11 248:10,17
253:2 254:5,7
256:12 257:20
258:18 264:8,14
268:25 269:16,17
269:19 271:2,4,11
274:10 276:4,5
283:11,12 286:2
299:4 300:5 301:5
305:17 336:2
339:6,8,10,12,16
339:18,22,24
340:1,3 344:25
345:2,4,6,10,12,16
345:18,20,22

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[textbook - time]**

Page 55

**textbook** 252:13
254:10,12,13
**texted** 243:1 246:2
259:6
**texting** 242:24
**texts** 267:19
**thank** 6:14 33:18
127:17 130:18
147:22 148:23
155:25 180:17,17
216:2 222:1
245:17 252:12,23
253:21 256:21
257:7 269:14
286:18 289:6
305:9,11 313:18
313:22 314:13
332:3 336:20,21
**thanks** 143:14
149:23 193:18
241:7 256:18
271:18,20 275:6
277:10
**thereof** 341:11
**thing** 8:12 62:12
96:6,24,25 97:5
101:23 104:5
115:4 117:23
137:4 139:3
159:14 166:11
171:19 225:8,19
243:18 269:10
289:5
**things** 8:2 9:19
53:11 57:8 87:20
95:23,24 111:8
114:1,4 119:10
135:8 150:19
166:8 221:17
236:15 238:3,4
240:16 248:2,12

269:15 303:6
307:8,19 320:11
320:15 322:1,18
329:8
**think** 7:24 12:8
15:20,20 18:17,19
29:4 32:7,9 37:23
38:17 41:8 50:17
50:18 51:17 55:8
59:20 65:16 69:7
72:8 84:25 85:18
100:8 109:6,25
126:25 136:5,10
136:20 137:4
139:20 146:20
150:17 151:21
154:19 160:4
167:6 168:14
170:23 172:17
173:22 174:1
175:7 176:7,20
177:20 181:9
187:13 203:12
208:1 209:10
211:12,13,15,16
218:16 220:17,25
221:15 223:11
229:19 233:10
235:16 246:18
251:8,21 252:13
255:12 257:1,25
259:9 260:13,15
260:21 263:4,17
264:3 276:16
282:25 283:7
285:21 287:16
296:8 300:10
303:1,4 306:25
313:16 314:16,17
317:7,9,9 318:15
320:14,20 323:9

324:22,23 325:19
326:2,14,16
327:22,23 333:19
**thinking** 65:15
300:24
**third** 88:11 249:9
**thomas** 1:6
**thompson** 1:18
4:14 341:3,21
**thought** 60:9
61:14 123:8
140:20 264:5
271:25
**thoughts** 220:20
**thousand** 66:24
318:18 334:13
**thousands** 319:24
321:24 324:14
**threads** 97:23
274:10
**three** 131:14 174:1
180:21 231:4
234:21 258:24,24
309:24 310:3,5
324:10 334:10
**threshold** 324:21
**thursday** 281:23
283:9
**ticket** 115:7
116:18 279:7,20
279:24 280:2,7
282:12 283:12
284:5 285:7,9,15
285:15,17 287:10
288:21 331:19,23
340:12 346:5
**tickets** 260:17,24
261:7,10,16
293:10 336:12
**tillman** 197:18,19
197:21

**time** 1:13 9:4
12:19 17:6 18:15
19:23 20:22 22:15
24:20,25 25:9
26:5 27:11 28:18
28:22,25 29:9,10
29:11,12 33:3,6,24
34:10 39:2,5,14
40:15 42:16 47:10
47:17 52:4,6
55:14 64:9 65:5,7
67:19 68:5 69:12
72:12 74:10 75:7
75:10,24 76:25
77:4,15 81:20,23
82:16,18 83:5,10
83:14 84:12,16
86:2,16 87:22,24
89:24 90:10 91:1
91:21 96:8 98:5,8
98:25 99:7,14,19
101:11 113:7
115:1,2,3 124:5
128:11 129:16,17
131:8,8,18 132:3
133:3 135:22
143:7 145:5
147:17 148:5,9
152:21,23,25
162:21 163:17,18
167:9 174:20
177:16,25 179:22
179:22 181:4
185:23 186:4,4
190:24 192:6,10
197:20 203:5
206:9 215:6
217:17 218:4,9,15
219:7,8 224:16,18
227:23 229:10
230:21 231:9,14

