UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

BRIAN BOWEN, II,

              Plaintiff,

    v.

JAMES GATTO, MERL CODE,
CHRISTIAN DAWKINS, MUNISH
SOOD, THOMAS GASSNOLA, and
CHRISTOPHER RIVERS,

              Defendants,

and ADIDAS AMERICA, INC.,

         Defendant-Cross Claimant,

    v.

MUNISH SOOD and
THOMAS GASSNOLA,

        Defendants-Cross Defendants,

and BRIAN BOWEN, SR.,

           Cross Defendant.

No. 3:18-cv-3118-JFA

**DEFENDANT-CROSS CLAIMAINT ADIDAS AMERICA,
INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT ON RICO STANDING**

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................... 1

BACKGROUND .......................................................................................................... 4

    I.    Factual Background ........................................................................................ 4

          A.    Bowen Jr. and His Parents ................................................................... 4

          B.    While Bowen Jr. Was in High School, His Parents Received Money and Other Benefits from a Prospective Sports Agent ................................... 5

          C.    Bowen Jr.'s Parents Also Received Payments in Return for Bowen Jr.'s Participation on His High School Basketball Team ............................... 6

          D.    When Deciding Where Bowen Jr. Would Attend College, the Bowens Received Cash Offers from at Least Five Universities ........................... 7

          E.    Bowen Jr. Enrolled at Louisville and Played with the Basketball Team Until the U.S. Attorney's Office Revealed its Investigation into Improper Payments in NCAA Basketball ........................................................... 9

          F.    Louisville Withheld Bowen Jr. From Its Men's Basketball Team and Declined To Seek His Reinstatement ................................................... 10

          G.    Bowen Jr. Transferred to USC, Which Also Gave Him a Full Scholarship ......... 11

          H.    Bowen Jr. Withdrew from the 2018 NBA Draft, Played Professional Basketball in Australia, and Signed an NBA Contract Following the 2019 NBA Draft ........................................................................................... 13

    II.    Procedural Background ................................................................................ 15

STANDARD OF REVIEW ........................................................................................ 16

ARGUMENT ............................................................................................................ 16

    I.    Bowen Jr.'s Claimed Harms Do Not Satisfy RICO's Injury Requirement ..................... 18

          A.    Louisville Scholarship:  Bowen Jr. Did Not Lose His Louisville Scholarship, and It Did Not Entitle Him To Play NCAA Basketball ................... 19

          B.    NCAA Eligibility:  Bowen Jr.'s Eligibility to Play in the NCAA Is Not a Business or Property Interest ............................................................. 21

          C.    Legal Fees and Costs:  Bowen Jr. Cannot Claim Injury From Legal Fees He Did Not Pay ............................................................................... 22

D.  Professional Earnings:  Bowen Jr.'s Expectation of Being Selected in the NBA Draft Is Not a Business or Property Interest ................................................ 23

II.  Bowen Jr.'s Claimed Harms Also Do Not Satisfy RICO's Causation Requirement ....... 25

A.  NCAA Eligibility:  The Alleged RICO Violations Were Not a But-For Cause of Bowen Jr.'s Claimed Ineligibility, Because His Family's Earlier Receipt of Improper Benefits Had Already Rendered Him Ineligible ................. 25

B.  Louisville Scholarship:  The Alleged RICO Violations Did Not Directly Cause Louisville To Withhold Bowen Jr. From Its Basketball Team ................. 27

C.  Legal Fees and Costs:  Bowen Jr.'s Claimed Legal Fees to Restore his NCAA Eligibility Were Not a Direct Result of the Alleged RICO Violations ............................................................................................................. 29

D.  Professional Earnings:  The Alleged RICO Violations Did Not Directly Cause NBA Teams To Not Select Bowen Jr. in the NBA Draft ......................... 29

III.  Bowen Jr. Lacks Standing Under RICO To Obtain Injunctive Relief ............................ 31

CONCLUSION ......................................................................................................................... 32

## TABLE OF AUTHORITIES

CASES

*Abrahams v. Young & Rubicam,*
    79 F.3d 234 (2d Cir. 1996) ...........................................................................28

*Adamek v. Pa. Interscholastic Athletic Ass'n,*
    426 A.2d 1206 (Pa. Commw. Ct. 1981) ........................................................21

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ......................................................................................16

*Anza v. Ideal Steel Supply Corp.,*
    547 U.S. 451 (2006) ................................................................................27, 30

*Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) ......................................................................................27

*B2Gold Corp. v. Christopher,*
    No. 1:18-cv-1202, 2019 WL 4015890 (E.D. Va. Aug. 26, 2019) .................29

*Bast v. Cohen, Dunn & Sinclair, P.C.,*
    59 F.3d 492 (4th Cir. 1995) ...........................................................18, 22, 24

*Bd. of Regents v. Roth,*
    408 U.S. 564 (1972) ......................................................................................18

*Brandenburg v. Seidel,*
    859 F.2d 1179 (4th Cir. 1988) ......................................................................16

*Bruce v. S.C. High Sch. League,*
    189 S.E.2d 817 (S.C. 1972) ..........................................................................21

*Castellanos v. Worldwide Distribution Sys. USA, LLC,*
    290 F. Supp. 3d 692 (E.D. Mich. 2017) .......................................................17

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,*
    140 S. Ct. 1009 (2020) ..................................................................................25

*Dan River, Inc. v. Icahn,*
    701 F.2d 278 (4th Cir. 1983) ........................................................................31

*Denis J. O'Connell High Sch. v. Va. High Sch. League,*
    581 F.2d 81 (4th Cir. 1978) .....................................................................21, 23

*Dickerson v. TLC The Laser Eye Ctr. Inst., Inc.,*
    493 F. App'x 390 (4th Cir. 2012) ..................................................17, 22, 31

*Doe v. Roe*,
  958 F.2d 763 (7th Cir. 1992) ...................................................................................23

*Galaxy Distrib. of W.V., Inc. v. Std. Distrib., Inc.*,
  No. 2:15-cv-04273, 2015 WL 4366158 (S.D. W. Va. July 16, 2015) .....................32

*Giuliani v. Duke Univ.*,
  No. 1:08-cv-502, 2010 WL 1292321 (M.D.N.C. Mar. 30, 2010).............................20

*Hall v. NCAA*,
  985 F. Supp. 782 (N.D. Ill. 1997) ...........................................................................23

*Hemi Grp., LLC v. City of New York*,
  559 U.S. 1 (2010).....................................................................................25, 27, 30

*Hengle v. Asner*,
  433 F. Supp. 3d 825 (E.D. Va. 2020) .......................................................................32

*Holmes v. Secs. Inv. Protection Corp.*,
  503 U.S. 258 (1992).............................................................................................25, 27

*Hysaw v. Washburn Univ. of Topeka*,
  690 F. Supp. 940 (D. Kan. 1987) .............................................................................20

*In re Am. Express Co. S'holder Litig.*,
  39 F.3d 395 (2d Cir. 1994)........................................................................................27

*In re Volkswagen "Clean Diesel" Mktg. v. Robert Bosch, LLC*,
  No. 20-15034, 2021 WL 248518 (9th Cir. Jan. 26, 2021).......................................27

*In re Xe Servs. Alien Tort Litig.*,
  665 F. Supp. 2d 569 (E.D. Va. 2009) .......................................................................32

*Jackson v. Drake Univ.*,
  778 F. Supp. 1490 (S.D. Iowa 1991) ........................................................................20

*Johnson v. Collins Entm't Co., Inc.*,
  199 F.3d 710 (4th Cir. 1999) ....................................................................................31

*Kimberlin v. Nat'l Bloggers Club*,
  No. GJH–13–3059, 2015 WL 1242763 (D. Md. Mar. 17, 2015) ............................24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014)..............................................................................................16

*Maio v. Aetna, Inc.*,
  221 F.3d 472 (3d Cir. 2000)......................................................................................18

*Marcantonio v. Dudzinski,*
    155 F. Supp. 3d 619 (W.D. Va. 2015) ...........................................................21, 24

*Maze v. Bd. of Dirs. for Commonwealth Postsecondary Educ. Prepaid Tuition Tr. Fund,*
    559 S.W.3d 354 (Ky. 2018) .........................................................................20

*McCormack v. NCAA,*
    845 F.2d 1338 (5th Cir. 1988) ...................................................................23

*Minter v. Wells Fargo Bank, N.A.,*
    593 F. Supp. 2d 788 (D. Md. 2009) ...........................................................32

*Muigai v. IB Prop. Holdings, LLC,*
    No. 08:09–cv–01623–AW, 2010 WL 5173313 (D. Md. Dec. 14, 2010) ........18, 22

*N. Am. Rescue Prods. v. PJ Richardson,*
    769 S.E.2d 237 (S.C. 2015) .......................................................................20

*Nunes v. Fusion GPS,*
    No. 1:19-cv-1148, 2021 WL 1225983 (E.D. Va. Mar. 31, 2021)...........................31

*Parish v. NCAA,*
    506 F.2d 1028 (5th Cir. 1975) ...................................................................23

*Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.,*
    262 F.3d 260 (4th Cir. 2001) .....................................................................31

*R.J. Reynolds Tobacco Co. v. Market Basket Food Stores, Inc.,*
    No. 5:05-cv-253-V, 2007 WL 319965 (W.D.N.C. Jan. 30, 2007) .......................32

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979)...................................................................................18

