# EXHIBIT 3

Bowen Sr. Dep. Tr.

Page 1

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                  COLUMBIA DIVISION
 3   BRIAN BOWEN, II,
 4              Plaintiff,
                                 Civil Action
 5        vs.                    No. 3:18-cv-3118-JFA
 6   JAMES GATTO, MERL CODE,
     CHRISTIAN DAWKINS, MUNISH SOOD,
 7   THOMAS GASSNOLA, and CHRISTOPHER RIVERS,
 8              Defendants,
 9   and ADIDAS AMERICA, INC.,
10              Defendant-Crossclaimant,
11        vs.
12   MUNISH SOOD and THOMAS GASSNOLA,
13              Defendants-Cross Defendants,
14   and BRIAN BOWEN, SR.,
15              Cross Defendant.
16
17   VIDEOTAPED VIDEOTELECONFERENCE
     DEPOSITION OF:  BRIAN L. BOWEN, SR.
18                   (Appearing via VTC)
19   DATE:           January 20, 2021
20   TIME:           9:36 AM
21   LOCATION OF     Goings Law Firm
     THE WITNESS:    1510 Calhoun Street
22                   Columbia, SC
23   TAKEN BY:       Counsel for Defendant-Crossclaimant
                     ADIDAS AMERICA, INC.
24
     REPORTED BY:    Sandra K. Bjerke, RDR, CRR, CBC
25                   (Appearing via VTC)
```

Brian L. Bowen , Sr                                    January 20, 2021
Bowen v. Adidas

Page 2

```
 1    APPEARANCES OF COUNSEL VIA VTC:
 2        ATTORNEYS FOR THE PLAINTIFF
              BRIAN BOWEN, II:
 3
              McLEOD LAW GROUP LLC
 4            BY:  COLIN V. RAM
              3 Morris Street, Suite A
 5            Charleston, SC  29403
              (843) 614-6477
 6            colin@mcleod-lawgroup.com
 7
 8        ATTORNEYS FOR DEFENDANT
              JAMES GATTO:
 9
              DEBORAH B. BARBIER, LLC
10            BY:  DEBORAH B. BARBIER
              1811 Pickens Street
11            Columbia, SC  29201
              (803) 445-1032
12            dbb@deborahbarbier.com
13
14        ATTORNEYS FOR DEFENDANT
              MERL CODE:
15
              FINGER MELNICK & BROOKS
16            BY:  TERRY A. FINGER
              35 Hospital Center Commons, Suite 200
17            Hilton Head Island, SC  29926
              (843) 681-7000
18            tfinger@fingerlaw.com
19
20        ATTORNEYS FOR DEFENDANT
              MUNISH SOOD:
21
              TROUTMAN PEPPER HAMILTON SANDERS, LLP
22            BY:  THOMAS H. CORDOVA
              3000 Two Logan Square
23            18th and Arch Streets
              Philadelphia, PA  19103
24            (215) 981-4000
              thomas.cordova@troutman.com
25
```

Brian L. Bowen , Sr                                    January 20, 2021
Bowen v. Adidas

Page 3

