**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

**COLUMBIA DIVISION**

| | | |
|---|---|---|
| BRIAN BOWEN II, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Civil Action No.: <u>3:18-3118-JFA</u> |
| ADIDAS AMERICA, INC.; | ) | |
| JAMES GATTO; MERL CODE; | ) | |
| CHRISTIAN DAWKINS; MUNISH | ) | |
| SOOD; THOMAS GASSNOLA; and | ) | |
| CHRISTOPHER RIVERS | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
<u>TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON RICO STANDING</u>**

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………………………….........................................................................................................1

BACKGROUND ...................................................................................................5

    A. Sneaker Wars ........................................................................5

    B. "Controlling Mom and Dad's Purse Strings" ............................................. 7

    C. Integrated Three-Step Strategy to Capture Young Players and Win Market Share ......7

    D. Adidas Grassroots Basketball and Consultants...........................................10

    E. Soul Patrol.......................................................................................12

    F. The NCAA and Bylaws Regarding Student-Athlete Eligibility.................................16

    G. Adidas is a Representative of Louisville's Athletics Interests
       Under NCAA Bylaws ......................................................................17

LEGAL STANDARD............................................................................................18

ARGUMENT ....................................................................................................19

I.  DEFENDANTS' STANDING ARGUMENT FAILS GIVEN THE AMPLE EVIDENCE SHOWING THEIR RACKETEERING ACTS DIRECTLY INJURED BRIAN BOWEN'S BUSINESS AND PROPERTY INTERESTS ......................................................19

    A. Brian's NCAA Eligibility is a Business and Property Interest Directly Injured by Defendant's Racketeering Conduct .......................................................22

    B. Brian's Agreement with Louisville is a Business and Property Interest Directly Injured by Defendants' Racketeering Conduct ....................................................27

    C. Neither Brian's Amateurism nor Eligibility was Harmed During High School ..........32

    D. Brian's Legal Fees and Costs Provide Standing to Bring RICO Claims....................35

    E. Brian's Professional Earnings were Directly Harmed by Defendants' Racketeering Conduct....................................................................................36

    F. Brian's Lost Professional Earnings are Recoverable under RICO .............................42

II.  THIS COURT HAS THE JURISDCITION AND POWER TO PROTECT THE PUBLIC AGAINST THE VERY HARM IDENTIFIED IN THE RICE COMMISSION REPORT ....46

CONCLUSION....................................................................................................50

i

# **TABLE OF CASES**

*Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C.,*
691 F. Supp. 2d 772, 790 (N.D. Ill. 2010) .............................................................. 19, 49

*Anza v. Ideal Steel Supply Corp.,*
547 U.S. 451, 460 (2006) ...................................................................................... 20-21

*AvalonBay Cmtys., Inc. v. Willden,*
2009 WL 2431571 (E.D. Va. Aug. 7, 2009) ................................................................27

*Bast v. Cohen, Dunn & Sinclair, PC,*
59 F.3d 492, 495 (4th Cir. 1995) ................................................................................36

*Bd. of Regents of State Colleges v. Roth,*
408 U.S. 564, 577 (1972) ............................................................................................ 20

*Bruce v. S.C. High Sch. League,*
258 S.C. 546, 553, 189 S.E.2d 817, 819–20 (1972) .................................................... 23

*Cedric Kushner Promotions, Ltd. v. King,*
533 U.S. 158, 165 (2001) ............................................................................................ 49

*Chevron Corp. v. Donziger,*
833 F.3d 74, 137-140 (2d Cir. 2016) ..........................................................................49

*Denis J. O'Connell High Sch. v. Va. High Sch. League,*
581 F.2d 81, 83 (4th Cir. 1978) ..................................................................................23

*Diaz v. Gates,*
429 F.3d 897 (9th Cir. 2005) ......................................................................................32

*Doe v. Roe,*
958 F.2d 763, 767-70 (7th Cir. 1992) ......................................................................... 36

*Domanus v. Lewicki,*
857 F. Supp. 2d 719, 727 (N.D. Ill. 2012) .................................................................. 51

*Giuliani v. Duke University,*
No.:1:08-cv-502, 2010 WL 1292321 (M.D.N.C. Mar. 30, 2010) .................................30

*Guerrero v Gates*,
442 F3d 697, 707 (9th Cir. 2006) ............................................................................32

*Hecht Co. v. Bowles*,
321 U.S. 321, 329 (1944)..........................................................................................51

*Hengle v. Treppa*,
433 F.Supp.3d 825 (E.D. Va. 2020)………………………………………………..48

*Holmes v. Sec. Inv. Prot. Corp.*,
503 U.S. 258, 269–70 (1992)………………………………………………...20, 21

*Huyer v. Wells Fargo & Co.*,
295 F.R.D. 332, 344 (S.D. Iowa 2013)…………………………………………….47

*Indiana ex rel. Carter v. Pastrick*,
384 F. Supp. 2d 1261, 1266 (N.D. Ind. 2005)…………………………………...21

*In re Am. Honda Motor Co., Inc. Dealerships Relations Litig.*,
941 F. Supp. 528, 540–41 (D. Md. 1996)…………………………………...…21

*In re Conco, Inc.*,
855 F.3d 703, 712 (6th Cir. 2017) …………………………...…………………31

*In re Managed Care Litig.*,
298 F.Supp.2d 1259, 1283 (S.D.Fla. 2003)…………………………………...…47

*In re Microsoft Corp. Antitrust Litig.*,
355 F.3d 322, 326 (4th Cir. 2004)……………………………………………….27

*Johnson v. Collins Ent. Co.*,
199 F.3d 710 (4th Cir. 1999)……………………………………………………..47

*Matthews v. Porter*,
239 S.C. 620, 628, 124 S.E.2d 321, 325 (1962)…………………………………21

*Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*,
18 F.3d 260 (4th Cir. 1994)……………………………………………………...21

*Motorola Credit Corp. v. Uzan,*
202 F.Supp.2d 239, 243–44 (S.D.N.Y. 2002)……………………………………………...47

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma,*
468 U.S. 85, 103 (1984)……………………………………………………………………24

*Nat'l Org. for Women, Inc. v. Scheidler*
267 F.3d 687, 695-700 (7th Cir. 2001)…………………………………………...49

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.,*
597 F.3d 570, 576 (4th Cir. 2010)…………………………………………………………18

*O'Bannon v. Nat'l Collegiate Athletic Ass'n,*
7 F.Supp.3d 955, 966 (N.D. Cal. 2014)………………………...……………....30, 24

*Phoenix Bond & Indem. Co. v. Bridge,*
477 F.3d 928, 930 (7th 2007) *aff'd*, 533 U.S. 639, 645 (2008)……………………….……27

*Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.,*
262 F.3d 260, 265 (4th Cir. 2001)………………………………………………...38, 52

*Presnell Const. Managers, Inc. v. EH Const., LLC,*
134 S.W.3d 575, 580 (Ky. 2004)………………………………………………...43

*Rotella v. Wood,*
528 U.S. 549, 550 (2000)……………………………………………………….……20

*Sedima, S.P.R.L. v. Imrex Co.,*
473 U.S. 479, 497–98 (1985)……………………………………………………………49

*United States v. Gatto,*
986 F.3d 104, 115 (2d Cir. 2021)……………………………………………...19

*Vardon v. W. Virginia,*
No. 2:11-CV-00399, 2012 WL 685863, at *2 (S.D.W. Va. Mar. 2, 2012)………………..……..18

*Warfield Nat. Gas Co. v. Allen,*
248 Ky. 646, 59 S.W.2d 534, 536 (1933)……………………………………………….31

Plaintiff Brian Bowen II ("Brian") respectfully submits his Response in Opposition to the motion for summary judgment on RICO standing filed by Defendants Adidas America, Inc. (ECF No. 205) and joined by Defendants Christopher Rivers (ECF No. 207), Merl Code and Christian Dawkins (ECF No. 210), and James Gatto (ECF No. 212). For the reasons set forth below, Defendants' motions should be denied in their entirety and this case should proceed to trial.

## **INTRODUCTION**

In the wake of the Adidas bribery scheme, the NCAA created an Independent Commission led by Condoleezza Rice to assess the state of college basketball. The Rice Commission concluded that "men's college basketball is deeply troubled. The level of corruption and deception are now at a point that they threaten the very survival of the college game as we know it."[1] Unfortunately for Brian Bowen, he was a direct victim of this corruption.

Brian was an elite basketball prospect and one of the most highly decorated players coming out of high school in recent memory. No one disputes this. At age 17, he was the MVP of the number one high school team in the country, La Lumiere, a McDonald's All-American player, MVP of the Jordan Brand Classic game, the Gatorade player of the year in Indiana, and a consensus five-star college recruit. His accomplishments and talents were widely tracked not only in the high school and college basketball world, but also by top scouts in the NBA. They were also closely tracked by Adidas, which at that time made finding elite players like Brian and steering them to Adidas-sponsored universities a core part of its plan to reverse years of missteps and poor business decisions so it could catch-up to the leaders in the athletic apparel space: Nike and Under Armour. Adidas tried to accomplish this mission through a three step plan: (1) targeting and acquiring elite

---

[1] Comm'n on College Basketball, Report and Recommendations to Address the Issues Facing Collegiate Basketball (2018) at 2, *available at* https://www.ncaa.org/sites/default/files/2018CCBReportFinal_web_20180501.pdf

basketball prospects to Adidas-sponsored AAU teams; (2) recruiting those captive AAU players to Adidas-sponsored universities; and (3) activating those elite players with shoe deals once they are drafted into the NBA.[2]   Adidas worked this plan through its network of "grassroots" consultants—individuals who on paper were vaguely described as travel team "directors" or "consultants" with modest stipends, but who in reality received millions of dollars from Adidas and used that money to acquire elite prospects by establishing relationships with top players and their families.   Through these grassroots consultants, Adidas "serviced" the families of elite prospects with cash bribes, thousands of dollars in credit on Adidas store cards, airline tickets, cruises, and expensive, hard-to-find sneakers.   They did so through a proven sham invoicing scheme used to launder and conceal corporate payments to parents and guardians of elite players so they would exercise their influence to steer their children to Adidas-sponsored Division I basketball programs.   In one notable instance, Adidas's Chris Rivers made regular payments to an Ashley Furniture store credit account held by the stepfather of a top South Carolina high school player in an ill-fated attempt to lure his son to an Adidas-sponsored university.   In another, Rivers and Adidas grassroots consultant Jillyn Pendleton discussed "writing (40) $500 checks to college kids.  Details for who and to where will be coming later in the month."[3]

In Brian's case, Defendants succeeded in securing his basketball labor and talent for Adidas's flagship University of Louisville ("UofL") through manipulation, fraud, and a bribe paid to his father.  But for Adidas, the scheme failed to pay the expected dividends.  As for Brian, because the bribe payment was made after he committed his eligibility and entered a four-year contract with Louisville, he was automatically rendered ineligible to participate in college basketball by operation of the NCAA's bylaws, his contract with the school was vitiated, and he

---

[2]  Ex. 1, Adidas Uprising Presentation
[3]  Ex. 2, Dec. 4, 2016 Email

suffered significant financial harm.  Brian was never able to play competitive Division I basketball during the most critical period of his professional development into an NBA player.

For purposes of this motion, Adidas and the other Defendants do not contest that they committed RICO violations through a scheme to defraud Brian of his NCAA eligibility by purposefully concealing their bribery scheme.  Nor could they.  The fact of the bribery has long been established and served as the basis for the convictions of Defendants Gatto, Code, Dawkins, Gassnola, and Sood.  Nor can Defendants in good faith point to any evidence that Brian had any knowledge of their scheme: evidence produced in response to subpoenas issued to the University of Louisville and its former assistant coach, Kenny Johnson, prove that <u>Louisville knew in May 2017 that Adidas was involved in the bribery scheme and that Brian had no knowledge of it</u>.  As clear evidence that Brian was being manipulated, just hours after Brian left campus after his May 30, 2017 recruiting trip to Louisville, Coach Kenny Johnson and Defendant Christian Dawkins exchanged a series of text messages, which at the time were available to Louisville's compliance staff had they bothered to look:[4]

> Dawkins:    The goal is to get him back by Thursday.  **But going to let him take the night <u>so he thinks he came to this decision by himself</u>**.

> Johnson:    What was the vibe after seeing the city?

> Dawkins:    They liked it.  **<u>I just need to talk to adidas when I'm away from them</u>** and get back with Them and we should be good.

