

Deposition of:

# Kenneth Laverne Johnson , Jr.

*April 14, 2021*

In the Matter of:

# Bowen v. Adidas

**Veritext Legal Solutions**

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 1

1                   UNITED STATES DISTRICT COURT

                OF THE DISTRICT OF SOUTH CAROLINA

2                        COLUMBIA DIVISION

3    - - - - - - - - - - - - - -x

4       BRIAN BOWEN, II,              :

5            Plaintiff,               :

6            v.                       : Case Number

7       ADIDAS AMERICA INC.,     : 3:18-cv-3118-JFA

8       et al.,                       :

9            Defendants.              :

10   - - - - - - - - - - - - - -x

11

12

13                            - - -

14                   Wednesday, April 14, 2020

15                            - - -

16

17

18   REMOTE ZOOM VIDEO deposition of KENNETH LAVERNE

19   JOHNSON, JR., beginning at 10:06 a.m., before

20   Christina S. Hotsko, RPR, CRR, when were present

21   on behalf of the respective parties:

22

Kenneth Laverne Johnson , Jr.                          April 14, 2021
Bowen v. Adidas

Page 124

1    Mr. Johnson, do you need to take a break?

2             THE WITNESS:  No.

3             MR. MCLEOD:  Well, let's take a 15-minute

4    break regardless, and -- because I'm going to eat

5    a half a sandwich, and then we'll get back at it.

6    How does that sound?  Is that good with everybody?

7             MR. FORBES:  That sounds good with me.

8             MR. MCLEOD:  All right.  15 minutes.

9             Madam court reporter and videographer, is

10   that all right with you all?

11            THE REPORTER:  That works with me.  Thank

12   you.

13            MR. MCLEOD:  Yes, ma'am.

14            VIDEO TECHNICIAN:  The time is 12:46 p.m.

15   This ends unit number 2.  We're off the record.

16            (A recess was taken.)

17            VIDEO TECHNICIAN:  The time is 1:12 p.m.

18   This begins unit number 3.  We're on the record.

19         EXAMINATION BY COUNSEL FOR PLAINTIFF

20   BY MR. MCLEOD:

21      Q.  Mr. Johnson, my name is Mullins McLeod,

22   and I represent Brian as a result of the injuries

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 125

1    he suffered from the Adidas bribery scheme.

2           The first thing I want to share with you

3    is I respect your constitutional rights to assert

4    the Fifth Amendment.  Okay?  Can you hear me okay?

5        A.  Yes, sir.

6        Q.  Okay.  And my purposes are not served

7    today by trying to trick you into waiving that

8    constitutional right of yours.  Okay?

9        A.  Okay.

10          MR. MCLEOD:  Mr. Crawford, it's okay with

11   me, you know, if we go through this and, at the

12   end, before we go off the record, I can give you

13   and Mr. Johnson time to caucus.  And if there is

14   some question that he answered that either you or

15   Mr. Johnson, you know, is concerned about, we can

16   go back on the record and, as far as I'm

17   concerned, you can identify that question and

18   assert the privilege, and as far as I'm concerned,

19   it won't constitute a waiver at all.  Okay?

20          MR. DICKEY:  I appreciate that.  I don't

21   think that's how it works.  I think once you let

22   the cat out of the bag, you can't, even for

Page 126

1   purposes of a deposition, go back.  I -- I

2   appreciate what you're offering, but I don't think

3   that's how it works.

4            MR. MCLEOD:  Well, I think that -- well,

5   anyway, that's just an offer I'm making.  And

6   we'll get going.

7   BY MR. MCLEOD:

8        Q.  So Mr. Johnson, first, I just want to

9   talk to you a little bit about basketball.  Okay?

10  Is that all right with you?

11       A.  Yes.

12       Q.  All right.  In this country, has youth

13  basketball developed fairly significantly within

14  the last 20 years?

15       A.  Yes.

16       Q.  And could you share with me please, sir,

17  how it has developed?

18       A.  I think the advent of social media has

19  shined a lot of light on the fact that there are a

20  lot of talented players all around the country.

21       Q.  Okay.  Has the youth basketball travel

22  circuits evolved a significant amount over the

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 127

1    last 20 years?

2         A.   Yes.

3         Q.   I think you shared, in your earlier

4    testimony, that the AAU acronym is kind of an

5    outdated, you know, designation.

6              Do you remember that?

7         A.   Yes.

8         Q.   And the AAU, does it stand for Amateur

9    Athletic Union?

10        A.   Yes.

11        Q.   And under the AAU designation, were those

12   leagues and tournaments governed by a governing

13   body known as the Amateur Athletic Union?

14        A.   Yes.  I believe so.

15        Q.   So 20 years ago, if somebody played AAU

16   basketball, that was the only comparable -- or

17   that was the only youth travel league available;

18   is that right?

19        A.   I believe so.

20        Q.   And then at some point in time, is it

21   true, sir, that companies, for-profit companies

22   like Adidas, developed their own travel ball

Kenneth Laverne Johnson , Jr.
Bowen v. Adidas

April 14, 2021

Page 128

1   circuits?

2        A.   Yes.   I'm not sure when, but yes.

3        Q.   Okay.   How long have you been in the

4   coaching profession, sir?

5        A.   I'd say since 2001, approximately.

6        Q.   All right.   So from 2001 until today has

7   Adidas had its own youth travel circuit?

8        A.   I'm not sure.

9        Q.   Okay.   Did Adidas have its own youth

10  travel circuit, to your knowledge, in 2014, 2015,

11  and 2016?

12       A.   Once again, I'm not sure when it began,

13  but I do remember -- I know that Adidas at one

14  point had their own circuit.

15       Q.   Okay.   And Nike, in fact, has its own

16  circuit as well, do they not?

17       A.   Yes.

18       Q.   And the Nike youth travel circuit is

19  referred to as -- what's the acronym?

20       A.   EYBL.

21       Q.   All right.   And -- you said EBYL?

22       A.   EYBL.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 129

1      Q.  And what does that stand for, sir?

2      A.  Elite Youth Basketball League.

3      Q.  All right.  Does Under Armor have its own

4   travel circuit for youth basketball in this

5   country?

6      A.  Yes.

7      Q.  And what is the name of the Under Armor

8   travel circuit, please, sir?

9      A.  I don't recall offhand.  If you know the

10  name, I can confirm.

11     Q.  That's okay.  If you don't recall, I

12  don't want you to guess.

13          Now, with regard to the Adidas travel

14  circuit, is it generally referred to as the

15  gauntlet series?

16     A.  Yes.  That's what I'm familiar with.

17     Q.  Okay.  And is it also your understanding

18  that, with regard to the Adidas gauntlet series,

19  they limit participation in that travel circuit to

20  top-tier teams?  Isn't that right?

21     A.  Yes.  I think -- yes.  I believe that

22  they determine the teams that they believe to be

Kenneth Laverne Johnson , Jr.                April 14, 2021
Bowen v. Adidas

Page 130

1    top tier and it's limited to them.

2         Q.   And so for example, if my son wanted to

3    play on the Adidas gauntlet series travel circuit,

4    if he wasn't a top-tier player, Adidas would not

5    allow him access to that travel circuit; isn't

6    that correct?

7         A.   Well, the teams are usually broken up

8    into a representative geographical region.  So

9    depending on the geographical region and the

10   bordering state that you lived in, your son would

11   need to make -- be able to be accepted on one of

12   those teams.  And if one of those teams was deemed

13   by Adidas to be good enough to participate in

14   their league, then that's how it would work.  I

15   don't think Adidas, like, goes through -- or any

16   of the shoe companies goes through and selects

17   individual players to say whether they're good

18   enough.  I think it's up to the individual teams

19   to select the player, and then those teams can try

20   to be qualified for the circuits.

21        Q.   Okay.  So your understanding of the way

22   the gauntlet series works is that teams try to

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 131

1    qualify with Adidas so that they are able to

2    compete on its premier circuit, otherwise known as

3    the gauntlet series; is that right?

4         A.  Yes.

5         Q.  Now, if -- once teams are allowed to

6    participate on the gauntlet circuit, do they

7    receive, to your knowledge, funds from Adidas?

8         A.  Yes.  To my knowledge, there's

9    sponsorship funds, yes --

10        Q.  Okay.

11        A.  -- and apparel.  Sponsorship funds and

12   apparel.

13        Q.  And would it be fair to say, sir, that

14   the Adidas gauntlet travel circuit is a

15   well-funded youth basketball travel circuit?

16        A.  It would be my opinion that I'd be

17   giving, but I would say yes.

18        Q.  So for example, on the gauntlet series,

19   you don't have circumstances where kids don't have

20   shoes to play ball, do they?

21        A.  I would say not typically.

22        Q.  Right.  And Adidas will provide the

Page 132

1    apparel and the gear needed to compete on that

2    circuit if the team requests the apparel; isn't

3    that your understanding?

4        A.   Yeah, I think each team -- I don't think

5    it's a universal deal.  I think each team

6    negotiates their own deal with a particular brand,

7    but I could be mistaken with that.  I don't

8    know -- I'm not familiar with everyone's

9    individual package.  And then they will, I guess,

10   compete with or without the apparel as they see

11   fit.

12       Q.   Okay.  And I know that the travel leagues

13   have been criticized, but in the beginning, wasn't

14   one of the useful purposes of the travel leagues

15   is it gave kids the ability to compete against

16   other elite prospects across the country?

17       A.   Yes.

18       Q.   And so for example, a player may be the

19   best player on his high school team and, in most

20   high school games, be the best player on the

21   court, and in that instance, the player doesn't

22   get the competitive minutes needed to properly

Kenneth Laverne Johnson , Jr.                          April 14, 2021
Bowen v. Adidas

Page 133

1    develop his basketball skill.

2            Would you agree with that?

3        A.  Yes.

4        Q.  Would you agree with me that there's

5    really no substitute in the preparation for the

6    NBA for competitive minutes against elite

7    competition?

8        A.  No substitute as far as the -- are you

9    saying that the summer gaunt- -- the series?

10       Q.  Yes.  Yes, sir.  While they are -- while

11   a player, an elite prospect, is in high school, is

12   there any product that can better prepare them,

13   basketball-wise, than these well-funded travel

14   circuits?

15       A.  I mean, I think that's subject for

16   debate.  I think that is definitely one of the top

17   two or three ways to prepare yourself.

18       Q.  For example, for a kid like Brian Bowen

19   from Saginaw, Michigan, the opportunity to develop

20   his basketball skills on a travel circuit would be

21   instrumental to his development, wouldn't it?

22       A.  I believe that is one of the ways that

Kenneth Laverne Johnson , Jr.                          April 14, 2021
Bowen v. Adidas

Page 134

1    would help him develop.

2        Q.   Okay.  Now, as far as elite prospects go,

3    are you familiar, I'm assuming, with the rating

4    system that has evolved over the years with regard

5    to identifying and rating top-tier prospects?

6        A.   Yes.

7        Q.   And would one of those ratings agencies

8    be Rivals.com?

9        A.   Yes.

10       Q.   Does ESPN have its own ratings system?

11       A.   Yes.

12       Q.   All right.  Share with me, please, sir,

13   whether or not, based upon your personal

14   knowledge, these ratings systems are fairly

15   involved and fairly reliable when it comes to

16   identifying and rating our nation's top basketball

17   prospects.

18       A.   Yes.  I mean, you're always going to

19   have, you know, differences of opinions.  But I

20   believe that, taken in its totality, the ratings

21   systems do a pretty good job of identifying

22   prospects and kind of putting them in a general

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 135

1   ballpark of where they kind of shape out across

2   the country.

3        Q.  Yes, sir.  And maybe a good way to look

4   at that is, to compare it with the sport of

5   football, football is just now getting to the

6   point where you have these seven-on-seven travel

7   teams, right?

8        A.  Yes.

9        Q.  When, 15 years ago, there was no such

10  thing as a -- you know, a seven-on-seven travel

11  football team, right?

12       A.  I'm not sure.

13       Q.  Well, let me -- maybe this is an easier

14  question:  Would you agree with me that, because

15  of the well-funded travel circuits, the

16  identification of elite prospects is more advanced

17  in basketball than it is in football?

18       A.  Yes.  There's a -- yeah, there's -- I

19  mean, there's a lot more members of football teams

20  and so many positions.  So I would say, yes, in

21  basketball, the top prospects do generally --

22  they're more easily identified or known.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 136

1      Q.  And sir, would one of the premier reasons

2   for that to be the fact that you have this

3   well-funded AAU -- I mean, I'm sorry, these

4   well-funded travel circuits that aid and assist

5   people in identifying the elite prospects?

6      A.  Yes.

7      Q.  Now, as far as Rivals goes, is it your

8   general understanding that there are very few

9   players in each high school class that qualify or

10  are rated as a consensus five-star player?

11     A.  Yes.  Very few.

12     Q.  And is it true, sir, that, on average,

13  there are roughly 30 five-star players in each

14  senior class in this country?

15     A.  Yes.

16     Q.  And the reason why there are 30 five-star

17  players in each class is because there are 30 NBA

18  teams; isn't that correct?

19     A.  I've never identified that as a fact, but

20  I can see how that makes sense.

21     Q.  Because there are, in fact, sir, 30 NBA

22  teams, correct?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 137

1      A.  Yes.

2      Q.  And each NBA team gets one selection in

3  the first round of each year's NBA draft; is that

4  correct?

5      A.  Yes.

6      Q.  Now, in addition to the five-star rating,

7  there's also a designation -- an award or accolade

8  known as the McDonald's All American; is that

9  right?

10      A.  Yes.

11      Q.  And share with me whether or not being

12  designated as a McDonald's All American is a

13  distinction in youth basketball in this country?

14      A.  Yes.  It's -- I believe it to be the

15  highest honor that you can -- that a student

16  athlete in high school would try to achieve, or be

17  awarded with, is a McDonald's All American

18  designation.

19      Q.  Okay.  And the Jordan Brand Classic game

20  is another accolade that is only given to the best

21  of the best as far as elite prospects go in this

22  country; is that correct?

Page 138

1      A.  It is.  But I guess -- I think Jordan

2    Brand is a little different because I think they

3    tend to select primarily from kids who played on

4    the Nike circuit, the EYBL circuit.

5      Q.  Okay.  Now, in Brian's case, he was a

6    consensus five-star recruit; isn't that correct?

7      A.  I'm not sure.  I believe -- I know that

8    he was highly ranked.  I'm not sure if he was

9    consensus...

10      Q.  Mr. Johnson, you don't know if Brian

11    Bowen was a consensus five-star recruit coming out

12    of high school?

13      A.  I want to be extremely accurate, and I

14    never recall seeing whether he was a five-star.  I

15    remember him being thought of as a top 20 player,

16    but I don't know what each -- when you say

17    consensus, I'm assuming you're talking about

18    across all the different ranking services.  So I

19    don't know what each ranking service had him

20    ranked.

21      Q.  Okay.

22      A.  I believe he -- if I had to make a guess,

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 139

1    I would say yes.

2         Q.   Okay.  And isn't it true, sir, that Brian

3    was an McDonald's All American coming out of high

4    school?

5         A.   Yes.

6         Q.   And he was the MVP of the Jordan Brand

7    Classic game; isn't that correct?

8         A.   Yes.

9         Q.   And Brian was also the Indiana Gatorade

10   player of the year in senior year in high school;

11   isn't that correct?

12        A.   Yes.

13        Q.   And as far as the Gatorade player of the

14   year selection in each state, is that a high honor

15   for an elite prospect to be awarded?

16        A.   I believe so.

17        Q.   And in particular, the State of Indiana

18   has a fairly proud basketball tradition, does it

19   not?

20        A.   Yes.

21        Q.   Just like Kentucky, as a state, has a

22   fairly proud basketball tradition; is that

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 140

1    correct?

2        A.  Yes.

3        Q.  So as far as an accolade or a distinction

4    is concerned, would you agree with me that being

5    the Indiana Gatorade player of the year is more of

6    a distinction than being the New Mexico Gatorade

7    player of the year?

8        A.  Yeah.  I think it's based off of sheer

9    population of athletes to choose from

10   participating at a high level, I would say so.

11       Q.  And there are more, generally speaking,

12   elite basketball players in the State of Indiana

13   than there are in states like New Mexico; isn't

14   that correct?

15       A.  Yes.

16       Q.  Now, isn't it true, sir, that, as far as

17   the NBA draft is concerned, an overwhelming

18   majority of first-round picks were McDonald's All

19   Americans coming out of high school?

20           MR. MORAN:  Objection.

21           THE WITNESS:  I would be speculating.  I

22   know that first-round picks are coming a lot from

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 141

1   Europe nowadays.  But if you're talking about

2   players that are coming in the United States, I

3   would assume that to be true.  I haven't seen any

4   details directly that speak to that.

5   BY MR. MCLEOD:

6       Q.  Okay.  I'm going to read for you a

7   statistic, and I'll just ask you whether you would

8   disagree -- agree or disagree with this statistic.

9       A.  Okay.

10      Q.  There have been seven acknowledged All

11  American games since 2013.  There are 24 players

12  selected each year, and 168 players the past seven

13  years.  Of those 168, 100, or 59.5 percent, were

14  selected in the NBA draft, and 73 were taken in

15  the first round.

16          Do you have any reason to believe that

17  those statistics are inaccurate?

18      A.  No, I don't.

19      Q.  Now, as far as the Jordan Brand Classic

20  game is concerned, I'm going to share with you

21  another statistic and just ask you, sir, whether

22  you agree or disagree with that statistic.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

                                          Page 142

1          There have been 14 co-MVPs of the Jordan

2    game since 2013.  Nine of the 14 were drafted in

3    the first round, or 64.2 percent, and one was

4    drafted in the second round.

5          Do those statistics appear to be accurate

6    to you, sir, based upon your personal knowledge of

7    recruiting and NBA draft picks?

8          A.  Yes.

9          Q.  Now, for an elite player like Brian,

10   would it be fair to say that the colleges compete

11   fiercely for the right to their basketball labor

12   and basketball talent?

13         A.  Yes.

14         Q.  And share with me, please, sir, how you

15   would generally describe the fierce competition

16   among the elite college teams for the elite

17   players.

18         A.  I think there's what you consider to be

19   high major conferences and -- or power five

20   schools.  I think that's more of a football term.

21   But, you know, high major schools in the bigger

22   conferences that will try to communicate with the

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 143

1    players.  There are some schools that will call

2    players every single day, at least once a day,

3    maybe possibly multiple members of the staff.

4    They will go and watch those players play with

5    their summer basketball teams when they're allowed

6    out.  They won't miss a game.  They'll have

7    somebody there to watch them play every game.

8            And they will go and watch them at their

9    high schools.  They'll go watch them in their fall

10   workouts.  They'll watch them during their season.

11   And they'll go watch them during their spring

12   workouts.  And then they will try to secure one of

13   the official visits for them to come to the school

14   so that they can host them at their school and try

15   to get them to want to be a part of their

16   university.

17       Q.  Okay.  And is part of the competition for

18   these elite prospects' basketball labor and talent

19   the offering of the basketball services that a

20   particular school offers?

21       A.  Yes.

22       Q.  And for Louisville, would it be fair to

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 144

1    say that, in 2017, it was one of the top programs

2    in the country?

3        A.   Yes.  I believe so.

4        Q.   And is that something that you were proud

5    of, and rightfully so?

6        A.   Yes.

7        Q.   It takes a lot of work to be good at

8    anything, doesn't it, Mr. Johnson?

9        A.   It does.

10       Q.   And the college basketball life for a

11   coach like you isn't as glamorous as it might look

12   to some that are sitting in the stands; isn't that

13   right?

14       A.   Yes, there are a lot of hours that go

15   into, and you're responsible for the lives of at

16   least 13 people.

17       Q.   Yes, sir.

18            Now, for Louisville, was one of the

19   things that Louisville offered -- was one of those

20   things Rick Pitino, a Hall of Fame coach?

