UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| BRIAN BOWEN, II, | |
| Plaintiff, | |
| v. | |
| JAMES GATTO, MERL CODE, CHRISTIAN DAWKINS, MUNISH SOOD, THOMAS GASSNOLA, and CHRISTOPHER RIVERS, | |
| Defendants, | |
| and ADIDAS AMERICA, INC., | |
| Defendant-Cross Claimant, | No. 3:18-cv-3118-JFA |
| v. | |
| MUNISH SOOD and THOMAS GASSNOLA, | |
| Defendants-Cross Defendants, | |
| and BRIAN BOWEN, SR., | |
| Cross Defendant. | |

**DEFENDANT-CROSS CLAIMAINT ADIDAS AMERICA, INC.'S
MEMORANDUM IN OPPOSITION TO CROSS DEFENDANT BRIAN BOWEN
SR.'S MOTION FOR SUMMARY JUDGMENT ON RICO CROSSCLAIMS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    I.    Bowen Sr. Participated in a Scheme To Misappropriate adidas Funds in
        Connection with His Son, Bowen Jr., Committing To Attend Louisville .......................... 3

        A.    Bowen Sr. and Dawkins Negotiated Multiple Offers of Cash and Benefits
               To Be Paid to Bowen Sr. Depending on Where Bowen Jr. Attended
               College .................................................................................................................. 3

        B.    Bowen Sr. and Dawkins Negotiated a $100,000 Payment to Bowen Sr. for
               Bowen Jr. To Commit to Louisville, Which Bowen Sr. Accepted ......................... 3

        C.    Code and Gatto Submitted Fraudulent Invoices to adidas Seeking
               Reimbursement of False Expenses in Order To Pay Bowen Sr. .............................. 4

        D.    Because of Delays Processing the Fraudulent Invoice, Dawkins's Business
               Provided Cash for the First Payment to Bowen Sr. ................................................ 6

        E.    In Reliance on the Misrepresentations In the First Fraudulent Invoice,
               adidas Paid the Requested Amount, Which Was Used To Further Pay
               Bowen Sr. and Repay Dawkins's Business ............................................................. 6

        F.    Code and Gatto Submitted a Further Fraudulent Invoice Seeking
               Reimbursement of False Expenses in Order To Pay Bowen Sr., Which
               adidas Paid in Reliance on Their Misrepresentations ............................................ 8

    II.    The U.S. Attorney's Office Announced Charges of Corruption in College
        Basketball, Which Revealed the Misappropriation of adidas Funds ............................... 10

STANDARD OF REVIEW .................................................................................................. 11

ARGUMENT ....................................................................................................................... 11

    I.    The Misappropriation of adidas's Money Constitutes Harm to adidas's Business
        or Property .................................................................................................................... 11

    II.    The Misappropriation of adidas's Money Directly Caused Harm to adidas's
        Business or Property ..................................................................................................... 13

CONCLUSION .................................................................................................................... 16

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................................11

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)................................................................................................................14

*Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)................................................................................................................14

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010)..............................................................................................................13, 14

*Holmes v. Secs. Inv. Protection Corp.*,
503 U.S. 258 (1992)................................................................................................................13

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)................................................................................................................11

*Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*,
884 F.3d 489 (4th Cir. 2018) .................................................................................................14

*United States v. Brien*,
617 F.2d 299 (1st Cir. 1980)..................................................................................................13

*United States v. Colton*,
231 F.3d 890 (4th Cir. 2000) .................................................................................................13

*United States v. Lanier*,
838 F.2d 281 (8th Cir. 1988) .................................................................................................15

*United States v. Maxwell*,
920 F.2d 1028 (D.C. Cir. 1990)..............................................................................................15

*United States v. Mehta*,
594 F.3d 277 (4th Cir. 2010) .................................................................................................15

*United States v. Mouzone*,
687 F.3d 207 (4th Cir. 2012) .................................................................................................16

**STATUTES AND RULES**

18 U.S.C. § 1962(c) ..................................................................................................................15

18 U.S.C. § 1964(c) .............................................................................................................11, 13

Fed. R. Civ. P. 56(a) ..................................................................................................................11

## INTRODUCTION

The Court should deny Cross Defendant Brian Bowen Sr.'s motion for summary judgment on adidas's crossclaims against him under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Bowen Sr.'s motion fails because adidas (unlike Bowen Jr.) has demonstrated statutory standing under RICO. The evidence shows that adidas was the victim of predicate-act wire frauds. Two rogue mid-level employees and two independent contractors of adidas submitted to the company sham invoices with intentional misstatements—as part of a fraudulent scheme involving Bowen Sr. and other family members of amateur basketball players—to misappropriate adidas's funds. The funds that adidas lost are a quintessential "business or property" harm, and the fraud directly caused that harm. This money was obtained under false pretenses and immediately lost to adidas without any intermediate step between the fraud and adidas's loss.