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[time - travel]**

Page 56

232:23 233:21
237:3 238:13
239:7,10,24 247:3
247:20,20 248:6
250:7,7 252:16
259:6,7,16 262:12
263:4,20 264:19
265:6 266:17
267:1,20 272:7,10
273:20,24 275:18
275:21 278:2,6,8
278:11 279:5
280:21,24 282:7
282:13 284:8
289:1 290:10
300:17 304:12
314:5,10,22
316:13,13 321:3
321:19 324:5,9,9
329:4 332:2 334:9
336:25
**timeline** 197:14,16
323:18
**times** 55:23 57:23
82:20,21,25
102:12 154:6
166:5 207:24
214:8 223:12
226:6 230:24
243:20 248:9
287:4,5 290:8
315:11 317:24
321:6,16 322:1,17
324:4 328:6
**title** 37:9 42:3,5,7
134:16
**tj** 109:16,20,21
110:16,21 111:3
111:18,21 112:2
124:8,16,18 125:3
125:4,12 128:7,21

129:1,4,22 134:3
144:24 161:17
195:2,16 196:24
198:2,5 199:23
201:20,24 215:18
233:22 234:1,2,3,4
234:8,9 235:7,8,11
235:14,18,19,24
**tj's** 124:12 125:16
129:6 196:3 198:6
198:18 202:23
**today** 7:2,7,15
10:8,18 11:20
12:22 13:12,19
14:13,15 54:15,16
75:15 90:24,25
92:6 93:16,18,20
95:13 100:14
101:25 104:10
120:3 150:5 151:9
253:11 259:2,8
260:2 264:15
272:14,18 279:6
307:12,17 309:1
310:22 313:19
314:17 317:8
330:8
**today's** 7:4 10:25
11:6 208:5
**told** 76:11 79:19
88:21 94:15 95:1
95:10 118:1
150:19 173:13
298:12 309:11,13
309:18 310:6
**tonie** 43:11 134:14
134:15 156:14
161:2,5 162:25
217:7 220:14
221:5 230:8
309:21

**tonight** 48:13
**top** 46:25 49:20
51:1 56:13,16,17
57:1 58:12 59:22
66:10 83:6 96:19
97:17 102:4 114:8
116:4,6,9,10,15,20
116:25 117:3,18
120:18 122:1
127:12 131:20
158:3 170:1,11,14
170:17 171:11,13
171:13,14,14
172:6,6 174:9,23
176:3 177:11,12
177:18 179:10,15
179:23 180:22
181:23 188:24
189:11 190:13
194:20 195:6
198:19 199:8,13
200:4,24 201:7,16
206:19 212:23
216:3 221:16
226:2 232:4
266:12 280:10
287:5,13 300:10
300:15 308:8
336:6
**topic** 32:8 84:21
92:12,15 150:8
183:16 328:23
**topics** 149:3 248:4
250:4 300:3
**tops** 313:25
**totaling** 313:9
**totally** 150:9
**touch** 7:13 140:8
140:15 141:1
159:16 160:4
162:8 165:16,25

166:6,10 168:25
170:11,15 173:14
176:2 179:20
221:19 300:7
**touched** 137:5
173:14 175:7
323:9
**tour** 246:17
**tournament**
115:21 310:16
320:19,22 321:22
334:2,16,19,21
335:16
**tournaments** 53:8
57:7 58:3,19
240:15 321:7,20
322:19 323:3
333:23 334:4,6,25
**tracked** 166:11
**tracker** 184:11
185:22
**tracy** 216:15,17,19
**train** 271:25
**transcript** 3:25
5:22 8:16 341:6
**transcription** 6:2
**transition** 139:15
**transitioning**
15:14
**translate** 154:16
**transpire** 7:15
**transpired** 279:22
**transportation**
224:1 295:18
**travel** 128:6,9
164:5 205:7,25
206:2,8 209:6
222:6,16 224:15
225:19,23 226:18
226:19 280:8
290:10,12,16