*Ricker v. Edmisten,*
    No. 93-CV-1756, 1994 WL 32807 (4th Cir. 1994) ..........................................20

*Sedima, S.P.R.L. v. Imrex,*
    473 U.S. 479 (1985)...............................................................................16, 17

*Siena Corp. v. Mayor & City Council of Rockville,*
    873 F.3d 456 (4th Cir. 2017) .....................................................................18

*Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.,*
    884 F.3d 489 (4th Cir. 2018) ................................................................27, 28, 29

*Strates Shows Inc. v. Amusements of Am., Inc.,*
    379 F. Supp. 2d 817 (E.D.N.C. 2005)...................................................18, 20, 23, 29

*Taylor v. Bettis*,
    976 F. Supp. 2d 721 (E.D.N.C. 2013) ..................................................................18

*The Knit With v. Knitting Fever, Inc.*,
    Nos. 08–4221, 08–4775, 2012 WL 2938992 (E.D. Pa. July 19, 2012) ............................17, 29

*Thompson v. Fayette Cnty. Pub. Schs.*,
    786 S.W.2d 879 (Ky. Ct. App. 1990) ..................................................................21

**STATUTES AND RULES**

18 U.S.C. § 1962(a) ..................................................................14

18 U.S.C. § 1962(c) ..................................................................14

18 U.S.C. § 1962(d) ..................................................................14, 15

18 U.S.C. § 1964(c) ..................................................................1, 16, 17, 22, 24, 31

Fed. R. Civ. P. 56(a) ..................................................................16

**OTHER AUTHORITIES**

Restatement (Third) of Torts: Phys. & Emot. Harm § 26 cmt. k. (2010) ......................................25

## INTRODUCTION

Plaintiff Brian Bowen Jr. cannot establish statutory standing for his claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). As a result, the Court should grant summary judgment to Defendant-Cross Claimant adidas America, Inc. ("adidas") and deny Bowen Jr.'s RICO claims in their entirety.

The availability of civil relief under RICO is narrowly circumscribed. To discourage opportunistic claimants attracted by the prospect of treble damages and fee shifting, only specific types of injuries can support an actionable claim. A plaintiff therefore can recover only for injuries that are both to "business or property" and that were actually and directly caused by a RICO violation. 18 U.S.C. § 1964(c). Each is an independent requirement; if a plaintiff's claimed harm is either not to business or property or not actually and directly caused by the RICO violation, the plaintiff lacks RICO standing.

Bowen Jr. has not suffered any injury that satisfies RICO's statutory standing requirements. He claims that the alleged predicate act of his father agreeing in May 2017 to accept money in exchange for Bowen Jr. attending Louisville ("May 2017 Agreement") caused him to not play basketball at Louisville, which he in turn speculates eventually caused him to not be selected in the first round of the NBA draft. But none of the categories of harms that Bowen Jr. alleges—supposed loss of scholarship benefits at Louisville, ineligibility to play NCAA basketball (under which he also seeks fees spent to recover his eligibility), and reduced future earnings in the NBA—meet RICO's standing requirements.

When this Court denied the motions to dismiss Bowen Jr.'s amended complaint, it recognized that "Defendants' standing arguments may have merit" but, because of the "early stage in the proceedings," the Court allowed Bowen Jr. the opportunity to establish factual support for his allegations in discovery. (Order at 21, Feb. 27, 2020, ECF No. 112 [Ex. 1].)

Discovery has now starkly confirmed Bowen Jr.'s lack of RICO standing and unambiguously rebutted the specious factual assertions he made when opposing the motions to dismiss his complaint.  The undisputed facts make clear that Bowen Jr.'s claimed harms were not to cognizable business or property interests.  Nor were the claimed harms actually or proximately caused by the alleged RICO violations.  Each of these twin flaws is, on its own, a sufficient basis to dismiss Bowen Jr.'s RICO claims.

*First*, none of Bowen Jr.'s claimed injuries are to tangible "business or property" rights, as required by RICO.  As to Bowen Jr.'s claimed lost scholarship benefits (*see* Argument Section I.A), discovery has proven that Louisville told Bowen Jr. he could remain on scholarship—not that Louisville "effectively . . . removed [him] from the University," as Bowen Jr. previously asserted.  (Opp. Mot. Dismiss Am. Compl. at 28, Oct. 18, 2019, ECF No. 101.)  Bowen Jr. himself abandoned his Louisville scholarship when he chose to transfer to the University of South Carolina ("USC").  Bowen Jr. also argued to the Court that he had a "contractually-guaranteed place" in college basketball and a right to "athlete . . . benefits" under his Louisville scholarship.  (Opp. Mot. Dismiss Compl. at 14–15, Mar. 8, 2019, ECF No. 55.)  But discovery has confirmed that Bowen Jr.'s scholarship promised him cost of attendance—"Tuition & Fees," "Books," "Housing," "Meals," and "Misc. Expenses"—but gave no guarantee of any athletic "benefits," let alone a spot on the team.  Bowen Jr. may have expected to play on Louisville's team, but the law is clear that a mere expectation is not a cognizable business or property right.  Nor did Bowen Jr. have any such right in his NCAA eligibility, because students have no business or property right in playing school sports, including in the NCAA.  (*See* Argument Section I.B.)  And Bowen Jr. cannot recover attorney's fees incurred to restore his NCAA eligibility, including for the basic reason that he did not pay those fees.  (*See* Argument Section

I.C.)  Further, Bowen Jr. cannot claim a business or property interest in the supposed lost professional earnings he hoped to obtain as a first-round NBA draft pick.  (*See* Argument Section I.D.)  Student-athletes do not have a property right in their anticipated professional careers.  Even were that not so, because Bowen Jr. asserts that he lost future earnings due to a personal harm—a purported reduced ability to play basketball from not playing in the NCAA—those claimed lost earnings would still not be cognizable under RICO.

*Second*, each of Bowen Jr.'s claimed harms also fails RICO's causation requirement.  Bowen Jr. cannot show that the May 2017 Agreement was a but-for cause of losing his NCAA eligibility, because his family's earlier, independent acceptance of improper benefits had already caused Bowen Jr. to lose his NCAA eligibility.  (*See* Argument Section II.A.)  Likewise, Bowen Jr.'s claimed loss of scholarship benefits at Louisville does not satisfy RICO's proximate causation element, which requires that the plaintiff's injuries have been the *direct* result of the alleged violation—at the *first step* in the causal chain.  (*See* Argument Section II.B.)  The purported loss of scholarship benefits was not the direct result of the May 2017 Agreement because it allegedly occurred only when Louisville learned of the Agreement months later and then withheld Bowen Jr. from the basketball team.  A RICO violation cannot be a direct cause of injuries that resulted from the discovery of the violation and not from the violation itself.  Beyond that fatal flaw, Bowen Jr.'s request for legal fees voluntarily incurred to restore his eligibility (*see* Argument Section II.C) and assertion of reduced career earnings from not being drafted by an NBA team (*see* Argument Section II.D) are even further attenuated and indirect.

*Third*, even if some of Bowen Jr.'s claimed harms were sufficient under RICO (which they are not), he still lacks standing to seek his requested injunction barring adidas from

sponsoring NCAA men's basketball programs.  Private plaintiffs cannot obtain such equitable relief under RICO.  (*See* Argument Section III.)

Bowen Jr. previously argued that the Court should not assess standing for each of his claimed injuries individually until after "discovery has commenced."  (Opp. Mot. Dismiss Am. Compl. at 31.)  That time has come.  It can no longer be genuinely disputed that Bowen Jr.'s claimed harms fail to satisfy RICO's standing requirements.  This Court should grant summary judgment, dismissing Bowen Jr.'s claims in their entirety because the injuries that Bowen Jr. has asserted do not meet RICO's standing requirements.  To the extent the Court determines that Bowen Jr. has alleged any harms that satisfy the RICO standing requirements, it should permit Bowen Jr. to pursue only those harms moving forward, and it should still dismiss his requested injunctive relief.

## **BACKGROUND**

### I.     **Factual Background**

#### A.     **Bowen Jr. and His Parents**

Bowen Jr. is a 22-year-old professional basketball player.  (Bowen Jr. Dep. 9:1–6, Jan. 7, 2021 [Ex. 2].)  His father is Cross Defendant Brian Bowen Sr., and his mother is Carrie Malecke, a non-party to this case.  (Bowen Sr. Dep. 12:12–18, Jan. 20, 2021 [Ex. 3].)

While Bowen Jr. was in high school, and, as early as the end of his sophomore year in 2015, he was considered among the top high-school basketball players in the United States.  By the time he began his senior year in 2016, publications that rank amateur-basketball talent placed him between the 14th and 21st best recruit in his high school class.  (*See* 247 Composite, *2017 Top Basketball Recruits* [Ex. 4].)

**B.     While Bowen Jr. Was in High School, His Parents Received Money and Other Benefits from a Prospective Sports Agent**

During his time in high school, Bowen Jr.'s parents profited off of Bowen Jr.'s amateur talent from multiple parties.  On numerous instances, and at least by the beginning of 2016, the Bowens received money and other benefits from Defendant Christian Dawkins, then an aspiring sports agent at ASM Sports (a then-premier sports agency), as inducements for him to serve as Bowen Jr.'s representative.