```
 1          ATTORNEYS FOR DEFENDANT
                 CHRISTOPHER RIVERS:
 2
                 NELSON MULLINS RILEY & SCARBOROUGH LLP
 3               BY:  ROBERT L. LINDHOLM
                 301 South College Street
 4               One Wells Fargo Center, 23rd Floor
                 Charlotte, NC 28202
 5               (704) 417-3000
                 robert.lindholm@nelsonmullins.com
 6
                 NELSON MULLINS RILEY & SCARBOROUGH LLP
 7               BY:  WESLEY TYLER MORAN
                 Pinnacle Corporate Center
 8               3751 Robert M. Grissom Parkway
                 Suite 300
 9               Myrtle Beach, SC  29577
                 (843) 448-3500
10               wes.moran@nelsonmullins.com
11
12          ATTORNEYS FOR DEFENDANT
                 ADIDAS AMERICA, INC.:
13
                 DEBEVOISE & PLIMPTON LLP
14               BY:  WILLIAM H. TAFT V
                      TRISTAN M. ELLIS
15               919 3rd Avenue
                 New York, NY  10022
16               (212) 909-6000
                 whtaft@debevoise.com
17               tmellis@debevoise.com
18
19          ATTORNEYS FOR CROSS DEFENDANT
                 BRIAN BOWEN, SR.:
20
                 GOINGS LAW FIRM, LLC
21               BY:  ROBERT F. GOINGS
                      JESSICA L. O'NEILL GOODING
22                    CHRISTOPHER M. PASCHAL
                 1510 Calhoun Street,
23               Columbia, SC 29201
                 (803) 350-9230
24               rgoings@goingslawfirm.com
                 jgooding@goingslawfirm.com
25               cpaschal@goingslawfirm.com
```

Brian L. Bowen , Sr                                January 20, 2021
Bowen v. Adidas

Page 4

1          ALSO PRESENT VIA ZOOM:

2                 Keith McIntire

                  Ashley Bowler, Videographer

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          (INDEX AT REAR OF TRANSCRIPT)

25

Brian L. Bowen , Sr                          January 20, 2021
Bowen v. Adidas

Page 12

1    of the time, maybe.

2          Q.   So every month you're down there about

3    a week?  Is that fair?

4          A.   You could say so.  Off and on.  Just

5    depends.

6          Q.   And when you stay -- when you're in

7    Indianapolis where do you stay?

8          A.   Where my son and Carrie are.

9          Q.   And you referred to Carrie.  That's

10   Ms. Malecke?

11         A.   Malecke, yes.

12         Q.   Malecke.  And Ms. Malecke is your

13   partner; correct?

14         A.   Correct.

15         Q.   And do you -- do you refer to her as

16   your wife, or should I refer to her as your

17   partner?  How would you like me to refer to her?

18         A.   Partner is fine.

19         Q.   Partner.  And what is their address in

20   Indianapolis?

21         A.   9 -- I think it's 914 North Washington,

22   if I'm not mistaken.  I think that's what it is.

23         Q.   Okay.

24         A.   Pretty sure that's what it is.

25         Q.   Now you testified in the prosecution of

Brian L. Bowen , Sr                    January 20, 2021
Bowen v. Adidas

Page 38