> Johnson:    I just sent the text to [Chris] Rivers that we had a good visit.  We going to be good I'm sure.  Lets go.

Because Brian's basketball labor and talents were in such high demand, there was quite a bit of angst regarding whether the scheme would work.  On May 30, 2017 at 6:44 p.m, Coach

---

[4] Ex. 3, K. Johnson text messages, lines 161-163, 174.

Johnson sent a text to Dawkins stating: "I'm not going to sleep until you tell me he is coming."[5] Apparently, Coach Johnson did not get a good night's rest because the following day he texted Dawkins about preparing Brian's college application: "Tugs doesn't need to know but we should get started so he can be admitted."[6]  As for Dawkins, Johnson instructed Louisville's Director of Basketball Operations, Mike Bowden, to "Remove Christian Dawkins from all records on this visit.  No paperwork."  Bowden's response to this illegal request to alter a public record?  "Ok. Never even heard the name before."[7]  After news of the Adidas bribery scheme became public, Louisville's senior associate athletic director for compliance, John Carns, instructed Bowden to go back and *add* Dawkins' name to the form before it was produced to federal prosecutors and the NCAA.

As a direct consequence of the Adidas bribe payment, Brian lost his NCAA eligibility. Twenty-four hours after the U.S. Attorney for the Southern District of New York unsealed the criminal complaints against Gatto, Code, Dawkins and others in widely-viewed press conference, and after the media quickly identified the redacted names of the players and schools impacted by the bribery scheme, Louisville's associate athletic director for compliance, Matt Banker, emailed UofL coaches and staff informing them in no uncertain terms: "MBB student-athlete Brian Bowen has been declared ineligible from athletics participation immediately. . . . This means Brian is both ineligible to compete and ineligible to participate in practice, conditioning, weights, sport performance, skill instruction or any other countable activity."[8]

Against these facts, Adidas cynically argues that Brian was not a victim of anything, that he suffered no direct injury, and that his loss of NCAA eligibility was a consequence not of the

---

[5] *Id.* at 169.
[6] *Id.* at 151.
[7] Ex. 4, UL text messages
[8] Ex. 5, M. Banker email (emphasis added).

company's widespread bribery scheme, but of Adidas and its co-defendants getting caught. (Adidas Mot. for Summ. J. ("MSJ") ECF No. 206 at 28).  In other words, Adidas—a German-owned company that profits off of dozens of taxpayer-funded and private institutions of higher education across the United States—believes this Court should dismiss Brian's case because if the FBI didn't catch them in the act, no one would have gotten hurt.

**FACTUAL BACKGROUND**

A. **Sneaker Wars**

In order to understand the direct causal link between the RICO violations that caused irreparable injury and damages to Brian, it is important to begin with examining the state of the sneaker industry in 2014 and the state of affairs at Adidas. In August 2014, Adidas's current president, Zion Armstrong, transferred from overseas to Adidas America's Portland headquarters to serve as its General Manager and second-in-command to then-President Mark King.  Armstrong learned very shortly after arriving in Portland that Nike owned a large percentage of the market share in the U.S. market. (Ex. 6, Armstrong Tr. 73:22 - 74:1; *see also* Ex. 7, McGuire Tr. 29:8-17.) Further, Nike's market capitalization was substantially greater than Adidas's market cap. (Ex. 6, Armstrong Tr. 74:23 - 75:1.) Mr. Armstrong also came to learn the North American sporting industry market accounted for approximately 45% to 50% of the worldwide market. (*Id.* 75:19-23.)  Adidas's German-based leadership made an increase in the company's North American market share a strategic priority. (*Id.* 76:25-77:3.) Armstrong learned of this new strategic objective when Kasper Rørsted, CEO of Adidas A.G., announced the company's new five-year strategy. (*Id.* 77:6-10.)  This priority was later reflected in Adidas's annual report:

> North America represents the biggest market in the sporting goods industry with a total share of approximately 40%. At the same time, from a geographical perspective, North America represents the biggest opportunity for the adidas brand, given its relatively small market share compared to other regions."

(Ex. 8, Adidas 2017 Annual Report at 65.)

Adidas's executives in Germany became "convinced that footwear has the highest influence on brand perception [and] is also the most powerful driver of NPS….and our potential to grow market share." (*Id.* at 67.)[9] To ensure Adidas would capitalize on the "biggest opportunity" in the world's "biggest market," Adidas linked its executives' Long Term Incentive Plan to meeting growth objectives in the U.S. sneaker market; specifically, incentives were based on an "increase in the presence on the US market measured by/assessed on the basis of the **increase in market shares of adidas footwear** and an improvement in the brand's popularity." (*Id.* at 47.)

At the time, Adidas was losing market share to its apparel industry rival, Under Armor. Adidas's Senior Director of Sports Marketing, Chris McGuire, testified that Adidas was then on a roller coaster and its financial performance was "inconsistent." (Ex. 7, McGuire Tr. 88:2 – 90:15.) To win the sneaker wars and achieve the desired growth and earnings, Adidas needed a focused strategy that could overcome Nike's and Under Armour's dominance in the marketplace.

Perhaps unlike in other markets, athlete and celebrity endorsements were and still are the "lifeblood" of the apparel industry in America." (Ex. 6, Armstrong Tr. 92:4-8.) Thus, the company recognized brand loyalty as a critical component of increasing market share in the U.S., and devoted significant corporate resources to increasing a metric known as an NPS score which measures brand loyalty in the U.S. market. (*Id.* 98:11-14.) Increasing corporate profits by increasing brand loyalty has taken on heightened importance in today's market considering the

---

[9] "NPS" stands for "Net Promoter Score" and is a widely-used metric created by Bain & Company "that predicts overall company growth and customer lifetime values." *See* https://www.bain.com/consulting-services/customer-strategy-and-marketing/customer-loyalty/# (last visited April 21, 2021).

consumer has so many options., (*Id.* 106: 21), so growing sneaker sales in the U.S. market was one of Adidas's most important priorities globally.

## B. **"Controlling Mom and Dad's Purse Strings"**

Adidas's prized targets are the millions of "13- to 17-year old high school athlete[s]." (Ex 7, McGuire Tr. 32:14 – 33:6; 92:8-23.) Chris McGuire described these kids as "the most influential consumers, our target audience," and, more importantly, "they're the ones that are controlling mom and dad's purse—purse strings." (*Id.* 34:23 – 35:3.) Yet, Adidas's struggled to reach those kids from 2013 through 2016. According to McGuire, "we've kind of lost our way and weren't focusing and seen as a credible sports brand, and our competitors not only at Nike but obviously Under Armour was becoming a major player in the market." (*Id.* 130:16 – 131:8.) This lack of focus cost the company dearly in terms of key apparel sponsorships with universities: "From about '13 to 2016 we lost a lot of universities – or bigger-named universities." (*Id.*) In 2014, Notre Dame walked away from a 17-year sponsorship agreement with Adidas and signed with Under Armour. This loss dealt a body blow to the company. As McGuire recounted in his deposition, "when we had Notre Dame the Dick's Sporting Goods in South Bend was one of our best-performing stores overall." (*Id.* 133:4-22.) Six months later, Adidas lost another sponsorship of the University of Cincinnati to Under Armour despite what Zion Armstrong characterized as a "pro active" attempt to re-sign the school. (Ex. 9, Feb. 6, 2015 email.) And six months after losing Cincinnati, the University of Michigan announced that it too was ending its relationship with Adidas. Adidas was effectively shut out of the midwestern market. "[W]hen you go back to the geographical look in losing Michigan, losing Notre Dame, we needed to maintain our place in the space." (Ex. 7, McGuire Tr. 182:5-20.)

7

**C. <u>Integrated Three-Step Strategy to Capture Young Players and Win Market Share</u>**

To win back market share, Adidas implemented a three-step corporate strategy: (1) secure elite prospects like Brian to Adidas sponsored AAU teams; (2) transition those elite prospects to one of its college sponsored teams while the prospect prepares for the NBA; and (3) activating the elite prospect to an athlete endorsement deal once in the NBA. Each step was designed to reward Adidas with increased earnings by building brand loyalty among fans.  In working across each of the three Adidas platforms, the company's stated objectives were to: Scout, Sign, Service and Activate. (Ex. 10, M. Ladinig Presentation.)  The company's integrated approach for scouting, signing, and servicing elite high school prospects and players on Adidas sponsored college teams was no different than its approach with current professional players. Since at least 2014 Adidas has allocated significant corporate resources, both in human capital and money, towards increasing athlete endorsements of its products. (Ex. 6, Armstrong Tr. 91:23 – 92:3.)

**Step 1: Scout and Sign.** Adidas only targeted the elite prospects like Brian who were projected to be drafted in the NBA. It did not waste company time or resources on students who "will be good college players" or "might make it in the NBA." Rather, documents prove Adidas specifically targeted the "Top 30" elite prospects in each class. Further, its grassroots basketball division was required to report their "touches" with each Top 30 player and the families of Top 30 players in each class.  (Ex. 11, NextGen Presentation.)  The "Top 30" was not a random number— there are 30 teams in the NBA and 30 draft picks in the first round of each year's NBA draft.

**Step 2: Service AAU and NCAA Teams.**  The Adidas Gauntlet series was the premiere travel basketball circuit that Adidas used to build and maintain relationships with elite prospects' families. Adidas did not create the Gauntlet series for a benevolent purpose, nor did it fund it for reasons related to fair play, sportsmanship, or an opportunity to compete.  Rather, Adidas

determined which teams it believed were "top tier" and limited participation accordingly. (Ex. 12, K. Johnson Tr. 129:17-130:1) Field Representatives for the series are to "**gather intel, forge relationships and develop these into brand assets [which] is a year round task**." (Ex. 1, Adidas Uprising Presentation.)

The travel ball teams are also the mechanism through which Adidas begins to target the families of some of the country's elite prospects and through which they transition the elite prospect to an Adidas sponsored college team. Adidas does so in part with the use of "sponsorship funds" and valuable Adidas apparel. (Ex. 12, K. Johnson Tr. 131:8-12.) When targeting the top players, Adidas goes one step further and tries to sign the player's parents to "consulting" agreements. For example, on January 1, 2017, Adidas entered into one such agreement with the mother of one of the country's top players (Zion Williamson) and agreed to pay her $40,000 annually as a "travel allotment" and provide her $20,000 worth of products for use by her son's team. (Ex. 13, SC Supreme Contract.) Adidas had a similar deal with the father of another top prospect, Romeo Langford. When Zion and Romeo graduated from high school, Adidas instructed Chris Rivers to "completely cut" its sponsorship of their teams because "no more Zion" and "no more Romeo." (Ex. 14, Aug. 30, 2017 email.) Romeo would play college ball for the Adidas-sponsored Indiana Hoosiers, while Zion attended Duke University despite Defendant Rivers' best efforts. Both Zion and Romeo went on to become first-round NBA draft picks.

Just like the AAU programs are a vehicle to forge relationships and service elite prospects families, so too are the apparel deals with NCAA member institutions. Adidas has invested approximately $1 billion to secure what it describes are "Assets." (Ex. 15, Collegiate Assets.) Evidence in this case also demonstrates Adidas made strategic, calculated decisions where to spend its for-profit dollars in the acquisition of NCAA assets; namely, Adidas maintains a ratings system

to determine which NCAA "assets" present the best opportunity for Adidas to gain market share. Not surprisingly, the ratings system is only used in two sports: FBS Football and Division I Men's Basketball. The ratings measured the following metrics on a 1 to 10 scale: coach, administration, tradition/heritage, national significance, television frequency, conference strength, recent winning and future outlook. One would expect the coach's rating to be based upon "winning percentage," "championships won," or perhaps "percentage of players graduating." Not at Adidas: coaches were assigned ratings based upon how **"Progressive"** Adidas perceived the coach to be. (*Id.*). Adidas was so calculated in analyzing these NCAA assets that it applied the ratings separately to football and basketball within the same NCAA asset, despite its sponsorship deals covering all sports. In 2013, UofL football ranked 11th out of the 13 Adidas NCAA assets due in large part because Adidas rated coach Charlie Strong a 4 out of 10 on the progressive scale. (*Id.*) Stated differently, Charlie Strong is man of character and integrity who doesn't play ball with Adidas. Conversely, in the same year Louisville Basketball was providing strippers and prostitutes to players and recruits, Adidas ranked its coaching staff a perfect 10 on the "progressive" scale. (*Id.*)

## D. <u>Adidas Grassroots Basketball and Consultants</u>

Adidas devotes an inordinate amount of money to its three-step strategy to AAU basketball. By 2016, grassroots basketball became the <u>third largest</u> sports marketing budget priority within Adidas, right after professional soccer and NFL football. (Ex. 7, McGuire Tr. 125:14 – 126:15.) Yet, to stay competitive, Adidas had to turn to the black market where it spent "millions of dollars on 'grassroots' campaigns to curry favor with children as young as 12 in their hunt of the next Michael Jordan or LeBron James, superstars whose endorsement shape the marketplace."[10] To

---

[10] *See* Bob Hohler, *Ethical questions raised as amateur basketball recruiters engage in battle for blue-chip recruits*, BOSTON GLOBE, Feb. 20, 2016 *available at* *https://www.bostonglobe.com/sports/2006/07/23/ethical-questions-raised-amateur-basketball-recruiters-engage-battle-for-blue-chip-recruits/2LoRNAv71WTWsBUmHI2zzL/story.html*

compete in the black market, Adidas had to find people comfortable working in the shadows. It found that person in T.J. Gassnola—who the Boston Globe described as "the sneaker giant's top New England recruiter" and "a free-wheeling recruiter whose tactics often have clashed with rules set by the National Collegiate Athletic Association to protect amateur athletes who aspire to careers in college sports." Gassnola has a long criminal history, and an equally long tenure with Adidas. Yet, in July 2012, the NCAA banned Gassnola and his AAU team, the New England Playaz, from participating in NCAA-sanctioned AAU basketball events for having "a prohibited association" with Andy Miller of the ASM Sports agency. (Ex. 16, NCAA statement.)