21       A.   Yes.  Rick Pitino is a Hall of Fame

22   coach, and he is known as a talent developer.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 145

1      Q.  And I was going to get to the talent

2   developer piece, and I'll come back to that.

3          But just with regard to Coach Pitino's

4   track record of success in college basketball,

5   would you agree with me that it is a fairly

6   sterling track record of success on the court?

7      A.  Yes.

8      Q.  And if I told you that Coach Pitino's

9   record in NCAA tournament play was approximately

10  75 percent, would that sound about right?

11     A.  Yes.

12     Q.  At Louisville, is it true that 12 of

13  Coach Pitino's of 15 Louisville Cardinal teams

14  made it to the NCAA tournament?

15     A.  Yes.  I believe so.

16     Q.  And the 2013 Louisville team won the

17  national championship; is that right?

18     A.  Yes.

19     Q.  Now, is Coach Pitino also one of a select

20  few to have ever coached elite basketball

21  prospects, to have coached multiple college teams

22  to a Final Four appearance?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 146

1          A.   Yes.

2          Q.   Did Coach Pitino do that at Providence?

3          A.   Yes.

4          Q.   Did he do that at Kentucky?

5          A.   Yes.

6          Q.   And did he also, sir, do that on multiple

7     occasions at the University of Louisville?

8          A.   Yes.

9          Q.   Would you agree with me, sir, that the

10    fact that Coach Pitino was able to take three

11    different schools to the Final Four is a strong

12    indicator that his coaching ability is extremely

13    high?

14              MR. MORAN:   Objection.

15              THE WITNESS:   Yes.

16    BY MR. MCLEOD:

17         Q.   Would you agree with me, sir, that for a

18    coach to be able to take a school like Providence

19    to the Final Four, it has to be a well-coached,

20    well-disciplined, and well-conditioned unit?

21         A.   Yes.

22         Q.   Now, at Louisville, did Louisville also

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 147

1    offer Brian, in addition to elite coaching, elite

2    competition?

3              MR. MORAN:  Objection.

4              THE WITNESS:  Are you asking about a

5    specific person or are you talking about

6    Louisville in general?

7    BY MR. MCLEOD:

8         Q.  Well, let me ask a more artful question.

9              For any player that comes to Louisville

10   and is a part of the men's basketball team, one

11   benefit they get is playing in the ACC, correct?

12        A.  Yes.  We play in the ACC -- they played

13   in the ACC.  They would play a competitive

14   non-conference schedule as well.

15        Q.  Okay.  And as far as the ACC is

16   concerned, is it generally understood within the

17   industry that the Atlantic Coast Conference is the

18   most competitive conference in all of college

19   basketball?

20             MR. MORAN:  Objection.

21             THE WITNESS:  I'm sure that it's going to

22   be up for debate with some of the other

Kenneth Laverne Johnson , Jr.                                    April 14, 2021
Bowen v. Adidas

Page 148

1   conferences, but I think it is definitely one of

2   the -- I mean, undeniably it's one of the top

3   basketball conferences.

4   BY MR. MCLEOD:

5        Q.   Okay.  And you mentioned, sir, that at

6   Louisville another benefit is you play a

7   competitive non-conference schedule; is that

8   right?

9        A.   Yes.

10       Q.   And share with me, please, sir, from a

11  basketball development and a national championship

12  objective, why that's important.

13       A.   Well, you want to test yourself against

14  some of the elite competition to see where you

15  stand.  A lot of times the non- -- well, majority

16  of the time the non-conference comes before your

17  conference play will begin, so you'll have what

18  you consider to be tuneups so you can kind of get

19  an understanding of what your strengths are and

20  what your weaknesses are.

21            But being on a stage where you're playing

22  nationally televised games against other elite

April 14, 2021

Page 149

1    competition, you know, sets you up for success in

2    the future.

3        Q.   And is it fair to say, sir, that at

4    programs like Louisville another reason why you

5    play a tough, competitive non-conference schedule

6    is the end goal is a deep run in the NCAA

7    tournament?  Is that right?

8        A.   Yes.  If you can have a strong strength

9    of schedule, that can -- on tournament selection

10   day, hopefully that will help you get you a

11   higher -- or a lower seed so that you are

12   hopefully having an easier route to advance in the

13   tournament.

14       Q.   Okay.  And so is it your understanding

15   that the NCAA selection committee uses your

16   non-conference schedule as part of the rating

17   system and how teams are assigned seeds within the

18   NCAA tournament?

19       A.   Yes.

20       Q.   And would it be fair to say, sir, that

21   colleges like Louisville spend a significant

22   amount of time trying to figure out and decide who

Kenneth Laverne Johnson , Jr.                          April 14, 2021
Bowen v. Adidas

Page 150

1    their non-conference opponents will be in a given

2    year?

3          A.   Yes.

4          Q.   And is that time and effort devoted for

5    that reason, for the selection committee in the

6    hopes of getting a good seed in return?

7          A.   Yes.   That's a part of it.

8          Q.   Would you agree with me, sir, that if 12

9    of Coach Pitino's 15 teams at Louisville made it

10   to the NCAA tournament, that that would represent

11   a fairly large percentage of his teams playing in

12   the tournament?

13         A.   Yes.

14         Q.   Would you agree, sir, that playing for

15   Coach Pitino, in comparison to his peers, gives

16   elite prospects like Brian a better chance of

17   playing in the NCAA tournament because of

18   Coach Pitino's track record of success?

19         A.   Yes.

20         Q.   Now, Mr. Johnson, would you describe

21   the -- how would you describe the competition

22   among NCAA member schools for the building of

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

                                                  Page 151

1    athletic facilities in general?

2        A.   The competition?  I mean, I'm not as

3    well-versed on the competition for the building of

4    the facilities.

5        Q.   Well, let me ask you this:  Isn't it

6    true, sir, that when -- at all times when you

7    worked at Louisville as an assistant coach,

8    whenever elite prospects would attend campus for

9    their visit, one of the things that you all

10   showcased were your training facilities; is that

11   correct?

12       A.   Oh, yes.

13       Q.   And --

14       A.   Especially recruiting and arena and

15   dormitories.

16       Q.   Okay.  And those basketball-related

17   services are important to elite prospects like

18   Brian in their decision on where to commit their

19   eligibility; isn't that correct?

20            MR. MORAN:  Objection.

21            THE WITNESS:  Oftentimes, yes.

22            (Discussion off the record.)

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 152

1    BY MR. MCLEOD:

2        Q.   So Mr. Johnson, would it be fair to say

3    that when an elite player like Brian chooses a

4    school, that choice is made for primarily

5    basketball reasons?

6            MR. MORAN:   Objection.

7    BY MR. MCLEOD:

8        Q.   You can answer.

9        A.   My opinion is that will be a large

10   portion of the reason why they would select a

11   school.

12       Q.   Okay.  And would you also agree, sir,

13   that when an elite prospect like Brian selects a

14   school, that that selection is, in part, based

15   upon economic gain down the road?

16           MR. MORAN:   Objection.

17           THE WITNESS:   Are you asking me about

18   Brian or are you asking me about just elite

19   prospects?  Can you --

20   BY MR. MCLEOD:

21       Q.   Elite prospects in general.

22       A.   Okay.  Can you repeat the question for

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 153

1    me?

2         Q.   Yeah.   Well, let me -- I'll ask you a

3    better question.

4              Would you agree with me that, in general,

5    a professional -- two of the most important

6    decisions a professional basketball player makes

7    in his career are made while he's still an

8    amateur:  One, where to spend the year or years

9    after high school graduation preparing for the

10   NBA; and two, when to forgo his NCAA eligibility

11   and enter the draft?

12             MR. MORAN:  Objection.

13             THE WITNESS:  I would agree with that.

14   BY MR. MCLEOD:

15        Q.   Okay.  And let's talk about the first

16   one, and that is where to spend the year or years

17   after high school graduation preparing for the NBA

18   draft.

19             Is there -- do you have any personal

20   knowledge of there being any comparable amateur

21   product in North America to prepare players for

22   the NBA outside of NCAA basketball?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 154

1        A.  I believe NC- -- my personal opinion is

2    that NCAA basketball is the best.  I know they've

3    established a G League component now.  I don't

4    know if it's called the G League or whatever

5    they're calling it.

6            But I believe, personally, that the NCAA

7    is the best way.

8        Q.  Okay.  And just to clarify my question,

9    as far as an amateur product is concerned -- okay?

10       A.  Yes.

11       Q.  -- is there any comparable amateur

12   product in North America other than -- that even

13   begins to compare with the NCAA in its ability to

14   prepare elite prospects for the NBA?

15           MR. MORAN:  Objection.

16           THE WITNESS:  Not in North America.

17   BY MR. MCLEOD:

18       Q.  For example, church leagues, while

19   beneficial in many regards, would not be a

20   suitable or a comparable product to NCAA

21   basketball with regards to preparation for the

22   NBA; is that correct?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 155

1          A.   Correct.

2          Q.   Are there any organized amateur leagues

3    in North America that even come close to offering

4    what the NCAA offers elite prospects like Brian in

5    preparation for the NBA draft?

6          A.   Not that I'm aware of.

7          Q.   Okay.  Now, with regard to the second

8    decision -- most important decision that

9    professional players make while they're still an

10   amateur, when to forgo their eligibility and enter

11   the draft, share with me why that is an important

12   decision to make for any amateur elite prospect

13   prior to going to the draft.

14          MR. MORAN:  Objection.

15          THE WITNESS:  If you -- my opinion is

16   that if you enter the draft before the NBA teams

17   that will select you don't feel as though you're

18   ready to -- if you're not a high draftable

19   prospect, you're forgoing your eligibility, so you

20   can't return to college.

21          So you have to be very selective about

22   making sure that you're ready to be drafted to

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 156

1    secure -- have a -- you know, preferably a

2    first-round draft pick so that you can have a

3    guaranteed contract which can kind of jump-start

4    your longer-term career in the NBA.

5         Q.  Yes, sir.  And that decisionmaking

6    process that elite prospects go through is

7    something that you are very familiar with, having

8    coached at a top-tier program like Louisville; is

9    that fair to say?

10        A.  Yes.

11        Q.  Now, once a player like Brian goes

12   through the NBA draft, they cannot return to

13   college, correct?

14        A.  Correct.

15        Q.  And is it true, sir, that you can only go

16   through the NBA draft once?

17        A.  Go into the NBA draft and remain?  Yes.

18        Q.  Okay.  And so, generally speaking, for

19   players like Brian, you want to make sure that,

20   when you go through the draft, your basketball

21   abilities and your stock is at its highest; is

22   that correct?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 157

1          A.   Yes.

2          Q.   And that's a decision that most kids make

3     while they are preparing for the NBA at elite

4     college teams at various colleges across the

5     country; isn't that right?

6          A.   Yes.

7          Q.   Okay.  Now, for Louisville, have you seen

8     any of the Forbes magazine articles that rate

9     Louisville as the richest, most valuable college

10    basketball team in the country?

11         A.   Yes.

12         Q.   And was it generally understood while you

13    were an assistant coach at Louisville that

14    Louisville was, in fact, the most valuable college

15    team in the country?

16         A.   Yes.

17         Q.   Was one of the things, to your

18    understanding, that led Louisville to be one of

19    the wealthiest college teams in the country its

20    apparel sponsorship deal with Adidas?

21         A.   I had identified it, from my

22    understanding, to be with the arena that they have

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 158

1   and the fact that they can generate that.  But I

2   could also, without -- well, I don't want to make

3   a guess about their apparel deal because I didn't

4   have any knowledge of what their actual apparel

5   deal was.

6        Q.  Yes, sir.  Fair enough.  And I don't want

7   you to guess.  Okay?  I totally understand.

8           In 2014 and 2015, it's been reported that

9   Louisville basketball program averaged

10  approximately $52 million in revenues.

11          Does that figure sound about right to

12  you, based upon having been a coach at Louisville?

13       A.  Yes.

14       Q.  All right.  And it's been reported that

15  Louisville, their profits during the same time,

16  eclipsed the profits of some NBA teams like the

17  Cleveland Cavaliers.

18          Is that your general understanding from

19  having worked -- I mean, having coached at

20  Louisville?

21       A.  That's my first time hearing that

22  statistic.

Kenneth Laverne Johnson , Jr.                            April 14, 2021
Bowen v. Adidas

Page 159

1        Q.   Okay.   Were you aware that it's been

2   reported that Louisville's annual revenues are

3   greater than the Oklahoma City Thunder?

4        A.   No, I hadn't read that.

5        Q.   Had you read it reported that

6   Louisville's annual revenues eclipsed those of the

7   Charlotte Hornets?

8        A.   No.

9        Q.   Okay.   Now, the arena where Louisville

10  plays its home games and practices is known as

11  what?

12       A.   Yum! Center.

13       Q.   Yes, sir.   And is that a fairly

14  sophisticated, state-of-the-art facility?

15       A.   Yes.

16       Q.   Has it been generally reported that the

17  cost of construction of that state-of-the-art

18  facility being $237 million?

19       A.   I don't know.

20       Q.   Share with me, please, sir, the type of

21  training and services that an elite prospects like

22  Brian can get within the arena known as the

Page 160

1  Yum! Center.

2       A.  The actual arena downtown Louisville, the

3  Yum! Center, we have the game floor, and there's

4  also a practice gym within that arena, as well as

5  there's hot tub, cold tub there, and I think some

6  other types of training equipment for recovery.

7       Q.  How about a weight room, sir?  Is a

8  weight room located in the arena?

9       A.  Not at the -- not when I was -- not at

10 the downtown arena.  There's the weight room on

11 campus, the little Yum! Center, where -- we

12 consider our practice facility had a practice

13 court, a weight room, and coaches' offices in that

14 building.

15      Q.  Okay.  And in the little Yum! Center, was

16 that also a state-of-the-art training facility?

17      A.  Yes.

18      Q.  And was the little Yum! Center and the

19 big Yum! Center two of the main attractions, if

20 you will, that Louisville used to compete for the

21 basketball services and basketball talents of

22 elite prospects like Brian?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 161

1        A.   Yes.

2        Q.   And as far as the big Yum! Center is

3   concerned, it seats roughly 20,000 fans; is that

4   right?

5        A.   Yeah.   Yes.   I'm sorry.

6        Q.   In comparison to other arenas in college

7   basketball, would you agree with me that that is a

8   very large arena?

9        A.   Yes.

10       Q.   Would you agree with me, sir, that in

11   fact, Louisville's arena is much larger than some

12   NBA arenas, as far as the number of fans allowed

13   in the arena?

14       A.   I'm not exactly sure how big a lot of NBA

15   arenas are.   But I know -- I guess from my

16   research at the time, I thought that the

17   attendance at our games was significantly more

18   than some NBA teams.

19       Q.   And that fan attendance and the size of

20   the arena, was that also part of the

21   basketball-related services that Louisville used

22   to attract elite prospects like Brian?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 162

1          A.  Yes.

2          Q.  Now, at Louisville, as far as the

3    revenues go, isn't it true, sir, that unlike at

4    other schools like Michigan or Alabama or Ohio

5    State, at Louisville a vast majority of the

6    revenue comes from basketball?  Isn't that right?

7          A.  Yes.  Referring to -- as opposed to

8    football?

9          Q.  As opposed to combining football and

10   basketball.

11         A.  Yes.

12         Q.  And if it has been reported that

13   Louisville's basketball team accounts for

14   72 percent of the athletic department's booster

15   donations, does that number sound about right to

16   you based upon your personal knowledge having

17   coached at Louisville?

18         A.  I don't know.

19         Q.  Okay.  Now, I want to read you a quote

20   and ask you if you agree or disagree based upon

21   your personal knowledge having coached at

22   Louisville.

Kenneth Laverne Johnson , Jr.
Bowen v. Adidas

April 14, 2021

Page 163

1           The modern legal understanding of

2    commerce is broad and surely encompasses the

3    transaction in which an athletic recruit exchanges

4    his labor and image and likeness rights for a

5    scholarship in a division I school because it is

6    undeniable that both parties -- the school and the

7    elite prospect -- to that exchange anticipate

8    economic gain from it.

9           Would you agree or disagree with that

10   quote?

11           MR. MORAN:  Objection.

12           THE WITNESS:  I have no opinion on that

13   quote.

14   BY MR. MCLEOD:

15       Q.  Okay.  When -- at the time Brian was

16   being recruited, was one of the criticisms of

17   Coach Pitino the perception that he did not like

18   one-and-done players?

19       A.  Yes.

20       Q.  And that perception of Coach Pitino was a

21   recruiting disadvantage for the school, was it

22   not?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 164

1          A.  Yes.

2          Q.  For example, Louisville's in-state rival,

3     Kentucky, is fairly well-known for one-and-done

4     recruiting classes, correct?

5          A.  Correct.

6          Q.  And isn't it true, sir, that one of the

7     reasons why Brian was so attracted to Louisville

8     and Adidas was because Pitino wanted to coach a

9     one-and-done player so he could get rid of that

10    public perception?

11         A.  Upon advice of counsel, I'm exercising my

12    Fifth Amendment privilege.

13         Q.  Okay.  Let me first show you -- we've got

14    this marked as Exhibit 17 [sic], which are your

15    text messages.  And they are text messages 137,

16    138, and 139.

17         A.  Is this is in Exhibit 3?

18         Q.  Yes, sir, it is.

19         A.  Okay.  And you said --

20         Q.  I thought they put in all the --

21         MR. MCLEOD:  Did you all put in all the

22    text messages?  Mr. Forbes?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

                                                        Page 165

1              THE WITNESS:  One has -- I mean, it has

2       19 --

3              MR. FORBES:  I don't think so.

4              MR. MCLEOD:  Okay.

5              MR. FORBES:  I mean, I think there are

6       other --

7              MR. MCLEOD:  Okay.

8              MR. FORBES:  There are other text

9       messages as well.

10             MR. MCLEOD:  All right.

11             So we're loaded up now, sir.

12             THE WITNESS:  Exhibit 4?  Okay.  137?

13             MR. MCLEOD:  Give me two seconds, please,

14      sir.

15             THE WITNESS:  Okay.

16             (Johnson Deposition Exhibit 4 marked for

17             identification and attached to the

18             transcript.)

19      BY MR. MCLEOD:

20         Q.  Okay.  So Mr. Johnson, this is Exhibit 4

21      to your deposition.

22             And do you have these text messages up on

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 166

1   your screen?

2        A.  Yes.

3        Q.  And let me first ask you -- I know they

4   asked you earlier -- but the phone number

5   associated with these text messages was, in fact,

6   your phone number back in May of 2017; is that

7   correct?

8        A.  Yes, if you're referring to

9   (301) 326-0616.

10       Q.  Yes, sir.  And did the university or the

11  athletic department pay your phone bill or provide

12  your phone?

13       A.  They gave us a stipend for the phone

14  bill.

15       Q.  Okay.  So a part of your compensation as

16  an assistant coach at Louisville included them

17  paying for your cell phone; is that correct?

18       A.  Yes.

19       Q.  And as far as your compensation goes in

20  general, you had the benefit of being a fairly

21  highly paid assistant coach; is that right?

22       A.  Yes.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 167

1          Q.  And I think your annual salary at the

2     time Brian lost his eligibility was approximately

3     $550,000.  Does that sound right?

4          A.  Yes.

5               MR. MORAN:  Objection.

6     BY MR. MCLEOD:

7          Q.  And I'm not criticizing you at all.

8     Everybody has a right to their own financial

9     affairs.  I just wanted to make sure that the jury

10    understood that you were pretty high up on the

11    food chain at Louisville as it relates to the

12    basketball team; is that right?

13         A.  As far as being on the staff?  Yes.

14         Q.  So there was Rick Pitino, and the person

15    with the next-most seniority within the basketball

16    program was yourself; is that correct?