The direct harm to business and property suffered by adidas stands in stark contrast to the attenuated harm that Bowen Jr. has alleged regarding his expectations of future professional basketball career earnings. As set forth in adidas's motion for summary judgment (ECF No. 205), Bowen Jr. lacks standing to pursue RICO claims premised on alleged racketeering, the discovery of which purportedly caused him to not play in the NCAA, which he alleges caused him to not develop his skills as anticipated, which he then alleges caused NBA teams to decline to draft him two years later. As a matter of law, Bowen Jr. had no business or property right in being selected in the NBA draft, and the causal connection between the claimed wrong and his future earnings falls miles short of the standard required to support a claim under RICO. By contrast, adidas's crossclaims allege that its money was stolen when sham invoices were submitted for payment and approved under false pretenses, creating a direct relationship between the predicate acts of wire fraud and the harm suffered.

1

Significantly, Bowen Sr. does not dispute that adidas's lost money is a business or property harm under RICO or that the sham invoices directly caused that harm. Indeed, in rejecting Bowen Sr.'s motion to dismiss adidas's crossclaims, this Court previously held that fraudulently induced payments constitute injury to property and that the misappropriation of adidas's funds was the direct result of the false invoices. (Order Denying Bowen Sr.'s Motion to Dismiss adidas's Crossclaims at 12, 14 ("Order on MTD Crossclaims"), Oct. 23, 2020, ECF No. 159 [Ex. 1].)

Bowen Sr. instead speculates that the adidas employees who authorized payment of the sham invoices must have known of the scheme and that adidas therefore did not have its money misappropriated. He also argues that, because Bowen Sr. did not himself submit the fraudulent invoices, proximate causation is lacking. Both arguments are wrong. First, Bowen Sr. does not (and cannot) establish that the adidas employees who reviewed and approved the sham invoices knew about or were involved in the scheme. To the contrary, these employees unequivocally deny knowledge of the scheme, and the evidence establishes that they were misled by the numerous acts of deception employed in the scheme. (*See* Argument Section I.) Bowen Sr.'s second argument is legally irrelevant because the compensable harm under RICO is the harm caused by the predicate acts, and, regardless of Bowen Sr.'s specific role in the predicate wire-fraud scheme, he has not (and cannot) contend that he did not participate in the scheme. (*See* Argument Section II.) For these reasons, and as explained further below, Bowen Sr.'s motion for summary judgment should be denied.

## BACKGROUND

In its crossclaims, adidas alleges that it was the victim of a scheme perpetrated by two mid-level employees within adidas's sports marketing department (Defendants James Gatto and Chris Rivers), two independent contractors to adidas (Defendant Merl Code and Defendant and

2

Cross Defendant Thomas Gassnola), and the advisors and family members (including Defendant

Christian Dawkins, an aspiring sports agent; his business partner, Defendant and Cross

Defendant Munish Sood; and Bowen Sr.) of certain amateur basketball players to misappropriate

adidas funds to pay those players' families.  For purposes of responding to Bowen Sr.'s motion

for summary judgment on adidas's RICO crossclaims,[1] adidas focuses here on the scheme to

misappropriate adidas funds to pay Bowen Sr. specifically.

I.    **Bowen Sr. Participated in a Scheme To Misappropriate adidas Funds in Connection with His Son, Bowen Jr., Committing To Attend Louisville**

      A.    **Bowen Sr. and Dawkins Negotiated Multiple Offers of Cash and Benefits To Be Paid to Bowen Sr. Depending on Where Bowen Jr. Attended College**

Bowen Sr.'s son, Bowen Jr., was a well-regarded amateur basketball player while in high

school.  (*See* adidas Br. Mot. Summ. J. at 4 and exhibit cited therein.)  Bowen Jr. received offers

of athletic scholarships from many universities, and in connection with at least five of those

schools the Bowen family was offered cash and other benefits.  (*See id.* at 7–8 and exhibits cited

therein; Bowen Sr. Dep. 134:15–19, Jan. 20, 2021 [Ex. 2].)  These offers were negotiated by

Christian Dawkins, an aspiring sports agent who repeatedly gave Bowen Sr. money and other

pecuniary benefits while Bowen Jr. was in high school in order to be Bowen Jr.'s sports

representative.  (*See* adidas Br. Mot. Summ. J. at 5–6 and exhibits cited therein.)