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

[travel - understanding]

Page 57

295:6,24 296:5
302:3,7,9 320:19
320:21 322:2,4,7,8
322:12
**traveled** 209:19
**traveling** 82:10
128:13 191:16
205:13 295:14
**travels** 211:8
**travis** 20:13
**treat** 147:9
**tremont** 197:23,25
**trial** 111:4,6 112:6
112:9,10,12,14
113:14,15,19,21
113:23 114:2
146:10 226:11,15
**trick** 119:22
203:20
**tried** 21:3 243:19
244:20
**trip** 140:4 172:21
209:4,10 210:11
211:1 224:14
226:10 284:3
288:10,17,20,20
303:5 335:20
336:8
**trips** 59:1,5 128:7
208:14 209:2,8,11
209:12,13,18
328:14,18,20
**troy** 217:7
**true** 74:15 104:1,4
105:8,15,17
115:10,11 117:22
120:6 213:4
267:23 296:6
310:24,25 317:1,5
328:4 336:17
341:6

**trust** 136:22
240:22
**trusted** 137:20
**trusts** 240:25
257:13
**truthful** 10:17
105:13
**try** 8:8,25 65:23
108:13,21 166:13
172:19 255:20
**trying** 36:9 39:25
40:2 46:23 85:21
106:20 119:22
125:10 139:4
150:24 210:5,7
211:17 228:9
245:11 249:14
253:4,5 254:20
258:19 260:18
268:17
**tuesday** 188:23
**turn** 67:6 105:21
113:23 230:25
259:6 313:21
320:12
**turnaround**
259:25
**turned** 175:2
**turning** 60:12
168:9
**twice** 71:10 82:23
164:18 187:14
**twitter** 223:20
**two** 5:18 18:19,19
52:10 67:12 75:1
75:4 76:17 82:6
84:10 85:9,9,15,22
85:24,25 90:21
91:25 101:7,7
131:14 165:15
230:9 258:8

262:15 273:4
300:10 307:22
313:9,13 324:10
333:16
**ty** 12:2
**type** 29:15 46:2,3
47:24 87:19 98:2
101:22 128:9
133:6 171:19
175:19 177:13
183:15 243:25
255:25
**typed** 72:6
**types** 129:20 209:7
225:17
**typical** 230:16
323:18
**typically** 243:24
318:19 323:10

**u**

**u.s.** 12:16 97:22
**ucla** 177:5 234:19
234:24
**udo** 125:22
**uh** 156:3 160:2
170:19 202:17
232:18 250:23
265:9 277:3
**umass** 16:15,16
**umbrella** 41:9
**unable** 22:4 146:1
146:12 266:17
286:15 290:9
**unavailable**
266:25
**unaware** 118:21
163:6
**uncommitted**
263:20
**underline** 147:4,7
147:12,20

**underlined** 147:15
**underneath** 70:7
70:11 128:4
157:17 170:17
244:7 270:4
308:12 311:19
**understand** 5:25
7:14 8:3,7 9:23
23:8 24:3 32:15
32:19 35:22 44:10
46:24 68:22 69:17
70:17,21 74:3
85:21 88:10,14
90:6 96:13 101:9
101:16 102:1
104:24 105:2,5
118:19 119:21
122:22,23 125:10
129:12 137:11
139:4 172:15
200:17 209:15
210:4,8 211:17
235:1 237:20
238:9,19 249:5
254:4 268:7
**understanding**
14:20 34:16 37:25
38:14 39:17,21
44:12 63:25 84:12
84:18 90:10
101:17,24 107:16
107:17,18,21
108:24 110:24
116:4,8,14 118:7
129:6 131:24
132:10,13 133:2
134:18 135:19
136:12 140:13,22
140:24 141:13,19
141:21 155:8
161:19 165:24