Dawkins joined ASM Sports in 2014, where his job included "recruiting" and "bringing [players] into the agency."  (*Dawkins* Trial Tr. 1218:8–17, 1218:23–24, May 1, 2019 [Ex. 5] (Dawkins testimony).)  ASM's method of attracting clients was to identify amateur basketball players and "pay[] players and pay[] their families"—it was "the way that ASM did business." (*Id.* at 1227:8–18; 1228:6–17, 1330:16–21 (Dawkins testimony).)  The goal was to "identify the talent as young as possible, sometimes as early as ninth grade," and "cultivate, ingratiate yourself with the family, the player."  (*Id.* at 1221:7–1222:5, 1329:12–17 (Dawkins testimony).) Dawkins recruited several prominent amateur players to ASM, some of whom have had successful NBA careers.  (*Id.* at 1218:18–1219:5; 1219:23–1220:13.)  He also paid players and their families with ASM's money.  (*E.g.*, *id.* at 1229:19–1230:3; 1231:17–21.)

Dawkins paid the Bowens on behalf of ASM.  Throughout 2016 and into 2017, Dawkins made repeated payments to Bowen Sr.—"[p]eriodically like [$]1,500, $2,000 a month" and "whenever he would come up with it, every month, every other few months, whatever"—in order to "be [Bowen Jr.'s] representative."  (*Gatto* Trial Tr. 544:22–545:9, 548:2–4, 552:17–553:10, Oct. 4, 2018 [Ex. 6] (Bowen Sr. testimony).)  In February 2016, Dawkins reimbursed Bowen Jr.'s mother for the cost of Bowen Jr., Bowen Sr., and herself flying to Omaha, Nebraska, to attend a February 9, 2016 men's basketball game at Creighton University, a Nike-sponsored

5

school.  (Pat Forde & Pete Thamel, *Exclusive: Federal documents detail sweeping potential NCAA violations involving high-profile players, schools*, Yahoo! Sports, at *4–6, *8 (Feb. 23, 2018) [Ex. 7]; USC Report to NCAA at *4, May 16, 2018 [Ex. 8].)  Before the flight, Dawkins texted Bowen Jr.'s mother for the "correct spelling of names [a]n[d] b[irth]days" of the Bowen family, which Bowen Jr.'s mother provided.  (Text Messages between C. Malecke and C. Dawkins at *5–11 [Ex. 9].)  He then sent her the flight and hotel information, saying that the reservation was "[i]n Brian's name."  (*Id.*)  The next month, Dawkins paid for Bowen Sr.'s dinner at an expensive restaurant and gave him $3,000 in cash.  (Yahoo! Sports Article at *7; USC Report at *4.)  Dawkins also paid for Bowen Sr. and Bowen Jr.'s unofficial college visits in 2016.  (*Gatto* Trial Tr. at 550:15–21, 551:9–16.)  And he and another associate at ASM paid for Bowen Sr.'s dinner at a New York restaurant in April 2017.  (*Id.* at 559:15–560:12.)

Dawkins worked at ASM until May 2017, when he started his own agency, LOYD Inc., with Defendant-Cross Defendant Munish Sood.  (*Dawkins* Trial Tr. at 1225:3–4, 1235:7–10, 1242:3–5, 1251:14–17.)  Dawkins took his representation of Bowen Jr. with him, telling Sood later in 2017 that Bowen Sr. had agreed to give Dawkins portions of any Bowen Jr. contracts and market deals in exchange for $2,000 per month.  (Email from C. Dawkins to M. Sood, Sept. 5, 2017 [Ex. 10].)

### C.    Bowen Jr.'s Parents Also Received Payments in Return for Bowen Jr.'s Participation on His High School Basketball Team

In addition to payments and other benefits provided by Dawkins and ASM in return for representing Bowen Jr., the Bowens also received payments from the head basketball coach at La Lumiere high school in return for Bowen Jr. playing on the school's basketball team.  In 2015, before his junior year of high school, Bowen Jr. transferred to La Lumiere School, a private college-preparatory school in La Porte County, Indiana, that has one of the nation's best

basketball programs and a sponsorship agreement with Nike.  (Bowen Jr. Dep. 49:5–10, 51:15–20, 52:10–22; Bowen Sr. Dep. 76:7–10.)

In return, La Lumiere's head basketball coach paid Bowen Sr. $2,000 per month.  (*Gatto* Trial Tr. 547:06–15; *see also* Bowen Sr. Tr. 85:1–5.)  Bowen Sr. acknowledged that the money paid was used for his and Carrie Malecke's personal rent and expenses and was compensation for Bowen Jr. playing on La Lumiere's basketball team.  (*Gatto* Trial Tr. 547:16–17; *see also* Bowen Sr. Tr. 38:22–39:10; 43:15–21; 255:2–11.)

### D.    When Deciding Where Bowen Jr. Would Attend College, the Bowens Received Cash Offers from at Least Five Universities

During and before Bowen Jr.'s senior year of high school, he was offered athletic scholarships from many universities.  ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████ [Ex. 11].)  With Louisville and at least four other universities (each sponsored by Nike, except for Louisville),[1] Dawkins negotiated side offers of cash payments and other benefits to the Bowen family if they were to direct their son to attend a particular school:

- To attend Creighton University, $100,000 in cash, as well as "[m]arketing deals" and "money for [Bowen Jr.] after school."  (*Gatto* Trial Tr. 556:8–16; Malecke and Dawkins Texts at *99–102.)  Bowen Jr.'s mother reported to Dawkins that, after she conveyed the Creighton offer to Bowen Jr., he said it was an "awesome move." (Malecke and Dawkins Texts at *102.)

- To attend the University of Texas, free housing for Bowen Sr.  (*Gatto* Trial Tr. at 555:14–23.)

- To attend Oklahoma State University, $150,000 in cash, $80,000 for a car, and an unidentified amount to buy a house from the university.  (*Id.* at 554:23–555:13.)

- To attend the University of Arizona, $50,000 in cash.  (*Id.* at 554:7–19.)

---

[1] (*See* Sports Illustrated, *How Adidas, Nike and Under Armour Have Divvied Up Major College Basketball* (Oct. 2, 2017) [Ex. 12].)

- To attend Louisville, $100,000 in cash. (*Id.* at 523:2–8.)

On May 31, 2017, Bowen Sr. accepted the cash offer for Bowen Jr. to attend Louisville, and Bowen Jr. committed to the university ("May 2017 Agreement"). (Text Message from C. Dawkins to TJ Gassnola, June 1, 2017 (12:20 AM) [Ex. 13].) Within ten days, Bowen Jr. signed an NCAA "Student-Athlete Statement" that included affirmations that "[y]ou have knowledge of and understand the application of NCAA Division I bylaws related to eligibility" and "amateur status," and "you have not violated any amateurism rules." (Brian Bowen II, Student-Athlete Statement – NCAA Division 1, June 9, 2017 [Ex. 14].)

As later alleged by prosecutors in the Southern District of New York ("SDNY"), after Bowen Jr.'s commitment to Louisville, Defendants Merl Code and James Gatto—a contractor and an employee of adidas, respectively—submitted fraudulent invoices to adidas seeking amounts they claimed were for "travel expenses" and "consulting fee[s]," but actually were intended to fund payments to the Bowen family. (Invoice from M. Code to J. Gatto, June 17, 2017 [Ex. 15].) adidas's internal processes raised red flags that delayed payment of the invoices, causing Code to complain that adidas was "asking for all th[e]s[e] P.O. numbers and vendor numbers and blah, blah, blah, blah, blah." (Recorded Conversation between M. Code and C. Dawkins at 12, July 7, 2017 [Ex. 16].) Concerned that adidas's "processes" and "corporate structure" were taking too long, Code asked Jeff D'Angelo and Sood—business partners of Dawkins at his new agency (though D'Angelo was in fact an FBI agent)—if D'Angelo could provide the funds to make an initial payment to Bowen Sr. (Recorded Conversation between M. Sood, M. Code, and J. D'Angelo at 1–12, July 10, 2017 [Ex. 17].) The group agreed, and D'Angelo provided Sood with the necessary funds, which were, unbeknownst to Sood or Dawkins, government funds. (*Id.*) Then, Sood met Bowen Sr. in a New Jersey parking lot and

handed him $19,400 in cash.  (Text Messages between C. Dawkins, M. Sood, and B. Bowen Sr. [Ex. 18].)

Besides this payment, Bowen Sr. accepted $1,300 from Louisville coach Kenny Johnson in the summer of 2017.  (Bowen Sr. Dep. Tr. 174:14–21; 176:4–14; 252:18–253:4.)  Throughout the summer of 2017, Bowen Sr. continued to accept $2,000 per month from Dawkins.  (Bowen Sr. Dep. Tr. 185:14–21.)

> **E.    Bowen Jr. Enrolled at Louisville and Played with the Basketball Team Until the U.S. Attorney's Office Revealed its Investigation into Improper Payments in NCAA Basketball**

Following the May 2017 Agreement, Bowen Jr. enrolled at Louisville.  During the summer of 2017, he took online courses, moved into his dormitory, and began practicing with the men's basketball team.  (Bowen Jr. Dep. Tr. 141:14–142:8; ███████████████████

███████; Text Messages between B. Bowen Jr. and K. Johnson at *4 [Ex. 19].)