```
 1          Q.    (Moves head up and down.)
 2          A.    No.  That money was more for what was
 3    going on with basketball.
 4          Q.    Specifically, that money was for --
 5    when you say what was going on with basketball,
 6    what do you mean?
 7          A.    Traveling and traveling expenses like
 8    that.  You know, all kinds of stuff like that.
 9          Q.    This was your son's basketball;
10    correct?
11          A.    My son's basketball?
12          Q.    Your son was the person playing
13    basketball that you were referring to; correct?
14          A.    Of course.  Yeah.  Correct.
15          Q.    So the money you were receiving was
16    being spent on your son's basketball career;
17    correct?
18                MS. GOODING:  Object to the form.
19                THE WITNESS:  No, no.  What do you
20    mean, spent on his career?
21    BY MR. TAFT:
22          Q.    Well, spent to support his ability to
23    play basketball.
24          A.    He was going to play basketball either
25    way.  So, I mean, he -- and for me to be able to go
```

Brian L. Bowen , Sr                          January 20, 2021
Bowen v. Adidas

Page 39

1    see him play basketball, to -- you know what I'm

2    saying -- move places to see him play basketball,

3    travel and stuff like that.  He was going to play

4    basketball.

5          Q.    So the money you were receiving was

6    covering your expenses.

7          A.    Yes.  Yeah.

8          Q.    And your wife's expenses.  Or

9    Ms. Malecke's expenses; correct?

10         A.    Cover expenses, yeah.

11         Q.    And were any of those expenses expenses

12   of your son, Mr. Bowen, Brian Bowen, Jr.?

13         A.    I don't -- I'm not sure what that

14   means.  Expenses of my son's?  What do you mean?

15         Q.    Well, you -- your son didn't have a

16   job; correct?

17         A.    Correct.

18         Q.    Did he receive an allowance?

19         A.    No.

20         Q.    Okay.  Did -- were you responsible for

21   all of his expenses?

22         A.    As in what?  Like clothes, stuff like

23   that?

24         Q.    Correct.  Clothes?

25         A.    Yeah.  I had a pension, too, and I

Brian L. Bowen , Sr                    January 20, 2021
Bowen v. Adidas

Page 43

1          A.    Correct.

2          Q.    And then they report what's described

3    as other income.  In 2015, for example, there's

4    $33,000 of other income.  Do you recall reporting

5    this other income?

6          A.    Correct.

7          Q.    Do you know what that other income

8    relates to?

9          A.    2015, I think it had some -- some of

10   the money that I had received.

11         Q.    Can you be more specific?

12         A.    Well, money that I received from

13   like -- I think from Christian and Adidas.  I think

14   that's what it was.

15         Q.    And was that money you received in

16   connection with your son playing on a amateur

17   basketball team?

18         A.    It was money paid to me, I guess, yeah.

19         Q.    For your son playing on an amateur

20   basketball team; is that correct?

21         A.    Correct.

22         Q.    Okay.  And in 2016 you reported also

23   $33,000 of other income.  Do you recall what that

24   money was in connection with?

25         A.    You said '15?  I'd have to see my tax

Page 76

1   was a major part of that.  I'm his dad, you know,

2   as far as at that age.

3          Q.   Did you identify schools that he should

4   consider going to?

5          A.   Yeah, we searched schools.  Of course,

6   yeah.

7          Q.   Okay.  And when it was ultimately time

8   to select the school were -- you selected La

9   Lumiere; correct?

10         A.   La Lumiere, yeah.

11         Q.   And what factors made La Lumiere the

12  best choice, in your opinion?

13         A.   It was a -- they were a national

14  championship team.  I mean, they were a national

15  caliber team, you know.  It was not really, really

16  far from where we -- where we were from, Michigan,

17  and the educational component was exceptional.

18         Q.   Was Mr. Dawkins involved in the

19  decision to have your son attend La Lumiere?

20         A.   Yeah, he was.  Of course.  Not -- yeah.

21  Yes.

22         Q.   And how would you describe his role?

23         A.   Just another piece of -- you know, one

24  of the people that discuss all the yeas and nays of

25  it.

Brian L. Bowen , Sr                                    January 20, 2021
Bowen v. Adidas

Page 84

1              MS. GOODING:   Object to the form.

2    BY MR. TAFT:

3         Q.   You rented a house for the last two

4    years of your son's high school in Indiana;

5    correct?

6         A.   Correct.

7         Q.   And that house was selected in order to

8    be close to the campus where he was attending

9    school; correct?

10        A.   Somewhat, yes.

11        Q.   And how did you pay for that rent?

12        A.   Through the coach, basically.

13   Christian.

14        Q.   Which coach?

15        A.   Shane Heirman, the head coach.

16        Q.   That's Shane Heirman?

17        A.   Yeah, however you say it, yeah.

18   Heirman, yeah.   Shane.

19        Q.   And when was it agreed that Shane would

20   pay the rent for you to live in Indiana?

21        A.   Kind of -- I'm sure prior to.  It was

22   discussed prior to us going there.  So he and