Adidas's grassroots director at the time, Jeff Robbins, clashed with Gassnola and his tactics and, following the NCAA's ban, reportedly refused to renew sponsorship of Gassnola's AAU team, the New England Playaz.[11] Gassnola pleaded with Robbins in an email, "I know you have concerns about some things I have done in the past and concerns about my program, I take this program to heart Jeff, I bleed 3Stripes and want nothing more than to continue with adidas as well as working with you!" (Ex. 17, Jan. 14, 2014 email.) Gassnola forwarded this email to McGuire, telling him "I have been with adidas for a long time. I have no interest going with any other company. I wanna stay and fight this war lol." (*Id.* (emphasis added).) Gassnola prevailed, and Adidas fired Robbins at the end of 2014, replacing him with Chris Grancio. Chris Rivers later championed the change in basketball leadership in a presentation he provided to McGuire and Grancio. (Ex. 11, NextGen Presentation at 2 ("In December, adidas Basketball underwent a leadership change. With that came a new way of thinking and new energy." (emphasis added)).)

---

[11] Schmidt and Manning, *Basketball Bribes: How Adidas bankrolled a black market for top teenage talent*, OREGONIAN, Feb. 3, 2019, *available at* https://www.oregonlive.com/business/2019/02/basketball-bribes-how-adidas-bankrolled-a-black-market-for-top-teenage-talent.html

In January 2015, Gassnola traveled to Fayetteville, North Carolina with Defendant Rivers and Adidas's Anthony Coleman to meet with the father and trainer of high school player Dennis Smith, Jr.  A few weeks later, on February 15, 2015, McGuire "received an unsolicited call" from N.C. State men's basketball head coach Mark Gottfried, who, according to McGuire, "didn't get along" with Robbins.  (Ex. 7, McGuire Tr. 232:1–234:15.)  In an email describing the call, McGuire wrote: "[Gottfried] wanted to express his appreciation and gratitude for all the work and attention you guys, and TJ, have been providing to him and his staff."  (Ex. 18, Feb. 19, 2015 email.)  Gottfried's staff at the time included assistant basketball coach Orlando Early who Gassnola testified was later paid "$40,000 to give to the family of Dennis Smith."  (Ex. 19; Gassnola Tr. 998:21-999:9.)  The same day as McGuire's call with Gottfried, Adidas signed Gassnola and the New England Playaz to a new "consulting" agreement.  (Ex. 20, Gassnola 2015-16 contract.)  McGuire signed that agreement on behalf of Adidas.  (*Id.*)

## E.  **Soul Patrol**

That "new way of thinking" Rivers referenced would become known within Adidas as "Black Ops," run by a large group of Adidas insiders and basketball consultants that called themselves the "Soul Patrol."  (*See, e.g.*, Ex. 21, Feb. 23, 2015 email; Ex. 22, Field Reps.)  Members of Soul Patrol included Defendants Gatto, Rivers, Code, and Gassnola, Adidas employees Anthony Coleman, Junior Duperrier, Tonie Hanson, and Corey Butler, as well as other Adidas grassroots basketball "consultants" including Dan Cutler, Corey "Hulio" Smith, Etop Udo Ema, and Jamie Palmer.  (Ex. 23, "Sole" Patrol Descriptions; Ex. 24, Black Ops Email.)  "Black Ops" refers to "payments to players and families of players" and Rivers made clear to Adidas employees that he "didn't want any proof of" such payments in writing.  (Ex. 25, Gassnola Trial Day 2 Tr. 951:23 – 952:1.)  The Adidas Soul Patrol's work included traveling across the country

targeting "Top 30 high school players," meeting with those players' families, and meeting with coaches at Adidas-sponsored universities.  (Ex. 24.)

Soul Patrol's work was not a secret within Adidas.  In April 2015, Defendant Rivers provided an update on Soul Patrol's activities to "upper management" that "detail[ed] the work [they] have been doing."  Rivers informed Soul Patrol: "[P]lease know that your efforts have been recognized all the way in Germany and now we are under the microscope to deliver what we are promising."  (Ex. 26, Apr. 10, 2015 email (emphasis added).)  In his report to Adidas's upper management, Rivers provided an update on the group's "key field contact touch points," which included the number of high school games attended, the number of "future first round pick direct contacts," the number of "Top 30 High School Players Met With In the 2016, 2017, and 2018 Classes," the number of "Top 30 Player Family Interactions," and the number of "Adidas College Coaches Touch Points."  (Ex. 11, Next Gen Presentation at 7.)  The report detailed Soul Patrol's priority to "maintain, initiate and extend relationships with top ranked prospects in every high school class regardless of brand affiliation," and to "target athletes . . . who are projected as lottery picks in the 2016 – 2019 NBA drafts."  (*Id.* at 10-11.)  It discussed the benefits of the "NCAA platform" and that Soul Patrol "[i]ncreased communication with head and assistant coaches," and "provided constant recruiting support and intelligence to school's staff."  (*Id.* at 22 (emphasis added).)

In December 2015, Rivers emailed Soul Patrol with a request to send Adidas consultant Dan Cutler a "list of top 5-7 players in the 2017 or 2018 classes that we should make a hard push to get (assuming it will take some creative persuasion to get it done)."  (Ex. 27, Soul Patrol Upcoming Missions.)  Among the top players identified by Soul Patrol to target from the 2017 class: Brian Bowen.  (Ex. 28, Dec. 22, 2015; *see also* Ex. 29, C. Hulio email; Ex. 30, Dec. 23,

13

2015 email.)  The group's work continued in 2016 and 2017 with Rivers providing periodic updates on their success. (*See, e.g.*, Ex. 31, Black Ops Mission Recap.)

Members of Adidas's Soul Patrol were well compensated for their efforts.  In a February 3, 2015 email, Rivers told Gatto, "I would also like to agree on a consultants dollars for TJ, I am not going to budge on his AAU deal but <u>I feel he should be compensated for what he does on the</u> "<u>Black Ops's Team/Soul Patrol</u>." (Ex. 32, Feb 3, 2015 email (emphasis added).)  Gassnola would, in fact, be well paid for his Adidas Black Ops work, with Adidas giving him and his AAU team over $1,000,000 from 2015 through 2017 despite his "consulting" agreements limiting his annual compensation to $60,000 to $75,000.  (Ex. 20, Gassnola 2015-16 Contracts; Ex. 33, Payment Chart.)

But the bribery scheme extended far beyond Gassnola.  Other Adidas "consultants" worked in the shadows to conceal the payment of Adidas money used in the company's bribery scheme.  For example, Jillyn Pendleton and her Nevada-based company Pendleton Promotions, who on paper was contracted to run various Adidas grassroots basketball events, was an active participant in the bribery scheme.  From 2016-17 she received over $2,000,000 from Adidas and the company's documents show that she worked hand in glove with the company to assist in making illegal bribe payments.  (*See, e.g.*, Ex. 2, Dec. 4, 2016 email.)  One such payment was made in connection with the Adidas bribe payment to Brian's father and occurred *the day after* Jim Gatto learned that the initial installment to be funneled through the South Carolina-based Karolina Khaos AAU basketball team would be delayed.  The following day, June 23, 2017, Pendleton received a payment of $25,000 from Adidas pursuant to an invoice she submitted that clearly made no effort to disguise that the money was intended to be given to the Karolina Khaos.  Adidas's internal accounting records show that the company was aware the payment to Pendleton was designated

14

for the "2017 Karolina Khaos Team," (*see* Ex. 34, Pendleton Invoice), raising the question: Why would Adidas willingly pay Pendleton—a part-time Adidas consultant and full-time principal and associate superintendent of the Clark County, Nevada public school system—$25,000 to then *forward* to the Greenville, SC based Karolina Khaos AAU team to be used as a bribe?

A common thread among many of these Soul Patrol basketball "consulting" agreements and Adidas's sponsorship agreements with the University of Louisville, Kansas, and N.C. State is that they were each approved and signed by Adidas's Chris McGuire. McGuire disclaimed in his deposition testimony any knowledge of Gassnola's role with Adidas other than as director of the New England Playaz AAU team. (Ex. 7, McGuire Tr. 236:25 – 237:22.) Yet, he nevertheless found it appropriate to approve hundreds of thousands of dollars in payments to Gassnola that far exceeded the amount he was due under this contract. (Ex. 33, Payment Chart.)

Many of the payments made to Adidas's grassroots consultants were facilitated through an obscure entity called "Adidas International, B.V." Grassroots consultants were instructed from time to time to submit their invoices to Adidas International's office in Amsterdam. (Ex. 35, Ja 27, 2015 email.) Yet, not even Adidas America's President Zion Armstrong (who, incidentally, was invited to join Soul Patrol members at the 2017 NCAA March Madness tournament, *see* Ex. 36, Extreme Wow Suite) could provide much information about the entity during his deposition. Although he admitted that Adidas International B.V. is headquartered in Amsterdam and he has visited its office, he could not answer a simple question about its relationship with Adidas America:

Q:    Do you know whether or not Adidas International BV is the parent company of
      Adidas America, Inc?

A:    I do not.

(Ex. 6, Z. Armstrong Tr. 29:14 - 30:17, 61:10- 67:19, 144:18–145:5.)  Nor could Armstrong

explain who at Adidas International B.V. had authority to pay invoices submitted by Adidas

America's basketball grassroots consultants.  (*Id.* 164:6-16, 217:21 – 218:18.)

### F.  <u>The NCAA and Bylaws Regarding Student-Athlete Eligibility</u>

The foundation for the multi-billion dollar college basketball market is the NCAA

eligibility of elite players like Brian Bowen and the NCAA bylaws designed to preserve

amateurism.  The Supreme Court has recognized that the NCAA Bylaws are valid as a matter of

law. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 117,

104 (1984).  Of relevance to Brian's injuries are the following bylaws addressing amateurism and

eligibility:

> § 6.4.1 – defining "Independent Agencies or Organizations" to include apparel manufacturers and other corporate entities that "promot[e] the institution's intercollegiate athletics program."

> § 6.4.2 – defining "Representatives of Athletics Interests" to include apparel manufacturers

> § 12.01.1 – stating that "Only an amateur student-athlete is eligible for intercollegiate athletics participation in a particular sport."

> § 12.01.3 – distinguishing between the terms "Individual" and "Student-Athlete"

> § 12.1.2 – defining the seven circumstances in which an individual loses his or her amateur status

> § 12.11.1 – "If a student-athlete is ineligible under the provisions of the constitution, bylaws, or other regulations of the Association, the institution shall be obligated to apply immediately the applicable rule and to withhold the student-athlete from all intercollegiate competition."

> § 13.01.1 – "The recruitment of a student-athlete by a member institution or any representative of its athletics interests in violation of the [NCAA's] legislation . . . shall result in the student-athlete becoming ineligible…"(emphasis added);

> § 13.02.15 – defining "Representative of Athletics Interests" in the section regarding recruiting violations.