17         A.  I was there -- if you're talking about

18    basketball coaches, I was there the same amount of

19    time as David Padgett.  If you're talking about

20    basketball staff, he had several members of the

21    staff that had been there many more years than I

22    had.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 168

1        Q.  Well, maybe I didn't ask an artful

2    question.

3              Was there anybody else on the Louisville

4    basketball staff that made -- of course other than

5    Coach Pitino -- that made over a half a million

6    dollars a year?

7        A.  No.

8        Q.  Was there anybody else on Louisville

9    basketball staff or coaching staff that made even

10   close to half a million dollars a year other than

11   yourself and Coach Rick Pitino?

12       A.  Yes, there was.

13       Q.  And would that have been Mr. Padgett?

14       A.  Yes.

15       Q.  Okay.  Were there any other highly

16   compensated members of the Louisville coaching

17   staff other than yourself, Mr. Padgett, and Coach

18   Rick Pitino?

19       A.  I'm not certain how much Jordan Fair made

20   at that time.

21       Q.  Okay.

22       A.  I know that he was compensated well.

Kenneth Laverne Johnson , Jr.                April 14, 2021
Bowen v. Adidas

Page 169

1      Q.  So let's go back to Exhibit 4.  And could

2  you just share with me the -- in general, without

3  reading it yet, what is contained in the far

4  right-hand column as it relates to Brian?

5      A.  I mean, I can tell you what it says.  I

6  don't know what you're asking me.

7      Q.  Is the information contained in the far

8  right-hand column of Exhibit 4 a scouting report

9  on Brian?

10     A.  I was -- so it says to Coach G, which is

11  the strength coach.  So it looks like there's

12  information about Brian that was sent to Coach G.

13     Q.  All right.  If you'll come back down to

14  the second paragraph -- and this is information

15  that you sent to Coach G?

16     A.  Yes.  That's what it says.  Yes.

17     Q.  And with regard to his rankings among

18  America's elite basketball product -- prospects in

19  the class of 2017, please share with us what you

20  communicated to Coach G.

21     A.  Okay.  It says five-star; 27 sports --

22  247 Sports - 18th in the country; Rivals - 20th in

Kenneth Laverne Johnson , Jr.                     April 14, 2021
Bowen v. Adidas

Page 170

1   the country; ESPN - 13th in the country; Scout -
2   18th in the country.
3       Q.  Okay.  And does -- right above what you
4   just read, does it also indicate McDonald's -- he
5   was a McDonald's All American?
6       A.  Played in McDonald American game, Jordan
7   Brand game, Ball is Life game.
8       Q.  Okay.  Now, having looked at Exhibit
9   Number 4 and seeing that you informed Coach G that
10  Brian was a five-star prospect, does that refresh
11  your memory with regard to whether or not he was,
12  in fact, a five-star recruit?
13      A.  Yes.
14      Q.  Now, when you sent this text message to
15  the strength and conditioning coach, did you send
16  this text in your capacity as -- and in the course
17  and scope of your employment with the Louisville
18  men's basketball team?
19          MR. FORBES:  Objection.
20  BY MR. MCLEOD:
21      Q.  This is not -- Mr. Johnson, this is not a
22  trick.

Kenneth Laverne Johnson , Jr.                April 14, 2021
Bowen v. Adidas

Page 171

1      A.  Okay.

2      Q.  You're acting as a coach, and that's why

3   you're sending the text to the strength coach.

4   And if you don't know, don't answer.  But that's

5   the purpose of the question.  My purpose is not to

6   trick you in any way.

7          So when you sent this text to the

8   strength and conditioning coach, did you send this

9   text in the course and scope of your work as a

10  member of the Louisville basketball coaching

11  staff?

12     A.  I don't remember if this was a forwarded

13  text message or if it was a text message that I

14  originated.  But Coach G was a coworker of mine,

15  so I would be sending this text -- I sent this

16  text message to my co-worker.

17     Q.  Okay.  And the text message was on May

18  29th, 2017.

19          Do you see that?

20     A.  Yes.

21     Q.  And was May 29th, 2017, on the eve of

22  Brian's recruiting visit to the University of

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 172

1    Louisville?

2        A.   Upon advice of counsel, I'm exercising my

3    Fifth Amendment privilege.

4        Q.   Okay.   I understand and respect that.

5             Isn't it true, sir, that strength and

6    conditioning was an important aspect of Brian's

7    selection of where to commit his basketball

8    talents and labors during his preparation for the

9    NBA?   Isn't that true?

10           MR. MORAN:   Objection.

11           THE WITNESS:   Upon advice of counsel, I'm

12   exercising my Fifth Amendment privilege.

13   BY MR. MCLEOD:

14       Q.   Okay.   Does it appear from Exhibit

15   Number 4 that you were forwarding the strength and

16   conditioning coach basic information about Brian

17   so that the strength and conditioning coach could

18   be knowledgeable about this particular recruit

19   upon his visit to the school?

20       A.   Upon advice of counsel, I'm exercising my

21   Fifth Amendment privilege.

22       Q.   Yes, sir.   Now, if you'll come down past

Kenneth Laverne Johnson , Jr.                     April 14, 2021
Bowen v. Adidas

Page 173

1    where it talks about the other schools he was

2    considering, could you read for me, please, sir,

3    the words that begin with, "Brian Bowen is a

4    nightmare matchup"?

5        A.   Yes.   "Brian Bowen is a nightmare matchup

6    who consistently completes sequences where he

7    rebounds the ball on the defensive, leads the

8    break, and makes a play for one of his teammates,

9    said La Lumiere head coach Shane Heirman.   His

10   shooting ability is unmatched.   He dominates the

11   glass on both ends of the floor."

12       Q.   And Mr. Johnson, when you forwarded that

13   information along to the strength and conditioning

14   coach, did that information appear to you to be a

15   truthful and accurate assessment with regard to

16   Brian being a nightmare matchup?

17       A.   Information was compiled -- are you

18   asking me if I agree with that assessment of the

19   quote from his head coach?   His high school --

20       Q.   Yes.   Do you agree with the assessment

21   that you forwarded to the strength and

22   conditioning coach on May 29th, 2017?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 174

1      A.   I would use different words, but I
2  definitely believed that he was a good player
3  and -- and he was a versatile player who shot the
4  ball really well and rebounded well for his
5  position.
6      Q.   Yes, sir.
7           And then if you come down to the next
8  paragraph that begins with "Bowen is as skilled as
9  you will find" -- do you see that, sir?
10     A.   Yes.
11     Q.   Could you please read that into the
12 record for us?
13     A.   Yes.   "Bowen is as skilled as you will
14 find for his size and youth.   He can feasibly play
15 any position on the floor other than center.   He
16 is best on the wing, where he can create and
17 score.   Bowen is very talented and has to be
18 considered one of the best freshman in the Midwest
19 if not, the country."
20     Q.   And when you forwarded that assessment of
21 Brian's basketball ability to the strength coach
22 on the eve of Brian's visit to Louisville, did you

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 175

1  have any reason to believe that assessment was

2  inaccurate for any reason?

3       A.  Are you asking me, after reading that

4  quote, do I feel like -- do I agree with what's

5  said?  Is that what you're asking me?  Or are

6  you asking me specifically what you --

7       Q.  Let me ask a better question.

8          Would you have forwarded that information

9  to the strength and conditioning coach if your

10  assessment of Brian's basketball ability differed

11  from that which is contained in this text message,

12  more particularly Exhibit 4?

13      A.  Upon advice of counsel, I'm exercising my

14  Fifth Amendment privilege.

15      Q.  Okay.  Now, while we're on the strength

16  and conditioning, let me ask you, again, isn't it

17  true, sir, that Brian, despite his basketball

18  abilities, was -- had a thin frame?

19      A.  You're asking me did -- okay.

20      Q.  So let me ask a better question.  Brian

21  was 6'7"; is that right?

22      A.  Yes.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 176

1        Q.   And he had a good wingspan; isn't that

2    correct?

3        A.   I believe so.  Yes.

4        Q.   And he had broad shoulders, did he not?

5        A.   I would say so.  Yes.

6        Q.   So he had a frame that, based upon your

7    coaching knowledge, could take additional weight,

8    strength, and muscle; isn't that correct?

9        A.   Yes.

10       Q.   And based upon your basketball knowledge,

11   strength, weight, and muscle is an important

12   development piece for elite prospects preparing

13   for the NBA -- their NBA careers; is that correct?

14       A.   Yes.

15       Q.   Now, Bowen, Sr. actually thanked you once

16   Brian got on campus for scheduling an appointment

17   with Brian to speak to one of the team's

18   nutritionists.

19            Do you remember that?

20       A.   Upon advice of counsel, I'm exercising my

21   Fifth Amendment privilege.

22       Q.   Okay.  Let me show you tab 16, please,

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 177

1    sir.

2         A.   Okay.

3              (Johnson Deposition Exhibit 5 marked for

4              identification and attached to the

5              transcript.)

6              THE WITNESS:   This is tab 18?

7              MR. MCLEOD:   No, sir.   I'm loading up

8    tab 16.

9              THE WITNESS:   There is a new one that

10   popped up that says tab 18.

11             (Johnson Deposition Exhibit 6 marked for

12             identification and attached to the

13             transcript.)

14   BY MR. MCLEOD:

15        Q.   All right.   Mr. Johnson, I believe this

16   is Exhibit 6 to the deposition --

17             MR. MCLEOD:   And madam court reporter,

18   you can correct me if I'm wrong.   Am I correct on

19   that Number 6?

20             THE WITNESS:   I see a 6 now.

21   BY MR. MCLEOD:

22        Q.   Okay.   Now, if you would, please, sir,

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 178

1    scroll down to text message 348.

2              (Discussion off the record.)

3    BY MR. MCLEOD:

4         Q.  Mr. Johnson, do you see text message

5    number 348?

6         A.  Yes.

7         Q.  All right.  And is this a text message

8    that was sent July 21st, 2017, from your phone to

9    Brian's father, Mr. Bowen, Sr.?

10        A.  Yes.

11        Q.  And the date of this text is roughly six

12   weeks after Brian signed a four-year contract with

13   Louisville wherein he committed his basketball

14   labor and services; is that correct?

15             MR. FORBES:  Objection.

16             THE WITNESS:  Upon advice of counsel, I'm

17   exercising my Fifth Amendment privilege.

18   BY MR. MCLEOD:

19        Q.  Okay.  At text message 348, this text

20   message that you sent to Bowen, Sr. on that day

21   states what, please, sir?  If you could read that

22   for the record.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 179

1        A.   "Nutritionist meeting set."

2        Q.   Okay.  And is it true, sir, that in this

3   text message you were letting Brian's father know

4   that you had followed through with setting up an

5   appointment for Brian to meet with a nutritionist

6   once on campus?

7        A.   Upon advice of counsel, I'm exercising my

8   Fifth Amendment privilege.

9        Q.   Okay.  When -- the phone number again

10  associated with this text message was your phone

11  number; is that correct?

12       A.   From 348?

13       Q.   Yes, sir.

14       A.   Yes.

15       Q.   And you sent this text message in your

16  capacity as an assistant basketball coach for the

17  Louisville men's basketball team; is that correct?

18       A.   Yes.  I was...

19       Q.   All right.  If you'll go down to text

20  message 350, please, sir.

21       A.   Okay.

22       Q.   And is this a text message from Brian's

Kenneth Laverne Johnson , Jr.                        April 14, 2021
Bowen v. Adidas

Page 180

1    father to you dated July 21st, 2017?

2         A.   Yes.

3         Q.   And did Bowen, Sr. refer to you sometimes

4    in text messages as Ken?

5         A.   Upon advice of counsel, I'm exercising my

6    Fifth Amendment privilege.

7         Q.   Okay.  Fair enough.

8              Could you read for the record, please,

9    sir, the contents of the text message that

10   Mr. Bowen sent to your phone, which was paid for

11   by the university, on July 21st, 2017, at

12   a.m.?

13        A.   Okay.  It says, on 350 -- it says, "Hey,

14   Ken, thanks a lot.  Because if he gets that

15   nutrition down, his muscles and strength gain will

16   skyrocket."

17        Q.   Okay.  Now, as far as your having worked

18   with youth basketball players and elite basketball

19   players, is consistent physical training an

20   important part of a player's overall development?

21        A.   Yes.

22        Q.   Based upon your work in the AAU circuit

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 181

1    and at elite levels of college basketball, are

2    competitive minutes important to a player's

3    development in preparation for the NBA?

4         A.  Yes.

5         Q.  Based upon your having worked at an elite

6    program in college basketball, is it important for

7    elite prospects like Brian, in preparing for the

8    NBA draft, to have good coaching?

9         A.  Yes.

10        Q.  And Mr. Johnson, is good coaching one of

11   the things that you were good at?

12        A.   In my opinion, yes.

13        Q.  And is it because one of the things that

14   drew you to the coaching profession was helping

15   players reach their maximum potential; is that

16   correct?

17        A.  Yes.

18        Q.  And helping players reach their maximum

19   potential was personally rewarding, wasn't it,

20   sir?  Forget about money.  Just that brought you a

21   level of satisfaction being able to help a player

22   reach his maximum potential; is that correct?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 182

1         A.   Yes.   I believe it to be my purpose.

2         Q.   Okay.   Now, in college basketball, you

3    all are pretty much sticklers when it comes to

4    fundamentals.   Would you agree with that?

5              MR. FORBES:   Objection.

6              THE WITNESS:   Are you asking college

7    basketball in general?   Or --

8    BY MR. MCLEOD:

9         Q.   At Louisville.

10        A.   Yes.   The coaching staff at Louisville

11   under Rick Pitino, yes, we were known as a

12   development program.

13        Q.   For example, I was watching March Madness

14   this year.   Wally Szczerbiak, talking about

15   Coach Pitino, said that he went to Coach Pitino's

16   camp when he was in the eighth grade, and even to

17   this day he still remembers some of the

18   fundamentals that Coach Pitino taught him and that

19   turned him into an NBA player.

20             Is that type of assessment of Coach

21   Pitino by Wally Szczerbiak consistent with what

22   you understood Coach Pitino's reputation to be

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 183

1    with regard to development of elite prospects?

2         A.   Yes.

3         Q.   And is it probably frustrating at times

4    that, when kids get to college, they don't know

5    how to play defense?  Is that right?

6         A.   Yes.

7         Q.   And it was probably frustrating to a

8    certain extent, but when these elite prospects got

9    to college for the first time, they really didn't

10   know how to train, did they?

11        A.   They didn't.

12        Q.   And is part of the importance of

13   preparing for the NBA at elite programs like

14   Louisville getting elite prospects accustomed to

15   consistent rigorous training?

16        A.   Yes.

17        Q.   Because isn't it true, sir, that, for

18   most kids, if not all, this is the first time that

19   they have lived away from home?

20        A.   Yes.

21        Q.   And with any type of development, is it

22   important for players like Brian to develop the

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 184

1    ability to read and watch -- study game film?

2         A.  Yes.

3         Q.  Based upon you having worked in high

4    school basketball and youth basketball, would it

5    be fair to say there's a lot more film study going

6    on at programs like Louisville as compared to your

7    average high school basketball team?

8         A.  Yes.

9         Q.  Now, with regard to fundamentals,

10   offensive and defensive schemes, would it be fair

11   to say that the coaching and preparation elite

12   players like Brian get at places like Louisville

13   is invaluable to their preparation for the NBA?

14            MR. MORAN:  Objection.

15            THE WITNESS:  In my opinion, yeah.

16   BY MR. MCLEOD:

17        Q.  So for example, if you were the head

18   coach of Louisville today and a five-star recruit

19   asked you whether he should play basketball at

20   Louisville or go through the G League, strictly

21   from a basketball preparation standpoint, what

22   would your advice be to that elite prospect?

Kenneth Laverne Johnson , Jr.                                  April 14, 2021
Bowen v. Adidas

Page 185

1              MR. MORAN:   Objection.

2              MR. FORBES:   Objection.

3              THE WITNESS:   That's hard for me to say.

4    I think I would need to know all the factors that

5    are associated with that particular prospect.   I

6    mean, I would love to say I would believe in my

7    personal development skills and the platform that

8    I would have for a player, but it's unfair to say

9    unless I know all the circumstances surrounding

10   that particular student athlete.

11   BY MR. MCLEOD:

12       Q.   Okay.   When programs like Louisville

13   compete with other programs for players like

14   Brian, is it fair to say that free -- you know,

15   traditional economic principles are not at play,

16   i.e., price?

17              MR. FORBES:   Objection.

18              THE WITNESS:   Can you repeat that?   I'm

19   sorry.

20   BY MR. MCLEOD:

21       Q.   Yeah.

22              So when Louisville pitches itself to

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 186

1    elite prospects like Brian, the essential focus of

2    that pitch is related to the basketball services

3    that the school offers; is that right?

4         A.   Basketball is a big part of it.

5         Q.   Okay.  And schools -- unlike in a

6    for-profit setting, schools can't compete with one

7    another with regard to price because the price is

8    capped by the NCAA; isn't that correct?

9              MR. FORBES:  Objection.

10             THE WITNESS:  Are you referring to the

11   tuition?

12   BY MR. MCLEOD:

13        Q.   Yes, sir.

14        A.   The scholarship is -- will cover all

15   room, books, and board.

16        Q.   So in a normal circumstance, consumers

17   make purchasing decisions oftentimes based upon

18   price.  You generally understand and recognize

19   that, don't you?

20        A.   Consumers?

21             MR. FORBES:  Objection.

22

Kenneth Laverne Johnson , Jr.                           April 14, 2021
Bowen v. Adidas

Page 187

1    BY MR. MCLEOD:

2         Q.  I'm sorry, sir?

3         A.  You said consumers?

4         Q.  Yes, sir.

5         A.  Yes.  Price.  I would agree with that.

6         Q.  All right.  And for elite basketball

7    products [sic], the topic of tuition, room, books,

8    and math class, that rarely, if ever, comes up.

9              MR. MORAN:  Objection.

10             THE WITNESS:  Rarely do we -- rarely

11   have, in my experience, have I discussed what the

12   tuition cost is for a high-profile student

13   athlete.

14   BY MR. MCLEOD:

15        Q.  Yes, sir.  And rather, your personal

16   experience has been the topic that is discussed

17   between you, members of Pitino's staff, and that

18   elite prospect relate almost exclusively to

19   basketball; isn't that correct?

20        A.  Yes.

21             MR. MCLEOD:  Okay.  Let's take just a

22   quick break, maybe ten minutes.  I want to make

Page 188

1    sure I've got these exhibits in order and give

2    everybody a chance to use the ladies' or men's

3    room.

4                VIDEO TECHNICIAN:  The time is 2:28 p.m.

5    This ends unit number 3.  We're off the record.

6                (A recess was taken.)

7                VIDEO TECHNICIAN:  The time is 2:45 p.m.

8    This begins unit number 4.  We're on the record.

9                MR. MCLEOD:  Mr. Johnson, are you ready?

10               THE WITNESS:  Yes.

11   BY MR. MCLEOD:

12       Q.  Mr. Johnson, before I turn to Exhibit 5,

13   let me go back real quick and ask you this.

14               Remember when we had talked about the two

15   most important decisions a basketball player makes

16   they make while they're still an amateur?

17               Do you remember that?

18       A.  Yes.

19       Q.  With regard to the second question on

20   when to forgo their NCAA eligibility and go

21   through the draft, what are the deadlines that the

22   NCAA allows college players with regards to

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 189

1    pursuing whether or not they want to go through

2    the draft and when they have to return back to

3    school in order to maintain their eligibility?

4            MR. MORAN:  Object to the form.

5            THE WITNESS:  In my understanding, those

6    deadlines changed this year.  I know they're

7    especially different now that there's a pandemic

8    going on.