      B.    **Bowen Sr. and Dawkins Negotiated a $100,000 Payment to Bowen Sr. for Bowen Jr. To Commit to Louisville, Which Bowen Sr. Accepted**

In May 2017, Dawkins offered to secure for Bowen Sr. $60,000 to $80,000 if Bowen Jr.

were to commit to Louisville, money that Bowen Sr. understood would be obtained from adidas.

---

[1] In addition to its substantive RICO and conspiracy to violate RICO claims against Bowen Sr. (*see* Crossclaims Counts I and II), adidas also has a claim against Bowen Sr. under Oregon law (*see* Crossclaims Count IV, alleging conspiracy to commit Oregon fraud), on which Bowen Sr.'s motion does not seek judgment.

(*Gatto* Trial Tr. 566:16–19 [Ex. 3] (Bowen Sr. testimony).)   Bowen Sr. and Dawkins later negotiated for the amount to be raised to $100,000, to be paid in four equal installments.  (Bowen Sr. Dep. 164:21–166:16; *Gatto* Trial Tr. 578:7–579:9, 622:20–623:2 (Bowen Sr. testimony).) Dawkins and Bowen Sr. agreed that Bowen Sr. would claim that he received the funds by acting as a "consultant" to adidas, which Bowen Sr. knew was false, as he was not actually a consultant for adidas and had never spoken with anyone at adidas about being a consultant.  (Bowen Sr. Dep. 167:19–169:6; *Gatto* Trial Tr. 580:1–13 (Bowen Sr. testimony).)  When Bowen Sr. spoke with Dawkins about the scheme and other instances of receiving money from Dawkins, Bowen Sr. used a separate phone (which he called his "bat phone") that "wasn't connected to [his] name" because "if you're doing something wrong, you don't want to be connected to your name." (*Gatto* Trial Tr. 606:2–16, 612:17–20 (Bowen Sr. testimony).)

On May 31, 2017, Bowen Sr. accepted the cash offer for Bowen Jr. to attend Louisville. (Text Message from C. Dawkins to TJ Gassnola, June 1, 2017 (12:20 AM) [Ex. 4].)  And in early June 2017, Bowen Jr. enrolled at Louisville.  (Bowen Jr. Dep. 151:10–152:15, Jan. 7, 2021 [Ex. 5]; Bowen Sr. Dep. 162:19–22.)

### C.    Code and Gatto Submitted Fraudulent Invoices to adidas Seeking Reimbursement of False Expenses in Order To Pay Bowen Sr.

After Bowen Jr.'s commitment to Louisville, Code and Gatto submitted fraudulent invoices to adidas seeking amounts they claimed were for travel and consulting fees but were in fact intended to fund payments to Bowen Sr.  In June 2017, Code spoke with Ricky Robertson, with whom Code operated an AAU team sponsored by adidas, the Karolina Khaos.  The Khaos had, earlier in 2017, requested and received reimbursement for $25,000 to cover legitimate travel expenses for the team's tournaments.  (*Gatto* Trial Tr. 1326:18–1327:18, 1337:23–1338:6 (Robertson testimony).)  Travel for AAU teams is a typical expense within adidas's grassroots

4

marketing budget.  (*Gatto* Trial Tr. 1272:1–4 (Harksen testimony).)   In June 2017, Code told

Robertson that the Karolina Khaos would be receiving additional money from adidas without

telling Robertson what the money was for.   (*Gatto* Trial Tr. 1327:19–1328:10 (Robertson

testimony).)

On June 5, 2017, Code emailed Gatto an invoice from the Karolina Khaos for $25,000 to

reimburse "Travel Team Expenses."  (Email from M. Code to J. Gatto, June 5, 2017 [Ex. 6].)

On June 13, 2017, Gatto forwarded the invoice to Trevor Ames, a financial analyst in adidas's

sports marketing department, under the subject "[i]nvoice to process."  (Email from J. Gatto to T.

Ames, June 13, 2017 [Ex. 7]; *Gatto* Trial Tr. 1279:12–18 (Harksen testimony); Ames Dep.

14:18–15:6, Dec. 2, 2020 [Ex. 8].)  On June 19, 2017, Gatto submitted another invoice from the

Karolina Khaos seeking an additional $5,000 for "July Travel Team Expenses."  (Email from J.

Gatto to O. Guidera, June 19, 2017 [Ex. 9].)