166:9 169:1,15
170:20 171:11
172:4 174:13,22
176:15 181:2
189:17,21,23,24
190:9 195:24
208:25 209:3,8
210:1,3,16 221:4
235:18 245:22
253:12
**understands** 88:20
**understood** 10:23
118:3,4 133:19
140:20 173:7
**unemployed** 94:9
**unfair** 110:14
**unfamiliar** 212:8
**unfortunately**
67:1 198:16 270:1
286:15
**unit** 4:3 76:24 77:3
148:4,8 192:9
231:9,13 314:5,9
**united** 1:1 4:7
**universal** 75:15
**universities** 114:8
114:9,12 115:13
116:5,18 117:8
275:16
**university** 15:2
116:16,17 118:16
239:17,17,18
240:4,4,6 242:13
244:19 247:7,8
263:5 272:23
274:6 275:22
286:11 289:16
298:24 299:1
325:11 329:7,22
330:2,6,20 331:24

**unofficial** 67:18
**unusual** 100:18
266:11 294:24
295:2,5,15 296:24
297:5
**upcoming** 188:17
189:8 192:23
193:10 195:16
199:23
**update** 131:10
217:6
**upper** 158:21
**uprising** 57:21
58:1,15 133:9
175:10 204:22
205:19 216:24
223:19
**ups** 333:16
**use** 21:10 49:17
51:4 102:5,9,25
103:14 104:2,7
107:25 131:6
154:2,3,4,19
164:10 192:2
231:5 290:3
296:10 301:24
318:4 319:15
**usual** 224:22
**usually** 21:14
117:4 239:2
247:23 290:17
315:11 323:15,22
323:23 327:16
**utah** 273:21,23
274:4 281:17
**utube** 147:21

**v**

**v** 2:5
**vacation** 243:11
**validates** 135:14
141:11

**valley** 110:10
**vanderbilt** 196:18
196:21
**vanilla** 158:5,7
**varied** 21:18,22
230:13
**varies** 251:18
**variety** 116:19
**various** 91:13
203:1
**vary** 21:23 60:14
**vcu** 298:25
**vegas** 318:22
**vendor** 322:14
**venue** 58:13 320:6
**verbal** 8:17
**veritext** 4:13,14
337:2
**verizon** 103:11
**versa** 61:5
**versed** 251:13
**versus** 4:6 60:19
228:16
**vice** 61:5
**video** 1:10 4:4
8:14 38:13 146:10
146:14
**videographer** 4:13
5:24
**videos** 168:17
**videotape** 1:10
3:23 4:1 5:13 33:2
33:5 39:1,4 76:23
77:2 81:18,22
148:3,7 192:5,8
231:8,12 239:23
255:4 272:6,9
280:20,23 314:4,8
336:24
**view** 56:13 70:25
137:1 175:10

196:20
**viewer** 159:24
**virginia** 298:23
299:20
**virtual** 337:1
**virtually** 4:10
**visibility** 117:19
**vision** 219:14,18
219:23,25 220:9
**visit** 120:12 166:7
280:9 284:6
285:18
**visual** 162:19
**voluntarily** 27:6,7
27:9
**volunteered**
261:15
**vs** 1:5
**vtc** 2:5,12,18 3:5
3:11,17

**w**

**wait** 251:20
**waited** 267:1
**waives** 91:23
**walk** 88:5 105:19
159:15
**wall** 147:11
**want** 14:17 15:22
32:21 33:19 34:15
35:21 47:1,23
50:5 61:18 73:18
73:25 75:14,15,22
77:11 80:23 85:13
95:13 96:5,24
97:6 98:14 104:24
105:21 108:12
112:13,17 113:25
114:1,3 117:23
127:18 135:9
138:7 140:19,21
140:22,23 141:12