In late September 2017, the U.S. Attorney's Office for the SDNY announced "charges of fraud and corruption in college basketball" against Code, Dawkins, Gatto, and others.  (*Press Conference Advisory*, U.S. Att'y's Office, S.D.N.Y., Sept. 26, 2017 [Ex. 20].)  The criminal complaint alleged that Code, Dawkins, and Gatto had "worked together to funnel $100,000 from" adidas to the family of "Player-10" on the men's basketball team at "University-6." (*United States v. Gatto*, No. 17-cr-686, at *7 (S.D.N.Y. Sept. 25, 2017) [Ex. 21] (criminal compl., ECF No. 1).)  Within an hour of the announcement, journalists had inferred and published that "Player-10" was Bowen Jr. and "University-6" was Louisville.  (*E.g.*, Gary Parrish (@GaryParrishCBS), Twitter (Sept. 26, 2017 10:23 AM) [Ex. 22].)

**F.    Louisville Withheld Bowen Jr. From Its Men's Basketball Team and Declined To Seek His Reinstatement**

The next day, Louisville withheld Bowen Jr. from all men's basketball team practices and

games ███████████████████████████████████████████████████████

████████████████████████████████████████████████████ [Ex.

23]; Bowen Jr. Personal Statement [Ex. 24]; Bowen Jr. Dep. 146:6–9; *see also* ███████████

███████████████████████████████████████████ [Ex. 25] (███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████.) ███████████████████████████████

███████████████████████    █████████████████████████

██████████████    As Louisville's athletic director later explained, the university withheld

Bowen Jr. from practice and competition because the SDNY's allegations "implicated" parties

"involved in [Bowen Jr.'s] recruitment," and relevant NCAA guidelines caution that "when a

prospective student-athlete allows a third party to involve himself . . . in the recruitment

process," that student-athlete "is then responsible for the actions of that third party."  (Letter

from J. Carns, Univ. of Louisville Sr. Assoc. Athletic Dir., to NCAA Legislative Relief Comm.,

May 7, 2018 [Ex. 26] ("J. Carns Letter").)

During Louisville's investigation, ███████████████████████████████

███████████████████████████████████████████████████████

██████████████████████    ████████████████████████    Bowen Jr. was

assisted in responding to Louisville's investigation, as well as inquiries from the SDNY, by

Jason Setchen, an attorney retained for him by his parents.  (Bowen Jr. Dep. 10:23-25, 80:11-25;

███████████████████████████████ [Ex. 27].)

10

Five days after Louisville's interview of Bowen Jr., the university told him that he could "remain" at Louisville and "continue to receive [his] athletics scholarship," but would "not be allowed to practice with or compete for [the university's] men's basketball team at any point in the future." (Letter from V. Tyra, Univ. of Louisville Interim Dir. of Athletics, to B. Bowen Jr., Nov. 22, 2017 [Ex. 28].) Louisville also shared this decision publicly, tweeting that "Brian Bowen will not play at the University of Louisville. He may remain on scholarship but will not be allowed to practice or compete." (@LouisvilleMBB, Twitter (Nov. 22, 2017, 10:44 AM) [Ex. 29].) ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████. ██████████████████████████████████ [Ex. 30].) Louisville declined to attempt to have Bowen Jr. play for the university—which would have required Louisville to declare Bowen Jr. ineligible and then seek his reinstatement—a decision its athletic director later described as "prudent" and "made after extensive internal review and discussion of the information our institution had at the time." (J. Carns Letter; *see also* Decl. of Prof. Josephine R. Potuto ¶ 9 (explaining that an "institution may, but is not obliged to, seek reinstatement of eligibility for a student-athlete").)

### G. Bowen Jr. Transferred to USC, Which Also Gave Him a Full Scholarship

In January 2018, just before his second semester of college, Bowen Jr. transferred from Louisville to USC, where he again received a scholarship covering his full cost of attendance. (Bowen Jr. Dep. 155:20–156:22; USC Athletics, Athletics Financial Aid Agreement for Brian Bowen II, Jan. 8, 2018 [Ex. 32].) He practiced with USC's basketball team, but was not allowed to play in games due to the NCAA's transfer rule, which required him to "to complete one full academic year of residence" at USC "before being eligible to compete." (NCAA 2017–18 Bylaws 14.5.1 [Ex. 33].)

In February 2018, *Yahoo! Sports* published an article revealing "[d]ocuments and bank records obtained in discovery" during the SDNY criminal investigation, which "detail[ed]" the expenditures of ASM Sports, including those of its founder and "his former associate Christian Dawkins." (Yahoo! Sports Article at *1.) The documents, published with the article, included "expense reports" from Dawkins "seeking reimbursement" from ASM Sports for money he "paid to college and high school players and their families." (*Id.* at *4) Among the items detailed in Dawkins's expense reports was $1,571.10 for the Bowen family's trip in February 2016 to see a Creighton University basketball game, as well as $3,000 in cash to "Brian Bowen" and $161.36 for a dinner with "Brian Bowen." (*Id. at* *4, *5–6, *7–8) The article noted that, according to the documents, "[Bowen Jr.] and his family received at least $7,000 in benefits" from ASM. (*Id.* at *4)

In May 2018, USC reported to the NCAA that it had "declared" Bowen Jr. "ineligible," but requested that the NCAA reinstate Bowen Jr.'s eligibility (as well as waive the transfer rule, which USC had separately requested in March 2018). (USC Report at *1, *3; *see also* Letter from C. Miller to NCAA Legislative Relief Comm., Mar. 27, 2018 [Ex. 34].) Because Louisville had declined to take this step, this was the first time that Bowen Jr. was declared ineligible to play NCAA basketball. USC explained its determination that Bowen Jr. was ineligible by listing not only the May 2017 Agreement but also the Bowen family's earlier, independent receipt of benefits from Dawkins on behalf of ASM, as described in the February 23, 2018 *Yahoo! Sports* article. (USC Report at *3–4.) USC concluded that the benefits from Dawkins violated the NCAA's bylaws on "Benefits from Prospective Agents." (*Id.* at *4 (citing NCAA 2017–18 Bylaws 12.3.1.3).) ████████████████████████████████



[Ex. 35].)

[Ex. 36].)  Bowen Sr. paid

Setchen for that work and did not expect to be reimbursed by his son.  (Bowen Sr. Dep. 219:19–

220:15, 369:23–371:16, 372:2–373:1 (testifying that Setchen's legal fees were paid from Bowen,

Sr.'s credit card and that Bowen Sr. did not intend to seek reimbursement from Bowen Jr.).)

### H.    Bowen Jr. Withdrew from the 2018 NBA Draft, Played Professional Basketball in Australia, and Signed an NBA Contract Following the 2019 NBA Draft

Ahead of the 2018 NBA draft, Bowen Jr. attended the draft combine, underwent medical

testing, and worked out with over a dozen NBA teams.  (2018 NBA Draft Combine Invitation

and Schedule, Apr. 28, 2018 [Ex. 37]; Bowen Jr. Dep. 166:1–3; 167:8–16.)  He had a poor

performance—described by one of his own putative experts as "underwhelming" and "subpar"

(Report of Pl.'s Expert Michael Bratz at *8, *14, Feb. 22, 2021 [Ex. 38])[2]—and withdrew from

the draft.  (Letter from B. Bowen II to E. Ruiz, June 11, 2018 [Ex. 39].)

Instead of returning to USC (whose reinstatement request had not yet been finally

adjudicated by the NCAA), Bowen Jr. signed a contract with Australia's National Basketball

League ("NBL")                                                      , and moved to

Australia to join the Sydney Kings.  (Bowen Jr. Dep. 193:7–9;

[Ex. 40].)  While in the NBL, Bowen Jr. played in televised games with

---

[2] Bratz's analysis is based on an "eyeball test" that does not come close to satisfying the requirements of expert testimony.  adidas intends to move to exclude Bratz from testifying.

and against professional basketball players, could work on his game fulltime, and (in his opinion) improved as a player.  (Bowen Jr. Dep. 197:1–10, 235:13–19, 314:12–315:20.)

After one season in Australia, Bowen Jr. entered the 2019 NBA draft.  Bowen Jr. believed he would be drafted but "wasn't sure" where, though he "had hopes of" the first round.  (Bowen Jr. Dep. Tr. 200:8–15.)  Prior to the 2019 draft, Bowen Jr. participated in a further round of team workouts.  (*Id.* at 198:7–20, 199:14–20; Rosenthal Dep. 72:10–13 [Ex. 41].)  As with the 2018 combine, his performance was again "underwhelming" and "subpar" (Bratz Report at *8, *14), and he was not selected.  Instead, he signed a "two-way" NBA contract with the Indiana Pacers and its development league affiliate, the Fort Wayne Mad Ants, allowing him to spend a limited number of days during the season with the NBA franchise and the rest with the development team.  (Bowen Jr. Dep. 209:11–210:20.) ███████████████████

███████████████████ ███████████████████

███████████████ [Ex. 42].)  He appeared in six games for the Pacers, playing a total of thirty-one minutes and scoring six points.  (The Stats Crew, *Brian Bowen* [Ex. 43].)

After the 2019-20 season, the Pacers declined to offer Bowen Jr. a standard NBA contract, leaving Bowen Jr. a free agent available to be signed by any NBA team.  (Bowen Jr. Dep. Tr. 213:20–214:3.)  But to Bowen Jr.'s knowledge, no other team offered him a standard NBA contract either, and instead he returned to the Pacers on another two-way contract.  (*Id.* at 216:12–24; ███████████████████

██████ [Ex. 44].) ███████████████████████ ████ The Pacers have again played him only for limited minutes—bits of four games totaling just eleven minutes as of April 7, 2021, out of fifty games played by the team.  (ESPN.com, *Brian Bowen II* [Ex. 45].)