23   Christian probably discussed it, I guess.  I don't

24   know.  It was probably -- had to be prior, I'm

25   sure, at some point.

Brian L. Bowen , Sr                                    January 20, 2021
Bowen v. Adidas

Page 85

1          Q.    So prior to your son transferring to
2    La Lumiere School you had an expectation that the
3    coach would be paying your rent to live in Indiana;
4    is that correct?
5          A.    Yeah, that would be correct.
6          Q.    Did you discuss that expectation with
7    your partner?
8          A.    No, I don't think so.
9          Q.    She never asked how are we going to
10   afford this?
11         A.    No, not really.
12         Q.    And did you discuss that expectation
13   with your son?
14         A.    No.
15         Q.    He never asked how are we going to
16   afford to rent a house in Indiana?
17         A.    No.
18         Q.    How much was the rent?
19         A.    1,600 or something like that I think it
20   was.  Don't quote me.  I think that's what it was.
21   Something in that area.  1,500, 1,600.
22         Q.    So about 1,600 --
23         A.    That might be a little high.  I'm not
24   certain.  Maybe -- I think so.  12, 16 -- between
25   12- and 1,600.  I can't recall directly now.  Maybe

Brian L. Bowen , Sr
Bowen v. Adidas

January 20, 2021

Page 86

1    11.  I did it again.  1,200, I think it was.  I

2    don't know.  Can't remember.

3         Q.   Was it your understanding that the

4    money was coming from Shane personally?  Sorry.

5    Coach Heirman personally?

6         A.   Yeah, either him or -- yes.  Either him

7    or Chris.

8         Q.   Did you have any other expectations

9    with respect to benefits that you would receive in

10   connection with your son attending La Lumiere

11   School?

12        A.   No, no.

13        Q.   Did you expect to be made a member of

14   the coaching staff?

15        A.   I don't think that was discussed

16   originally, no.  I don't recall it being discussed.

17        Q.   When was that first discussed?

18        A.   Probably just like going to practices

19   and stuff and, you know, just knowing -- he knew my

20   background with basketball.

21        Q.   Were any other players at the school --

22             MR. TAFT:  Strike that.

23   BY MR. TAFT:

24        Q.   Were any of the other coaches at

25   La Lumiere, while your son attended, related to

Brian L. Bowen , Sr                     January 20, 2021
Bowen v. Adidas

Page 174

1    Whenever I needed to go back or whenever I wanted
2    to go back I'd just go back.
3            Q.    So did you tell your partner that you
4    were flying to New York City?
5            A.    She knew I was going to New York.
6            Q.    Did she ask why?
7            A.    No, not really.  Basically I said I was
8    going to meet Christian or something.  I can't even
9    remember.  I didn't discuss anything with her.
10           Q.    You told her that you were going to
11   meet Christian Dawkins?
12           A.    Maybe.  I think so.  I traveled all the
13   time, though.  It wasn't a big deal.
14           Q.    You received payments from Kenny
15   Johnson, a coach at University of Louisville;
16   correct?
17           A.    I received payments?
18           Q.    You received cash payments from Kenny
19   Johnson, the coach at Louisville?
20           A.    He gave me money at one time, I
21   believe.
22           Q.    Did you ask him for that money?
23           A.    In a roundabout way, yes.
24           Q.    How did you ask him for that money?
25           A.    Roundabout way.  I just kinda -- you

Brian L. Bowen , Sr                    January 20, 2021
Bowen v. Adidas

Page 176

1         Q.    $2,000 a month?

2         A.    I was just relaying what was told to

3    me.

4         Q.    And ultimately he did pay you some

5    cash?

6         A.    He said, I'll give you a onetime

7    payment of whatever he gave me.  I can't remember.

8    11-, 1,300, something like that.  I can't remember.

9    It was more than a thousand dollars.

10        Q.    And when was that payment made?

11        A.    I don't know.  We were there in July,

12   maybe.  I can't recall the date.  I mean, while --

13   during the tenure we were there.  Could have been

14   later.  I don't know.  I'm not certain.

15        Q.    Now this money had nothing to do with

16   the money you were receiving from Adidas; correct?

17             MS. GOODING:  Object to the form.

18             THE WITNESS:  No, I don't think it did.

19   No, I don't believe so.  I wasn't certain at that

20   point.

21   BY MR. TAFT:

22        Q.    And what was your understanding as to

23   why Mr. Johnson was paying you this money?

24             MS. GOODING:  Object to the form.  Go

25   ahead.

Page 185

1    out of Louisville that summer after he had

2    enrolled?

3            A.    At what point?  What do you mean?  Like

4    after all this stuff?  What do you mean?

5            Q.    No.  This is before the news broke in

6    July and August of 2017, shortly after he arrived

7    at Louisville.

8            A.    I don't think -- no.

9            Q.    Do you recall having any discussions

10   about your son changing schools?

11           A.    I don't recall that.  With who?  I

12   don't recall that.  It was a good location.  It was

13   a good spot.

14           Q.    During those first few months in