§ 13.2.1 – "An institution's staff member or any representative of its athletics interests shall not be involved, directly or indirectly, in making arrangements for or giving or offering to give any financial aid or other benefits to a prospective student-athlete or his or her relatives or friend.");

§ 16.01.1 – "A student-athlete shall not receive any extra benefit. Receipt by a student-athlete of an award, benefit or expense allowance not authorized by NCAA legislation renders the student-athlete ineligible for athletics competition in the sport for which the improper award, benefit or expense was received.") (emphasis added);

§ 16.02.3 – "An extra benefit is any special arrangement by an institutional employee or representative of the institution's athletics interests to provide a student-athlete or the student-athlete family member or friend a benefit not expressly authorized by NCAA legislation.")

(*See* Ex. 37; NCAA bylaws.)

### G. Adidas is a Representative of Louisville's Athletic Interests Under NCAA Bylaws

There is no dispute that at all relevant times, Adidas was the athletic apparel sponsor of the University of Louisville.  (Ex. 38, UofL Endorsement Agreement.)  Under this sponsorship agreement, Adidas pays the athletic department $160 million over ten years, including $79 million in cash.  (*Id.*)  NCAA bylaws define "Representative of Athletics Interests" in NCAA Bylaws § 6.4.2 and § 13.02.15.  (Ex. 37, NCAA bylaws.)  These definitions clearly encompass Adidas and its employees and consultants, as Adidas is an apparel manufacturer that by contract "promotes" its sponsored-institutions' athletics programs via financial contributions; Adidas, its employees and consultants assisted in the recruitment of prospective student-athletes, and Adidas employees and consultants provided "benefits" to enrolled student-athletes, as that term is defined to include payments to players' families, via bribe payment to their parents/guardian.

Adidas does not and cannot deny this.  During his March 26, 2021 deposition, Adidas President Zion Armstrong was asked to review the relevant NCAA bylaws defining

17

"Representative of Athletics Interest," and the "Eligibility Effects of Recruiting Violations," §

13.01.1. After doing so, he was asked a few simple questions:

> Q:  And so Adidas qualifies for the type of entity that fits the definition of a representative of athletics interest per this bylaw; is that correct?
>
> Mr. Levine:    Objection.
>
> A:  Now that I've just read this, I do now understand that, yes.
> …
> Q:  And, Mr. Armstrong, isn't it true, sir, that, beginning in 2014, when the contract was first entered into with Louisville, at all times thereafter your company made significant financial contributions to the Louisville athletic department?
>
> Mr. Levine:    Objection.
>
> A:  I don't recall the year it was first signed; but, yes, we were a sponsor to the college --
>
>     (crosstalk)
>
> Q:    All right.  And representatives of the college's athletic interest; isn't that correct, sir?
>
> Mr. Levine:    Objection.
>
> A:    After reading this document and being educated, yes.

(Ex. 6; Armstrong Tr. 237:2 – 241:24.)

John Carns, Louisville's Senior Associate Athletic Director for Compliance, likewise testified during the *Gatto* criminal trial that Adidas is "considered [a] representative of the university's athletic interests" under NCAA rules.  (Ex. 39, J. Carns Trial Tr. 402:23 – 403:5.)

## LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). The burden is on the moving party in the first instance to inform "the district court of the basis for its

motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment." *Vardon v. W. Virginia*, No. 2:11-CV-00399, 2012 WL 685863, at *2 (S.D.W. Va. Mar. 2, 2012). In ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Id.* "The question of whether conduct is a proximate cause of the alleged injuries is typically a question of fact for the jury." *See Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst.*, 691 F. Supp. 2d 772, 790 (N.D. Ill. 2010).

## **ARGUMENT**

### I.  **Defendants' Standing Argument Fails Given the Ample Evidence Showing Their Racketeering Acts Directly Injured Brian Bowen's Business and Property Interests**

Rather than address the realities of the difficult path it chose to take in its motion, Adidas simply ignores prior court opinions, logic, common sense, and—most critically—evidence developed during discovery that directly contradicts its arguments. That evidence and logic show that Defendants enacted a successful scheme to defraud and, as a result, Brian was directly injured by it. The path Adidas chose here is made even more difficult because the parallel criminal convictions of Defendants Gatto, Code, Dawkins, Sood, and Gassnola were based on *the same facts* at issue in this civil case. Had Adidas's causation argument had any merit, there would have been no legal or factual basis to support the guilty verdicts of Defendants Jim Gatto, Merl Code, and Christian Dawkins let alone the affirmance of their convictions by the Second Circuit Court

19

of Appeals.  *See United States v. Gatto*, 986 F.3d 104, 115 (2d Cir. 2021) ("Defendants' co-conspirators admitted on wiretaps that their conduct violated NCAA rules. Gassnola, who worked directly under Gatto, explained to the jury that had the Universities learned that [Dennis] Smith's family had been paid, he 'would have been deemed ineligible' and 'would never have played [at N.C. State].'").  Given that a federal jury in New York and the Second Circuit each came to this conclusion is hardly surprising, since it is the only rational way to understand Defendants' actions.

## RICO Standing

The Clayton Act and federal RICO statute "share a common congressional objective of encouraging civil litigation not merely to compensate victims but also to turn them into private attorneys general, supplementing Government efforts by undertaking litigation in the public good." *See Rotella v. Wood*, 528 U.S. 549, 550 (2000).  Defendants cannot credibly argue the Adidas bribery scheme does not affect the public good considering the U.S. Department of Justice prosecuted and secured unanimous guilty verdicts and guilty pleas from Gatto, Code, Dawkins, Gassnola, and Sood for having engaged in the same underlying criminal conduct at issue in this case—all of which was predicated on Brian's injuries.  Just as Congress envisioned, this case supplements the efforts already undertaken by federal prosecutors in two important respects: (1) this action seeks to vindicate the wrongs committed against Brian who was the most directly injured person in the Adidas bribery scheme; and (2) this action seeks to prosecute Adidas which thus far has escaped any responsibility for its substantial role in the bribery scheme.  As the Hon. Lewis Kaplan who presided over the *Gatto* trial confirmed, Brian was "the worst victim, most seriously injured victim of the Louisville scheme."  And "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant

upon suits by plaintiffs injured more remotely." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006) (*quoting Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 269–70 (1992)).

To have standing under § 1964, a civil RICO plaintiff must have injury to "his business or property." 18 U.S.C. § 1964(c). Whether a property interest falls within the ambit of § 1962(c)'s "injury to business or property" is ultimately a matter of state law. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *see also Indiana ex rel. Carter v. Pastrick,* 384 F. Supp. 2d 1261, 1266 (N.D. Ind. 2005) (referring to "state law to determine whether a property interest exist[s] for the purposes of a civil RICO suit"). With respect to a "business" injury, "lost profits are remediable in RICO, notwithstanding the fact that any lost profits calculation inherently involves some assumptions about what would have happened in the past." *In re Am. Honda Motor Co., Inc. Dealerships Relations Litig.*, 941 F. Supp. 528, 540–41 (D. Md. 1996); *see also Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928, 930 (7th 2007) ("Extra bids reduce plaintiffs' chance of winning any given auction, and loss of a (valuable) chance is real injury.") *aff'd*, 533 U.S. 639, 645 (2008) (discussing Seventh Circuit's holding that "respondents suffered a 'real injury' when they lost the valuable chance to acquire more liens, and because 'that injury can be redressed by damages."); *Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*, 18 F.3d 260 (4th Cir. 1994) (finding "lost revenues and customers" are sufficient injuries to establish RICO standing).

In practice, standing under RICO is much like standing in a common law negligence case, As explained by the Supreme Court, "the *Holmes* Court turned to the common-law foundations of the proximate-cause requirement, and specifically the 'demand for some direct relation between the injury asserted and the injurious conduct alleged.'" *Anza* at 457. The doctrine of intervening superseding negligence further ensures an appropriate causal chain between the act and the injury. "Evidence of an independent negligent act of a third party is directed to the question or proximate

cause.  To exculpate a negligent defendant, the intervening cause must be one which breaks the sequence or causal connection between the defendant's negligence and the injury alleged. The superseding act must so intervene as to exclude the negligence of the defendant as one of the proximate causes of the injury." *Matthews v. Porter*, 124 S.E.2d 321, 325 (S.C. 1962).

### A. Brian's NCAA Eligibility Is A Business and Property Interest Directly Injured by Defendants' Racketeering Conduct

Brian's loss of his NCAA eligibility is unquestionably an injury to his business and property interests caused by Defendants.  NCAA eligibility is a bargained-for benefit under NCAA rules. Brian was required to register with the NCAA Eligibility Center and undergo an extensive certification process prior to gaining eligibility status.  (Ex. 39, Carns Trial Tr. 383:14 - 385:25.) The Eligibility Center reviews academic records and assesses each prospective student-athlete's amateur status during the certification process.  (*Id.*)  The NCAA certified Brian's eligibility before he applied to college and again prior to August 25, 2017.  (Ex. 40, Cert. of Eligibility.)

Brian's NCAA eligibility to participate in Division I men's basketball was also a valuable business interest to him.  As Plaintiff's expert Mike Bratz (who has 36 years of experience in the NBA—as a player, coach, front office executive, director of scouting, and assistant GM—spanning eleven NBA teams and twenty NBA drafts) stated in his report, the NCAA is the proving ground for the NBA. (Ex. 41, Bratz Report at 13.)  Elite players like Brian are not permitted to play in the NBA until they are one year removed from high school and, unlike other professional sports, no player may contract with an NBA team unless they have first participated in the NBA draft.[12]  (*Id.* at 12-13.)  Therefore, there are two career decisions players like Brian make following high school

---

[12] *See* NBA-NBPA COLLECTIVE BARGAINING AGREEMENT JAN. 19, 2017, Article X: Player Eligibility and NBA Draft, at 273 (Jan. 19, 2017) *available at* https://nbpa.com/cba ("No player may sign a Contract or play in the NBA unless he has been eligible for selection in at least one (1) NBA Draft. No player shall be eligible for selection in more than two (2) NBA Drafts.") (last visited Apr. 22, 2021).

graduation that are critical to their career as a professional athlete: (1) where to play basketball after high school graduation and prior to the NBA draft; and (2) when to forego the amateur status and participate in the NBA draft.  (*Id.* at 13.)  Therefore, there is ample evidence to support Brian's claim that his NCAA eligibility is a valuable business interest.  That his eligibility was valuable is further evidenced by Defendants' funding a $100,000 bribe to ensure Brian played basketball for Adidas-sponsored Louisville over other options such Nike-sponsored Oregon or any other school or professional team.  (Ex. 42, Dawkins and Code text.)

Adidas's motion for summary judgment headlines its argument as, "Bowen Jr.'s Eligibility to Play in the NCAA Is Not a Business or Property Interest," (MSJ at 21), but the argument that follows focuses not on eligibility, but on whether "participation in interscholastic athletics" is a constitutionally-protected property interest.  Adidas cites a string of cases involving such constitutional claims, such as *Denis J. O'Connell High Sch. v. Va. High Sch. League*, a case in which a private non-profit Catholic high school was denied entry into the Virginia High School League because the League's constitution limited membership to public high schools.  581 F.2d 81, 83 (4th Cir. 1978).  Adidas described this case as holding "that there is no right to 'participation in interscholastic athletics," yet to the extent the Fourth Circuit addressed "participation in interscholastic athletics," it did so by making the unremarkable observation that "Education is not a fundamental right under the Constitution . . . and, of course, neither is participation in interscholastic athletics such a right."  *Denis J. O'Connell High Sch.* at 84.  Further, the Fourth Circuit expressly stated in its opinion that the right allegedly abridged and at issue in its holding "is not the right to education or the right to participate in interscholastic athletics; rather, the alleged abridgement is of the right of private school students to be treated similarly as public school students with regard to participation in interscholastic athletics where there is no rational basis for

treating the two classes of students differently." *Id.* (emphasis added). Adidas's similar reliance on other equal protection cases involving public high schools and athletics is equally unavailing. *See, e.g.*, *Bruce v. S.C. High Sch. League*, 258 S.C. 546, 553, 189 S.E.2d 817, 819–20 (1972). Indeed, these cases are inapposite to the standing issue because the plain language of § 1964(c) of the RICO statute does not restrict claims to only those injuries to *constitutionally-protected* business or property interest. More particularly, none of these cases address the issue here: that an elite college athlete's bargained-for right to eligibility under NCAA bylaws to train for a professional basketball career is a business and property interest under the RICO statute.