9    BY MR. MCLEOD:

10           Q.  Yes, sir.

11           A.  Back in 2017, what I recall was the

12   player had to enter their name into the draft

13   officially with the NBA to let them know that they

14   can be evaluated.  And then there was a deadline

15   of sometime in May -- and I don't know the exact

16   time -- where they would have to determine whether

17   they're going to stay in the draft or return back

18   to school and remove themselves from the draft.

19           Q.  Okay.  So it is your -- it has been your

20   personal knowledge that the NCAA allows a window

21   of time for college players to be evaluated by NBA

22   teams without fully committing themselves to the

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 190

1    draft; is that correct?

2         A.   Yes.

3         Q.   And my understanding of that window of

4    time is generally right after the season in early

5    spring, and the player is allowed to be evaluated

6    and get information, but they must return back to

7    school sometime before June.

8              Does that sound about right to you?

9         A.   Yes.

10        Q.   And that window of time that the NCAA

11   allows is a very important window of time for

12   elite prospects like Brian; is that right?

13        A.   Yes.

14        Q.   And could you share with me, please, sir,

15   why that window of time is so important to an

16   amateur player's decision when and whether to

17   forgo his NCAA eligibility and begin his NBA

18   career?

19        A.   Well, that period of time is usually

20   spent -- a lot of prospects will get invited to

21   try out for the pro teams or go to their workouts

22   so the pro scouts can watch them play and then

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 191

1   give them feedback on where they project their

2   potential draft status to be.

3       Q.  And based upon -- has it been your

4   personal knowledge that, based upon the feedback

5   that these elite college players get, they use

6   that feedback and evaluation to ultimately make

7   decisions whether to begin their NBA career or to

8   stay in school in hopes of improving their stock

9   and their chances of being a first-round

10  selection?

11      A.  Yes.

12      Q.  All right.  Now, for somebody like Brian,

13  isn't it true that trying to find the right

14  basketball fit is a very important component of

15  any elite prospect's decisionmaking process with

16  regard to where to commit his basketball labor and

17  services?

18      A.  In my opinion, yes.

19          MR. MORAN:  Object to form.

20          MR. FORBES:  Objection.

21  BY MR. MCLEOD:

22      Q.  And was it your experience, generally,

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 192

1   that the elite prospects were very selective in

2   ultimately deciding where to commit their

3   eligibility because they wanted to make sure that

4   the particular school was, in fact, a good

5   basketball fit with regard to their preparation

6   and entry into the NBA?

7           MR. FORBES:  Objection.

8           THE WITNESS:  In my experience, yes.

9   BY MR. MCLEOD:

10      Q.  Now, some of the lawyers in this case

11  have insinuated directly and other times

12  indirectly that Brian somehow did something wrong

13  with being patient in the selection process of

14  where to commit his basketball labor and services.

15          Do you remember those questions?

16          MR. MORAN:  Objection.

17          THE WITNESS:  Are you asking me

18  specifically about Brian or about student athletes

19  in general taking their time?

20  BY MR. MCLEOD:

21      Q.  Well, I'm asking you about elite

22  prospects in general.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 193

1        A.   Can you repeat the question for me?

2        Q.   Yes.

3             Are most elite prospects fairly

4    deliberate in making the decision on where to

5    commit their basketball labor and talent?

6             MR. MORAN:   Objection.

7             THE WITNESS:   In my experience, what I

8    found is that the players that are in a position

9    to be selective, they do take their time in

10   selecting a school because they want to make sure

11   that when they go to that particular school, that

12   there is the playing time available that they

13   would be looking for.  And a lot of times they --

14   some of those players are waiting to see if the

15   other prospects that are currently on that team

16   ultimately decide to go pro.

17   BY MR. MCLEOD:

18       Q.   Right.  And so -- actually, in Brian's

19   case, there was one of your players, Donovan

20   Mitchell, that played on the 2016 team; is that

21   right?

22       A.   You're asking me about in Brian's case or

Kenneth Laverne Johnson , Jr.                        April 14, 2021
Bowen v. Adidas

Page 194

1   are you just asking me about Donovan --

2        Q.   No.   Did Donovan Mitchell play on the

3   Louisville Cardinal men's basketball team during

4   the 2016 season?

5        A.   Yes.

6        Q.   And did Donovan Mitchell take advantage

7   of that window of time after the season to be

8   evaluated by NBA teams in order to make a decision

9   whether to remain at Louisville or whether to

10  enter the NBA draft?

11       A.   Yes, he did.

12       Q.   And with regard to Donovan Mitchell, it

13  wasn't until late spring that he ultimately

14  decided to forgo his NCAA eligibility and declare

15  for the draft; isn't that correct?

16       A.   Yes.

17       Q.   And based upon your personal knowledge of

18  having coached Donovan Mitchell, one of the

19  reasons why he chose to declare for the draft at

20  that time was because he was projected to be a

21  first-round pick; is that correct?

22       A.   Yes.   He went into it not knowing where

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 195

1    he would be --

2              MR. FORBES:  Objection.

3              THE WITNESS:  -- but then he ultimately,

4    from my opinion, decided to stay in because he

5    felt like he was going to be a first-round draft

6    pick.

7    BY MR. MCLEOD:

8        Q.   Okay.  And based upon your personal

9    knowledge of having coached Donovan Mitchell, was

10   it your understanding that based upon the feedback

11   and evaluations that he got from NBA teams, that

12   it was his time to go because he believed he would

13   be a first round pick?

14       A.   Yes.

15       Q.   And did Mr. Mitchell end up being the

16   13th selection in that year's NBA draft?

17       A.   Yes.

18       Q.   And with any first-round selection in the

19   NBA draft, does that guarantee the player's

20   salaries for at least two years?

21       A.   Yes.

22       Q.   And under the collective bargaining

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 196

1    agreement with the NBA, does that first-round

2    draft status also give the clubs a third and

3    fourth year one-year option with regard to that

4    initial rookie contract?

5         A.   Yes.

6              MR. FORBES:   Objection.

7    BY MR. MCLEOD:

8         Q.   Now, for some elite players, I would

9    imagine there are some difficulties getting them

10   into school for academic reasons.

11             Have you seen those occasions during the

12   course of your career?

13        A.   Not only with the elite prospects.  But,

14   you know, different student athletes have

15   different challenges.

16        Q.   Yes, sir.  And I don't want to ask you

17   anybody's names.  I just want to know, generally,

18   are there circumstances with basketball players

19   where it is a difficult task getting them admitted

20   into an institution like Louisville for academic

21   reasons?

22        A.   Yeah, I've found that -- it's really

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 197

1    dependent on the individual case-by-case scenario.

2    But there are some student athletes who -- because

3    we're talking about high academic institutions

4    that -- you know, they may not meet the general

5    standards with their grade point average and/or

6    their test scores.  So, you know, they have to

7    make sure that they meet those standards before

8    they would be able to gain admittance to that

9    university.

10        Q.  Yes, sir.  And so for a lot of players,

11   they don't have the benefit of being able to wait

12   to the last minute to commit to a team because the

13   entry into the school takes a lot longer because

14   of academic reasons; is that correct?

15            MR. MORAN:  Objection.

16            MR. FORBES:  Objection.

17            THE WITNESS:  I mean, that's a

18   generalization.  I can't really...

19   BY MR. MCLEOD:

20        Q.  Do you disagree with that generalization?

21        A.  I, personally, don't disagree with that.

22        Q.  Okay.  And in Brian Bowen's case, he had

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 198

1    a good academic record, did he not?

2              MR. MORAN:  Objection.

3              THE WITNESS:  I don't really remember the

4    specifics of --

5    BY MR. MCLEOD:

6         Q.  Okay.  Based upon your personal knowledge

7    of Brian, were there any issues with regard to his

8    academic record, his test scores, and getting him

9    admitted at Louisville University?

10        A.  Upon advice of counsel, I'm exercising my

11   Fifth Amendment privilege.

12        Q.  Okay.  Now, let's go to Exhibit 5,

13   please, sir; in particular text number 156.

14        A.  156?  Okay.

15        Q.  Yes, sir.  Now -- so, again, this is a

16   transcription of text message sent from your phone

17   to Brian, Jr. on September 8, 2016; is that

18   correct?

19        A.  Yes.

20        Q.  And when you sent this text to Brian, you

21   did it in your capacity as a coach for the

22   Louisville basketball team; is that correct?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 199

1          A.  Yes.

2          Q.  And does the transcription of the text

3     message that you forwarded to Brian on that date

4     and at that time fairly and accurately depict

5     the -- the text that you did, in fact, send to

6     him?

7          A.  Yes.

8          Q.  Could you read for the record, please,

9     sir, the main points that you outlined with regard

10    to why Brian should choose Louisville regarding

11    whether Louisville in particular was a good

12    basketball fit for Brian?

13         A.  "The main points are immediate playing

14    time, featured scorer, playing the 2 and 3

15    position.  We have five players 6'10" and bigger,

16    so never the 4.  The fact that he wants to coach a

17    one-and-done so people stop saying he doesn't like

18    them or won't let them be.  Plus scandal being

19    behind us."

20         Q.  Okay.  Now, Mr. Johnson, at the top of

21    it, immediate playing time, was there any doubt in

22    your mind that Brian Bowen would get immediate

Kenneth Laverne Johnson , Jr.                April 14, 2021
Bowen v. Adidas

Page 200

1  playing time as a member of the Louisville men's

2  basketball team?

3       A.  Are you asking about the time that I

4  wrote this text message?

5       Q.  Yes, sir.

6       A.  No, I didn't believe so.

7       Q.  You didn't think there was any issue.

8  This kid was going to come to Louisville, he was

9  going to start, and he was going to be a

10  significant part of the 2017 season's team; is

11  that correct?

12            MR. MORAN:  Objection.

13            THE WITNESS:  On September the 8th, 2016,

14  yes, that's what I believed.

15  BY MR. MCLEOD:

16       Q.  Okay.  Now, the reference in here

17  regarding playing the 2 and the 3 position, for

18  players of Brian's size, at 6'7", are they

19  versatile in that they can play multiple positions

20  on the floor?

21       A.  Yes.  I felt like -- well, I felt like

22  Brian had versatility to play multiple positions.

Kenneth Laverne Johnson , Jr.                April 14, 2021
Bowen v. Adidas

Page 201

1    I think that his rebounding ability would lead to,

2    for a lot of programs, having to play the

3    power forward position, which wouldn't necessarily

4    help him in his ultimate development of being a

5    wing player if he was to have pro potential and

6    aspirations.  I felt like he needed to play more

7    of a guard position than solely be used for his

8    rebounding abilities.

9         Q.  Yes, sir.  And was one of the Brian's

10   concerns that if he went to the wrong program and

11   they tried to make him play the 4 position, that

12   that would inhibit his preparation for the NBA,

13   and is that why he was adamant that he believed he

14   should be a 2 or 3 guard?

15             MR. MORAN:  Objection.

16             THE WITNESS:  I don't -- I don't remember

17   a specific conversation, you know, at that point

18   with Brian about that topic.

19   BY MR. MCLEOD:

20        Q.  Okay.  With regard to your text to him

21   indicating that he would play the 2 or 3 position,

22   was one of the reasons why you told him that he

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 202

1    would play one of the 2 or 3 positions is because

2    of his shooting ability?

3         A.  Yes.

4         Q.  Brian had a pretty good outside shot,

5    didn't he, Mr. Johnson?

6         A.  I felt like he was one of the better

7    prospects in the country shooting the ball.

8         Q.  And when we say one of the better

9    prospects in shooting, he was a natural shooter;

10   is that fair to say?

11            MR. MORAN:  Objection.

12            THE WITNESS:  In my opinion, yes.

13   BY MR. MCLEOD:

14        Q.  Sir?

15        A.  In my opinion, yes.

16        Q.  Okay.  Now, the second part that

17   indicates the fact that he wants to coach a

18   one-and-done so people stop saying he doesn't like

19   them, were you referring to Coach Pitino with

20   those words texted to Brian on September 8, 2016?

21        A.  Yes.

22        Q.  And would it be fair to say, sir, that,

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 203

1    in addition to Brian's basketball abilities, one

2    of the attractions for Coach Pitino was to get

3    this stigma off his back that he didn't like

4    one-and-done players; is that accurate?

5              MR. MORAN:  Objection.

6              THE WITNESS:  That was my opinion.  It's

7    never something that Coach Pitino said to me

8    directly.

9    BY MR. MCLEOD:

10       Q.  I understand.  And that was your opinion

11   based upon being involved in the intensive

12   recruiting battles for the elite prospects across

13   the country; is that correct?

14       A.  Yes.

15       Q.  And in -- being involved in those intense

16   battles for the elite prospects, you came to learn

17   what your competitors were saying about your

18   coach; is that correct?

19       A.  Yes.  In the form of the term "negative

20   recruiting," that was one of the things that they

21   talked about.

22       Q.  Yes, sir.  Now, if you go down to text

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 204

1    message 164, this is a text, again, from -- well,

2    let me ask you.  Is this a text from you to Brian

3    dated July 23rd, 2016, at just after midnight?

4         A.  Is it after midnight East Coast time

5    or -- I don't know what that time is.

6              But yes, I see the text message you're

7    referring to, 164.

8         Q.  Okay.  And did you, in fact, initiate

9    this text to Brian on that date at that time as

10   depicted in Exhibit 5?

11        A.  Yes.

12        Q.  And did you initiate that text in your

13   capacity as an assistant coach for the Louisville

14   men's basketball team?

15        A.  Yes.

16        Q.  Now, it has been argued in this case that

17   Brian might not make the men's basketball team.

18              Do you find that argument to have any

19   merit, or do you find that argument to be wholly

20   without merit?

21              MR. MORAN:  Objection.

22              THE WITNESS:  I need you to repeat --

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 205

1    explain that question.  I didn't really understand

2    what you were saying.

3    BY MR. MCLEOD:

4        Q.  Was there any doubt in your mind at any

5    time during the recruitment of Brian Bowen that he

6    was going to play a substantial role in the team's

7    success the following season?

8        A.  If you're referencing my thoughts from

9    2016, that -- would I -- I don't -- I would have

10   assumed that Brian Bowen would have been a

11   valuable member of the basketball program.

12       Q.  Okay.  And if you would read for the

13   record text 164, please, sir.

14       A.  "Yeah.  We need a featured scorer for

15   next year.  Searching for a potential early entry

16   pro."

17       Q.  All right.  And when you sent that text

18   to Brian, were you referring to Brian as the

19   featured scorer that Louisville was searching for?

20       A.  Yes.

21       Q.  And when you sent that text to Brian in

22   your capacity as assistant basketball coach at

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 206

1   Louisville, did you fully believe at that time

2   that Brian would be an early entry pro?

3        A.   At that time, it would be too early for

4   me to tell.  It was common recruiting language

5   that I may use.  I felt like he had -- with my

6   limited analysis of his game, I felt like he had

7   the potential to be a very good college basketball

8   player who had pro potential --

9        Q.   And --

10       A.   -- but I couldn't --

11       Q.   Would you agree with me, sir, that at the

12  time Brian committed to play for Louisville, it

13  was substantially [sic] certain that at some point

14  he would be drafted in the first round of the NBA

15  draft?

16            MR. MORAN:   Objection.

17            MR. FORBES:   Objection.

18  BY MR. MCLEOD:

19       Q.   You can answer, Mr. Johnson.

20       A.   You're asking me about a period of

21  time -- upon advice of counsel, I'm exercising my

22  Fifth Amendment privilege.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 207

1        Q.   Okay.  Are you familiar with the NBA
2    projection website known as NBADraft.net?
3        A.   Yes.  I've seen it before.
4        Q.   Is it a fairly well -- reputable resource
5    for people within the industry as it relates to
6    the evaluation and a projection of NBA draft
7    picks?
8             MR. MORAN:  Objection.
9             THE WITNESS:  I'm not really well versed
10   on those websites.  In my opinion, I would think
11   that it would be, you know, on par with some of
12   the other sites.
13   BY MR. MCLEOD:
14       Q.   Okay.  And if NBADraft.net projected
15   Brian as the 18th pick in the 2018 NBA draft,
16   would you have any reason to disagree with that
17   projection based upon your personal knowledge of
18   Brian's basketball ability?
19            MR. MORAN:  Objection.
20   BY MR. MCLEOD:
21       Q.   You can answer, sir.
22       A.   That's a hard projection for me to make

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 208

1    based off of their opinion.  I don't know what

2    their basis is, so I don't really -- I can't

3    really give an opinion off of what their --

4         Q.  Well, my question, sir, is whether, based

5    upon your personal knowledge of Brian's basketball

6    ability at the time he committed to Louisville, do

7    you have any reason to disagree with

8    NBADraft.net's projection of Brian as a first

9    round pick --

10             MR. MORAN:  Objection.

11   BY MR. MCLEOD:

12        Q.  -- in the 2018 draft?

13             MR. FORBES:  Objection.

14             THE WITNESS:  I don't know.

15   BY MR. MCLEOD:

16        Q.  You can answer.

17        A.  I'm sorry, I don't know.

18        Q.  Based upon your personal knowledge of

19   Brian, do you have any reason to disagree with

20   that --

21             MR. FORBES:  Objection.  Asked and

22   answered.  Mullins, you've asked the question, I

Kenneth Laverne Johnson , Jr.                        April 14, 2021
Bowen v. Adidas

Page 209

1    think, three or four times now, and he's answered

2    your question.

3    BY MR. MCLEOD:

4        Q.  Mr. Johnson, you can answer.

5        A.  What is the question?

6        Q.  Well, let's go to tab number -- let's

7    see.  We'll get to you talking about, hey -- you

8    know, haters can hate, let's get the popcorn,

9    Final Four.  I'm going to -- you know, we'll go

10   through all that.  Okay?  Let's start with tab 19,

11   Exhibit Number 7.

12           (Johnson Deposition Exhibit 7 marked for

13            identification and attached to the

14            transcript.)

15   BY MR. MCLEOD:

16       Q.  Sometimes I have to ask you to admit the

17   obvious, and if you don't, we've got to go --

18   we've got to do it the long way, we'll do it the

19   long way.

20       A.  So tab --

21       Q.  So Exhibit 17 [sic].

22       A.  Okay.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 210

1        Q.   Text message 166.   Again, is this a text
2    message that you sent to Brian on July 22nd, 2016?
3        A.   Which exhibit?
4        Q.   Exhibit Number 7.   Text message number
5    166.
6        A.   I don't have -- 166.   "You have to admit
7    our style of play fits you.   We encourage our
8    guards to get buckets."
9        Q.   Okay.   Was that a text that you sent to
10   Brian on July 22nd, 2016?
11       A.   Yes.
12       Q.   Did you send that text in your capacity
13   as an assistant coach of Louisville's men's
14   basketball team?
15       A.   Yes.
16       Q.   And did you believe at that time what you
17   indicated in that text?
18       A.   Yes.
19       Q.   Mr. Johnson, isn't it true that, in fact,
20   you stated that it was an honor for Brian to even
21   consider committing his basketball talents and
22   services to the University of Louisville?

Page 211

1          MR. MORAN:  Objection.

2          THE WITNESS:  I don't recall saying that

3     to him in those words.

4          MR. MCLEOD:  All right.  Give me one

5     minute.

6          (Johnson Deposition Exhibit 8 marked for

7          identification and attached to the

8          transcript.)

9     BY MR. MCLEOD:

10         Q.  Let me point your attention, sir, to tab

11    number -- I mean, Exhibit Number 8.

12         A.  Okay.

13         Q.  And Mr. Johnson, do you see text

14    number 109 in Exhibit 8?

15         A.  Yes.

16         Q.  All right.  And is this a text message

17    that you sent in your capacity as assistant coach

18    for the Louisville men's basketball team to

19    Brian's mother on May 25th, 2017?

20         A.  Yes.

21         Q.  And do you remember, sir, that one of the

22    things that you all were concerned about was

Kenneth Laverne Johnson , Jr.                      April 14, 2021
Bowen v. Adidas

Page 212

1    making Brian's mother feel comfortable with

2    Louisville as a destination because of the

3    Strippergate scandal?

4         A.   Upon advice of counsel, I'm exercising my

5    Fifth Amendment privilege.

6         Q.   Okay.  Mr. Johnson, did the Strippergate

7    scandal involve allegations that, from 2010 until

8    2014, Louisville recruits were lured with

9    prostitutes and female dancers?