On June 22, 2017, Ames emailed Gatto that he could not find the Karolina Khaos in

adidas's approved vendor payment system and would need to "set them up as a vendor" in order

to process the invoices.  (Email from T. Ames to J. Gatto, June 22, 2017 [Ex. 10].)  On July 6,

2017, Code submitted a combined version of the June 8 and June 19 invoices from the Karolina

Khaos, this time seeking $30,000 for "July Travel Team Expenses" and including the Khaos's

adidas vendor number.  (Email from M. Code to O. Guidera, Jul. 6, 2017 [Ex. 11].)  The invoice

was false and was not for actual travel expenses.  (*Gatto* Trial Tr. 1338:7–18; 1339:10–25,

1342:4–6 (Robertson testimony).)  In sending the false invoice, Code also misrepresented that

Robertson "wanted [Code] to pass along the invoice with the Vendor/Customer number

included," when in fact Robertson had not requested the payment.  (*Id.* at 1340:1–11.)

**D.    Because of Delays Processing the Fraudulent Invoice, Dawkins's Business Provided Cash for the First Payment to Bowen Sr.**

The next day, in a call with Dawkins about the planned payments to Bowen Sr., Code complained that adidas was "asking for all th[e]s[e] P.O. numbers and vendor numbers and blah, blah, blah, blah, blah." (Recorded Conversation between M. Code and C. Dawkins at 12, July 7, 2017 [Ex. 12].)  He had to "create a vendor number" and a "purchase order" to induce payment. (*Id.* at 13.)  Meanwhile, Bowen Sr. felt the payment was not coming to him as quickly as he had hoped; he discussed with Dawkins why it was taking so long and understood that the delay was due to "[r]ed tape" with "processing the money." (Bowen Sr. Dep. 169:12–170:13.)

Concerned that circumventing adidas's "processes" and "corporate structure" was taking too long, Code asked Jeff D'Angelo and Sood—business partners of Dawkins at his new agency (though D'Angelo was in fact an FBI agent)—if D'Angelo could loan the funds to make an initial payment to Bowen Sr.  (Recorded Conversation between M. Sood, M. Code, and J. D'Angelo at 1–12, July 10, 2017 [Ex. 13].)  The group agreed, and D'Angelo provided Sood with the necessary funds, which were, unbeknownst to Sood or Dawkins, government funds. (*Id.*)  On July 13, 2017, Sood met Bowen Sr. in a New Jersey parking lot and handed him $19,400 in cash, which Bowen Sr. assumed came from adidas.  (Text Messages between C. Dawkins, M. Sood, and B. Bowen Sr. [Ex. 14]; Bowen Sr. Dep. 170:20–171:8; *Gatto* Trial Tr. 623:3–11 (Bowen Sr. testimony).)

**E.    In Reliance on the Misrepresentations In the First Fraudulent Invoice, adidas Paid the Requested Amount, Which Was Used To Further Pay Bowen Sr. and Repay Dawkins's Business**

In order to fund the initial cash payment and further payments to Bowen Sr., Gatto pressed for payment of the sham invoice he and Code had submitted for $30,000 to the Karolina Khaos.  On July 25, 2017, Gatto emailed Ames the invoice and wrote that he had "been having

6

issues getting this paid," noting that "it has been over a month." (Email from J. Gatto to T. Ames, Jul. 25, 2017 [Ex. 15].) Soon thereafter, the invoice was brought to Ames's boss in adidas's marketing finance department, Lindsay Harksen. (*Gatto* Trial Tr. 1269:21–22, 1279:12–18, 1282:11–13 (Harksen testimony); Harksen Dep. 21:4–13, Nov. 13, 2020 [Ex. 16].)

The role of Harksen and her colleagues who approved invoices was to ensure that the invoice had a vendor number and budget code and that the marketing employee overseeing the expense and submitting it to the finance team for approval—in this instance, Gatto—had signed off. (*Gatto* Trial Tr. 1282:25–1283:4 (Harksen testimony); Harksen Dep. 136:20–25, 231:12–17.) It was the responsibility of the employee submitting the expense to validate that it should be paid, including by requesting and reviewing supporting documentation. (*Gatto* Trial Tr. 1275:5–9, 1280:3–21, 1284:9–12 (Harksen testimony); Harksen Dep. 341:17–342:1.) It was not expected that Harksen or her team would have firsthand knowledge of the particular expenses for which reimbursement was sought. (*Gatto* Trial Tr. 1283:6–23, 1289:9–14 (Harksen testimony); Harksen Dep. 135:23–136:5, 231:23–232:2.) Rather, by approving and submitting the invoice, Gatto represented that he had verified the expense and validated that it needed to be paid. (*Id.*)