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[want - work]**

Page 59

| | | | |
|---|---|---|---|
| 142:18,25 143:2,4 | **waste** 237:2 | **weekend** 246:16 | **willing** 146:5,17 |
| 143:10 145:18 | **watch** 48:13 168:3 | **weekly** 71:9 315:9 | 146:23 |
| 149:18 150:25 | 168:11,15,20 | **weeks** 14:11 | **win** 114:7,7,7,8,10 |
| 152:6,13 154:16 | 286:15 | **wells** 3:6 | 114:17,17,17 |
| 159:16 160:4,6 | **watched** 115:23 | **went** 10:9 118:1 | 248:8 |
| 162:4 165:20 | 210:11,12 | 118:16 210:10,17 | **winning** 114:13 |
| 171:10 172:24 | **watching** 38:13 | 211:1 224:7 | 115:7 117:13 |
| 176:14,17 183:14 | 48:16,23 113:19 | 233:18 247:5 | **withhold** 71:11 |
| 183:16 185:14 | 146:14,20 168:6 | 256:18 288:15 | **witness** 4:10 5:14 |
| 187:20 203:13 | **waters** 197:24 | 295:22 323:15 | 5:16,22 31:17 |
| 206:6 208:4,18 | 198:1 | 328:17 | 39:11 81:16 143:3 |
| 209:15 210:5 | **way** 29:8 57:14 | **wes** 5:6 | 147:23 150:13,24 |
| 212:23 214:20 | 58:20 81:7 103:19 | **wes.moran** 3:8 | 151:16,22 231:4 |
| 220:16 225:4 | 124:3 147:3,6 | **wesley** 3:4 | 255:9 336:21 |
| 230:25 231:16,25 | 152:10 158:25 | **west** 126:2,9 | 341:13 |
| 232:19 233:16 | 171:18 181:6 | 265:21 288:16 | **wmba** 145:9 |
| 242:16 250:13 | 211:9 225:1 | **whatsoever** | **wondering** 228:3 |
| 253:19 257:11 | 228:13 234:1,12 | 107:22 | 254:18 |
| 264:17 271:10 | 243:15 245:9,23 | **whetmore** 34:7,8 | **woods** 125:14 |
| 272:17 297:19 | 252:13 276:12 | 34:12 36:19,24 | **word** 8:20 221:6 |
| 301:5 303:8 | 283:15 301:16,24 | 37:3 | 228:11 296:11 |
| 304:18 307:23 | 326:20 327:22 | **white** 12:9,10 | **words** 138:7 |
| 315:16,16 317:6 | 330:5 | 77:10,13,16,24 | 141:16,17 190:6,9 |
| 318:3 319:13 | **ways** 103:22 | 78:2,5,10,11,12 | 190:11 191:4 |
| 325:17 327:25 | 104:20,22 116:19 | 79:16,20,23 80:2 | **work** 14:23 15:12 |
| **wanted** 36:25 | 125:15 136:5 | 81:11,13 82:1,6 | 15:16 17:14 23:17 |
| 44:11 63:19 89:5 | 252:3 | 83:11 84:11,13,15 | 23:20 24:18 27:2 |
| 89:8 108:21 118:2 | **we've** 134:11 | 85:9 90:22 92:4 | 27:14 28:19 29:7 |
| 118:6,17 148:13 | 142:23 156:13 | 92:16 93:20 94:3 | 33:19 34:3,16 |
| 148:19 213:19 | 160:4,6 174:7 | 277:8 | 37:21 40:16 42:11 |
| 221:2,18,25 224:8 | 192:13 194:10 | **wide** 9:19 238:24 | 42:14 44:7,13 |
| 243:12 259:18 | 195:23 208:2 | **wife** 101:22 | 58:1 60:1 63:16 |
| 261:23 321:11 | 280:18 314:15 | **william** 342:25 | 66:2 70:23 73:25 |
| **wanting** 175:1 | **website** 250:10 | 343:25 344:25 | 75:9 90:21 101:18 |
| **wants** 21:25 143:3 | **wednesday** 205:1 | 345:25 | 101:23 102:9,12 |
| 148:12 238:11 | 205:15 213:2 | **williamson** 292:1 | 102:22,25 113:10 |
| 251:1,3 | **week** 56:4 58:7 | 292:2,3 293:1 | 123:5,13,14,25 |
| **warm** 238:8 | 148:21 158:21 | 297:2,23 298:2,8 | 126:4 145:11 |
| **warn** 254:21 | 205:4 237:25 | 299:5,7 306:12 | 147:2 150:3 154:9 |
| **warned** 254:19 | 246:15 256:19 | **williamson's** | 157:2 158:22 |
| | | 304:11 306:1,18 | 159:8 161:6 164:2 |