14

## II.     Procedural Background

Bowen Jr. alleges four counts of violations of RICO: two counts of substantive RICO violations (Am. Compl. ¶¶ 274–82, Aug. 23, 2019, ECF No. 84; *id.* ¶¶ 291–99 (alleging violations of 18 U.S.C. § 1962(a) and (c)), and two counts of conspiracy to commit RICO violations (*id.* ¶¶ 283–90; *id.* ¶¶ 300–06 (alleging violations of 18 U.S.C. § 1962(d)). He names seven defendants: adidas, Merl Code, Christian Dawkins, Christopher Rivers, TJ Gassnola, James Gatto, and Munish Sood. (*Id.* ¶¶ 15–21.)

His core contention is that Defendants committed predicate acts of wire fraud against student-athletes and universities by offering payments to the families of high-school basketball players for those players to attend such universities on scholarships, which allegedly rendered false the certifications of NCAA eligibility that those players made to the universities. *(Id.* ¶¶ 137–39.) Bowen Jr. claims that, as a result of these alleged acts of racketeering, he suffered "three . . . categories" of damages: "(1) damage to his protected property interest and the services guaranteed therein via the June 1, 2017 contract with the University of Louisville; (2) damage to his NCAA eligibility; and (3) damage to his earnings as a professional basketball player." (Bowen Jr.'s Suppl. Initial Disclosures at 2, Jan. 5, 2021 [Ex. 31].)

This Court, on two sets of motions to dismiss, pared Bowen Jr.'s allegations but permitted him to engage in discovery on his alleged standing to bring RICO claims. As to RICO standing, in ruling on the motions to dismiss Bowen Jr.'s original complaint, the Court "reserved its decision on whether Plaintiff's allegations satisfied the RICO standing requirements 'due to the leave granted to Plaintiff to amend his pleadings.'" (Order at 20 (quoting Aug. 8, 2019 Order at 8 n.2) [Ex. 46]).) When Defendants raised the issue again in moving to dismiss the amended complaint, the Court recognized that "Defendants' standing arguments may have merit," but declined to dismiss Bowen Jr.'s claims on that ground at "this early stage in the proceedings."

(*Id.* at 21.)  The Court reasoned that, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" and that Defendants' standing arguments "remain[] open to review at all stages of the litigation."  (*Id.*)

At a February 3, 2021 discovery conference, the Court granted adidas's request for leave to file summary judgment in two phases, with the first motion focused on RICO standing.  (Hr'g Tr. 54:13–16, Feb. 3, 2021, ECF No. 191; *see also* Final Amended Scheduling Order, Mar. 22, 2021, ECF No. 200 [Ex. 47] (setting deadline for "dispositive motions pertaining to RICO standing").)

## STANDARD OF REVIEW

Summary judgment is warranted when a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect the outcome under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence presented is such that a reasonable jury may return a verdict for the non-movant.  *Id.* at 248.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.* at 247–48.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 248.

## ARGUMENT

RICO provides a civil cause of action only to persons "injured in [their] business or property by reason of a violation of [the RICO statute]."  18 U.S.C. § 1964(c).  The Fourth Circuit has referred to these statutory "injury and causation requirements" as RICO's "standing" requirement, *Brandenburg v. Seidel*, 859 F.2d 1179, 1187 (4th Cir. 1988), *overruled in part on*

*other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996)), in that they strictly limit the categories of claimed injuries that warrant treble damages and attorney's fees under RICO.[3]  This statutory standing requirement includes both an injury component, mandating that claimed injuries be to "business or property," and a causation component, requiring that claimed injuries occur "by reason of" the RICO violation.  18 U.S.C. § 1964(c).  Failure to show either is fatal to a RICO claim.

Because a RICO plaintiff "can only recover *to the extent that*[] he has been injured in his business or property by the conduct constituting the violation," *Sedima, S.P.R.L. v. Imrex*, 473 U.S. 479, 496 (1985) (emphasis added), Bowen Jr. must establish RICO standing for *each* of his claimed injuries.  For that reason, courts "consider[] each category of [a] [p]laintiff's claimed damages individually."  *The Knit With v. Knitting Fever, Inc.*, Nos. 08-4221, 08-4775, 2012 WL 2938992, at *5 (E.D. Pa. July 19, 2012); *e.g.*, *Dickerson v. TLC The Laser Eye Ctr. Inst., Inc.*, 493 F. App'x 390, 394 (4th Cir. 2012) (examining plaintiff's claimed RICO injuries separately and explaining that a plaintiff "can only recover if he shows that his injury caused by the RICO violation damaged his business or property").  If some alleged injuries satisfy RICO's standing requirements while others do not, those that do not must be dismissed.  *See, e.g.*, *Castellanos v. Worldwide Distribution Sys. USA, LLC*, 290 F. Supp. 3d 692, 696–99 (E.D. Mich. 2017) (granting summary judgment on RICO claims to the extent plaintiff sought compensation for non-cognizable harms and permitting the claims to proceed for the sole cognizable harm).  Any

---

[3] These statutory requirements are distinct from—and more limited than—constitutional standing under Article III of the U.S. Constitution.  Although the Fourth Circuit followed the Supreme Court's description of RICO's limitations "as aspects of standing," *Brandenburg*, 859 F.2d at 1187 (citing *Sedima, S.P.R.L. v. Imrex*, 473 U.S. 479, 496-97 (1985)), the Supreme Court has since clarified that "statutory standing" refers to the "absence of a valid cause of action" and "does not implicate subject-matter jurisdiction," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387–88 & n.4 (2014) (internal quotation marks and alterations omitted).

other approach would circumvent the RICO standing requirement and allow treble damages for all nature of harms that are personal or not proximately caused by the alleged violations.

Here, there can be no genuine dispute that Bowen Jr. fails to satisfy both the injury (*see infra* Argument Section I) and causation (*see infra* Argument Section II) requirements of RICO standing. This Court should thus grant adidas's motion for summary judgment as to all of Bowen Jr.'s RICO claims and alleged harms.

## I.    Bowen Jr.'s Claimed Harms Do Not Satisfy RICO's Injury Requirement

Bowen Jr. lacks RICO standing because his claimed injuries are not to "business or property," as required by § 1964(c). For an injury to be to "business or property" under RICO, it must be to a concrete, tangible interest. A RICO plaintiff's claimed "injury to mere expectancy interests or to an intangible property interest" cannot confer RICO standing. *Taylor v. Bettis*, 976 F. Supp. 2d 721, 737 (E.D.N.C. 2013) (dismissing for lack of RICO standing), *aff'd*, 693 F. App'x 190 (4th Cir. 2017) (affirming for the reasons stated by the district court). Even if an "expectancy interest" is "highly certain," it "is not a recognizable property interest" under RICO. *Strates Shows Inc. v. Amusements of Am., Inc.*, 379 F. Supp. 2d 817, 828 (E.D.N.C. 2005). Nor can a plaintiff evade RICO's injury requirement by claiming pecuniary losses that derive from harms that are not to business or property. *E.g.*, *Bast v. Cohen, Dunn & Sinclair, P.C.*, 59 F.3d 492, 495 (4th Cir. 1995) (holding that alleged "pecuniary losses occurring" from personal injury "are not sufficient to meet the statutory requirement of injury to 'business or property.'"). The "restrictive significance" of "business or property" "helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff." *Muigai v. IB Prop. Holdings, LLC*, No. 08:09-cv-01623-AW, 2010 WL 5173313, at *5 (D. Md. Dec. 14, 2010) (first quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); then quoting *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000)). These principles mirror those in the due process context,

18

where the Fourth Circuit has held that a property interest requires a "legitimate claim of entitlement" under a "source such as state law"; a mere "unilateral expectation" or "abstract need" is insufficient. *Siena Corp. v. Mayor & City Council of Rockville*, 873 F.3d 456, 461 (4th Cir. 2017) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

Here, none of the injuries claimed by Bowen Jr. are to "business or property" and therefore none are actionable under RICO:

### A.     Louisville Scholarship:  Bowen Jr. Did Not Lose His Louisville Scholarship, and It Did Not Entitle Him To Play NCAA Basketball

Bowen Jr. claims that he "lost" his Louisville scholarship (Bowen Jr. Suppl. Disclosures at 2), but discovery has proven this claim to be false.  Louisville did not withdraw Bowen Jr.'s scholarship.  Even after Louisville withheld Bowen Jr. from its basketball team, its director of athletics confirmed to Bowen Jr. by letter that "[i]f you choose to remain at [Louisville], you will continue to receive your athletics scholarship."  (V. Tyra Letter.)  Louisville confirmed this position publicly, publishing a tweet that Bowen Jr. could "remain [at Louisville] on scholarship."  (@LouisvilleMBB Twitter Post.)  These facts are indisputable, and Bowen Jr. acknowledged at his deposition that he was permitted to remain on scholarship at Louisville despite being withheld from the basketball team.  (Bowen Jr. Dep. Tr. 24:13–20; 146:18–147:4, 150:5–8.)  Bowen Sr., too, acknowledged that Louisville continued to offer Bowen Jr. his scholarship.  (Bowen Sr. Dep. Tr. 189:20–25.)  The record is clear that Bowen Jr. only "lost" his Louisville scholarship when he voluntarily relinquished it, transferred to USC, and effectively exchanged it for another full scholarship from that institution.