15   Louisville you were continuing to receive payments

16   from Mr. Dawkins; correct?

17           A.    Periodic payments, yeah.

18           Q.    And did you use those payments to pay

19   rent at the Galt House Hotel?

20           A.    Periodic payments, yes.  When he gave

21   me money, yeah, I would.

22           Q.    Well, you expected to be paid on the

23   1st of every month; correct?

24           A.    I'm not sure.

25                 MS. GOODING:  Object to the form.  Go

Brian L. Bowen , Sr                          January 20, 2021
Bowen v. Adidas

Page 189

1          A.    Yeah.

2          Q.    -- were you involved in your son's

3    decision to leave Louisville after the first

4    semester?  Let me unpack that.

5                Your son spent one semester at

6    Louisville; correct?

7          A.    Correct.

8          Q.    And after that he transferred to the

9    University of South Carolina; is that correct?

10         A.    Yes.

11         Q.    Did you have any discussions with your

12   son about transferring from Louisville to South

13   Carolina?

14         A.    I'm sure I did, I mean.

15         Q.    Did he ask you for your advice about

16   that decision?

17         A.    We just talk about stuff if something

18   needs to be talked about.  It's not like -- it was

19   obvious we had to do something, you know, so...

20         Q.    Now your son would have been allowed to

21   stay at Louisville; correct?

22         A.    Not as a basketball player.

23         Q.    But he was allowed to keep his

24   scholarship; correct?

25         A.    Correct.

Brian L. Bowen , Sr                          January 20, 2021
Bowen v. Adidas

Page 219

1          A.    Oh, I got it, yeah.  I see it.

2          Q.    Mr. Bowen, this is an invoice issued by

3    Jason Setchen.  That's the lawyer you found for

4    your son; correct?

5          A.    Yeah.  Well, I didn't find -- yeah,

6    this is the lawyer he had, yeah.

7                THE REPORTER:  I'm sorry?

8                THE WITNESS:  Yes, this is the lawyer

9    he had, yeah.  Um-hum.

10   BY MR. TAFT:

11         Q.    And again, you have no recollection of

12   how you were put in touch with Mr. Setchen?

13         A.    It might have been my -- might have

14   been my nephew, Kareem.  I'm not certain.  Some --

15   it was either him or it was someone on -- that we

16   had dealt with during the basketball journey, that

17   he suggested that he was a really good attorney.

18   Stuff like that.

19         Q.    You'll see on the front -- on the first

20   page of this document that the first entry date is

21   June 29th, 2017.  Fee for initial retainer for

22   representation per agreement.  Do you recall that

23   there was a retainer agreement with Mr. Setchen?

24         A.    I just don't recall that.  No, I don't.

25         Q.    Did you pay this invoice?

Brian L. Bowen , Sr                    January 20, 2021
Bowen v. Adidas

                                                      Page 220

1          A.   I don't -- no, I didn't pay it.

2          Q.   If you go to the page that's marked

3     4111, it's the --

4          A.   I don't --

5          Q.   -- third page of this document.

6          A.   Oh, yeah.  411.

7          Q.   You'll see that there's at the bottom a

8     list of payments starting on September 29th, 2017,

9     and the last payment is May 4th, 2018.  Do you see

10    that list?

11         A.   Yeah.

12         Q.   Did you make any of those payments

13    yourself?

14         A.   This came off my credit card.  I don't

15    recall this.  I really don't recall that.

16         Q.   So you don't recall making any of these

17    payments.

18         A.   I don't really recall it.  Is that my

19    credit card?  Maybe I did.

20              THE REPORTER:  I'm sorry.  I didn't

21    hear that.

22              THE WITNESS:  I'm just thinking to

23    myself once again.  If it's off my credit card, I

24    guess I paid it.  I just didn't recall it.

25    BY MR. TAFT:

Brian L. Bowen , Sr                                    January 20, 2021
Bowen v. Adidas

Page 252

1    or are you saying you didn't?

2          A.    I didn't receive any money for Jason.

3                MS. GOODING:  Object to the form.

4    BY MS. BARBIER:

5          Q.    What?

6          A.    I said I didn't receive any money for

7    Jason to play basketball.

8          Q.    Did you receive any money for him ever

9    on his behalf?

10               MS. GOODING:  Object to form.

11               THE WITNESS:  No.

12   BY MS. BARBIER:

13         Q.    Nobody ever gave you any money for him.

14               MS. GOODING:  Object to form.

15               THE WITNESS:  I didn't get any money

16   for him, no.

17   BY MS. BARBIER:

18         Q.    Okay.  When Mr. -- when Kenny Johnson

19   gave you money, do you recall that?

20         A.    Yes.

21         Q.    You telling me that?  Okay.  You said

22   that you asked him for money; correct?

23               MS. GOODING:  Object to form.

24               THE WITNESS:  Yes, money that I thought

25   he was supposed to give me, yes.

Brian L. Bowen , Sr                        January 20, 2021
Bowen v. Adidas

Page 253

1   BY MS. BARBIER:

2        Q.    And how much did he end up giving you?

3        A.    $1,100 or 1,300.  11 or 13 I think it

4   is.