Unlike public high schools, the NCAA is a private entity made up of member institutions and regulates the intercollegiate sports industry. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 103 (1984). College basketball has become a lucrative enterprise which generates billions of dollars in annual revenue. (Ex. 41, Bratz Report at 3.) The labor market for top tier prospects like Brian Bowen is intense and competitive. (*Id.*) Colleges with the help of for-profit apparel companies like Adidas compete for an elite players services in exchange for compensation packages and benefits. (Ex. 43, Athletic Tender Agreement). The compensation and benefits colleges exchange as consideration for a player like Brian's basketball services are not governed by free market economic principles. *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F.Supp.3d 955, 966 (N.D. Cal. 2014), aff'd in part, vacated in part, 802 F.3d 1049 (9th Cir. 2015). Adidas has invested hundreds of millions of dollars for the endorsement rights of NCAA member institutions including the $160M endorsement deal with UofL which was negotiated during the same time Brian was targeted by the Adidas bribery scheme. (Ex. 38, UofL Agreement.) Adidas and UofL announced the new deal on August 25, 2017 less than three months

after Brian committed to play for Louisville and the same day Louisville certified his eligibility. (Ex. 40, Cert. of eligibility.)

Let there be no mistake: the foundation for the multi-billion-dollar industry of college basketball is the NCAA eligibility of elite players like Brian Bowen. (Ex. 6; Armstrong Tr. 250:21 – 251:7.). How can Adidas credibly argue that Brian's NCAA eligibility and basketball services are essentially worthless and therefore he lacks standing when that same NCAA eligibility and labor are worth so much money to Adidas?  That type of mentality was abolished in this country on January 31, 1865 with the passage of the 13th Amendment.

Adidas's President, Zion Armstrong, conceded the obvious during his deposition:

Q:    Would you agree with me, sir, that player's NCAA eligibility is of significant value to the player?

Mr. LEVINE: Objection.

A:    **Yes.**

(Ex. 6; Armstrong Tr. 248:1-6.).  Thus, there is ample evidence upon which a jury can conclude that Brian's NCAA eligibility held significant value as both a property and a business interest.

Further, that Brian's NCAA eligibility was directly injured by Defendants' racketeering cannot seriously be in dispute.  Once the first installment of the Adidas bribe payment was paid to Bowen Sr. on July 13, 2017, it became an "extra benefit" under NCAA bylaws §§ 16.01.1 and 16.02.3.  That it was received by Brian's father makes no difference under the bylaws, *see* §§ 16.02.3, 16.02.4.  All that matters is that Brian was a "student-athlete" at the University of Louisville when the bribe payment was made.  That it came from Adidas via its employees and consultants Gatto, Rivers, and Code also operates to destroy Brian's eligibility.  *See* § 13.01.1 ("The recruitment of a student-athlete by a member institution or any representative of its athletics

25

interest in violation of the Association's legislation . . . shall result in the student-athlete becoming <u>ineligible to represent that institution</u> in intercollegiate athletics.").

To resolve any doubt, the September 27, 2017 email from Louisville's Associate Director of Athletic Compliance made clear that "MBB student-athlete Brian Bowen has been declared ineligible from athletics participation immediately." (Ex. 5, M. Banker email.)  Louisville had no choice or discretion in the matter—NCAA bylaw § 12.11.1 states that "[i]f a student-athlete is ineligible under [NCAA bylaws], the institution <u>shall be obligated to apply immediately the applicable rule and to withhold the student-athlete from all intercollegiate competition</u>.").

The impact of § 13.01.1 further compounded Brian's injury because it prohibited him from *ever* participating on Louisville's men's basketball team.  This is because this rule exists to prohibit schools like Louisville from profiting from the illegal recruiting activities engaged in by representatives of their athletics interests, particularly in the case of elite athlete where the benefit of the recruiting the player in violation of the rules exceeds the perceived risk of getting caught.  Thus, any quibbling about whether Brian was ineligible or merely "withheld" from competition is irrelevant—the terms of the bylaws clearly rendered him ineligible and mandated that Louisville withhold him from competition.  And because the NCAA bylaws at the time required a student-athlete to sit out one year of competition after transferring schools, the July 13, 2017 bribe payment effectively sidelined Brian from college basketball for 18 months—a time period that "is critical" to player's development.  (Ex. 41, Bratz Report at 14.)

Given that the individual Defendants' conduct to destroy Bowen's NCAA eligibility has already been established (and admitted to) as the predicate of the wire fraud and wire fraud conspiracy committed against the University of Louisville in the criminal cases, these Defendants are foreclosed from relitigating or otherwise challenging Brian's standing to bring suit against

them in this case. *See, e.g.*, *United States v. Sood*, No. 18-cr-620, ECF No. 70 at 6 (Aug. 18, 2018 Criminal Information) ("Sood . . . participated in a scheme to defraud NCAA Division I universities by facilitating and concealing payments to prospective and current student-athletes at those universities, and their families . . . <u>thereby causing those universities to provide or agree to provide athletic scholarships to student-athletes who, in truth and in fact, were ineligible to compete as a result of the payments</u>."), *and* ECF 41-2 at 5 (Tr. 25:24-25) ("The overt acts in the information accurately describe my conduct."). Collateral estoppel is routinely invoked against defendants in RICO actions who dispute essential elements of their convictions. *See, e.g.*, *AvalonBay Cmtys., Inc. v. Willden*, No. 1:08-CV-777, 2009 WL 2431571, at *3-6 (E.D. Va. Aug. 7, 2009), *aff'd*, 392 F. App'x 209 (4th Cir. 2010) (invoking *sua sponte* collateral estoppel and judicial estoppel in granting summary judgment in favor of a civil RICO plaintiff). The doctrine of offensive, non-mutual collateral estoppel forecloses the re-litigation of whether Defendants' predicate acts of wire fraud caused Brian to lose his NCAA eligibility: this fact has already been established beyond a reasonable doubt in the trial of Gatto, Code, and Dawkins; and Sood and Gassnola admitted under oath that this fact would have been proven beyond a reasonable doubt at trial.[13] *See In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004).

**B. Brian's Agreement with Louisville Is A Business and Property Interest Directly Injured by Defendants' Racketeering Conduct**

Brian Bowen was an elite player who at the time he committed to play at the University of Louisville was a projected first round pick in the 2019 NBA Draft. (Ex. 18, NBADraft.net) (Ex. 41; Bratz Report). Prior to committing to play at a particular school, Brian possessed and had sole

---

[13] Importantly, the issue Defendants Gatto, Code, Dawkins, Sood, and Gassnola are estopped from challenging relates to the *causal sequence* of the injuries suffered by Bowen. Accordingly, a judgment that establishes proximate cause of Bowen's injuries against Gatto, Code, and Sood necessarily establishes proximate cause against all defendants, including Adidas and Rivers, as the amended complaint alleges concerted action by all Defendants.

control over his labor and NCAA eligibility that had significant monetary value to Division I basketball programs and for-profit companies like Adidas.

The transaction through which a high school recruit exchanges his labor (i.e., his basketball talent) and his name, image, and likeness rights for the basketball services offered and guaranteed him by a university, such as Brian's exchange of his basketball labor for basketball development services at Louisville, clearly meets the definition of commerce (i.e. a business interest) because both parties to that exchange anticipate economic gain from it. See *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1065 (9th Cir. 2015) ("[T]he modern legal understanding of 'commerce' is broad [and] surely encompasses the transaction in which an athletic recruit exchanges his labor and NIL rights for a scholarship at a Division I school because it is undeniable that both parties to that exchange anticipate economic gain from it."). Additionally, the NCAA rules "clearly regulate the terms of commercial transactions between athletic recruits and their chosen schools." *Id.* The "exchange they regulate – labor for in-kind compensation – is a quintessentially commercial transaction." *Id.* Here, the evidence shows that Brian enrolled at Louisville for basketball reasons. Namely, to prepare for the NBA.

The bargained for exchange that occurred between Brian Bowen and UofL had nothing to do with tuition, room, board or the books offered by the university. (Ex. 12, K. Johnson Tr. 185:21 – 186:4, 187:15-20.) Defendants' argument that Plaintiff has not produced any evidence of a property or business interest and that he was not entitled to play basketball at UofL, or that playing basketball there was simply his subjective belief, are demonstrably false. Rather, the testimony from the primary witness—and potentially the only university witness with personal knowledge of what Louisville offered Brian during his recruitment (its then-assistant coach Kenny Johnson)— confirms that the transaction was not about an academic scholarship, but about Brian providing

28

basketball labor to the school in exchange for his receiving athletic development, preparation, and entry into the NBA.  (*Id.* 191:22 – 192:8.).  In particular, Coach Johnson testified that based upon his work at elite levels of college basketball, competitive minutes are important in preparation for the NBA.  (*Id.* 180:22 – 181:4.)  He testified regarding the strength and nutrition services that he knew Brian was seeking from a school, that were discussed during his recruitment, and that were provided to him once he arrived in Louisville.  (*Id.* 175:15 – 180:21.)  He testified that for elite prospects like Brian preparing for the NBA draft (1) good coaching is important; (2) that "the coaching staff at Louisville under Rick Pitino . . . we were known as a development program," (3) that elite prospects in college need training, particularly on playing defense; (4) agreed that part of the importance of preparing for the NBA at elite programs like Louisville is getting elite prospects accustomed to consistent rigorous training; and (5) that there is a lot more study of game film at Louisville compared to high school teams.  (*Id.* 182:9 – 184:8.)  Most critically, Coach Johnson agreed that with regard to basketball fundamentals, the coaching and preparation that elite players like Brian get at places like Louisville is invaluable to their preparation for the NBA.  (*Id.* 184:9-15.)  Moreover, Coach Johnson testified that when he first began recruiting Brian in 2016, he believed Brian was going to be a starter and a significant part of Louisville's 2017-18 team.  (*Id.* 200:7-14.)  This was not mere flattery; rather, Coach Johnson texted Brian with "a message from Coach Pitino."  In it, he wrote:

> The main points are: immediate playing time.  Featured scorer, playing the 2 & 3 position.  We have 5 players 6'10 and bigger so never the 4.  The fact that he [Pitino] wants to coach a 1 and done so people stop saying he doesn't like them or won't let them be.  Plus scandal behind us.

(Ex. 45, K. Johnson texts with Brian at line 156-57; *see also* Ex. 12, K. Johnson Tr. 198:12 – 203:21.)  That is what the University of Louisville offered "1 and done" Brian if he committed his basketball talent and services to the team: immediate playing time, scoring, and playing the 2 & 3

positions. (*See also* Ex. 45, K. Johnson texts with Brian at line 164 (describing Brian as "an early entry pro")) That Louisville viewed Brian as "an early entry pro" is further substantiated by a message Coach Johnson sent to Bowen Sr. on June 5, 2017: "3 NBA teams called me about Donovan today and guess what half the conversation was about Tugs…they love how hard he plays!" (Ex. 46, K. Johnson text with Bowen, Sr., line 143; *see also* Ex. 12, Tr. 222:7 – 225:2.) When asked directly during his testimony if it "was substantially certain that Brian Bowen would be a first [sic] pick in the NBA draft, whichever year he elected to forgo his NCAA eligibility," Coach Johnson could only reply, "Upon advice of counsel, I'm exercising my Fifth Amendment privilege." (*Id.* 224:15 – 225:2.) At trial, a jury can reasonably infer the answer to this question.

As for Brian, he testified to the value of the services he was to receive under the agreement:

> Just playing for a Hall of Fame coach. That's huge. You know, Rick Pitino is a Hall of Fame Coach. His record stands for itself. The amount of NBA players he has and just seeing where I can fit in in a place that's missing my key position and other—Donovan Mitchell had just said he was going to enter into the NBA draft at that time. So that's my position. That's where I fit.

(Ex. 47, B. Bowen Tr. 127 – 128.) Any argument that Brian's preparation for the NBA draft and obtaining the valuable professional athletics services from Louisville was not part of the exchange has no support in the record. Brian testified that he needed "people that can help develop [him]" as part of his pre-professional college athletics experience. (*Id.* at 165:1-16.)