10        A.   Yes.

11        Q.   And did Strippergate -- did the

12   Strippergate scandal involve allegations that the

13   strippers and the prostitutes were provided in the

14   men's dormitory or in the basketball facility?

15        A.   My understanding about the -- strippers

16   were provided in the dormitory.  I do recall

17   hearing that.  I never heard about them being

18   provided in the men's basketball facility.

19        Q.   Okay.  Do you have any personal knowledge

20   of whether Adidas paid for or provided the

21   strippers or the prostitutes that were involved in

22   the Strippergate scandal at Louisville?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 213

1        A.  I do not have any knowledge of that.

2        Q.  Isn't it true, sir, that Mr. McGee gave

3   out on some occasions 2 and $3,000 in cash during

4   these prostitute and female dancer coordinated

5   events for elite recruits at Louisville?

6        A.  I have no --

7            MR. FORBES:  Objection.

8   BY MR. MCLEOD:

9        Q.  You can answer, sir.

10       A.  I have no knowledge of that.

11       Q.  Would it surprise you if Adidas provided

12  some of the cash needed to provide this rather

13  inappropriate recruiting pitch to young high

14  school kids?  Would that surprise you if Adidas

15  was involved?

16       A.  I don't have an opinion on that.

17       Q.  You don't have a -- you can't tell me

18  that Adidas was not involved in providing the cash

19  for those female exotic dancers or prostitutes,

20  do [sic] you?

21       A.  I cannot.

22       Q.  Now, the Strippergate scandal, based upon

Kenneth Laverne Johnson , Jr.                         April 14, 2021
Bowen v. Adidas

Page 214

1    your personal knowledge, was it first made public

2    sometime in October of 2016?

3         A.   I don't recall exactly when it was first

4    made public.

5         Q.   Okay.  Do you recall that the

6    Strippergate first became public sometime in the

7    calendar year 2016?

8         A.   I don't recall exact -- I don't recall

9    the year or the time when it was made public.

10        Q.   Okay.  If it's been reported that it

11   first became public in 2016, do you have any

12   personal knowledge that would disagree with that

13   date?

14        A.   I don't.

15        Q.   All right.  Could it have been reported

16   earlier, sometime in October of 2015?

17        A.   I don't recall.

18        Q.   Okay.  You do recall, though, sir, that

19   the Strippergate scandal became public while Brian

20   was in high school; isn't that correct?

21        A.   Yes.  That would make sense.

22        Q.   Now, as a result of the Strippergate

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 215

1   scandal at Louisville, Coach Pitino and the

2   university decided to self-report and to take a

3   voluntary reduction in scholarships as a

4   self-administered penalty; is that correct?

5        A.  Yes.

6        Q.  And is the university allowed to provide

7   an elite prospect like Brian a scholarship if it

8   is not -- if it does not have a scholarship to

9   give?

10       A.  No.

11            MR. FORBES:  Objection.

12  BY MR. MCLEOD:

13       Q.  So are scholarships in the competition

14  for elite prospects like Brian a precious

15  commodity at schools like Louisville?

16            MR. MORAN:  Objection.

17            THE WITNESS:  Yes.

18  BY MR. MCLEOD:

19       Q.  And that scholarship is how -- one of the

20  ways that you secure the basketball talent and

21  services of elite prospects like Brian; is that

22  correct?

Kenneth Laverne Johnson , Jr.                                  April 14, 2021
Bowen v. Adidas

                                                    Page 216

1            MR. MORAN:  Objection.

2            THE WITNESS:  Yes.

3    BY MR. MCLEOD:

4        Q.  Now, do you have any personal knowledge

5    of any time after the Strippergate scandal became

6    public when anybody from Adidas came to Louisville

7    and indicated that Adidas was uncomfortable with

8    the corporate relationship with Louisville in

9    light of the prostitutes and the exotic dancers

10   being provided to young top recruits?

11           MR. FORBES:  Objection.

12           THE WITNESS:  Upon advice of counsel, I'm

13   exercising my Fifth Amendment privilege.

14   BY MR. MCLEOD:

15       Q.  Do you -- would it surprise -- well, do

16   you have any knowledge whether Adidas ever let the

17   University of Louisville know that it was

18   uncomfortable for corporate governance or business

19   ethics reasons to be in a contract with the

20   university in light of the Strippergate scandal?

21       A.  Can you repeat that question one more

22   time, please?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 217

1          Q.   Yes, sir.

2              Do you have any personal knowledge of

3      anybody from Adidas ever coming to University of

4      Louisville and indicating any reservations about

5      being -- continued involvement with the university

6      in light of the Strippergate scandal?

7          A.   I don't have any personal knowledge.

8          Q.   Okay.  Because in fact, Adidas, after the

9      Strippergate scandal, renewed their contract with

10     the University of Louisville, did they not?

11         A.   I'm not sure of the dealings with Adidas

12     and Louisville.

13         Q.   Are you generally aware, sir, that

14     sometime after the Strippergate scandal, the

15     for-profit company Adidas entered into a $160

16     million deal with the University of Louisville,

17     which at that time was the fourth largest sports

18     apparel contract in the country?

19             MR. FORBES:  Objection.

20             THE WITNESS:  Yeah, I don't have

21     firsthand knowledge of that.  I -- no, I don't

22     have firsthand knowledge of that deal.

Kenneth Laverne Johnson , Jr.                          April 14, 2021
Bowen v. Adidas

Page 218

1    BY MR. MCLEOD:

2         Q.   Did your salary increase as an assistant

3    coach at Louisville in light of the new contract

4    that Louisville entered into with Adidas?

5         A.   That is not my understanding.

6         Q.   Okay.  Now, going back to tab number 20,

7    and more particularly text message number 109.

8         A.   Okay.

9         Q.   This is a text from you to Carrie; is

10   that correct?

11        A.   Yes.

12        Q.   And could you share with us, please, sir,

13   what you text her on May 25th, 2017, in the leadup

14   to her coming to Louisville campus for Brian's

15   official visit?

16        A.   109?

17        Q.   Yes, sir.

18        A.   "Patience is a virtue.  This will be a

19   memorable story.  I always tell people you may not

20   get who you want, but you always get who you need.

21   It's an honor to even be considered.  Enjoy

22   graduation tomorrow.  That's such a great

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 219

1    accomplishment.  I had one graduate from

2    elementary and one from middle school this week

3    myself."

4         Q.  And Mr. Johnson, does that text

5    message -- the transcription of that text message

6    fairly and accurately depict that which you text

7    Brian's mother on May 25th, 2017?

8         A.  Yes.

9         Q.  And I am assuming, sir, that you would

10   not have indicated anything untruthful to her on

11   purpose, would you?

12        A.  No.

13        Q.  And so you did, in fact, believe, as an

14   assistant coach at University of Louisville, that

15   it was an honor to be considered by Brian as the

16   destination where he would commit his basketball

17   talent and services; is that correct?

18        A.  Yes.

19        Q.  Now, let me turn you to -- this is tab

20   21, so I don't know what exhibit that is.

21             MR. MCLEOD:  We might have to upload this

22   one.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

                                                    Page 220

1              (Johnson Deposition Exhibit 9 marked for

2              identification and attached to the

3              transcript.)

4    BY MR. MCLEOD:

5         Q.   And Mr. Johnson, this is Exhibit 9.  And

6    in particular, sir, if I could turn your attention

7    to text message number 163.

8         A.   Okay.

9         Q.   And again, is this a text message that

10   you sent to Brian's mother on May 26th, 2017?

11        A.   Yes.

12        Q.   And I don't know if you were aware of

13   this, but some of the defendants in this case,

14   even the ones who have pled the Fifth for fear of

15   going to federal prison longer than they already

16   are, have been critical of Brian's mother.

17             Did you share their scorn or criticism of

18   her?

19             MR. MORAN:  Objection.

20             MR. FORBES:  Objection.

21             THE WITNESS:  I don't know what they have

22   said about her.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 221

1   BY MR. MCLEOD:

2       Q.  Okay.  Could you read for the record what

3   you text Carrie on May 26th, 2017?

4       A.  "I'm sure everyone compliments you.  You

5   did such a great job with him.  We may have to get

6   you to adopt a few more, or at least do a seminar

7   on how to raise a young man in today's world."

8       Q.  And Mr. Johnson, you did, in fact,

9   believe that Carrie was a wonderful mother based

10  upon the son that she raised; is that true, sir?

11          MR. MORAN:  Objection.

12          THE WITNESS:  That's what I -- that is

13  what I text messaged her.

14  BY MR. MCLEOD:

15      Q.  Okay.  And Brian is a little bit unique

16  from other elite prospects in that he's a little

17  quiet, isn't he?

18      A.  From what I remember about him, I really

19  don't have an opinion on his personality.

20      Q.  Okay.  Do you recall whether or not Brian

21  was generally shy, despite his basketball talents?

22      A.  I don't.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 222

1        Q.  Now -- okay.  Mr. Johnson, this is going

2   to be Exhibit 10.  I think we're loading it now.

3            (Johnson Deposition Exhibit 10 marked for

4            identification and attached to the

5            transcript.)

6   BY MR. MCLEOD:

7        Q.  And this is Exhibit 10.  And in

8   particular, could you please, sir, go to text

9   message 143.

10           Do you have that up on your screen,

11  please, sir?

12       A.  I do.

13       Q.  All right.  And is this a text message

14  that was sent by you to Brian's father on

15  June 5th, 2017?

16       A.  Yes.

17       Q.  And was this text message sent after

18  Louisville had secured the rights to Brian's

19  basketball talent and labor?

20           MR. MORAN:  Objection.

21           THE WITNESS:  Upon advice of counsel, I'm

22  exercising my Fifth Amendment privilege.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 223

1    BY MR. MCLEOD:

2         Q.   Okay.   Fair enough.

3              Could you read for me, please, sir, what

4    you text Brian's father on June 5th?

5         A.   "Three NBA teams called me about Donovan

6    today.   And guess what?   Half the conversation was

7    about Tugs.   They love how hard he plays."

8         Q.   And is that transcription of that text

9    message that you sent to Brian's father on

10   June 5th, 2017, a fair and accurate depiction of

11   the text that you, in fact, sent?

12        A.   Yes.

13        Q.   And is it true, sir, that at least three

14   NBA teams had called you within one week of Brian

15   signing a four-year contract whereby Louisville

16   secured his basketball labor and talents and

17   inquired about him as an NBA prospect?

18             MR. MORAN:   Objection.

19             MR. FORBES:   Objection.

20             THE WITNESS:   Upon advice of counsel, I'm

21   exercising my Fifth Amendment privilege.

22

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 224

1   BY MR. MCLEOD:

2       Q.   Mr. Johnson, the NBA teams that called

3   you weren't asking about Tugs' ability to perform

4   in the chemistry lab, were they?

5            MR. FORBES:   Objection.

6            THE WITNESS:   Upon advice of counsel, I'm

7   exercising my Fifth Amendment privilege.

8   BY MR. MCLEOD:

9       Q.   Mr. Johnson, the three NBA teams that

10  called you within one week of Brian arriving at

11  Louisville did not inquire about the number of

12  books or which classes he was taking, did they?

13      A.   Upon advice of counsel, I'm exercising my

14  Fifth Amendment privilege.

15      Q.   Okay.   Isn't it true, sir, that at the

16  time that you sent this text on June 5th, 2017, it

17  was substantially certain that Brian Bowen would

18  be a first [sic] pick in the NBA draft, whichever

19  year he elected to forgo his NCAA eligibility;

20  isn't that true, sir?

21           MR. MORAN:   Objection.

22           MR. FORBES:   Objection.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 225

1           THE WITNESS:  Upon advice of counsel, I'm

2    exercising my Fifth Amendment privilege.

3    BY MR. MCLEOD:

4       Q.  Okay.  Now, once he -- from the time that

5    he visited Louisville on May 30th, 2017, until the

6    time that the university secured the rights to his

7    basketball labor and talents, there was a fair

8    amount of angst among the coaching staff whether

9    or not Brian would actually choose Louisville;

10   isn't that correct?

11          MR. FORBES:  Objection.

12          THE WITNESS:  Upon advice of counsel, I'm

13   exercising my Fifth Amendment privilege.

14   BY MR. MCLEOD:

15      Q.  Okay.  Did you indicate during that

16   window of time that you would not be able to sleep

17   until Brian officially chose the University of

18   Louisville?

19          MR. MORAN:  Objection.

20          THE WITNESS:  Upon advice of counsel, I'm

21   exercising my Fifth Amendment privilege.

22          MR. MCLEOD:  Bear with me please, sir.

Kenneth Laverne Johnson , Jr.                          April 14, 2021
Bowen v. Adidas

Page 226

1           THE WITNESS:  No problem.

2           MR. MCLEOD:  I may have to come back to

3    that one.

4           In order to keep us moving, let me point

5    your attention to tab 10.  I'll let you know which

6    exhibit it is.

7           (Johnson Deposition Exhibit 11 marked for

8           identification and attached to the

9           transcript.)

10   BY MR. MCLEOD:

11        Q.  So this is Exhibit 11, sir.

12        A.  Okay.

13        Q.  And again, I hate to keep asking you the

14   same question over, but the rules of evidence

15   require me to do it.

16           Is this a text message -- in particular,

17   text message number 22 -- that was sent by you

18   from your 301 telephone?

19        A.  Yes.

20        Q.  And who did you send this text to on

21   May 25th, 2017?

22        A.  Which line are you --

Page 227

1          Q.   Number 22, please.

2          A.   So it says to Brian, Jr., to Brian, Sr.,

3     and to Carrie.

4          Q.   All right.  And could you share with us,

5     please, sir, what you text to the family on

6     May 25th, 2017, prior to his arrival at

7     Louisville?

8          A.   I text, "We are one star away from a

9     Final Four run.  We have a very good team.  One

10    piece away from being great."

11         Q.   And Mr. Johnson, is what you read for the

12    record a fair and accurate depiction of the text

13    message that you, in fact, sent on May 25th to the

14    Bowen family?

15         A.   Yes.

16         Q.   And Mr. Johnson, in this text message you

17    refer to the team being one star away from a Final

18    Four run.

19              Was the one star you were referring to

20    Brian Bowen?

21         A.   In that text -- yes.

22         Q.   Okay.  And based upon having refreshed

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 228

1   your memory with this text, would you agree with

2   me that it would be rather absurd for anybody to

3   draw the inference from that text that Brian Bowen

4   might not make the men's basketball team at

5   Louisville?

6            MR. MORAN:  Objection.

7            THE WITNESS:  I can't really give you an

8   opinion on what someone would think.

9   BY MR. MCLEOD:

10       Q.  Based upon that text message, do you

11   think there's any way for someone to reasonably

12   conclude from the contents of that text message

13   that Brian Bowen might not make the men's

14   basketball team?

15       A.  In my opinion, no.

16            MR. FORBES:  Objection.

17   BY MR. MCLEOD:

18       Q.  Now -- and Mr. Johnson, one of the

19   reasons why you don't believe it would be

20   reasonable for somebody to draw that conclusion is

21   because you wanted the family to know there was no

22   doubt in your mind that Brian Bowen was that star

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 229

1    to help get Louisville to the Final Four; isn't

2    that correct?

3              MR. MORAN:  Objection.

4              THE WITNESS:  Upon advice of counsel, I'm

5    exercising my Fifth Amendment privilege.

6    BY MR. MCLEOD:

7         Q.  All right.  Let me -- bear with me, I'm

8    sorry.

9              Did you -- as part of helping assure

10   Brian that Louisville was a good basketball fit,

11   did you have Donovan Mitchell reach out to Brian?

12        A.  Upon advice of counsel, I'm exercising my

13   Fifth Amendment privilege.

14        Q.  Isn't it true, sir, that the team did, in

15   fact, ask Donovan Mitchell to reach out to Brian

16   to help persuade him that Louisville was a good

17   basketball fit, considering Donovan Mitchell had

18   officially declared for the draft?

19        A.  Upon advice of counsel, I'm exercising my

20   Fifth Amendment privilege.

21        Q.  Yes, sir.  Now, I'm going to show you tab

22   number 13.  And this will be Exhibit 12, sir.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 230

1           (Johnson Deposition Exhibit 12 marked for

2           identification and attached to the

3           transcript.)

4    BY MR. MCLEOD:

5        Q.  All right.  Mr. Johnson, do you have

6    Exhibit 12 on the screen, sir?

7        A.  Yes.

8        Q.  All right.  And these are text messages,

9    again, from your phone.  And I'll ask you to go to

10   text message 110.

11       A.  Okay.

12       Q.  Now, before I ask you about this text

13   message, do you remember when we visited earlier

14   about the intense recruiting battles that exist

15   and that you've participated in with regard to

16   securing the rights to elite prospects in college

17   basketball?  Do you remember that?

18       A.  Yes.

19           MR. MORAN:  Objection.

20   BY MR. MCLEOD:

21       Q.  Once Brian committed to Louisville and

22   the school secured the rights to his basketball

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 231

1    talents and labor, some schools and fans were

2    upset, were they not?

3              MR. MORAN:  Objection.

4    BY MR. MCLEOD:

5         Q.  Sir?

6         A.  Can you repeat the question?

7         Q.  All right.  Well, let me just -- I'll ask

8    you -- let's look at text message number 111.

9              And is that a text message, sir, that was

10   initiated by you to Bowen, Sr. on June 3rd, 2017?

11        A.  Yes.

12        Q.  All right.  And was that text message

13   sent in your capacity as assistant basketball

14   coach of the Louisville men's basketball team?

15        A.  Yes.

16        Q.  And do the contents of that text message

17   fairly and accurately depict the text message that

18   you, in fact, sent to Brian's father on that date?

19        A.  Yes.

20        Q.  Could you read for me please, sir, and

21   for the record, the contents of that text message?

22        A.  "Kentucky and MSU fans aren't happy."

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 232

1        Q.  All right.  And the MSU fans that you
2    refer to in text message number, 111, are you
3    referring to the Michigan State University fans?
4        A.  Yes.
5        Q.  And why was Kentucky, your in-state
6    rival, upset or unhappy that Louisville secured
7    the rights to Brian's basketball talents and
8    labor?
9             MR. MORAN:  Objection.
10             THE WITNESS:  Upon advice of counsel, I'm
11    exercising my Fifth Amendment privilege.
12    BY MR. MCLEOD:
13        Q.  Why were Michigan State fans in Brian's
14    home state of Michigan unhappy about Louisville
15    securing the rights to Brian's basketball labor
16    and talents?
17             MR. MORAN:  Objection.
18             THE WITNESS:  Upon advice of counsel, I'm
19    exercising my Fifth Amendment privilege.
20    BY MR. MCLEOD:
21        Q.  All right.  If you would, let's go down
22    to 114 in the same exhibit.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 233

1          And before I ask you about this text

2    message, would it be fair to say, sir, that in

3    these intense recruiting battles for our nation's

4    elite basketball prospects, you win some and you

5    lose some?

6          A.   Yes.

7          Q.   And it's no different than sometimes on

8    the court you win games and you lose games.

9          A.   Yes.

10         Q.   And in Brian's case, isn't it true, sir,

11   that the University of Louisville felt like they

12   won by securing the rights to his basketball labor

13   and talents?

14              MR. MORAN:   Objection.

15              MR. FORBES:   Objection.

16              THE WITNESS:   Upon advice of counsel, I'm

17   exercising my Fifth Amendment privilege.

18   BY MR. MCLEOD:

19         Q.   Let's look at text message 114.  And is

20   this a text message that you sent on June 3rd,

21   2017, to Brian's father?