In late July 2017, relying on the misrepresentations within the invoice, Harksen approved payment of $30,000 to the Karolina Khaos. (Email from T. Ames to J. Gatto and O. Guidera, Jul. 26, 2017 [Ex. 17] (attaching approved invoice); *Gatto* Trial Tr. 1282:11–13 (Harksen testimony).) When she signed the invoice, Harksen had no knowledge of the scheme to use adidas money to pay Bowen Jr.'s family. (*Gatto* Trial Tr. 1284:13–23 (Harksen testimony).) Had she known that the Khaos had not in fact incurred $30,000 in expenses and that the money would instead be provided to Bowen Sr., she would not have approved the invoice. (*Id.*) After Harksen's approval, Ames responded to Gatto that the Khaos "should be seeing payment soon."

(Email from T. Ames to J. Gatto and O. Guidera, Jul. 26, 2017.) Ames, too, was unaware that the purported reimbursement was in fact being used to pay Bowen Jr.'s family. (Ames Dep. 116:2–8.)

On August 1, 2017, $30,000 in adidas funds were transferred to the Karolina Khaos's South Carolina bank account. (*Gatto* Trial Tr. 1328:14–20, 1332:6–11 (Robertson testimony); Karolina Khaos Wells Fargo Checking Account Statements at 15 [Ex. 18].) Code then directed Robertson to write a check for $25,000 to LOYD Incorporated, Dawkins and Sood's company, and deposit it at LOYD's bank, which Robertson did. (*Gatto* Trial Tr. 1329:3–7, 1332:12–23 (Robertson testimony); Karolina Khaos Account Statements at 15.) Robertson, per Code's instruction, had written on the check that it was for "consulting fees," though LOYD had not provided any consulting work to the Khaos. (*Gatto* Trial Tr. 1334:11–1335:19 (Robertson testimony); Checks from Karolina Khaos to LOYD, Inc. at 1 [Ex. 19].) Robertson texted Code a picture of the receipt confirming the check's deposit, which Code forwarded to Dawkins. (*Gatto* Trial Tr. 1345:15–23, 1346:22–1347:6 (Robertson testimony); Text Messages between M. Code and R. Robertson [Ex. 20]; Text Messages between C. Dawkins and M. Code [Ex. 21].) Robertson also, again at Code's direction, withdrew $5,000 in cash from the Khaos's bank account and gave the money to Code. (*Gatto* Trial Tr. 1332:24–1333:7 (Robertson testimony); Karolina Khaos Account Statements at 15.) Dawkins then provided Bowen Sr. the additional roughly $6,000 needed to complete Bowen Sr.'s first installment of the $100,000 payment. (*Gatto* Trial Tr. 632:3–13 (Bowen Sr. testimony).)

**F.    Code and Gatto Submitted a Further Fraudulent Invoice Seeking Reimbursement of False Expenses in Order To Pay Bowen Sr., Which adidas Paid in Reliance on Their Misrepresentations**

On September 13, 2017, Gatto and Code discussed when to make the next payment to Bowen Sr., and Gatto directed Code to "get the invoice in now." (Recorded Conversation

8

between M. Code and J. Gatto at 15, Sept. 13, 2017 [Ex. 22].)  On September 14, 2017, Code emailed Gatto that, "[p]er our discussion I'm sending over the invoice requested for submission and processing."  (Email from M. Code to J. Gatto at 1, Sept. 14, 2017 [Ex. 23].)  Attached was an invoice requesting reimbursement of $25,000 to the Karolina Khaos for "November Travel Team Expenses."  (*Id.*)  As with the June 2017 Karolina Khaos invoice, this invoice was false and not for actual travel expenses.  (*Gatto* Trial Tr. 1338:7–18; 1342:21–1343:10 (Robertson testimony).)