Daniel R Cutler
Bowen v. Adidas

March 23, 2021

**[work - zones]**

Page 60

164:9 176:19
178:12,20 193:14
195:19 200:13,14
203:6,9,10,14,21
206:12 209:19
211:14 213:17,19
213:21,25 214:2
217:4 219:18,20
223:14 256:1
268:22,24 281:25
282:9 291:23
302:6 317:4 324:6
**worked** 15:6,7,9
15:10 17:7,9 20:2
20:11 26:15,24
34:4,24 35:14,23
36:19 40:20 43:14
53:12 55:21 58:3
60:2 64:17 68:10
89:23 103:20
104:17 121:20
123:1 124:5 132:4
138:20 162:17,23
179:25 214:5
221:1 294:2 302:7
**workers** 29:13
**working** 17:4
19:23 21:7 26:18
64:7 103:17 113:6
122:15 123:19
124:1 126:8
191:21 214:8
217:8 222:5 224:9
234:17,23 238:23
240:3
**works** 58:20
245:23
**worries** 283:2
**wristbands** 260:24
261:7,11

**write** 43:19 209:4
233:22,25 234:12
282:1 304:17,25
**writes** 135:11
140:3 141:8
188:19 193:16
194:1 202:16
204:25 208:12
209:21 234:22
277:5 281:11
**written** 66:9,13
68:14 71:3,6
109:11 290:17
**wrong** 23:9,11
147:11 176:24
258:1
**wrote** 27:18
109:15 121:24
124:14 125:7
135:20 206:4
281:16

| **x** |
| --- |
| **x** 342:1,19 |

| **y** |
| --- |
| **y'all** 333:2 |

**yeah** 14:2 17:8
22:13 24:5 27:20
34:15,21 35:21
37:16 42:17 48:1
48:3 49:16 51:17
52:17 53:11 55:22
56:17,24 58:14
63:18 67:14 80:23
91:5 103:25 106:1
109:3 113:16,18
117:21 120:21
126:6,10 127:14
128:12,25 131:8
134:11 146:24
156:11 161:1

167:19 168:3
173:4 174:19,25
175:14 177:23
178:25 181:21
183:7 192:3
197:25 198:16
199:1,17,24
200:21 201:6
202:5 212:4,20
221:22 223:16
229:19 233:4
236:21 240:17,21
241:6 242:23
244:18 250:2
252:22 254:15
255:12 257:3,6,19
260:13 261:22
262:21 264:11
265:22 271:12
273:24 274:3
275:5 276:7,19,25
279:18 282:5,6,14
282:20 287:18,23
292:18 293:18
299:22 303:20
304:12,20 314:20
316:9 317:22
318:10 320:7,12
322:20 324:16
327:7 334:23
**year** 30:11 56:14
67:7,8 71:10
77:18 164:18
173:5,6 180:21
226:23 251:17
278:4 312:11
**years** 18:20 19:25
45:9,11,12 52:7
55:16,20 66:5
67:12 100:10
104:10 109:23

112:25 132:2
186:14 187:4
199:2 229:9 235:4
239:15 249:17
273:1,7
**yeezy** 265:20
**yeezy's** 265:11
266:7,21 268:16
270:24 271:1,19
**yeezys** 266:4
**yellow** 144:8
161:16
**yep** 104:7 185:20
188:10 229:23
249:16 262:5
**yesterday** 252:12
**yo** 249:11 277:6
**york** 2:13 12:5,6
79:14 105:3
**young** 294:17
**younger** 41:10,12
**youth** 180:25

| **z** |
| --- |
| **zion** 292:1,2,3,16 |

293:1,10 294:18
296:21 297:2,23
297:25 298:2,8,14
298:17 299:5,7
304:11,22 306:1
306:12,18
**zion's** 304:18
305:7,18
**zip** 33:15
**zones** 152:23

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.