Bowen Jr. also contends that he lost "basketball related services" that he claims his scholarship "guaranteed," such as "strength and conditioning, trainers, nutritionists, elite coaching, and practice and competition time alongside other elite athletes and teams."  (Bowen

Jr. Suppl. Disclosures at 2.)   But Bowen Jr. has not produced any evidence of any such contractual right.  The scholarship itself said nothing of the sort; it promised Bowen Jr. his full cost of attendance—"Tuition & Fees," "Books," "Housing," "Meals," and "Misc. Expenses"— but nowhere guaranteed Bowen Jr. "basketball related services" or even a spot on Louisville's basketball team.  (Univ. of Louisville Athletics Fin. Aid Agreement for B. Bowen II at 1, June 1, 2017 [Ex. 48].)   Nor does a student have a right under the NCAA's rules to a spot on a university's sports teams.  (*See* Prof. Potuto Decl. ¶ 10.)

Bowen Jr. may believe he had a right to play basketball at Louisville, but that subjective belief "is insufficient to construe [the scholarship] contract at variance with its plain and unambiguous terms."  *Maze v. Bd. of Dirs. for Commonwealth Postsecondary Educ. Prepaid Tuition Tr. Fund*, 559 S.W.3d 354, 363 (Ky. 2018) (internal quotation marks omitted); *see also N. Am. Rescue Prods. v. PJ Richardson*, 769 S.E.2d 237, 241 (S.C. 2015) ("Interpretation of a contract is governed by the objective manifestation of the parties' assent at the time the contract was made, rather than the subjective, after-the-fact meaning one party assigns to it." (internal quotation marks omitted)).  Other courts have likewise rejected attempts to find an "implicit . . . right to play basketball" in a university's financial aid agreement.  *Jackson v. Drake Univ.*, 778 F. Supp. 1490, 1493 (S.D. Iowa 1991); *Hysaw v. Washburn Univ. of Topeka*, 690 F. Supp. 940, 944 (D. Kan. 1987) (rejecting "attempt to read into" scholarships a "contractual right . . . to play football"); *see also Giuliani v. Duke Univ.*, No. 1:08-cv-502, 2010 WL 1292321, at *6 (M.D.N.C. Mar. 30, 2010) ("[C]ontractual athletic scholarships do not ensure a student's right to play a sport.").  Even if Bowen Jr. had a "highly certain" expectation to play basketball at Louisville and receive "basketball related services," that expectation "is not a recognizable property interest."  *Strates Shows*, 379 F. Supp. at 828; *see also Ricker v. Edmisten*, No. 93-CV-

1756, 1994 WL 32807, at *2 (4th Cir. 1994) (per curiam) (stating that "unilateral expectations, however earnestly held," do not create a "property interest"); *Hysaw*, 690 F. Supp. at 944 (plaintiffs' claimed "contractual rights" to play football were "no more than 'unilateral expectations'" and thus did not constitute a "property interest").

### B.    NCAA Eligibility:  Bowen Jr.'s Eligibility to Play in the NCAA Is Not a Business or Property Interest

Bowen Jr. next claims "damage to his NCAA eligibility," under which he also groups certain alleged costs of an attorney helping Bowen Jr. to attempt to return to college basketball. (Bowen Jr. Suppl. Disclosures at 2–3.)  Neither is a cognizable injury here.

Bowen Jr.'s eligibility to play NCAA basketball, no matter how much value he ascribes to it, is not a cognizable interest upon which he can assert RICO claims.  South Carolina, like Kentucky and many other states, has long held that "participation in interscholastic athletics" is not a "property or pecuniary right[] or interest[]" but a "privilege." *Bruce v. S.C. High Sch. League*, 189 S.E.2d 817, 818–19 (S.C. 1972); *see also Thompson v. Fayette Cnty. Pub. Schs.*, 786 S.W.2d 879, 881–82 (Ky. Ct. App. 1990) (rejecting student's claim to "a property right within the realm of interscholastic athletic activity" and holding that "a student has neither a property interest nor any fundamental right to participate in extracurricular activities in Kentucky"); *Adamek v. Pa. Interscholastic Athletic Ass'n*, 426 A.2d 1206, 1207 (Pa. Commw. Ct. 1981) (collecting cases and noting that "[t]he overwhelming majority of . . . jurisdictions have rejected the notion that participation in athletics is a property right").  The Fourth Circuit, too, has held that there is no right to "participation in interscholastic athletics." *Denis J. O'Connell High Sch. v. Va. High Sch. League*, 581 F.2d 81, 84 (4th Cir. 1978).

Courts have applied these principles to reject claims asserting a property interest in playing NCAA sports, and these "[c]ases widely hold that college athletic scholarships and

participation in collegiate athletics are not cognizable property interests." *Marcantonio v. Dudzinski*, 155 F. Supp. 3d 619, 635–36 (W.D. Va. 2015) (collecting cases and rejecting student-athlete's claim under state law that similarly requires harm to "business and property interests," where student-athlete alleged that defendants' actions prevented him from competing at his university). Further, even if Bowen Jr. had a property right to his NCAA eligibility—which he did not—it would at most be an intangible right, and "[c]ourts have ruled that . . . an intangible property interest is not sufficient for RICO standing." *Muigai*, 2010 WL 5173313, at *5; *see also, e.g.*, *Dickerson*, 493 F. App'x at 395 & n.2 (affirming dismissal of RICO claim where, even assuming plaintiff had "intangible property interest in his medical records," that intangible interest was not legally cognizable).

### C.    Legal Fees and Costs:  Bowen Jr. Cannot Claim a Business or Property Injury From Legal Fees He Did Not Pay

Nor do the "legal fees and costs" paid to Setchen for advice during Bowen Jr.'s efforts to regain his NCAA eligibility constitute a harm to his "business or property" (Pl.'s Suppl. Disclosures at 3) for the simple reason that Bowen Jr. did not pay the fees and costs in question. Instead, his father, Bowen Sr., paid Setchen, which Bowen Jr. admitted at his deposition. (Bowen Jr. 278:13–18.) ████████████████████████████████████ ████, and Bowen Jr. did not "have a Visa card" at that time. (Bowen Sr. Dep. 291:16–18.) Bowen Sr. likewise confirmed at his deposition that he paid for Bowen Jr.'s lawyer and that the fees "came off my credit card." (*Id.* at 220:7–24; 371:13–16.) Bowen Sr. has claimed no expectation of being repaid. (*Id.* at 372:24–373:1.) Because Bowen Jr. did not incur the cost of the legal fees, he cannot claim them as harm to "*his* business or property," as required by RICO. 18 U.S.C. § 1964(c) (emphasis added).

Even if Bowen Jr. had paid the fees, because they derive from an attempt to remedy a non-cognizable harm—a claimed inability to compete in NCAA basketball—they are not recoverable. Such derivative injuries, even if nominally to business or property, do not suffice for RICO standing. *E.g.*, *Bast*, 59 F.3d at 495 (holding that a RICO plaintiff cannot recover "pecuniary losses" as a result of "personal injury"); *Doe v. Roe*, 958 F.2d 763, 770 (7th Cir. 1992) (although "[m]ost personal injuries . . . will entail some pecuniary consequences," those resulting pecuniary harms "are not compensable under RICO").

### D. Professional Earnings: Bowen Jr.'s Expectation of Being Selected in the NBA Draft Is Not a Business or Property Interest

Bowen Jr. also claims that the May 2017 Agreement eventually caused him to not be selected in the first round of the NBA draft, thereby hurting his future "career earnings." (*See* Pl.'s Supp. Initial Disclosures at 3.) But no one, Bowen Jr. included, has a business or property right in their hope of being drafted by an NBA team, much less in a hope of becoming a first-round pick with a guaranteed two-year NBA contract. An amateur athlete cannot claim a property interest in lost future earnings resulting from not playing school sports. *See, e.g.*, *Denis J. O'Connell High Sch.*, 581 F.2d at 84 (holding that the possibility of obtaining a "professional bonus" from playing interscholastic athletics is not a "property right"); *Parish v. NCAA*, 506 F.2d 1028, 1034 n.17 (5th Cir. 1975) (noting that students challenging ineligibility to play NCAA basketball "wisely abandoned at oral argument their attempt to create a property interest out of the alleged injury to their hoped-for careers in professional basketball"), *abrogated in part on other grounds as recognized by McCormack v. NCAA*, 845 F.2d 1338, 1346 (5th Cir. 1988); *Hall v. NCAA*, 985 F. Supp. 782, 799 (N.D. Ill. 1997) ("While participation in intercollegiate basketball has been recognized as a training ground for a professional basketball career, the

possibility of obtaining that professional basketball career is too speculative to even constitute a present economic interest."  (internal quotations omitted)).

Because Bowen Jr. had a mere expectation of (and not an entitlement to) a lucrative professional career, that expectation—no matter its likelihood—is not a cognizable business or property interest under RICO.  *Strates Shows*, 379 F. Supp. 2d at 827–28 (plaintiff lacked interest in expectation of being awarded a state contract, even though it had been awarded the contract "as a matter of course in past years" and "could expect to a high degree of certainty that it would be awarded the contract in the future").  The loss of "an expected award of a contract" is insufficient for statutory standing under RICO.  *Id.* at 826–27 (collecting cases); *see also, e.g.*, *Marcantonio*, 155 F. Supp. 3d at 636 (holding that student-athlete's claimed loss of "becoming a professional athlete" was not a "cognizable" harm to business or property); *Kimberlin v. Nat'l Bloggers Club*, No. GJH-13-3059, 2015 WL 1242763, at *12 (D. Md. Mar. 17, 2015) (holding that claimed "lost employment and funding opportunities" was "an injury to mere expectancy interests" (quoting *Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721, 730 (8th Cir. 2004))).