5        Q.    What did you do with that money?

6        A.    Probably paid bills, probably.  Put it

7   on my credit card.

8        Q.    What kind of bills?

9        A.    Bills.  Housing bills or just bills,

10  you know.  Normal bills.

11       Q.    Okay.  What about the money that you

12  got when your son was playing basketball for the

13  Mustangs?  Do you recall that?

14            MS. GOODING:  Object to form.

15            THE WITNESS:  What like specifically?

16  What are you talking about specifically?

17  BY MS. BARBIER:

18       Q.    You received money when your son played

19  basketball for the Mustangs; correct?

20       A.    Correct.

21       Q.    Okay.  Who gave it to you?

22       A.    You're talking about Christian, I

23  guess.  Or T -- I don't know.  I can't remember.

24  Are you talking about -- which -- who are you

25  talking about?  There was different instances.

Page 255

1    it.  Of course.  Yeah.

2           Q.    Okay.  What about when your son was

3    playing for La Lumiere?

4           A.    Um-hum.

5           Q.    And the coach gave you money as well;

6    correct?

7           A.    Correct.

8           Q.    And what did you do with that money?

9           A.    Same thing.  Pay like the house note

10   or, you know -- not house note, but rent, gas,

11   travel.  Stuff like that.

12          Q.    And did you give any of this money to

13   your son?

14          A.    No.

15          Q.    Why not?

16          A.    That's not --

17                MS. GOODING:  Object to form.

18                THE WITNESS:  That's not what it was

19   for.

20   BY MS. BARBIER:

21          Q.    Well, he was the one playing

22   basketball; right?

23          A.    Yes.

24          Q.    Okay.  And you testified that when

25   somebody is making money from another person they

Brian L. Bowen , Sr                    January 20, 2021
Bowen v. Adidas

Page 291

1          Q.    Okay.

2          A.    Yeah.

3          Q.    Plus, they paid for your son's prom

4    travel that spring; am I correct?

5                MS. GOODING:  Object to form.

6                THE WITNESS:  You know, I wanted to see

7    that.  I'm not certain if they paid for it.  I

8    think so, though.  They might have.  I asked --

9    BY MR. FINGER:

10         Q.    Did you pay -- did you -- did you pay

11   for it?

12         A.    I can't recall.  I just remember him

13   wanting to leave and go from one tournament to his

14   prom.  I remember that.  So I can't remember who

15   paid for it.

16         Q.    Did your son have a Visa card in June

17   of 2017?

18         A.    No.  Of course not, no.

19         Q.    All right.  So those charges that

20   Mr. Taft asked you about for that lawyer down in

21   Miami, those were paid by you, not your son; isn't

22   that correct?

23               MS. GOODING:  Object to form.

24   BY MR. FINGER:

25         Q.    If he didn't have a Visa card.  They

Brian L. Bowen , Sr                     January 20, 2021
Bowen v. Adidas

Page 346

1    BY MR. CORDOVA:

2          Q.    Was Munish Sood involved in this

3    payment?

4          A.    No.

5          Q.    And just to back up, did -- was Dawkins

6    still working for Andy Miller at this time?

7          A.    I guess he was.  I can't say for sure,

8    but I assume he was.

9          Q.    Well, when your son was playing for --

10   playing for the MeanStreets, did you ever meet

11   Munish Sood?

12         A.    No, I don't -- no, I don't recall that.

13   No.  I only met him once.

14         Q.    Okay.  I want to jump ahead to

15   La Lumiere High School.  I believe I'm pronouncing

16   that correctly.  Is that right, La Lumiere?

17         A.    As good as I can, yeah.

18         Q.    All right.  So you also mentioned that

19   when your son played for La Lumiere you received

20   $2,000 a month; is that correct?

21         A.    Correct.

22         Q.    And how much did you receive in total?

23   I know that you sort of tried to guess and figure

24   out before, but can you give an estimate of how

25   much you received in total?

Brian L. Bowen , Sr                     January 20, 2021
Bowen v. Adidas

Page 369

1    those individuals' various roles were over time in

2    terms of money being paid to families of basketball

3    players?

4          A.    I can't -- I can't say that.  I don't

5    know.  I'm sure they had something to do with it.

6    I mean, they're named.

7          Q.    You can only testify to what you know;

8    right?

9          A.    Right.

10         Q.    Okay.  And so if Mr. Gatto was involved

11   in getting bribe money to you but you never

12   interacted with him, that doesn't mean that he

13   didn't have a role --

14               MS. BARBIER:  Object to the form.

15   BY MR. RAM:

16         Q.    -- in getting that money to you, does

17   it?

18         A.    I guess not.  I don't know.  No, I

19   guess it wouldn't.  I don't know.  No.

20         Q.    You just wouldn't know one way or

21   another what he did.

22         A.    I don't know that.

23         Q.    All right.  I want to talk to you about

24   Tugs' NCAA eligibility and what happened after news

25   of all this broke in 2017.

Brian L. Bowen , Sr                    January 20, 2021
Bowen v. Adidas

Page 370

1              Now you were shown a copy of a legal

2     invoice where some payments were made to Tugs'