Adidas has failed to cite any evidence to rebut these facts. Rather, it offers only argument that Brian's scholarship "did not entitle him to play NCAA basketball." (MSJ at 19.) But regardless of what may hold true for other athletes in other sports, the evidence of Brian's recruitment to UofL puts the lie to the argument that he would not play competitive minutes on the team. Adidas reliance on the unreported case of *Giuliani v. Duke University*, No.:1:08-cv-502, 2010 WL 1292321 (M.D.N.C. Mar. 30, 2010) demonstrates the weakness of this argument: there, a student sued Duke University for breach of an oral contract after he was removed from the men's

golf team following a coaching change, alleging that he was promised an "opportunity to compete" orally by the prior coach. Yet the court found "no meeting of the minds" on this term to sustain the existence of an oral contract. Here, in contrast, not only did UofL and Brian have a meeting of the minds as to their obligations to each other, Brian's business decision to attend Louisville was memorialized in a written contract. (See Ex. 43, Athletic Tender Agreement.) Adidas' argument that "student athletes aren't guaranteed a spot on the team" has zero application in light of the evidence to the contrary. To accept Adidas's argument that Brian did not have a guaranteed spot on the team, a jury would have to believe: (1) that Adidas spent hundreds of millions of dollars on an integrated plan to acquire the top level talent for Adidas-sponsored college teams on the hope that the players "might" get some playing time; (2) Hall of Fame Coach Rick Pitino, who was coming off an Elite Eight appearance, would use his final basketball scholarship to replace a first round draft pick on kid not expected to get any court time; and, similarly, (3) Louisville's highest rated recruit was not certain to get any playing time during a game. (Ex. 48, July 12, 2017.)

Adidas also fails to acknowledge that under the athletic tender agreement Brian was required to tender his basketball labor to Louisville. According to its terms and conditions, the contract could be reduced or canceled at any time if Brian voluntarily withdrew from the team for personal reasons. (Ex. 43.) Thus, consistent with the understanding of the purpose of the agreement between Brian and UofL's representative (Kenny Johnson) Brian was required to play basketball at Louisville and Louisville was required to provide Brian with the professional development, nutritional support, strength training, and playing time it agreed to provide him. Yet, even if the Court finds the agreement is silent on this point, the law will compel such an understanding. *See In re Conco, Inc.*, 855 F.3d 703, 712 (6th Cir. 2017) (finding under Kentucky contract law "if a contract is silent on a certain point, the law will imply an obligation to carry out

31

the purpose for which the contract was made"); *Warfield Nat. Gas Co. v. Allen*, 248 Ky. 646, 59 S.W.2d 534, 536 (1933) ("It is a familiar principle in the law of contracts that, in the absence of specification of duties and obligations intended to be assumed, the law will imply an agreement to do and perform those things that according to reason and justice the parties should do in order to carry out the purpose for which the contract was made.").  Here, the purpose of the contract was to fulfill both Brian's and UofL's business interests.  And it was Brian's business decision to commit to UofL to prepare for the NBA, and the resulting contract he entered into with Louisville would bind him to its Adidas-sponsored basketball program.  That was the target of the RICO scheme.  Put more bluntly, Adidas withheld the bribe payment until after the contract was entered and Brian's basketball labor and talents were chained to its flagship college basketball team to ensure Brian became obligated to play basketball for UofL and no one else.

As an immediate and direct result of the bribery scheme, Brian lost that very contract and the property interests therein.  The scheme made it impossible for Brian to fulfill his obligations under the contract because Defendants destroyed his eligibility and, for the same reason, made it impossible for him to contract to play and develop with another top tier college program. Courts widely recognize that interference with current or prospective contractual relations constitutes an injury to business or property under RICO, as contracts have long been recognized as property interests worthy of protection under the law.  *See, e.g.*, *Guerrero v Gates*, 442 F3d 697, 707 (9th Cir. 2006) (allegations of interference with contract and prospective contractual relations alleged an injury to business or property under RICO where plaintiff alleged lost employment and employment opportunities); *Diaz v. Gates*, 429 F.3d 897 (9th Cir. 2005) (interference with current or prospective contractual relations are torts that constitute injury to business or property under

RICO).  Thus, Brian has standing to redress the injuries he suffered to his business and property interests and the jury in this case will be able to assign a value to those damages.

### C. Neither Brian's Amateurism nor Eligibility Was Harmed During High School

Adidas contends in its memorandum that Brian's parents allegedly "profited" off Brian by receiving money while he was a teenager playing on the AAU Circuit, thereby rendering him ineligible under NCAA rules.  Aside from the many evidentiary issues which will likely exclude such arguments at trial, it is wholly unsupported by any evidence in this case. The plain fact is Brian "was cleared by the NCAA Clearinghouse and certified as . . . being eligible prior to enrolling at the University of Louisville." (Ex. 49, J. Carns De Bene Esse Tr. 31:23 - 32:2.)

Under NCAA rules, "only an amateur student-athlete is eligible for intercollegiate athletics participation in a particular sport." (Ex. 37, NCAA Bylaw § 12.01.1.) Further, NCAA rules specifically define "amateur status" and these bylaws control amateur status and eligibility. (*Id.* § 12.1.2; *see also* Ex. 49, J. Carns De Bene Esse Tr. 28:15-25.)  There is zero evidence in this case that Brian did anything to affect his amateur status or anything in violation of the plain reading of § 12.1.2.  Louisville's head of compliance agreed there is **zero evidence** that Brian **at any time** violated any of the foregoing. (Ex. 49, J. Carns De Bene Esse Tr. 29:13-24).  In fact, Mr. Carns further testified:

> Q.    All right. So at the time that the University of Louisville Athletic Association sent that email (9/27/17) would you agree with me, sir, that Brian Bowen was an amateur athlete whose amateur status was intact, based upon the plain reading of bylaw 12.1.2?
>
> A.    Yes.
>
> Q.    And **any insinuation** that Brian was not an amateur or was not qualified for participation in intercollegiate athletics **is flat wrong**, isnt't that correct, sir, prior to that email dated September 27, 2017?
>
> A.    **Yes. He was certified as eligible prior to that**.

(*Id.*)  Adidas "insinuation" that any alleged conduct of third parties during Brian's AAU days affected his eligibility cannot withstand the sworn testimony of Louisville's head of athletic compliance who has direct personal knowledge of Brian's eligibility and more than twenty-two years of NCAA compliance experience.

Even had Brian violated amateurism rules prior to enrollment at Louisville that **would not** have resulted in him being automatically ineligible. (*Id.* Tr. 33:22 - 34:20.) Simply put, there is zero <u>evidence</u> in this case from which a jury could reasonably conclude any alleged payments or benefits that Bowen Sr. received from Adidas, Defendant Rivers, or others when Brian was in high school had any impact on his NCAA eligibility.  Adidas' arguments on this issue are easily dismissed as illogical: had any payments allegedly received by Bowen Sr. during Brian's AAU days (or any other benefits received by anyone else) rendered him ineligible or otherwise destroyed his amateurism there would have been no factual basis to support the individual defendants' criminal convictions in the *Gatto* trial, the Second Circuit's affirmance of those convictions, and the University of Louisville's request for restitution for having awarded an athletic scholarship to player rendered an ineligible by the Adidas bribe payments.  (Ex. 50, Restitution letter; Ex. 51 Gov't Sentencing Memo at 34-35.)

Adidas incorrectly suggests that a visit Brian made to Creighton University, rather than the Adidas bribery scheme itself, "rendered Bowen Jr. ineligible" and cites in support a report submitted by the University of South Carolina to the NCAA that sought his reinstatement.  (MSJ at 26.)  Yet again, the document **does not** say what Adidas claims it does.  Brian had no choice but to transfer from UofL because NCAA bylaw § 13.01 resulted in him being ineligible to represent Louisville in athletics competition.  And because Brian was a transfer student, he had to "compete one full academic year of residence . . . before being eligible to compete." (Ex. 37, NCAA bylaw

§ 14.5.)  On March 27, 2018, South Carolina's Senior Associate Athletics Director Chance Miller

sent a letter to the NCAA specifically requesting a "One-Time Transfer Exception" for Brian per

Bylaw § 14.5.5.2.10 because under the transfer rules, Brian would not be able to compete until

Spring 2019, which was after the start of the fall basketball season.  (*See* ECF. No. 205-36.)  Miller

stated that the request was based Brian having already "sat out a season of competition" because

he could not practice or compete at UofL and was not able to compete at USC in Spring 2018.

The "USC Report" was submitted to obtain an exemption from the one year in residence

requirement so that Brian could play for the Gamecocks.  Moreover, USC did not conclude that a

flight to Omaha destroyed Brian's amateur status or his NCAA eligibility; rather, USC clearly

indicates the eligibility violation "occurred at SA's previous institution" and clearly identified the

Adidas bribery scheme as the date of the violation.  (ECF No. 205-10 at 4.)  Lastly, USC determined

there were NO secondary violations to report.  (*Id.*)  The only mention to Creighton is by way of a

citation to "a yahoo sports article."  Had USC believed Brian lost his amateur status during high

school on a visit to Creighton, it would have had no basis to seek a waiver of the year in residence

requirement because such a waiver would not have made any difference.

### D.  **Brian's Legal Fees and Costs Provide Standing to Bring RICO Claims**

Defendants disingenuously argue that Brian "did not pay the [attorney's] fees and costs"

incurred with respect to his lost NCAA eligibility and through the criminal investigation that

ensued of the Adidas bribery scheme.  (MSJ at 22-23.)  Indeed, in making this argument, Adidas

omitted key facts from the record.  First, Brian's attorney, Jason Setchen, who represented him in

his efforts to regain his NCAA eligibility and during the government's criminal investigation of

the Adidas bribery scheme, testified at his April 9, 2021 deposition that Brian directly paid him

for those services as reflected on his legal invoice. Specifically, Mr. Setchen testified that Brian made three payments. (Ex. 52, J. Setchen Tr. at 113:18 – 116:15.)

Second, the portion of the record that Adidas cites to from Brian's deposition in which it argues that he did not pay his legal fees cuts-off immediately prior to the portion of his testimony that guts this argument: that Brian is, in fact, reimbursing his parents for the legal costs he incurred in connection with (a) the government's investigation of the Adidas Bribery Scheme and (b) from his efforts to restore his NCAA eligibility—expenses that were advanced to his lawyer on his behalf by his parents when he was in college and had no money. (Ex. 47, B. Bowen Tr. 278:13 – 279:21.)[14] Thus, there is simply no factual support for Adidas's argument that Brian somehow lacks standing "for the simple reason that Bowen Jr. did not pay the fees and costs in question." Adidas's argument is yet another example of how the company is misrepresenting the record in this case on summary judgment in order to avoid liability in a public trial.

The two cases cited by Adidas in support of this lack of standing argument do not stand for the proposition that legal fees are not recoverable in RICO actions; rather, they stand for the simple premise that "personal injuries" are not recoverable in a RICO case. *See Bast v. Cohen, Dunn & Sinclair, PC*, 59 F.3d 492, 495 (4th Cir. 1995) ("At most, Bast pleads that he 'suffer[ed] extreme mental anguish' when he learned of Pettit's recordings."); *Doe v. Roe*, 958 F.2d 763, 767-70 (7th Cir. 1992) (recognizing that "Doe never paid Roe [an attorney] money to satisfy his judgment or his bills for additional fees, but rather paid only in "sexual servitude"—a personal, not property,

---

[14] The excerpts of Brian's deposition transcript in Adidas's motion includes only a portion of the testimony regarding the payment of his legal fees on page 278, but inexplicably omits the continuation of his testimony on page 279 where he unequivocally states, "I pay the lawyers now," and explains that his father had to advance some of the initial retainer paid to his attorneys because "[a]t the time, I was in college. I didn't have any money." (Ex. 47, Tr. 278:13 – 279:21.) Brian further testified that he, in fact, has reimbursed his father for money advanced to his lawyers. In this sense, Brian's father's advancement of some portion of the legal retainer when Brian had no money is no different than if he took out a loan from a third-party to pay his lawyer or borrowed money from a bank. A debt is a debt and no matter how hard Adidas attempts to distort the record, money is undoubtedly a property interest under the RICO statute.

injury." Courts recognize that legal fees incurred as a result of a RICO violation are recoverable. *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 152–53 (S.D.N.Y. 2014); *Stochastic Decisions, Inc. v. DiDomenico,* 995 F.2d 1158, 1167 (2d Cir.1993); *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1105 (2d Cir.1988).

### E. Brian's Professional Earnings Were Directly Harmed by Defendants' Racketeering Conduct

Adidas argues Brian's loss of professional earnings was not proximately caused by Defendants' racketeering activity. (MSJ at 29-31.) Defendants' burden is to demonstrate the absence of any genuine issues of material fact as to Brian's loss of earnings when viewed in the light most favorable to him. Adidas provides little to no support for their contention that Defendants' conduct did not directly harm Brian's earnings. Adidas refers to a handful of players who did not play college basketball but who were selected in the first-round of the NBA draft, and point to two undrafted players who were ranked higher than Brian. Even if this could be considered evidence, which it is not, it is anecdotal at best and does not disprove the overwhelming evidence which proves the RICO violations were the proximate cause of Brian' lost earnings.