22         A.   Yes.

Kenneth Laverne Johnson , Jr.                          April 14, 2021
Bowen v. Adidas

Page 234

1          Q.   And is it fair to say Brian's father was

2     a little taken back by the negative press people

3     complained about not getting Brian to their

4     school?

5               MR. MORAN:   Objection.

6               THE WITNESS:   I don't know.

7     BY MR. MCLEOD:

8          Q.   Okay.   Read for me, please, sir, what you

9     text Brian's father on that date in your capacity

10    as assistant coach of Louisville men's basketball

11    team.

12         A.   "They scared.   They know what's about to

13    happen.   Get your popcorn ready."

14         Q.   And is that a fair and accurate

15    description of the text message that you, in fact,

16    sent to Brian's father on June 3rd, 2017?

17         A.   Yes.

18         Q.   And Mr. Johnson, when you referred to

19    "get your popcorn ready," were you referring to

20    the deep run that the Louisville men's basketball

21    team was going to make in the upcoming year's NCAA

22    tournament?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 235

1           MR. MORAN:  Objection.

2           THE WITNESS:  I'm not sure what I was

3    referring to exactly at that moment.

4    BY MR. MCLEOD:

5       Q.  Were you referring to get your popcorn

6    ready in order to watch a movie?

7       A.  I'm not sure what I was referring to at

8    that moment.

9       Q.  Were you referring to get your popcorn

10   ready so you could watch a Netflix or some other

11   streaming content on a television?

12      A.  I'm not sure what I was referring to, but

13   I wouldn't assume that that's what I was referring

14   to.

15      Q.  Referring to a deep run in the NCAA

16   tournament for the Louisville men's basketball

17   team in Brian's freshman year, correct?

18           MR. MORAN:  Objection.

19           THE WITNESS:  I'm not sure if that's what

20   I was referring to.

21   BY MR. MCLEOD:

22      Q.  When you indicate in text message 114

Page 236

1    "they are scared," who were you referring to by

2    the words "they"?

3         A.   I'm not sure who specifically I was

4    referring to.

5         Q.   Mr. Johnson, would there be any reason

6    for the University of Louisville, which is

7    considered, by all accounts, one of the winningest

8    programs in NCAA history, to be scared of Brian if

9    he was going to sit the bench?

10             MR. MORAN:  Objection.

11             THE WITNESS:  I don't -- there's a lot of

12   layers to that question.  I don't know.

13   BY MR. MCLEOD:

14        Q.   Based upon your having coached against

15   the University of Kentucky for many years, do you

16   think John Calipari has ever game planned against

17   a player who sits on the bench?

18             MR. MORAN:  Objection.

19             MR. FORBES:  Objection.

20             THE WITNESS:  Not based on my

21   understanding of what -- assumption of what they

22   would be doing; they wouldn't be game planning for

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 237

1    somebody on the bench.

2    BY MR. MCLEOD:

3        Q.  Based upon your coaching at the

4    University of Louisville alongside Rick Pitino, a

5    hall of fame coach, did you all ever game plan for

6    a player who sat the bench?

7            MR. FORBES:  Objection.

8            THE WITNESS:  Are you referring to

9    someone who never ever gets in the game or

10   somebody who's on the roster?

11   BY MR. MCLEOD:

12       Q.  Yeah.  Somebody who never gets in the

13   game.

14       A.  Not traditionally, no.

15       Q.  Right.  And based upon your coaching at

16   Louisville alongside hall of fame coach Rick

17   Pitino, did you ever participate in any game plan

18   where you all drew up defenses for an opposing

19   player who might not even make the squad?

20           MR. MORAN:  Objection.

21           THE WITNESS:  No.

22

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 238

1    BY MR. MCLEOD:

2        Q.  Is it true, though, sir, that in your

3    capacity as an assistant coach at Louisville

4    working alongside Rick Pitino, a hall of fame

5    coach, you all often game planned against an

6    opposing player who was a five-star recruit,

7    McDonald's All American?  Isn't that correct, sir?

8            MR. MORAN:  Objection.

9            THE WITNESS:  Yes.

10   BY MR. MCLEOD:

11       Q.  And was that the case, sir, because in

12   basketball, unlike in sports like football, one

13   out of five players can make a significant

14   difference in the outcome of a game?

15           MR. MORAN:  Objection.

16           THE WITNESS:  Yes.

17   BY MR. MCLEOD:

18       Q.  Have you watched any of the Pelicans

19   games over the last three weeks where they put

20   Zion Williamson at the point position?

21       A.  Yes.

22       Q.  Hasn't the team's success, once they

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 239

1    moved Zion Williamson to the point, increased

2    simply by moving him to a different position?

3         A.   I believe so.  Yes.

4         Q.   And based upon your coaching background

5    and watching those Pelican games, do you believe

6    that one of the reasons for the team's new success

7    is that the ball is in the hands of a former

8    McDonald's All American and five-star recruit

9    named Zion Williamson?

10             MR. MORAN:  Objection.

11             THE WITNESS:  Yes.  In my opinion.

12   BY MR. MCLEOD:

13        Q.   Mr. Johnson, now, do you have -- aside

14   from injury, do you -- can you recall any instance

15   where any college team that you coached for signed

16   a McDonald's All American and a five-star recruit

17   and that player did not make the basketball team?

18   Did that ever happen in your career that you're

19   aware of?

20        A.   Not in my career.

21        Q.   Okay.  Has it been your experience in

22   your career that the McDonald's All Americans and

Kenneth Laverne Johnson , Jr.                        April 14, 2021
Bowen v. Adidas

Page 240

1    five-star recruits are the creme de la creme and

2    they make immediate impacts at the college level

3    in preparation for the NBA?  Has that been your

4    experience, sir?

5              MR. MORAN:  Objection.

6              THE WITNESS:  In my experience, the

7    high-profile recruits contribute.

8    BY MR. MCLEOD:

9         Q.  Immediately.  Isn't that correct, sir?

10             MR. MORAN:  Objection.

11             THE WITNESS:  The majority of them.  Yes.

12   BY MR. MCLEOD:

13        Q.  Now, for Brian's recruiting class at

14   Louisville for 2017, he was the only five-star

15   recruit in that year's class that committed their

16   athletic services and basketball talents; isn't

17   that correct?

18             MR. MORAN:  Objection.

19             THE WITNESS:  Upon advice of counsel, I'm

20   exercising my Fifth Amendment privilege.

21   BY MR. MCLEOD:

22        Q.  Isn't it true, sir, that Brian was one of

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

                                                    Page 241

1   only two five-star recruits on the team

2   considering all classes, freshman through senior,

3   for the 2017 Louisville men's basketball team?

4            MR. FORBES:  Objection.

5            THE WITNESS:  I am not certain.

6   BY MR. MCLEOD:

7       Q.  Isn't it true, sir, that when Brian

8   committed to the University of Louisville, he was

9   at that time the most highly decorated, highly

10  ranked player that Louisville had on its men's

11  basketball team, regardless of class?

12           MR. MORAN:  Objection.

13           MR. FORBES:  Objection.

14           THE WITNESS:  I'm not certain.

15  BY MR. MCLEOD:

16      Q.  Can you share with me, please, sir, any

17  player who was on that Louisville roster who was

18  more highly decorated or was more highly rated

19  than Brian in June 2017?

20      A.  I can't.

21           MR. FORBES:  Objection.

22           MR. MCLEOD:  Do you want to take a five

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 242

1   or ten-minute break, Mr. Johnson, or would you

2   prefer to keep going?

3           THE WITNESS:  I would prefer to keep

4   going.

5           MR. MCLEOD:  Okay.

6           MR. MORAN:  Mullins, let me ask, how much

7   longer do you think you have?  Because it may make

8   sense to take a bathroom break now if you're going

9   to go a while longer.

10          MR. MCLEOD:  Okay.  Let's just take a

11  break.  I don't want this to be an endurance test

12  for anybody.  I'm sorry it's taking longer, but,

13  you know, just -- I've got to do what I've got to

14  do.  So let's take a quick break.

15          MR. MORAN:  And real fast, before we go

16  off the record, can we put on that stip that we

17  talked about on the last break that an objection

18  to form for one is an objection to form for all?

19  Does that work for you?

20          MR. MCLEOD:  Yeah, I don't have a problem

21  with that.

22          MS. BARBIER:  Can I just ask for planning

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 243

1    purposes -- I consent, too.

2            Can I -- this is Debbie.  Can I just ask,

3    for planning purposes who is going to have

4    questions after Mullins, if anybody?

5            MR. MORAN:  This is Wes.  As of now, I do

6    not have any follow-up questions.

7            MS. BARBIER:  Okay.

8            MS. GOODING:  I don't have any.

9            MS. BARBIER:  Just checking.  Thank you.

10           MR. FORBES:  Debbie, I'll probably have a

11   couple -- just a couple of follow-up questions.

12           MS. BARBIER:  Okay.

13           MR. FORBES:  I can go after you.

14           MS. BARBIER:  Thank you, all.

15           VIDEO TECHNICIAN:  The time is 3:49 p.m.

16   This ends unit number 4.  We're off the record.

17           (A recess was taken.)

18           VIDEO TECHNICIAN:  The time is 4:00 p.m.

19   This begins unit number 5.  We're on the record.

20           (Johnson Deposition Exhibit 13 marked for

21           identification and attached to the

22           transcript.)

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 244

1    BY MR. MCLEOD:

2         Q.   Mr. Johnson, I'm going to refer you now

3    to Exhibit 13.   Tab 6.

4              Do you have that up, sir?

5         A.   Yes.

6         Q.   And could you scroll down, please, sir,

7    to text message number 174?

8              Are you there, sir?

9         A.   Yes.

10        Q.   All right.   And this is a text message

11   that was sent by defendant Christian Dawkins,

12   who's already been convicted for this underlying

13   conduct, to you on May 30th, 2017.

14             Do you see that?

15        A.   Yes.

16        Q.   And could you read for us what the text

17   messages that you received stated?

18        A.   174?

19        Q.   Yes, sir.

20        A.   "The goal is to have him back by

21   Thursday.   But going to let him take the night so

22   he thinks he came to the decision by himself."

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 245

1        Q.   Okay.   Mr. Johnson, did you receive that

2   text in your capacity as an assistant basketball

3   coach for the Louisville men's basketball team on

4   May 30th, 2017?

5        A.   Yes.

6        Q.   Now, later that day, at 6:44 p.m., and in

7   particular text number 169, did you send Christian

8   Dawkins a text indicating whether or not you

9   anticipating getting a good night's sleep or being

10  rather restless over the anticipation of the

11  university securing the rights to Brian's

12  basketball talents and labor?

13       A.   169, "I'm not going to sleep until you

14  tell me he is coming."

15       Q.   And was that a text message that you, in

16  fact, sent to Mr. Dawkins on May 30, 2017?

17       A.   Yes.

18       Q.   And did you do so in your capacity as

19  assistant coach of the Louisville men's basketball

20  team?

21       A.   Yes.

22       Q.   Now, isn't it true, sir, that there was

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 246

1    some conversation about enrolling Brian before he

2    made his decision so that he would be stuck and

3    bound by that commitment to University of

4    Louisville?

5              MR. FORBES:  Objection.

6              THE WITNESS:  Upon advice of counsel, I'm

7    exercising my Fifth Amendment privilege.

8              (Johnson Deposition Exhibits 14 and 15

9              marked for identification and attached to

10             the transcript.)

11   BY MR. MCLEOD:

12        Q.  Let me show you Exhibit Number 14.

13        A.  Okay.

14        Q.  And if you would, please, sir, in

15   particular, text message number 151.

16        A.  Uh-huh.

17        Q.  And is this a text message that was sent

18   by you to Christian Dawkins?

19        A.  It says, "Tugs doesn't need to know, but

20   we should get started so he can be admitted."

21        Q.  All right.  And is that a text message

22   that you, in fact, sent on May 31st, 2017, to

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 247

1    defendant Christian Dawkins?

2        A.   Yes.

3        Q.   And does that text -- transcription of

4    that text message fairly and accurately depict

5    what you, in fact, sent Mr. Dawkins?

6        A.   Yes.

7        Q.   Based upon your general knowledge of the

8    NCAA bylaws, once a player is enrolled at a member

9    institution, they are prohibited from playing any

10   intercollegiate sports if they transfer from that

11   institution for at least one year.

12           MR. FORBES:  Objection.

13           THE WITNESS:  I'm not sure I understand.

14   BY MR. MCLEOD:

15       Q.   So let me ask you this:  Once an elite

16   prospect like Brian enrolls at the university,

17   does that secure his eligibility and basketball

18   services by the very fact that he was enrolled?

19           MR. FORBES:  Objection.

20           THE WITNESS:  By enrolling, the student

21   athlete would have to sign documentation enrolling

22   and sign a financial aid agreement.  So I think

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 248

1    it's a lot more than just being admitted to --

2    BY MR. MCLEOD:

3        Q.   Well, if Brian -- if somebody submitted

4    paperwork to the university enrolling him as a

5    student, under NCAA laws, he wouldn't be able to

6    play at any college other than Louisville for the

7    upcoming season; isn't that correct, sir?

8        A.   I don't think someone could submit

9    paperwork enrolling him without his consent.

10       Q.   So what were you referring to, sir, here

11   when you indicated, "Tugs doesn't need to know,

12   but we should get started so he can be admitted."

13       A.   Upon advice of counsel, I'm exercising my

14   Fifth Amendment privilege.

15       Q.   Okay, sir.  Now, with regard to the NCAA

16   bylaws generally, you answered some questions

17   earlier and certainly to the best of your ability;

18   you don't hold yourself out to be an expert on the

19   NCAA bylaws and compliance therewith, do you?

20       A.   No.

21       Q.   And Mr. Johnson, would you defer to the

22   NCAA bylaws with regard to what they mean and

Kenneth Laverne Johnson , Jr.                        April 14, 2021
Bowen v. Adidas

Page 249

1    what, if any, impact they had on Brian's

2    eligibility?

3         A.   Yes.

4         Q.   Now, with regard to Brian's eligibility,

5    isn't it true, sir, that there is a certification

6    process that all student athletes go through prior

7    to being declared eligible to play for an NCAA

8    membership institution?

9         A.   Yes.

10        Q.   And does that process include submitting

11   paperwork to the NCAA clearinghouse and for

12   examinations to be done and for the NCAA to

13   ultimately make a decision whether or not the

14   player is, in fact, eligible for participation in

15   sports or ineligible for participation in sports?

16        A.   Yes.

17        Q.   And sir, is the NCAA the sole governing

18   body with regard to deciding who gets to play and

19   who does not get to play when it comes to

20   eligibility?

21             MR. MORAN:   Objection.

22

Kenneth Laverne Johnson , Jr.                                  April 14, 2021
Bowen v. Adidas

Page 250

```
 1   BY MR. MCLEOD:
 2        Q.  Sir?
 3        A.  To my understanding, yes.
 4        Q.  Okay.  And isn't it true, sir, that the
 5   only reason Brian was unable to play at the
 6   University of Louisville was because of the Adidas
 7   bribery scheme?
 8             MR. FORBES:  Objection.
 9   BY MR. MCLEOD:
10        Q.  Isn't that true, sir?
11        A.  I have no opinion on that.
12        Q.  Did the NCAA declare Brian eligible for
13   participation prior to the Adidas bribery scheme
14   payment being made to his father?
15             MR. MORAN:  Objection.
16             THE WITNESS:  Upon advice of counsel, I'm
17   exercising my Fifth Amendment privilege.
18   BY MR. MCLEOD:
19        Q.  Okay.  You don't have any information
20   today to dispute the fact that the NCAA did, in
21   fact, certify Brian's eligibility prior to the
22   Adidas bribery scheme payment being made, do you?
```

Page 251

1              MR. MORAN:  Objection.

2              MR. FORBES:  Objection.

3              THE WITNESS:  Upon advice of counsel, I'm

4    exercising my Fifth Amendment privilege.

5    BY MR. MCLEOD:

6         Q.  Okay.  And I don't want to go through the

7    bylaws with you chapter and verse, because they'll

8    be admitted into evidence at trial, and I think

9    the court will be able to call balls and strikes

10   on it, but I do want to ask you about one thing

11   because they keep asking about this in these

12   depositions.

13              They asked you about a meeting that you

14   had in Las Vegas.  Do you remember that?

15              MR. FORBES:  Objection.

16              THE WITNESS:  What exactly are you

17   referring to?

18   BY MR. MCLEOD:

19        Q.  Well, let me ask you this:  Under the

20   NCAA bylaws, there are permitted and permissible

21   contact periods wherein colleges can communicate

22   with recruits about their basketball services and

Kenneth Laverne Johnson , Jr.                April 14, 2021
Bowen v. Adidas

Page 252

1    securing their commitments, correct?

2            MR. MORAN:  Objection.

3            MR. FORBES:  Objection.

4            THE WITNESS:  I'd need you to rephrase

5    that for me.

6    BY MR. MCLEOD:

7        Q.  Sure.

8            In the recruiting of a prospective

9    student athlete, are there time periods where it

10   is permissible for coaches like yourself to make

11   contact with recruits?

12       A.  Yes.

13       Q.  Under the NCAA bylaws, are there periods

14   of time wherein coaches like you are prohibited

15   from making contacts with prospective student

16   athletes?

17       A.  Yes.

18       Q.  And isn't it true, sir, that it is up to

19   the university to govern whether or not these

20   permissible contact periods are adhered to?

21           MR. MORAN:  Objection.

22           THE WITNESS:  Yes.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 253

1   BY MR. MCLEOD:

2        Q.   There's nowhere in the NCAA bylaws that

3   you're aware of, sir, that it requires a high

4   school student to be knowledgeable about the

5   permissible contact periods in relation to the

6   impermissible contact periods, is there?

7             MR. FORBES:   Objection.

8             THE WITNESS:   Not that I have seen.

9   BY MR. MCLEOD:

10       Q.   And Mr. Johnson, would it be a fairly

11  ineffective enforcement scheme to rely on a

12  teenager to become knowledgeable about the

13  permissible contact periods and to enforce the

14  permissible contact periods for member

15  institutions that are recruiting him?

16            MR. MORAN:   Objection.

17            MR. FORBES:   Objection.

18            THE WITNESS:   Are you asking my opinion?

19  BY MR. MCLEOD:

20       Q.   Yes, sir.

21            MR. FORBES:   He's asking you to

22  speculate.

Kenneth Laverne Johnson , Jr.                April 14, 2021
Bowen v. Adidas

Page 254

1              THE WITNESS:  I don't really feel

2     comfortable speculating.

3     BY MR. MCLEOD:

4         Q.  All right.  Well, under rule -- bylaw

5     13.1.1.1, isn't it true, sir, that any contact

6     that occurs between a coach like yourself and an

7     elite prospect like Brian is considered an

8     institutional violation only?

9              MR. MORAN:  Objection.

10             THE WITNESS:  I'm not an authority on the

11    NCAA rule book.

12    BY MR. MCLEOD:

13        Q.  All right.  Were you not aware, sir, that

14    if there is impermissible conduct that the NCAA

15    bylaws specifically state on page 10 of the

16    preamble that that impermissible conduct shall

17    have no effect on the prospective student

18    athlete's eligibility to participate in NCAA

19    athletics?

20             MR. MORAN:  Objection.

21             THE WITNESS:  You say was I aware of

22    that?  No.  But I could read the -- you know, if

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 255

1    the situation arose, I could refer back to the

2    rule book to find that information.

3    BY MR. MCLEOD:

4        Q.  So let me read for you how the NCAA

5    defines de minimis violations, and I'll ask you

6    whether or not this comports with your general

7    knowledge of the NCAA bylaws.  On page 10 of the

8    preamble, "Violations of articles designated by

9    capital letter D in brackets and bold

10   front [sic] '[D]' at the end of the legislative

11   language shall be considered institutional

12   violations per constitution 2.8 [sic].  However,

13   the involved prospective student athlete's or

14   student athlete's eligibility shall not be

15   affected."