On September 14, 2017, Gatto approved the false invoice to pay the Karolina Khaos $25,000 and forwarded it "to process."  (Email from J. Gatto to O. Guidera at 1, Sept. 14, 2017 [Ex. 24].)  Relying on the invoice's false statements, adidas paid $25,000 to the Karolina Khaos's bank account on September 20, 2017.  (*Gatto* Trial Tr. 1286:25–1287:2 (Harksen testimony); *id.* at 1333:8–18 (Robertson testimony); Karolina Khaos Account Statements at 18.)  Code then directed Robertson to again issue a check for $25,000 from the Karolina Khaos to LOYD Incorporated and deposit it at LOYD's bank, which Robertson did.  (*Gatto* Trial Tr. 1333:19–1334:1, 1335:20–25 (Robertson testimony); Karolina Khaos Account Statements at 19; Checks from Karolina Khaos to LOYD, Inc. at 2.)  As before, Robertson texted Code a picture of the receipt confirming the check's deposit, which Code forwarded to Dawkins.  (*Gatto* Trial Tr. 1346:15–21, 1347:7–17 (Robertson testimony); Text Messages between R. Robertson and M. Code, Sept. 21, 2017 [Ex. 25]; Metadata of Text Messages between C. Dawkins and M. Code, Sept. 21, 2017 [Ex. 26].)  On September 22, 2017, Dawkins informed Bowen Sr. that another payment would be paid soon, but, before it could be transferred, Code, Dawkins, and Gatto were arrested by federal authorities and Sood and Bowen Sr. were interviewed by the FBI.  (*Gatto* Trial Tr. 632:14–22, 635:3–25 (Bowen Sr. testimony).)

9

II.    **The U.S. Attorney's Office Announced Charges of Corruption in College Basketball, Which Revealed the Misappropriation of adidas Funds**

On September 26, 2017, the U.S. Attorney's Office for the Southern District of New York announced "charges of fraud and corruption in college basketball" against Code, Dawkins, Gatto, and others.  (*See* adidas Br. Mot. Summ. J. at 9 and exhibits cited therein.)  The complaint alleged, among other things, that Code, Dawkins, and Gatto had "worked together to funnel $100,000 from" adidas to the family of "Player-10" on the men's basketball team at "University-6," which journalists soon inferred (correctly) were references to Bowen Jr. and Louisville.  (*Id.*)

The same day, the FBI came to Bowen Sr. to interview him regarding his involvement in the scheme to obtain $100,000 for Bowen Jr. to attend Louisville.  (*Gatto* Trial Tr. 522:15–523:4, 597:7–10 (Bowen Sr. testimony).)  At the interview, Bowen Sr. told multiple confessed lies, including denying knowledge about the scheme to pay him $100,000 for Bowen Jr. to commit to Louisville, denying that Louisville's assistant coach had also given Bowen Sr. money, and denying receiving money and benefits from Dawkins while Bowen Jr. was in high school. (*Id.* at 523:21–23, 598:5–13, 599:2–600:1.)  Bowen Sr. also threw away his second phone—the "bat phone"—after the FBI interviewed him and gave him a subpoena for his communications with Dawkins.  (*Gatto* Trial Tr. 606:25–607:14 (Bowen Sr. testimony); Bowen Sr. Dep. 229:15–230:6, 299:23–300:21.)

Later, Bowen Sr. entered into a non-prosecution agreement, in which the government agreed to not prosecute Bowen Sr. for his involvement in the scheme in return for various commitments, including providing truthful trial testimony.  (Gatto Trial Tr. 602:3–603:17 (Bowen Sr. testimony); Bowen Sr. Non-Prosecution Agreement [Ex. 27].)  Gatto was the only adidas employee charged, and Harksen testified for the government at the trial of Code, Dawkins, and Gatto.

**STANDARD OF REVIEW**

Summary judgment is warranted when a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect the outcome under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence presented is such that a reasonable jury may return a verdict for the non-movant. *Id.* at 248.

**ARGUMENT**

RICO provides a civil cause of action only to persons "injured in [their] business or property by reason of a violation of [the RICO statute]." 18 U.S.C. § 1964(c). This statutory standing requirement includes both an injury component, mandating that claimed injuries be to "business or property," and a causation component, requiring that claimed injuries occur "by reason of" the RICO violation. *Id.* Although these are strict limitations on the categories of claimed injuries that warrant treble damages and attorney's fees under RICO, adidas's RICO claims against Bowen Sr. satisfy both.

**I.      The Misappropriation of adidas's Money Constitutes Harm to adidas's Business or Property**

The misappropriation of adidas's money is a quintessential harm to "business or property." *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (interpreting similar language in the Clayton Act and explaining that "[w]hen a commercial enterprise suffers a loss of money it suffers an injury in both its 'business' and its 'property'"). Indeed, this Court previously concluded that "[f]raudulently induced payments are sufficient to constitute an injury pursuant to RICO's requirement that the plaintiff be 'injured in his . . . property.'" (Order on MTD Crossclaims at 12 (quoting 18 U.S.C. § 1964(c)).)