Bowen Jr.'s claimed lost earnings are also not recoverable under RICO for the separate reason that Bowen Jr. alleges that they derive from his personal harms.  Bowen Jr.'s putative expert asserts that as a result of Bowen Jr. playing in Australia instead of at Louisville, Bowen Jr. lacked "exposure to NBA talent evaluators" and "regressed" as a basketball player and thus was not drafted because he "had subpar performances" in pre-draft workouts.  (Bratz Report at 14.)  But reduced reputation and basketball skill are personal harms, and "pecuniary losses occurring" from "personal injury"—such as Bowen Jr.'s claimed lost professional earnings here—are "not sufficient to meet the statutory requirement of injury to 'business or property.'"  *Bast*, 59 F.3d at

495; *see also, e.g.*, *Kimberlin*, 2015 WL 1242763, at *30–31 (money lost as a result of reputational harm was not cognizable under RICO).

## II.    Bowen Jr.'s Claimed Harms Also Do Not Satisfy RICO's Causation Requirement

Bowen Jr. also lacks RICO standing because none of his alleged injuries occurred "by reason of" the alleged RICO predicate acts.  *See* 18 U.S.C. § 1964(c).  Section 1964(c)'s "by reason of" language imposes a dual causation requirement—a RICO plaintiff must "show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.'"  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Secs. Inv. Protection Corp.*, 503 U.S. 258, 112 (1992)).  Here, the May 2017 Agreement was neither a but-for cause nor the proximate cause of any of Bowen Jr.'s claimed injuries:

### A.    NCAA Eligibility:  The Alleged RICO Violations Were Not a But-For Cause of Bowen Jr.'s Claimed Ineligibility, Because His Family's Earlier Receipt of Improper Benefits Had Already Rendered Him Ineligible

Bowen Jr. cannot prove that, but for the May 2017 Agreement, he would have been eligible to play NCAA basketball.  To satisfy but-for causation, "a plaintiff must demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred."  *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).  It is not enough for a plaintiff to assert that the alleged wrongdoing *could have* caused its harm, if the wrongdoing did not *in fact* cause that harm because the harm had already occurred.  "An act or omission cannot be a factual cause of an outcome that has already occurred."  Restatement (Third) of Torts:  Phys. & Emot. Harm § 26 cmt. k. (2010).

The May 2017 Agreement cannot have been the but-for cause of Bowen Jr. claimed NCAA ineligibility, because his parents' earlier, independent receipt of benefits and payments from Dawkins in 2016, when Dawkins was a prospective agent working for the sports agency ASM, had already caused Bowen Jr. to lose his NCAA eligibility.  The benefits the Bowens

received from Dawkins on behalf of ASM—which included a trip to Creighton University, free dinners, and multiple cash payments—were unrelated to the subsequent May 2017 Agreement.

Those benefits from Dawkins rendered Bowen Jr. ineligible under the NCAA's bylaws, as reflected in USC's subsequent request to reinstate Bowen Jr.'s eligibility, which listed benefits from Dawkins in 2016 as a basis for Bowen Jr.'s ineligibility, together with the later May 2017 Agreement. (USC Report at *3–4; *see also* Prof. Potuto Decl. ¶ 4.) USC's report noted that, "in February 2016," the Bowen family "accepted flights . . . paid for by a sports agent," and that, in March 2016, the "same agent paid for a dinner" and "arranged" $3,000 "for Brian Bowen." (USC Report at *4.) USC's report cited a violation of NCAA Bylaw 12.3.1.3 (*id.*), which at the time addressed "Benefits from Prospective Agents" and provided that an "individual shall be ineligible per Bylaw 12.3.1 [governing use of agents] if he or she (or his or her relatives or friends) accepts transportation or other benefits from: [a]ny person who represents any individual in the marketing of his or her athletics ability . . . or [a]n agent" (NCAA 2017–18 Bylaws 12.3.1.3). Dawkins, in his efforts to pursue Bowen Jr. on behalf of ASM, fit either of those categories; the NCAA Bylaws define "agent" to include "any individual who, directly or indirectly . . . attempts to represent an individual for the purpose of marketing his or her athletics ability or reputation for financial gain" or "[s]eeks to obtain any type of financial gain or benefit from . . . a student-athlete's potential earnings as a professional athlete." (*Id.* 12.02.1.)

In addition to the agent benefits from Dawkins, another independent, preceding event that likewise caused the loss of Bowen Jr.'s NCAA eligibility was Bowen Sr.'s receipt of money ($2,000 per month) from the head coach of La Lumiere high school's basketball team, in return for Bowen Jr. transferring to and playing at the school. Those payments were also unrelated to the subsequent May 2017 Agreement, and they were yet another separate basis on which Bowen

Jr. was ineligible to play in the NCAA, because the NCAA's bylaws prohibit the receipt of "pay" for a sport prior to playing that sport in the NCAA.  (NCAA 2017–18 Bylaws 12.1.2, 12.1.2.1.6; *see also* Prof. Potuto Decl. ¶ 5.)   The Bylaws broadly define "pay" to include "[a]ny direct or indirect salary, gratuity or comparable compensation" and payments "in excess of [the amateur's] actual and necessary travel, room and board expenses."  (NCAA 2017–18 Bylaws 12.1.2.1.1, 12.1.2.1.4.4; *see also id.* 12.02.2.1 (reimbursement for "[a]ctual and necessary expenses" does "not include the expenses . . . of anyone other than the individual who participates as a member of the team").)  Bowen Sr. has conceded that the payments he received when Bowen Jr. was at La Lumiere were not to reimburse Bowen Jr.'s expenses but were compensation for his son's participation on the La Lumiere basketball team.  (Bowen Sr. Dep. 84:11–86:7, 346:18–21.)

### B.    Louisville Scholarship:  The Alleged RICO Violations Did Not Directly Cause Louisville To Withhold Bowen Jr. From Its Basketball Team

Bowen Jr.'s claimed loss of his scholarship (and supposed "basketball related services" under the scholarship) when Louisville withheld him from the university's basketball team also does not satisfy RICO's strict proximate cause element.  RICO does not permit "all factually injured plaintiffs to recover."  *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018) (quoting *Holmes*, 503 U.S. at 265–66).  Rather, "when a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led *directly* to the plaintiff's injuries."  *Id.* (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).  Proximate causation "turns on the *directness* of the resultant harm, not the *foreseeability* of that harm" or "whether it was 'the *intended* consequence of that behavior.'"  *Id.* (quoting *Hemi*, 559 U.S. at 12).   Therefore, "RICO causation requires a proximity of statutory violation and injury such that the injury is sequentially the direct result—

generally at 'the first step' in the chain of causation." *Id.* at 494 (quoting *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983)).

Under this standard, where a RICO plaintiff's claimed harms "were caused by reason of the fraud's discovery, not the fraud itself," proximate causation is lacking. *In re Volkswagen "Clean Diesel" Mktg. v. Robert Bosch, LLC*, No. 20-15034, 2021 WL 248518, at *2 (9th Cir. Jan. 26, 2021). In that instance, the plaintiff's "theory of proximate causation necessarily encompasses an intervening step: the discovery of the fraud." *Id.* (citing *Hemi*, 559 U.S. at 14–15); *see also, e.g.*, *In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994) (holding that plaintiffs failed to adequately allege proximate causation because their losses "were caused only because the scheme itself was exposed and thus failed"). In *Abrahams v. Young & Rubicam*, 79 F.3d 234 (2d Cir. 1996), for instance, the Second Circuit rejected a plaintiff's claim of harm that, like here, purportedly resulted from discovery of a bribery scheme premised on influencing the actions of the plaintiff, a Jamaican government official who claimed to be unaware of the bribes. When the scheme was discovered, the plaintiff allegedly suffered harm to his reputation and business interests. The Second Circuit affirmed the dismissal of the plaintiff's RICO claims for lack of proximate causation, explaining that the plaintiff's harms were "not the target" of the scheme and instead had been caused "by the fallout from the scheme's exposure." *Id.* at 239.

So too here. Bowen Jr. not playing NCAA basketball at Louisville was not *directly* caused by the May 2017 Agreement. Indeed, what Bowen Jr. alleges to be the purpose of that alleged Agreement—benefiting certain defendants if Bowen Jr. played well at Louisville (Am. Compl. ¶ 228)—was the exact opposite of Bowen Jr. *not* playing at Louisville. Rather than occur at the "first step" following the Agreement, that harm happened only after the public

discovery of the alleged scheme in September 2017 and Louisville's subsequent decision to withhold Bowen Jr. from its basketball team.  Bowen Jr.'s removal from Louisville's basketball team was not "sequentially the direct result" of the alleged RICO violation, and therefore does not meet RICO's proximate-cause requirement.  *Slay's Restoration*, 884 F.3d at 494.