3     attorney.  Do you recall seeing that document?

4              A.   Yes, I do.

5              Q.   And you were asked about various credit

6     card payments that were reflected on that invoice.

7     Do you remember those questions?

8              A.   Yes.

9              Q.   And I believe, but correct me if I'm

10    wrong, you don't recall whether it was you or

11    whether it was Carrie who made those credit card

12    payments; right?

13             A.   I don't remember that.  No, I don't.

14             Q.   Okay.  And at the time Tugs was just

15    starting his freshman year at the University of

16    Louisville; right?

17             A.   Correct.

18             Q.   And he had just graduated high school a

19    few months before; right?

20             A.   Yes.  Yeah.

21             Q.   And he didn't have a part-time job in

22    high school or in college at that point, did he?

23             A.   No.

24             Q.   He didn't have any way of earning

25    income, did he --

Brian L. Bowen , Sr                              January 20, 2021
Bowen v. Adidas

Page 371

1          A.    No.

2          Q.    -- up until that point?

3          A.    No.

4          Q.    And he didn't have an allowance, did

5    he?

6          A.    No.

7          Q.    But he needed a lawyer to help with his

8    NCAA eligibility after news of Adidas's bribe came

9    to light; right?

10         A.    Of course.

11               MR. TAFT:  Object; form.

12   BY MR. RAM:

13         Q.    And so you and Carrie, one or both of

14   you helped him initially retain and pay for a

15   lawyer; is that right?

16         A.    That's right.  Correct.

17         Q.    Now Tugs today is a professional

18   basketball player with the Indiana Pacers; right?

19         A.    Yes.

20         Q.    And he's in the second year of a

21   contract with the Pacers; right?

22         A.    Yes.

23         Q.    And he's just now starting to earn some

24   money for himself as a young basketball player; is

25   that right?

Brian L. Bowen , Sr                    January 20, 2021
Bowen v. Adidas

Page 372

1          A.    That's correct.
2          Q.    And is Tugs the kind of person, the
3    kind of son who's going to go to you and say, Dad,
4    thank you for helping me cover this when I needed
5    it, now here's some money for my legal bills that
6    you initially paid for?
7                MR. TAFT:  Object to form.
8                THE WITNESS:  I'm not sure I understand
9    that question.
10   BY MR. RAM:
11         Q.    Well, I'm just trying to ask you, is he
12   the kind of person who's going to come to you, now
13   that he's got some money, and reimburse you for any
14   expenses that he incurred as part of this case?
15               MR. TAFT:  Same objection.
16               THE WITNESS:  Is he going to -- you're
17   saying would he help me out?  Is that what you're
18   saying?  I'm not sure exactly.
19   BY MR. RAM:
20         Q.    No, not help you out.  Repay you for
21   any money that you paid his lawyer to help him with
22   the NCAA eligibility issues.
23               MR. TAFT:  Object to form.
24               THE WITNESS:  I'm sure he would do
25   that, but I'm not going to ask him nothing like

Brian L. Bowen , Sr                         January 20, 2021
Bowen v. Adidas

Page 373

1    that.

2    BY MR. RAM:

3         Q.    Well, I know as a dad you're not going

4    to ask your son for money, but I'm asking you the

5    other way around.  Tugs.  He's a young man now;

6    right?

7         A.    Yeah.

8         Q.    He's no longer a teenager.

9         A.    Right.

10        Q.    Okay.  He was a teenager when all this

11   stuff happened; right?

12        A.    Right.

13             MR. TAFT:  Objection.

14   BY MR. RAM:

15        Q.    And now that he's a professional

16   basketball player, would it surprise you if he

17   says, Dad, you helped me when I needed it and now I

18   want to pay you back?

19        A.    Oh, no, that wouldn't surprise me, no.

20   That wouldn't surprise me.

21        Q.    Okay.  All right.  And your

22   involvement.  You were asked some questions about

23   your phones and that type of thing.

24             Let me just ask you:  When you were

25   talking to federal prosecutors in New York and FBI

Brian L. Bowen , Sr                         January 20, 2021
Bowen v. Adidas

Page 381

1                    CERTIFICATE OF REPORTER

2

3              I, Sandra K. Bjerke, Registered

4    Professional Reporter and Notary Public for the

5    State of South Carolina at Large, do hereby certify

6    that the foregoing transcript was transcribed to

7    the best of my ability using the Zoom technology

8    platform, including, but not limited to, its

9    inherent shortcomings of garbled speech,

10   overmodulation, and voice-overlap cancellation;

11             I further certify that I am neither

12   related to nor counsel for any party to the cause

13   pending or interested in the events thereof.

14             Witness my hand, I have hereunto

15   affixed my official seal this 27th day of January,

16   2021 at Charleston, Charleston County, South

17   Carolina.

18

19

20

21

22   

23

24             Sandra K. Bjerke, RDR, CRR, CBC
               My Commission Expires
25             May 6, 2030

Brian L. Bowen , Sr
Bowen v. Adidas

January 20, 2021

Page 382