This fact is also supported by expert testimony provided in this case, "unlike his peers in the 2017 high school graduation class, he wasn't able to play against the best competition and improve his basketball skills…" (Ex. 41, Bratz Report at 14.) NCAA basketball is where elite players train to become NBA draft selections. (*Id.* at 13.) "There is no other comparable product in North America where a player can get premium training and acquire experience playing against the best players in their age group." (*Id.*) Furthermore, Brian has offered uncontested expert opinion that "[i]t is the development in the one to two years after high school graduation that is critical to a young player." (*Id.* at 14.) Adidas's President Zion Armstrong testified that "the vast

majority" of elite prospects in the U.S. train for the NBA by playing NCAA college basketball because there is no comparable amateur option.   (Ex. 6, Z. Armstrong Tr. 250:21 – 251:7.)

It is critical for young players to train professionally and grow into their bodies and develop their basketball skills under elite coaching, precise strength and conditioning and proper nutrition support.  (Ex. 12, K. Johnson Tr. 180:7-21.)  The strength and conditioning was very important to Brian and his preparation for the NBA.   On his visit to Louisville he met with the Athletic Department's certified nutritionist. Soon after his arrival at Louisville Bowen, Sr., text Kenny Johnson thanking him for following through with having a nutritionist work with Brian. In particular, Bowen, Sr. stated, "Hey Ken thx a lot because if he gets that nutrition down his muscle and strength gain will skyrocket." (*Id.*)

Furthermore, the Hall of Fame Coaching and competitive minutes were two of the basketball related reasons he chose Louisville.  (Ex. 47, B. Bowen Tr. 129:1-4 ("And, you know, with Donovan Mitchell leaving to enter the draft, you know, it's my exact position and going in and playing bigtime minutes, that's-that's how I viewed it.").)  When considering this testimony from Brian, the jury will also consider what the University of Louisville represented to Brian as the "main points" for committing to play basketball at Louisville: "Immediate playing time, featured scorer, playing the 2 & 3 position…"  (Ex. 12, K. Johnson Tr. 198:12 – 203:21.)

Adidas President Armstrong, a former athlete who represented New Zealand in the 1998 Commonwealth Games and trained for the Olympics, agreed that "[i]t would be very, very challenging" to stop training for 18 months and qualify for the Olympics, because **"[y]ou wouldn't be fit if you didn't train for 18 months.  If you're not fit, you're not in competition**."  (Ex. 6, Z. Armstrong Tr. 251:8 – 252:21.)  He also was unable to identify *a single Adidas-sponsored athlete* from the U.S. that did not prepare for the NBA by attending an NCAA institution.  (*Id.*

261:3-8.)   In sum, the scant, anecdotal examples Adidas offers by way of *argument* ignores the substantial *evidence* in this case—including that from its chief executive.  From this evidence, a jury can reasonably conclude Brian's loss of earnings was the natural, probable, and direct consequence of Defendants' RICO violations. Such loss is a recoverable under the RICO statute. *See Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc*., 262 F.3d 260, 265 (4th Cir. 2001).

Moreover, there is a significant evidence that proves Adidas knew its RICO violations would cause a loss of earnings.  But for Brian's eligibility being destroyed it was substantially certain he would have been a first-round pick in the NBA draft. (Ex. 41, Bratz Rep. at 14.)  "Mr. Bowen was an elite high school basketball player. Strong statistical evidence suggests that with a high degree of certainty he would have been a first-round NBA pick." (Ex. 53, McFall Reps. at 9.) In fact, "[i]n the past 8 years (2013-2020) there have been 480 players selected in the 1st or 2nd rounds of the NBA draft. Of those 480 players, 382 or 79.5% of them played college basketball in the United States." (Ex. 41, Bratz Rep. at 10.)  Additionally, 76% of college players drafted played in the NCAA tournament the year they were drafted. (*Id*. at 13.)  Furthermore, "Had Brian been able to play basketball at Louisville, he would have been a first- round draft pick." (*Id.* at 14.)

Plaintiff's expert Mike Bratz developed an extremely high degree of specialized knowledge and expertise over the course of his thirty-six-year career in the NBA as a player, coach, scout and front office executive. In addition to the opinions contained in his report, Mr. Bratz is a witness who has direct personal knowledge of the natural and probable consequences of Defendants' RICO violations.  Brian was not only a highly rated prospect coming out of high school he was a highly decorated player. He may be the only elite prospect who was the MVP of the high school national championship team, a McDonald's All-American, the Gatorade Player of the Year (Indiana), and the MVP of the Jordan Brand Classic Game.  Adidas is well aware that being named McDonald's

All-American is the "highest individual honor for a high school basketball player." (Ex. 1, Adidas Uprising Presentation; *see also* Ex. 7, McGuire Tr. 109:20 – 110:4 ("It's a recognition and solidifies yourself as one of the – one of the best athletes in America.").)  In fact, Adidas devotes significant resources just to be "affiliated" with the McDonald's All-American Game, which it believes "represents one of our largest growth opportunities." (Ex. 1, Adidas Uprising.)

Mr. Bratz has personal knowledge of Brian's basketball talent and skills.  In 2017, Vlade Divac was the General Manager for the Sacramento Kings. His Director of Scouting: Mike Bratz. Mr. Bratz watched in-person when Brian played in the McDonald's All-American Game in Chicago on March 29, 2017, he watched Brian practice on April 12-13, 2017 in New York, and he watched Brian play in the Jordan Brand Classic Game at the Barclays Center in his capacity as Director of Scouting for the Kings.  (Ex. 41, Bratz Rep. at 4.)  As he stated in his report, "**After I saw Brian in the Jordan Brand game, I projected him to be in the 16-21 range in the 2018 draft**." (*Id.* at 12.)  Furthermore, had Brian been able to play at Louisville for two years he would have been a late lottery to mid-teens pick in the 2019 NBA Draft. (*Id.*)

Discovery in this case thus far consists of more than 100 hours of sworn testimony and the exchange of approximately 300,000 documents. Adidas fails to cite a single sworn word or a single document that suggests Brian was anything other than a projected first round pick when he committed to play at the University of Louisville. Adidas's Zion Armstrong could not identify a single document or a single fact to dispute the plain fact that Brian was a projected first round pick when he committed to play for Louisville.  (*See* Ex. 6, Armstrong Tr. 256:15 – 257:9 ("Q: Do you have any personal knowledge or any facts that you could share with me to indicate that Brian was anything other than a potential first-round pick when he committed his NCAA eligibility to Louisville? A: I read a couple articles. I don't recall if those articles stated whether he was first

round, second round of third round. Q: So is a fair answer to my question that you don't have any facts or any documents you can point me to today, of which you had personal knowledge, that would indicate Brian was anything other than a potential first-round pick at the time he committed his eligibility to Louisville: is that correct? A. I don't recall any documents at the time."

Perhaps the reason Mr. Armstrong was unable to identify any documents that would create an issue of fact regarding whether Brian suffered lost earnings when his NCAA eligibility was destroyed is because the *entire* focus of the Adidas bribery scheme was to profit from the very fact that it now disputes—that Brian would be selected in the first round of the NBA draft. Defendants targeted him for two primary reasons: (1) to make money off of his NIL while he played for Adidas's flagship school; and (2) to sign Brian to an endorsement deal upon his being drafted to the NBA. Preventing Brian from playing for a Nike-sponsored university was an added benefit. (Ex. 54, July 14, 2017 Wiretap.) Perhaps another reason Mr. Armstrong could not recall which articles he read is because shortly after Brian committed to play for Hall of Fame Coach Rick Pitino one of the industry's leading-most comprehensive draft websites projected Brian as the #18 pick in the 2019 draft. (*See* Ex. 44, NBADraft.net).

Adidas identified, scouted and began targeting Brian long before the FBI intercepted telephone calls and text messages between Defendants. On April 27, 2015, more than twenty Adidas personnel, including Chris Grancio, received a recap/report of an Adidas Gauntlet event in Indianapolis, where Brian is listed third among the Class of 2017. (Ex. 55, Apr. 27, 2015 email extract.) "All weekend he was a stud for the Mustangs, proving his status as an elite prospect." (*Id.*). Further, each December ESPN showcases the country's top players by televising high school games. Adidas's Soul Patrol scouted Brian at the December 15, 2016 game between La Lumiere and New Albany. The post trip scouting report identifies Brian as a key 2017 player "ranked #13

by ESPN." (Ex. 56, Soul Patrol Scouting Rep. at 2; *see also* Ex. 28, Dec. 22, 2015 email (Soul Patrol email targeting Brian fourth on the list of "Soul Patrol Upcoming Missions.")

Adidas also targeted NBA prospects for endorsement deals by performing internal NBA Draft projections. Adidas refers to these college players as "NBA Draft Targets." (Ex. 57, NBA Draft Targets.) In an executive summary that pre-dated the 2018 NBA draft, Adidas states: "We are tracking to sign two of the Top 3 NBA picks: Markelle Fultz, Josh Jackson, Dennis Smith." (*Id.* at 2.) Like Brian, players Fultz, Jackson and Smith were 5-stars coming out of high school. And just like Brian, two of the three were McDonalds' All-Americans. Dennis Smith was injured and could not participate, but like Brian he too was one of Soul Patrol's key targets. Unlike Brian, however, Fultz, Jackson and Smith all prepared for the NBA by playing college basketball, with Smith at N.C. State and Jackson at Kansas—both Adidas-sponsored schools. That Adidas was "tracking to sign" Smith and Jackson ahead of the draft demonstrates the Adidas bribery scheme was starting to pay off. As for Fultz, he played at the University of Washington which at the time was sponsored by Nike. Not to be outdone, however, the school announced in April 2018 that it was breaking its 20-year relationship with Nike to sign a $119M deal with Adidas. Furthermore, and directly at odds with what Adidas has argued in this case: Adidas' NBA draft projections were spot on. Its "tier I" targets were projected as follows: Fultz as the #1 pick, Jackson as the # 3 pick, and Smith as a "Top 5 pick." (*Id.*) Fultz was indeed the #1 overall draft pick and went to the Orlando Magic, Jackson went to the Phoenix Suns as the 4th overall pick, while Smith went 9th overall to the Mavericks. A jury can reasonably conclude from this evidence that the reason Adidas targeted Brian while he was in high school was because he was an NBA lottery pick that it could bring to an Adidas school and later sign to an endorsement deal.

### F. Brian's Lost Professional Earnings Are Recoverable Under RICO

In addition to the legal protections afforded under contract law, a person's business interest is also legally protected from tortious interference. The interference tort remedies are designed to protect plaintiffs from unjustifiable interference with their commercial or economic relationships. *See* W. Prosser, THE LAW OF TORTS § 129, at 978 (5th ed. 1984). Unlike in personal injury actions, however, where purely economic losses are not recoverable absent some underlying physical injury, purely economic losses are recoverable in an economic/business tort action. In 2004, the Supreme Court of Kentucky adopted the Restatement (Second) of Torts § 552 (1977), recognizing that pecuniary losses (i.e., lost earnings) claimed in this matter are compensable injuries for which damages are recoverable in this RICO action. More particularly:

> [O]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for **pecuniary loss** caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 580 (Ky. 2004).

Here, there is significant evidence from which a jury can reasonably conclude: (1) Adidas had a pecuniary interest in Brian playing basketball for their flagship university; and (2) Adidas supplied false information directly and through its co-conspirators to lure Brian into believing Louisville was a good basketball fit and to secure his basketball labor and talent, when in fact doing so would render him ineligible. For example, the $160M contract between Adidas and Louisville, and the wiretaps evidencing Adidas' financial motives in targeting Brian, clearly demonstrate the pecuniary interest involved here. Further, among other evidence the text messages exchanged between Kenny Johnson and Defendant Dawkins on Brian's recruiting visit proves Brian was being manipulated into believing Louisville was a good basketball fit. (Ex. 4, UofL Text Messages). In fact, there exists in this case zero evidence Adidas did not have a pecuniary

interest in Brian attending UofL or that it and its co-conspirators did not falsely lead him to believe Louisville was a good basketball fit.