16           Does that language from the NCAA bylaws

17   comport with your general knowledge on what, if

18   any, repercussions the student athlete receives in

19   any impermissible contact?

20           MR. MORAN:  Objection.

21   BY MR. MCLEOD:

22       Q.  You can answer.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 256

1        A.   Yes.

2        Q.   Okay.  Now, with regard to this AAU stuff

3   that people keep asking about, isn't it true, sir,

4   that nothing that happened during Brian's teenage

5   years had any impact on his NCAA eligibility to

6   play for the University of Louisville, did it?

7             MR. FORBES:  Objection.

8             MR. MORAN:  Objection.

9             THE WITNESS:  I don't know.

10  BY MR. MCLEOD:

11       Q.   Sir?

12       A.   I don't know.

13       Q.   You don't have any personal knowledge of

14  anything that happened during Brian's teenage

15  years having any impact on his eligibility to play

16  at Louisville, do you?

17            MR. MORAN:  Same objection.

18            THE WITNESS:  I don't know what happened

19  during his teenage years.  I don't have any

20  personal information.

21  BY MR. MCLEOD:

22       Q.   Yes, sir.  You have no personal knowledge

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 257

1    of the NCAA ever making any decisions that

2    impacted Brian's eligibility other than the Adidas

3    bribery scheme; isn't that correct?

4            MR. MORAN:  Objection.

5            MR. FORBES:  Objection.

6            THE WITNESS:  Upon advice of counsel, I'm

7    exercising my Fifth Amendment privilege.

8    BY MR. MCLEOD:

9        Q.  Did you know a gentleman named T.J.

10   Gassnola?

11       A.  Upon advice of counsel, I'm exercising my

12   Fifth Amendment privilege.

13       Q.  In dealing with Mr. Gassnola, who worked

14   for Adidas and, in particular, under the direction

15   of Jim Gatto, did you anticipate that the

16   gentleman would be reputable because he worked for

17   Adidas' interest?

18           MR. MORAN:  Objection.

19           THE WITNESS:  Upon advice of counsel, I'm

20   exercising my Fifth Amendment privilege.

21   BY MR. MCLEOD:

22       Q.  Were you aware of the extensive criminal

Kenneth Laverne Johnson , Jr.                          April 14, 2021
Bowen v. Adidas

Page 258

1    record that was reported in the public realm on

2    July 23rd, 2006, regarding Mr. Gassnola's rather

3    prolific criminal history and driver history?

4    Were you aware of that?

5              MR. MORAN:  Objection.

6              MR. FORBES:  Objection.

7              THE WITNESS:  Upon advice of counsel, I'm

8    exercising my Fifth Amendment privilege.

9    BY MR. MCLEOD:

10       Q.  Do you remember -- two seconds.

11           Do you remember a player named Corey

12   Maggette that played for Duke?

13       A.  Corey Maggette?

14       Q.  Maggette.  Yes, sir.  I'm sorry.

15       A.  Yes.

16       Q.  Do you remember a player named Kareem

17   Rush?

18       A.  Yes.

19       Q.  Where did Kareem Rush ultimately play

20   college basketball?

21       A.  I don't know.

22       Q.  Do you remember a player names Korleone

Kenneth Laverne Johnson , Jr.                              April 14, 2021
Bowen v. Adidas

Page 259

1    Young?

2         A.   I'm familiar with that name as well.

3         Q.   Okay.  Were all three of those players

4    considered elite prospects coming out of high

5    school?

6         A.   I believe so.

7         Q.   Okay.  And do you recall that a gentleman

8    by the name of Myron Piggie of Kansas City,

9    Missouri?

10        A.   I'm familiar with that name.

11        Q.   And Mr. Piggie was sentenced to 37 months

12   in prison as it related to $35,000 worth of

13   payments to five teenagers, including Mr. Rush,

14   Mr. Young, and Corey Maggette; isn't that correct?

15        A.   I don't know.

16        Q.   Isn't it true, sir, that that particular

17   circumstance involved substantial sums of money

18   that were paid directly to the players during the

19   summer basketball circuit?

20             MR. FORBES:  Objection.

21             THE WITNESS:  I don't know that story.

22

Kenneth Laverne Johnson , Jr.                              April 14, 2021
Bowen v. Adidas

Page 260

1   BY MR. MCLEOD:

2       Q.  Did you know, sir, that the NCAA found

3   out about those significant moneys received by

4   those elite prospects prior to those prospects

5   being certified as being eligible to participate

6   in NCAA athletics?

7              MR. MORAN:  Objection.

8              MR. FORBES:  Objection.

9              THE WITNESS:  I didn't.

10  BY MR. MCLEOD:

11      Q.  Do you remember, sir, that despite those

12  payments, the penalties assessed by the NCAA

13  against those specific individuals ranged from

14  five to nine-game suspensions and five to

15  nine-game suspensions only?

16             MR. MORAN:  Objection.

17             THE WITNESS:  I didn't know that.

18             MR. FORBES:  Objection.

19  BY MR. MCLEOD:

20      Q.  All right.  Now, with regard to the

21  eligibility certification process, do you think

22  that people who are accused of wrongdoing should

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 261

1    have the ability to be put on notice and argue in

2    their defense?

3        A.  One more time, please.

4            MR. MORAN:  Objection.

5    BY MR. MCLEOD:

6        Q.  Do you think that people who are charged

7    with wrongdoing should have the right to be

8    informed of such and argue in their own defense?

9            MR. MORAN:  Same objection.

10           THE WITNESS:  In reference --

11   BY MR. MCLEOD:

12       Q.  Just generally speaking.

13       A.  Okay.  Last time.  One more time with the

14   question.

15       Q.  Well, let me ask you this:  Do you

16   recognize that Brian Bowen has been significantly

17   harmed by the Adidas bribery scheme?

18           MR. MORAN:  Objection.

19           THE WITNESS:  I don't have an opinion on

20   that.

21   BY MR. MCLEOD:

22       Q.  Would you agree with me, sir, that

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 262

1    Brian's preparation for the NBA draft experienced

2    a significant disruption as a result of the Adidas

3    bribery scheme?

4              MR. MORAN:  Objection.

5              THE WITNESS:  I don't want to speculate.

6    BY MR. MCLEOD:

7         Q.  Are you aware, sir -- well, let me ask

8    you, for elite players preparing to play in the

9    NBA, is it a good thing or a bad thing to be

10   exiled from basketball for 18 months?

11             MR. MORAN:  Objection.

12             THE WITNESS:  I would think that that

13   would be bad.

14   BY MR. MCLEOD:

15        Q.  And would it be -- well, based upon your

16   knowledge as a basketball coach, and more

17   particularly at University of Louisville, would

18   being out of the game of basketball for 18 months

19   have a direct and immediate impact upon your entry

20   into the NBA?

21             MR. MORAN:  Objection.

22

Kenneth Laverne Johnson , Jr.                          April 14, 2021
Bowen v. Adidas

Page 263

1    BY MR. MCLEOD:

2        Q.  Sometimes I have to ask you the obvious,

3    sir.  I'm sorry.

4        A.  Yeah -- if you're not allowed to

5    participate, would that hurt you?  I would say --

6    I would assume that it would.

7        Q.  Yes, sir.

8            And if you're not allowed to have

9    competitive minutes in competitive games, that,

10   too, will have a direct adverse effect on your

11   entry into the NBA; isn't that correct, sir?

12           MR. MCLEOD:  Objection.

13           THE WITNESS:  I would assume potentially,

14   yes.

15   BY MR. MCLEOD:

16       Q.  And that is based upon your having

17   coached in basketball at the highest levels; is

18   that correct?

19       A.  Yeah.  That's where my opinion comes

20   from.

21       Q.  And that -- your assessment is based upon

22   having coached players who were drafted in the

Kenneth Laverne Johnson , Jr.                          April 14, 2021
Bowen v. Adidas

Page 264

1    first round of the NBA draft; is that correct?

2        A.   Yes.   That's been my experience.

3        Q.   And Mr. Johnson, you have gained over the

4    years a significant amount of knowledge and

5    experience with regard to what it takes, from a

6    training and basketball development standpoint, to

7    prepare for the NBA; is that correct?

8             MR. MORAN:   Objection.

9             THE WITNESS:   (No verbal response.)

10   BY MR. MCLEOD:

11       Q.   Now, let me --

12            THE REPORTER:   I'm sorry.   This is

13   Christina.   I didn't actually hear an answer.

14            THE WITNESS:   I didn't give one.

15   BY MR. MCLEOD:

16       Q.   Is your assessment of the impact of not

17   being able to train and play competitive minutes

18   and its adverse effect upon your entry into the

19   draft, is that assessment based upon you and your

20   work as a basketball coach over the years?

21       A.   Yes.   That's my opinion.

22            MR. FORBES:   Objection.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

                                                    Page 265

1   BY MR. MCLEOD:

2        Q.  Let's look at tab number -- Exhibit

3   Number 13, please, sir.  Now, let's go to text

4   message number 180.

5            Do you see that?

6        A.  I do.

7        Q.  All right.  And that's a text message

8   that counsel for Adidas asked you about relating

9   to an Audi.

10           Do you remember those questions?

11       A.  I do.

12       Q.  Isn't it true, sir, that Brian Bowen

13  never owned an Audi at any time he was at the

14  University of Louisville?

15           MR. FORBES:  Objection.

16           THE WITNESS:  Upon advice of counsel, I'm

17  exercising my Fifth Amendment privilege.

18  BY MR. MCLEOD:

19       Q.  Isn't it true, sir, that one way we know

20  that that does not reference an automobile is by

21  the fact that Brian did not have a car while he

22  was at Louisville and participated with the

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 266

1    University of Louisville basketball team?

2        A.   Upon advice of counsel, I'm exercising my

3    Fifth Amendment privilege.

4        Q.   Okay.  You don't have any personal

5    knowledge, sir, of Brian ever owning an

6    automobile, do you?

7        A.   I don't know of his automobile ownership.

8        Q.   Okay.  Now, in your coaching career, have

9    you become familiar with what is generally

10   referred to in the insurance industry as a loss

11   value insurance policy?

12       A.   Yes.

13       Q.   And loss value insurance policies are

14   actually promoted by the NCAA as an inducement for

15   elite players like Brian to spend their year

16   following high school preparing for the NBA in the

17   college ranks; isn't that correct?

18       A.   Yes.

19       Q.   And based upon your having been involved

20   with personally and as a coach, is the fear of

21   injury during their preparation for the NBA a

22   reasonable concern for any elite player?

Kenneth Laverne Johnson , Jr.                April 14, 2021
Bowen v. Adidas

Page 267

1          A.  Yes.

2          Q.  And is that why some players or some

3    universities take out loss value insurance

4    policies on a particular elite prospect?

5          A.  Yes.

6          Q.  So for example, are you generally aware

7    that it's been reported that Zion Williamson,

8    while at Duke University, had in place a loss of

9    value policy in the event that his - in the event

10   that he suffered an injury and his first-round

11   pick fell below number 16 in the draft?

12         A.  Yes.

13         Q.  And isn't it true, sir, that the

14   University of Louisville purchased the exact same

15   type of insurance for Brian Bowen?

16         A.  Upon advice of counsel, I'm exercising my

17   Fifth Amendment privilege.

18         Q.  Okay.  Sir, in text message number 179 at

19   5/30 at 2:47 p.m. --

20         A.  Yes.

21         Q.  -- could you read for the record, sir,

22   what Christian Dawkins texts to you?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 268

1        A.   It says, "I have the quote and paperwork.

2    Just need AD to approve that it's paid for."

3        Q.   And does that indicate there that you

4    read that text message?

5        A.   Yes.

6        Q.   All right.  Based upon your work at

7    University of Louisville, do you have any personal

8    knowledge of the head athletic director ever

9    getting involved in car insurance for any student

10   athlete?

11       A.   No.

12       Q.   In your work with the University of

13   Louisville, do you have any personal knowledge of

14   Lloyd's of London, which is located on another

15   continent, issuing a liability policy in the State

16   of Kentucky with regard to an automobile owned by

17   anyone?

18       A.   No.

19       Q.   In your work with elite prospects at

20   Louisville, have you come to understand that

21   Lloyd's of London is an insurance company that

22   does underwrite and issue policies commonly

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 269

1    referred to as loss of value insurance?

2         A.   Yes.

3         Q.   Is it your understanding, sir, based upon

4    readily available published reports, that Lloyd's

5    of London was the carrier that issued Zion

6    Williamson's policy while he was a freshman at

7    Duke?

8         A.   Yes.

9         Q.   Have you -- I'm assuming you own your own

10   car?

11        A.   Yes.

12        Q.   And you have to have insurance on the

13   car, correct?

14        A.   Yes.

15        Q.   And throughout your personal and

16   professional endeavors, you've had to purchase

17   insurance for a broad range of things; is that

18   correct?

19        A.   Yes.

20        Q.   Based upon your personal knowledge of

21   having purchased insurance products throughout

22   your career, have you come to learn that the

Kenneth Laverne Johnson , Jr.                        April 14, 2021
Bowen v. Adidas

Page 270

1    insurance industry is fairly sophisticated?

2        A.  Yes.

3        Q.  Has it been your personal experience in

4    purchasing insurance products throughout your

5    personal and professional life that the insurance

6    industry is heavily regulated?

7        A.  Yes.

8        Q.  Is it your understanding with loss of

9    use -- loss of value policies that they

10   specifically ensure earnings for the prospective

11   student athlete?

12       A.  One more time.

13       Q.  Is it your understanding of loss of value

14   insurance policies that they ensure the prospect's

15   NBA earnings?

16       A.  Yeah, to a certain percentage, I believe

17   so.

18       Q.  Right.  And is it your understanding of

19   these policies, and the ones that the NCAA

20   promotes, that they are insurable interests?

21   "They" being the NBA earnings.

22       A.  Yes.

Kenneth Laverne Johnson , Jr.                              April 14, 2021
Bowen v. Adidas

Page 271

1        Q.   And those NBA earnings are insured and

2    protected while the elite prospect like Brian is

3    playing college basketball, correct?

4        A.   Yes.

5        Q.   And based upon your having purchased

6    insurance products both personally and

7    professionally, has it been made aware to you that

8    insurance companies do not issue insurance

9    policies that insure against the criminal acts of

10   third parties?

11            MR. FORBES:   Objection.

12            THE WITNESS:   I'm not familiar with that.

13   BY MR. MCLEOD:

14       Q.   Well, let me ask you, based upon your

15   having purchased different insurance products in

16   your personal and professional career, are you

17   aware of any insurance product offered by any

18   carrier anywhere on this continent or any of the

19   other six continents that would protect Brian from

20   the criminal acts of third parties?

21            MR. FORBES:   Objection.

22            THE WITNESS:   I'm not aware of that.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 272

1    BY MR. MCLEOD:

2        Q.   Now, going to text message 177.  Do you

3    see that, sir?

4        A.   I do.

5        Q.   And is that a text message that you sent

6    to Christian Dawkins on May 30th, 2017?

7        A.   Yes.

8        Q.   And did you send that text message, sir,

9    in response to Defendant Dawkins' text message at

10   approximately 44 -- 43 minutes earlier where he

11   told you that he had a quote and the paperwork,

12   just needed the AD to approve that it's paid for?

13           Is that text 177 your response to the

14   text that is shown at 179?

15       A.   It says --

16           MR. FORBES:  Objection.

17           THE WITNESS:  -- "100 percent done.  Tom

18   Jurich."

19   BY MR. MCLEOD:

20       Q.   And that text at 177, that is an accurate

21   transcription of the text that you sent to

22   Mr. Dawkins on May 30th, 2017, correct?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 273

1          A.   Yes.

2          Q.   And tom Jurich was the athletic director

3     at Louisville at that time; is that correct?

4          A.   Yes.

5          Q.   Now, what personal knowledge do you have

6     about Adidas providing Mr. Jurich's daughter a job

7     with the company shortly before or shortly after

8     the $160 million extension was entered into

9     between Adidas and the university?

10         A.   I don't have any knowledge --

11              MR. FORBES:  Objection.

12              THE WITNESS:  I don't have any knowledge

13    of that.

14    BY MR. MCLEOD:

15         Q.   Okay.  And Mr. Forbes asked you earlier

16    about a text that said, Make sure you tell coach

17    about Carrie's Tourette's.

18              Do you remember that?

19         A.   I do.

20         Q.   Were you all worried that somebody was

21    going to pick on her?

22         A.   Upon advice of counsel, I'm exercising my

Kenneth Laverne Johnson , Jr.                                      April 14, 2021
Bowen v. Adidas

Page 274

1  Fifth Amendment privilege.

2      Q.  Well, why do you think Mr. Forbes -- why

3  do you think Adidas' counsel asked you about that?

4          MR. FORBES:  Objection.

5          THE WITNESS:  I don't know.

6  BY MR. MCLEOD:

7      Q.  Do you think if somebody has any type of

8  disability or any type of medical condition, that

9  other people should respect that?

10     A.  Do I think that a medical condition

11 should be respected?

12     Q.  Yes, sir.

13     A.  Yes.

14     Q.  And that is a matter of human decency and

15 dignity, is it not?

16     A.  Yes.

17     Q.  Now, what was the date that you were

18 basically suspended and/or terminated as a

19 basketball coach at Louisville?

20     A.  I don't recall the exact day that I was

21 suspended with pay, but I do recall the day that I

22 was effectively terminated being on or around

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 275

1   November the 23rd.

2        Q.   Of what year, please, sir?

3        A.   2017.

4        Q.   All right.  And when was it that you were

5   hired at La Salle University?  Just roughly.

6        A.   Roughly, May of 2018.

7        Q.   Now, from the time that you were let go

8   at Louisville until May of 2013, did you work

9   extremely hard to find other gainful employment in

10  the coaching profession?

11       A.   Yes.  2018?  Yes.

12       Q.   And during that six-month window --

13  actually, do you have children, sir?

14       A.   I do.

15       Q.   Was that a stressful period of time for

16  you and your family?

17       A.   Yes.

18       Q.   How long were you able to stay at

19  La Salle before you were terminated from that job?

20       A.   Two years.

21       Q.   Okay.  And what was the date of your

22  separation from La Salle?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 276

1        A.   It was approximately May the -- it was

2    May of 2020.

3        Q.   2020?

4        A.   Early May of 2020.

5        Q.   All right.  And from the time you were

6    let go at Louisville until the time you were hired

7    at La Salle, was it difficult to find a job in the

8    coaching profession because of all the media

9    coverage related to the Adidas bribery scheme?

10       A.   Yes.

11            MR. FORBES:  Objection.

12   BY MR. MCLEOD:

13       Q.   Was it difficult for you to explain away

14   all that was reported in the news relating to the

15   Adidas bribery scheme?

16            MR. FORBES:  Objection.

17   BY MR. MCLEOD:

18       Q.   Was that difficult for you?

19       A.   Yes.

20            MR. FORBES:  Objection.

21   BY MR. MCLEOD:

22       Q.   If there were two coaching candidates of

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 277

1    equal credentials, was it your experience that the

2    college would choose the coach that was not

3    implicated or mentioned in the Adidas bribery

4    scheme?

5         A.   They never gave me a full explanation as

6    to why they would choose other candidates.

7         Q.   Do you know whether you will ever be able

8    to get back into the coaching profession?

9         A.   I do not.

10        Q.   Is that an uneasy prospect for you to

11   digest based upon the many years and the level of

12   expertise that you developed in your career?

13        A.   I don't like it.

14        Q.   Have the last two years been difficult on

15   you financially?

16        A.   The last three-and-a-half years.  Yes.

17        Q.   And is it your experience, based upon

18   your own personal situation, that people should

19   have the right to make their own financial

20   decisions and chart their own path in life without

21   being injured by third parties?