11

Bowen Sr. nevertheless contends that adidas cannot claim injury from the misappropriated funds because its employees who approved the false invoices must have known of the scheme (Bowen Sr. Br. at 7–8), ignoring their unequivocal testimony to the contrary. Harksen and Ames, the two individuals within adidas's finance department who approved payment of the false invoices used to pay Bowen Sr., both affirmed that they had no knowledge of the scheme and no idea that the invoices were not for legitimate expenses. (*See Gatto* Trial Tr. 1284:13–23 (Harksen testimony); Harksen Dep. 329:17–330:8; Ames Dep. 116:2–8.) Others within adidas who approved false invoices used by the scheme to pay the families of other amateur players have likewise denied all knowledge of the scheme. (Armstrong Dep. 270:8–22, Mar. 26, 2021 [Ex. 28]; McGuire Dep. 235:14–236:2, 299:22–300:1, Dec. 8, 2020 [Ex. 29].)

Bowen Sr.'s contention also overlooks the myriad steps taken by Gatto, Code, Dawkins, and Bowen Sr. to disguise their scheme. Bowen Sr. used a second phone, unconnected to him, to discuss the plan with Dawkins; he agreed to state falsely that he earned the money as a "consultant" to adidas; and he received the payments in cash. The payments to Bowen Sr. were sent to an AAU team, then to Dawkins, and only then to Bowen Sr. The invoices Code produced to misappropriate adidas's funds hid their true purpose, falsely stating that they were reimbursement for the AAU team's expenses.

Bowen Sr. claims "strong evidence" that Harksen, Ames, and others within adidas knew of the scheme because they did not "attempt[] to validate the expenditure[s]" when they approved the sham invoices for payment. (Bowen Sr. Br. at 3–5, 8.) But Bowen Sr. ignores that when Gatto (or Rivers, in some instances not involving Bowen Sr.) approved the invoices for payment, he falsely represented to others within adidas that he had verified the expense, including any supporting documentation, and validated that it was legitimate. (*Gatto* Trial Tr.

12

1275:5–9, 1280:3–21, 1284:9–12 (Harksen testimony); Harksen Dep. 341:17–342:1.)  It was not expected that Harksen, Ames, or their supervisors would undertake that review or have firsthand knowledge of the expenses.  (*Id.*; *see also Gatto* Trial Tr. 1283:6–23, 1289:9–14 (Harksen testimony); Harksen Dep. 135:23–136:5, 231:23–232:2.)  And to the extent Bowen Sr. argues that Harksen and others *should* have discovered the fraud, that is no defense to wire fraud.  *See United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) (explaining that "[t]he susceptibility of the victim of the fraud . . . is irrelevant" and "'it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical'" (quoting *United States v. Brien*, 617 F.2d 299, 311 (1st Cir. 1980))).

The testimony of adidas employees denying knowledge of the scheme, together with the scheme's multiple layers of deception, is overwhelming evidence that, aside from Gatto and Rivers, adidas employees in fact had no knowledge of the scheme.  Bowen Sr.'s speculation based on those employees not undertaking proactive efforts to root out a fraud they did not know existed is no basis to infer actual knowledge.  And even if the evidence did not clearly show that they lacked knowledge of the scheme (as it does), at best that is a dispute of fact that precludes granting Bowen Sr.'s motion for summary judgment.

Bowen Sr. further contends that adidas has not provided evidence of loss "specifically because of Bowen Sr." (Bowen Sr. Br. at 8), but that is the same erroneous assertion that Bowen Sr. makes with respect to causation, which is addressed in the following section.

## II.    The Misappropriation of adidas's Money Directly Caused Harm to adidas's Business or Property

Section 1964(c)'s "by reason of" language requires a RICO plaintiff to "show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.'"  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes v.*

13

*Secs. Inv. Protection Corp.*, 503 U.S. 258, 268 (1992)).  Proximate cause under RICO "requires a proximity of statutory violation and injury such that the injury is sequentially the direct result—generally at 'the first step' in the chain of causation."  *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 494 (4th Cir. 2018) (citing *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983)).

Bowen Sr. initially argues that he should not be liable for frauds taken with respect to other amateur basketball players' families, but the point is moot.  As Bowen Sr. notes (*see* Bowen Sr. Br. at 9), adidas's crossclaims include predicate acts with respect to amateur basketball players other than Bowen Jr.  To be clear, adidas seeks damages against Bowen Sr. only for the money misappropriated to pay Bowen Sr.

As to the remainder of Bowen Jr.'s argument, he does not dispute that the RICO predicate acts of misappropriating funds through wire fraud were a direct cause of adidas's harm.  Indeed, this Court has already held that adidas's "misappropriated funds" were "the direct result" of "falsifying invoices to funnel [a]didas money into improper payments to Bowen Sr." (Order on MTD Crossclaims at 14.)