### C.   Legal Fees and Costs:  Bowen Jr.'s Claimed Legal Fees to Restore his NCAA Eligibility Were Not a Direct Result of the Alleged RICO Violations

Even if Bowen Jr. had paid the legal fees and costs incurred to attempt to restore his NCAA eligibility (which he did not, *see infra* Argument Section I.C), those voluntary expenditures would not be proximately caused by the alleged RICO violations.  "[E]xpenses and legal fees" incurred by a plaintiff in response to alleged RICO violations "do not qualify as an injury proximately caused by a defendant's RICO violation."  *B2Gold Corp. v. Christopher*, No. 1:18-cv-1202, 2019 WL 4015890, at *2 (E.D. Va. Aug. 26, 2019).  As in *Strates Shows*, Bowen Jr.'s claimed "legal fees and costs," if he had paid them, would be only an "'indirect' injury which [he] did not automatically incur, but chose to incur, in mitigating the effect of defendants' conduct."  379 F. Supp. 2d at 833; *see also, e.g.*, *The Knit With*, 2012 WL 2938992, at *7 (explaining that expenses incurred while "mitigating damages" were not "direct injury").

### D.   Professional Earnings:  The Alleged RICO Violations Did Not Directly Cause NBA Teams To Not Select Bowen Jr. in the NBA Draft

The purported causal connection between the alleged RICO violations and Bowen Jr.'s claimed lost future career earnings is even less direct.  Bowen Jr.'s convoluted causal theory requires the occurrence of: the alleged RICO violations that are the subject of his claims; the discovery of those violations; independent decisions by Louisville (and USC) to withhold Bowen Jr. from playing NCAA basketball and not seek reinstatement (or the NCAA to deny reinstatement); every NBA team with a first round pick perceiving Bowen Jr. as less skilled because he played in Australia's professional league instead of the NCAA; and that perception of

diminished skill causing each NBA team to not draft Bowen Jr. in the first round of the NBA draft when at least one of them otherwise would have. To put it lightly, this "chain of causation . . . extends significantly beyond 'the first step.'" *Slay's Restoration*, 884 F.3d at 494.

Bowen Jr.'s attenuated causal chain "grossly oversimplifies" how an amateur basketball player is drafted in the NBA. *Id.* at 495 (refusing to "assume" that "potential intervening causes" in an indirect causal chain would not have reduced plaintiff's insurance claim regardless of the alleged fraud). Bowen Jr. and his agent have acknowledged the many factors that can influence an NBA team's draft selection, including team fit, work ethic, injuries, and personal conduct. (Bowen Jr. Dep. 163:3–23, 169:13–18, 188:5–25; Rosenthal Dep. 97:12–98:15.) Bowen Jr. also has conceded the numerous recent examples of both individuals choosing not to play in the NCAA and yet being drafted in the first round (Bowen Jr. Dep. Tr. 162:21–163:2, 181:23–185:15, 189:1–191:20, 340:4–9),[4] and also individuals ranked higher than Bowen Jr. as high school players, playing at top NCAA programs, and yet not being drafted (*id.* at 172:4–181:22).[5] Bowen Jr. acknowledged that he was "not sure" why others were drafted by NBA teams from Australia's professional league but he was not and guessed that it was due to "a lot of factors." (*Id.* at 188:5–25, 340:10–16.) And Bowen Jr. recognized that "there's no guarantee that even if you played for a top-ranked university, that you will ultimately be drafted." (*Id.* at 178:18–20.) Indeed, Bowen Jr.'s own reputed expert concluded that NBA teams did not select Bowen Jr. in the 2019 NBA Draft because of his "subpar performances at the NBA Draft Combine in both

---

[4] The examples include Darius Bazley, Terrence Ferguson, RJ Hampton, Anfernee Simons, and LaMelo Ball. Ferguson, Hampton, and Ball played in Australia's professional league, like Bowen Jr. Bazley trained independently. Simons spent a fifth year in high school. All were first round picks in the NBA draft.

[5] The examples include Trevon Duval and Brandon McCoy. Each was ranked higher than Bowen Jr. in Bowen Jr.'s high school class. Duval went to Duke University, and McCoy went to UNLV. Neither was drafted.

2018 and 2019." (Bratz Report at *14.) Even if those subpar performances could somehow be attributed to not playing in the NCAA, Bowen Jr.'s NCAA ineligibility would still not be a *direct* cause of his not being drafted.

Simply put, the "conduct directly responsible" for Bowen Jr. not being chosen in the NBA draft—the independent decisions of NBA teams—is "entirely distinct" from the conduct that Bowen Jr. alleges violated RICO. *Hemi*, 559 U.S. at 10–11 (quoting *Anza*, 547 U.S. at 458). Whatever causes together led NBA teams to not select Bowen Jr. in the draft, the May 2017 Agreement was not a *direct* cause.

## III.    Bowen Jr. Lacks Standing Under RICO To Obtain Injunctive Relief

Even if any of Bowen Jr.'s claimed harms satisfied RICO's statutory standing requirements, he would still lack a basis under RICO to pursue his requested injunctive relief.[6] In addition to treble damages, Bowen Jr.'s amended complaint requested an order enjoining adidas from sponsoring any NCAA Division I men's basketball programs. (Am. Compl., Relief Requested, at 103–04.) Putting aside the merits of such a drastic prohibition of lawful activity, Bowen Jr. lacks statutory standing to obtain such relief under RICO.

The great weight of authority within this Circuit holds that private plaintiffs cannot pursue injunctive relief under RICO. The Fourth Circuit has expressed "substantial doubt whether RICO grants private parties a cause of action for equitable relief." *Johnson v. Collins Entm't Co., Inc.*, 199 F.3d 710, 726 (4th Cir. 1999) (alteration omitted) (quoting *Dan River, Inc.*

---

[6] Of course, if—as is the case—none of Bowen Jr.'s claimed harms satisfy RICO standing, then he cannot recover any relief, even injunctive, under the statute. *E.g.*, *Dickerson*, 493 F. App'x at 396 (explaining that because plaintiff "has not sufficiently pled a RICO claim" he could not "be entitled to injunctive relief"); *Nunes v. Fusion GPS*, No. 1:19-cv-1148, 2021 WL 1225983, at *13 (E.D. Va. Mar. 31, 2021) (expressing doubt "that equitable relief is available to a private RICO plaintiff," but dismissing claim for equitable relief because plaintiff failed to state a RICO claim).

*v. Icahn*, 701 F.2d 278, 290 (4th Cir. 1983) and noting that "[n]o federal statute expressly authorized the relief that plaintiffs sought"). *Johnson* explained that, "[w]hile section 1964(c) of RICO grants private parties a right to seek treble damages from a RICO violator, it makes no mention whatever of injunctive or declaratory relief." *Id.* That omission is "in sharp contradistinction" to section 1964(b), which "permits the attorney general to bring proceedings" under RICO and "allows for equitable relief." *Dan River*, 701 F.2d at 290. Although courts have characterized *Johnson*'s and *Dan River*'s reasoning as dicta,[7] every district court within this Circuit to address the question has concluded that "RICO does not provide private plaintiffs with a right to injunctive relief." *Hengle v. Asner*, 433 F. Supp. 3d 825, 886 (E.D. Va.), *appeal filed*, No. 20-1359 (4th Cir. Mar. 26, 2020).[8] As a result, even if Bowen Jr. has statutory standing under RICO to pursue some of his claimed harms, the Court should enter summary judgment dismissing his request for injunctive relief.

## CONCLUSION

Bowen Jr. lacks standing for his RICO claims. The Court should enter summary judgment against Bowen Jr. in full or, in the alternative, in part to the extent of each alleged injury that does not support RICO standing and to the extent injunctive relief is sought.

---

[7] The Fourth Circuit later declined to decide "whether equitable relief is available in a private civil RICO action." *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 267 n.4 (4th Cir. 2001).

[8] *See also Galaxy Distrib. of W.V., Inc. v. Std. Distrib., Inc.*, No. 2:15-cv-04273, 2015 WL 4366158, at *5 (S.D. W. Va. July 16, 2015) ("[E]quitable relief is not available under RICO."); *Minter v. Wells Fargo Bank, N.A.*, 593 F. Supp. 2d 788, 796 (D. Md. 2009) ("[T]here is no private right of injunctive relief under civil RICO."); *In re Xe Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 599 (E.D. Va. 2009) (rejecting claim for "injunctive relief on [plaintiffs'] RICO claims" because treble damages was the "exclusive" statutory remedy); *R.J. Reynolds Tobacco Co. v. Market Basket Food Stores, Inc.*, No. 5:05-cv-253-V, 2007 WL 319965, at *8–9 (W.D.N.C. Jan. 30, 2007) (refusing to "consider or rely upon [p]laintiff's RICO claims in determining whether injunctive relief is warranted").

By: /s/ *Matthew T. Richardson*

Matthew T. Richardson (D.S.C. Id. No. 7791)
Mary Lucille ("Lucy") Dinkins (D.S.C. No. 11961)
WYCHE
807 Gervais Street, Suite 301
Columbia, South Carolina 29201
Tel: (803) 254-6542
mrichardson@wyche.com
ldinkins@wyche.com

Andrew J. Ceresney (admitted *pro hac vice*)
William H. Taft V (admitted *pro hac vice*)
Nathan S. Richards (admitted *pro hac vice*)
Matthew D. Forbes (admitted *pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Tel: (212) 909-6000
aceresney@debevoise.com
whtaft@debevoise.com
nsrichards@debevoise.com
mforbes@debevoise.com

*Counsel to Defendant adidas America, Inc.*

Dated:  April 8, 2021