```
1                   I N D E X

2

3                                      Page      Line

4     BRIAN L. BOWEN, SR.              6          25

5     EXAMINATION                      7          2

6     BY MR. TAFT

7     EXAMINATION                      234        4

8     BY MS. BARBIER

9     EXAMINATION                      282        17

10    BY MR. FINGER

11    EXAMINATION                      304        21

12    BY MR. LINDHOLM

13    EXAMINATION                      340        10

14    BY MR. CORDOVA

15    EXAMINATION                      357        23

16    BY MS. BARBIER

17    EXAMINATION                      360        6

18    BY MR. RAM

19    EXAMINATION                      375        14

20    BY MR. TAFT

21    CERTIFICATE OF REPORTER          381        1

22

23

24

25
```

Page 383

1                   REQUESTED INFORMATION INDEX

2

3               (No Information Requested)

4

5

6                      E X H I B I T S

7

8                                       Page        Line

9   EXHIBIT 1, 2009 900-EZ Short      29          4

10  Form Return of Organization

11  Exempt From Income tax

12  EXHIBIT 2, 2015 1040 US           44          9

13  Individual Income Tax Return

14  for Brian L. Bowen

15  EXHIBIT 3, Screenshots of Text    91          25

16  Messages between Mr. Dawkins

17  and Mr. Bowen, Sr.

18  EXHIBIT 4, Trial Transcript in    118         18

19  the Matter of United States of

20  America vs. James Gatto dated

21  10-4-18

22  EXHIBIT 5, Trial Transcript in    120         3

23  the Matter of United States of

24  America vs. James Gatto dated

25  10-9-18

Brian L. Bowen , Sr                                    January 20, 2021
Bowen v. Adidas

Page 384

1    EXHIBIT 6, Bank of the West        111        1
2    Corporation Signature Card,
3    with Attachments
4    EXHIBIT 7, Screenshots of Text     120        23
5    Messages between Mr. Anderson
6    and Mr. Bowen, Sr.
7    EXHIBIT 8, University of           158        19
8    Louisville Unofficial Visit
9    Record
10   EXHIBIT 9, Lease Agreement         186        13
11   between the Galt House Hotel
12   and Mr. Bowen dated 6-26-17
13   EXHIBIT 10, Reputation             215        14
14   Defender Service Agreement
15   dated 6-22-16
16   EXHIBIT 11, Invoice to             218        20
17   Mr. Bowen from Jason A.
18   Setchen, PA dated 8-19-19
19   EXHIBIT 12, Chat with Dad          334        19
20   dated 9-24-16
21
22
23
24
25

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.