Risk is endemic to life and business and something that most risk-averse individuals and firms have good reason to manage. Broadly defined, risk is a condition in which more than one outcome is possible. *See* Nat'l Ass'n of Ins. Comm'rs, *A Regulator's Introduction to the Insurance Industry* (2005). Adidas fully understands risk and the importance of planning and forecasting to its financial success. (Ex. 6, Z. Armstrong Tr. 261:9-12.) For example, budgeting is an integral part of a for-profit corporation's annual financial success. At Adidas, the budget projections are based upon, among other things "the prior year's results." (*Id.* 261:17 - 262:21.) This type of planning forms the basis of Adidas's execution of its corporate business. (*Id.* 262:1-4.) Brian's planning and preparation for earnings does not get second-citizen treatment under the law. His planning and preparation for earnings met the same criteria used by Adidas in executing corporate policy. Both Brian and Adidas look at "last year's results." Adidas utilizes the confidence in and demand for its products to ensure corporate earnings, and Brian's planning and preparation for earnings is no different. There is a high demand for elite players like Brian in the first round of every NBA Draft. (*See generally* Ex. 53 McFall Reports, Ex. 41 Bratz Report.)

In addition to forecasting and proper planning, businesses also plan for potential interruptions or disruptions. Undoubtedly, in any business a disruption or interruption can cause problems with top-line growth. (Ex. 6, Z. Armstrong Tr. 262:18-21.) Much like Adidas—any interruption or disruption with Brian's preparation for the NBA would naturally affect his professional earnings. Although Adidas attempts otherwise, its arguments are wholly unsupported by the facts of this case. More particularly, its arguments are completely at odds with the testimony of its President, Zion Armstrong:

> Q.     Okay.  When it comes to training for the NBA as an elite prospect, would you agree with me that an interruption or disruption to that training is never a good thing.
>
> A.     If you're referencing an injury, correct.
>
> Q.     Okay. Because any interruption or disruption in an elite prospect's training for the NBA is going to have a direct effect upon that player's entry into the NBA; isn't that correct."
>
> A.     Potentially.
>
> . . .
>
> Q.     So in order to for an elite player's entry into the NBA to be at its best, it's important for that elite prospect to have continuous training, continuous coaching, and continuous competition minutes prior to him entering the NBA draft?
>
> A.     I'm not a basketball expert or coach. You know, staying injury-free is of course, for any athlete doing any sport very important.

(*Id.* at 266:10-23, 267:1-10.)

The fact finder will be well suited in determining the proper weight to give to Mr. Armstrong's testimony considering (1) he is the highest-ranking executive at Adidas America, Inc. (2) he has personal knowledge considering he trained for the Olympic as a 400-meter hurdler but was unable to compete due to injury. (*Id.* 251:8-21.)  Furthermore, he is not just "any executive of any company." Rather, he is the highest-ranking executive at a company whose stated mission is to: "seek to help athletes of all skill levels achieve peak performance with every product we bring to market." (Ex. 58, Adidas Mission Statement.)

In the insurance industry there is a distinction between "pure risk" and "speculative risk." "Pure risk involves no chance of economic gain and uncertainty about whether a financial loss will occur and possibly how much that financial loss will be. Speculative risk involves the chance of gain or loss and in theory is not insurable. Gambling is an example of speculative risk." *See* NAT'L ASS'N OF INS. COMM'RS, *A REGULATOR'S INTRODUCTION TO THE INSURANCE INDUSTRY* at 6 (2005). Brian's earnings were not the least bit speculative as demonstrated by the fact that the insurance industry offers a product known as "loss of value" insurance to NCAA players, which the NCAA

describes as an "[i]nsurance products to protect future earnings."[15]  Coach Kenny Johnson has personal knowledge of such loss of value insurance products offered to basketball student-athletes, including their promotion to elite players like Brian when the spend a year preparing of the NBA playing college basketball.  (Ex. 12, K. Johnson Tr. 266:8 – 269:8.) He testified that Zion Williamson had a loss of use policy during his freshman year at Duke. (*Id.*)  But when he was asked, "[I]sn't it true, sir, that the University of Louisville purchased the exact same type of insurance for Brian Bowen?," Coach Johnson replied, "Upon advice of counsel, I'm exercising my Fifth Amendment privilege."  (*Id.*)  From this testimony, and the related text messages exchanged with Dawkins discussing the purchase of insurance from Lloyds of London that was approved and paid for by Louisville's Athletic Director, Tom Jurich, a jury can reasonably conclude that Brian's future earnings were a non-speculative and insurable business interest. (Ex. 3, K. Johnson Text Messages at line 177-180.)  And while the value of his future earnings can be ascertained by underwriters or by reference to the 2018-19 NBA Rookie Scale set forth in the NBA Collective Bargaining Agreement and relied on in the McFall Reports (Ex. 53), ultimately a jury has the final say on Brian's damages.  *See Potomac Elec. Power Co.*, 262 F.3d at 265-66.

## II.    THIS COURT HAS THE JURISDCITION AND POWER TO PROTECT THE PUBLIC AGAINST THE VERY HARM IDENTIFIED IN THE RICE COMMISSION REPORT

Equitable relief is likewise necessary where, as here, there is no adequate remedy to prevent Adidas from continuing to employ the same exploitive tactics on other young student-athletes. The NCAA through its bylaws seeks to "protect[] student athletes from exploitation by professional and commercial enterprises."  (Ex. 37, NCAA bylaw § 2.9.)  However, the NCAA's

---

[15] *See* NCAA, Loss-of-Value White Paper, *available at* https://www.ncaa.org/about/resources/insurance/loss-value-insurance-white-paper (last visited Apr. 22, 2021).

reach extends only as far as its member institutions. It is powerless to enforce its bylaws against private corporations even if those corporations are sponsors or representatives of a member institution's athletics interests. Nowhere is this more evident than the NCAA's utter lack of disciplinary enforcement against Adidas and the University of Louisville for their knowing involvement in the improper and illegal recruitment of Brian Bowen, and Adidas's refusal to cooperate with the NCAA's investigation. (Ex. 59, Adidas email to NCAA ("adidas is not prepared at this time to produce the documents that you have requested. . . . good luck with the investigation.")).

As evidenced by the 2014 sponsorship agreement between Louisville and Adidas, and the subsequent $160 million amendment, Adidas exercised extensive control over the promotion, recruitment and benefits provided to Louisville's student-athletes. (*See* Ex. 38, UofL Endorsement Agreement). This level of influence has been a longstanding concern for the NCAA, which promotes "amateurism" as its core principle and mechanism for maintaining the highest level of competition in intercollegiate athletics. As early as 1999, the NCAA sought to address the growing influence of athletic apparel companies by amending its bylaws to specifically include "apparel or equipment manufacturers" as "representatives of athletics interests" of the colleges and universities they sponsored and endorsed. (Ex. 37, NCAA Bylaw § 13.02.15.)

The term "representative of athletics interests" is especially relevant to the underlying case, as § 13.01.1 mandates that the "recruitment of a student-athlete by a member institution or *any representative of its athletics interests* in violation of the Association's legislation . . .. shall result in the student-athlete becoming ineligible to represent that institution in intercollegiate athletics."

47

NCAA Bylaw, § 13.01.1.[16]  The prohibition against improper recruitment by a representative of the school's athletics interests is of particular significance in light of § 6.4.2, which confers on the institution responsibility for the conduct of a representative of athletics interests.  (Ex. 37, NCAA bylaw § 6.4.2; *see also* § 6.4.1, stating same as to any corporate entity or apparel manufacturer where the institution has knowledge that the entity is promoting the institution's athletics program.)

The University of Louisville has demonstrated it will not police Adidas nor will it protect student athletes as is required by the NCAA rules. Rather, Louisville has proven it will protect the hand that feeds it no matter what. On September 16, 2020 Louisville responded to the NCAA's notice of allegations and stated as follows: "Code, Gatto and their co-conspirators engaged in a reprehensible course of misconduct.  But the enforcement staff's efforts to hold the University responsible for this scheme is severely misplaced. The University was a victim of the conspiracy, not a participant in it."  (Ex. 60, Louisville Response to NCAA Notice of Allegations at 10.) You see, the NCAA has no idea Louisville was in on the deal, or that it likely committed crimes in altering records to conceal the bribery scheme.  The NCAA is powerless if its member institutions behave as Louisville has here.

Even worse, Louisville sat on evidence which proved Brian's innocence: "going to let [Brian] take the night so he thinks he came to this decision by himself," (Ex. 3, K. Johnson Text Messages at line 174), and withheld it from him until it was subpoenaed in this case for no other purpose than to protect its own interests against the NCAA even though it did not hesitate to put its hand out and seek restitution in the *Gatto* criminal case. (Ex. 50, Restitution Letter.)

---

[16] Similarly, § 13.01.2 provides that "a member of an institution's athletics staff *or a representative of its athletics interests* shall not recruit a prospective student-athlete except as permitted by this Association, the institution and the member conference, if any."  NCAA Bylaw, § 13.01.2.

As provided by NCAA rules, Louisville had legal notice of Johnson's text messages and because he is its employee, his conduct is imputed to the school just as Adidas' conduct is imputed to it through its sponsorship and promotion of the athletics department.  *See* NCAA Bylaws §§ 6.4.1, 6.4.2, 13.01.1, 13.01.2, 13.02.1, and 13.02.15.  Through these rules, the NCAA has available an enforcement remedy to penalize the University of Louisville for its implication in the underlying scheme—no matter how ineffective it has proven thus far.  However, no such remedy is available to right the wrongs committed by Adidas.  Absent injunctive relief, there is simply no mechanism to hold Adidas accountable for its involvement in the illegal recruiting scheme and its gross indifference to the livelihood of student-athletes.

In effect, absent injunctive relief, RICO would be rendered hollow as it applies to illegal bribery schemes by corporate sponsors to influence intercollegiate recruiting for profit.  Preventive injunctive relief is the sole vehicle to provide meaningful impact on the livelihood and development of student-athletes, like Brian Bowen, who have been exploited by corrupt enterprises motivated by corporate and institutional gain.

The public has both an interest in preventing fraud and an interest in enforcing RICO. *Domanus v. Lewicki*, 857 F. Supp. 2d 719, 727 (N.D. Ill. 2012); *Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C.,* 691 F.Supp.2d 772, 788 (N.D.Ill. 2010) (one of the aims of RICO is to "protect the public from those who would run organizations in a manner detrimental to the public interest") (quoting *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 165 (2001)).  Courts in other circuits recognize the availability of injunctive relief in civil RICO actions.  *See Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 695-700 (7th Cir. 2001); *Chevron Corp. v. Donziger*, 833 F.3d 74, 137-140 (2d Cir. 2016).  And the Supreme Court has repeatedly stated that RICO "be liberally construed to effectuate its remedial purposes."  *See Sedima, S.P.R.L. v. Imrex*

*Co.*, 473 U.S. 479, 497–98 (1985).  Accordingly, injunctive relief is available under RICO and imperative in this case to deter Adidas' illegal corporate influences from continuing to perpetrate intercollegiate athletics recruiting.[17]

## CONCLUSION

It bears remembering what this case is about: holding Adidas, its employees, consultants, and bagmen accountable for a wide-spread, illegal bribery and money laundering scheme that targeted young kids and was utterly contrary to—and undermined—the sanctity of amateur sports in America.  It is about the unquestionable injuries that Brian suffered as a direct result of that scheme, and the damages to his professional basketball career that resulted.  Because the Supreme Court has repeatedly stated that the RICO statute should be liberally construed to effectuate its remedial purposes, particularly when the public's interest and the welfare of young people are at stake, the Court should deny Adidas's motion for summary judgment on the issue of standing.

Dated: April 22, 2021                    Respectfully submitted,

                                         **MCLEOD LAW GROUP, LLC**

                                          /s/ W. Mullins McLeod, Jr.
                                         W. Mullins McLeod, Jr.  (Fed ID No.: 7142)
                                         Colin V. Ram (Fed ID No.: 12958)
                                         H. Cooper Wilson, III (Fed ID No.: 10107)
                                         P.O. Box 21624
                                         Charleston, South Carolina 29413
                                         Tel: (843) 277-6655
                                         Fax: (843) 277-6660

                                         *Attorneys for Plaintiff Brian Bowen II*

---

[17] While the Fourth Circuit has not weighed in on the availability of injunctive relief to private parties under RICO, oral argument on this issue was recently held on January 26, 2021, in *Hengle v. Treppa*, 433 F. Supp. 3d 825 (E.D. Va. 2020) (Appeal Nos. 20-1062(L), 20-1063, 20-1358, 20-1359).  While a decision has not yet been rendered, the Fourth Circuit is expected to issue a ruling within the coming months.