22             MR. MORAN:   Objection.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 278

1          MR. FORBES:  Objection.

2          THE WITNESS:  I didn't really understand

3    that question.

4    BY MR. MCLEOD:

5          Q.  Well, when you look back on where you

6    were May 26th, 2017, you were at a very good place

7    in your professional and personal life, were you

8    not?

9          A.  Yes.

10         Q.  Your trajectory in the coaching

11   profession was onward and upward, was it not?

12         A.  Yes.

13         Q.  Is your trajectory in the coaching

14   profession very different today?

15         A.  In regards to being a college basketball

16   coach or coaching at college, yes, it's very

17   different.

18         Q.  And is your trajectory different today as

19   a result of the Adidas bribery scheme?

20         MR. MORAN:  Objection.

21         THE WITNESS:  Upon advice of counsel, I'm

22   exercising my Fifth Amendment privilege.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 279

1    BY MR. MCLEOD:

2        Q.   Okay.   In your dealings with Adidas while

3    you were assistant coach at Louisville, did you

4    find Adidas to be easy to work with or difficult

5    to work with?

6        A.   Upon advice of counsel, I'm exercising my

7    Fifth Amendment privilege.

8        Q.   Based upon your work at Louisville, did

9    Adidas come on campus and assert themselves with

10   pretty much in regard to everything that involved

11   the men's basketball team?

12           MR. FORBES:   Objection.

13           THE WITNESS:   Upon advice of counsel, I'm

14   exercising my Fifth Amendment privilege.

15   BY MR. MCLEOD:

16       Q.   Based upon your having -- working next to

17   Rick Pitino during those years, isn't it true that

18   Coach Pitino became very vocal and concerned about

19   the outside influence that sneaker companies had

20   with regard to college basketball?

21           MR. MORAN:   Objection.

22           MR. FORBES:   Objection.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 280

1            THE WITNESS:   One more time that

2     question.

3     BY MR. MCLEOD:

4          Q.   Yes, sir.

5            During your work alongside Coach Pitino,

6     did you come to understand that Coach Pitino was

7     concerned about the outside influence sneaker

8     companies like Adidas had on college basketball?

9          A.   I think he spoke about that --

10           MR. FORBES:   Objection.

11           THE WITNESS:   -- at a press conference

12     once.

13     BY MR. MCLEOD:

14          Q.   And did you share that concern at that

15     time?

16          A.   I personally did not share that concern.

17          Q.   Okay.   Now, in any employment contract,

18     do you, based upon your personal and professional

19     experience, believe that there should be a level

20     of good faith and fair dealing between the

21     employee and the employer?

22           MR. MORAN:   Objection.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 281

1              THE WITNESS:  Yes.

2    BY MR. MCLEOD:

3        Q.  Did you know that Adidas, in an effort to

4    avoid criminal prosecution of the company, told

5    the United States Department of Justice that, if

6    you prosecute Jim Gatto, that will be enough

7    deterrence and no prosecution against the company

8    will be necessary?

9              Were you aware of that?

10       A.  I wasn't.

11             MR. FORBES:  Objection.

12   BY MR. MCLEOD:

13       Q.  Were you aware, sir, that after Adidas

14   made those representations through their attorneys

15   to the United States Department of Justice, they

16   then worked alongside the Department of Justice in

17   preparing exhibits and documents that were

18   admitted into evidence against Mr. Gatto?  Were

19   you aware of that?

20       A.  I didn't know that.

21             MR. FORBES:  Objection.

22

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 282

1    BY MR. MCLEOD:

2        Q.  Were you aware that, after Adidas made

3    those representations to the Department of

4    Justice, that they worked alongside the Department

5    of Justice, which resulted in Gatto's conviction

6    and, ultimately, federal prison?

7                MR. FORBES:  Objection.

8                THE WITNESS:  I didn't know that.

9    BY MR. MCLEOD:

10       Q.  Now, were you aware that Adidas has

11   agreed to pay -- has been paying Mr. Gatto's legal

12   bills from the very beginning?  Were you aware of

13   that?

14       A.  No, I wasn't.

15       Q.  Did you know that Mr. Gatto's -- that

16   Adidas has spent more than $10 million on

17   attorneys fees for Mr. Gatto just in the criminal

18   case alone?

19               Were you aware of that?

20       A.  I wasn't.

21       Q.  Do you know, sir, whether or not Adidas

22   required of Mr. Gatto that he exercise his Fifth

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 283

1    Amendment privilege and not defend himself in

2    exchange for the $10 million worth of attorneys

3    fees?

4              MR. FORBES:  Objection.

5              THE WITNESS:  I didn't.

6    BY MR. MCLEOD:

7         Q.  Did you know, sir, that during the

8    criminal trial, Adidas specifically spent [sic] a

9    gentleman named Paul Loving to New York to

10   chauffeur Mr. Gatto's family around New York while

11   Mr. Gatto was in the courtroom being prosecuted by

12   the Department of Justice?

13             Were you aware of that?

14        A.  No.

15             MR. FORBES:  Objection.

16   BY MR. MCLEOD:

17        Q.  Were you aware that while Adidas was

18   assisting the Department of Justice in preparing

19   exhibits for the prosecution of its 25-year

20   employee, Mr. Loving at the same time was taking

21   Mr. Gatto's wife out to dinner and assuring her

22   that everything would be okay?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 284

1      A.   No.

2            MR. FORBES:   Objection.   Mullins, I mean,

3      the witness doesn't have personal knowledge of any

4      of this.

5            MR. MCLEOD:   I'm getting ready to ask him

6      a question.

7      BY MR. MCLEOD:

8      Q.   Do you think that it would be fair for a

9      for-profit company to undertake those actions

10     against a 25-year executive like Mr. Gatto?

11           MR. FORBES:   Objection.

12           THE WITNESS:   I don't know how to form an

13     opinion on that.

14     BY MR. MCLEOD:

15     Q.   Does that offend your sense of right and

16     wrong?

17           MR. FORBES:   Objection.

18           THE WITNESS:   I don't feel like I have

19     enough information to make an accurate decision on

20     that.

21     BY MR. MCLEOD:

22     Q.   Have you talked to Mr. Gatto about any

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 285

1    arrangements that he has with Adidas with regard

2    to the defense in either the criminal case or this

3    action?

4         A.   Upon advice of counsel, I'm exercising my

5    Fifth Amendment privilege.

6         Q.   Based upon your involvement with

7    Mr. Gatto while you were a coach at University

8    Louisville, did you ever believe that Mr. Gatto

9    was a peon or low down the totem pole with regard

10   to his job at Adidas?

11             MR. FORBES:  Objection.

12             THE WITNESS:  Upon advice of counsel, I'm

13   exercising my Fifth Amendment privilege.

14   BY MR. MCLEOD:

15        Q.   Rather, Mr. Johnson, did you become aware

16   that Mr. Gatto was the person that Adidas trusted

17   to negotiate multi-million dollar endorsement

18   deals on behalf of the for-profit entity?  Were

19   you aware of that?

20             MR. FORBES:  Objection.

21             THE WITNESS:  I wasn't.

22

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 286

1    BY MR. MCLEOD:

2        Q.   Were you aware that Mr. Gatto was the

3    lead negotiator on behalf of the for-profit

4    company in endorsement deals that exceeded a

5    hundred million dollars?

6        A.   I wasn't.

7            MR. FORBES:   Objection.

8    BY MR. MCLEOD:

9        Q.   Would you let somebody act on your

10   behalf --

11           MS. BARBIER:   Objection.

12   BY MR. MCLEOD:

13       Q.   -- in negotiating a multi-million dollar

14   contract that you did not trust to look out for

15   your best interest?

16       A.   No.

17           MR. FORBES:   Objection.

18           MR. MCLEOD:   Let's take a quick break.  I

19   want to go through these notes, and hopefully

20   we're real close.  Mr. Johnson, I appreciate your

21   patience.

22           VIDEO TECHNICIAN:   The time is 4:45 p.m.

Kenneth Laverne Johnson , Jr.                                        April 14, 2021
Bowen v. Adidas

Page 287

1    We're off the record.

2            (A recess was taken.)

3            VIDEO TECHNICIAN:  The time is 4:54 p.m.

4    This begins unit number 6.  We're on the record.

5    BY MR. MCLEOD:

6        Q.  Mr. Johnson, I've just got a few more

7    questions.  And -- first off, for a lot of student

8    athletes that get scholarships to NCAA schools,

9    the general rule is that the scholarships are

10   given on an annual basis; is that correct?

11       A.  Yes.

12       Q.  And for those one-year scholarships, the

13   way that the bylaws work is that the coach at the

14   end of that year makes a decision whether or not

15   to renew that scholarship or whether or not not to

16   renew the scholarship; is that correct?

17       A.  Yes.

18           MR. MORAN:  Objection.

19   BY MR. MCLEOD:

20       Q.  I'm sorry, sir?

21       A.  Yes.

22       Q.  Okay.  Now, for elite prospects like

Page 288

1    Brian, was it your experience that these top-tier

2    schools would offer them one-year scholarships

3    like, for example, a member of the golf team, or

4    was it your experience that these elite prospects

5    were offered a different deal?

6              MR. MORAN:  Objection.

7              MR. FORBES:  Objection.

8              THE WITNESS:  I think everyone is offered

9    the same one-year scholarship.

10   BY MR. MCLEOD:

11        Q.  Okay.  And do you have any personal

12   knowledge of Rick Pitino or the athletic director

13   ever signing a contract where there was a one-year

14   scholarship offer for any player on the Louisville

15   men's basketball team?

16             Do you have any personal knowledge of

17   that ever occurring?

18        A.  I don't have any personal knowledge.

19        Q.  Okay.  Has it been your understanding,

20   sir, working as a men's basketball coach, in NCAA,

21   that, typically, under the one-year scholarship

22   offer, the document is signed at the financial aid

Kenneth Laverne Johnson , Jr.                              April 14, 2021
Bowen v. Adidas

Page 289

1    department?

2              MR. FORBES:   Objection.  It's ambiguous,

3    Mullins.  Can you --

4              MR. MCLEOD:   Yeah, I'll try to --

5              MR. FORBES:   What financial aid

6    department?

7              MR. MCLEOD:   -- ask a better question.

8    BY MR. MCLEOD:

9         Q.  Has it been your general understanding

10   that for most scholarships for student athletes,

11   the student and his parent signs a document with

12   the financial aid office and that that document is

13   generally referred to as an aid agreement, a

14   grant-in-aid agreement?

15        A.  Yes.

16        Q.  All right.  Now, do you have any

17   knowledge of Rick Pitino, the hall of fame coach,

18   or Tom Jurich, ever having signed on any

19   grant-in-aid agreements for any players at the

20   University of Louisville?

21        A.  I don't know what they signed.

22        Q.  Okay.  Were you aware that the contract

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 290

1    that Brian entered into with Louisville was for a

2    guaranteed four years?  Were you aware of that?

3         A.  Upon advice of counsel, I'm exercising my

4    Fifth Amendment privilege.

5         Q.  Were you aware, sir, on the contract

6    whereby the University of Louisville secured

7    Brian's basketball services and talent, hall of

8    fame coach Rick Pitino's signature is on that

9    document?

10             MR. MORAN:  Objection.

11             MR. FORBES:  Objection.  Misstates the

12   document.

13   BY MR. MCLEOD:

14        Q.  You can answer.

15        A.  Upon advice of counsel, I'm exercising my

16   Fifth Amendment privilege.

17        Q.  Okay.  Sir, were you aware that the

18   contract that Brian entered into with Louisville

19   whereby Louisville secured the rights to Brian's

20   basketball labor and talent was also signed by the

21   athletic director at the university?

22             MR. MORAN:  Objection.

Kenneth Laverne Johnson , Jr.                April 14, 2021
Bowen v. Adidas

Page 291

1            MR. FORBES:  Objection.

2            THE WITNESS:  Upon advice of counsel, I'm

3    exercising my Fifth Amendment privilege.

4    BY MR. MCLEOD:

5        Q.  Okay.  Do you understand as a parent that

6    there can be legal issues with enforcement when a

7    parent purports to sign on behalf of a child who

8    is of majority age?

9            MR. FORBES:  Objection.

10           THE WITNESS:  Am I aware of that?  No.  I

11   mean, I would be speculating.  I haven't had that

12   experience with that.

13   BY MR. MCLEOD:

14       Q.  All right.  I'll come back to that.  Let

15   me show you right now, though, Exhibit Number 14.

16       A.  All right.

17       Q.  Now, Exhibit 14 in particular, the text

18   message at 162.

19           Do you see that?

20       A.  Yes.

21       Q.  And is that text message that you

22   received on May 30 of 2017 in your capacity as

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 292

1   assistant basketball coach at Louisville?

2        A.   Yes.

3        Q.   And based upon that text message, does it

4   indicate that defendant Dawkins is coordinating

5   with Adidas with regard to Brian's visit at the

6   University of Louisville?

7             MR. FORBES:  Objection.

8             THE WITNESS:  It says, "They liked it.  I

9   just need to talk to Adidas when I'm away from

10  them and then get back to them and we should be

11  good."

12  BY MR. MCLEOD:

13       Q.   All right.  Is that an accurate

14  transcription of the text message that you

15  received on May 30th, 2017?

16       A.   Yes.

17       Q.   Now, at text message 161, does defendant

18  Dawkins also indicate to you that he is reporting

19  back to a Mr. Rivers?

20            MR. MORAN:  Objection.  Misstates the

21  text message.

22            THE WITNESS:  The text message says, "I

Kenneth Laverne Johnson , Jr.                April 14, 2021
Bowen v. Adidas

Page 293

1   just sent the text to Rivers that we had a good

2   visit.  We should -- we going to be good, I'm

3   sure.  Let's go."

4   BY MR. MCLEOD:

5        Q.  Based upon your understanding of having

6   been involved in Brian's recruitment, is the

7   Mr. Rivers that is referenced in that text

8   message, in fact, Mr. Rivers who was employed by

9   Adidas?

10       A.  Upon advice of counsel, I'm exercising my

11  Fifth Amendment privilege.

12       Q.  Now, during the -- in the aftermath of

13  the Strippergate, did that pose additional

14  recruiting challenges for the Louisville men's

15  basketball team?

16       A.  Yes.

17       Q.  And in the aftermath of Strippergate, did

18  that jeopardize the school's revenues, considering

19  72 percent of the athletic department's revenues

20  come from the basketball team?

21       A.  I don't want to make an assumption.  I

22  don't know.

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 294

1    Q.  Would it be fair to say, sir, that during

2    the time of Brian's recruitment, the hope and the

3    expectation on behalf of Louisville is that you

4    all had finally gotten clear of the Strippergate

5    scandal?

6          MR. FORBES:  Objection.

7          THE WITNESS:  Can you rephrase that?  I

8    don't really know what you're asking.

9    BY MR. MCLEOD:

10   Q.  Well, tell me, sir, what, if any,

11   challenges you faced, in the aftermath of

12   Strippergate, in recruiting elite prospects to

13   play at the University of Louisville.

14   A.  I personally didn't feel like we had too

15   many challenges other than just explaining what

16   went on during those years.  I think that the

17   program was doing fine as far as being able to

18   recruit players.

19   Q.  For elite prospects like Brian, if a

20   school was under the cloud of investigation, that

21   weighs fairly heavy in their decisionmaking

22   process, does it not?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 295

1              MR. MORAN:  Objection.

2              MR. FORBES:  Objection.

3              THE WITNESS:  It depends on the student

4     athlete.

5     BY MR. MCLEOD:

6        Q.  Well, for example, if Brian committed to

7     University of Louisville and then, after his

8     commitment, Louisville was banned from all

9     post-season play, that would likely affect Brian's

10    basketball development.

11             Would you agree with that?

12             MR. FORBES:  Objection.  It calls for the

13    witness to speculate, Mullins.

14             MR. MCLEOD:  Well, I can actually prove

15    he has personal knowledge of it, Mr. Forbes, if

16    you would just give me five minutes.

17             THE WITNESS:  It would eliminate their

18    opportunity to perform in the NCAA tournament.

19    BY MR. MCLEOD:

20       Q.  And that would upset elite basketball

21    players who are preparing for the NBA by playing

22    at Louisville, correct?

Kenneth Laverne Johnson , Jr.                          April 14, 2021
Bowen v. Adidas

Page 296

1        A.   Upset as in disappoint them?

2        Q.   Yes.

3        A.   Yes, I would assume that they would be

4   disappointed.

5        Q.   For example, in the wake of the

6   Strippergate scandal, didn't Coach Pitino announce

7   that the university was going to institute a

8   self-ban on post-season play during the middle of

9   the season?

10       A.   Yes.

11       Q.   And didn't you all have two transfers

12  that were fairly upset about the fact that they

13  would not be able to play in the NCAA tournament?

14       A.   Yes.

15       Q.   And what were those players' names, sir?

16       A.   Damion Lee and Trey Lewis.

17       Q.   Okay.  And were they upset, sir, based

18  upon your having worked -- been the basketball

19  coach because they were fearful of what negative

20  impact they may suffer by not being able to

21  participate in what is generally referred to as

22  March Madness?

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 297

1           MR. MORAN:  Objection.

2           THE WITNESS:  I mean, that could be a

3   part of it.  I know they were also -- they were

4   upset just in general about being competitors and

5   wanting to play in the NCAA tournament.

6   BY MR. MCLEOD:

7       Q.  Right.  And when they were -- where did

8   they transfer from in to Louisville?

9       A.  Cleveland State, Trey Lewis.  Drexel,

10  Damion Lee.

11      Q.  Okay.  Cleveland State and Drexel?

12      A.  Yes.

13      Q.  Do you know whether Drexel has any

14  corporate affiliation with Adidas?

15      A.  I don't know.

16      Q.  Do you know whether Cleveland State has

17  any corporate affiliation with Adidas?

18      A.  I don't know.

19      Q.  Had they established themselves at their

20  respective schools as elite basketball players

21  prior to transferring to Louisville?

22      A.  I believe -- I guess it just depends on

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 298

1    who's judging it.  I mean, they were both highly

2    sought-after grad transfers.  Damion had at one

3    point in his career led the country in scoring.

4         Q.  And did they come to Louisville because

5    of the basketball services that Louisville offered

6    in preparing them for the NBA?

7         A.  Yes, as well as the opportunity to play

8    in the tournament and at a higher level.

9         Q.  Based upon your personal recollection of

10   that time, was Adidas involved in the discussions

11   prior to Coach Pitino announcing the post-season

12   ban?

13        A.  I don't know.

14            MR. FORBES:  Objection.

15   BY MR. MCLEOD:

16        Q.  Do you have any personal knowledge

17   whether or not Adidas was involved after

18   Coach Pitino announced the post-season ban with

19   regard to either one of those two players?

20        A.  No.

21            MR. FORBES:  Objection.

22

Kenneth Laverne Johnson , Jr.                    April 14, 2021
Bowen v. Adidas

Page 299

1    BY MR. MCLEOD:

2         Q.   Do you know whether the university or

3    anybody at Louisville or Adidas consulted with

4    either one of those players before announcing the

5    post-season ban?

6         A.   No.

7         Q.   Do you think, sir, it would have been

8    fair to the student athlete who transferred to

9    Louisville for its basketball services for you all

10   to have at least consulted with them about what

11   their thoughts were on a post-season ban?

12            MR. FORBES:  Objection.

13            THE WITNESS:  I'm not in that

14   decisionmaking process, so I wouldn't think to

15   have an opinion on that.

16            MR. MCLEOD:  Okay.  I think that's all I

17   have, Mr. Johnson.  And if they have some other

18   questions, if I've missed something, I'll come

19   back to it.  I appreciate your patience, sir.

20            THE WITNESS:  Okay.

21            MR. MORAN:  Matt, I'll go ahead if that's

22   okay with you.  I just have a couple of questions.