Instead, Bowen Sr. argues that proximate causation is lacking against him because his role within the predicate wire fraud scheme was not to submit the false invoices that directly caused adidas's harm.  But that is no basis to deny Bowen Sr.'s participation in those predicate acts, and it is thus no defense to the direct harms caused by those predicate acts.  "[T]he compensable injury flowing from a RICO violation necessarily is the harm caused by the predicate acts," *Hemi*, 559 U.S. at 13 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006)) (internal brackets, quotation marks, and alterations omitted), and Bowen Sr. is liable under RICO for the wire frauds he committed that directly harmed adidas's business or property.

14

Bowen Sr. does not dispute in his motion that he participated in the predicate acts of wire fraud that harmed adidas. Bowen Sr. suggests that adidas lacks evidence of Bowen Sr.'s involvement in the scheme—despite the substantial evidence outlined above—but he does not move on that basis and instead "assumes," for the purpose of his motion, that adidas "has developed evidence of a § 1962(c) RICO violation." (Bowen Sr. Br. at 2 n.1, 9 n.4.)

Nor could Bowen Sr. contest his involvement in the wire-fraud predicates. A defendant need not have sent the false wires to be liable for wire fraud, which instead criminalizes the knowing "participat[ion] in a scheme to defraud" where wires are used in furtherance of the scheme. *United States v. Mehta*, 594 F.3d 277, 280 (4th Cir. 2010); *see also United States v. Maxwell*, 920 F.2d 1028, 1036 (D.C. Cir. 1990) ("All that is required is that appellant have knowingly and willingly participated in the scheme; she need not have performed every key act herself."); *United States v. Lanier*, 838 F.2d 281, 284 (8th Cir. 1988) (evidence sufficient where defendant did not directly make misrepresentations to victims but did participate in scheme knowing it was fraudulent); Order on MTD Crossclaims at 21 (explaining that participation in the scheme is sufficient for liability, even if others made "the actual misrepresentations"). Bowen Sr. has already admitted that he was "involved in [the] plan to receive [] $100,000 from [a]didas in connection with [his] son's decision to attend Louisville." (Bowen Sr. Trial Tr. 523:5–8.) And his role in the scheme was pivotal: agreeing to accept the illicit payments in return for his son attending Louisville, not to mention his own acts to disguise the scheme by agreeing to claim that the money was for "consulting," using a separate phone, accepting payments in cash, and lying to the FBI. Those facts are also more than sufficient to show Bowen Sr.'s "participation in the conspiracy" for purposes of adidas's claim that Bowen Sr. conspired to violate RICO, because even if Bowen Sr. had not committed wire fraud, "a

15

defendant can conspire to violate RICO . . . without himself commit[ting] . . . acts of racketeering activity." (Order on MTD Crossclaims at 22–23 (quoting *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012)).)

Because the misappropriation of adidas's money through wire frauds directly caused harm to adidas's business or property, and because Bowen Sr. was an active participant and conspirator in those predicate acts, adidas has statutory standing to assert RICO claims against Bowen Sr. Bowen Sr.'s further causal contention—that his acceptance of the illicit payment did not cause the misappropriation (*see* Bowen Sr. Br. at 10)—is thus legally irrelevant. It is also wrong on the basic facts. The false invoices were submitted after Bowen Sr. agreed to accept payment and Bowen Jr. committed to Louisville, not before.

Bowen Sr. also argues for dismissal of adidas's claim for conspiracy to violate RICO, but his only basis is his claimed contention that the substantive claim lacks RICO standing (*see* Bowen Sr. Br. at 10–11), which is erroneous for the reasons explained above.

## CONCLUSION

The Court should deny Bowen Sr.'s motion for summary judgment on adidas's RICO crossclaims.

By: /s/ *Matthew T. Richardson*

Matthew T. Richardson (D.S.C. Id. No. 7791)
Mary Lucille ("Lucy") Dinkins (D.S.C. No. 11961)
WYCHE
807 Gervais Street, Suite 301
Columbia, South Carolina 29201
Tel: (803) 254-6542
mrichardson@wyche.com
ldinkins@wyche.com

Andrew J. Ceresney (admitted *pro hac vice*)
William H. Taft V (admitted *pro hac vice*)

16

Nathan S. Richards (admitted *pro hac vice*)
Matthew D. Forbes (admitted *pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Tel: (212) 909-6000
aceresney@debevoise.com
whtaft@debevoise.com
nsrichards@debevoise.com
mforbes@debevoise.com

*Counsel to Defendant-Cross Claimant adidas America, Inc.*

Dated:  April 26, 2021

17